United States General Accounting Office

# GAO

## Performance and Accountability Series

January 2003

# Major Management Challenges and Program Risks

# Department of Veterans Affairs





EXHIBIT

25

## A Glance at the Agency Covered in This Report

The Department of Veterans Affairs administers a variety of programs, including one of the world's largest health care systems and a comprehensive benefits program. The department's complex health and benefits missions include

- providing directly and through contractors primary and specialty care, and related medical and social support services to veterans;
- managing special health care related programs, such as those for Gulf War veterans, post-traumatic stress disorder, and hepatitis C;
- conducting and supporting medical education and research;
- providing backup health care services to the Department of Defense during war, and supporting communities during national emergencies;
- providing monthly compensation payments for disabilities sustained or aggravated during active military service; and
- providing monthly pension payments to needy disabled wartime veterans and to needy surviving spouses and dependent children of deceased wartime veterans.

**The Department of Veterans Affairs' Budgetary and Staff Resources**



**Budgetary Resources** [a, b, c]
**Dollars in billions**

| Fiscal year | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| | 49 | 52 | 54 | 57 | 61 |



**Staff Resources** [b]
**FTEs in thousands**

| Fiscal year | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| | 207 | 206 | 203 | 207 | 207 |

Source: Budget of the United States Government.

[a] Budgetary resources include new budget authority (BA) and unobligated balances of previous BA.

[b] Budget and staff resources are actuals for FY 1998-2001. FY 2002 are estimates from the FY 2003 budget, which are the latest publicly available figures on a consistent basis as of January 2003. Actuals for FY 2002 will be contained in the President's FY 2004 budget to be released in February 2003.

[c] To ensure consistency, the balances for veterans insurance programs are excluded from the 1998 totals.

## This Series

This report is part of a special GAO series, first issued in 1999 and updated in 2001, entitled the *Performance and Accountability Series: Major Management Challenges and Program Risks*. The 2003 Performance and Accountability Series contains separate reports covering each cabinet department, most major independent agencies, and the U.S. Postal Service. The series also includes a governmentwide perspective on transforming the way the government does business in order to meet 21st century challenges and address long-term fiscal needs. The companion 2003 *High-Risk Series: An Update* identifies areas at high risk due to either their greater vulnerabilities to waste, fraud, abuse, and mismanagement or major challenges associated with their economy, efficiency, or effectiveness. A list of all of the reports in this series is included at the end of this report.



G A O
Accountability·Integrity·Reliability

# Highlights

Highlights of GAO-03-110, a report to
Congress included as part of GAO's
Performance and Accountability Series

January 2003

## PERFORMANCE AND ACCOUNTABILITY SERIES

# Department of Veterans Affairs

## Why GAO Did This Report

In its 2001 performance and
accountability report on the
Department of Veterans Affairs
(VA), GAO identified management
challenges related to health care
quality, access, resource
management, and disability claims
processing. In addition to these
and other continuing challenges,
VA must now prepare for biological
and chemical acts of terrorism. The
information in this report aims to
sustain congressional attention and
a departmental focus on continuing
to make progress in addressing
these challenges and ultimately
overcoming them. This report is
part of a special series of reports
on governmentwide and agency-
specific issues.

### What Remains to Be Done

GAO believes that VA should

- ensure veterans have timely
  access to needed health care,
- aggressively pursue opportunities
  to more efficiently use its health
  care resources,
- establish medical emergency
  preparedness centers and carry
  out other activities to prepare for
  potential terrorist attacks,
- seek solutions to update its
  disability criteria and continue
  efforts to improve timeliness and
  quality of disability claims
  decisions, and
- successfully execute its
  information technology strategy
  to achieve its vision of providing
  seamless service to veterans and
  their families.

www.gao.gov/cgi-bin/getrpt?GAO-03-110

To view the full report, click on the link above.
For more information, contact Cynthia A.
Bascetta, at (202) 512-7101.

## What GAO Found

VA has taken a number of actions to address its management challenges. VA
has greatly increased veterans' access to health care by opening hundreds of
outpatient clinics. While VA has made some progress in improving disability
claims processing, GAO has added modernizing federal disability programs
to its high-risk list because of fundamental problems with outmoded criteria
and the need to address challenges in claims processing. Additional actions
are needed for VA to successfully overcome other challenges as well.

- **Ensuring access to quality health care.** Although VA has opened
  hundreds of outpatient clinics, waiting times are still a significant
  problem. To help address this, VA has taken several actions including
  the introduction of an automated system to schedule appointments. VA
  must also better position itself to meet the changing needs of an aging
  veteran population by improving nursing home inspections and
  increasing access to noninstitutional long-term care services.

- **Managing resources and workload to enhance health care
  delivery.** VA has begun to make more efficient use of its health care
  resources to serve its growing patient base. However, to meet the
  growing demand for care, VA must carry out its plan to realign its capital
  assets and acquire support services more efficiently. At the same time,
  VA needs to improve its process for allocating resources to its 21 health
  care networks to ensure more equitable funding. VA must also seek
  additional efficiencies with the Department of Defense, including more
  joint purchasing of drugs and medical supplies.

- **Preparing for biological and chemical acts of terrorism.**
  Following the attacks of September 11, 2001, VA determined that it
  needed to stockpile pharmaceuticals and improve its decontamination
  and security capabilities. VA also has new responsibilities to establish
  four medical emergency preparedness centers.

- **Improving veterans' disability program.** VA acted to improve its
  timeliness and quality of claims processing, but is far from achieving its
  goals. Of greater concern are VA's outmoded criteria for determining
  disability and its capacity to handle the increasing number and
  complexity of claims. VA will need to seek solutions to providing
  meaningful and timely support to veterans with disabilities.

- **Developing sound departmentwide management strategies to
  build a high-performing organization.** Since 1997, VA has spent about
  $1 billion annually on its information technology. VA has established
  executive support and is making strides in developing an integrated
  departmentwide enterprise architecture. To safeguard financial, health
  care, and benefits payment information and produce reliable
  performance and workload data, VA must sustain this commitment.

# Contents

Transmittal Letter                                          1

Major Performance                                           2
and Accountability
Challenges

GAO Contacts                                               35

Related GAO Products                                       36

Performance and                                            42
Accountability and
High-Risk Series

This is a work of the U.S. Government and is not subject to copyright protection in the
United States. It may be reproduced and distributed in its entirety without further
permission from GAO. It may contain copyrighted graphics, images or other materials.
Permission from the copyright holder may be necessary should you wish to reproduce
copyrighted materials separately from GAO's product.



**Comptroller General
of the United States**

**United States General Accounting Office
Washington, D.C. 20548**

January 2003

The President of the Senate
The Speaker of the House of Representatives

This report addresses the major management challenges and program risks facing the Department of Veterans Affairs (VA) as it works to carry out its multiple and highly diverse missions. The report discusses the actions that VA has taken and that are under way to address the challenges GAO identified in its Performance and Accountability Series 2 years ago, and major events that have occurred that significantly influence the environment in which the department carries out its mission. Also, GAO summarizes the challenges that remain, a new challenge that has evolved, and further actions that GAO believes are needed.

This analysis should help the new Congress and the administration carry out their responsibilities and improve government for the benefit of the American people. For additional information about this report, please contact Cynthia A. Bascetta, Director, Health Care—Veterans' Health and Benefits Issues, at (202) 512-7101 or at bascettac@gao.gov.

David M. Walker
Comptroller General
of the United States

GAO-03-110 VA Challenges

# Major Performance and Accountability Challenges

In our last Performance and Accountability Series in January 2001, we identified the following performance and accountability challenges for the Department of Veterans Affairs (VA): ensuring access to quality health care; managing resources and workload to enhance health care delivery; improving disability claims processing; and developing sound departmentwide management strategies to build a high-performing organization. Over the past 2 years, the VA has undertaken a number of initiatives to address each of these challenges. For example, VA has opened hundreds of new community-based outpatient clinics (CBOC), increasing veterans' access to care. To better ensure quality of care for a growing number of aging veterans, VA has also begun to improve its oversight of community nursing homes. VA has explored ways to use its resources more efficiently, including realigning its capital assets, outsourcing certain services, and partnering with the Department of Defense (DOD) to share health care resources. VA has similarly taken actions to improve its processing of disability compensation claims, such as hiring and training hundreds of new claims processing staff.

But certain areas need emphasis if VA is to achieve its goals, and these areas continue to be performance and accountability challenges in 2003. For example, VA must continue to seek ways to ensure that it can provide veterans reasonable access to acute and long-term care. To enhance its health care delivery, VA must continue to aggressively pursue opportunities to more wisely use its health care resources. For example, it is critical that the department achieve additional efficiencies by realigning its capital assets to better meet its health care needs and expanding its use of alternative methods for acquiring support services. VA also needs to continue to work with DOD to identify—and implement—partnerships that offer cost-effective ways to serve both veterans and military personnel, including jointly purchasing drugs and medical supplies. At the same time, VA needs to improve its process for allocating resources to its 21 Veterans Integrated Service Networks to ensure equity of funding.[1] In addition to these health care challenges, VA must meet a new challenge to prepare for chemical and biological acts of terrorism. VA must also make progress in its efforts to improve the timeliness and quality of disability claims processing for veterans who have disabilities sustained or aggravated during military service. Of greater concern are other complex challenges

---

[1] VA's 21 health care networks have responsibilities for allocating resources to their facilities, such as medical centers, and managing operations to ensure efficient provision of health care delivery.

facing VA's disability program.  These include outmoded criteria for determining disability and expected increases in the number and complexity of veterans' disability claims.  Because of these sustained challenges, we have added modernizing federal disability programs to our 2003 high-risk list. Finally, VA has more work to do to become a high-performing organization, especially with regard to ensuring an appropriate information technology (IT) infrastructure. VA's IT strategy, which aims to improve services provided to veterans and their families through new uses of information technology, must be successfully executed to ensure that VA can safeguard financial, health care, and benefits payment information and produce reliable performance and workload data.



