UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

In Re: DEPARTMENT OF VETERANS      :
AFFAIRS (VA) DATA THEFT            :
LITIGATION                         :
                                   :
_____:   Misc. Action No. 06-0506 (JR)
                                   :   MDL Docket No. 1796
This Document Relates To:          :
ALL CASES                          :
_____:

### PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION
### TO PLAINTIFFS' RULE 56(f) MOTION FOR DISCOVERY

Pursuant to Federal Rules of Civil Procedure 7 and Local Civil Rule 7, Plaintiffs hereby reply to "Defendants' Opposition to Plaintiff's Rule 56(f) Motion For Discovery" filed on March 16, 2007 ("Defs.' Opp."). In sum, Defendants failed to identify any substantive reason that the Court should not grant Plaintiffs' motion for appropriate discovery. If anything, Defendants' arguments regarding the relevance of the factual material Plaintiffs' seek and the affidavit requirements of Federal Rule of Civil Procedure 56 ("Rule 56"), while unavailing here, do serve as an admission that "Defendants' Motion To Dismiss Or, in the Alternative, For Summary Judgment" (Feb. 22, 2007) ("Defs.' Mot.") is, as a matter of law, based on irrelevant and unsupported factual information. As such, Plaintiffs expect Defendants to admit their error when responding to Plaintiffs', "Motion to Strike" (filed Mar. 13, 2007, which seeks to eliminate all such defective material from Defendants' Motion).

The essence of Defendants' opposition to limited discovery in this matter is that: (1) the motion for summary judgment is only "in the alternative;" (2) Plaintiffs "seek discovery unrelated to the allegations in their complaint" or based on "speculation;" and (3) Plaintiffs have not supported their motion with proper affidavits. *See* Defs.' Opp. at 1, 4-6. None of these reasons withstand even the most cursory consideration. Moreover, if Defendants' arguments were valid, their "alternative" summary judgment motion would be without any factual or legal

foundation and the Court would be compelled to deny it.

I.      Defendants' Filing is a Rule 12 Motion in Name Only

Defendants' assertion that their February 22, 2007, filing is primarily based on Federal Rule of Civil Procedure 12 ("Rule 12") ignores and misleads the Court as to the extensive evidentiary thrust of their moving papers. While it is true in a very narrow sense that Defendants moved for dismissal pursuant to Rules 12(b)(1) (lack of jurisdiction), (5) (insufficiency of service) and (6) failure to state a claim, the reality is that any Rule 12 dismissal of all these actions is not reasonably anticipated.

Turning first to Defendants' Rule 12(b)(5) assertion of insufficient service reveals that it applies only to the *Bivens* claims – not the actions *in toto*. *See* "Memorandum of Law In Support of Defendants' Motion To Dismiss or, in the Alternative, For Summary Judgment" (Feb. 22, 2007) ("Defs.' Mem.") at 35-36. Thus, even assuming the *Bivens* claims were dismissed, it would have no effect on the other claims.

Next, and as Defendants well know, Rule 12 explicitly states that if "on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(b) (emphasis added); *see, e.g.*, *Colbert v. Potter*, 471 F.3d 158, 164 (D.C. Cir. 2006). Here, Defendants' filing of 27 supporting exhibits in excess of 300 pages constituted "matters outside the pleadings." *See* Defs.' Mem., Exs. 1-27. Thus, unless the Court excludes all of these exhibits from consideration, all of Defendants' Rule 12(b)(6) assertions must be treated as provided for in Rule 56, not Rule 12.

It then remains that only Defendants' Rule 12(b)(1) assertions, could possibly result in a complete dismissal. Defendants have, of course, asserted that neither the organizational or

individual Plaintiffs have standing. Defs.' Mem. at 18-24. But the Court, however, need only find a single Plaintiff has standing to require the Rule 56 "alternative" per Rule 12. Where "one plaintiff establishes standing to sue, the standing of other plaintiffs is immaterial." *National Wildlife Federation v. Agricultural Stabilization and Conservation Service*, 955 F.2d 1199, 1203 (8th Cir. 1992) (citing *Bowen v. Kendrick*, 487 U.S. 589, 620 n.15 (1988)); *see also Price v. Pierce*, 823 F.2d 1114, 1118 (7th Cir. 1987) ("it is enough to give us jurisdiction over the case if one of the plaintiffs has standing") (citing *Sec'y of Interior v. California*, 464 U.S. 312, 319 n.3 (1984)).

And this determination leans heavily in favor of Plaintiffs. It has long been established that "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). The "adverse effect" reference in 5 U.S.C. § 552a(g)(1)(D) "acts as a term of art identifying a potential plaintiff who satisfies the injury-in-fact and causation requirements of Article III standing, and who may consequently bring a civil action without suffering dismissal for want of standing to sue." *Doe v. Chao*, 540 U.S. 614, 624 (2004). And here, standing has been properly pled: "Each of Defendants' Privacy Act violations caused Plaintiffs adverse effects." *See, e.g.,* VVA Compl. ¶ 64; *see also id.* ¶¶ 29-37, 39, 40 (alleging "adverse effects"); "As a direct and proximate result of Defendants acts and omissions, Plaintiffs have been exposed to a risk of substantial harm and inconvenience, and have incurred actual damages in purchasing comprehensive credit reports and/or monitoring of their identity and credit." Hackett Compl. ¶26; *see also id* ¶¶ 6, 25, 28, 29, 35-38, and VII (Prayer for Relief). Thus, Defendants' Motion hinges on evidentiary materials, and will clearly "be treated as one for summary judgment and disposed of as provided in Rule 56," and therefore Plaintiffs' should "be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."

II.    <u>Defendants' Opposing Arguments Here Support  Plaintiffs' Contention That Their Supporting Summary Judgment Materials Should Be Stricken</u>

Defendants would have it both ways – they rely heavily on the VA OIG Report in their moving papers, yet here they label as "unrelated" the very underlying source documents upon which the report is founded.  It is here that Defendants' arguments unravel:  there is no legal basis for their position that the VA OIG Report – which is facially based upon summarizations and compilations of underlying factual material – *is* relevant for purposes of Defendants' moving papers; yet, the *actual* factual materials that allegedly underlie the summaries, are *not*. Specifically, Defendants assert that the Plaintiffs "seek discovery <u>unrelated</u> to allegations in their complaint" (Defs.' Opp. at 5 (emphasis added)) that "are not relevant to whether defendants committed Privacy Act violations." *Id.* at 8.  However, Defendants plainly ignore, as detailed in Plaintiffs' Memorandum, that Plaintiffs seek discovery of only the factual material underlying the report that Defendants' cited <u>31 times</u> in their "Material Facts As To Which There Is No Factual Genuine Issue" and upon which their entire Motion is based.  *See* Pls.' Mem. at 3, 5 and Ex. A.  Thus, Defendants challenge – if not conveniently ignore – the seemingly obvious principle that if information is relevant to one party's assertions, it must be relevant to the other party's rebuttal.[1]

All Plaintiffs seek is the same information that the VA Office of Inspector General stated formed the factual basis for the report Defendants relied upon for every substantive "fact" supporting their Motion.  *See* VA OIG Rep't at 2; Pls.' Mem. at 3.  Plaintiffs cannot fathom a discovery request any more "precisely tailored to uncovering facts that would prevent summary judgment," Defs.' Opp. at 7, than to request the facts upon which the summary judgment motion is based.  Defendants' arguments otherwise turn the Federal Rules and common sense topsy turvy.

