Page

Page 1

DEPARTMENT OF VETERANS AFFAIRS

OFFICE OF INSPECTOR GENERAL

WASHINGTON, D.C.

Administrative Investigation: Lost Data

CONDUCTED BY

████████████████████████

Office of Inspector General

SWORN TESTIMONY OF

████████ Information Technology Specialist

Wednesday, May 17, 2006

[TRANSCRIPT PREPARED FROM AN AUDIOTAPE RECORDING.]

MALLOY TRANSCRIPTION SERVICE

(202) 362-6622

1   while.
2       And how long have you been in this position?
3   A  I've been with VA in this position since February
4   of 2002.
5   Q  And could you explain to us who is in your
6   supervisory chain?
7   A  Certainly.  When I first came to this position, my
8   immediate supervisor was Susan Krumhaus, and her immediate
9   supervisor was Laura O'Shea.  Who was above that, I'm not
10  actually sure.  I think it might have been David Veland [ph]
11  at that time, who was the VA policy.
12      When Mr. McLendon came on, within about a year,
13  Laura O'Shea was assigned to other duties, and our nominal
14  second-tier supervisor became Michael Moore, but I -- I
15  still reported mainly to Susan Krumhaus, and then Michael
16  Moore was our supervisor of record for things like approving
17  leave and whatnot.
18      Since then, through what I would describe as an
19  accumulation of duties or alternative duties, I have taken a
20  lot of direction from Dat Tran, and, however, Mr. Moore is
21  still our -- is still my time and leave approver.  And I
22  still worked with Ms. Krumhaus, but because that project has

Page 2

1              PROCEEDINGS
2       ████████ This i███████ with the Office
3   of Inspector General, Office of Investigations.  I am here
4   wit████████, Office of Investigations, and ████████
5   Office of Audit.  Today is May 17th, and we are interviewing
6   ████████
7       Would you raise your right hand, please.  Do you
8   swear or affirm that the information you are about to
9   provide is the truth, the whole truth, and nothing but the
10  truth?
11      ████████ I do.
12  Whereupon,
13  ████████
14  was called as a witness and, after having been first duly
15  sworn, was examined and testified as follows:
16              EXAMINATION
17  ████████
18  Q  For the record, would you state your name and
19  title?
20  A  My name is ████████  My title is
21  Information Technology Specialist.
22  Q  We all have to think about that every once in a

Page

1   largely quelled and the other project that she's still
2   involved in has not really wrapped up, for the time being
3   I'd say most of what I do is for Dat Tran.
4       ████████ How do you spell his name?
5       THE WITNESS:  D-a-t is his first name, Dat, and
6   Tran, T-r-a-n, is his second.
7       ████████ How do you spell Susan's last name?
8       THE WITNESS:  K -- Krumhaus, K-r-u-m-h-a-u-s.
9
10  Q  Okay.  What we want to talk to you today about is
11  the depth of your computer and the data that was on it.
12  A  Uh-huh.
13  Q  And I know that you've probably talked to
14  everybody and their brother so far, but we need this for the
15  record.  So, if it's repeating a lot of things, please bear
16  with us.
17      Can you tell us what official VA data you have on
18  your personal computer?
19  A  Okay.  I -- I partition my answer into two pieces.
20  On my laptop, I don't believe I had any VA official data.
21  On my hard drive, I'm sure I had some VA data.  The reaso█
22  for the partition is that I had a desktop that was not

Page 5

1 stolen. This machine was so old that it was unappealing to
2 the thieves, but it -- it served well enough for surfing,
3 and so that was the machine that I and my children could use
4 if we wanted to access the Internet.
5      Because on occasion I would want to connect my
6 laptop to the Internet, I had purchased an external hard
7 drive so that, when I was connected to the Internet, my own
8 personal data and VA data would not be attached to the
9 machine at the same time.
10 Q  Okay.
11 A  But this wasn't a hundred-percent of the time, but
12 it was -- it was -- it was something I tried to follow
13 whenever I could.
14      I'll give you an example of an exception. The day
15 before the theft and even the morning of the theft, I was
16 working on an application for another position in VA. I had
17 my resume in a product called DataTech Quick and Easy for
18 the SF-171, but the 171 was not acceptable as a form of
19 application. So I thought, okay, I'm going to have to
20 recast this, I'll cut and paste, to the extent I can. So I
21 needed to have my -- my SF-171.
22      Now, on that occasion, I believe what I did was I

Page 6

1 copied the 171 to my laptop because I was going to be
2 connected for some time using OPM's online resume filter.
3 So I don't think I had the hard drive connected to the
4 machine for any substantial period of time on that occasion.
5 Nonetheless, I'm sure I did in the past.
6      So my perceived threat to theft with the data, I
7 was never concerned about contamination because I had CDs of
8 my own data. I had CDs on which I transported the data to
9 home of the VA data. So I was never concerned about actual
10 malicious alteration of the data.
11      What I was concerned about was somehow while I was
12 connected to the Internet, someone could get something into
13 my machine and hoover out my files. So that's what I was
14 basically engaged in when I had sort of a clean laptop and a
15 hard drive loaded with everything that I wanted to keep
16 apart from the Internet.
17      
18 Q  Well, I just wanted to -- so you didn't -- you
19 would connect to the Internet with that laptop sometimes,
20 but not when the external hard drive was connected to it?
21 A  That was -- that was my intention.
22 Q  Okay.

Page

1 A  I dare say on at least one occasion or more, I, in
2 fact, did, but I mean, that was -- that was my idea of sort
3 of keeping a clean separation.
4      Okay. Now, I could go on, but --
5
6 Q  Well, I --
7 A  -- did you want to redirect?
8 Q  Yeah. If you can tell us on what you then -- what
9 you had on your hard drive.
10 A  Okay. Yeah. On the hard drive -- of course, I
11 can't consult the hard drive now.
12 Q  Right.
13 A  So what I've tried to do is think about not only
14 the things I found on the CDs at home and on my memory stick
15 -- and incidentally, my memory stick was not stolen. My
16 write-up about the incident was misunderstood, and people --
17 people have continued to ask questions like, well, what was
18 on your memory stick, as though it had been stolen. It was
19 not stolen.
20      As far as I can tell, the CDs were of no interest
21 to the thieves either because a good many of the CDs were
22 nested in the same drawer next to the hard drive's

Page

1 container, which was a small red nylon bag.
2      When I first spoke to people here at the office
3 about this incident, I think I was still downstairs in the
4 kitchen or in the back yard while the officers were dusting
5 and doing their thing, and so it at least was a possibility
6 to me that my data had been taken, but, in fact, I found
7 many CDs and DVDs in the drawer, and on that basis, I don
8 feel that any of my CDs or DVDs were taken.
9      I have no proof because I had no inventory, but
10 that's my strong suspicion. I would bet on it.
11      So my sources for guessing as to what was on my
12 hard drive that belonged to VA when it was stolen consists
13 of my memory stick, the CDs in the drawer, and then just n
14 own inclinations and what I -- what I had been accumulatir
15 data on the hard drive for anyway.
16      So what -- what I believe very likely was on the
17 hard drive was a January 2006 extract of information from
18 the BIRLS data file. The BIRLS is a large file. It has
19 about 26 million records. What I was interested in was
20 Social Security number, three possible service numbers in
21 the data record, three possible entry on active-duty dates,
22 the three possible separation from active-duty dates, the

Page 5 - Page

ble blc
193

Page 9

1 birth date, the date of death, if any, and what I especially
2 wanted was the clean form of the veteran's first, middle,
3 and last names, and I'll come back to that at some other
4 point, but that was --
5    Q So, when you're saying it's an extract, it's all
6 the veterans' names that were on there, but only certain
7 pieces of information about them?
8    A Yeah. Those pieces that I just enumerated.
9    ▬▬▬▬▬▬▬
10    Q But for all 26 million records?
11    A Right.
12    Q The information was in BIRLS?
13    A Exactly. But BIRLS data system, of course,
14 contains many more items.
15    Q Right.
16    A But those were not of interest to me.
17    Q How did you get this extract? Did you do it
18 yourself?
19    A Well, yes. I had downloaded the data from the
20 mainframe at Austin.
21    We had a quarterly extract prepared under an
22 agreement between Susan Krumhaus and -- I can show it to

Page 10

1 you, but it was some years ago. But this was a quarterly
2 data extract that was prepared for us. It was in
3 fixed-field character format, which means that to pick data
4 out of that record, you needed to know where to go for it,
5 and I can't tell you exactly right now how long each of the
6 data records on the mainframe was, but we continued to get
7 these quarterly extracts. But we have increased the number
8 of fields in each extract. So things that we have asked for
9 that we did not used to get before include the service
10 numbers.
11    Anyway, this BIRLS file, I'm pretty sure was on my
12 machine because it represented the step forward for my
13 interests, which was to have the service numbers for the
14 first time. All previous BIRLS extracts lacked those, and
15 the reason why I wanted these service numbers was with those
16 service numbers, I could go after veterans who were in what
17 we refer to as the "mustard gas file," who didn't have SSNs,
18 but whose service numbers were written down. So it was a
19 combination of service number and the veteran's name in the
20 mustard gas file.
21    I had a basis for pulling data from the BIRLS file
22 which would contain the SSN, and the reason why I did that

1 was the -- my -- my office mate, Joe Salvatore who came from
2 VBA, is still sort of tagged with being a point man for
3 helping VBA with this process for dealing with not only the
4 mustard gas vets, but the SHAD vets -- that's the --
5 something like hazardous substances -- and more vets who --
6 whose participation in classified trials and tests are
7 becoming declassified over time. So, I mean, it's something
8 that's probably ongoing.
9    So the service numbers in this version of the
10 BIRLS enabled me to use a machine process to go after and
11 actually identify a bunch of vets and get their SSNs, and
12 then I gave that data to, I think, this guy named Dave
13 Abbott [ph] in VBA.
14    Q So this was a project you were working on?
15    A Yeah. That was a project I was working on.
16    Have I --
17    ▬▬▬▬▬▬▬
18    Q Okay. Well, in -- so, in addition to the -- the
19 extract of the BIRLS data, what other kinds of files did you
20 have on there?
21    A Oh, I had other files as well. With Ms. Krumhaus,
22 I worked on the National Survey of Veterans. That data was

