Page 1

DEPARTMENT OF VETERANS AFFAIRS

OFFICE OF INSPECTOR GENERAL

WASHINGTON, D.C.

Administrative Investigation: Lost Data

CONDUCTED BY

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Office of Inspector General

SWORN TESTIMONY OF

▇▇▇▇▇▇▇▇▇▇
Information Technology Specialist

Thursday, May 18, 2006

[TRANSCRIPT PREPARED FROM AN AUDIOTAPE RECORDING.]

MALLOY TRANSCRIPTION SERVICE

(202) 362-6622

Page 2

1           PROCEEDINGS
2       ▇▇▇▇▇▇ sir, as we discussed before, it is
3   the policy of the Office of Inspector General to tape-record
4   all interviews, and for the record, if you would give your
5   full name.
6       ▇▇▇▇▇▇▇▇▇▇
7       ▇▇▇▇▇▇ Okay. And spell the last name.
8       ▇▇▇▇▇▇
9       ▇▇▇▇▇▇ Okay. And today is May 18th of
10  2006. It is now 1:20 p.m.
11      And, sir, if you would raise your right hand,
12  please. Do you swear or affirm to tell the truth, the whole
13  truth, and nothing but the truth?
14      ▇▇▇▇▇▇ Yes.
15      ▇▇▇▇▇▇ Okay. Thank you.
16  Whereupon,
17      ▇▇▇▇▇▇▇▇▇▇
18  was called as a witness and, after having been first duly
19  sworn, was examined and testified as follows:
20      ▇▇▇▇▇▇ Present in the room is als▇▇▇▇▇▇
21  ▇▇▇▇▇▇ assisting me. My name i▇▇▇▇▇▇
22

Page 3

1           EXAMINATION
2       BY ▇▇▇▇▇▇
3   Q   Could you for the record give your job title?
4   A   Information Technology Specialist.
5       BY ▇▇▇▇▇▇
6   Q   Grade level?
7   A   Thirteen.
8       BY ▇▇▇▇▇▇
9   Q   And when we had spoke to you before, you had
10  talked about wearing many hats for various different
11  responsibilities you have. Besides your official job title,
12  what are some of the other duties that are assigned to you?
13  A   I am the privacy officer. I am the security
14  officer, information security officer. I am the emergency
15  evacuation shelter in place. I work with the inventory.
16  Q   And going into the different duties and
17  responsibilities for each of these, as the privacy officer,
18  what are your duties and responsibilities there?
19  A   Oh, to coordinate the training of all employees,
20  to review statements of work to make sure that they have the
21  privacy initiatives and required training for contractors.
22      Privacy officer. I'm struggling with this because

Page 4

1   I wasn't prepared to go into this, but just generally,
2   that's basically where my focus is, to make sure that the
3   employees are trained, to review and to go over policies,
4   handling of data, those types of things; with division
5   chiefs, make sure their staff is aware of how and what
6   they're supposed to do.
7   Q   And did you receive any type of training to be a
8   privacy officer?
9   A   I take the annual required privacy officer
10  training.
11  Q   Is there any other required training, any outside
12  training, in-house, out, external training?
13  A   Not that's required, no.
14  Q   Is there any that you've taken?
15  A   Well, I haven't taken any extra because I haven't
16  gone through the CSCP, the privacy or the security officer
17  training that extends -- that professionalizes the position.
18  Q   Okay. Is there -- is there a requirement to
19  receive that training before you're officially a security
20  officer? It's just --
21  A   No. It's not a requirement. The CIO, a couple of
22  years ago, initiated a program to try and professionalize

Page 5

1  the information security officer position, but they did not
2  make any requirement other than the annual training.
3     Q  So you had -- is that an online training that you
4  take?
5     A  Yes, it is. Annual online training. Correct.
6     Q  Annual? And when was the last time you took that?
7     A  I've already completed the training for this year.
8  I've --
9     Q  Ball-park time frame?
10    A  The beginning of the year.
11    Q  And your duties as the ISO, information security
12 officer, what are the duties and responsibilities there?
13    A  To inform, to train similarly to the privacy
14 officer, to review and -- and communicate with staff on
15 procedures and policies of the agency on similar things of
16 data security, information security, desktop-type security
17 issues.
18    Q  What's the difference between the two?
19    A  Security deals more with protecting information in
20 the environment on the systems and protecting systems. The
21 privacy deals more with protecting the information within
22 the files.

Page 6

1     Q  What would be the process for -- for someone in an
2  instant to report a compromise of -- let's go into the fact
3  as an ISO, there is a compromise of the network. There is a
4  compromise of the computers. What would be the reporting
5  process for that?
6     A  The ISO, we have a reporting portal that we use
7  for reporting incidents -- I'm sorry. That's incorrect. We
8  had the portal for the privacy. The portal went down, and
9  I'm about to re-register for the new portal in Austin for
10 reporting privacy issues.
11       The security side is reported through the VA SOC,
12 and they give incident numbers.
13    Q  And is that something you do via e-mail, through
14 the Internet, you pick up the phone?
15    A  Via e-mail or the phone.
16    Q  Is there a point of contact?
17    A  Yes.
18    Q  Who would that be?
19    A  Let's see. For the privacy, I was using [redacted]
20 [redacted] d recently she informed me that someone else was
21 tasked with that, and I -- again, I forgot the name. I --
22 she e-mailed me back this morning.

Page 7

1     Q  But that's for the privacy.
2     A  But that's for the --
3     Q  But for the SOC, for the VA SOC who is --
4     A  For the VA SOC, I would normally contact [redacted]
5  [redacted] he ISO, the Central Office ISO, and I think
6  -- I believe she's recently been promoted to a regional --
7     Q  [redacted]
8     A  Exactly.
9     Q  And did you mention earlier that you were the
10 network administrator as well?
11    A  Yes. I am the NTOU organization unit
12 administrator.
13    Q  And what are the duties and responsibilities with
14 that position?
15    A  Okay. With that, I am responsible for controlling
16 access to the network. So it's more of a dual -- dual hat
17 with the security officer. I'm actually the one that makes
18 the request for e-mail boxes and different access to the
19 network. Once that's done, I sit with the individual. I
20 communicate the fact that they will have to take the privacy
21 and security training, and I kind of go over the
22 requirements of the training and what's involved, that they

Page 8

1  have to register. I talk about the different network
2  drives, and I also talk about the limited use clause at the
3  VA. You use the computer during your work time or break --
4  more break time, and it can't steal from the resources of
5  the agency, and if you meet those requirements, you can do
6  browsing on the Internet or use Government for personal use,
7  equipment for personal use.
8     Q  All right. So, in that capacity, you -- someone
9  has to request, and you process them for access to e-mail --
10    A  Correct.
11    Q  -- other databases or access?
12    A  Well, yes.
13    Q  Such as?
14    A  Depending on the area that you're in -- for
15 example, I also control security and law enforcement.
16 They're standing up a new organization with preparedness.
17       There was a time when the function of background
18 checks and getting your clearances were done. We have the
19 database in-house that has all the information of
20 everybody's SSN that gets a clearance.
21       If someone comes in and they're going to work in
22 that office, then at that point, I give them access to the

Page 9

1  network. We then have to look at whether they have
2  clearance enough to access the database to do the different
3  things. So it works kind of nice that I am the network
4  administrator because I'm right in there when different
5  accesses are requests.
6    Q  So, if someone needed access to the BIRLS system,
7  for example, is that something they would request through
8  you?
9    A  Normally, you would fill out an ACRS form. I've
10 given you an example of one. You fill out the ACRS request
11 form and --
12   Q  The ACRS time-sharing request form?
13   A  That is the one. Now, you would fill that out,
14 and there are different codes that go with it requesting
15 different areas.
16      Now, if you are requesting a sensitive area or
17 database, there are contact people to the specific database.
18 So, at that point, I would call Austin. I would ask them
19 the code or the contact point. They'd give me the point of
20 contact, and then we would address with the appropriate
21 document letter requesting access and then carry --
22 hand-carry it to that office. They'd either approve it or

Page 10

1  deny it. Usually, they would approve it if it's
2  work-related, and then I would then fax it to Austin after I
3  sign it as the security officer.
4    Q  And then something is -- who provides them a
5  password or --
6    A  That would be all done through us.
7    Q  Through us.
8    A  And they send in their package, their ID password
9  and rules of behavior. I do believe that's where they get
10 it.
11   Q  And do you keep -- and who keeps a copy of that
12 packet, the rules of behavior and --
13   A  That would be strictly for the user on the
14 mainframe. The mainframe is done in a different way than
15 most everything. The ID and password are mailed to the
16 user, so that they only have access to that, and that is
17 where all the information on that account and I believe the
18 information -- when I got my Austin account years ago, I had
19 the rules of behavior statement in there also.
20   Q  And you keep that? The employee keeps that in
21 their own file?
22   A  They're supposed to, yes.