## Performance and Accountability Challenges

- Ensure access to quality health care
- Manage resources and workload to enhance health care delivery
- Prepare for biological and chemical acts of terrorism
- Improve veterans' disability program
- Develop sound departmentwide management strategies to build a high-performing organization

## Ensure Access to Quality Health Care

Over the past several years, VA has done much to ensure that veterans have greater access to care and that the care they receive is appropriate and of high quality.  Yet VA remains challenged to ensure that veterans receive the care they need, when they need it—a challenge that has become even greater with the recent expansion of benefits.  In addition, inadequate national oversight often hampers VA's ability to assess the quality and timeliness of the care it provides and limits VA's ability to identify performance problems and appropriate measures to improve performance.

More National Action Needed to Ensure Veterans Have Reasonable Access to Care

As part of its effort to "honor and serve veterans in life" and "restore the capability of disabled veterans to the greatest extent"—two of the department's strategic goals—VA has taken significant steps to improve veterans' access to health care. Reflecting trends in the private sector, VA has opened hundreds of new CBOCs to provide primary care to veterans in outpatient settings. Growth in the number of CBOCs increased the number of veterans having reasonable geographic access to VA-provided outpatient care, which VA defined as living within 30 miles of a VA primary care clinic until November 2002.[2] VA estimated that 86 percent of VA's patients had such access to a primary care clinic in fiscal year 1999.

Despite this progress, excessive waiting times for VA outpatient care—a problem we have reported on since October 1993—persist. A Presidential task force reported in its July 2002 interim report that veterans are finding it increasingly difficult to gain access to VA care in selected geographic regions.[3] For example, the task force found that the average waiting time for a first outpatient appointment in Florida—which has a large and growing veteran population—is over 1 year, well in excess of VA's 30-day standard. Our examination of waiting times at medical centers in Florida and other areas of the country indicates that meeting VA's 30-day standard is also a continuing challenge for many specialty clinics.[4] For example, in August 2001, we reported that, based on data from sites we visited, two-thirds of the specialty care clinics we visited (36 of 54) did not meet VA's 30-day standard. At these clinics, waiting times ranged from 33 days at one urology clinic to 282 days at an optometry clinic (see fig. 1).[5]

[2]In November 2002, VA redefined reasonable access in terms of minutes rather than distance from primary, inpatient, and tertiary care. VA defines reasonable access to primary outpatient care as that which is available by no more than a 30 minute drive by veterans residing in urban and rural areas, and a 60 minute drive by veterans in highly rural areas.

[3]*President's Task Force to Improve Health Care Delivery for Our Nation's Veterans, Interim Report*, (Washington, D.C.: July 31, 2002).

[4]VA's medical centers include primary and specialty care clinics.

[5]U.S. General Accounting Office, *VA Health Care: More National Action Needed to Reduce Waiting Times, but Some Clinics Have Made Progress*, GAO-01-953 (Washington, D.C.: Aug. 31, 2001).

Major Performance and Accountability
Challenges



Figure 1:  Range of Waiting Times for Patient Care at 54 VA Specialty Clinics

Source: Clinic data provided by VA officials during site visits from November 2000 through March 2001.

Some medical centers we visited had begun to make noteworthy progress in reducing waiting times at their specialty clinics, primarily by improving their scheduling procedures and making better use of staff. One medical center restructured its health care delivery system—the center assigned all patients to a primary care provider for all routine, nonurgent care; established a triage system for walk-in patients; and implemented a centralized scheduling system for all of its clinics. As a result of these and other changes, all but one of the center's five specialty care clinics we reviewed were meeting the 30-day standard.  To help address these issues, VA has contracted with the Institute for Healthcare Improvement to disseminate best practices departmentwide.[6]

---

[6] The Institute for Healthcare Improvement is a not-for-profit organization VA contracted with in July 1999 to develop strategies to reduce patient waiting times.

VA has also taken several actions to try to mitigate the impact of long waiting times.  Most recently, on January 17, 2003, VA issued an interim final rule to limit enrollment of certain veterans in 2003 to address excessive waiting times.[7] This rule suspends additional enrollment of certain veterans, those who generally have no service-connected disability and incomes above certain income limits set for geographic regions.  In the fall of 2002, VA took other actions to better ensure that veterans with service-connected disabilities receive more timely care.[8]  On September 17, 2002, VA issued a regulation granting priority for appointments to two groups of veterans:

- those with moderate and severe service-connected disabilities regardless of whether they need treatment for their service-connected disabilities or for other reasons, and

- all other veterans with a service-connected disability who need treatment for their service-connected disability.

VA also has other actions under way to address its waiting times problems. For example, it is in the process of implementing an automated system to improve its measurement of the length of time veterans are waiting for appointments to better identify problems.  VA is also developing a national set of guidelines for primary care providers to use in deciding when to refer patients to specialists, as we recommended.

## Growing Demand for Long-Term Care Needs Attention

VA must position itself to meet the changing health care needs of an aging veteran population. VA expects the number of veterans over age 85—currently estimated at about 640,000—to more than double over the next decade, peaking at about 1.3 million by fiscal year 2013. This aging will likely add to the demand for long-term care because the prevalence of chronic health conditions and disabilities increases markedly at advanced age.  To meet this challenge, VA needs to improve its inspections to ensure quality care in community nursing homes and needs to ensure access to services in noninstitutional settings.

[7]Provision of Hospital Outpatient Care to Veterans Subpriorities of Priority Categories 7 and 8 and Annual Enrollment Level Decision, 68 *Fed. Reg.* 2670 (2003) (to be codified as 38 C.F.R. pt 17) (interim final rule Jan. 17, 2003).

[8]Priorities for Outpatient Medical Services and Inpatient Hospital Care, 67 *Fed. Reg.* 58528 (2002)(to be codified as 38 C.F.R. pt. 17) (interim final rule Sept. 17, 2002).

**Major Performance and Accountability
Challenges**

In fiscal year 2001, VA spent 92 percent of its long-term care dollars in institutional settings, such as nursing homes—the costliest long-term care setting. However, VA's oversight of community nursing homes—where about 4,000 veterans received care each day in fiscal year 2001—has not been adequate to ensure acceptable quality of care. While VA has begun to implement certain policies to improve oversight of these homes, as we recommended in July 2001, VA has yet to develop a uniform oversight policy for all community nursing homes under VA contract.[9] Further, VA plans to rely increasingly on the results of state inspections of community nursing homes rather than conducting its own inspections, but it has not developed plans for systematically reviewing the quality of state inspections.

The Veterans Millennium Health Care and Benefits Act (P.L. 106-117), enacted in November 1999, enhanced VA's authority to offer certain long-term care services in noninstitutional settings, such as adult day health care. VA has begun to respond to the act's requirements, but its spending for long-term care in noninstitutional settings still comprised only 8 percent of fiscal year 2001 long-term care expenditures. In addition, the availability of noninstitutional long-term care services varies across facilities (see fig. 2).

---

[9]U.S. General Accounting Office, *VA Long-Term Care: Oversight of Community Nursing Homes Needs Strengthening*, GAO-01-768 (Washington, D.C.: July 27, 2001).

Major Performance and Accountability
Challenges

**Figure 2:  Number of Facilities Offering Specific Noninstitutional Long-Term Care Services**



VA long-term care service

Source: GAO survey of VA facilities; VA headquarters data.

Notes: Geriatric evaluation includes facilities reporting geriatric evaluation and management services in our survey and facilities reported by VA as offering geriatric primary care.

Although VA has 172 medical centers, in some instances 2 or more medical centers have consolidated into health care systems.  Counting health care systems and individual medical centers that are not part of a health care system as single facilities, VA has 139 facilities.

## VA's Hepatitis C Initiative Could Be Improved

Hepatitis C is a chronic blood-borne virus that can cause potentially fatal liver-related conditions.  In 1998, VA launched a major initiative to screen all patients for hepatitis C risk factors and test those who are at risk.  If detected early, transmission risks can be reduced and timely treatment can be ensured to prevent progression of liver disease.  VA characterized hepatitis C as a serious national health problem, and at the end of fiscal year 2002, VA had identified almost 160,000 veterans with hepatitis C infections.  Since 1999, VA included a total of $700 million in its budgets submitted to the Congress to screen, test, and provide veterans who test positive with a recommended course of treatment.

GAO-03-110 VA Challenges

In June 2001, we testified that VA missed opportunities to screen as many as 3 million veterans who visited medical facilities during fiscal years 1999 and 2000, potentially leaving as many as 200,000 veterans unaware that they have hepatitis C.[10]  Most remained undiagnosed primarily because local managers adopted restrictive hepatitis C screening practices.  Moreover, of those screened, an unknown number likely remained undiagnosed because of flawed procedures for testing veterans for the infection.  For example, at the clinics we visited, blood tests were not ordered for many veterans who were shown to have hepatitis C risk factors during screening.  In cases where blood tests were ordered, clinicians frequently did not follow up to ensure that the ordered tests were actually completed.  We pointed out that in order for VA to expeditiously identify undiagnosed veterans, VA would need to establish early detection as a standard for care and hold managers accountable for the timely screening and testing of veterans who visit VA medical centers.

In response to our testimony, VA has begun to improve screening and testing procedures.  VA established in fiscal year 2002 a process to monitor screening and testing performance.  This process consists of an external review of medical records, immediate performance feedback to local managers, and network manager accountability for performance targets.  In addition to monitoring VA's progress in screening and testing veterans for hepatitis C, we are assessing its efforts to notify veterans who test positive and to evaluate veterans' medical conditions regarding potential treatment options.

---

[10]U.S. General Accounting Office, *Veterans' Health Care: Standards and Accountability Could Improve Hepatitis C Screening and Testing Performance*, GAO-01-807T (Washington, D.C.: June 14, 2001).