---

[1]    As but one example, Defendants claim that their assertion based on the VA OIG Report that John Doe <u>was</u> authorized to access the Privacy Act records is a "fact," but Plaintiffs' allegation that he was <u>not</u> authorized based on sworn testimony is "speculation" without "evidentiary foundation."  Defs' Opp. at 8.

4

Defendants' arguments regarding Plaintiffs' supporting affidavit, to the extent they have any substance at all, serve only to highlight Defendants' total reliance on inadmissible hearsay in their Motion. The few affidavits submitted by Defendants with their Motion are limited to peripheral issues such as returns of service and VA employee training and do not address any of the substantive issues. *See* Defs.' Facts (only 11 of 22 "material facts" cite affidavits). In challenging Plaintiffs' affidavits, Defendants have erected a standard that they themselves miserably fail to meet. In any event, it is clear that if Plaintiffs' motion should fail, which it does not as set forth below, for want of adequate affidavits, Defendants' Motion must fail on the issues where it lacks any affidavits.

Further, only one affidavit was obtained from any individual, Dat P. Tran, with first hand knowledge of John Doe or the Privacy Act records at issue. *See*, Defs.' Mem., Ex. 20, Declaration of Dat P. Tran. Ironically, Mr. Tran's declaration clearly fails to meet Defendants' stated interpretation of Rule 56 standards, as it does not contain any "specific facts" and is entirely "conclusory" regarding the material issues. *See* Decl. of Dat P. Tran ¶¶ (repeatedly stating "I followed established policies" without identifying the policies or the requirements therein). Mr. Tran made no statement regarding the real issues at bar including whether (1) he was the individual authorized to grant access, (2) he had any personal knowledge of John Doe's actual authorization for access, or (3) "established policies" met minimum Privacy Act safeguards requirements. Thus, per Defendants' own standard, Mr. Tran's declaration is deficient "as a matter of law."

Even more befuddling is Defendants' inflammatory rhetoric questioning of the factual basis of allegations regarding "backdating" and "cover-up" (*see* Defs.' Opp. at 5) when the basis of these allegations ***is the very sworn testimony of Mr. Tran himself*** which was obtained before this litigation was initiated. Notably, it was Mr. Tran himself who identified and reported the "backdated" document; and it was Mr. Tran who expressed concern about misleading Congress

5

as well concerns regarding what, if any, "established policies" were applicable to the events at issue in this case.

>Mr. Tran:  . . .  It's called the Security Guideline for Single-User Remote Access, and they told me that the document had been down there since March 10th, 2006.
>
>. . .
>
>So, when I – I thought I go in and – look it up in the Office of Cyber Security and Office of IT website, and I did a search,
>
>. . .
>
>the properties show that that document was created at 3:51 p.m. on May the 22nd . . .
>
>. . .
>
>Mr. Tran: [in progress][2] – mean the Secretary and other senior official at the hearing on the 25th, and I know that this was the document that the VA basically told Congress and everyone that this is the guideline that the employee violated, which I told Mr. McClendon, I thought it was kind of odd that how can an employee violate a guideline that was dated after the incident, and that's the reason why I thought I should bring it to your attention.

Sworn Testimony of Dat Tran, Acting Director, Data Management and Analysis Service, Office of Policy (May 30, 2006) (attached as Exhibit A) at 4-8; *see also id*. at 22-24, 45-46 ("Mr. Secretary, you don't even know your own VA policy.  You sat in front of us at a hearing and say the employee violate all these things, and there is no such thing.").  Thus, Mr. Tran's contemporary sworn testimony was not that he followed policies, but that he was unsure what policies even existed, let alone applied.  Thus, not only is there factual basis for Plaintiffs' "information and belief" in the motion for discovery, but the veracity and basis of Defendants' lone substantive affidavit in support of their Motion to Dismiss is called into question.

Thus, the Court should grant the pending Motion because Plaintiffs:  (1) cannot fully present relevant facts in opposition to Defendants' Motion; (2) can identify specific sworn

---

[2]  The "[in progress]" text appears in the transcript and illustrates one of the issues with the documents that Plaintiffs' have been able to obtain despite Defendants' obstructions.  Many of the transcripts are redacted, appear incomplete, do not contain the exhibits discussed in the text, or combinations of all three.

interview testimony, documents, and other material in Defendants' possession, but not available to Plaintiffs, that establish those facts; and (3) <u>can</u> demonstrate how discovery of the specific information and deposition of specific individuals will enable Plaintiffs to not only rebut Defendants' assertions of no genuine issues of fact, but, upon information and belief, also establish one or more willful and intentional Privacy Act violations by Defendants.

Plaintiffs also respectfully renew their request that the Court timely rule on the pending Motion or extend the date for filing Plaintiffs' opposition to summary judgment until a reasonable time after such a ruling is forthcoming or the ordered discovery is completed.

Respectfully submitted,

    /s/ Douglas J. Rosinski

| | |
|---|---|
| Donald A. Cockrill | John C. Murdock |
| Douglas J. Rosinski | Jeffrey S. Goldenberg |
| Ogletree, Deakins, Nash, | Murdock Goldenberg |
|   Smoak & Stewart, P.C. |   Schneider & Groh, LPA |
| 1320 Main Street, Suite 600 | 35 E. 7th Street, Suite 600 |
| Columbia, SC  29201 | Cincinnati, OH  45202 |
| (803) 252-1300 | (513) 345-8291 |
| (803) 254-6517 (fax) | (513) 345-8294 (fax) |
| Counsel in No. 1:06-CV-01943(JR) | Counsel in No. 1:06-CV-01943(JR) |
| | |
| Marc D. Mezibov | Gary E. Mason |
| Christian A. Jenkins | The Mason Law Firm, L.L.P.. |
| Mezibov & Jenkins, LLP | 1225 19th Street, N.W., Suite 500 |
| 401 E. Court Street, Suite 600 | Washington, DC  20036 |
| Cincinnati, OH  45202 | (202) 429-2290 |
| (513) 723-1600 | (202) 429-2294 (fax) |
| (513) 723-1620 (fax) | Counsel in No. 1:06-CV-01943(JR) |
| Counsel in No. 1:06-CV-01943(JR) | |
| Mark D. Smilow | Alexander E. Barnett |
| Weiss & Lurie | The Mason Law Firm, L.L.P. |
| The French Building | 1120 Avenue of the Americas |
| 551 Fifth Avenue, Suite 1600 | Suite 4019 |
| New York, NY  10176 | New York, NY 10036 |
| (212) 682-3025 | (212) 362-5770 |
| (212) 682-3010 (fax) | (917) 591-5227 |
| Counsel in No. 1:06-CV-01944(JR) | |

Dated: March 20, 2007

## Page 1

DEPARTMENT OF VETERANS AFFAIRS

OFFICE OF INSPECTOR GENERAL

WASHINGTON, D.C.

Administrative Investigation: Lost Data

CONDUCTED BY

███████████████████

Office of Inspector General

STATEMENT OF

DAT TRAN, Acting Director,

Data Management and Analysis Service, Office of Policy

Tuesday, May 30, 2006

(TRANSCRIPT PREPARED FROM AN AUDIOTAPE RECORDING.)