Page 1

1 collected in 2001. The survey itself is often referred to
2 as the "NSV 2000" because that's sort of when it was
3 supposed to happen, but it was collected in 2001, and data
4 actually began to arrive at VA in 2002.
5    And I'm going to tell you a story now; a true
6 story, however. The NSV interview had grown to 45 minut
7 It's a telephone interview, and not only was this tedious
8 for everybody involved, but it was becoming more expensi
9 So VA and the contractor, Westat, consulted on ways to
10 shorten the interview, and one of the ways they hit upon w
11 for the respondents who had been selected from VA's
12 administrative sample frame, rather than through random
13 digit dialing, for those people who were known to be pulle
14 from the administrative frame, we wouldn't ask them their
15 Social Security number. We wouldn't even ask them for i
16 and we wouldn't ask their permission to use it.
17    Now, people who came from the RTD part were aske
18 if VA could have it. They were assured that if they
19 provided it, it wouldn't be to their detriment. They
20 wouldn't -- none of their benefits would be jeopardized.
21    Okay. So there we were with -- I think it was
22 maybe 7,000, or close to it, vets who had been drawn fron

ble b2c
194

Page 13

1  the administrative part of this sample or from the frame out
2  of 20,000, and we -- we could not get the Social Security
3  numbers from Westat. They said, "No. Our internal review
4  board has met on this. It would be unethical for us to give
5  you the Social Security numbers for those people because we
6  didn't ask them for their permission." So that was it.
7       However, in my opinion, these people, if we could
8  identify them, would have given us some interesting
9  information. For instance, throughout the survey, we asked
10 veterans about their relationship with VA, but I think in
11 terms that maybe it made good sense to people in VA, but
12 maybe not to the veterans themselves.
13      So, for instance, we would ask them about payments
14 they got from VA. we'd say, "Do you receive veterans
15 disability compensation payment?" We'd also ask, "Do you
16 receive veterans pension?" And it may be clear as day to
17 some vets what the difference is, but it wasn't clear to me
18 as a new employee, and, you know, I've got a command of the
19 English language. It didn't strike me that we necessarily
20 got good data without explanation, but, I mean, there's no
21 room for explanation on a 45-minute telephone interview.
22 You cannot do that.

Page 14

1       So that's not the only thing. We asked the
2  veterans if they had ever applied for service-connected
3  disability benefits, and if they had, then we asked them,
4  "Well, do you know what your total combined disability is?,"
5  and again, this is something that you can get for any vet
6  out of the C&P, but I don't know if a vet has any means of
7  actually knowing what his percentage is. Maybe he does;
8  maybe he doesn't. I'm not a vet. I wouldn't know. So that
9  was something else that I thought was interesting.
10      Q  What were you trying to do with this data?
11      A  Well, my goal was if we could figure out for the
12 7,000 people who they actually were, then we could compare
13 their responses on some of these intricate questions with
14 what we could tell from the admin files, or at least let me
15 -- let me be candid. That was my excuse. That -- that is
16 why I set off with this in mind.
17      Now, I will tell you honestly that this whole
18 process of trying to identify these veterans fascinated me,
19 and so I had a personal interest in this project as well. I
20 had invested time. I made more than one attempt, decided,
21 well, you know, maybe this part of what I was doing was a
22 little subjective. You know, if I was ever going to try to

1  explain this to anyone else, I can't even remember in a lot
2  of these cases why I made the decision that I did, like,
3  yeah, this vet's so and so and this one isn't. So I had a
4  lot of hacks at this.
5       Some, I could machine-match. Others, about the
6  best I could do was I -- every -- every respondent had a
7  telephone number. So I used reverse directory facilities on
8  AT&T's AnyWho, and I also had a piece of software called
9  SelectPhone, which is basically a database, and you can get
10 them, say, for old years very cheaply on the Internet from
11 places like eBay. So I had gotten one for 2001, which was
12 the right time period.
13      So what I would do is for people I hadn't been
14 able to line up automatically, that is, some folks in our
15 admin frame, if they had used VHA health services, we had a
16 telephone number. So, if I had a respondent in the survey
17 whose telephone number was exactly the same, I said that's
18 it, and, you know, I'm not even going to bother to check
19 gender, not at this stage anyway. So then I moved on to try
20 to look up the people I couldn't match by means like that.
21      So, anyway -- so I did a lot of this work. I had
22 fragmentary files. I don't think they were all on my hard

Page

1  drive, but some of them undoubtedly were.
2       Q  I just want to compare that to what we got this
3  morning, if there's anything that -- okay. You talked about
4  the BIRLS extraction.
5       A  Well, I -- I wrote this stuff this morning myself.
6  So -- .
7       Q  Oh. Is that --
8       A  Yeah. So talked about BIRLS, talked about NSV, I
9  think --
10      Q  Yeah.
11      A  -- and BIRLS and C&P. Yeah. Okay. But there's
12 -- you know, Dat called me yesterday evening and said the
13 general counsel wants this information by noon tomorrow, and
14 then within a half an hour, he called and said, "Correction.
15 General counsel wants it by 9:00." So I didn't know,
16 really, what the scope of the data request was going to be
17 anyway, but I came in at my usual time which was 7:30, and I
18 began to work on this, and that's as far as I got.
19      I'm not saying that's all, and I told Dat and
20 Mike, "This isn't all, but it's all I've got for you right
21 now."
22      Q  Okay.

195

Page 17

1    A  So -- but since we're on NSV, it was the NS -- I'm
2    pretty sure the NSV file itself was on there, and I think
3    some of my fragmentary work files where I was trying to
4    establish ID for the participants from the -- for the 6- or
5    7,000 people who had used VA services, I was trying to
6    establish their IDs, and I think fragmentary work files for
7    those were on my hard drive.
8    ███████
9    Q  So this is the NSV file that has these 20,000
10   records?
11   A  Yeah.  That --
12   Q  This data, you had on all the 20, but you were
13   doing various little projects off of that, the files?
14   A  Yeah.  But, I mean, in those subfiles, I wouldn't
15   be toting around all 600-plus variables from the NSV.
16   Again, I was only interested identifying some.  I'd have --
17   I'd have their address.  I'd have -- or what address I could
18   get.
19   Q  Right.
20   A  Name.  And again, not everybody gave their name.
21   Q  Right.
22   A  The thing I had for everybody was a telephone

Page 18

1    number.  Yeah.
2        Now, the bad news on that one is as I made
3    matches, I had a -- what I did was I basically built
4    something that looked like an ASCII file, a text file, and I
5    -- I had a pair of brackets like this, and if I felt that
6    this guy whose information matched someone I was looking
7    for, then I would put the SSN inside those brackets because
8    then I could find that information later, just skimming the
9    whole file, reading, looking for brackets with numbers
10   between them.  So I'm sure I can find something like that to
11   show you, if you wish.
12       So some stuff has SSNs out there.  Otherwise, it's
13   basically names of people and where they live and telephone
14   numbers.  Yeah.
15   ███████
16   Q  Were all of these SAS files?
17   A  No.
18   Q  You were talking about the fragmentary?
19   A  No, they weren't.  For the stuff where I was doing
20   look-up, I used text because what I could do is I could
21   highlight the information I wanted to copy out of AnyWho or
22   SelectPhone and then paste it into a text file.  So that

Page 19

1    worked well for me, but I could convert that later to SAS by
2    reading it, if I wished, but I never really -- I won't say I
3    never, but it didn't often happen that I felt satisfied
4    enough with what I gathered.  So, you know --
5    ███████
6    Q  I just want to make sure I'm clear on that.  Some
7    of these fragmentary files would be used as text files?
8    A  Yes.  Definitely.
9    Q  All right.
10   A  And I -- I have an example at least to show you.
11   ███████
12   Q  And when was all this done?  I mean, is this
13   something that was just done in the past 2 or 3 months, or
14   has this been since way back in 2002?
15   A  You mean my fascination project?
16   Q  Well, putting the data on your -- bringing it home
17   and putting it on your hard drive.
18   A  Well, I didn't buy my own laptop and my own hard
19   drive until May of last year, May 2005.  So none of this
20   data sat on -- well, I won't say that, but the desktop that
21   I tell you -- that I told you that the thieves didn't want,
22   I had some of this fragmentary stuff, these text files where

Page 20

1    I was trying to match against AnyWho on that machine.
2        They're not on there now, and they haven't been
3    since I got my laptop.
4        So the laptop and the hard drive -- I know I
5    bought the laptop in May of 2005.  I go the hard drive
6    later.  I don't think I've got a receipt for it.  So I'm not
7    sure when that was, but I would think it would have been
8    within a few months.
9        Now, to give you an idea, though, about how long
10   I've been taking data home, it wasn't just when I got my
11   laptop.
12       In my office right now, I have a wonderful
13   workstation class machine.  I got that at the end of
14   December 2005.  It replaced a laptop that belonged to the
15   office that I had had since early -- sometime in 2004.
16       While I had that laptop, it was my practice at the
17   end of the day either to lock it in a cabinet there in my
18   cubicle or to take it home with me.  I couldn't just leave
19   it connected because it would walk.
20       So I did a lot of these things at home on my VA
21   computer between whenever I got that laptop in 2004 and when
22   I relinquished it, which would have been not the same date

Sworn Testimony of ~~~

1  that I got my workstation, but within one or -- maybe 2 or 3

2  weeks after that. I was given a grace period to get my

3  stuff off the laptop onto the workstation.

4        But even before I got the laptop, I would take

5  stuff home to work on, particularly this, trying to use

6  reverse directory to identify these people.

7    Q  How did you get the information? Did you put it

8  on a CD or use your flash drive?

9    A  Well, I only got the flash drive fairly recently.

10 I'm not sure when I first -- when I actually got my flash

11 drive. I, you know -- I know where I bought it. It was

12 over on K Street, but I can't remember exactly when. But it

13 was certainly after I got my own laptop at home because it

14 had no floppy disk drive. The only way you could transport

15 data in any reasonable sort of way, short of burning a CD

16 for -- for everything you wanted to do, was to use flash

17 memory. So I got it.

18        I would say I got my memory stick after I had

19 purchased my own laptop.

20        Before that, I could have used floppy disks or CDs

21 to get data home, or even DVDs.

22

1    Q  But these files are -- some of these files are

2  very large.

3    A  They are.

4    Q  Are you zipping them? I mean, how do they -- some

5  of these are so big, they would be hard to fit the --

6    A  They would. Well, the thing is -- for instance,

7  the January 2006 BIRLS extract that I told you about, I had

8  to transport that thing on a DVD, but it wasn't transported

9  as one zipped file because each -- the compression program

10 will only zip something that itself is smaller than 4 gigs

11 because, well, under -- under 32-bit computing, 4 gigs is

12 the max that you can address, and I think that's why. I'm

13 not really sure, but -- so what I did was I wrote out enough

14 of the file in two pieces that I could compress each piece,

15 and then those two pieces did fit on a DVD. So I took them

16 home that way, decompressed them, and then merged them.

17    Q  Okay. And then like that BIRLS file is -- the

18 extract that you had from that, you said you -- is it a

19 quarterly extract that this office receives? So you just

20 extract it from that quarterly extract?

21    A  Yeah. But I mean, I didn't keep doing it because

22 it's really pointless. You wouldn't expect the BIRLS to

1  change much --

2    Q  Right.

3    A  -- from one quarter to another.

4    Q  So January 1, it was something that was available

5  to you, to do that extract from something that was available

6  to you?