Page 11

1    Q  And does anyone keep a copy of that?
2    A  I don't have access to the copy of that because
3  each account is specific to the user.
4    Q  And the reason I ask is, for an example, I know I
5  signed something for access --
6    A  Right.
7    Q  -- but it went -- it was sent forward, and I don't
8  have a copy of it for my files because whatever it is I
9  signed --
10   A  Right.
11   Q  -- I passed it on to whoever needed that form with
12 a signature.
13   A  Okay. I understand that.
14   Q  You're saying that with Austin, they send it back
15 to you, and you maintain it in your own personal file?
16   A  It goes along with -- I think it -- when I got
17 mine, it was stated that accepting this and logging onto the
18 system, something of this wording, you agree to abide by
19 this, and when I came in, it was like in '84. So it's
20 probably changed, the way they send the statement out.
21   Q  What type of accesses did ███████ have?
22   A  Actually, he had limited access. He had access to

Page 12

1  the survey through my ACRS form, the -- I believe that's the
2  survey of veterans, and the other cost accounting code --
3  not cost code, but the other code was for VHA patient data.
4    Q  And what -- what databases would these be through?
5  For access to survey of vets, is that --
6    A  Well, if you look at this letter that goes with
7  the request for the access, it describes the function, why
8  they need it.
9    Q  All right. What is a C&P file?
10   A  Comp and pension, comp and pension --
11 compensation.
12        ███████ Pension.
13        THE WITNESS: Pension. Thank you. I've got it in
14 there.
15
16   Q  All right. And then the second one, the second
17 code was for VHA patient data, and is that such as the VistA
18 files, the CPRS, the -- is it like medical records?
19   A  Yeah. It's actually the medical records, and they
20 were requesting access to the real SSNs with medical
21 records, so that they could do the merge with the -- with
22 the other files of the survey.

Sworn Testimony of

**Page 13**

1  Q  And is this separate and distinct from the BIRLS?
2  A  Yes.
3  Q  Did he ever request access to the BIRLS?
4  A  Not through me.
5  Q  Do you know --
6  A  I believe that the BIRLS file, they had access to
7  the BIRLS file when their service went to the benefits
8  office, the office of -- their business office, and I made
9  arrangements with the VBA business office to get the file.
10 So I was not involved in any of that.
11 Q  Who did you contact at VBA?
12 A  I was not involved in any of that.
13 Q  All right. So it was --
14 A  It was done by either Mr. McLendon or Dat Tran.
15 Q  So Mr. Dat Tran or Mr. McLendon?
16 A  Right, were negotiating that or Dat through Mr.
17 McLendon, but I was not involved in that negotiation.
18 Q  So somehow they spoke with VBA to obtain --
19 A  VBA's business office, right, and they obtained
20 access to the file.
21 Q  To the BIRLS?
22 A  Right.

**Page 14**

1  Q  Once someone has gained access, other than the
2  annual training, the cyber training and Privacy Act
3  training, is there any other training that goes along --
4  A  No.
5  Q  -- with the access?
6  What is the policy once someone has access with
7  what they can do with that information they have access to?
8  A  What is the policy with -- well, this office
9  basically does the analytical work. So it's an understood
10 thing that we're going to work with those files and do
11 projections or analytical work.
12 So I -- I'm taking your question to mean do we
13 have any overriding on how to handle --
14 Q  Is there any -- is there any office policy, local
15 policy, VA policy you're aware of that provides for these
16 individuals that have access to this information, they've
17 been approved to have access to --
18 A  Right. Right.
19 Q  -- protect it, how they must protect it and how
20 they can use?
21 A  Not other than their training, their privacy
22 training.

**Page 15**

1  Q  And are these individuals permitted to freely take
2  this information off of the system and put it on CDs or --
3  A  No -- well, freely --
4  Q  -- memory sticks and --
5  A  Memory sticks, I would say no.
6  We do discuss how the data is to be handled. We
7  have constant conversations with Mr. Tran and most of the
8  staff on security and privacy issues because we do deal with
9  files that are sensitive. So it's understood that the files
10 did not walk out the door.
11 Now, do we have anything that he has signed beyond
12 the training and the understood that we communicate, you
13 know, constantly? No.
14 Q  Do you have any training such as weekly or monthly
15 or biannually training because of in your position, where
16 the employees are gathered together, and you have updated
17 talks about securing the information and how to handle it?
18 A  No, we don't. We don't do that, only because I
19 work so closely with the staff whenever any kind of issue
20 comes up or the question, can I do this. I'm right there,
21 and they just walk right up and say, hey, can we do this, is
22 this allowed. No, it's not. We talk about storing

**Page 16**

1  information in safes and safeguarding it, that it can't be
2  put in, you know, a sliding desk drawer. Contractors can't
3  just walk out with it.
4  We have these conversations constantly because
5  we're constantly working with data that people are
6  requesting. So we do the analytical work with the
7  identified data with the identifiers, and we do let the
8  analytical work walk out the door, but we cannot let the
9  stated ones.
10 Q  Well, what about personal information on veterans
11 such as names, date of birth, Social Security numbers,
12 addresses?
13 A  Right.
14 Q  What type of instruction has been given to the
15 employees concerning the safeguarding of that information?
16 A  Well, one of the things that we had discussed in
17 the past that one of the employees was working on -- and the
18 employee that lost the data is the employee that was working
19 on it -- was doing an algorithm to scrub.     b6
20 Q  And who was this individual?
21 A  [redacted]                                      b7C
22 Q  [redacted]

Page 17

1  A  He was writing a program to scrub SSNs off the
2  data that they had gotten directly from VBA.
3  When we get access on the mainframe, there is an
4  area where when you go to the SSNs, they're scrambled. So
5  you have to run their program to unscramble them, and that's
6  how it's protected on the mainframe.
7  When they got the data from VBA direct, there was
8  no scrambling. It was just raw numbers, everything
9  unprotected.
10 So ▬▬▬ assignment was, once they started using
11 the data and saw what they had -- was to come up with an
12 algorithm that would scramble it, so that they could track
13 across many different records and all would be scrambled,
14 but they'd still be able to track one vet.
15 Q  Is there any requirement to encrypt Social
16 Security numbers? I read one of the policies in AIS policy
17 that talked about transferring of information, how there was
18 a requirement to encrypt or scramble Social Security
19 numbers.
20 A  I -- yes. You should scramble them to protect
21 them, and again, I say when they got the data from VBA, I
22 was not involved with any of that. It was an after-the-fact

Page 18

1  that I was notified that they had that.
2  Q  How did the information from VBA come to them?
3  Did it come in a CD? Did it --
4  A  Don't know.
5  Q  -- come in e-mail? Did it --
6  A  I couldn't tell you. I couldn't. I was not
7  involved in any shape, form, fashion.
8  Q  Is it accepted practice in the office for
9  employees to take VA work home and work on it at home?
10 A  VA work? I would say many take things home and
11 work on them. Most that do that telecommute and have VP in
12 accounts, secured connection.
13 But I'd say yeah, generally yes. People take
14 stuff home. It's a small office, and there's -- there is a
15 lot of time crunches for the tenth floor or whoever. So I
16 would say people do take work home, but as far as the data
17 people, they VP back in to access the mainframe and whatever
18 is back here that they need to get and pretty staunch about
19 that.
20 Q  Is there any limitations on what type of work they
21 can take home? Would someone be free to take home data that
22 contained personal information such as name, dates of birth,