Major Performance and Accountability
Challenges

# Manage Resources and Workload to Enhance Health Care Delivery

Over the past several years, VA has made more efficient use of its available health care resources—a critical element to achieving its strategic goals. The department is serving more patients and providing more acute care in less costly outpatient settings.  Between fiscal years 1996 and 2002, VA's patient base has increased from about 2.6 million to 4.2 million—due, in part, to expanded eligibility for Priority 7 veterans.[11]  This growth has certain implications for the equity of resource allocation and for certain VA health care expenditures.  In addition to improving the equity of its allocations, VA needs to continue to work to make the most efficient use of its resources.

## Greater Equity Could Be Achieved through Changes to VA's Resource Allocation System

In fiscal year 1997, VA began allocating most of its medical care appropriations under the Veterans Equitable Resource Allocation (VERA) system, which aims to provide networks comparable resources for comparable workloads. Prior to its implementation, VA generally based its allocations on facilities' historical expenditures. By aligning resources with workloads, VERA shifted substantial resources from certain networks to others—reflecting shifts in workload—and provided an incentive for networks to serve more veterans.

While VERA has resulted in more equitable allocation of resources, certain improvements to VERA could result in even greater equity.  Increasing the number of categories used to adjust for patient care cost differences would have the largest positive effect on resource allocation. Currently, VERA uses three case-mix categories—complex, basic vested, and basic non-vested.  These three categories are based on 44 patient classes, and the average costs for patients within each class within a category can vary significantly.  For example, in fiscal year 2000, the national average cost for home-based primary care and for ventilator-dependent care—two patient classes in complex care—was about $24,000 and $163,000, respectively; yet networks received approximately $42,000—the capitation amount for complex care—per patient in these two classes. As a result, networks with

---

[11]The Veterans' Health Care Eligibility Reform Act of 1996 required VA to establish priority categories for enrollment to manage access in relation to available resources.  VA established seven priority categories, with Priority 1 veterans—those with service-connected disabilities rated 50 percent or more—having the highest priority for enrollment.  Priority 7 veterans are primarily nonservice-connected veterans with higher incomes.  The act also eliminated restrictions that previously prevented VA from treating some veterans in outpatient settings.

Major Performance and Accountability
Challenges

proportionately more home-based primary care patients would receive more resources relative to their costs than other networks, and networks with more ventilator-dependent care patients would receive fewer resources relative to their costs.

VERA does not include most Priority 7 veterans in its workload for allocating resources to networks. Including Priority 7 veterans—mostly higher income veterans who do not have service-connected disabilities—in VERA's measurement of network workload would affect network allocations because some networks' workloads include a greater proportion of Priority 7 veterans than other networks. The number of Priority 7 veterans VA has served has increased rapidly to more than a million in fiscal year 2002 (see fig. 3), representing a quarter of VA's total patient workload in that year. VA expects the Priority 7 patient population to continue growing at least through fiscal year 2010.[12]

---

[12]In October 2002, VA issued a new regulation that divided the Priority 7 veteran category into two new priority categories–Priority 7 and Priority 8. The new Priority 7 veterans are primarily veterans with no service-connected disabilities who have incomes under limits established for geographic regions by the U.S. Department of Housing and Urban Development to reflect regional costs of living. By contrast, Priority 8 veterans are primarily veterans with no service-connected disabilities whose incomes are above the limits set for these geographic regions.

**Major Performance and Accountability
Challenges**

**Figure 3: Growth of Priority 7 Veterans Treated Nationally, Fiscal Years 1996 through 2002**



Source: GAO analysis of VA data.

Note: Because the Priority 7 classification was not developed until fiscal year 1999, we used VA's previous classification that most closely represents this priority group, Category C. Category C data for fiscal years 1996 through 1998 slightly underestimate the number of Priority 7 veterans for those years.

The combined effect of incorporating all 44 VA patient classes in VERA's case-mix categories and funding Priority 7 basic vested veterans at 50 percent of costs would result in the reallocation of approximately $200 million in fiscal year 2001. Although the allocation changes overall would represent about 2 percent of networks' budgets, the change would be more substantial for some networks—as much as 5 percent of their annual budgets (see fig. 4).

Major Performance and Accountability
Challenges

**Figure 4: Estimated Change in VERA Allocations from Incorporating 44 Case-Mix Categories and Priority 7 Basic Vested Veterans Treated, Fiscal Year 2001**



Source: GAO analysis of VA Data.

Notes: We used fiscal year 1999 expenditure data for the calculations, the most recent data available for fiscal year 2001 VERA allocations.

In January 2002 VA merged networks 13 and 14 to form a single network.

In response to recommendations we made in February 2002 regarding VERA's case-mix categories and Priority 7 workload, VA said that further study was needed to determine how and whether to change VERA.[13]  VA announced in November 2002 that it plans to make changes to VERA for the 2003 fiscal year when VA's appropriation is finalized.  Some of the planned changes, if implemented, could address recommendations we made.  Delaying these improvements to VERA means that VA will continue to allocate funds in a manner that does not align workload and resources as well as it could.  This puts some networks at a financial disadvantage.

## Priority 7 Veterans' Increased Use of VA's Outpatient Pharmacy Benefit Has Increased VA's Outpatient Pharmacy Expenditures

The increase in the number of Priority 7 veterans over the past several years has resulted in a greater use of VA's outpatient pharmacy benefit—a benefit particularly attractive to veterans covered by Medicare because Medicare does not offer such a benefit.  This expanded use has increased VA's outpatient pharmacy expenditures for Priority 7 veterans from $178 million to $418 million between fiscal years 1999 and 2001—a growth rate more than four times that for other veterans.  Priority 7 veterans now constitute 14 percent of VA pharmacy benefit spending.

VA has been able to partially offset about 10 percent of pharmacy expenditures for Priority 7 veterans through the collection of medication copayments.  This offset reduced VA's net expenditures to $377 million for providing drugs and supplies to Priority 7 veterans in fiscal year 2001 (see table 1).  VA collected $41 million in fiscal year 2001 by charging $2 copayments for a 30-day or less drug supply.  Such revenues are expected to grow because VA increased the copayment charged to Priority 7 veterans to $7 for a 30-day or less supply in February 2002.

---

[13]U.S. General Accounting Office, *VA Health Care: Allocation Changes Would Better Align Resources with Workload*, GAO-02-338 (Washington, D.C.: Feb. 28, 2002).

**Table 1: Net Expenditures for VA's Outpatient Pharmacy Benefit Less Drug
Copayments, Fiscal Years 1999 through 2001**

Dollars in millions

| Net outpatient pharmacy expenditures | 1999 | 2000 | 2001 |
|---|---|---|---|
| Priority 7 veterans | $164 | $247 | $377 |
| All other veterans[a] | $1,916 | $2,169 | $2,458 |
| **Total** | **$2,080** | **$2,417** | **$2,835** |

Source: GAO analysis of VA data.

Note: Numbers in table may not add to total outpatient pharmacy expenditures because of rounding.

[a]Veterans with service-connected disabilities rated greater than 50 percent, receiving drugs for
service-connected conditions, or with incomes lower than the VA pension level are exempt from paying
drug copayments.

## Further Realignment of VA's Infrastructure Could Better Meet Veterans' Health Care Needs

A significant portion of VA's annual health care budget is spent to operate, maintain, and improve about 4,700 buildings and 18,000 acres of property—including unused and underused hospitals and other facilities. In 1998, we reported that in the Chicago area alone, as much as $20 million could be freed up annually if VA served area veterans with three instead of four hospitals.[14] We recommended that VA develop and implement a market-based plan for restructuring its delivery of health care.[15] By doing so, VA could reduce funds spent on unneeded assets and better serve veterans' needs by placing health care resources closer to where veterans live.

In response, in October 2000 VA established the Capital Asset Realignment for Enhanced Services (CARES) program, which calls for assessments of veterans' health care needs and available service delivery options to meet those needs in each health care market—a geographic area with a high concentration of enrolled veterans. In 2002, VA completed a pilot study in Network 12 (Chicago), which includes Chicago and other locations, and entered the second phase of the initiative—to conduct CARES in the

---

[14]U.S. General Accounting Office, *VA Health Care: Closing a Chicago Hospital Would Save Millions and Enhance Access to Services*, GAO/HEHS-98-64 (Washington, D.C.: Apr. 16, 1998).

[15]To determine their asset needs, OMB guidelines suggest that agencies conduct market-based assessments that include determining a target population's needs, evaluating the capacity of existing assets, identifying any excesses or deficiencies, estimating assets' life-cycle costs, and comparing such costs with alternatives for meeting the target population's needs. (See *Capital Programming Guide*, ver. 1.0, Washington, D.C.: OMB, July 1997).

remaining 20 networks.  VA expects to issue its plans for each market by
the end of 2003.

VA's plan from its pilot study calls for the closing of inpatient services at
one location, consolidation of services at remaining locations, and the
opening of several new outpatient clinics.  The plan also calls for leasing or
demolishing 20 of the network's 30 unneeded vacant buildings.  For the
remaining buildings, VA officials believe that maintaining ownership of the
buildings is the least expensive course of action.  However, all relevant cost
information on the various disposal options was not always systematically
evaluated when making this assessment.  To ensure that VA makes the best
decisions regarding the disposition of its vacant buildings, we recently
recommended that VA test a model that includes complete cost information
on each disposal option in Network 12 (Chicago).[16]

VA needs to build and sustain the momentum necessary to achieve
efficiencies and effectively meet veterans' current and future needs. The
challenge is to do this while mitigating the impact on staffing, communities,
and other VA missions.  Successfully completing this capital asset
realignment will depend on VA's ability to strategically and expeditiously
complete the implementation of CARES.

VA is one of many federal agencies facing challenges in managing problems
with excess and underutilized real property, deteriorating facilities, and
unreliable property data. As a result, we have added federal real property
as a high-risk area.[17]

## Expanded Use of Alternative Methods for Patient Care Support Services Could Realize Additional Savings

VA's transformation from an inpatient- to an outpatient-based health care
system has significantly reduced the need for certain patient care support
services, such as food and laundry. To make better use of these resources,
some facilities have consolidated food production locations, used lower-
cost Veterans Canteen Service (VCS) workers instead of higher-paid
Nutrition and Food Service workers, or contracted out food services. VA

---

[16]U.S. General Accounting Office, *VA Health Care: Improved Planning Needed for
Management of Excess Real Property*, GAO-03-326 (Washington, D.C.: Jan. 29, 2003).