MALLOY TRANSCRIPTION SERVICE
(202) 362-6622

## Page 2

1    PROCEEDINGS
2    ███████████████████
3    ██████ Today is Tuesday, May 30th, 2006, and we are
4    on the record again with Mr. Dat Tran.
5        ██████ Dat, do you recall a telephone
6    conversation you had with Judy and myself this past Friday?
7        MR. TRAN: Yes, I did.
8        ██████ Could you just for the record -- I
9    think you had some pretty important facts and positions on
10   -- on this whole issue dealing with policies and directives
11   because we had asked you during one of our interviews last
12   week with you if you know of any policies or procedures that
13   provided the -- the -- I shouldn't say guidance, but
14   provided actually any written policies that would pertain to
15   this particular incident, and in your -- in your research,
16   you came to understand that -- that one of the -- one of the
17   policies that was being promoted by VA as applicable in this
18   particular situation was this security guideline for
19   single-user remote access, and there's been a lot of
20   discussion about that, and I thought maybe you could again
21   reiterate your position and what you told us on Friday about
22   this particular -- because we had some further questions.

## Page 3

1        MR. TRAN: Sure. You know, I recall at least on
2    two occasions last week during my conversation with you that
3    I know at least on one occasion -- well, actually I remember
4    now that you, ███████ asked me a direct question, and then
5    Nick asked me on Tuesday another direct question that do I
6    know of any VA policy that ████████████ violated as a
7    result of him taking data home, and at the time, I told you
8    that I was not aware of any VA policy that I know of, and
9    also at the time I told you that the only training that we
10   have on privacy is from the Internet privacy training that
11   we receive, that we have to take once a year, that
12   applicable to all VA employee.
13       So, you know, I went back and I did a little bit
14   more research after you asked me those questions, and I
15   looked in the VA office of IT website that is responsible
16   for all directives and handbooks in VA, and that's basically
17   my understanding in working with VA directive and handbooks
18   that those are considered to be official policy in VA, and I
19   did my research on data and privacy issue, and I was looking
20   specifically for any kind of directive that have to do with
21   employee taking sensitive data out of the building, and I
22   could not find anything.

## Page 4

1        And during the course of my research, I was told
2    -- and I don't remember specifically who it was -- in the
3    Secretary's office that associate with this whole issue told
4    me about a guidebook that the Office of IT, specifically
5    cyber security, have put out. Yes. It's called the
6    Security Guideline for Single-User Remote Access, and they
7    told me that the document had been down there since March
8    10th, 2006.
9        Even though I am not a single-user remote access
10   because I don't have VPN or SIDRICS [ph] from home, I
11   thought it was interesting because that guideline is
12   supposed to apply for all user that work with data.
13       So, when I -- I thought I go in and -- and look it
14   up in the Office of Cyber Security and Office of IT website,
15   and I did a search, and when my research result pull up, I
16   notify that the document was modified on May the 22nd at, I
17   believe, 4:12 p.m., which was last Monday, and I thought it
18   was curious that the document was modified very recently.
19       So, upon further research, I look at the
20   properties file that show up next to the title of the
21   document on the cyber security website, and when I open that
22   up, the properties show that that document was created at

Page 5

1  3:51 p.m. on May the 22nd, and it was modified about 20, 21
2  minutes later at 4:12 p.m. on May the 22nd.
3      And then when I looked further down at the bottom
4  of that page, at the time I went into it, I believe it was
5  Tuesday or Wednesday, and I have the document, there were
6  only 10 user access it at the time. So I thought it was
7  kind of odd that the document was modified and created the
8  same date.
9      So, you know, I -- I decided to go back and talk
10 to three of our staff who telecommute, even though they
11 don't report to me, but I know that they telecommute. So I
12 ask all of them that since they telecommute from home and
13 they have to have access to the VA network, if they have
14 ever seen or heard of the particular document on single-user
15 remote access.
16     They all told me that that was the first time that
17 they have ever heard of it. I -- when they came back, when
18 I make it back into the office the next day, I show them the
19 document cover, and they told me that they had never seen it
20 before, and I asked one of the three employees to go back
21 and look in her old e-mail to see, A, if that document was
22 communicated because I assume that if a guideline come out,

Page 6

1  that you have to communicate that to the employees. So I --
2  and the only people that would -- would disseminate
3  something like that, my -- my assumption would have been
4  either ███████ our ISO, or the Office of IT who put
5  out the document.
6      And they told me that they went back, and she did
7  not keep a lot of the IT e-mail, but she did not see
8  anything from ███████ from March 10th and afterward
9  about the dissemination of that document.
10     So I decided to go back and take a look further to
11 see what kind of document that the Office of Cyber Security
12 put out as guideline, and as a result, I found there are
13 multiple ways that you can access this document, and there
14 are certain ways you can see and kind of get a feel for when
15 the document was created, and I decided to make a copy, and
16 you can take a look at that copy.
17     ███████ okay.
18     MR. TRAN: If you go in and you look at the
19 document page that put out by the Office of Cyber Security,
20 you will see the document when -- when the document already
21 existed and get updated, the web administrator would put in,
22 in red lettering, "updated." A brand-new document would get

Page 7

1  a word next to it, say "new," and when I pull up the
2  document in the whole library, I pull up the whole list of
3  everything they have, and what I found was what I told you
4  on Friday, was that the document was basically created at
5  3:51 on May 22nd, and next to it was the word "new," that
6  indicate that that document was not updated, that it was
7  new.
8      Upon further talk with people, I was told that the
9  document was -- the only reason that the document show that
10 it was modified on the 22nd at 4:12 p.m. was because
11 somebody from the Office of IT noticed the word "draft," and
12 they went in there and they removed the word "draft."
13 That's why it show modification on 5/22nd, but it actually
14 have been down there since March.
15     But, you know, it's the property of the document,
16 which is basically like a time stamp in the computer system.
17 Basically, it's giving a different -- [audio break].
18     [Side B of audiotape recording begins.]
19     MR. TRAN: [In progress] -- mean the Secretary and
20 other senior official at the hearing on the 25th, and I know
21 that this was the document that the VA basically told
22 Congress and everyone that this is the guideline that the

Page 8

1  employee violated, which I told Mr. McLendon, I thought it
2  was kind of odd that how can an employee violate a guideline
3  that was dated after the incident, and that's the reason why
4  I thought I should bring it up to your attention.
5      ███████ what did Mr. McLendon -- what was his
6  response to your -- your concern about this?
7      MR. TRAN: Well, Mr. McLendon basically sent an
8  e-mail to the current acting CIO, Mr. Bob Howard, and raised
9  this issue, and Mr. Howard responded that he have started an
10 audit trail in the Office of IT to find out how this
11 document was disseminated, when it was disseminated, and how
12 was it communicated to the employee when it was
13 disseminated, and this was -- this was on the Thursday the
14 25th in the afternoon. We have yet to see anything,
15 feedback.
16     ███████ one of the things that's a little
17 confusing is that with this document, though, you have this
18 thing called a "change history." Have you taken a -- have
19 you seen that?
20     MR. TRAN: Yes. I printed out the document like
21 --
22     ███████ hat does that -- what does that tell

Page 9

1  us in your estimation?
2      MR. TRAN: This basically told me that the
3  original document was put out on April the 11th in 2003, and
4  it was revised in 2005, and it was revised for the third
5  time in March the 10th, but since I have never seen any of
6  these document before, I could not tell, A, you know, what
7  was changed in these revision and, B, if it was ever posted
8  out on the VA Intranet for our -- our employees to see.
9      ▓▓▓▓▓ Right.
10     MR. TRAN: And the third, I think, important point
11 that I want to bring up is -- and this is what I have said
12 to several folks in the Secretary's office and to my boss,
13 Mr. McLendon, that we could have a guidebook or policy or
14 anything that we wanted to say that is out there, but if
15 this never got communicated or disseminated to the employee,
16 it is just as good as having no policy or guidebook, and
17 that's the way I strongly feel about it, especially after I
18 found out that, you know, none of our employees that
19 telecommute have ever seen this document.
20     ▓▓▓▓▓ Have you -- have you or will you be
21 able to poll other folks in the office as to whether or not
22 they have seen this particular document?