7    A  Oh, yes.

8    Q  Okay.

9    A  Yeah.

10   Q  And how did you -- how did you get this National

11 Survey of Veterans data?

12   A  Oh, that fits easily on a CD.

13   Q  Okay.

14   A  It's --

15   Q  Well, where did you get it from?

16   A  Oh. It's -- it's always been on my machine.

17   Q  Okay.

18   A  That -- that's been the --

19   Q  You got these records from the start?

20   A  Right.

21   Q  Okay.

22   A  Yeah. Or at least since data began to arrive, yes.

1    Q  Right. Data in the record.

2    A  Yeah.

3    Q  Now, what about the BIRLS and the C&P? Is that

4  something that you --

5    A  Oh, okay. One of the problems -- okay. To get

6  back to this fascination project, some of the people in the

7  NSV agreed to give their names. That would be informal

8  versions of their names like "Rick Adams" instead of

9  "Richard" or -- you know.

10   Q  Right.

11   A  Or "Jo" instead of "Josephine," whatever.

12        That was -- that was something that made it

13 difficult to match data. In other words, you'd have to use

14 eyesight and a little bit of interpretation to decide

15 whether or not there was a match.

16        But worse than that, even searching the 14,000 or

17 so possibilities from our admin records to see which one o

18 them might be closest to this person was a chore, and the

19 reason for that was -- well, let me back up and tell you wl

20 there were 14,000.

21        When Westat said, "We can't give you the SSNs for

22 these people because they didn't give their consent, becau

ble b
197

Sworn Testimony of ▮▮▮▮▮▮▮

Page 25

1  we didn't ask," we sort of said, "Well, gee, you know, it
2  would be really nice if we could get those SSNs. Do you see
3  any way to -- to, you know, ease your conscience in thinking
4  about this? You know, it would be really useful for survey
5  research." They finally said, "Well, okay. There's about
6  7,000 guys. Tell you what we'll do. We'll give you the
7  14,000 SSNs that we initially selected from the admin files
8  from which the 7,000 were actually contacted." So they gave
9  us two for one, and what I finally did was I said, "Okay.
10  That's way better than nothing because I'd much rather only
11  sift through 14,000 guys for a match than through 2.8
12  million guys for a match." So it was -- it was way easier,
13  but the problem was in the C&P file, name and address are
14  confounded into what's basically a mailing label.
15      So, in some cases, because of custody or
16  guardianship, you would have "Estrello Sanchez, spouse of
17  Rubin Sanchez," wherever, or you'd have "Frank Adams,
18  conservator for Richard Adams." You just never knew where
19  in the six possible lines of address to look for the
20  veteran's actual name, and you couldn't just sort of say,
21  well, let's see, you know, if it's -- if it's sort of a
22  guy's name or a girl's name or a common family name, I'll

Page 26

1  take it, because you couldn't be sure that you weren't
2  getting the spouse or the guardian or the conservator. So
3  it was really tough.
4      So what I basically had to do when I wanted to
5  find anyone whose name was something similar to "Joe
6  Shorter," I'd have to look for "Shorter" throughout the
7  whole stupid 14,000 names in a text file.
8      Now, "Shorter" might not be so bad, but if you had
9  "Harrison," say, then you're going to get all of the
10  Harrison Streets as hits. You're going to get Harrisonburg.
11  You're going to get, you know, everything like that. So
12  that was a real problem.
13      So the reason why I constructed this file where I
14  tried to get an honest to goodness plain name for each of
15  the guys in the C&P was if I did that, then I would be able
16  to put data into fields. I could say, okay, I'm not looking
17  for all Harrisons, including burgs and towns and so forth
18  and streets. I'm looking for Harrison in a particular field
19  for last name. So that was the idea. So that file should
20  have had the -- the size of the C&P for when I was trying to
21  match.
22      I'm not positive, but I think it would have been

Page 27

1  like December '01 because I think that's what we used for
2  our survey admin frame for the C&P side of things, and I
3  would have gotten the -- name information from the BIRLS
4  for those people.
5      Of course, it wouldn't have been right for female
6  vets who had remarried and changed their names, but that's a
7  very small percentage of the file compared to the males.
8      Q  And I just want to be real clear. You don't
9  believe you had the C&P Mini Master, the whole file?
10      A  Not there. Not there.
11      Now, I have had the C&P Mini Master on my office
12  machine lots of times.
13      Q  Right.
14      A  I don't think I took the entire C&P Mini home, but
15  I could have. I could have.
16      Q  Is there a possibility it was on the external hard
17  drive or on the laptop? Well, you said there was nothing on
18  the laptop.
19      A  Well, you know, every single file that I ever took
20  home on -- on CD, there's a possibility it's on the hard
21  drive. However, I don't think so, if only because I
22  wouldn't have a use for all of the diagnostic information,

Page 28

1  for example, or at least not in connection with the
2  fascination project, but I've had other -- other projects
3  where I've had to go after veterans who had the disability
4  code for PTSD, and the thing is, though, for things like
5  that, there would have been a specific year that was of
6  interest. So I can't say that for this December '01 that
7  I've had -- that I would have had the whole thing, but it's
8  a possibility. It's certainly a possibility.
9      ▮▮▮▮▮▮▮
10      Q  You said this isn't necessarily a complete list,
11  that this is just where you were?
12      A  That's as far as I got. Yeah.
13      Q  Can you -- have you updated it?
14      A  I have continued to work on it because I figured
15  the question would arise.
16      Q  Okay. I think we would like it when it's done.
17      ▮▮▮▮▮▮▮
18      Q  Yeah. It's ASAP.
19      But let me, before you move on, ▮▮▮ in my own
20  mind -- so the fact that you keep calling or referring to
21  the "fascination project," is that referring to the survey
22  of veterans or the mustard gas?

198

Page 29

1     A   It's referring to trying to identify who the

2 respondents were who fell into the survey from our admin

3 files in the NSV, and there were about 7,000 of those.

4     Q   Okay. And that's the reason why you had these --

5 these BIRLS files, these extracts?

6     A   In my mind, that's why I had them.

7     Q   Oh, okay. Okay.

8     A   Yeah.

9     Q   And then you had the survey, and then this mustard

10 gas spreadsheet, at least up to this date, you're still

11 trying to figure out, well -- and then the mustard gas

12 spreadsheet was a separate project?

13     A   Yeah. It was separate. Yeah. I mean, this --

14 this thing about identifying the vets, the NSV, goes back to

15 -- I'm sure into 2003, if not 2002. Whereas, the mustard

16 gas sort of came over with Joe Salvatore when he came to our

17 office, which I think was like November or so last year.

18 Maybe it was -- maybe it was before then. I -- I don't

19 know.

20     Q   Who is Joe Salvatore?

21     A   Joe Salvatore is my cubicle mate.

22     Q   Okay.

Page 30

1     A   He came from VBA.

2

3     Q   And why were you bringing this home? Do you have

4 -- did you work regularly at home?

5     A   The mustard gas, for instance?

6     Q   Well, any of this data. Why --

7     A   Well, the project that I keep calling the

8 "fascination project," that wasn't something that I could

9 really spend time on at the office. It was very manual. I

10 had to look up stuff on AnyWho. I was -- I was willing to

11 invest a little of my own time to see if I could get some

12 traction on this, but I couldn't really take that sort of

13 time at the office. I had things to do at the office.

14     Q   So this is a project you took upon yourself to --

15     A   That is correct.

16     Q   -- to do?

17     A   Yeah. Yes. And as a matter of fact, most of my

18 supervisors would not have been aware of that if -- but

19 perhaps tangentially.

20       I mean, I've talked with Susan, for example, about

21 this business with Westat. I mean, that's why we got the

22 14,000 SSNs out of them.

1     Q   Uh-huh.

2     A   Yeah.

3

4     Q   Except who? You said most of your supervisors

5 would not know about your -- about this project except who?

6     A   Susan.

7

8     Q   Krumhaus?

9     A   Yeah. But that's how we got the 14,000 SSNs out

10 of them.

11     Q   Is that -- is that generally true of every -- of

12 all of the data that you took home that they -- that these

13 were personally -- projects of personal interest to you that

14 you --

15     A   No. No, not at all.

16       The -- I've tried to -- to paint a picture for you

17 of being personally interested in identifying those NSV

18 vets.

19     Q   Uh-huh.

20     A   But the other stuff I took home, I took home

21 either related to that or to get some headway on stuff I was

22 struggling with at the office.

Page 3

1       For instance, the mustard gas guys, I found their

2 -- I found Joe Salvatore's initial file for the mustard gas

3 vets on my memory stick, but I know I did a lot of stuff an

4 turned over a lot of stuff to VBA on vets whom I thought I

5 found their SSNs.

6       I did that in two sections. The first section, I

7 didn't have the benefit of SSNs because I didn't yet know

8 that -- sorry. I did that without the benefit of being able

9 to check the veteran's service number easily, but the second

10 batch I turned over to VBA was after I had gotten my hands

11 on the -- the BIRLS, which included the service number, and

12 then I was able to get some real traction to do something

13 with that, but stuff like that, I worked on at the office

14 and I worked on at home. I just took my laptop with me.

15     Q   Do you have a telework agreement with that sort of

16 an arrangement?

17     A   No. I always come to the office. I don't work at

18 home. I don't work at home on a scheduled basis.