Page 19

1  and Social Security numbers?
2  A  No. That -- that is not supposed to happen. That
3  is the point of VP getting back in because you can access
4  the information off the mainframe, off -- wherever you need
5  to get it from, other than having it on your local machine
6  at home.
7  Q  Is there any type of policy or e-mails or
8  something that have been sent out to reinforce that to the
9  employees?
10 A  We more have conversations about how to handle
11 what we're doing because, like I said, everybody is standing
12 right there, and when somebody brainstorms about something
13 and says, well, we were thinking about putting these on CDs
14 and just, you know, that way everybody -- and, you know, we
15 have those discussions and say, "Well, if you put it on a
16 CD, then it has to go in a safe when it's not being used.
17 It has to have some kind of control. You have to sign it
18 out. You have to do certain safeguards for it. You can't
19 just have the data." We have these conversations
20 constantly.
21 B▬▬▬▬▬
22 Q  There's nothing written about that? There's no

Page 20

1  written policy or directives? It's all verbal
2  conversations? It's got to be someplace written some --
3  someplace. What if you leave, somebody leaves? Who takes
4  the ball and continues on?
5  A  And continues on. I understand what you're
6  saying. When I came in, we didn't really have anything
7  other than the agency understanding, the organizational
8  understanding of memos that go back and forth. When I came
9  in, that was kind of the way they did business off the
10 mainframe, which was much more secure.
11 In the transitional period, it kind of moved to
12 the PC, and it was more of a political decision, and it was
13 hard to fight that. So, again, I'd say as far as securing
14 the information to this point, it was safe on the mainframe.
15 Most of the time -- well, it was pretty safe here. We're --
16 we're pretty secure. We haven't had this kind of thing
17 happen ever, but a new employee took it on his own to do
18 something to shortcut his own work.
19 B▬▬▬▬▬
20 Q  Were you aware that ▬▬▬▬▬ was taking --
21 A  No.
22 Q  -- work home?

Page 21

1  A  No. Actually, I was not.
2  ▓▓▓▓▓ was working off a docking station
3  where he was writing his programs and running them off of
4  wherever he was running the mainframe when he had his laptop
5  here. So it was nothing for him to take his laptop home
6  during that period and work on the program without the data.
7  He could have created, you know, temporary files, and we had
8  talked about that, and it's like, you know, you shouldn't do
9  this.
10      So, when the docking station went away and he got
11  a big machine, that's when -- through conversation after the
12  fact, of course, that's when he said, "Well, that's when I
13  bought the backup device, so it would be easy to work from
14  home," and I just cringed. So, at that point, I just said,
15  "Well, you know, write all this up," but --
16      BY ▓▓▓▓▓
17  Q  When was that?
18  A  Well, this was the conversation when I first
19  interviewed him on Friday. We started a verbal interview,
20  and I started taking notes, and he started to get frantic
21  and saying different -- different kinds of things, and I
22  couldn't take the notes. So I told him just you write what

Page 22

1  you write, and then -- wait a minute. Did I not have an
2  e-mail? Yeah. I think I put it in the back. We talked
3  about that. Yes, in the back.
4      I told him to write his explanation and just
5  e-mail it to me. That way, it didn't have to be my memory
6  or, you know, it could be straight what he said.
7      BY ▓▓▓▓▓
8  Q  Is it permitted for an employee to take VA
9  software and install it on their home computers?
10  A  No.
11  Q  Under any conditions?
12  A  Well, certain conditions, but I said no pretty
13  quick, only because I was thinking of the network
14  environment.
15      We used to have a contract with Microsoft where
16  you could take office products home and install them. Now
17  you can't, but we do have software within the office, such
18  as SAS, that we bought 20 licenses for the software
19  internally, and there is an agreement with SAS that allows
20  us to take that software and install it on a user's home,
21  but they have to sign an agreement not to install it more
22  than at home and they uninstall it when they're done.

Page 23

1  Q  So did ▓▓▓▓▓ sign one of these agreements to
2  install SAS on his home computer?
3  A  I don't control that. That's controlled by the
4  COTR.
5  Q  Who would the COTR be?
6  A  ▓▓▓▓▓
7  Q  Can you spell her last name for me?
8  A  ▓▓▓▓▓
9  Q  So ▓▓▓▓▓ he's a -- she's the COTR?
10  A  For the SAS contract.
11  Q  For the SAS contract.
12  A  Right.
13  Q  And if someone wanted to take SAS software home
14  and put it on their home computer --
15  A  Right.
16  Q  -- they would need to go to her to request --
17  A  Exactly.
18  Q  -- and sign the agreement?
19  A  Exactly.
20  Q  Then they would take the software home and install
21  it on their computer?
22  A  And bring the disks back. Right.

Page 24

1  Q  Do you know ▓▓▓▓▓ requested to obtain SAS
2  software?
3  A  No. I don't know.
4  Q  Did ▓▓▓▓▓ ever ask you for the SAS software?
5  A  Well, if you remember, he had a docking station.
6  So he had it loaded on the laptop, the docking laptop. So
7  he had no reason to install it on his home computer, but he
8  could have asked because he did have a home computer. But
9  I'm not aware. I'm just not aware.
10  Q  Okay. Because then you said that he lost the
11  docking station, then he had the home computer, but he had
12  the external drive.
13  A  Yeah. I took the docking station and I gave him a
14  server, basically because they were having problems with
15  time constraints. So, once he went to the server and
16  couldn't -- wasn't as mobile, I think that's when he was
17  saying that he tried to shortcut this or streamline the
18  process, and he --
19  Q  And he bought the --
20  A  Right.
21  Q  -- external drive for his home computer.
22  A  Correct.

Page 25

1  Q  So, for him to be able to work at home using that
2  external, would he possibly not need the SAS software?
3  A  No. He would still need SAS software. That's why
4  I'm saying I'm not sure at what point -- his explanation to
5  me was that when he put the data on the drive, he had
6  finished with it and put it away, and in my mind, I'm saying
7  -- thinking that it was when he had the laptop with SAS on
8  it. That part of the project was done. He lost the laptop.
9  He may not have gotten nor had a need for the SAS.
10 Q  So, in your mind, you're thinking that once he no
11 longer had access to the laptop, he was no longer using that
12 external drive?
13 A  Yeah, in my mind, but that -- I mean, he didn't
14 say specifically, but in my mind, I could see that how --
15 that's how it would play out.
16 Q  Tell me exactly what you know about this incident
17 with ■■■ and the loss of this computer and --
18 A  I know what -- what he wrote and what he told me.
19 He said his house was broken into, that he had been using
20 this personal device of his, of his own that he had VA data
21 on, and he wasn't sure exactly what data was on it, but he
22 thought that there were certain files. So I asked him to

Page 26

1  write out which files he thought he might have included in
2  there, and if he thought there was a mild possibility that
3  it was there, please put it in there because we can work it
4  out later whether it was or wasn't or whatever.
5  Q  When did he first notify you?
6  A  That Friday when he came in, I went to him.
7  Q  Okay. When did he -- how did you first hear of
8  it, of the break-in and --
9  A  I came to work on Thursday, and on my way to the
10 office, I believe Mr. Tran pulled me to the side and said he
11 had to talk to me, and we sat in his office. He told me
12 what happened.
13 Q  Okay. So Mr. Tran was the first to tell you of
14 it?
15 A  I believe so, yes.
16 Q  What time of the day was that?
17 A  Between 8:30 and a quarter to 9:00.
18 Q  And what exactly did he tell you?
19 A  Basically that, that ■■■ house was broken into
20 and that he had his -- his personal storage device, and he
21 had possibly VA information o it.
22 Q  And at that point, what did you do?

Page 27

1  A  At that point -- what did I do? I continued on
2  with my day actually because there was nothing I could do
3  until I confirmed that through ■■■ or some other authority
4  figure that something did happen.
5      So I asked them when ■■■ was going to be coming
6  in. They said, "Well, he didn't come to work today, but
7  he'll be in tomorrow," and I said, "Well, I'll need to get
8  his statement tomorrow and move forward."
9      After that is when I went to Mr. Duffy and told
10 him there was -- there's a possibility that there was an
11 incident.
12 Q  So, on Thursday, you went to Mr. Duffy?
13 A  Thursday evening, I caught him in the hall, and I
14 mentioned it to him, and, you know, he just told me, "Well,
15 keep me in the loop. Keep me abreast," and I said, "Well,
16 I'm not sure what's really going on because I haven't talked
17 to ■■■ yet."
18          BY ■■■
19 Q  What time is that about?
20 A  When I saw Mr. Duffy?
21 Q  Yeah.
22 A  Maybe 4:00-ish in the evening-ish, something like

Page 28

1  that.
2          BY ■■■
3  Q  So you learned about it Thursday morning.
4  Thursday afternoon, you told Mr. Duffy?
5  A  Yeah, something like that. I think I had talked
6  to Dat maybe once or twice in the day.
7  Q  What did Dat say he was doing about it, or did he?
8  A  He didn't say that he was doing anything. He said
9  that he knew he needed to notify me.
10 Q  Did he -- did you at that time -- there's the loss
11 of this equipment. There's possible VA data.
12 A  Well, I --
13 Q  Did they say specifically what kind of data might
14 be there?
15 A  No. No. It wasn't real clear when I talked to
16 Mr. Tran that he understood what was there. It was still,
17 "Well, it could be this. It could be that," and I didn't
18 want to just throw up some flags for could be, you know,
19 might be, this kind of thing. So I said, "Well, it's
20 important that I talk to ■■■ When is ■■■ coming in?,"
21 and that's when he said, "Well, he'll be here tomorrow, and
22 you can talk to him then."