[17] U.S. General Accounting Office, *High-Risk Series: Federal Real Property*, GAO-03-122
(Washington, D.C.: January 2003).

facilities have also consolidated laundries, contracted for labor to operate them, or contracted out laundry services to commercial organizations.

However, VA needs to systematically explore further use of such options across its health care system. In November 2000, we recommended that VA conduct studies at all of its food and laundry service locations to identify and implement the most cost-effective way to provide these services at each location.[18] At that time, we identified 63 food production locations that could be consolidated into 29, saving millions of dollars annually. We also found that using lower-cost VCS employees at all VA food production locations could save additional millions annually. The potential for savings through consolidating laundry services was similar. VA may also be able to reduce its food and laundry service costs at some facilities through competitive sourcing—where VA would determine whether it would be more cost-effective to contract out these services or provide them in-house. However, VA must ensure that contract terms on payments and service quality standards are met. For example, we found that weaknesses in the monitoring of VA's Albany, New York, laundry contract appear to have resulted in overpayments, reducing potential savings.

In August 2002, VA issued a directive establishing policy and responsibilities for its networks to follow in implementing a competitive sourcing analysis to compare the cost of contracting and the cost of in-house performance to determine who should do the work. VA needs to follow through on its commitment to ensure that the most cost-effective, quality service options are applied throughout its health care system and to conduct systemwide feasibility assessments for consolidation and competitive sourcing.

---

[18]U.S. General Accounting Office, *VA Laundry Service: Consolidations and Competitive Sourcing Could Save Millions,* GAO-01-61 (Washington, D.C.: Nov. 30, 2000); U.S. General Accounting Office, *VA Health Care: Expanding Food Service Initiatives Could Save Millions,* GAO-01-64 (Washington, D.C.: Nov. 30, 2000).

## VA and DOD Need to Increase Joint Activities to Maximize Federal Health Care Resources

In an effort to save federal health care dollars, VA and DOD have sought ways to work together to gain efficiencies. For example, local VA medical centers and military treatment facilities have entered into agreements to exchange inpatient, outpatient, and specialty care services, as well as support services. Some local VA and DOD facilities have entered into joint venture agreements, pooling resources to build a joint medical facility or capitalize on an existing facility. Local facilities have also arranged to jointly purchase pharmaceuticals, laboratory services, medical supplies, and equipment. Underscoring the importance of maximizing federal health care resources, the President created the Task Force to Improve Health Care Delivery for Our Nation's Veterans in May 2001. Its mission includes reviewing barriers and challenges that impede VA and DOD coordination and identifying opportunities for improved resource utilization through VA and DOD partnerships.[19]

Local VA and DOD officials whom we surveyed in 1999 found that, by sharing resources, better use has been made of their local facilities, staff, and equipment; in some cases, beneficiary access and patient satisfaction have improved. However, in our review of VA/DOD sharing agreements in fiscal year 1998, we found that most sharing activity occurred through a relatively small number of sharing agreements and joint ventures.[20] Overall, 75 percent of direct medical care episodes provided through sharing occurred under just 12 local agreements for inpatient care, 19 local agreements for outpatient care, and 12 local agreements for ancillary care. Joint venture activity was similarly concentrated in Albuquerque, New Mexico, and in southern Nevada.

To ensure sharing occurs to the fullest extent possible, VA needs to continue to work with DOD to address remaining barriers, as we recommended in our 2000 report. It is particularly critical that VA take a long-term approach to improving the VA/DOD sharing database, which VA administers. While the database captures information on the number of agreements and the range of services covered, these data are inadequate to assess progress. Currently, VA and DOD do not collect data on the volume

---

[19]The task force issued an interim report in July 2002. Its final report is expected in March 2003.

[20]U.S. General Accounting Office, *VA and Defense Health Care: Evolving Health Care Systems Require Rethinking of Resource Sharing Strategies*, GAO/HEHS-00-52 (Washington, D.C.: May 17, 2000).

of services provided, the amounts of reimbursements collected, and the costs avoided through the use of sharing agreements. Without a baseline of activity or complete and accurate data, VA and DOD—and the Congress—cannot assess the progress of VA and DOD sharing.

Additional opportunities also exist for VA and DOD to jointly purchase pharmaceuticals and obtain higher discounts from manufacturers. In fiscal year 2000, VA and DOD's combined spending for pharmaceuticals was about $3.2 billion. While the two departments saved an estimated $51 million from jointly awarded national committed-use contracts with suppliers in that year, we reported in May 2001 that significantly more federal health care dollars could be saved.[21] In response to our recommendation, VA and DOD have taken additional action to expand their use of joint national committed-use contracts.[22] From August 2001 through August 2002, VA and DOD increased their joint contracts from 49 to 67 and decreased their "unilateral" contracts from 57 to 24. VA reported that, overall, joint pharmaceutical contracts resulted in cost avoidance of more than $98 million (about $18 million for DOD and $80 million for VA) in fiscal year 2001. VA needs to continue to work with DOD to achieve even greater savings.

In a June 2002 hearing on VA's medical procurement practices, opportunities were discussed for VA and DOD to achieve greater efficiencies through joint procurement of medical and surgical supplies.[23] However, as we reported in June 2002, VA and DOD have not made progress in jointly contracting for such items, and it is unlikely that the two departments will have joint national contracts for medical and surgical supplies anytime soon.[24] This lack of progress has, in part, been the result

---

[21]U.S. General Accounting Office, *DOD and VA Pharmacy: Progress and Remaining Challenges in Jointly Buying and Mailing Out Drugs*, GAO-01-588 (Washington, D.C.: May 25, 2001).

[22]Under committed-use contracts, VA commits to using primarily the contract drug, instead of other therapeutically interchangeable drugs, to guarantee drug companies a high volume of use in exchange for lower prices.

[23]Hearing on H.R. 3645 Veterans Health-Care Items Procurement Reform and Improvement Act of 2002:, Before the Veterans Affairs Subcommittee on Health, 107th Cong. June 26, 2002.

[24]U.S. General Accounting Office, *VA and Defense Health Care: Potential Exists for Savings through Joint Purchasing of Medical and Surgical Supplies*, GAO-02-872T (Washington, D.C.: June 26, 2002).

Major Performance and Accountability
Challenges

of their different approaches to "standardizing"—that is, agreeing on particular items that their facilities would purchase and then contracting with the manufacturers of these items for discounts based on their combined larger volume. Because DOD has opted to follow a regional approach to standardization and VA has opted for a national approach, opportunities for national joint procurement will be more difficult to achieve. In addition, neither department has accurate, reliable, and comprehensive procurement information—a basic requirement for identifying potential medical and surgical items to standardize.

## VA Needs to Resolve Long-standing Performance Problems to Maximize Third-Party Collections

In fiscal year 2002, VA collected $687 million in payments from third-party insurers—the largest source of revenue to supplement VA's $21 billion medical care appropriations.[25] These funds help pay for veterans' growing demand for care.

VA's third-party collections increased in fiscal year 2001—reversing a trend of declining collections—and again in fiscal year 2002. However, over the past several years, we have reported on persistent collections process weaknesses—such as lack of information on patient insurance, inadequate documentation of care, a shortage of qualified billing coders, and insufficient automation—that have diminished VA's collections.[26] VA's Inspector General similarly reported that VA missed billing opportunities, had billing backlogs, and inadequately followed up on accounts receivable in fiscal years 2000 and 2001.[27] It is uncertain how much more revenue could be collected if VA were to collect for currently missed billing opportunities, all backlogged billing, and all collectable accounts receivable, since VA does not have a national estimate of the total dollar amount of potentially billable and collectable care.

---

[25]VA can bill insurers for care it provides to veterans for medical conditions not related to service-connected disabilities. Beginning in 1997, VA was allowed to retain these collections to supplement its medical care appropriations.

[26]U.S. General Accounting Office, *VA Health Care: VA Has Not Sufficiently Explored Alternatives for Optimizing Third-Party Collections*, GAO-01-1157T (Washington, D.C.: Sept. 20, 2001); U.S. General Accounting Office, *VA Health Care: Collections Fall Short of Expectations*, GAO/T-HEHS-99-196 (Washington, D.C.: Sept. 23, 1999).

[27]VA Office of Inspector General, *Audit of the Medical Care Collection Fund Program* (Washington, D.C.: Feb. 26, 2002).

Major Performance and Accountability
Challenges

VA has taken several steps to improve its collections performance, including developing the *Veterans Health Administration Revenue Cycle Improvement Plan* in 2001, which aims to address its long-standing collections problems. More recently, in May 2002, VA created a Chief Business Office that is planning additional initiatives to improve collections. However, by the end of fiscal year 2002, VA was still working to implement proposed initiatives for resolving its long-standing collection problems. To ensure it maximizes its third-party collections, VA will need to be vigilant in implementing its plan and initiatives.

## Prepare for Biological and Chemical Acts of Terrorism

The September 11, 2001, attacks on the World Trade Center and the Pentagon and the dissemination of weaponized anthrax through the U.S. mail exposed our nation's vulnerabilities to terrorism and the need for better emergency medical preparedness and response capabilities. In the month following the attacks, we reported that VA, in a supporting role, made a significant contribution to the emergency preparedness response activities carried out by lead federal agencies.[28] As part of its strategic goals, VA remains committed to help improve the nation's preparedness for response to war, terrorism, national emergencies, and natural disasters by developing plans and taking actions to ensure continued provision of services to veterans as well as support national, state, and local emergency management and homeland security efforts.[29]

By October 2001, VA had quickly assessed its ability to take action in the event of a national emergency and concluded that it needed to improve its emergency management capabilities. VA also made improved response a goal in its 2003 Departmental Performance Plan. VA is currently working to address key areas of need, including pharmaceutical stockpiles, decontamination, and security. For example, VA established a policy requiring designated VA facilities to store caches of pharmaceuticals to treat victims. VA is also assessing its facilities' needs and capabilities for decontamination and security to ensure that potentially large numbers of victims could be managed and entrances and exits controlled in the event of another terrorist attack.