Page 10

1      MR. TRAN: Yes. If you would like for me to do
2  so, I would be more than happy because I know who our
3  programmers are. I mean, I know not too many of them have
4  access to VPN and so on from home because, you know, I just
5  know that they don't work at home.
6      ▓▓▓▓▓ Well, yeah. If you could do that,
7  that would be -- that would be great.
8      The other -- the other thing, a couple things, I
9  think, is speak to -- and I think you did this a little bit
10 -- speak to the difference in your mind about directive and
11 guidelines and also speak to the concurrence -- concurrence
12 process, and I think you were talk -- you told us Friday
13 that you had some issues with the policy itself.
14     MR. TRAN: Yes.
15     ▓▓▓▓▓ Okay. And maybe you can articulate
16 specifically those things that you have a problem with as it
17 relates to this particular incident and whether or not the
18 things that are contained in that policy, this policy here,
19 whether or not they even do pertain.
20     MR. TRAN: Okay.
21     ▓▓▓▓▓ okay?
22     MR. TRAN: I would be more than happy to.

Page 11

1      I have reviewed this guideline, and like I said,
2  this is a guideline, and I have been told specifically by
3  our ISO, ▓▓▓▓▓, that if the guideline is nothing
4  but a recommended practice, it is not enforceable. It is
5  not a policy.
6      I do know a little bit about VA policy and
7  directives because about 2 years ago, I was tasked by the
8  Chief of Staff to do a program evaluation type of study on
9  the VA directives process. So I do know a little bit about
10 VA directives and handbook.
11     My understanding based on my study is that
12 policies that apply to workplace for all VA employees is
13 called either -- or considered to be directives or in the
14 older days they are contained in VA handbooks. If somethin
15 is not in VA directives or handbooks, they are not
16 officially considered to be VA workplace policies.
17     The Office of IT is responsible for posting all VA
18 directives and handbooks electronically on their VA Intranet
19 site as much as possible because some of the older
20 handbooks, they don't have electronic copies. So they don't
21 post them, but there is -- if there is a workplace policy
22 that apply to employee, whether it have to do with data or

Page 12

1  whether it have to do with pay and attendance and all of
2  those things, are posted under VA directives and handbooks.
3      The Office of Cyber Security have their own
4  section of document which they call "guideline," which to
5  the best of our understanding, that is basically a
6  recommended practice, but it's not enforceable because there
7  is no directives that direct all employee to use a
8  particularly -- particular guideline. Okay? And that's
9  what the Office of Cyber Security and the Office of IT is
10 currently doing. They are currently having the directives
11 out there. That will make the guideline that you just show
12 me to be a guideline that everybody have to follow, okay,
13 which as now become policy.
14     And I -- our office, basically the Office of
15 Policy, Planning and Preparedness, the security division
16 under Mr. Baffa -- the Office of Planning and the Office of
17 Policy, we all work together, and we recommended to Mr.
18 Dennis Duffy, our Acting Assistant Secretary for Policy,
19 Planning and Preparedness, to not concur with the guidebook
20 because upon reviewing of the guidebook, we strongly feel
21 that it still does not address the issue of removing data
22 from a VA or a Federal facility. That is not addressed

Case 1:06-mc-00506-JR   Document 16-2   Filed 03/20/2007   Page 4 of 11

Statement of DAT TRAN (5/30/2006)   CondenseIt™   Administrative Investigation: Lost Dat.

**Page 13**

1 anywhere in the guidebook, number one.
2         Number two, we felt that the guidebook did not
3 address other mean of data being removed that could be
4 removed from the facility such as fax, such as e-mail, such
5 as FTP because we feel that those are loophole that people
6 could still taking or sending data, sensitive data, out of
7 the Department. So that's another reason that we did not
8 concur because we felt that it is a big loophole that people
9 can -- can use to take sensitive data out of the building.
10         And also, third, we recommend that the IG should
11 be taken into consideration and have a chance to concur to
12 that guidebook.
13         So, as of this morning, we were told that we would
14 have a new extension until the 5th of June because the other
15 thing that we brought up in our non-concurrence is that we
16 were given the guidebook, which is a very complex document,
17 and we were basically given 24 hours to concur to it, and
18 our Office of Policy, Planning and Preparedness, we all felt
19 that that was not appropriate time for us to review such a
20 complex document and thoroughly think things through and
21 agree to it, to concur or not to concur.
22         So they now have given us until the 5th of June.

**Page 14**

1 I have not yet to review the latest document, and my
2 colleagues have not had a chance to review the document, but
3 my stand on this is unless the document was modified, as we
4 recommend in the original non-concurrence, I personally will
5 recommend Mr. Duffy to non-concur again on June 5th because
6 in the Office of Policy, Planning, and Preparedness, we feel
7 very strongly that what happened with Mr. Wayne Johnson,
8 that situation did not get cover under the guidebook, and
9 that's the reason why we did not concur with it.
10         ▓▓▓ And when did you originally get the
11 document to concur or non-concur?
12         MR. TRAN: We got the document on -- it was given
13 -- it was put into EDMS on Thursday, I believe, either
14 morning or afternoon because I was at the hearings all day.
15 I got that document in my hand on Thursday afternoon, and we
16 were given until 2 o'clock Friday afternoon to concur with
17 the directives.
18         ▓▓▓ And -- and in your department, who did
19 you list as being the reviewers of -- of this would be
20 yourself, Mr. Baffa?
21         MR. TRAN: Mr. -- actually, the person who
22 non-concur or recommended non-concurrence for Mr. Baffa was

**Page 15**

1 ▓▓▓ I believe he's one of the
2 director under Mr. Baffa. On the Office of Planning side,
3 it was ▓▓▓ who is the director and also
4 acting. I believe he is currently acting DAS for Planning,
5 but don't quote me on that.
6         ▓▓▓ Right.
7         MR. TRAN: But he is the director of Office of
8 Planning, and, of course, in Mr. McLendon's office, it was
9 referred to me because I know about data issues and IT
10 security best. So he asked me to -- to take care of it.
11         ▓▓▓ Was there anyone else on the committee
12 that concurred or recommended concurrence to concur?
13         MR. TRAN: We are not aware of how -- we did not
14 have a chance because this was -- we were given actually
15 less than 24 hours to review and concur with it. We did not
16 even have a chance to go in to look and see what other
17 offices have to say about it.
18         ▓▓▓ Within this office, I'm talking about.
19         MR. TRAN: Oh. Within this office, no. It's
20 unanimous. We -- we have three -- it was assigned to three
21 -- we have four branches in this office. The fourth branch
22 was preparedness, but I don't know why preparedness was not