19     Q   Right.

20     A   Let's put it that way.

21     Q   Okay.

22     A   Yeah.

vol b
199

Page 33

1    Q  All right.  So, when you do work at home, would
2  you say evenings, weekends?
3    A  Oh, yeah.  Yeah.  That's the only time it could
4  be.
5        And don't get me wrong.  It's not like I don't
6  have anything better to do at all, but in my line of work,
7  if you tried one thing, you've tried another, and your
8  program still isn't working, that's immensely frustrating,
9  and so what you need is you need some test data and you need
10  some quiet time to just try things and try to figure out
11  where you are doing something wrong, and so I do that both
12  at the office and at home.
13              BY MR. JONES:
14    Q  Well, you said that most of your supervisors
15  weren't aware of what you were doing except possibly
16  Krumhaus.  Was Krumhaus or any of your supervisors aware
17  that you had this data, specifically had this data at home
18  on -- on your -- on your personal computer?
19    A  They weren't aware of that.  No.
20    Q  Was anybody aware of that?
21    A  I don't think anybody was aware of that, but when
22  I had my laptop, I had that same data in my house.  I took

Page 34

1  it to and fro my home on a -- whenever I wished.  I had that
2  laptop for 2 years.  I never had to consult with a soul, and
3  there was never any suggestion that some data was
4  appropriate for storage on my laptop or not.  So --
5    Q  There was never any discussions with anyone about
6  -- about data, securing data, bringing data, securing data,
7  proper -- proper ways of -- of handling data?  None of that
8  ever came up during the time period that --
9    A  Well, that's not true.  That's not true at all.
10    Q  Well, I am asking.
11    A  Okay.  We have an annual requirement to take a --
12  I don't know who sponsors it -- privacy and data security
13  online course, and I always do that.
14    Q  Uh-huh.
15    A  Now, let me tell you what I think those courses
16  tell a person who takes them.
17    Q  Uh-huh.
18    A  The privacy course tells you why -- it tells you
19  the names of all the laws that protect medical information.
20  It tells you about the grave consequences of release of
21  confidential information about other persons.  It basically
22  cautions you not to give this data to anyone outside the

Page 35

1  organization, and even within the organization, you should
2  really only entertain requests from your own supervisors, or
3  if they agree, then you can oblige someone else, but that's
4  -- that's how it goes.
5        As for physical security, I was told I needed to
6  lock my laptop in one of my cabinets if I left it at the
7  office, which I always did, or if I took it home, just to --
8  I mean, actually there was no -- no particular direction
9  given as to its physical security at home.  It's just that I
10  was well aware that if it became damaged, if I dropped it,
11  or if it was stolen, there would be a lot of disgruntlement,
12  but -- but what I'm trying to tell you is it was completely
13  apparent to me that I had the files I was working with on my
14  laptop.  It was completely apparent to me that when I took
15  my laptop home, those files traveled with me.  That didn't
16  -- that didn't bear any discussion with anyone.
17        I took that same laptop, my work laptop, to
18  California with me when I went on annual leave because, on
19  some occasions, there was a possibility that Susan, for
20  example, might need some data.  So I would take it, and in
21  fact, once I naively tried to get connectivity at a veterans
22  center in Oakland.  I called them up ahead of time, said who

Page 36

1  I was, said I can provide, you know -- I brought my ID with
2  me.
3        [Side B of Audiotape No. 1 of 2 begins.]
4        THE WITNESS:  (In progress) -- was just obliging.
5  He said, "Well, yeah.  It sounds okay to me.  Come on down,"
6  and, you know, so I did, and there was a workstation where
7  the person was going to be out for the day, and so I was
8  looking at their connections.  So I found the ethernet wire
9  that went into that workstation.  I said, okay, I'll just
10  put that into my laptop, and the guy who had let me in and
11  looked at my ID all brought a colleague of his in, and
12  this guy said, "Wait a second.  Wait a second.  Don't you
13  touch that."  I said, "Well, okay.  You know, I just asked,
14  and he said it was all right."  "No.  Don't you touch that."
15  I said, "All right.  Fine."
16        So, with that, I left the vets center in downtown
17  Oakland.  I walked over to the Twin Towers at the courthouse
18  in downtown Oakland, and I went up into the regional office,
19  and I sat around for a couple of hours talking to their IT
20  people, and I said, you know, "This is who I am.  You can
21  talk to my people back in D.C.  Remember the time
22  difference," and so they finally said, "Oh, you know, okay.

Sworn Testimony

1 Ms. Krumhaus says it's okay."

2      So, with all that, there was a -- well, actually

3 I'm getting off, way off the subject, but with all of that,

4 they finally said, "Okay. We believe you are who you are.

5 We believe you have a legitimate reason for connecting, but

6 let us take a look at your machine now." I said, "Okay.

7 This is my office machine. I'll fire it up for you. You

8 can look at it," typed in the password. He said, "Okay.

9 Let me check your virus -- anti-virus software. Oh, it's

10 not the right edition. You know, it's not the same as what

11 we run. Can't let you connect." I said, "Okay. Fine. You

12 can't let my machine connect. Can I use one of your

13 machines to talk with Ms. Krumhaus?," and so he said, "Okay.

14 You can try." I said, "Well, do you mind if I use that

15 vacant one there?"

16      So I got on. We powered it up. Every VA employee

17 not only has his log-on initials, but he's got a domain that

18 he belongs to. So I go to the dropdown box where you choose

19 your domain, and mine wasn't an option. So, I mean, that

20 was really bad.

21      So then I talked to the -- guy in charge out

22 there of IT, and he was a kindly guy. He said, "You know,

1 Wayne, I'm sorry it took so long. If you ever need to do

2 this again, what I'd really advise you to do is to get the

3 -- the one VA VPN, the virtual private network stuff." So I

4 did, and I've used that from California since for -- for

5 e-mail and whatnot.

6      So I've -- I've taken my machine home. I've taken

7 it to California. My office machine --

8 ▮▮▮▮▮▮▮▮▮▮▮▮▮

9      Q And who's -- who's aware that you took your laptop

10 home and that you took it on vacation with you?

11      A I never asked permission to take it home. I had a

12 carrying bag that was issued to me.

13      Q Right. But even without asking permission, it --

14 you should know or have a feel for who -- who saw you do it,

15 who was aware, whether they had specifically gave you

16 permission or not, who was aware you were doing that.

17      A Well, that would be hard to say. What I'll --

18 what I'll just say is why don't you ask. I -- I honestly

19 think you should just ask Mr. Tran and Ms. Krumhaus whether

20 they were aware of when I had my office laptop, whether I

21 took it home. I felt they were. That's -- that's what I am

22 saying.

1      Now, whether they were aware on every occasion

2 that I took it home, no, I never -- I never went by either

3 one of them to say, "See you. See you tomorrow, and, you

4 know, I'm taking it home tonight."

5      Q But you did it routinely --

6      A Frequently.

7      Q -- and as far as you know, they at least sometimes

8 saw you leave the building and enter the building with it or

9 --

10      A Well, they wouldn't have seen me enter or leave,

11 but I'm positive they were aware. They -- yes.

12 ▮▮▮▮▮▮▮▮▮▮▮

13      Q They were aware of you taking a laptop, but they

14 were not aware that you had put data on or had an external

15 drive and put it on your personal?

16      A No. They weren't aware of that.

17      Q Okay.

18      A No. No. And I never attempted to ask permission.

19 I didn't ask permission to do that.

20      Q Did you think that that was okay within the

21 parameters of best practices and VA directives?

22      A No, I didn't.

1      Q Okay.

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮

3      Q And so why did you do it?

4      A Well, when I took -- when, for -- when, for

5 instance, I got my workstation and I could no longer take m

6 office laptop home, yet I still took work home to work on,

7 had SAS installed on my personal laptop, which incidently

8 legal.

9      We had a home use waiver from the SAS Institute.

10 That's -- that's okay.

11      So, when I took work home, be it on CD or memory

12 stick, to work on my laptop, I felt I was not committing an

13 crime or even hazarding the data. I did not consider that

14 the data was at any sort of risk because I took pains not to

15 be connected to the Internet while I was doing any data wo

16 at home, but now, in the light of what's happened --

17      Q Right.

18      A -- I have to say that, you know, the physical

19 security was something I took for granted. I just didn't

20 envision someone actually burglaring -- burglarizing the

21 house.

22      I did keep my hard drive out of view because I

201061

Sworn Testimony

1  didn't want either my daughter or my son, who are both
2  computer savvy, to indulge any curiosity, and I didn't want
3  the cat-sitter who is there while we're away to indulge in
4  any curiosity.
5    Q   So where was it?
6    A   It was in a dresser drawer up in my bedroom.
7  Whereas, the laptop itself was on an old kitchen table down
8  in the family room which is sort of a subgrade.
9
10   Q   Is that where it was the day it was stolen?
11   A   Yeah.  Both items were where I just said.  The
12  laptop was sitting down in my family room, and the hard
13  drive was upstairs in the dresser drawer.
14
15   Q   And though you said you never asked permission to
16  take the data home, did anyone ever specifically tell you
17  that you shouldn't do that?
18   A   No.  And -- but I will also -- not to be
19  argumentative, but I will also say no one ever said you
20  shouldn't take your office laptop out of the office.  I'm
21  positive that my office people were aware of that.  They had
22  to know that I'd taken it to California when we went through

1  this big deal.
2    Q   Uh-huh.
3    A   They had to know when -- how would they know other
4  times?  They might not have had a way of knowing at other
5  times, but I certainly felt they were aware of that much, of
6  that much, but they -- they had no way to know if I put data
7  on my own machine.
8    Q   Well, why did they issue you a laptop as opposed
9  to a desktop?
10   A   Well, I think I may even be to blame for that.
11  Long before, we had a meeting in the auditorium, and one of
12  the topics of this office-wide meeting was what sort of
13  accommodations might have to be met, especially for clerical
14  people who might apply for working at home, and I remember
15  saying, "Well, the way that people who wanted to telework
16  were accommodated at the National Center for Health
17  Statistics was the IT people would get a laptop for the use
18  of that person, but basically if you went that route, you
19  were also sort of relinquishing your permanent claim to your
20  real estate in the office."  In other words, you couldn't
21  continue to say this is my office with a closable door and a
22  window to the outside and continue to work at home.  So it

1  was sort of one way or the other.  You had to choose.
2        The way they did it, a person needed to come in
3  every now and then at least to have face-to-face time, but
4  -- so I was surprised when subsequently the office did
5  acquire some laptops.  I was very pleased, of course.
6
7    Q   Speaking of not just your supervisors, but did any
8  -- any of your coworkers or family workers or anybody else
9  know that you had this data at home on your hard drive?
10   A   Mr. O'Neal [ph] has asked whether my family knew
11  or any of my family's friends.
12   Q   Right.
13   A   And I told Mr. O'Neal that I felt that probably my
14  wife and son and daughter knew because, you know, I bring
15  home my office computer.
16   Q   Right.
17   A   I told Mr. O'Neal that on one occasion when one of
18  my daughter Valerie's friends was over visiting, I had been
19  working on a piece of software that would pick up a name --
20  not a name -- would pick up a 10-digit telephone number from
21  a list of such in a text file, automatically go to a
22  neighboring window and initiate a search for that telephone

1  number in a telephone number database and do a reverse
2  directory search, and if a hit was found, it would then
3  highlight the name and address that were used, copy it, then
4  it would flick back to the window where it had come from and
5  write it or perhaps it even wrote it into a third file which
6  would be cleaner, and this, I had been working on it.  It
7  was beginning to click.
8        And I remember saying to Valerie and to Sarah, who
9  was visiting, "You got to see this.  This is amazing," you
10  know, because I was really proud of it, and I think I
11  probably told both Valerie and Sarah that this involved
12  searching for names and addresses for telephone numbers that
13  belonged to vets that I couldn't identify otherwise.
14   Q   Uh-huh.
15   A   But having said that, that was before I got my
16  laptop, and it was certainly before I got my hard drive.  So
17  I don't see a connection between that and the theft of my
18  laptop and my hard drive.
19   Q   Okay.  What about the -- and I'm not really
20  zeroing in on the theft, but did any of your coworkers know
21  that you -- did you discuss this with any of your coworkers
22  in terms of the data that you had on the external drive?