Page 29

1  So I came in, and immediately, I pulled ▮▮▮ to
2  an office, secured him, you know. We were all alone. He
3  started his ramble. I kind of cut that off and said,
4  "Before you, you know, say something I can't validate, let's
5  just go. You write it up and then send it to me."
6  Q  Okay. So you spoke to him on that Friday morning?
7  A  Correct.
8  Q  Told him to go write something up?
9  A  Exactly. Told him to write up in his own words
10  what happened and focus on what files are possibly lost or
11  compromised, and that's really where -- that's what I asked
12  him, and that's what he did.
13  Q  And what time of the day did he get back to you
14  with his written-up explanation?
15  A  The e-mail is there. I think it was 1:34,
16  something to that effect. It's on the prior page. It has
17  the date and stamp on it.
18    BY ▮▮▮▮▮
19  Q  1:46?
20  A  Yeah. I'm sorry. This is the prior page. I
21  printed out the e-mail with the time.
22  Q  Was that when you read it too? About that same

Page 30

1  time, that's when you sent it, but when did you read it?
2  A  I'm trying to think. I believe maybe around 2:00.
3  Two o'clock. Because I -- or maybe shortly after that
4  because I was asked to do a white paper, explaining what
5  happened, and I kind of told Mr. Duffy, "Well, I don't know
6  what happened, Mr. Duffy. I'm going by what he said. So
7  all I can do is kind of streamline what he wrote." He said,
8  "Fine. Just, you know, give me something."
9    BY ▮▮▮▮▮
10  Q  Did you report it to ▮▮▮▮▮ at day?
11  A  I went to ▮▮▮▮▮ before -- I'm trying to
12  remember. I think I went to ▮▮▮▮▮ that day, yes, as
13  a matter of fact, to give her a heads-up that something
14  would be coming because I gave Mr. Duffy the heads-up, told
15  him that it might be. I got his statement, and then what
16  was I asked? I was told to let them see it, and if they
17  would carry it upstairs.
18  Q  And who is they?
19  A  Mr. Duffy and Mr. McLendon.
20  Q  So Mr. Duffy and Mr. McLendon --
21  A  Got a copy of --
22  Q  -- got a copy of this on Friday, May 5th?

Page 31

1  A  Well, they didn't get a copy of that. I didn't
2  want to send what ▮▮▮ wrote to them. So --
3  Q  What did you send to them?
4  A  I did not send that to you. I should have printed
5  that off, but what I did instead of keeping in the
6  extraneous parts about him going through his house or doing
7  -- you know, the emotional portion --
8  Q  The background part of it, yeah.
9  A  Yeah. That -- we weren't interested in that. So
10  I took most of that out and basically used his words.
11  Q  Did you -- did you inform them, what it says here,
12  that the CDs, that the data extracted from the BIRLS, it
13  contained Social Security numbers, date of birth, names and
14  formatted fields?
15  A  Yes.
16  Q  The SAS file on the CD would contain BIRLS, first,
17  last, and middle names for each veteran, and the C&P, you
18  think Social Security? They were informed of all that?
19  A  I put all of that in their e-mail. I'll print off
20  a copy.
21  Q  If you would, please.
22  A  I apologize for not thinking of that one.

Page 32

1  Q  So, based on the information you forwarded to
2  them, they were aware at that time on May 5th that there was
3  this personal information?
4  A  The -- yes, the possibility because, see, at that
5  point, ▮▮▮ was still "Well, I think this was there, and I"
6  -- you know, "I thought," and I just said, "Put what you
7  think. We can figure it out later. If it was possibly
8  there, identify it."
9  Q  Because for an example, here it says possible
10  exposure, but then here it says the flash memory stick. It
11  doesn't say possible. It said it contains Excel file to --
12  you know, that contained Social Security, names, date of
13  birth.
14  A  Right.
15  Q  So, when you passed on this information, did you
16  say that this information was possibly there or we know for
17  a fact from what he's told us that on the memory stick, it
18  is there?
19  A  I -- when I reported to them, I was saying b6 b7C
20  possible because I knew somebody had to investigate, and I
21  wasn't trying to be specific. I wanted to use his statement
22  and move forward with that because, as I said, it was a

Page 33

1  secondary. I was just reporting.
2      Q  Uh-huh.
3      A  So I tried to make sure with what I took out, I
4  did not change intent, meaning, I didn't float any
5  punctuation to change --
6      Q  Because there is -- and I understand his emotional
7  state of mind here --
8      A  Right.
9      Q  -- but there are some cases where he's saying it's
10 possible exposure, but then there's others where he's saying
11 that this is definite information that was there.
12     A  And that's why I didn't want to try to reword
13 anything because I didn't want my words to be accusatory
14 toward him, and I knew that he was in kind of a volatile
15 state emotionally. So --
16     Q  All right. So, yeah, if I could get a copy of the
17 information you provided Mr. Duffy and Mr. McLendon?
18     A  Certainly.
19         ▓▓▓▓▓ his might be the memo, but we'll just
20 double-check if we got a copy. This might be it.
21         THE WITNESS: Yeah. This looks like what I would
22 have done. Yeah. I'll have to --

Page 34

1         ▓▓▓▓▓ e'll still receive a copy anyway, to
2  make sure.
3         THE WITNESS: Yeah. I'll have to make sure that
4  it's the copy that I did send.
5         ▓▓▓▓▓ I want to make sure I get it from
6  him with the -- with the heading that shows it came off of
7  his computer as what he sent.
8         BY ▓▓▓▓▓
9      Q  So, at that point in time, you've notified Mr.
10 Duffy and Mr. McLendon that there's the loss -- the
11 possibility, the loss of this data?
12     A  Correct.
13     Q  What was the next -- your responsibilities after
14 that?
15     A  I had talked with ▓▓▓▓▓ n the cyber
16 security staff and had instructed -- the paper was going to
17 go upstairs, and I was asked to do everything that I was
18 supposed to do as far as reporting.
19     Q  So you report. You did the paper. You passed it
20 up the chain.
21     A  Right.
22     Q  You spoke with ▓▓▓▓▓

Page 35

1      A  Right.
2      Q  At that point, is that where your responsibilities
3  end?
4      A  No. I e-mailed the SOC.
5      Q  The SOC.
6      A  Because at this point, he was still -- well, I'm
7  not sure about what was, what wasn't. So, in my mind, it
8  was more of a security issue at that point to investigate to
9  find out whether there was a privacy issue.
10     Q  So you -- when you say SOC, was that where you
11 reported it to ▓▓▓▓▓ was there someone
12 else?
13     A  No. There is an e-mail box --
14     Q  An e-mail box.
15     A  -- where we report security breaches, information,
16 security breaches in that mailbox at the VA SOC.
17     Q  And you mailed that on the 5th? Was that on
18 Friday, May 5th?
19     A  That's on the Friday. Yes.
20     Q  Friday, May 6th.
21         ▓▓▓▓▓ n we get a copy of that too?
22         THE WITNESS: Okay.