---

[28]U.S. General Accounting Office, *Homeland Security: Need to Consider VA's Role in Strengthening Federal Preparedness*, GAO-02-145T (Washington, D.C.: Oct. 15, 2001).

[29]Department of Veterans Affairs, *Secretary's Annual Statement 2002-2003* (Washington, D.C.: December 2002).

Major Performance and Accountability
Challenges

The Department of Veterans Affairs Emergency Preparedness Act of 2002 also created new requirements for VA.[30] Specifically, the act calls for the establishment of four medical emergency preparedness centers. The mission of the centers includes research on detection, diagnosis, prevention, and treatment of injuries, diseases, and illnesses arising from the use of chemical, biological, radiological, incendiary, or explosive weapons posing threats to public health and safety. The centers are also charged with providing education, training, and advice to health care professionals through the National Disaster Medical System.

# Improve Veterans' Disability Program

VA expects to provide about $25 billion in disability compensation and pension benefits to over 3 million veterans, family members, and survivors in fiscal year 2002. In administering these benefits, VA faces long-standing challenges to improve the timeliness and quality of disability claims decisions, which are made by its 57 regional offices. In addition to creating delays in veterans' receipt of entitled benefits, untimely, inaccurate, and inconsistent claims decisions can negatively affect veterans' receipt of other VA benefits and services, including health care, because VA's assigned disability ratings help determine eligibility and priority for these benefits. Of greater concern, VA's criteria for determining disability are outmoded. While the department is taking actions to address these problems in the short term, longer-term solutions may require more fundamental changes to the program including those that require legislative actions. For these reasons, we have added VA's disability benefits program, along with other federal disability programs, to the 2003 high-risk list.

The Secretary has made improving claims processing performance one of VA's top management priorities, setting a 100-day goal for VA to make accurate decisions on rating-related compensation and pension claims,[31] and a reduction in the rating-related inventory to about 250,000 claims by the end of fiscal year 2003. The Secretary also established the Claims Processing Task Force in May 2001 to make specific recommendations to relieve the veterans' claims backlog and make claims processing more timely. In fiscal years 2001 and 2002, VA hired and trained hundreds of new claims processing staff. VA also set monthly production goals for fiscal year

---

[30]Pub. L. No. 107-287, 116 STAT. 204 (2002).

[31]Rating-related claims are primarily original claims for compensation and pension benefits and "reopened" claims by veterans.

**Major Performance and Accountability
Challenges**

2002 for each of its regional offices, incorporating these goals into regional office directors' performance standards. VA is also in the process of responding to the more than 30 recommendations made by the Task Force in its October 2001 report to the Secretary.

## VA Faces Short-Term and Long-Term Challenges to Improving Timeliness

While VA has made some progress in improving production and reducing inventory, it is far from achieving the Secretary's goals. VA completed almost two-thirds more decisions in fiscal year 2002 than fiscal year 2001 (see table 3). However, it still did not meet its production goal of completing about 839,000 claims in fiscal year 2002. VA also reduced its end of year inventory from 420,603 claims in fiscal year 2001 to 345,516 in fiscal year 2002, but did not meet its end-of-year inventory goal of about 316,000 claims.

**Table 2: Changes in VA's Workload of Rating-Related Claims, Fiscal Years 1997 to 2002**

| Fiscal year | Rating-related compensation and pension claims | | |
|---|---|---|---|
| | Received | Completed | End of year inventory |
| 1997 | 740,052 | 701,717 | 213,193 |
| 1998 | 691,461 | 663,400 | 241,254 |
| 1999 | 639,070 | 630,145 | 250,179 |
| 2000 | 578,773 | 601,451 | 227,501 |
| 2001 | 674,219 | 481,117 | 420,603 |
| 2002 | 721,727 | 796,814 | 345,516 |

Source: Veterans Benefits Administration data.

In addition, the average time to complete rating-related decisions rose, from 181 days in fiscal year 2001 to 223 days in fiscal year 2002 (see fig. 5), missing VA's fiscal year 2002 goal of 208 days and leaving it far from the Secretary's 100-day goal for the last quarter of fiscal year 2003. However, VA has made recent timeliness improvements; in the first quarter of fiscal year 2003, VA completed rating-related decisions in an average of 200 days.

**Major Performance and Accountability Challenges**

Figure 5:  Average Days to Complete Rating-Related Claims, Fiscal Years 1999 to 2003



Source: Veterans Benefits Administration.

Improving timeliness, both in the short and long term, requires more than just increasing production and reducing inventory. VA must also continue addressing delays in obtaining evidence to support claims, ensuring that it has experienced staff for the long term, and implementing information systems to help improve productivity. One of the most significant delays is in obtaining medical evidence—such as medical records, examinations, and opinions—from VA medical facilities.  However, it is not clear to what extent VA's initiatives to expedite obtaining medical information—such as providing regional offices access to VA's medical records database—will improve timeliness. Similarly, VA needs to overcome delays in implementing its information system improvements. In 1986, VA began developing a new system to replace its outdated benefits payment system. However, after 16 years, VA still has not fully implemented this new system and continues to rely on its existing benefits delivery network until the new system can be completed.

VA will also need to continue to adjust to external factors, such as court decisions and the filing behavior of veterans. Since its establishment in 1989, the U.S. Court of Appeals for Veterans Claims has introduced a number of complex procedural and documentation requirements that VA must comply with, including providing a description of the evidence and rationale leading to the decision on each claimed disability. The implementation of the Veterans Claims Assistance Act of 2000 (VCAA) has added to VA's workload. The act requires VA to take specific steps to assist claimants once they file claims for benefits. The act also allows for the reworking of claims previously denied because they were not well-grounded.[32] VA identified 98,000 such claims and directed its regional offices to perform any rework needed to comply with VCAA, such as sending additional notifications and making new decisions. VA also directed regional offices to do any needed rework on 244,000 claims that were pending when the law was enacted. Finally, changes in veterans' benefits affect VA's workload. In July 2001, diabetes was added as a presumptive service-connected disability for veterans who served in Vietnam, significantly increasing VA's workload.  VA expects that, by the end of fiscal year 2003, it will receive about 197,500 diabetes claims. VA also expects to receive additional claims due to "concurrent receipt" legislation enacted in December 2002. If a military retiree receives VA disability compensation, the retiree's military retirement payments are reduced by the amount of the VA compensation. Under the new legislation, DOD can provide special compensation payments to some disabled military retirees.[33] The effect of this legislation on VA's workload is not yet known.

[32]In its July 1999 *Morton* decision, the U.S. Court of Appeals for Veterans Claims held that VA did not have a duty to assist veterans in developing their claims unless they were "well-grounded"—that is, enough information was provided for VA to determine that the claim was plausible.

[33]Military retirees are eligible for this new benefit if the disability (1) was caused by an injury for which they received the Purple Heart and which was rated by the military service or VA as 10 percent disabling or higher, or (2) was service-connected, incurred under certain conditions, and rated 60 percent disabling or higher by the military service or VA.

Major Performance and Accountability
Challenges

In addition to these challenges, VA's key rating-related timeliness measure could be improved. Currently, this measure aggregates timeliness data for VA's three main disability programs, obscuring significant timeliness differences among the programs. Aggregating VA's timeliness data by program—instead of across programs—shows that, in fiscal year 2002, it took VA an average of 241 days to complete disability compensation claims decisions, compared to 126 days for pension claims and 172 days for dependency and indemnity compensation claims. In December 2002, we recommended that VA establish separate claims processing timeliness goals for each program and incorporate these goals into VA's strategic plan and annual performance plans, and report its progress in meeting these goals in its annual performance reports.[34]

## Effect of Efforts to Improve Quality Are Not Yet Known

Since VA began its Systematic Technical Accuracy Review (STAR) program in fiscal year 1999, the accuracy of compensation and pension claims decisions has improved. For fiscal year 2002, preliminary STAR data show an 81 percent accuracy rate for rating-related decisions[35]—a major improvement over the 59 percent accuracy rate in fiscal year 2000. But it is still well below VA's 96 percent strategic goal for fiscal year 2006.

Recent changes to the STAR program should provide VA with more useful data to measure its progress in improving decision accuracy. Beginning with claims decided in fiscal year 2002, VA's key accuracy measure focuses on whether decisions to grant or deny benefits were correct, not on procedural and technical issues, such as failure to include all the documentation in the case file. VA also plans to review more decisions per year, so it can obtain statistically valid accuracy data at the regional office level. Further, to ensure independent reviews, VA has centralized the STAR program, rather than have the reviews conducted in the regional offices. Finally, VA is developing a quality review system that will measure the accuracy of individual employee decisions. Once these enhancements are made to the STAR program, VA should be better able to identify accuracy problems at the national, regional office, and individual employee levels, so more detailed reviews can be done to identify underlying causes of inaccuracies and target corrective actions, such as additional training.

---

[34]U.S. General Accounting Office, *Veterans' Benefits: Claims Processing Timeliness Performance Measures Could Be Improved*, GAO-03-282 (Washington, D.C.: Dec. 19, 2002).

[35]This accuracy is based on STAR reviews completed through December 31, 2002.