**Page 16**

1 asked to review and concur with it, but the three branches
2 that were assigned this document to and coordinate was
3 Office of Policy, Office of Planning, and Office of Security
4 and Law Enforcement, and all three office unanimously
5 rejected the guideline.
6         ▓▓▓ Right. And who gave you this
7 assignment?
8         MR. TRAN: It was -- it came from Mr. Duffy. I
9 believe through his acting executive assistant, ▓▓▓
10 ▓▓▓ and it was maybe -- the assignment was made to the
11 three of us.
12         I handle all EDMS for Mr. McLendon. So I talked
13 to Mr. McLendon, and he told me to handle it directly
14 myself, and ▓▓▓ had it assigned to Office of
15 Planning, you know, so Office of Security and Law
16 Enforcement, and, you know, the director of Office of
17 Planning took it upon himself to review it directly, and so
18 actually we -- Mr. Marshall and I, we basically reviewed the
19 document together in his office --
20         ▓▓▓ Right.
21         MR. TRAN: -- because of the short time.
22         ▓▓▓ And who -- if you happen to know, who

Page 17

1  was providing the direction to Mr. Duffy to get this group
2  together? Who is driving this quick review? Do you know
3  which office?
4      MR. TRAN: The Office of IT.
5      ███ The Office of IT.
6      MR. TRAN: Right. This EDMS was -- was the owner
7  of this EDMS is the Office of Information Technology.
8      ███ And was there a name? Who -- is it
9  just the boss over there or --
10     MR. TRAN: I believe it's from Mr. Howard, but I
11 can get that information for you because the information
12 just got circulated back to us.
13     ███ Right.
14     ███ How unusual would it be to have the
15 24-hour turnaround on something like this?
16     MR. TRAN: It's not uncommon. It's not uncommon,
17 but -- but on technical issues, we sometime get a little bit
18 more than 24 hours or day. This have always been a problem
19 in the Department. Sometime we don't get more than 2 days
20 or 3 days to review, let's say, a 4- or 500-page document
21 and concur to it or not concur, but it's not that uncommon.
22 But I thought it was -- it was a little bit uncommon in this

Page 18

1  case considering the sensitivity of this issue, and -- and,
2  you know, we -- and that the complexity of the issue, I
3  thought it was unusual that they gave us less than 24 hours.
4      ███ Would it be unusual that they are
5  asking for your concurrence on this, on something that is
6  dated in March?
7      MR. TRAN: It is unusual because I did point it
8  out, and I made a copy of it.
9      Oh, actually, you know, I forgot I have it right
10 here. The person who -- the sponsor of this EDMS is Mr. Bob
11 Howard, and it is EDMS 354304. The date of the document
12 that was entered was May 25th. Even though the due date was
13 interestingly -- was July 10th for the document to -- you
14 know, to be closed, but as you can see for the individual
15 assignment to each of the office, we were given to the 26th
16 to concur. Okay.
17     We also -- one of the other reason we also
18 disagree with the -- the quick turnaround to concur with the
19 directive, because I believe there is a 30-day period for
20 our directive, you know, process to take place for people to
21 review the directives and so on, and we just felt that, you
22 know, the 24 hours was -- was not appropriate.

Page 19

1      I did point it out to Mr. McLendon on Thursday
2  afternoon that I thought it was interesting that there was a
3  note in our assignment that not only asked us to review and
4  concur to an EDMS, but it's -- it's -- it basically stated
5  that when this document have been out on the web, which I
6  thought was rather unusual because that is irrelevant
7  information that had been out there since March the 10th,
8  and I mentioned to Mr. McLendon that unless somebody really
9  tried to show that it was out there on March the 10th, why
10 would they even raise it in the EDMS assignment.
11     ███ Sure.
12     MR. TRAN: Okay. That's just my opinion.
13     ███ I hear you.
14     And -- and what about the title itself? I mean,
15 did you talk about that? Isn't that a little misleading?
16     MR. TRAN: Yes. Yes, we did. We talked about the
17 title of the document because when I reviewed this document,
18 this document was addressing those user who have access into
19 the VA system from their home or on the road, but it does
20 not address those user who take work home, and that's why we
21 thought it was rather interesting that this document was
22 used as the guideline to cover everything from remote access

Page 20

1  to -- to taking work home for people who have no access
2  directly into the VA system.
3      We did talk about that. ███ nd I did
4  talk about that, and we felt that it was just a quick rush
5  to get something out there, and that's why we felt that this
6  is not addressing or -- and this is not applicable to the
7  situation that we just had happen here. That's basically an
8  employee taking data out of the building.
9      ███ What about someone who might raise the
10 position that this policy is out there and even though
11 employees didn't know, they should have known? How do you
12 comment?
13     MR. TRAN: My comment on that would be you cannot
14 expect an employee to know what is out there unless there is
15 some evidence that it was communicated or publicized.
16     When I talked to all of our employees -- and none
17 of them have ever heard -- none of the people who
18 telecommute that have access to VA system from home. This
19 document specifically addressed to them as remote access
20 user, and all three of them told me, they have never seen it
21 or heard of it until I brought it up to them last week.
22     So my point is it's -- it did not exist, or if it

Page 21

1 exist, nobody communicated that, and more importantly, from
2 a legal standpoint, if the employee knew about this and the
3 -- and the employees, you know, violate from a legal
4 standpoint -- and I'm not a lawyer. So I will go on a limb
5 here. I'm not so sure it's enforceable because it's not a
6 policy.
7     But to answer your question directly, if the
8 employee have seen this document and if there is a part in
9 there that address specifically about copying sensitive data
10 and take it out of the building and take it home, then, yes,
11 I think the employee knowingly violate something that they
12 know is a guideline or even a, you know, best practice, but
13 this document does not specifically address anything about
14 employee taking data out of the building.
15     ████ So it doesn't address, as far as
16 you're concerned from your read of it. The employees don't
17 know, have never heard of this document --
18     MR. TRAN: Right.
19     ████ -- that you touched base with so far.
20     MR. TRAN: Right.
21     ████ The supervisory chain apparently
22 doesn't -- wasn't aware of this. So how about Mr. -- who

Page 22

1 were the reviewers? Mr. -- did M████ow anything
2 from -- from discussions?
3     MR. TRAN: I did not ask Mr. -- I did not ask
4 ████ he ever heard of this. I did not ask
5 because I felt like, well, I --
6     ████ Okay.
7     MR. TRAN: -- don't need to share my research with
8 all of them --
9     ████ Yeah. Okay.
10     MR. TRAN: -- about the case.
11     ████ What -- what about Mr. McLendon or Mr.
12 Duffy? Did they? From your discussions, did they seem to
13 know about this?
14     MR. TRAN: I -- Mr. Duffy does not communicate
15 much with me. I communicate everything to Mr. Duffy the
16 majority of the time through Mr. McLendon, and Mr. McLendon
17 have never seen or heard of this document.
18     ████ Uh-huh. Okay.
19     Can you think of anything else?
20     ████ You talked about you did some sort of
21 research where you found that this was not posted until May
22 22nd?