Sworn Testimony --

1    A   No.

2    Q   So this was all pretty much closed --

3    A   Yes.

4    Q   -- with yourself?

5    A   Yes, it was.  Yeah.

6        No.  I wasn't -- I wasn't trying to -- yeah.

7    Q   I'm just thinking.  Were there any file products

8    that were produced as a result of your work at home here, or

9    is it still a work in progress?

10   A   On -- on what I've referred to as my

11   "fascination," no, I never got to the -- I mean, I -- I came

12   up with lists of people whom I thought were adequately

13   matched, but then there were still a lot left to go, and I

14   was always trying to close the gap and get every last one of

15   them.  So I never went with what I had to the point of

16   actually then saying, "Oh, let's see whether they got it

17   right."

18   Q   And this so-called "fascination project" was not

19   something that was commissioned by the bosses?  This was

20   just something that you were just spearheading on your own

21   to see if there's something that you can make, you know,

22   cake out of milk and sugar or whatever?

1    A   That's -- that's pretty fair.  Yeah.  But if I had

2    gotten it to work, you can bet I would have dragged it in

3    and shown it off because it was something to be proud of.

4    Q   Okay.

5    A   For the other work, though, where I took stuff

6    home, I think they had to be aware that -- well, maybe they

7    didn't have to be aware, but, I mean, I knew that I debugged

8    programs at home.  You don't debug programs generally with

9    one or two concocted pieces of test data.  You can, but why

10   do that when you've got live data?

11       So I -- I felt it was recognized that I took my

12   computer home.  I also -- I also believed that it was

13   recognized that I worked at home at times when I was trying

14   to test things to make things work.

15   Q   Okay.

16   A   Yeah.

17

18   Q   Are we ready to move on to the day of the

19   burglary?

20   A   Oh, yeah.  Sure.

21   Q   Okay.  Can you tell us when it occurred and who

22   you initially notified and what happened from there?

1    A   Okay.  Of course, I don't know when it occurred.

2    Q   Okay.

3    Q   All right.  But that day --

4    Q   And this is --

5

6    Q   Is that -- but that's -- that's -- you -- you

7    don't -- you just know the day that you --

8    A   Discovered it.

9    Q   -- that you discovered it.  So it could have

10   occurred a day to --

11   A   No.  It happened that day.

12

13   Q   You were home in the morning.

14   A   I was home in the morning using the laptop.  Yeah.

15

16   Q   Okay.

17   A   Yeah.  I don't think I was using the hard drive

18   that day.

19

20   Q   And that was on Wednesday, May 3rd?

21   A   Exactly.  Yeah.  And my estimate, because I -- the

22   job I was applying for closed on Thursday, the day after.

1    So I was going to get this OPM version of my resume up to

2    date, and the big deal for me was, well, will this -- will

3    this transcript where I've typed everything in for my

4    bachelor's, my master's, and my Ph.D., will that suffice.  I

5    mean, it was pretty untidy, and there was no way I could

6    actually make it align.  I tried and tried.  Eventually, I

7    just started putting in spacing characters, and it still

8    looked crummy.  So that was one of the things I worked on

9        Eventually, though, I said, "Okay.  Enough."  I'll

10   ask them whether I can fax in a copy of the transcript, or

11   if they want to get really tedious, maybe what they'll

12   accept is a scanned image of the transcripts, which wasn't

13   much better, but I done all I could.  So I got out of there.

14   I think I finished with my stuff at about 10:00, and I think

15   I was out of the house at about 10:15.

16       I can check to find out what kind of leave time I

17   put in for that morning to infer when I actually got to the

18   office, but I'm guessing it was around 11:30 or so.  Okay

19   So I think I was out of the house at about 10:15.

20       Beverly got home, because we had driven separatel

21   that day.

22

Sworn Testimony of Wayne Johnson

1  Q  Is that your wife?

2  A  Yes.

3     She got home I thought at about 5:00, but she
4  might have gotten home a little bit sooner. She lugged
5  groceries into the kitchen and put things away, and when she
6  walked into the living room to go upstairs, we have a little
7  barrier at the foot of our stairs to the upstairs to keep
8  the cat from roaming. We're not sure whether we're going to
9  be allergic to her or not. She's sort of our foster cat.
10 She belonged to our son.

11     But when she got to the barrier, she noticed that,
12 you know, some of the drawers in the furniture were pulled
13 out. Well, we never leave the drawers out. So she
14 immediately began to wonder, and then one of the coin
15 containers from my son's room was a big old plastic pretzel
16 container. It was down in the living room. I think it was
17 either on one of the couches or on the floor, and she looked
18 at that, and then I think the last thing she said was that
19 there were some comic books in the living room.

20     Now, I don't know whether they were on the
21 furniture or on the floor. I didn't see them, but Valerie
22 had been a comic book collector, and so these must have come

1  from her room.

2     So she saw all of this. She said, "You know, I
3  didn't leave this. ████████ wouldn't leave this, this way.
4  Someone else has been here," and so she called the police.

5     I got to my car in the parking structure of
6  Wheaton, and I called Beverly at about 5:00 just to talk
7  about dinner. She said, ████████ I think someone's been in
8  the house," and I -- I don't know whether she said "I'm
9  going to call the police" or "I have called the police." I
10 said, "I'll be there in 10 minutes," and I was.

11     Shortly after I got home, the first of the
12 policemen arrived. I think that -- well, I'm not sure which
13 one it was. It could have been Officer Cruz [ph] or it
14 could have been Krell [ph]. I'm not sure which. I think it
15 was Cruz. And -- but in that brief time, she had led me
16 downstairs because she had already done some looking. My
17 laptop was gone. We went upstairs, and her jewelry had been
18 scattered on her bed, basically beads and necklaces, and the
19 drawers had been taken out, particularly from the dresser
20 where the drive had been kept because it was a smaller
21 dresser. It didn't really match the furniture in our room,
22 but that's where I would put things like old tax forms,

1  stuff I didn't want to deal with now, but maybe would sort
2  through later, my hard drive, my CDs, anything that I just
3  didn't want people looking through if they were feeding the
4  cat or visiting us in the house.

5     So those drawers were out and basically on the
6  floor, and I saw the red bag where I kept my hard drive, and
7  I looked in and the drive wasn't there. The transformer
8  was. The electric chord that goes into the transformer was
9  there, and the data chord between the -- the drive and the
10 computer was there. So they just elected to take the hard
11 drive itself and none of the paraphernalia that would really
12 help it work. I -- I don't understand that.

13     In the same drawer, there were the CDs. When I
14 looked at them initially -- when I looked at the drawer
15 initially, I couldn't tell whether anything had been taken
16 or not. I was afraid it had been taken. I was afraid some
17 of the CDs had been, but in retrospect, I don't think any of
18 them were.

19     There was a plastic bag that had a Sony digital
20 camera in it, like maybe 3 megs. The whole thing, you know
21 batteries, charger, it was all there. So, I mean, there was
22 a camera sitting right next to this piece of computer

1  equipment. The thieves didn't want it.

2     They -- we're positive that they had gotten into
3  what used to be the nursery upstairs in our house. It's
4  also become a place where we put our suitcases. We've go
5  furniture that's partially filled in there. There's a lot
6  of storage, bookcases. We have grandfather's desk covered
7  with check stubs, Beverly's sewing machine. There's a lot
8  of stuff in there. We don't really know for sure what all
9  they might have checked.

10    I found my father's Lica camera on the floor. I
11 found my Nikon, something 70, film camera on grandfath
12 desk untouched. So what I'm saying is the thieves' choice
13 of things to take was peculiar. I would have thought that
14 the cameras were valuable.

15    Q  Maybe what a Lica was --

16    A  Yeah. Or -- or even useful. I mean, you know,
17 maybe -- I don't know whether thieves take it for themsel
18 or just to sell, but what they did take, which we could
19 understand, was our coin drawers, collections, just all our
20 spare change, but we don't think they could have gotten a
21 whole lot that way.

22    So I've been very puzzled by this. I don't really

204

1 understand what type of person got into the home. The

2 police have suggested when I've spoken with them about this

3 that they thought it was juveniles. I don't really know.

4 ▓▓▓▓▓▓▓▓

5    Q  Who did you notify from VA?

6    A  That evening, actually while the police were

7 there, I called -- well, let me show you. I -- I pulled a

8 card out of my pocket. This card has people's names on it

9 to call in the event of whatever, like if I'm going to be

10 sick or not going to be able to get to the office.

11    Okay, there is Ms. Howerton. There is Mr. Tran.

12 There is Ms. Krumhaus. There is Mike Moore, Mike McLendon,

13 Henry Kaplan, and Christy Fick who is our AO, and I began

14 going down this list, and I just really wasn't able to find

15 anybody there.

16    Now, I got Ms. Kelley eventually. I'm not really

17 sure how I did that. I think maybe it was when I called Ms.

18 Howerton's number because she works up front too, and I -- I

19 said, "Ms. Kelley, may I please speak with Mr. McLendon?"

20 She said, "Well, I'm the only one left here now." So I said

21 okay.

22    Q  She is his secretary; is that right?

1    A  Ms. Kelley, Jean Kelley, is the chief secretary up

2 front. Yeah.

3    When we actually have an assistant secretary for

4 Policy, Planning and Preparedness, she'll sort of be --

5    Q  Uh-huh.

6    A  -- his secretary, but yeah, she's in charge, and

7 so she said, "But, you know, you can -- you can get in touch

8 with Mike. I can -- I can send it" -- I think she said

9 "I'll send him a text message to call you." So she said,

10 "What's your number?" I gave her my number, and a while

11 later, the phone rang in the kitchen. I picked it up, and I

12 said "hello," and somebody said is this so and so. It

13 wasn't me they were asking for. I said, "No. I think

14 you've got the wrong number." I hung it up.

15    About 10 minutes later, the phone rings again, and

16 it's Mike. He says, "▓▓▓▓, this is Mike McLendon." "Oh.

17 Hi, Mike." He said, "Yeah. You know, I called you before,

18 but I just had your number. I didn't know who I was

19 supposed to talk to."

20    So, anyway, I told him. I said, "Mr. McLendon, my

21 -- my house was burglarized today, and my laptop and hard

22 drive were stolen, but the worst thing is there were VA

1 files I'm sure on my hard drive," and so we talked about

2 that.

3    Then I tried to get in touch with Dat Tran. I

4 already knew that there was no one left at the office. So I

5 got out the Virginia directory, and there were two "Dat

6 Trans." I left a message on each one's answering machine,

7 basically, you know, "If this is the Dat Tran who works at

8 VA, please call ▓▓▓▓▓▓ and eventually Dat called

9 me, and I also explained to him, and he asked some questions

10 about the type of data and what format it was written in and

11 that sort of thing, and then I think it was during that

12 conversation that Dat said, "Well, look, ▓▓▓▓ don't come

13 in Thursday. You know, take care of what you've got to do

14 because we had" -- for all I knew, we had a broken window,

15 in fact, and I was going to have to at least secure that to

16 keep out bugs and critters.