Page 36

1         ▓▓▓▓▓ nything that's related to this, we
2  need a copy, anything that you're bringing up.
3         THE WITNESS: Sure.
4         BY MR. WISE:
5      Q  You said you were aware that your paper was going
6  to go upstairs. Who do you mean by upstairs?
7      A  Well, Mr. Duffy had indicated that he was going to
8  go to the tenth floor and have discussion on this issue.
9      Q  And by the tenth floor, what office are you
10 communicating that to?
11     A  I would guess either the Secretary's office, Chief
12 of Staff, somebody along that line.
13     Q  Okay.
14         BY ▓▓▓▓▓
15     Q  So, at that point, you have reported it to the
16 SOC. You have reported it to ▓▓▓▓▓ ou have given
17 it to Mr. Duffy and Mr. McLendon. What were your actions at
18 that point?
19     A  My actions at that point?
20     Q  What would -- what happened next as far as you
21 were concerned? Did you have any other responsibilities?
22     A  Well, at that point, that was end of day. Where I

Page 37

1   was on Friday --
2   Q  So, when you were doing this, you were acting
3   under the -- under the auspices of being the ISO?
4   A  Correct.
5   Q  At what point in time did you take it on as a
6   privacy issue?
7   A  Well, I was -- I really hadn't done that until --
8   [audio break].
9       [Side B of audiotape begins.]
10      BY [redacted]
11  Q  When the tape cut out, you were --
12  A  I had been interviewed by [redacted]. He had
13  been made aware by [redacted] that there may be an issue.
14      BY [redacted]
15  Q  Can I just jump in there? We -- I guess we left
16  off with Friday, and then on your timeline, Laykee is on
17  Tuesday.
18  A  Right.
19  Q  Can you tell us about Monday first?
20  A  Okay. Monday. Okay. I had the paperwork from
21  [redacted] and I sat with Mr. Duffy, kind of went over who
22  I had spoken to, who I had reported to. He had asked me

Page 38

1   what I thought, you know, how I thought the process would
2   go, and we talked about that, and then I sat with Mr.
3   McLendon, I do believe, that day also, and we discussed
4   similar things.
5       Mr. McLendon was telling me about, you know, the
6   employee's intent, you know, which at that point, it didn't
7   matter to me, one way or another, but I was waiting for
8   information back to determine whether or not it truly was a
9   privacy issue. In my mind, I was waiting for some -- some
10  investigation to be done to determine the files because,
11  after talking to him, I couldn't determine what was lost.
12  Q  And when you say Mr. McLendon was discussing the
13  employee's intent, what did Mr. McLendon tell you about the
14  employee's intent?
15  A  Well, he was basically saying that the employee
16  had a good heart, that he was trying to crunch work out and
17  trying to shortcut the process and, you know, that he felt
18  bad and that kind of thing.
19  Q  And were you getting any feedback from the SOC
20  concerning the report that you had filed --
21  A  No.
22  Q  -- at this time?

Page 39

1   A  No.
2   Q  Okay. And when you say you're waiting for
3   investigation on -- on the nature of the data, who was going
4   to be conducting that investigation?
5   A  Well, I'm not -- I'm not really sure, and that's
6   why I reached out to so many different factions, and I
7   followed up with a conversation. I had been up on the sixth
8   floor, and as I said, I talked with Mr. Doyle, and he was
9   indicating that, you know, it was out of his area, as I
10  thought it would be.
11  Q  And when did you -- and the sixth floor, that's
12  the Office of Security and Law Enforcement?
13  A  Correct.
14  Q  And do you remember when you contacted Mr. Doyle
15  about that?
16  A  Well, it wasn't a point of contact. I also
17  install machines, set up users. So in --
18  Q  When you spoke with him?
19  A  Right. In the gaps of all these times, it's not
20  like I was doing or sitting at my desk. I'm constantly on
21  the move. So --
22  Q  Sure.

Page 40

1   A  -- I would touch base with something, and then I
2   would go away and not even think about it. So, when you
3   asked what was I -- what was my next step, I have plenty to
4   do. I just didn't think about it. I reported the incident
5   as a security -- possible security incident. Security and
6   Law had already been involved with it.
7   Q  Okay. Tell us about that.
8   A  Well, in that -- when the burglary occurred and
9   from what I heard from [redacted] and what [redacted] at the
10  front desk told me, that the police were at his house when
11  he called the office on Wednesday night when it happened --
12  Q  Okay.
13  A  -- and they forwarded the call upstairs.
14  Q  Would that be the Montgomery County Police as far
15  as you understand?
16  A  It could have been Rockville or Montgomery County.
17  They didn't tell me which police.
18  Q  So the local, the local jurisdiction.
19  A  The local jurisdiction was there. Yes.
20  Q  Okay. And how about the VA Security and Law
21  Enforcement people? Were they involved?
22  A  In that I was told up front that there was no VA

Page 41

1 equipment involved -- and I didn't understand why they made
2 the -- forwarded the call up there because they wouldn't be
3 involved unless it was something physical here or VA
4 equipment was stolen.
5  Q  Who made what referral?
6  A  [redacted] at the front desk, when the employee
7 called in.
8  Q  Referred him up to the sixth floor?
9  A  Because I think he asked for Baffa.
10  Q  Okay.
11  A  If I'm -- and this is -- I wasn't on the call.
12  Q  Okay.
13  A  From my understanding, he had asked for Baffa.
14  Q  Okay.
15  A  [redacted] rwarded the call upstairs, and Baffa had
16 left for the day. So Kevin Doyle was next in line. So she
17 gave the call -- either gave the call to Kevin. I believe
18 the secretary there gave the employee, Kevin Doyle's cell
19 phone number. He called him himself.
20  Q  Okay. And then did you have any contact with Mr.
21 Doyle?
22  A  Not right away. Not -- no.

Page 42

1  Q  At any time since then have you had any contact?
2  A  Just -- just when I bumped into him and in
3 passing, he said, "Yeah. It wasn't VA equipment."
4  Q  And when did that occur?
5  A  Sometime this week.
6  Q  Okay. I was just getting my timeline straight.
7  A  Right.
8      BY [redacted]
9  Q  Was it yesterday or before yesterday?
10  A  It was before yesterday, but it wasn't --
11  Q  Did you have any discussion about the incident at
12 all, if he was aware of it, if Baffa was there?
13  A  He was just talking. I mean, I was busy doing --
14 you know, moving computers in. They have some interns
15 coming in. So I was setting up the accounts for the
16 interns, setting up the computers. He saw me in the area,
17 and he said, "Yeah. The guy called me, and I don't know
18 what that was about." I didn't indicate data. I didn't --
19  Q  Did he say the guy's name?
20  A  He could have. I just knew what he was talking
21 about.
22  Q  Right.

Page 43

1  A  So it was me doing what I'm doing, and he started
2 in kind of behind me and --
3  Q  Did he mention anything about the data involved or
4 any of that?
5  A  Honestly, I couldn't tell you, but the gist of his
6 conversation was: "So? So?" You know, that's what he was
7 telling me, as the gentleman was telling him different
8 things. He said, "And? So? VA equipment, no? And? So?"
9 And so that was pretty much what -- what he was saying, and
10 I -- I just said, "Yeah. I kind of knew you weren't
11 involved," and then I kept doing what I was doing.
12  Q  Doing your thing. Yeah. Okay.
13      BY [redacted]
14  Q  I'd like to go over this, this one timeline that
15 we have. I know we discussed it a little bit before, and
16 you said that there may be some inaccuracies. This is a
17 timeline that one individual gave us.
18      So let's go over it day by day, and you can tell
19 us from your point of view, what is accurate and what is
20 not.
21  A  Okay.
22  Q  It starts out with Wednesday, May 3rd.

Page 44

1  [redacted] And for the record, this timeline is
2 from the SOC report?
3  [redacted] This is from the SOC, their office.
4 Yeah, the VA SOC's office.
5      BY [redacted]
6  Q  Wednesday, May 3rd, unknown time, VA employee's
7 house is broken into, possible compromise of data. I mean,
8 that seems to be --
9  A  Right.
10  Q  -- generally known here.
11  A  Right.
12  Q  Thursday, May 4th, 2006, exact time unknown. It
13 says [redacted] ISO/PO, stated that VA police
14 contacted him concerning the possible compromise of VA
15 information.
16  A  Okay.
17  Q  Is that accurate or not? Tell me what --
18      BY [redacted]
19  Q  You got to answer that one.
20  A  Oh. No. That's -- I'm sorry. Yeah. No. That's
21 not accurate. I don't remember telling anybody. I did not
22 contact the VA police on Thursday.