To help improve decision accuracy and consistency across regional offices, VA has established the Training and Performance Support System (TPSS), a computer-assisted system designed to provide standardized training for staff at all regional offices. However, many of the modules were not available to help train the new claims processing staff VA hired during fiscal years 2001 and 2002, and, in May 2001, we reported that VA had pushed back its completion of all TPSS modules until sometime in 2004. Until VA completes TPSS implementation, it will not be able to evaluate the program's impact on claims processing accuracy and consistency. More recently, we recommended in August 2002 that VA establish a system to regularly assess and measure the degree of consistency across all levels of VA claims adjudication, as well as made specific recommendations to improve the quality of decisions made by VA's Board of Veterans' Appeals.[36]

## Reexamination of Disability Criteria Needed

Of greater concern is VA's use of outmoded criteria for determining disability. In 1997, we reported that VA's disability ratings schedule is still primarily based on physicians' and lawyers' judgments made in 1945 about the effect service-connected conditions had on the average individual's ability to perform jobs requiring manual or physical labor. Although the ratings in the schedule have not changed substantially since 1945, dramatic changes have occurred in the labor market and in society since then. Thus, VA may not be equitably distributing compensation funds among disabled veterans.

More recently, we reported that the criteria used by VA and other federal programs to determine disability have not been fully updated to reflect medical and technological advances and have not incorporated labor market changes.[37] We recommended that VA use its annual performance plan to delineate strategies for and progress in periodically updating its disability criteria. We also recommended that VA study and report to the Congress the effect that a comprehensive consideration of medical treatment and assistive technologies would have on VA disability programs'

[36]U.S. General Accounting Office, *Veterans' Benefits: Quality Assurance for Disability Claims and Appeals Processing Can Be Further Improved*, GAO-02-806 (Washington, D.C.: Aug. 16, 2002).

[37]U.S. General Accounting Office, *SSA and VA Disability Programs: Re-Examination of Disability Criteria Needed to Help Ensure Program Integrity*, GAO-02-597 (Washington, D.C.: Aug. 9, 2002). This report also identified claims processing challenges in the Social Security Administration.

Major Performance and Accountability
Challenges

eligibility criteria and benefit package. VA did not concur with our recommendations. The Secretary of Veterans Affairs stated that the current medically based criteria are an equitable method for determining disability and that VA is in the process of updating its criteria to account for advances in medicine. However, we believe that until VA aligns its disability criteria with medical and technological advances and holds itself accountable for ensuring that disability ratings are based on current information, future decisions affecting its disability program will not be adequately informed. This fundamental problem and sustained challenges in processing disability claims put the VA disability program at high risk of poor performance.

# Develop Sound Departmentwide Management Strategies to Build a High-Performing Organization

VA faces additional challenges in several areas critical to building a high-performing organization: budget formulation and execution, information technology, and financial management. To meet its strategic goal of creating "One VA"—an environment that fosters the delivery of seamless service to veterans and their families—VA has begun to address some of these issues through its plans to implement an IT framework that supports the integration of information across the department and to continue to achieve unqualified audit opinions on its annual financial statements.

## VA Needs to More Closely Link Its Health Care Budget Formulation and Planning Processes

Establishing a close link between budgeting and planning is essential to instilling a greater focus on results. While VA's health care budget formulation and planning processes are centrally managed, they are not closely linked. VA's annual performance plan describes the department's goals, strategies, and performance measures. However, the relationship between its performance plan and its health care budget formulation is unclear. Through fiscal year 2003, VA's health care budget formulation has largely been incremental, reflecting prior years' appropriations with adjustments for projected increases in workload, efficiencies, and new policies.

Budgeting and performance are more closely linked during the budget execution phase—that is, after VA receives its appropriation and funds are allocated to the networks. Some health care networks consider resource utilization, cost, and performance data in making resource allocations to their health care facilities and programs. They also use various communication methods, both within their networks and across other

Major Performance and Accountability
Challenges

networks, to share information on performance measures and ways to meet those measures.

VA officials noted that steps are being taken to better integrate their health care budget formulation and planning processes. However, VA continues to face challenges in further integrating these processes and in defining areas for improvement.

## VA Continues to Face Information Technology Challenges

Over the past 5 years, VA has spent an estimated $1 billion annually on its IT program to help realize its vision of providing seamless service to veterans and their families. In August 2000, we recommended that VA take certain actions to improve its decision-making process for IT investments and to fully implement key provisions of the Clinger-Cohen Act of 1996, which aims to strengthen IT leadership and management at federal agencies. Over the past 2 years, VA's commitment to addressing critical weaknesses in the department's IT management has been evident. To provide leadership, VA hired a department-level chief information officer, who, in October 2002, was given authority over all IT appropriations across the department. In addition, VA has established crucial executive support and a strategy to define products and processes essential to the development of an integrated departmentwide enterprise architecture.[38] Further, to address numerous computer security weaknesses, VA established a department-level information security management program and hired an executive-level official to head it. VA also instituted information security performance standards that require greater management accountability among senior executives.

Nonetheless, challenges to improve key areas of IT performance remain. Specifically, VA's success in developing, implementing, and using a complete and enforceable enterprise architecture hinges upon continued attention to putting in place a sound program management structure. In addition, VA's computer security management program requires further actions to ensure that the department can protect its computer systems,

---

[38]An integrated IT architecture is a blueprint, consisting of logical and technical components, to guide and constrain the development and evolution of a collection of related systems. At the logical level, the architecture provides a high-level description of an organization's mission, the business functions performed and the relationships among them, the information needed to perform the functions, and the flow of information among functions. At the technical level, the architecture provides the rules and standards needed to ensure that the interrelated systems are built to be interoperable and maintainable.

networks, and sensitive health and benefits data from vulnerabilities and
risks.

In June 2002, we recommended that VA take specific actions to achieve a
more stable, reliable, and modernized systems environment to effectively
support critical decision making and operations and to realize better
overall returns on its IT investments.[39]  VA concurred with our
recommendations and has initiated a number of actions to address them.
For example, in September 2002, the Secretary approved the initial version
of VA's enterprise architecture that focused on defining the "as is" and
desired "to be" target environments for selected business functions.  Also,
to help provide a more solid foundation for detecting, reporting, and
responding to security incidents, VA contracted to expand departmentwide
incident response and analysis capabilities, including enhancing security
monitoring and detection.  However, VA's IT investment and management
challenges are significant, and its ability to resolve them with the right
combination of people, processes, and technology that are focused on
achieving solid results will take time and sustained effort and commitment.
Table 4 summarizes the challenges that VA continues to face to strengthen
the leadership and management of its IT initiatives and the department's
status in responding to each.

[39]U.S. General Accounting Office, *Veterans Affairs: Sustained Management Attention Is
Key to Achieving Information Technology Results*, GAO-02-703 (Washington, D.C.: June 12,
2002).

Major Performance and Accountability
Challenges

**Table 3: Status of IT Challenges Facing VA**

| Challenge | Status |
|---|---|
| **IT investment management** | |
| Sound IT investment management requires maximizing the value and return on IT investments and mitigating associated risks. | In 2002, as part of its enterprise architecture development effort, VA (1) synchronized in-process reviews of IT projects within an integrated IT management process, and (2) began developing guidance to manage IT projects under the integrated management process. |
| **Integrated business process reengineering** | |
| Before making major IT investments, agencies are required under the Clinger-Cohen Act to analyze their missions and revise and improve mission-related and administrative processes accordingly. To do this, agencies should have an overall business process improvement strategy—one that coordinates and integrates ongoing reengineering and improvement projects, sets priorities, and makes appropriate budget decisions. | In September 2002, VA completed version 1.0 of its departmentwide enterprise architecture. The document identified the business process reengineering opportunities in VA's registration and eligibility and contact management functions, but it does not provide specifics on how these functions may be reengineered. Therefore, VA has not yet developed an overall business process improvement strategy. |
| **Integrated IT architecture** | |
| In achieving the department's strategic and IT goals, CIOs are charged with implementing an architecture that will provide a framework for evolving or maintaining existing IT and for acquiring new IT. | In 2001, VA initiated an effort to develop a departmentwide enterprise architecture. In September 2002, VA completed its first version of this architecture, containing high-level elements of the department's baseline and target architectures, technical reference model, and standards profiles. VA plans to further develop this document to support IT investment management and its "One VA" concept. |
| **Tracking IT expenditures** | |
| A uniform mechanism for tracking IT expenditures allows agencies to make informed decisions on whether to modify, accelerate, or discontinue projects. | Although *VA Directive 6000* and VA's capital investment guide require it to maintain complete and accurate cost data for IT projects, there is no uniform mechanism for tracking IT expenditures across the department. In 2001, VA reported that it would begin using a numbering system within the department's financial management system to track IT capital investment costs beginning with the execution of the fiscal year 2002 projects. However, this system would not allow VA to track personnel costs for IT projects automatically. VA planned to extend this numbering scheme once its new financial management system is implemented in October 2004. |
| **Assessing IT performance** | |
| The Clinger-Cohen Act requires executive branch agencies to establish performance measures that relate to how well IT supports their programs. | While VA's fiscal year 2003 performance plan identified IT initiatives for improving claims processing quality and timeliness, it did not include performance goals. Without such goals, it will be difficult to assess the performance of these initiatives. |

Major Performance and Accountability
Challenges

*(Continued From Previous Page)*

| Challenge | Status |
|---|---|
| **Computer security** | |
| VA also needs to implement appropriate security measures to ensure that financial, health care, and benefits payment information is not at risk of inadvertent or deliberate misuse, fraud, improper disclosure, or destruction. | Since September 1998, we and VA's IG have reported on VA's computer security weaknesses, which continue to place financial, health care, and benefits payment information at risk of misuse, fraud, improper disclosure, or destruction—possibly occurring without detection. In 2001, VA established a department-level information security management program and hired an executive-level official to head it. As of November 2000, VA had finalized an information security management plan to provide a framework for addressing long-standing departmentwide computer security weaknesses. The plan does not articulate critical actions that VA will need to take to correct specific control weaknesses or the time frames for completing key actions. Also, the plan does not provide a framework to guide the monitoring activities by identifying the specific security areas to be reviewed, the scope of compliance work to be performed, the frequency of reviews, the reporting requirements, or the resolution of reported issues. VA continues to be without a comprehensive, centrally managed process that will enable it to identify, track, and analyze all computer security weaknesses. |

Source: GAO analysis of VA documentation.