Page 23

1     MR. TRAN: Right.
2     ████ Is it possible that it was posted
3 somewhere else or earlier than that?
4     MR. TRAN: Well, if it was posted somewhere else,
5 then that's -- you know, that's something I think the Office
6 of Cyber Security, who is basically the OCIS, responsible
7 for this document. That's the only place that they would
8 know.
9     The reason I found this document was because not
10 that somebody gave me a link, but somebody told me the brief
11 name of it. So I found it by typing in "single user remote
12 access," and I came up with a search result.
13     ████ Uh-huh.
14     MR. TRAN: And -- and when you go into the system
15 and you search for a document, you see a property which is
16 what we call the "meta data" or the property of that
17 document that show you when it was created, when it was
18 modified, and how many people have access it, and the -- you
19 know, a bunch of other technical information.
20     If you go through a link, let's say someone give
21 you a link to where this document is listed, you will not
22 see the properties of the document. The properties only

Page 24

1 show up when you do a search of the VA intranet. Okay.
2     So, if you go in and you look for this document
3 specifically by going to a link like this, you will not see
4 the properties of the document. The only date you will see,
5 okay, is the last time it was modified, but there is a third
6 way that you can go in and look for this document is by --
7 if you don't know anything about this document and you
8 happen to know that there is a library in the Office of
9 Cyber Security, if you go and click into -- go into that
10 library, then you see a different screen that show you when
11 all of -- all of the document that is available and when it
12 was created and whether it was an updated document or it was
13 a new document.
14     ████ Right.
15     MR. TRAN: So I found it three different ways, and
16 there different ways give me basically, in my opinion,
17 pretty conclusive evidence that this document did not get
18 posted until May the 22nd.
19     ████ Right. Okay. On that issue, anyway.
20     ████ have a question on another issue.
21 Could you clarify when you realized that the BIRLS extract
22 that Mr. Wayne had on his external drive was -- contained

Page 25

1  information on 20-some-million veterans?
2       MR. TRAN: I found that out on -- I found that out
3  on Wednesday. I'm trying to think of the Wednesday. It's
4  the -- I don't have my calendar.
5       ▓▓▓▓▓ It would be 3 -- at least 10th?
6       MR. TRAN: It -- no. No.
7       ▓▓▓▓▓ Seventeenth?
8       MR. TRAN: It would be Wednesday the 17th when we
9  were asked to -- by the Secretary's office and the General
10 Counsel to go in and -- and itemize and get the various
11 specific detail of what was in those potentially databases
12 or datasets that Mr. ▓▓▓▓▓ might have thought that he
13 lost, and Mr. ▓▓▓▓▓ himself was the one who went into
14 those dataset and -- and pull them out because he know what
15 they are.
16      ▓▓▓▓▓ So is he the one who came to you and
17 said it's potentially 20-some million?
18      MR. TRAN: No. Actually, I was tasked to work
19 with him because the General Counsel's office on Tuesday --
20 and I apologize. I don't have my calendar.
21      ▓▓▓▓▓ The 16th.
22      MR. TRAN: But on Tuesday, the General Counsel and

Page 26

1  the -- asked Mr. McLendon to pull together a list of all of
2  the details of all of the databases and so on by Wednesday
3  at noon, and that's when Mr. McLendon said to me, "I need
4  you to work with Wayne and pull this together and then send
5  it up to me, so I can give it to the General Counsel's
6  office."
7       Later on, when Mr. -- when I found -- I told Mr.
8  McLendon that Mr. ▓▓▓▓▓ was going to come in to work late
9  on Wednesday, and he -- he told the General Counsel that the
10 12 o'clock deadline might slip. That's when the General
11 Counsel told us that they want it sooner. So they told us
12 they want it by 9:00, and that's when I contacted Mr.
13 ▓▓▓▓▓ and told him at home that I need him to cancel his
14 -- his scheduled visit to the police department to get the
15 report, to come in early as possible the next morning and
16 start going in and doing queries or whatever he needs to do,
17 to tell us what data elements and how many records and all
18 of those details because the General Counsel want it by 9
19 o'clock, and I believe Mr. ▓▓▓▓▓ came in early that
20 morning.
21      I didn't specific ask him what time because he
22 beat me into it, but I came in also earlier than usual. But

Page 27

1  Mr. ▓▓▓▓▓ told me that he would take care of all of it
2  because he know what those database or datasets are, and he
3  was the one who pulled up the majority of that information.
4       Not until about 9 o'clock that Wednesday morning
5  when we gave me a preliminary draft copy of what he have
6  done so far, that's when -- you know, that's when I found
7  out that there was 26.5 million records in the BIRLS.
8       ▓▓▓▓▓ Was there ever any discussion of a
9  number 20,000, 20,000 records associated with the BIRLS?
10      MR. TRAN: No.
11      ▓▓▓▓▓ That number is not familiar?
12      MR. TRAN: No.
13      ▓▓▓▓▓ Before May 17th, did you have any idea
14 on how many?
15      MR. TRAN: No. Because as I mentioned to you
16 before, I have -- I have never work with the BIRLS, and Mr.
17 ▓▓▓▓▓ is my expert. So I rely solely on him, and I said
18 to you before, ever since that I been to VA and heard of the
19 BIRLS, it depends on who you talk to. You get a different
20 number, anywhere from 20 million to 25 million to 30
21 million, but not until the Sunday night of the 21st that I
22 found out that the whole BIRLS record have 48 million

Page 28

1  records, and I found that out from the Under -- the Deputy
2  Under Secretary for Benefits himself, and that's when they
3  questioned me why does Mr. ▓▓▓▓▓ only have 26.5 million.
4       ▓▓▓▓▓ Yeah.
5       MR. TRAN: So that's when I said I have no idea.
6       ▓▓▓▓▓ Only.
7       ▓▓▓▓▓ But I think it's fair to say that -- I
8  think we talked about this before -- that when ▓▓▓▓ called,
9  you spoke to him initially on, and even ▓▓▓▓ I think we
10 had a discussion with ▓▓▓▓ that the word "BIRLS" just
11 conjures up this image that there's a boatload of records,
12 if you will.
13      MR. TRAN: Right. But we don't know what's in it.
14      ▓▓▓▓▓ But you don't know --
15      MR. TRAN: We know some specific that there are --
16 you know, some vet have SSN --
17      ▓▓▓▓▓ Yeah. Yeah.
18      MR. TRAN: -- and some vet have birthday because
19 we know the BIRLS is very spotty. That's all we know.
20      ▓▓▓▓▓ Right. So you don't recall -- and I
21 just want to make sure it's clear that there was never a
22 discussion about 20,000 records being possibly compromised.