17    As it turned out, in fact, they hadn't even broken

18 a window. We had a -- we had a -- an aluminum-framed window

19 with one pane that can slide sideways, and if you have a

20 shower stall in your home with a door that slides sideways,

21 you may know that if you need to clean it that all you had

22 to do is lift it up in its track so that it's up there, then

1 pull it out like this, and it will clear the bottom, and

2 then you can just carry it to wherever you want to wipe it

3 off and wash it. That's exactly what they did with our

4 window pane. Somehow they got the thing up and out. The

5 laid it just as gently and nice as you please against the

6 inside door which had a -- our side door in our utility room

7 had a -- what do you call it? -- a dead bolt.

8    Now, the key was hanging on a hook just beside the

9 door, out of sight for anyone outside, but they didn't take

10 that. So we haven't changed that lock, as a matter of fact.

11    So they got in by making a small incision in the

12 bug screen, not even all the way up, and they -- I don't

13 know how they got the window open. I believe it was

14 latched, and I'm pretty sure we had a dowel in the lower

15 track. So it shouldn't have been real easy, but if they got

16 it unlatched somehow or if they somehow managed to lift i

17 up, that's how they got in.

18 ▓▓▓▓▓▓▓▓

19    Q  So Tran called you back. Did you make any further

20 notifications?

21    A  Yes, I did, but that notification was before Mr.

22 McLendon or Dat had spoken with me. I said -- I think I

Sworn Testimony

1  explained part of why I was concerned to Ms. Kelley, and she
2  said, "Well, I'll give you Mr. Doyle's telephone number."
3  This is a guy named Kevin Doyle.
4      Q  You -- excuse me.  You -- you called Ms. -- Ms.
5  Kelley back?
6      A  No, no, no.
7                    ▇▇▇ original call.
8  .
9      Q  The original call.
10     A  Yeah, the original call.
11     Q  Okay.
12     A  And so I got -- I think I got Kevin Doyle's number
13  during that, and I called him, and it wasn't a long talk.
14  He -- I think he just said, "Well, you know, I hear you,
15  and, you know, we'll deal with it."
16     Q  But what did you tell him specifically?
17     A  I think I told him that my house had been
18  burglarized and that I had VA data that I feared had been
19  stolen.
20     Q  You think you said that, that he -- that you had
21  VA data?
22     A  I think so.

1      Q  Okay.
2      A  Yeah.  I mean, I can't see why I'd talk to him
3  otherwise.  I certainly wouldn't just report the theft of my
4  private property to him.
5      ▇▇▇▇▇▇
6      Q  Do you think that you talked to him about the type
7  of data and the quantity of the data that was on there?
8      A  No.  And I don't think it came up.
9      Q  Just -- just that there was VA data on that?
10     A  I think what Mr. Doyle basically said was, "Well,
11  you know, you need to talk with your information security
12  officer," and that did happen, but not that evening.  Mark
13  wasn't around either, Mark Whitney.
14     ▇▇▇▇▇▇
15     Q  So Doyle, you speak to that night, though, that
16  evening?
17     A  Yes.
18     Q  Yeah.
19     A  Yeah.  And that would have been shortly after 5:00
20  and probably before 6:00.
21     ▇▇▇▇▇
22     Q  And he's with VA security office?

1      A  He's part of the preparedness folk, which also
2  comes under our general office, 008, Policy, Planning and
3  Preparedness.  Yeah.
4      Q  And was that the only time you talked to him?
5      A  That's the only time I talked to him.  I didn't
6  come in on Thursday.
7      Q  Right.
8      A  And then when I came in on Friday, Dat said, you
9  know, "Mark is going to want some information from you."  So
10  Mark and I talked in a private room, and he asked me to
11  describe what had been taken and what VA data had been put
12  in jeopardy.
13  ▇▇▇▇▇▇▇▇
14     Q  Where was that?  Or Mark Whitney?
15     A  Yeah.  W-h-i-t-n-e-y.
16     Q  That was Friday?
17     A  Yeah.  That would have been the 5th.
18     Q  And was that a meeting or just a discussion with
19  him?
20     A  Well, Mark asked me to speak with him, and we went
21  into an unused office near where I sit.  Yeah.
22  ▇▇▇▇▇▇▇

1      Q  Basically, you gave him some idea of the data you
2  thought might have been compromised?
3      A  Right.  And then he asked me to write it up
4  because he knew he was going to have to forward that
5  information as soon as possible, that day.
6      Q  Did you tell him what you had?
7      A  Oh, yeah.  Of course, I did.  In fact, I assumed
8  that you've seen all of this stuff, but maybe that isn't
9  true.
10  ▇▇▇▇▇▇
11     Q  Bits and pieces, but we just want to make -- be
12  comprehensive here about that.
13     A  Sure.  Okay.
14     Q  So you spoke to Doyle that night.  Anybody else
15  from the VA that evening?
16     A  No.
17     Q  The Wednesday?
18     A  No.
19         And after I had spoken with Mike and with Dat, I
20  felt that covered it.  I mean --
21     Q  Okay.
22     A  -- they'd tell me who to speak to subsequently.

1    Q  You didn't speak to anyone on Thursday then.  You

2  had Thursday off?

3    A  I stayed at home.

4    Q  Right.

5    A  I was at home.

6    Q  Right.

7    A  Anybody wanted to reach me, there I was.

8    Q  That's fine.

9    A  Yeah.

10    Q  And then Friday, Mark Whitney in the morning?

11    A  Yes.

12    Q  And -- and he asked you to write some things up --

13    A  Which I did.

14    Q  -- which you did, and then anybody else?

15    A  I don't think so.  Let me think about this.  I'm

16  trying to think when I first spoke with Mr. O'Neal and Ms.

17  King.  I think that was this week.  They are from the Office

18  of the IG.  I think that was this week.  I could -- I could

19  probably tell you definitely if I looked at some of my

20  e-mails.

21    Q  Well, we can get that.

22    A  Yeah.

1    Q  Other than those folks, anybody in your chain of

2  command?

3    A  Well, I've spoken with Dat and Mike about it

4  since.  I know I wrote up a description initially for Mark,

5  and that was much misunderstood because, in that

6  description, I said my sources for reconstructing what may

7  have been on the drive included CDs and my memory stick, and

8  ever since, people have asked, "Well, you know, what was on

9  the memory stick that was stolen?," more or less.  Well, it

10  wasn't, and neither, I think, were the CDs.

11    Nonetheless, when I refer to CDs and memory stick,

12  I am talking about what I had after the burglary, and

13  incidently, I've given the CDs to Mr. Duffy this afternoon

14  at his request, and he also asked for my memory stick, which

15  I haven't yet given to him --

16    Q  Okay.

17    A  -- but he's going to get it.

18    Q  How did Mr. -- do you know how Mr. Duffy got

19  notified?

20    A  I don't know -- I --

21    Q  Do you have personal knowledge?

22    A  No.  I don't know how or when Mr. Duffy was

1  informed about this.

2    I did see Mr. Duffy today.  He dropped by.  He

3  wanted to ask me himself -- what did he ask?  Well, I think

4  he just had a fairly harrowing set of discussions.

5    ████████

6    Q  Are you familiar with someone named Keith Frost?

7    A  No.  I don't think I've ever heard of him.

8    ████████ Okay.

9    ████████ Well, I had a couple of thoughts here,

10  but go ahead, Judy.  ████ I'm sorry.

11

12    Q  Well, I was just going to follow up on -- you

13  know, you've already told us it was your practice to

14  disconnect the hard drive while you were on the Internet.

15  What other security measures did you have for the VA data

16  that was on your hard drive?

17    A  That was it.

18    Q  Was there a password?  Did you need a password?

19    A  No.  If you've got the hard drive, you've got

20  everything.

21    It wasn't that I slighted the VA.  I mean, my own

22  data was at the same risk.  I just thought it wasn't a risk.

1    ████████

2    Q  Did you -- let me look back.  Did you access the

3  VA network from home?

4    A  On occasion.

5    Q  Okay.

6    A  Yeah.  But particularly, usually before I would go

7  off to California, if I intended to take -- if I intended to

8  take my VA laptop with me or if I intended to take my own

9  laptop with me after I had gotten it, I would test my one V

10  VPN connectivity in a situation where I knew that I had

11  decent DSL connection to see whether that worked.  If that

12  didn't work, then I knew I was sunk and I needed -- I mea

13  I've been downstairs to talk with people about the one VA

14  VPN stuff on more than one occasion.

15    I also used one VA VPN on occasion to access the

16  Austin mainframe, not that I was FTP-ing stuff to that

17  machine, but just to check on job status to see whether sor

18  of the jobs I had submitted had executed or not, and -- and

19  if they had, then to browse the results to see whether I

20  needed to resubmit because a lot of these were very

21  time-consuming.  Go ahead.

22    Q  There's no -- I guess one thing I'm getting at --

*ble b7c
207*

Page 65

1  and I'm not really technically savvy, but on your laptop,
2  would there be anyone -- any way for whoever took your lap
3  -- or whoever has it now to get into any VA systems?
4     A  I don't think so.
5        Okay.  And I'm not that much more of an expert
6  than you are, but I have a little cheat sheet now that I
7  carry close -- close to my heart in my trouser pocket, and I
8  have my private passwords on one piece of paper, and I've
9  got my VA passwords on another, and what I can see for
10  logging onto VA is that you'd have to know my VA ID which
11  is, in my case, VACO███████ No one but a VA employee would
12  be able to figure that out even if they knew whom they'd
13  burgled, and I don't think it would reside on my laptop.  I
14  mean, it's possible there is a trace somewhere, but I doubt
15  it.
16        Then once you're in or once you're connected --
17  and you'd have to -- you'd have to do things in the right
18  sequence.  You'd have to have either a dial-up connection or
19  a DSL connection to the Internet.  Then you'd have to go in
20  and you'd have to fire up one VA VPN.
21     Q  Uh-huh.
22     A  After that, to get my stuff, you'd have to log in

1  but I had it written down on a piece of paper, locked in one
2  of my drawers here at the office, and actually, I should go
3  an expunge that too, but then I've got something for
4  ███████2@VA.GOV which I think was probably for the
5  dial-up access to the Internet from a VA laptop.  Then I've
6  got my everyday password for work here at the office, and
7  I've got yet another password for Zegato.
8        So what I mainly changed, to be honest with you,
9  because I thought they were the things that were in
10  jeopardy, were all of the things that I kept at home.
11     Q  Right.
12     A  I mean, I didn't keep any of my office passwords
13  at home.
14     Q  No.
15     A  What I kept at home were things like Amazon.  I
16  had something for the base station on my router for the
17  Internet in my home.  I had -- I had a Hotmail password.  I
18  had an Orbitz password, a T-Mobile password.  I had a
19  Verizon password and something for The Washington Post, you
20  know.
21     Q  Right.
22     A  So those were the things I changed.  I didn't