1      B▓▓▓▓▓▓▓
2      Q   Okay. And the police did not contact you either?
3      A   No.
4      Q   From what you told us, it was Dat Tran told you --
5      A   Correct.
6      Q   -- of the incident.
7      A   Correct.
8      Q   And then you reported it to Mr. Duffy --
9      A   Correct.
10     Q   -- on that date.
11         Friday, May 5th, 2006, around 3:46 in the afternoon, ▓▓▓▓▓ notified the VA SOC of possible compromise of data.
14     A   That -- that's probably the right time, and yes.
15     Q   Because you did say that on the 5th, you e-mailed the SOC.
17     A   Right. I e-mailed the SOC, and I had talked to ▓▓▓▓▓ fore I had done that.
19     Q   All right. On around 1430 -- I'm sorry. Military time here. 5:30, the VA SOC tried to contact you concerning the details of the case. However, they were unable to reach you. A message was left for you to call the VA SOC

Page 46

1  concerning this case. Do you remember receiving that message?
3      A   Yes.
4      Q   Which would probably be Monday?
5      A   Right. When I got the message, I got it Monday, but I didn't -- I'm trying to remember. I didn't get my voice-mails until late in the day because I was a very popular person that day. A lot of people approached me.
9      Q   I can guess.
10     A   Yes.
11     Q   It shows on Monday, May 8th, around 8:00 a.m., the VA SOC called ▓▓▓▓▓ to inform him this is a privacy case and should be referred as such, in addition, to report any additional information concerning this case to the VA SOC for documentation purposes. Do you remember that conversation?
17     A   No.
18     Q   So you don't remember on Monday, May 8th, the SOC informing you that this was a privacy issue?
20     A   No.
21     Q   Did you speak with anybody in the SOC's office that day?

Page 47

1      A   No.
2      Q   Okay. You're saying this is inaccurate?
3      A   Yes.
4      Q   Okay. If -- if you had spoke to the VA SOC and they had informed you this was a privacy case, what would your actions have been? What would your -- at that point?
7      A   To report it as a privacy breach.
8      Q   Okay. So that --
9      A   Immediately.
10     Q   That didn't happen, and you didn't --
11     A   I didn't get a decision one way or another.
12     Q   Again, on -- on Monday, May 8th, it says that you interviewed the victim, ▓▓▓▓▓, on that day. Did you interview ▓▓▓▓▓ on the 8th?
15     A   Oh, I'm sorry. I was -- you're reading from this document.
17     Q   I'm reading from that document. Yes.
18     A   No. I interviewed ▓▓▓▓▓ on that Friday.
19     Q   On May 5th?
20     A   Yes.
21     Q   And did you reinterview him or speak with him again on that Monday?

Page 48

1      A   No. I took his e-mail. I did not want to talk to him again. I didn't want to -- if he had changed his mind or did whatever, I didn't want to know, and I didn't want to hear it.
5      Q   Why is that?
6      A   I didn't want to be involved with a conflict, having one statement or then having another statement and then having to go back. I didn't want that.
9      Q   What if he had additional information to give you? Because, you know, sometimes once people have calmed down and the emotions are down and they --
12     A   Well, understandable. If he had requested to talk to me, then I would have if he had something to share, but I gave him the opportunity to send the e-mail and get everything in it. He sent it, and we've had no contact since.
17         BY ▓▓▓▓▓
18     Q   And that was May 5th? I'm sorry.
19     A   Yes.
20     Q   Your --
21         BY ▓▓▓▓▓
22     Q   And then it says on Tuesday, May 9th, the IG, Mr.

Sworn Testimony of ▮▮▮▮▮   CondenseIt™   Administrative Investigation: Lost Data

### Page 49

1  [ph], interviewed you and the ---
2   A  Okay. On the 9th. Okay. Actually, that's not --
3  is that -- ▮▮ No.
4   Q  You're showing on your timeline that you were
5  interviewed --
6   A  Right.
7   Q  -- b▮▮▮▮▮▮▮▮n Monday, May 15th.
8   A  Correct. On the May 9th. ▮▮▮▮▮▮
9  ▮▮▮▮ brought ▮▮▮▮▮ my office, an▮
10 ▮▮▮▮ had conversation.
11  Q  Okay. So you didn't speak with ▮▮▮
12 Tuesday, May 9th?
13  A  No.
14  Q  Do you have any documentation to show when -- when
15 you were interviewed by ▮▮▮▮▮▮d you were interviewed
16 b▮▮▮▮▮▮ther than this timeline that you have given
17 us, do you have any notes that you took, calendars?
18  A  No. The ▮▮▮ interview was an impromptu
19 interview that they just caught me ▮▮▮▮▮ an▮
20 caught me at my office, and we had that discussion.
21 ▮▮▮▮▮▮ tried to schedule meeting me on the
22 past Friday, which was my cws day. So he came to the front

### Page 50

1  office and requested. They notified him, I wasn't available
2  and wouldn't be in until Monday. So they came in on Monday
3  and just caught me.
4    BY ▮
5   Q  So that would have been Friday, the 12th of May?
6   A  Correct.
7   Q  And that's your day off?
8   A  That's my day off.
9   Q  So Monday, the 15th --
10  ▮▮▮▮ The 15th.
11   THE WITNESS: The following -- exactly. It's the
12 first time I saw him.
13  ▮▮▮▮kay. Which is a Monday. Yeah.
14    BY ▮
15   Q  Was he alone? Wa▮▮▮▮▮alone?
16   A  No. Actually, the lady -- I believ▮▮ I
17 don't -- I didn't write her name down. She was kind of
18 taking a second chair. I offered to make her a copy of the
19 package.
20   Q  What time was that interview on Monday?
21   A  Time. I didn't get the time.
22   Q  Morning or afternoon?

### Page 51

1   A  I would say it would probably have been closer to
2  the morning because I think they came Friday and then came
3  right back.
4    BY ▮
5   Q  When you do those types of contacts with
6  individuals and meet, do you then go maybe into your Outlook
7  calendar and put it in there?
8   A  I would if it was something that was scheduled.
9   Q  Scheduled.
10  A  And all of these were people just coming down and
11 saying "we got you."
12  Q  "We got you."
13  A  Yeah. So I didn't really have -- I ended up
14 having to do the normal, which is run to the office and
15 print off the statement for them and that kind of thing.
16   BY ▮
17  Q  How can you explain the dates? I mean, do you
18 have any explanation of why the dates in there would be long
19 or --
20  A  On that timeline? I don't know.
21   BY ▮
22  Q  When did you do your timeline, your incident

### Page 52

1  timeline? When did you put this together?
2   A  Gosh.
3   Q  I mean, it goes all the way up through today. Is
4  this something you compiled today, or is this something
5  that's been ongoing since it happened?
6   A  No. I think I started this on May 9th after
7  speaking with ▮▮▮▮▮
8   Q  So then you've just been adding to it?
9   A  Yeah. Yes.
10   BY ▮
11  Q  Did anyone from the SOC contact you to try to get
12 dates and times, or did you provide -- when you sent them a
13 document, did it provide them with --
14  A  No.
15  Q  -- information on it?
16  A  No.
17  Q  I wonder where they got the information.
18  A  Well, they did interview me. Two gentlemen came,
19 and I indicated on the timeline that I was interviewed by
20 the SOC, and that was yesterday and --
21   BY ▮
22  Q  That wasn't until yesterday, May 17th?