VA is also challenged to develop an effective IT strategy for sharing information on patients who are both VA and DOD beneficiaries or who seek care from DOD under a VA/DOD sharing agreement. The lack of complete, accurate, and accessible data is particularly problematic for veterans who are prescribed drugs under both systems. While each department has established safeguards to mitigate the risk of medication errors, these safeguards are not necessarily effective in a shared environment—in part because VA's and DOD's IT systems are separate. Consequently, DOD providers and pharmacists cannot electronically access health information captured in VA's system to aid in making medication decisions for veterans, nor can they take advantage of electronic safeguards such as computerized checks for drug allergies and interactions.

## Financial Management Enhancements Needed to Correct Material Deficiencies

In December 2002, VA's independent auditor issued an unqualified audit opinion on VA's consolidated financial statements for fiscal years 2002 and 2001.[40]  However, the unqualified opinion was achieved, for the most part, through extensive efforts of both program and financial management staff and the auditors to overcome material internal control weaknesses to produce auditable information after year-end.  The auditor reported two long-standing systems and control problems that remain unresolved.  In addition, VA's accounting systems—similar to those of most major agencies—did not comply substantially with Federal Financial Management Improvement Act (FFMIA) requirements.  These weaknesses continue to make VA's program and financial data vulnerable to error and fraud and limit the department's ability to monitor programs through timely internal financial reports throughout the fiscal year.

VA has demonstrated management commitment to addressing material internal control weaknesses previously reported and made significant improvements in financial management.  For example, in February 2001 the auditor reported that VA had improved on its reporting and reconciling of fund balances with Treasury—removing this as a material weakness.[41]  VA also continued to make progress in implementing recommendations from our March 1999 report[42] that resulted in improved control and accountability over VA's direct loan and loan sale activities and compliance with credit reform requirements.

However, during its audit of VA's fiscal year 2002 financial statements the auditor reported that two previously reported material weaknesses still exist in the areas of information systems security and financial management system integration.  A brief description of each material weakness follows.

---

[40]*Report of the Audit of the Department of Veterans Affairs Consolidated Financial Statements for Fiscal Years 2002 and 2001*, Office of the Inspector General, Report No. 02-02-01638-47 (Washington, D.C.: Jan. 22, 2003).

[41]*Report of the Audit of the Department of Veterans Affairs Consolidated Financial Statements for Fiscal Years 2000 and 1999*, Office of the Inspector General, Report No. 00-01702-50 (Washington, D.C.: Feb. 28, 2001).

[42]U.S. General Accounting Office, *Internal Controls:  VA Lacked Accountability Over Its Direct Loan and Loan Sale Activities*, GAO/AIMD-99-24 (Washington, D.C.: Mar. 24, 1999).

Major Performance and Accountability
Challenges

- Departmentwide weaknesses in security controls over automated data processing continue to make VA's sensitive financial and veteran medical and benefit information at risk of inadvertent or deliberate misuse or fraudulent use. Examples of weaknesses include inappropriate access privileges and inadequate segregation of duties. Additionally, security and process control weaknesses were observed in critical loan guaranty system applications due to a lack of accountability and definition of responsibility for implementing and enforcing consistent security administration standards and the lack of appropriate reconciliation procedures.

- Material weaknesses continue to hamper timely completion of financial statements. Specifically, VA continues to have difficulty related to the preparation, processing, and analysis of financial information to support the efficient and effective preparation of its financial statements. In many cases, significant manual work-arounds and out-of-date feeder systems are still in place because VA has not yet completed its transition to a fully integrated financial management system.

In its discussion of compliance with laws and regulations, the auditor reported that VA's financial systems did not substantially comply with federal financial systems requirements—one of the three requirements of FFMIA. The auditor found significant weaknesses in (1) the design and operation of internal controls over financial reporting, particularly with the control, monitoring, and reconciliation processes in support of the preparation of VA's consolidated financial statements, and (2) the effectiveness of the information technology security controls.

VA has demonstrated management commitment to addressing material internal control weaknesses and made significant improvements in financial management. The target dates for completing corrective actions on the information technology security control weaknesses is fiscal year 2003, while the target date for corrective action on financial management system deficiencies is fiscal year 2004, when implementation of VA's integrated financial system is scheduled for completion. It is important that VA meet these targets because noncompliance with federal financial systems requirements impedes VA's ability to provide reliable, useful, and timely information needed to manage day-to-day operations.

# GAO Contacts

| Subject(s) covered in this report | Contact person |
|---|---|
| Ensuring access to quality health care<br><br>Managing resources and workload to enhance health care delivery<br><br>Preparing for biological and chemical acts of terrorism<br><br>Improving veterans' disability program | Cynthia A. Bascetta<br>Director, Health Care—Veterans' Health and Benefits Issues<br>(202) 512-7101<br>bascettac@gao.gov |
| Linking budget formulation and performance planning processes | Paul L. Posner<br>Managing Director, Federal Budget Analysis, Strategic Issues<br>(202) 512-9573<br>posnerp@gao.gov |
| Overcoming information technology challenges | Joel C. Willemssen<br>Managing Director, Information Technology<br>(202) 512-6253<br>willemssenj@gao.gov<br><br>Robert F. Dacey, Director<br>Information Security Issues<br>Information Technology<br>(202) 512-3317<br>daceyr@gao.gov |
| Enhancing financial management to correct material deficiencies | McCoy Williams<br>Director, Financial Management and Assurance<br>(202) 512-6906<br>williamsm1@gao.gov |

# Related GAO Products

| | |
|---|---|
| **Ensure Access to Quality Health Care** | *VA Long-Term Care: Implementation of Certain Millennium Act Provisions Is Incomplete, and Availability of Noninstitutional Services Is Uneven.* GAO-02-510R. Washington, D.C.: March 29, 2002. |
| | *VA Health Care: More National Action Needed to Reduce Waiting Times, but Some Clinics Have Made Progress.* GAO-01-953. Washington, D.C.: August 31, 2001. |
| | *VA Long-Term Care: Oversight of Community Nursing Homes Needs Strengthening.* GAO-01-768. Washington, D.C.: July 27, 2001. |
| | *Veterans' Health Care: Standards and Accountability Could Improve Hepatitis C Screening and Testing Performance.* GAO-01-807T. Washington, D.C.: June 14, 2001. |
| | *VA Health Care: Community-Based Clinics Improve Primary Care Access.* GAO-01-678T. Washington, D.C.: May 2, 2001. |
| | *Veterans' Health Care: Observations on VA's Assessment of Hepatitis C Budgeting and Funding.* GAO-01-661T. Washington, D.C.: April 25, 2001. |
| | *VA Drug Formulary: Better Oversight Is Required, but Veterans Are Getting Needed Drugs.* GAO-01-183. Washington, D.C.: January 29, 2001. |
| | *Veterans' Health Care: VA Needs Better Data on Extent and Causes of Waiting Times.* GAO/HEHS-00-90. Washington, D.C.: May 31, 2000. |
| | *Disabled Veterans' Care: Better Data and More Accountability Needed to Adequately Assess Care.* GAO/HEHS-00-57. Washington, D.C.: April 21, 2000. |
| **Manage Resources and Workload to Enhance Health Care Delivery** | *VA Health Care: Improved Planning Needed for Management of Excess Real Property.* GAO-03-326. Washington, D.C.: January 29, 2003. |
| | *VA Health Care: Expanded Eligibility Has Increased Outpatient Pharmacy Use and Expenditures.* GAO-03-161. Washington, D.C.: November 8, 2002. |
| | *VA and Defense Health Care: Increased Risk of Medication Errors for Shared Patients.* GAO-02-1017. Washington, D.C.: September 27, 2002. |

*VA and DOD Health Care: Factors Contributing to Reduced Pharmacy Costs and Continuing Challenges.* GAO-02-969T. Washington, D.C.: July 22, 2002.

*VA and Defense Health Care: Potential Exists for Savings through Joint Purchasing of Medical and Surgical Supplies.* GAO-02-872T. Washington, D.C.: June 26, 2002.

*VA Health Care: Allocation Changes Would Better Align Resources with Workload.* GAO-02-338. Washington, D.C.: February 28, 2002.

*VA Health Care: VA Has Not Sufficiently Explored Alternatives for Optimizing Third-Party Collections.* GAO-01-1157T. Washington, D.C.: September 20, 2001.

*VA Health Care: Continuing Oversight Needed to Achieve Formulary Goals.* GAO-01-998T. Washington, D.C.: July 24, 2001.

*Veterans' Health Care: Standards and Accountability Could Improve Hepatitis C Screening and Testing Performance.* GAO-01-807T. Washington, D.C.: June 14, 2001.

*DOD and VA Pharmacy: Progress and Remaining Challenges in Jointly Buying and Mailing Out Drugs.* GAO-01-588. Washington, D.C.: May 25, 2001.

*VA Laundry Service: Consolidations and Competitive Sourcing Could Save Millions.* GAO-01-61. Washington, D.C.: November 30, 2000.

*VA Health Care: Expanding Food Service Initiatives Could Save Millions.* GAO-01-64. Washington, D.C.: November 30, 2000.

*VA and Defense Health Care: Evolving Health Care Systems Require Rethinking of Resource Sharing Strategies.* GAO/HEHS-00-52. Washington, D.C.: May 17, 2000.

*VA Health Care: VA Is Struggling to Address Asset Realignment Challenges.* GAO/T-HEHS-00-88. Washington, D.C.: April 5, 2000.

*VA Health Care: Collections Fall Short of Expectations.* GAO/T-HEHS-99-196. Washington, D.C.: September 23, 1999.

*VA Health Care: Improvements Needed in Capital Asset Planning and Budgeting.* GAO/HEHS-99-145. Washington, D.C.: August 13, 1999.