Page 29

1  You don't remember that number --
2      MR. TRAN: No.
3      ███████ -- associated with any specific
4  database that he may have been accessed? Does that ring a
5  bell at all? Can you recall anybody talking about the --
6      MR. TRAN: Oh. The only 20,000 number that I know
7  was later on in the -- the 20,000 number that I know later
8  on in the week, but that have nothing to do with the BIRLS.
9  That is the sampling size of the National Survey for
10 veterans, I believe. That's the number of people that they
11 survey on our National Survey for Veterans. That is the
12 20,000. That is like a 20,000 and change. That's the total
13 number of people that the National Survey of Veteran survey
14 back in 2001.
15     ███████ nd that database was being discussed
16 apparently because wasn't that a part of the ███████
17 description of what he may have had on his external drive?
18     MR. TRAN: That's what -- that's what he listed
19 out.
20     ███████ Yeah.
21     MR. TRAN: That's what he listed out is one of the
22 database that he think may have been on his hard drive --

Page 30

1      ███████ ight.
2      MR. TRAN: -- because that is one of his major
3  responsibility is to be -- to work on the National Survey
4  for Veterans.
5      ███████ o -- so maybe -- I mean, whether or
6  not you were part of any discussion, but that could have
7  been something that someone else could have been discussing
8  in terms of what may have been compromised? Is that --
9      MR. TRAN: Well, he -- put it this way. I only
10 know about the NSV because I know roughly how many people we
11 survey, and that's the only thing that I could think of that
12 have 20-some-thousand, but you have to understand is the
13 NSV, there's -- it's like the BIRLS. There's a lot of
14 pieces that Mr. ███████ work with, like the frame and the
15 things like that. So, when you're talking about NSV, we
16 have no idea what the NSV that he might have had on there
17 because it could have been the survey result. It could have
18 been, you know, just basically his initial framework to do
19 the -- for the future survey.
20     ███████ Right.
21     MR. TRAN: That was -- that was unsure. It's not
22 until when we put the list together or when he put the list

Page 31

1  together and send it to me and said I did some -- you know,
2  I did some work on the NSV that I think might have been on
3  the hard drive, and that's when I saw his number that listed
4  out. That's when it dawned on me that, you know, that's
5  what he -- he have also lost.
6      ███████ So the 20,000 number would be the
7  whole -- the whole --
8      MR. TRAN: Right. And from his write-up that he
9  gave me and also from Susan Krumhaus told me later on, tha
10 of those 20-some-thousand, only about 6,000 of them
11 volunteered their SSN on the survey. Okay.
12     ███████ Let me -- let me change course a
13 little bit with regard to that survey and actually sort of
14 -- it's one of the questions I had.
15     We've heard some folks talk about -- ███████ and
16 actually Susan, I guess -- talking about using the reverse
17 -- what do you call it? Reverse directory. I guess, if I
18 understand this right, taking the phone number of the
19 anonymous veteran to set -- you know, answer it or respond
20 and so forth. Taking that phone number and trying to do a
21 reverse directory review to try to identify that veteran, to
22 do X, Y, and Z.

Page 32

1      MR. TRAN: Right.
2      ███████ And it occurred to me. Is there an
3  ethical issue there? I mean, the -- I'm just wondering.
4  Okay. The veteran is under the impression that -- that the
5  information that he or she is submitting is being submitted
6  anonymously, provides the phone number, and then we as an
7  agency are going back in, trying to identify for legitimate
8  purposes, but is that something that -- that is questionable
9  in terms of procedure and so forth as it relates to ethics?
10     And I'm not trying to raise a hornet here, but I'm
11 just trying to understand. To me, it hit me. Why would --
12 why would we do that? The veteran, if he wanted to give a
13 Social Security number or his name, here she would have done
14 it, you know.
15     MR. TRAN: Uh-huh. I don't know anything about
16 that reverse until after, and please let me know if you're
17 ready to stop the tape. I'll stop talking.
18     And actually I found -- I learned about that
19 whatever project, if you want to call it a project or -- or,
20 you know, whatever they call it, that task until after I met
21 to you and you asked me something about hobby.
22     ███████ Hobby. The fascination project.

Page 33

1  Yeah.
2      MR. TRAN: Right. Fascination. And I came back,
3  and I ran into Ms. Susan Krumhaus, and I said I -- I met
4  with the IG and the investigator, and they asked me about a
5  project that ▆▆▆▆ was working on named hobby or something
6  fast -- fantasy or something, and she said fascination. And
7  I said what the heck is that, and that's when she told me
8  about this for the first time.
9      To be honest with you, I have not thought much
10 about it because I don't know anything about it, but it does
11 not surprise me for somebody like a ▆▆▆▆ because he is such
12 a -- what do you call it? ▆▆▆▆ is the type that have a lot
13 of curiosity, that if you ask him to look into something, he
14 will search until the end of the earth to try to come up
15 with an answer for you, and even sometime, you know, if you
16 tell him that what you gave me is good enough, you know,
17 whenever he found some down time, you know, like between
18 projects, out of curiosity sometimes ▆▆▆▆ would still like
19 go back and peak into it and try to, you know, fine-tune and
20 tweak it.
21     ▆▆▆▆ Yeah.
22     MR. TRAN: I don't know enough about that project

Page 34

1  to tell you if that's ethical or unethical because I don't
2  know what they -- they reverse or what they match. So I
3  cannot comment on that because -- yes, if the veterans did
4  not give us their SSN, we have no right, in my opinion, to
5  go back and try to find the SSN of the veterans because,
6  yes, to me that if that's the case, we should have notified
7  the veterans that there is a potential that we could come up
8  with his or her Social Security number, but I'm not familiar
9  with what --
10     ▆▆▆▆ Right.
11     MR. TRAN: -- he was doing. So I cannot comment
12 what exactly they tried to find out.
13     ▆▆▆▆ Yeah. I mean, that's -- that's --
14 that's the part that's still a little puzzling on our part
15 as well.
16     MR. TRAN: Right. And -- and when you say hobby,
17 I thought it must have been some top secret program that he
18 was working on that I had never heard of.
19     ▆▆▆▆ Well, it's good to hear -- hear you at
20 least articulate the fact that -- that something of that
21 nature --
22     MR. TRAN: Right.

Page 35

1      ▆▆▆▆ I mean, if they were doing something,
2  that we need to be careful what we're doing there. That's
3  all.
4      MR. TRAN: Right. Oh. No, I totally agree with
5  you that if we have a survey and we ask the veterans for
6  their SSN and they tell us that for privacy they prefer not
7  to give us -- their SSN to us, I don't think it is
8  appropriate for us to go back and use other piece -- other
9  piece of information together --
10     ▆▆▆▆ Right.
11     MR. TRAN: -- that they have honestly -- at least,
12 you know, we have to take it that they gave us an honest
13 answer, that we piece all the pieces of information that we
14 have from them to trace back and find out their SSN.
15     ▆▆▆▆ See, that was a part of it. If I
16 understand this project, if I understand it properly, that
17 was a part of the deal is they were trying to trace back to
18 identify the veterans, so they can validate what the veteran
19 said, compare it to the information that was already on file
20 here in our various databases.
21     MR. TRAN: Okay.
22     ▆▆▆▆ Legitimate purpose to see because the

Page 36

1  projections and so forth are based on --
2      MR. TRAN: Right.
3      ▆▆▆▆ -- on what they're saying and so
4  forth, but it just struck me funny that we would be going in
5  the back way to get that information.
6      MR. TRAN: I think that if the veterans gave us
7  their SSN, I think it's legitimate since they offer us their
8  SSN. That mean they know that we can look up other things
9  in our internal system --
10     ▆▆▆▆ Right.
11     MR. TRAN: -- if they do use the -- I think then
12 it's -- to me, it's okay if we want to validate to make sure
13 their answer does not, you know, conflict with each other,
14 but if they did not give us SSN, okay -- and they all
15 supposed to know because I believe -- I was told at least by
16 Susan and other that we asked them if they would share their
17 SSN with us, and they can say yes or no.
18     Now, I wanted -- I wanted to say for the record
19 that if we did not -- if they decline to give us their SSN
20 and we come -- try to come up with it by using the survey
21 result, then I strongly believe that, you know, that's not
22 appropriate.