Page 66

1  as VACO███████ and you'd have to give a password, and
2  there's no way they're going to get that unless there is
3  some mysterious residue on my machine, but I don't think
4  that's the case because, if it were the case, we're all
5  screwed anyway because -- you know?
6     Q  Right.
7     A  So I -- I don't think that's a problem.
8     Q  Have you changed your password since this?
9     A  I did.  I didn't change my VA log-in that I use
10  here because I considered that secure anyway.
11     Q  So what one did you change?
12     A  What I did change when I got home was basically
13  all of my private ones, and I organized this stuff.  I mean,
14  I've got a separate password for Austin.  I've got a
15  password for EES.  I'm not really sure what that is.  I've
16  got a separate password for Employee Express.  I've got a
17  pass -- yet another password for ETA which is the time and
18  leave.  I've got another password for HRLINK$9293.
19     Q  Well, you don't have to tell us.
20     A  Okay.  Well, I mean, I -- you know --
21     Q  Right.
22     A  Okay.  Whatever that is, I -- I don't even use it,

1  think that my VA stuff was in jeopardy.
2     Q  Okay.  And I just want to be clear, and I'm not --
3     A  Yes.
4     Q  -- saying one way or the other --
5     A  Yes.
6     Q  -- but that the first password you enter when you
7  log onto your computer here at work in the morning, you
8  haven't changed that?
9     A  No, I haven't yet.
10    Q  Right.
11       ████████  Do you have some follow-up?
12       ████████  No.  I just want to make sure you
13  covered all of the protections and everything.
14       ████████
15    Q  We did talk.  You said there was -- there was no
16  password for the hard drive.
17       ████████
18    Q  Firewalls and all that, then that really wasn't
19  the -- wasn't the issue for going home.
20    A  Right.
21    Q  Okay.  Security measures, computer.
22    A  I have lots of -- I had lots and lots of firewall

Page 65 - Page

Page 69

1  protection for my home computers, but it wasn't always all
2  from the same vendor. Right now I've got something from
3  McAfee, which supposedly covers you from soup to nuts.
4  Q  Your level of access right now, level of access of
5  data, did we talk about that? I'm sorry. I must --
6  ████████ well, that one, I guess depended on the
7  system.
8  ████████ system, yeah.
9
10  Q  You had like BDN access?
11  ████████ Yes.
12  THE WITNESS: We were given -- Calvin Beeds [ph]
13  and I were given BDN access to -- so that we could use an
14  online system to make individual queries one at a time, and
15  that wasn't what we were asking for at all, so -- well,
16  wait. I think that was BDN, but what we were seeking, in
17  fact, was BIRLS data.
18      We've had a long deal on this BIRLS stuff. First,
19  we thought, okay, we'll ask for what we want fresh. We got
20  nowhere with that. So then I said, "You know, actually,
21  Dat, Susan has this recurring quarterly extract. Maybe what
22  we can do is we can modify that," and in fact, that's what

Page 70

1  we did.
2      We spoke to Susan and said, "Susan, we're not
3  going to change any of the stuff that you get presently, but
4  we'd like to add some things. How's that strike you?" She
5  said, "That's fine." So we went with that, and that was
6  approved, and we began to get that. So --
7  ████████
8  Q  So like that Mini Master, the C&P Mini Master, as
9  far as you know, you get the complete --
10  A  Oh. I have access, yeah. Let me explain to you
11  what sort of computer access I have that I'm aware of.
12      In fact, you can also check this with -- there is
13  an access administrator at AAC. I think it's called "ACRS."
14  It's like access control something system, access control
15  for resources.
16      Anyway, VHA has data files for medical research,
17  and, you know, economic policy research that basically are
18  protected by scrambling the SSN of the person's, and the
19  reason why they even have a scrambled SSN is in case you
20  want to match records from one type of file, like the
21  outpatient with records from the inpatient, or you want
22  compare records over time. So you could talk about the same

Page 7

1  guy from year to year. You need some sort of identifier.
2  So they have that.
3      Well, I know that as part of my access, I also
4  have access to the key, which tells you, okay, this
5  scrambled SSN corresponds to that real SSN. So the data
6  files themselves have been scrambled, but I also have access
7  to the key. All right.
8      The Mini Master access that I have is, as far as I
9  can tell, broadly available to the mainframe programmers in
10  my office. That is, if you have -- if you have -- use your
11  initials at AAC, then I think you probably have access to a
12  version of the C&P Mini that our office prepares for our
13  office use.
14      You can also, with my access, go right to the
15  version of the C&P that VHA puts out on a regular basis.
16  They also do that, so yeah.
17  ████████ Okay. Are we -- [audio break].
18  [Side A of Audiotape 2 of 2 begins.]
19  THE WITNESS: [in progress] -- don't know Mr.
20  Frost.
21  ████████
22  Q  And Mr. Doyle, you did speak to and provide him

Page

1  with information, and again, his response simply was "We'
2  work this out," or, again, what --
3  A  It -- all I seem to recall from it was that he
4  said, "You really should be talking to your ISO" --
5  Q  ISO.
6  A  Information security officer.
7  Q  Okay.
8  A  -- who would be Mark Whitney, and I did talk with
9  Mark when I came in on Friday.
10  Q  The next -- yeah.
11  A  And, you know, we -- we talked about what had been
12  taken, and I wrote it up for him.
13  Q  Right.
14  ████████
15  Q  Could you -- is there any way we could get a copy
16  of what you were writing Mr. Whitney?
17  A  Oh, absolutely.
18  ████████
19  Q  As a matter of fact, any written correspondence,
20  any e-mails that you have with regard to this whole entire
21  issue, would it be possible to --
22  A  Absolutely.

Page 73

1   Q  I mean, we may have copies of things that you --

2   you've provided, but to -- other folks, but just to make

3   sure we have your -- your information and, as I think Judy

4   said --

5   ▮▮▮▮▮▮  Particularly the rest of the --

6   THE WITNESS:  Okay.

7

8   Q  The update, yes.

9   ▮▮▮▮▮▮  Yeah.  And --

10  THE WITNESS:  Well, the first exhibit here is the

11  police report.  They didn't get it entirely right.

12  ▮▮▮▮▮▮  Did we get three copies?

13  THE WITNESS:  For instance, I think they put the

14  police station's on zip code here.

15  ▮▮▮▮▮▮

16  Q  That's okay.

17  A  Yeah.

18  Q  All right.  Okay.  We'll work it out.

19  A  But that's a start.  We got the -- my wife had to

20  drive over to the records department today to get a copy.

21  We may have gotten our first requested mail copy

22  today, in today's mail.  I just don't know, but we've

Page 74

1   decided we couldn't wait any longer.

2   Q  Okay.

3   ▮▮▮▮▮▮  I don't think I have anything else at

4   this point.

5   ▮▮▮▮▮▮  Just, I guess, make sure he knows who

6   to contact when he has that stuff.

7   ▮▮▮▮▮▮  Yeah.  Here's my business card when

8   you have -- when you have this completed, this memo

9   completed and --

10  ▮▮▮▮▮▮  And the other --

11  ▮▮▮▮▮▮  And the other documents.

12  ▮▮▮▮▮▮  I'm wondering.  Maybe tomorrow.  I'm

13  not sure we'll be back tomorrow.  If possible, if we could

14  get a demonstration on SAS and talk about that.

15  ▮▮▮▮▮▮  Yeah.

16  THE WITNESS:  Sure.

17

18  Q  Do you think you could do that, just show us how

19  SAS works?

20  A  Very easily.

21  Q  Yeah.

22  A  Yeah.

Page 7

1   ▮▮▮▮▮▮

2   Q  Is that a particularly difficult program to open?

3   We understand that a number of these files are in S-A-S.  A

4   S-A-S file, I guess is the way to --

5   A  Yeah.  Yeah.

6   Well, let me put it this way.  S-A -- SAS is -- I

7   call it "SAS."  It stands for Statistical Analysis System,

8   way, way back when.  Now it's just S-A-S.

9   It's not hard for me.  I don't think even if I

10  showed you where to click, you'd really know what to do.

11  think more than that, the real -- the real barrier here is

12  that SAS is a really expensive system.  I can't afford SAS

13  myself.  That's why when I came to the office, I really

14  pushed, so that we could have SAS for home use because we

15  had had it at the National Center for Health Statistics.

16  I -- it's very expensive, and it's -- it's not

17  something that you buy and then it's yours for -- for life.

18  It's leased, and it's an expensive lease.  So very few

19  people are going to have this, but that doesn't mean that

20  the data can't get into someone's hands who then takes it to

21  someone who has SAS.  That can happen.

22  ▮▮▮▮▮▮

Page

1   Q  Well, school me a little bit further before we

2   leave here.  The computer laptop was stolen that had no data

3   on it --

4   A  Right.

5   Q  -- but has SAS loaded.

6   A  It had SAS.

7   Q  An external drive was stolen that has data on it.

8   A  Right.

9   Q  Now, someone just with a little computer savvy,

10  could they hook that external drive up and use SAS?

11  A  Well, there's two -- there's two barriers.  One is

12  they've got to know my password.

13  Q  Okay.

14  A  Okay?

15  ▮▮▮▮▮▮

16  Q  To your laptop.

17  A  Yeah.

18  Q  At the Microsoft level.

19  A  Yes.

20  ▮▮▮▮▮▮

21  Q  Right.

22  A  Now, that's not an absolute barrier.  I'm sorry to

b6 b7C
2?c

## Page 77

1  say that on the day that I was doing my resume preparation,

2  I had to also pick a password for the OPM website.

3      Q  Uh-huh.

4      A  Guess which password I chose?

5      Q  The same one.

6      A  Yeah.  So -- but I wrote that password down on a

7  piece of paper.  It was amongst the litter of papers on this

8  kitchen table, down in the family room.  I was very

9  concerned that whoever took the laptop might have inferred

10  the password, but even though I suspect that the -- the

11  thieves looked through every drawer in the old teacher's

12  desk where my desktop sat to see what they could find, I

13  found all the papers pertaining to passwords.  They hadn't

14  been taken.

15          I changed as many passwords as I could in as short

16  amount of time as possible, just as a precaution, and, you

17  know, canceled my bank ATM cards and did credit checks to

18  see whether anybody had inferred things from their rummaging

19  in our house to start running up bills on our credit cards.