Page 53

1    BY ▮▮▮▮▮▮▮
2  Q  Did they ask you for dates in their interview?
3  A  Did they ask me for dates. Yeah. They --
4    BY ▮▮▮▮▮▮▮
5  Q  What time of day was that?
6    BY ▮▮▮▮▮▮▮
7  Q  Yeah. What time did they interview you yesterday?
8    B ▮▮▮▮▮▮▮
9  Q  Before lunch? After lunch?
10 A  I may not have taken lunch, though, at the time.
11 The day runs on for me. I'm -- it had to be earlier in the
12 day. The reason I made that -- I got a phone call. Let me
13 -- let me try and retrace this. I got a phone call from
14 ▮▮▮▮▮▮▮ He was asking me about a tracking number for the
15 privacy issue, and I said I didn't have one. He said,
16 "Well, you know, you're going to need one." I said, "Well,
17 I'm working on that." So that was around 8:00 -- 9:00, 9:00
18 or 10:00 when I talked to him.
19      Then he came back, and he said he needed to ask
20 some questions or get some clarification. So he came. We
21 talked. I tried to then get a tracking number for the
22 privacy issue. I was told that the person wouldn't be in

Page 54

1  until today. So I said fine. I sent her an e-mail. I
2  think I talked to ▮▮▮▮▮▮▮ shortly after that. She said
3  that they had worked around that, and I'd probably get an
4  e-mail with the tracking number, but that was after the two
5  gentlemen talked to me, went back to their office. They
6  tried to get a privacy issue tracking number and couldn't,
7  and I believe Mr. Davis, the DAS or ADAS, made a phone call
8  and got the tracking number, and they sent it to me, but all
9  that was yesterday.
10 Q  If you look in --
11    B ▮▮▮▮▮▮▮
12 Q  Charlie Davis?
13 A  Uh-huh. Yes, sir.
14 Q  Okay. And so do you have any -- obviously, you
15 were contacted yesterday with the SOC and with contacts with
16 the privacy. Do you have any recollection of them
17 discussing with you earlier than yesterday that this was a
18 privacy issue?
19 A  No. They asked for the first time about it
20 yesterday morning, and I said I didn't have a tracking
21 number. So -- well, you know, this is, you know -- we need
22 to track it on the right line. Fine. I'll work toward

Page 55

1  doing that. So I had gone, looking at some old archived
2  mail for the link to the old tracking system, and I came
3  across the e-mail that said the tracking system was down
4  and, until further notice, this is the reporting.
5       So I started to fill out the form to shoot to
6  Austin, and I said, "Well, wait a minute. Let me -- this is
7  too quick. I need -- I need something. I can't wait for
8  access." So I called ▮▮▮▮▮▮▮ to see if she
9  could generate a number for me.
10      She told me she couldn't, the person that would do
11 it is out until tomorrow, which is today, and that I should
12 send her an e-mail. So I said fine, and then I talked to
13 ▮▮▮▮▮▮▮ again, and she said, "Oh, really?" So I said,
14 "Yeah, but I'm doing what I need to do."
15      So later she came back and said, "Go in your
16 e-mail. You know, you'll have a tracking number in there."
17 So I said fine, and while we were talking, she asked me a
18 couple of questions, statement, things of that nature, and I
19 provided those when I got back to my desk. I had the
20 tracking number. I sent -- I believe I gave her the
21 tracking number at that point when I was sitting, talking to
22 her, because I had my Blackberry. I read it off to her, but

Page 56

1  I got all the privacy stuff yesterday. Nobody contacted me,
2  talked about it.
3    BY ▮▮▮▮▮▮▮
4  Q  If you look down here on this, down here to
5  Wednesday, May 10th, it says the SOC followed up in an
6  e-mail to ▮▮▮▮▮▮▮ out the status of the incident and
7  to ensure the privacy officer was notified for proper
8  resolution.
9  A  Okay.
10 Q  It shows that that was sent Wednesday, May 10th,
11 at almost 8:00 in the evening, which means you would have
12 got --
13 A  Wow.
14 Q  You would have received it, you know, normally,
15 typical workday, Thursday, May 11th.
16    BY ▮▮▮▮▮▮▮
17 Q  You have a Blackberry. Right?
18 A  Yes, I do.
19 Q  Do you take it home with you?
20 A  Yes, I do.
21 Q  Okay.
22 A  I do not live with it. I usually just pick it

Page 57

1 back up in the morning.
2   Q  Sure.
3   A  And I'm pretty good about my e-mail and sorting
4 them because I have so many responsibilities.
5       BY ▮▮▮
6   Q  But do you remember receiving an e-mail from the
7 SOC?
8   A  No.
9   Q  So, as far as the privacy --
10  A  Right.
11  Q  -- issue, the first it came to your attention was
12 what date?
13  A  Yesterday.
14  Q  Yesterday, May 17th?
15  A  Correct.
16  Q  Do you remember speaking with the SOC on Tuesday,
17 May 16th, concerning the status of this incident? They said
18 they left a voice-mail message for you to contact them.
19  A  And I may have gotten that yesterday. I do not
20 spend much time in my office, so --
21  Q  And then it says Tuesday, May 16th, they sent an
22 e-mail to you to find out the status of the case and to

Page 58

1 ensure the privacy office has been properly notified. So
2 that's -- that's going in to where you first became aware of
3 it sometime yesterday.
4   A  Okay. I don't remember if -- I don't remember
5 reading any e-mail requesting -- or notifying me of the
6 privacy issue. So I will look in my mailbox. If I missed
7 it, I --
8   Q  I would like you to. If you can find any e-mails
9 that you have, a correspondence with the SOC,▮▮▮
10 Mr. Davis, ▮▮▮▮ her office, anything
11 having to do with this, this incident, I'd like a copy of --
12  A  Most of our -- most of our e-mails would be more
13 of not in my office, need to talk to you about this incident
14 or this issue, but we didn't discuss anything over e-mail.
15 It's been pretty much face to face, and if I got an e-mail
16 while I was meeting with somebody, because I had been
17 meeting with people, that might explain it, but I don't
18 remember reading anything from the gentleman other than we
19 need to talk or an e-mail saying, you know, I'm trying to
20 reach you, but nobody had indicated that it was a privacy
21 issue until yesterday.
22       B▮

Page 59

1   Q  And who in the SOC would you talk to, besides
2 ▮▮▮
3   A  I don't remember talking to anybody in the SOC
4 other than ▮▮▮ I got an e-mail from him, but I
5 don't talk to too many people.
6   ▮▮▮ Why don't we just take a break now,
7 and then we'll come back to this in a few minutes.
8       THE WITNESS: Let me go look in my e-mail.
9   ▮▮▮ Okay. We are going to turn the
10 tape off for the moment.
11       [Off the record.]
12       BY ▮▮▮
13  Q  ▮▮▮, when we broke, we had a 10-minute
14 break, actually a little longer than that. That's okay. We
15 needed the time. I just wanted to remind you that the tape
16 is back on and that you are still under oath. Okay?
17  A  Thank you.
18  Q  You retrieved some e-mail documentation?
19  A  Yes. Yes, I did, and I forgot one piece, which
20 was the white paper I sent out, and I apologize for that.
21  Q  I may have a copy of that, but go ahead and
22 explain what e-mails you have there.

Page 60

1   A  Okay. I'll just go through them, and I'll read
2 the dates in general.
3       All right. This was dated Wednesday, May 3rd,
4 8:15 p.m., from Dat Tran, urgent, please call me, employee
5 situation. ▮▮▮ ease get a hole of me as soon as
6 possible tomorrow.
7       The next e-mail that related to the topic was from
8 Mike McLendon. May 5th, 12:01 p.m. Dennis and I reviewed
9 the paper.
10  Q  Is that the white paper you're referring to?
11  A  Yes. Dennis asked that I review the paper, that
12 Dennis had asked me to provide.
13  Q  Now, not to break in, but is that the same white
14 paper that you provided ▮▮▮
15  A  Yes.
16  Q  Because she sent me -- she gave me a copy of this.
17 Does that appear to be one in the same?
18  A  Correct. Yes.
19  Q  Okay. So this is your white paper?
20  A  This is exactly what I sent, stripped down of all
21 --
22  Q  Okay.