*VA Health Care: Closing a Chicago Hospital Would Save Millions and Enhance Access to Services.* GAO/HEHS-98-64. Washington, D.C.: April 16, 1998.

| Prepare for Biological and Chemical Acts of Terrorism | *Homeland Security: Need to Consider VA's Role in Strengthening Federal Preparedness.* GAO-02-145T. Washington, D.C.: October 15, 2001. |
|---|---|

| Improve Veterans' Disability Program | *Veterans' Benefits: Claims Processing Timeliness Performance Measures Could Be Improved.* GAO-03-282. Washington, D.C.: December 19, 2002. |
|---|---|

*Veterans' Benefits: Quality Assurance for Disability Claims and Appeals Processing Can Be Further Improved.* GAO-02-806. Washington, D.C.: August 16, 2002.

*SSA and VA Disability Programs: Re-Examination of Disability Criteria Needed to Help Ensure Program Integrity.* GAO-02-597. Washington, D.C.: August 9, 2002.

*Veterans' Benefits: VBA's Efforts to Implement the Veterans Claims Assistant Act Need Further Monitoring.* GAO-02-412. Washington, D.C.: July 1, 2002.

*Veterans' Benefits: Despite Recent Improvements, Meeting Claims Processing Goals Will Be Challenging.* GAO-02-645T. Washington, D.C.: April 26, 2002.

*Veterans Benefits Administration: Clarity of Letters to Claimants Needs to Be Improved.* GAO-02-395. Washington, D.C.: April 23, 2002.

*Veterans' Benefits: Quality Assurance for Disability Claims Processing.* GAO-01-930R. Washington, D.C.: August 23, 2001.

*Veterans' Benefits: Training for Claims Processors Needs Evaluation.* GAO-01-601. Washington, D.C.: May 31, 2001.

Related GAO Products

*Veterans' Benefits:  Veterans Have Mixed Views on a Lump Sum Disability Payment* Option. GAO-01-172. Washington, D.C.: December 18, 2000.

*Veterans Benefits Administration: Problems and Challenges Facing Disability Claims Processing.* GAO/T-HEHS/AIMD-00-146. Washington, D.C.: May 18, 2000.

*Veterans' Benefits:  Promising Claims-Processing Practices Need to Be* Evaluated. GAO/HEHS-00-65. Washington, D.C.: April 7, 2000.

*Veterans Benefits Administration:  Progress Encouraging, but Challenges Still Remain.* GAO/T-HEHS-99-77. Washington, D.C.: March 25, 1999.

*Veterans' Benefits Claims:  Further Improvements Needed in Claims-Processing* Accuracy. GAO/HEHS-99-35. Washington, D.C.: March 1, 1999.

*VA Disability Compensation:  Disability Ratings May Not Reflect Veterans' Economic Losses.* GAO/HEHS-97-9. Washington, D.C.: January 7, 1997.

*Veterans' Benefits:  Effective Interaction Needed Within VA to Address Appeals Backlog.* GAO/HEHS-95-190. Washington, D.C.: September 27, 1995.

*Veterans' Benefits:  VA Can Prevent Millions in Compensation and Pension Overpayments.*  GAO/HEHS-95-88. Washington, D.C.: April 28, 1995.

| | |
|---|---|
| Develop Sound Departmentwide Management Strategies to Build a High-Performing Organization | *Managing For Results:  Efforts to Strengthen the Link Between Resources and Results at the Veterans Health Administration.* GAO-03-10. Washington, D.C.: December 10, 2002.<br><br>*VA Information Technology: Management Making Important Progress in Addressing Key Challenges.* GAO-02-1054T. Washington, D.C.: September 26, 2002.<br><br>*Veterans Affairs: Sustained Management Attention Is Key to Achieving Information Technology Results.* GAO-02-703. Washington, D.C.: June 12, 2002. |

*VA Information Technology: Progress Made, but Continued Management Attention Is Key to Achieving Results.* GAO-02-369. Washington, D.C.: March 13, 2002.

*Veterans Affairs: Status of Achieving Key Outcomes and Addressing Major Management Challenges.* GAO-01-752. Washington, D.C.: June 15, 2001.

*Computer-Based Patient Records: Better Planning and Oversight by VA, DOD, and IHS Would Enhance Health Data Sharing.* GAO-01-459. Washington, D.C.: April 30, 2001.

*Managing for Results: Emerging Benefits From Selected Agencies' Use of Performance Agreements.* GAO-01-115. Washington, D.C.: October 30, 2000.

*VA Information Technology: Progress Continues Although Vulnerabilities Remain.* GAO/T-AIMD-00-321. Washington, D.C.: September 21, 2000.

*Computer Security: Critical Federal Operations and Assets Remain at Risk.* GAO/T-AIMD-00-314. Washington, D.C.: September 11, 2000.

*VA Information Systems: Computer Security Weaknesses Persist at the Veterans Health Administration.* GAO/AIMD-00-232. Washington, D.C.: September 8, 2000.

*Information Technology: VA Actions Needed to Implement Critical Reforms.* GAO/AIMD-00-226. Washington, D.C.: August 16, 2000.

*Information Technology: Update on VA Actions to Implement Critical Reforms.* GAO/T-AIMD-00-74. Washington, D.C.: May 11, 2000.

*Executive Guide: Maximizing the Success of Chief Information Officers, Learning From Leading Organizations.* GAO/AIMD-00-83. Washington, D.C.: March 2000.

*Information Systems: The Status of Computer Security at the Department of Veterans Affairs.* GAO/AIMD-00-5. Washington, D.C.: October 4, 1999.

*Internal Controls: VA Lacked Accountability Over Its Direct Loan and Loan Sale Activities.* GAO/AIMD-99-24. Washington, D.C.: March 24, 1999.

**Related GAO Products**

*Credit Reform: Key Credit Agencies Had Difficulty Making Reasonable Loan Program Cost Estimates.* GAO/AIMD-99-31. Washington, D.C.: January 29, 1999.

*Information Systems: VA Computer Control Weaknesses Increase Risk of Fraud, Misuse, and Improper Disclosure.* GAO-AIMD-98-175. Washington, D.C.: September 23, 1998.

*Observations on the Department of Veterans Affairs' Fiscal Year 1999* Performance Report and Fiscal Year 2001 Performance Plan. GAO/HEHS-00-124R. Washington, D.C.: June 30, 2000.

# Performance and Accountability and High-Risk Series

*Major Management Challenges and Program Risks: A Governmentwide Perspective.* GAO-03-95.

*Major Management Challenges and Program Risks: Department of Agriculture.* GAO-03-96.

*Major Management Challenges and Program Risks: Department of Commerce.* GAO-03-97.

*Major Management Challenges and Program Risks: Department of Defense.* GAO-03-98.

*Major Management Challenges and Program Risks: Department of Education.* GAO-03-99.

*Major Management Challenges and Program Risks: Department of Energy.* GAO-03-100.

*Major Management Challenges and Program Risks: Department of Health and Human Services.* GAO-03-101.

*Major Management Challenges and Program Risks: Department of Homeland Security.* GAO-03-102.

*Major Management Challenges and Program Risks: Department of Housing and Urban Development.* GAO-03-103.

*Major Management Challenges and Program Risks: Department of the Interior.* GAO-03-104.

*Major Management Challenges and Program Risks: Department of Justice.* GAO-03-105.

*Major Management Challenges and Program Risks: Department of Labor.* GAO-03-106.

*Major Management Challenges and Program Risks: Department of State.* GAO-03-107.

*Major Management Challenges and Program Risks: Department of Transportation.* GAO-03-108.

Performance and Accountability and High-
Risk Series

*Major Management Challenges and Program Risks: Department of the Treasury.*  GAO-03-109.

*Major Management Challenges and Program Risks: Department of Veterans Affairs.*  GAO-03-110.

*Major Management Challenges and Program Risks: U.S. Agency for International Development.*  GAO-03-111.

*Major Management Challenges and Program Risks: Environmental Protection Agency.*  GAO-03-112.

*Major Management Challenges and Program Risks: Federal Emergency Management Agency.*  GAO-03-113.

*Major Management Challenges and Program Risks: National Aeronautics and Space Administration.*  GAO-03-114.

*Major Management Challenges and Program Risks: Office of Personnel Management.*  GAO-03-115.

*Major Management Challenges and Program Risks: Small Business Administration.*  GAO-03-116.

*Major Management Challenges and Program Risks: Social Security Administration.*  GAO-03-117.

*Major Management Challenges and Program Risks: U.S. Postal Service.*  GAO-03-118.

*High-Risk Series: An Update.*  GAO-03-119.

*High-Risk Series: Strategic Human Capital Management.*  GAO-03-120.

*High-Risk Series: Protecting Information Systems Supporting the Federal Government and the Nation's Critical Infrastructures.*  GAO-03-121.

*High-Risk Series: Federal Real Property.*  GAO-03-122.

| | |
|---|---|
| **GAO's Mission** | The General Accounting Office, the investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through the Internet. GAO's Web site (www.gao.gov) contains abstracts and full-text files of current reports and testimony and an expanding archive of older products. The Web site features a search engine to help you locate documents using key words and phrases. You can print these documents in their entirety, including charts and other graphics. |
| | Each day, GAO issues a list of newly released reports, testimony, and correspondence. GAO posts this list, known as "Today's Reports," on its Web site daily. The list contains links to the full-text document files. To have GAO e-mail this list to you every afternoon, go to www.gao.gov and select "Subscribe to GAO Mailing Lists" under "Order GAO Products" heading. |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to: |
| | U.S. General Accounting Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548 |
| | To order by Phone:    Voice: (202) 512-6000<br>TDD: (202) 512-2537<br>Fax: (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Public Affairs** | Jeff Nelligan, Managing Director, NelliganJ@gao.gov (202) 512-4800<br>U.S. General Accounting Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

**PRINTED ON**  **RECYCLED PAPER**

United States
General Accounting Office
Washington, D.C. 20548-0001

Official Business
Penalty for Private Use $300

Address Service Requested

Presorted Standard
Postage & Fees Paid
GAO
Permit No. GI00