Page 37

1      ▓▓▓▓ And I'm just thinking out loud here.
2  I think that was part of it.
3      ▓▓▓▓ maybe you can help me out here.
4      I don't think they had the SSN on a lot of these.
5  That's why they were using the reverse --
6      MR. TRAN: They told me -- they told me -- well,
7  ▓▓▓▓ told me that there's only about 6,000 SSN. They only
8  have about 6,000 and change out of the 20,000 sample.
9      ▓▓▓▓ Yeah. Yeah.
10     ▓▓▓▓ And there was some issue with the
11 contractor.
12     ▓▓▓▓ Had it. We give it to them.
13     MR. TRAN: I heard that some story about they
14 forgot to include some language in the contract --
15     ▓▓▓▓ Right.
16     MR. TRAN: -- and the contractor didn't give out
17 --
18     ▓▓▓▓ So they weren't --
19     MR. TRAN: Yeah. But that's -- when you asked me
20 the 20,000 about the BIRLS, I didn't associate, but then it
21 flare up in my mind that maybe that's what he was talking
22 about --

Page 38

1      ▓▓▓▓ Right.
2      MR. TRAN: -- the 20,000.
3      ▓▓▓▓ But again, that was not a number you
4  would have been familiar with?
5      MR. TRAN: Not with the BIRLS. Not with the
6  BIRLS.
7      ▓▓▓▓ The 20,000 at any point between --
8      MR. TRAN: The 20,000, if you throw out the 20,000
9  to me, it would take me a long time to try to figure out
10 what it was because what -- what I do is I also manage -- my
11 office manage the website for -- for the Office of Policy
12 and Planning, and what they used to do is they used to give
13 me the National Survey of Veterans, you know, aggregated
14 result that the contractor put together to post out on the
15 web.
16     ▓▓▓▓ Right.
17     MR. TRAN: And I would have to think really hard
18 to remember that.
19     ▓▓▓▓ So just to be clear, when the memo
20 started getting drafted on May 5th and May 8th, there was no
21 discussion about 20,000 records?
22     MR. TRAN: No. I don't recall to see any specific

Page 39

1  number.
2      ▓▓▓▓ Yeah.
3      MR. TRAN: I did not remember seeing any, and I
4  have the original memo that ▓▓▓▓ drafted up and then
5  Mr. McLendon modified.
6      If I recall correctly, I don't remember any
7  numbers being tossed around in there --
8      ▓▓▓▓ Right.
9      MR. TRAN: -- because no one have -- have gone in
10 and asked Mr. Johnson to pull out the specific.
11     ▓▓▓▓ Right.
12     ▓▓▓▓ Is there a reason why, why no one did
13 that between, say, May 5th when you initially talked to Mr.
14 Johnson and the 15th or 16th when it came back down to come
15 up with this more detailed list? Why didn't anyone in the
16 interim in the Office of Policy think that it was important
17 to start getting that information collected?
18     MR. TRAN: ▓▓▓ I'll honestly answer that
19 question this way. We follow the prescribed procedure that
20 was put out by whoever, cyber security or the security
21 operations center, whoever put out that policy for us that
22 basically said when you have an incident, you immediately

Page 40

1  respond, report that incident to your ISO, and then your ISO
2  will then follow the prescribed process and go with the
3  process instead of, you know, you go out there and try to
4  figure out what you need to do.
5      And to be honest with you, Mr. McLendon and I,
6  after we notify ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ notify Mr. Duffy
7  and Mr. McLendon notify Mr. Duffy, we were basically go with
8  whatever, you know, the prescribed process is asking us to
9  do because I even remember Mr. McLendon said to me on the
10 side, this is one of those things where you don't want to
11 take it upon yourself and run out and tell everybody because
12 you could -- you know, you could get in trouble, and he even
13 said, "I have seen this kind of stuff happen on other things
14 before, when I'm not with VA, at DoD where people take it
15 upon themself not to follow the process and ended up like
16 they're the one who messes is up."
17     ▓▓▓▓ Uh-huh.
18     MR. TRAN: So we would basically report to ▓▓▓
19 and we told ▓▓▓▓▓ just tell us whatever we
20 need to do next, and -- and, you know, like I said, not
21 until the -- the Tuesday, the 16th or 15th, that's when we
22 got direction coming from above that, you know, need to put

Page 45

1  go back to the office. I said let's go talk to Dat about
2  the thing on Friday, but I know there probably are going to
3  be some more questions.
4       MR. TRAN: Sure.
5       ████ whenever we look over your
6  transcripts, we may have some additional information, but I
7  want to get it framed out.
8       MR. TRAN: Well, let me tell you this, why I think
9  this is important that you talk about this. Number one,
10 because you asked me all of these questions that, you know,
11 as somebody who -- who deal with statistic and data and, you
12 know, work in the Office of Policy, I thought, well, it is
13 something that I'm curious when you asked me about this
14 policy because, you know, I wanted to see what policy are
15 out there.
16      And the one thing that I -- I was very nervous
17 about was -- was when I sat there at the hearing and I see
18 that the Secretary is using this single-user remote access
19 guideline as something that Mr. ████ -- he didn't
20 mention him by name, of course -- or said the employee, you
21 know, have -- should have known that he violate this
22 guideline. That, to me, makes me nervous, not -- not just

Page 46

1  for the Secretary, but for the Department because I feel
2  like, wait a minute, we are not even 100-percent sure about
3  this. Why are we having the Secretary go out on a limb to
4  standing before Congress and say this is what -- this is
5  what the employee did? Because you know what going to
6  happen is when the cows come home and whatever, we find out,
7  and if it's indeed true that this document did not get
8  disseminated or posted or communicated to the employee, not
9  only since March the 10th, but if it did not get posted out
10 there until May the 22nd, I just feel that that is -- we are
11 basically -- put the Secretary in a bad spot because all it
12 take is for Congress to say, "Mr. Secretary, you don't even
13 know your own VA policy. You sat in front of us at hearing
14 and say the employee violate all of these things, and there
15 is no such thing."
16      ████ Yeah.
17      MR. TRAN: "You don't even know your own policy or
18 guidance or whatever in the Department, Mr. Secretary," and
19 I hear this on the news and I have heard this last year,
20 "You should resign," and I don't want to see the Secretary
21 put in that spot. I don't think that's fair, you know.
22 That's why I think I need to speak up, and I might get in

Page 47

1  trouble for speaking up, but I just think -- this is what I
2  told Mr. McLendon. If we don't have a policy in VA, we mess
3  up, let's be man and woman enough to stand up and say we did
4  not have a policy in place to prevent something like this
5  from happening, but we are going to learn from it, and we
6  are going to do something about it. But, you know, don't
7  try to say that we have something in place if we didn't. To
8  me, that's unethical, and that's why I decided to speak up.
9       ████ Okay.
10      MR. TRAN: Okay?
11      ████ Well, we appreciate that.
12      MR. TRAN: You're welcome.
13      [Whereupon, the statement of DAT TRAN concluded.]
              - - -