20  That was all clear.

21          So it's not absolute, but I think it's a good -- I

22  think it's a good bet that they were in too much of a hurry

## Page 78

1  to actually take note of all the junk that was on top of my

2  kitchen table.

3          Now, I felt that, you know, my life had been laid

4  open because there my work history, and there were all these

5  passwords in the desk next to the laptop -- sorry -- next to

6  the desktop.  So I think it's protected.  How good that

7  protection is, I don't know.  I honestly don't know.

8          I do know this.  At one point after I had acquired

9  the laptop, I had done something, and I had to call up

10  Hewlett-Packard say, "Look, you know, I registered this

11  product with you.  Now I've done something where I can't

12  even get on to the Internet.  That's why I'm calling you,"

13  and what it was, it was some kind of horrendous conflict

14  between Zone Labs firewall and something else that was on

15  the computer, and they said, "Okay.  What we'll do is we'll

16  help you step back to your initial configuration."

17          Now, if that happens, I don't know whether

18  stepping back to an initial configuration obliterates

19  anything that's been installed subsequently.  I strongly

20  suspect it doesn't, but I don't know.

21      Q  And finally for me, notwithstanding the fact that

22  you couldn't -- couldn't foresee that someone break in,

## Page 79

1  steal -- steal the physical equipment, you felt comfortable

2  taking this data home, and, I mean, you felt that you did

3  everything you could in terms of not having someone come in

4  while you're on the computer, using -- using the Internet,

5  using the external drive either by itself, and so you felt

6  comfortable that no one could dip in and take a look at

7  this, that you took the precautionary steps that you think

8  needed to be done to keep that from happening.  Is that --

9  is that what I'm understanding?

10      A  That's -- that's how I felt.

11      Q  Yeah.

12      A  In retrospect, if I had acquainted myself with

13  data encryption, then maybe I could have encrypted all of

14  the data on my hard drive or maybe just part of it, but that

15  wasn't anything I ever did at work.  So I had no familiarity

16  with that.

17          Yeah.  I wish I had done that.

18          I was comfortable.  Obviously, now I would not be.

19      Q  Uh-huh.

20      A  I'm going to put my neck out here a little bit.  I

21  think -- I think when you guys think about what I did, the

22  real -- I think the real question is did this guy who knew

## Page 80

1  what he was doing really have the right to take VA data and

2  put it on his personal equipment, and I'm willing to admit

3  that I think that was a step that was very questionable.

4  Certainly, it was a questionable step in terms of my

5  judgment.

6          I think it was also questionable in terms of

7  intent.  I mean, to some extent, I felt like this was my

8  data because I had invested in it.  I had worked with it.  I

9  had spent a lot of time and aggravation to acquire just

10  things like serial numbers, the service numbers --

11      Q  Right.

12      A  -- that we hadn't had previously.

13          So I freely admit that I felt there was a degree

14  of entitlement.  Nonetheless, until this happened, I thought

15  the data was safe.

16          Beyond that, I will also say it had crossed my

17  mind whether if I ever left VA or moved on to another job

18  whether I would relinquish all of the data, and that partly

19  had to do with the fascinating aspect of trying to tease out

20  from the horrible C&P six lines of address and names

21  confounded.  I was thinking, well, maybe there's some way

22  can keep that part and make this work some day.

211

Sworn Testimony

Page 81

1    Q  Uh-huh.

2    A  I hadn't resolved that, but, I mean, I was

3  definitely -- it had crossed my mind that maybe I'd hang on

4  to some form of it.

5    Q  Yeah.

6    A  But --

7      ███████████

8    Q  Are you aware of any particular policy that you

9  violated?  You have to --

10    A  Oh.  I'm sorry.  No.  No.  I'm not aware of --

11  sorry.  No.  Yeah.

12    Q  Okay.

13      ██████████

14    Q  The SAS, that's -- the VA had the license for that

15  SAS and --

16    A  Yes.

17    Q  All right.  Did they -- did anyone -- were they

18  aware it was on your personal PC?

19    A  Oh, definitely.

20      ███████████

21    Q  Your supervisors would have been aware that you

22  had SAS on your personal?

Page 82

1    A  You know, I don't see how they could not, but, I

2  mean, it's possible.

3      Let me put it this way.  I have a coworker in the

4  office, Cathy Tomczak, who works in the Office of the

5  Actuary, and she was designated, more or less, as the point

6  of contact for policy and planning's site license for use of

7  SAS.  There is no general VA site license, which probably

8  would be more advantageous.  Everybody has to fight for it

9  themselves.

10      So, when I came aboard, I said to Cathy, "You

11  know, at NCHS, employees were allowed to install SAS on

12  their home computers."  There was an addendum to the site

13  license agreement between the SAS Institute and the National

14  Center for Health Statistics that this was okay and it was

15  legal, and Cathy said, "Well, you know, we don't have any

16  such thing."  I said, "Well, nonetheless, it's possible."

17      And so, anyway, after some nagging and time

18  passage, it did happen.  We got such an addendum, or at

19  least I believe so.

20      I could not have installed SAS on my home computer

21  by myself.  I had to get the disks.  The disks were in Mark

22  Whitney's custody because Mark basically does software

1  installations for us.

2    Q  Uh-huh.

3    A  Now, Mark said, "Okay.  You can take these disks

4  home and install it."  Well, I will admit to you, I made

5  copies of those disks because I'd be a fool not to because,

6  A, what if my system crashes.  I have to reformat or, you

7  know, reinstall.

8      So, anyway, I have SAS on disks at home, and that,

9  as far as I'm concerned, also is legal.

10      Now, how the license stuff actually gets worked

11  out, I don't know.  The SAS we use appears not to have a

12  time bomb in it.  I think at the National Center for Health

13  Statistics, some products had time bombs, or at least they

14  did for a while.

15      I know that SUDAN, which was a program for

16  estimating standard errors, had a very definite lease

17  period, and it would start warning you when you were within

18  30 days of expiration.

19      This SAS doesn't seem to do that.  So it's

20  probably good forever, and that was another thing that I

21  sort of thought to myself, "Well, you know, what if I go to

22  another office?  Do I really need to tell anyone that you

Page 8

1  know, this copy is still living at home?"  And I hadn't made

2  up my mind about that.  I mean -- but it hasn't actually

3  come to pass yet.  Yeah.

4      But, I mean, I want you to understand you're

5  dealing with someone who is not entirely a sheep, but he's

6  also not entirely a wolf.  Okay?  So --

7    Q  That's fine.

8    A  All right.

9      ███████████  I'm good.

10      █████████████  think we're good, good for now,

11  then.

12      ██████████████

13    Q  Do you have anything else you want to say before I

14  turn the tape off?

15    A  Well, you mean in the way of apologies?

16    Q  Anything at all.

17    A  No -- well, yes.  I mean, to be honest, when I

18  realized that -- well, when I realized that we really had

19  been broken into and my laptop was gone, I really began to

20  get frightened.

21      So we went upstairs, and I looked to see whether

22  the hard drive was there, and it wasn't, and I felt really

b6  b7C
212

Page 85

1  sick. I mean, I was really frightened then, and I had to
2  think really hard about whether I should bring this up to VA
3  or not. I mean, it could be very serious.
4      I mean, it was already serious, but I didn't --
5  informing VA was going to make it unpredictably serious, but
6  still, I thought, well, if I don't inform VA and if this
7  stuff actually ever does get loose, then I'm really cooked.
8      So, to me, the decision to tell my boss was
9  something I knew I couldn't afford to put off. I had to
10  decide soon, and I -- I felt bad about it. I felt like, you
11  know, this -- this shouldn't have happened. The damage is
12  very serious. Just even the uncertainty about what's
13  happened to this data is very serious. So I thought, you
14  know, I'm going to get in trouble for this, but if I tell
15  them, I'm not going to get in as much trouble as if I don't
16  tell them because, if I don't tell them, then I'm going to
17  become part of this crime. So that's really -- that's
18  really why I decided to come clean on this. So --
19  ██████
20      Q  Well, my understanding of your telling the
21  timeline, I mean, you were calling here within 10 or 15
22  minutes of being home.

Page 86

1      A  Well, I told you I was frightened. I was very
2  frightened because I -- if I hadn't informed VA about this
3  at all and the data had gotten loose, then I could
4  definitely see prison, and at my age, you know -- well,
5  forget age. Who wants prison? So that was one thing. I
6  was very frightened, but then the next day, Thursday, when
7  Dat said, you know, "Stay at home. Take care of what you've
8  got to take care of," well, the window was already taken
9  care of. I -- I had thought, oh, maybe we'll have to get a
10  workman in because I'm not really good with my hands and
11  that sort of thing. That didn't turn out to be true.
12      So then I started checking credit things, and then
13  I was able to really obsess about what a thief who had taken
14  the time might have been able to see about my personal
15  affairs, but particularly just about my computer setup. So
16  I spent time changing the password to control my base
17  station for the -- it's like a local area network router in
18  my house. It connects to the DSL modem, but more than one
19  computer can connect via ethernet to this router. That has
20  a password. It's got a built in firewall. I changed the
21  password.
22      Then I changed my Verizon e-mail password, even

1  though I hardly ever use Verizon because that was written
2  down on a piece of paper in this desk.
3      Subsequently, I found out that because of that
4  minor change or what I felt was a minor change, I had locked
5  myself out of access to Verizon DSL also. They were
6  related. I didn't -- I didn't even suspect that.
7      I later corrected that, but to complete this job
8  application on Thursday morning, I had to go into my wife's
9  office with her, first thing. I -- I had to brush up one or
10  two items in the resume itself. I had to take an online job
11  experience questionnaire, and I also needed to fax my
12  transcripts to a telephone number. I did all of those three
13  things, and then I ran home as quick as I could because I
14  didn't want to leave the house unguarded, and that's when I
15  took care of all the -- the other credit-checking stuff.
16      So my fright had several levels. I was -- I was
17  worried about the legal liability because of what I had
18  done, taking the VA data. I was also worried about possible
19  financial ruin if someone got into our accounts, and I'm at
20  rest with that now. I don't think that happened.
21      And only after I dealt with all of that did I
22  realize that if this stuff really does get out into the

Page ▮

1  world, there's going to be 26 million people worried about
2  the same sort of stuff.
3      ▮▮▮▮▮  Okay. Well, I appreciate the --
4  [audio break].
5      [Whereupon, the sworn testimony of ▮▮▮▮▮▮▮▮▮▮▮
6  concluded.]
7          - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

b6 b7C
213

████████████ (OIG)

**From:**
**Sent:**          Wednesday, May 17, 2006 6:16 PM
**To:**            ████████████ (OIG); ████████ (OIG)

As you requested, I will have turned on my cell-phone.

OFC:   (202) 273-8972
CELL:  (301) 326-8484
HOME: (301) 460-8628

My office email address is ████████████████████ and my private email address is ████████████████

5/17/06 6:16 PM

1