Page 61

1   A  -- extraneous information.
2   Q  Continue with the e-mails.
3      BY ▮▮▮
4   Q  And when you said Dennis, the last name is?
5   A  Duffy.
6   Q  Okay.
7   A  The next e-mail from ▮▮▮▮▮ Friday, May 5th, 1:03 p.m., security incident, reminder, provide brief written description on above subject.
        Friday, May 5th, 3:34 p.m., from McLendon to ▮▮▮▮▮ and it's Duffy. Possible data loss. The note says will review over the weekend.
        And this is the -- okay. Mike McLendon, Monday, May 8th, 9:35 a.m., to Dennis Duffy, ▮▮▮ c to Dat Tran, memo, lost data. I have edited ▮▮▮ draft memo and added further detail to clarify. Based on a review of the data that was lost or reported lost, it appears that over 90 percent of the data was in SAS format, which mitigates the risk of misuse since that would have had to be trained in SAS.
        That's the message and the modified document.
        BY ▮▮▮

Page 62

1   Q  Okay.
2   A  I have a copy of the modified document.
        Mike McLendon, Monday, 2006, 10:15, to Dennis Duffy ▮▮▮ memo, lost data. White paper on lost data two. The paper needed a couple of small edits. Please replace the earlier version with this one. That's the second copy.
        Let's see. Mike McLendon, Dennis Duffy, ▮▮▮ at Tran, lost data memo. Hold the paper. Dat has continued to query ▮▮▮ about the data that was on the hard drive disk. Dat knows the data business and more details, so questions and answers are important.
        Monday, May 8th, 1:32, from McLendon to Duffy and ▮▮▮ Dat accelerated his discussion with Wayne. I do not want to split hairs.
        Dat Tran ▮▮▮ I need to talk to you both -- I'm sorry. The date, Tuesday, May 16th, 2006, 10:30 p.m. I need to talk to you as soon as possible this morning regarding ▮▮▮ Situation has now reached Chief of Staff and GC. Please get a hold of me before 9:00.
        Then my e-mail to ▮▮▮ Let me make sure. I'm trying to get the timeline right. I had made the phone

Page 63

1   call. I had already gotten the message from ▮▮▮
2   So this is my attempt to ▮▮▮ possible privacy
3   violation, dated Wednesday, May 17th, 11:14 a.m.
4   have been unable to find the link to report the issue. It's
5   been reported on the security side, and then I explained the
6   employee had his house broken into, need to make sure that
7   proper track is taken. Please contact me when you return.
8       ▮▮▮ Wednesday, May 17th, 11:37 a.m.,
9   to ▮▮▮ Are you in your -- are you in the office?
10      ▮▮▮ Wednesday, May 17th, 12:07, to
11  ▮▮▮ c ▮▮▮ [ph], OCIS, and
12  ▮▮▮ it's VA SOC -- subject, VA SOC, and the
13  provided number, and they asked me so you know what thes
14  acronyms are, C&P Mini Master, SC disability.
15      Wednesday, May 17th, 1:20 ▮▮▮ to Johnny
16  Davis, ▮▮▮ PVTS complaint
17  number, AAC229836FY06. ▮▮▮ The subject
18  complaint number has been entered into the privacy violatio
19  track per your request. If you need anything further,
20  please contact me at the number below. ▮▮▮
21      And your e-mail from ▮▮▮ ying that -- or
22  ▮▮▮ aying that you would like to meet with me today at

Page 64

1   1:00.
2   Q  Okay.
3   A  And that's what I have.
4   Q  That's what you have in total?
5   A  That's it.
6   Q  That's it.
7       So the first you heard of it when it was -- in
8   your capacity as an ISO --
9   A  Correct.
10  Q  -- you reported it as you felt was required --
11  A  Right.
12  Q  -- to the SOC. You reported it to Mr. Duffy, up
13  to your chain of command, Mr. McLendon.
14  A  Correct.
15  Q  And from that point on, you were expecting any
16  further efforts on your part based on anything that may come
17  out of the SOC's investigation or directives through your
18  chain of command?
19  A  Well, after I made the initial -- and I talked
20  with the ISO, the regional -- or the VACO ISO at the time,
21  it was -- I guess it was the following Tuesday when I had
22  talked with ▮▮▮ So I figured that the system --

Page 65

1  things were gearing up and that something would take place
2  to determine whether or not loss of data had occurred
3  because, as I said, during the interview process, I couldn't
4  determine, and I'm not a trained investigator. So because
5  his conversation was so all over the road, I wanted somebody
6  to talk to him that could make those determinations.
7      Q   Is there any reason why you couldn't have reported
8  it both through both resources, through the privacy office
9  and the security office?
10     A   There was actually no reason. When I talked to
11 [redacted] she indicated that she was going to be
12 briefing the DAS, and at that point, I thought that because
13 of the magnitude of what we were talking about, because he's
14 in charge of both sides, that it would be tracked
15 appropriately.
16     Q   And who is the DAS?
17     A   Pedro Cadinas [ph].
18     Q   Pedro Cadinas.
19     A   Correct.
20     Q   So it was your understanding that once Mr. Cadinas
21 was aware of it, because he covers both sides of the house,
22 that a determination would be made as far as --

Page 66

1      A   One way or another. You're right.
2      Q   One way or the other.
3      A   Right.
4  [redacted]
5      Q   The privacy office, what organization is that in?
6  Is it the Information Resource Branch or --
7      A   I couldn't -- I'm not sure of the structure. We
8  change so constantly. We're under a reorg right now. So
9  I'm not really sure what part they're in.
10     B [redacted]
11     Q   When you reported it to [redacted] he
12 indicated to us that you -- when you discussed it with her
13 that you told her you had no knowledge of [redacted] taking
14 VA work home with him.
15     A   I had no knowledge of him taking the data --
16     Q   That data home with him.
17     A   -- home with him. Correct.
18     Q   That particular data.
19     A   Correct.
20     Q   And then would you explain to us about the SAS
21 software --
22     A   Uh-huh.

Page 67

1      Q   -- that to be able to get that software, the
2  individual, [redacted] would have had to go through the
3  COTR [redacted]
4      A   [redacted]
5      Q   --
6      A   Correct.
7      Q   -- for that.
8          It had come to my attention that [redacted]
9  claimed that you had provided him that software.
10     A   Okay. And that's possible.
11     Q   Is that possible?
12     A   Right. Yes.
13     Q   Well, how would it be that you would provide him
14 that software?
15     A   I do all the software installation because I am
16 the network administrator. So, if I had the software at
17 that time and I was asked, please provide this to so and so,
18 I would either give it to the person or give it back to the
19 COTR and have them give it to the person.
20         If -- if I was the person that handed it to him,
21 then it's possible, but I'm the person that would hand it or
22 hand it to the COTR.

Page 68

1      Q   When you say hand it to him, in CD form?
2      A   Physically, the SAS software.
3      Q   Uh-huh.
4      A   Just the SAS software, to be able to run the
5  software, yes. I would either give it back to the COTR and
6  she would give it to him after getting all the appropriate
7  forms --
8      Q   Uh-huh.
9      A   -- or she would notify me that I should give him a
10 copy of the CDs or the CDs to take home to load the
11 software.
12     Q   Okay. And do you remember giving him the CDs for
13 the SAS software?
14     A   No, not directly. I'm not saying I didn't do it.
15 I probably did. If he got them, he got them from me or
16 [redacted] it as I said, we have 20 people that use those
17 licenses, and I don't keep track of, you know who's taking
18 it home. I try not to.
19     Q   So there's a possibility you gave him that
20 software --
21     A   Oh, guaranteed.
22     Q   -- to take home to install on his home computer?

Page 69

1  A  Guaranteed. Guaranteed.
2  Q  Okay.
3  A  Yeah.
4  Q  So that would not be out of the ordinary, and if
5  he said that, it's probably true?
6  A  Right. Right. Guaranteed. Yes. The software is
7  -- it's okay to take the software home and write your
8  programs and do all that, but when you run it against the
9  data, you can either create your own test data, which a lot
10 of people do, or you wait until you get back and run it on
11 real data here, but it's not out of the ordinary to have SAS
12 on a machine at home.
13 Q  And ▓▓▓▓▓▓▓ would be the individual who would
14 have any forms that he signed --
15 A  Correct.
16 Q  -- to have that? Okay.
17    ▓▓▓▓▓▓▓ Do you have any questions?
18    BY ▓▓▓▓▓▓▓
19 Q  You didn't find any e-mail from the SOC▓▓▓
20 did you?
21 A  Just the ones that I read. Are you -- he left
22 voice-mail.

Page 70

1  Q  Right. But he didn't -- you didn't find that if
2  there was -- he mentioned in that one timeline that he
3  e-mailed you.
4  A  Right.
5  Q  But you didn't -- you didn't write --
6  A  No. Actually, I sorted by his name and in my
7  archives. So I printed off the two contacts that I did have
8  from him.
9  Q  Okay.
10 A  I did not receive -- I don't think I had anything
11 else even that said VA SOC.
12    ▓▓▓▓▓▓▓ am going to turn the tape off
13 just for a minute.
14    [Off the record.]
15    BY ▓▓▓▓▓▓▓
16 Q  ▓▓▓▓▓▓▓ turned the tape off just for a
17 minute to ask my colleague and question, and since we have
18 no more questions, I just wanted to tell you on tape that we
19 will end your testimony here.
20 A  Thank you.
21    [Whereupon, the sworn testimony of ▓▓▓▓▓▓▓
22 concluded.]