**Sworn Testimony:** ▮▮▮▮▮▮▮▮▮▮▮

Page 1

DEPARTMENT OF VETERANS AFFAIRS

OFFICE OF INSPECTOR GENERAL

WASHINGTON, D.C.

Administrative Investigation: Missing Data

CONDUCTED BY

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

and ▮▮▮▮▮▮

Office of Inspector General

SWORN TESTIMONY OF

▮▮▮▮▮▮▮  Information Technology Specialist

(Accompanied by JONATHAN AXELROD, ESQ.)

Friday, June 16, 2006

[TRANSCRIPT PREPARED FROM AN AUDIOTAPE RECORDING.]

MALLOY TRANSCRIPTION SERVICE

(202) 362-6622

Page 2

**PROCEEDINGS**

1 This is ▮▮▮▮▮▮▮▮ with the Office
2 of Inspector General. With me also from the Office of
3 Inspector General is ▮▮▮▮▮▮▮▮▮▮▮▮, and ▮
4 ▮▮▮▮ Today is June 16th, 2006, and we are about to
5 interview ▮▮▮▮▮▮ With ▮▮▮▮▮▮ is his
6 attorney, Mr. Jonathan Axelrod.
7 ▮▮▮▮▮▮ would you raise your right hand,
8 please. Do you swear or affirm that the information you're
9 about to present is the truth, the whole truth, and nothing
10 but the truth?
11 ▮▮▮▮▮▮ I do.
12 Whereupon,
13 ▮▮▮▮▮▮▮▮
14 was called as a witness and, after having been first duly
15 sworn, was examined and testified as follows:
16 **EXAMINATION**
17 ▮▮▮▮▮
18 Q I would like to go through some of the topics that
19 we discussed the last time, and we have talked to a lot of
20 people since then. We have a number of follow-up questions
21 or repeat questions.

Page 3

1 A Uh-huh.
2 Q And first of all, I'd like to start with your
3 telephone conversation with Kevin Doyle, who was the
4 representative from the Office of Security and Law
5 Enforcement on the evening or late afternoon when your house
6 was burglarized, and I am wondering if you can recall with
7 any specificity what it is that you told him.
8 A I spoke with Mr. Doyle. I knew that he was part
9 of the Preparedness Office in the Office of Policy, Planning
10 and Preparedness. So I assumed he had some sort of police
11 background, and I simply told him that my house had been
12 burglarized during the day and that there had been VA data
13 on my external hard drive and that VA needed to know about
14 this. And his reply basically was that his office was
15 involved with operational things on a day-to-day basis, but
16 that this needed reported to the -- what you call it? -- the
17 information security officer.
18 Q Okay. And did you tell him specifically what
19 equipment had been stolen?
20 A He didn't ask.
21 Q And did you -- what did you volunteer as far as
22 what had been stolen?

Page 4

1 A Well, I think I told him that, in general terms, a
2 notebook computer and a hard drive, but I don't know whether
3 I actually told him the details of what had been stolen.
4 But I did say that computer equipment had been stolen and
5 that it contained VA data.
6 Q Okay. So, at the least, it was computer equipment
7 had been stolen.
8 A Yes, ma'am.
9 Q And how about the VA data? Did you get into any
10 description of what the data was?
11 A No. He did not ask.
12 Q Okay. When you talked to him, did you have any
13 difficulty hearing him? Was there background noises? Did
14 you have to repeat yourself?
15 A I don't recall.
16 Q Okay. And --
17 A Let me just say --
18 Q Okay.
19 A -- I don't remember any such noises or difficulty.
20 Q Okay.
21 A But my cell phone at my end of conversations
22 sometimes sounds distorted. I will say that. I don't know

Page 1 - Page

Sworn Testimony: ███████████ ██/██ ████████

**Page 5**

1 whether people at the other end experience similar

2 distortions.

3     Q Well, did he say anything to you to indicate that

4 he wasn't hearing you very well?

5     A I don't believe so. I don't recall that, ma'am.

6     Q Okay. And did you give him your name and what

7 office you worked in?

8     A You know, I'm sure I must have introduced myself.

9 Otherwise, it would have been sort of like an anonymous tip,

10 which would be meaningless and senseless. So I believe I

11 must have done that.

12     Q Okay. And how about what office you worked in?

13     A I expect so. I'm sure I did.

14     Q Okay. Did you make a comment to him that -- that

15 this -- this loss of data could be career-ending?

16     A I did not.

17     Q Okay. And now I'd like to ask you some questions

18 about your interactions --

19 ████████ Can I stop you there for one second?

20 ████████ Sure.

21 ████████ Can we, if we have a question --

22 ████████ Sure.

**Page 6**

1 ████████ -- kind of stop? Okay. I'm not

2 sure I can ask it.

3     This is ████████ again, for the transcription

4 purposes.

5 ████████ Speak up.

6 ████████ this is ████████ king this

7 question.

8     BY ████████

9     Q Just trying to jog your memory a little bit -- may

10 I call you ████████?

11     A Absolutely, sir.

12     Q When you -- did you have any discussions with him

13 in terms of you and I working the same unit? Because I

14 believe that now or at least it appears that maybe Security

15 and Law Enforcement and OPPP are joined in some fashion or

16 other. Is that possible? I'm just trying to establish

17 whether you -- how -- maybe jog your memory a bit, how you

18 told him who you were and where you worked. Any

19 conversations like that, "Hey, I've seen you around the

20 office. I work in the" --

21     A No. I don't know Mr. Doyle at all.

22     Q Okay.

**Page 7**

1     A I've never met him. I don't -- I don't think I've

2 ever spoken to him in person.

3     People from the Preparedness Office work in a

4 physically separate location in the building. They have

5 appeared from time to time at functions held in the front

6 office, people going away or people coming on board, but my

7 group generally would stand around in a knot of people from

8 our own group. The people from Planning would stand around

9 in theirs, and the people from Preparedness would appear,

10 and there would be some introductions sometimes, but there

11 wasn't any real interaction.

12     Q Okay. So there was no conversation along those

13 lines. Just trying to establish whether you identified

14 yourself and where you work and whether that prompted any

15 conversations about, "Oh, yeah, I work" -- "We all work for

16 the same boss," that kind of stuff.

17     A Well, you know, I don't know whether we went over

18 this earlier. When I -- when I tried to get in touch with

19 people at VA, I had a card in my wallet. I'll see if I can

20 find it. It has names of supervisors and people with whom I

21 work with closely, and what I did was I went through the

22 numbers. I tried to reach Dat. I tried to reach Mike

**Page 8**

1 McLendon. I think I came up with Ms. -- Ms. Jean Kelley's

2 name on this card, and she was the one person I found, and

3 she said that basically everyone had gone home by then

4 because I asked her whether she could put me in touch with

5 Mr. McLendon or Dat.

6     She said, well, she could send a text message to

7 Mr. McLendon's Blackberry, and I think she said that Mr. --

8 that someone, maybe Mr. Doyle -- maybe she said his name --

9 hadn't left yet or still to be around, and I don't recall

10 whether I called him directly or whether she forwarded my

11 call.

12     Q Okay.

13     A Sorry.

14     Q No, that's fine.

15 ████████ that's all.

16

17     Q Okay. Our understanding is that on the afternoon

18 of May 3rd when you got him, in addition to talking to Kevin

19 Doyle, you talked to Mr. McLendon --

20     A Right.

21     Q -- and eventually to Dat Tran.

22     A Yeah.

ble bte
216

**Page 9**

1  Q  Okay.  And then the next day, Thursday, May 4th,

2  you were at home.

3  A  That is correct.

4  Q  Did you talk to anyone from the office on that

5  day?

6  A  I don't think so.  I was fairly busy.  No, I don't

7  believe I did.

8  Q  Okay.  And then on Friday, May 5th -- and right

9  now, I'm just trying to establish who you talked to, when.

10  Friday, May 5th, what kind of meetings did you have to

11  discuss this?

12  A  I came in.  I don't specifically remember.  I

13  think I spoke with Mr. McLendon.  I think I expressed regret

14  that this had happened, and I think Mike said, "Well, ▇▇▇▇▇,

15  I" -- he either said then or later in a -- in a -- in a

16  similar conversation.  He said, "I expect you've learned

17  your lesson now, haven't you?"  I said, "Yes, I have."

18  But the rest of that day and really most of the

19  following week, I had my head down, thinking that I might be

20  able to hang in.

21  Q  And did you -- did you have any meetings with Mark

22  Whitney?

**Page 10**

1  A  Yes.  Mark, I think, was on Friday.  Thank you.

2  Mark said that he needed to have something to pass

3  on to his superiors by noon on what type of data had been

4  lost on this equipment.  So I began to draw up a list, and I

5  was fairly sure that I had an extract of BIRLS on my

6  external hard drive, which consisted of the veteran's last

7  name and then separately the veteran's first name,

8  separately the veteran's middle name, any suffix, his Social

9  Security number, his serial number -- well, actually,

10  there's information for up to three periods of service.  So,

11  for each period of -- for each possible period of service, I

12  had the entrance on active duty, the separation from active

13  duty, and the service number for that period because a man

14  could possibly have different service numbers.  So those

15  were the items that I had extracted and initially downloaded

16  from the January -- what I call the January version of

17  BIRLS.

18  Subsequently, we did another download in

19  preparation for giving data to a contractor called the

20  Institute for Defense Analyses, and they were just asking

21  for almost everything we had, except the real identifiers,

22  and we simply decided to download the records physically;

**Page 11**

1  that is, they were -- they were something on the order of

2  500-characters long.  And so when I say we downloaded them

3  physically, what I mean is that instead of picking out

4  fields, as I had done earlier in January, we just downloaded

5  the whole record, and we thought that this would be a

6  time-saver for us because it was possible that these people

7  could say, "Oh, you know, we meant to ask you for X.

8  Sorry," and then we'd have to do the whole thing over again.

9  So that was to be a time-saver.

10  But the stuff that was on my home computer was not

11  the whole BIRLS data extract that had been prepared for us

12  at AAC.  It was specifically chosen items of information,

13  and I've enumerated those just now.

14  Q  So it was an extract of an extract?

15  A  Yes, ma'am.

16  Q  Okay.  Let me go back to just trying to identify

17  who you spoke to on which day.

18  A  Yeah.

19  Q  So, on Friday, you had a conversation with Mr.

20  McLendon.  You met with Mark Whitney.

21  A  Yeah.  Actually, I met with Mark.  We talked about

22  it privately, and then he asked me to put something in

**Page 12**

1  writing that he could pass on to supervisors, and I haven't

2  finished describing that writing, but we can return to that.

3  Q  Oh, we will.

4  A  Okay.  All right.

5  Q  And on that day, did you talk to Dat Tran?

6  A  I'm sure I must have, but, you know, Dat -- Dat

7  sometimes is in the office, and sometimes he's elsewhere.

8  If I had a particular scene in mind that I could remember, I

9  could maybe pick up a memory that way, but I don't associate

10  Dat especially for that day.  Sorry.

11  Q  Okay.  All right.  So let's -- what I want to go

12  through is what you -- what you can recall you told each of

13  these people about what may have been lost.

14  A  Uh-huh.

15  Q  So, when you talked to McLendon on Friday morning

16  or whenever it was on Friday, did you talk about those

17  specific files you thought were on your hard drive?

18  A  I don't think Mike was looking for details from me

19  at that point.  When I spoke with him on Wednesday evening,

20  I told him that a big file with a lot of data had been

21  stolen, or maybe that's just me remembering what BIRLS means

22  to me.

217

Page 13

1    Q   Uh-huh.

2    A   Okay?  But I think I tried to convey that, you

3    know, this was serious, that --

4    Q   Okay.  So, as far as you can recollect, you didn't

5    -- you didn't call it "BIRLS," you didn't -- you didn't name

6    --

7    A   Oh, I think I would have used "BIRLS," yeah, but

8    I'm not sure it would have meant anything necessarily to Mr.

9    McLendon.  Certainly, it would have to Dat.

10   Now, Mark may or may not have known what BIRLS

11   was, but Dat would certainly know what BIRLS was.

12   Q   And when you -- when you told Dat it was an

13   extract, what -- did you further define what you meant by

14   extract, or when you say "extract" in the office, does that

15   automatically mean something?

16   A   No.  I mean, it doesn't have an automatic meaning,

17   but in the context of my work, I would be referring to the

18   variables I enumerated for you, for the cases that we had

19   gotten from AAC, but, you know, you don't generally go into

20   such fine detail when you're telling someone something in a

21   hurry because, if you do, you don't get anything out of your

22   mouth.

Page 14

1    So, if I speak to you in a highly qualified

2    manner, you're going to get very tired of listening to me

3    very quickly, and so, if I'm talking to Dat, I'll say

4    "BIRLS," and that should bring to his mind what I'm doing

5    with BIRLS.  It wouldn't bring to his mind what someone else

6    is doing with BIRLS.  That's about all I can tell you.

7    BY MR. JONES:

8    Q   Well, what would bring to his mind in your

9    estimation?

10   A   I don't think DAT would have known exactly the

11   number of cases.

12   I'll give you an example.  Either speaking to Mr.

13   McLendon subsequently during one of his calls to me or

14   perhaps during one of Dat's calls to me or -- you know, I

15   had to call in daily to maintain contact with the office,

16   and I would call Dat's number.  Sometimes we would connect.

17   Other times, I'd just leave a voice message, but when we

18   spoke, he'd sometimes have a question for me.

19   Anyway, Dat, Mr. McLendon, or someone else at one

20   point asked me -- or it could even have been Jim O'Neill --

21   how many -- how many records were in the BIRLS file.  I

22   said, "Well, I think there were 26 million," and he said,

Page 15

1    "Well, you know, we've heard from people at AAC that there's

2    44 million in their file."  I thought, you know, that's

3    great, and I told him that the estimated number of living

4    veterans in 2001 was about 25 million.  So I said, "25

5    million or 26-1/2 million sounds good to me.  This 44

6    million, I don't know what that means."  I said, "The only

7    thing that it suggests to me is that perhaps in that 44

8    million, they're including deceased veterans."

9    You know, otherwise, I don't know what the

10   additional number, to bring it up to 44, is.

11

12   Q   But this conversation, whoever it was with --

13   A   Yes, ma'am.

14   Q   -- took place after you were put on administrative

15   leave?

16   A   Absolutely.

17   Q   Okay.

18   A   And it -- yes, ma'am.

19   Q   Okay.  We're really interested in what your

20   supervisor, project manager, what your ISO knew from May 3rd

21   when you made your first phone call until, let's say,

22   Monday, May 8th, based on your conversations with -- with

Page 16

1    Mark Whitney, Dat Tran, and the information you submitted to

2    them at their request.

3    A   Uh-huh.

4    Q   So, for BIRLS, did they -- did you offer to them

5    or did they ask you what the magnitude of the records were

6    at that point in time?

7    A   Well, I thought I laid this out in my initial

8    appreciation of what was at risk for Mark Whitney.

9    Now, I -- this question has arisen more than once,

10   and on more than one occasion, I have asked in return,

11   "Well, don't you have what I gave to Mark Whitney?"  I mean,

12   I would like to see that, if you do.

13   Q   Yeah.

14   A   If you don't have it, it's --

15   Q   We do have -- you know --

16   BY MALE QUESTIONER:

17   Q   The written document that you prepared?

18   A   Yes, sir.  Yes, sir.  That was dated May 5th, I

19   guess.

20

21   Q   While he's looking for that, let me --

22   A   Sure.

Page 13 - Page

Sworn Testimony: ████████  ▓/16/00   Condensent   Administrative Investigation...g --

## Page 17

1    Q  Let me see if I can jog your memory a little bit

2    --

3    A  All right.

4    Q  -- just to follow up with what Judy said.  We're

5    trying to -- trying to get some sense of who knew what in

6    terms of what BIRLS meant during the time frame that we're

7    speaking of.

8    A  Yeah.

9    Q  And let me see if I can jog your memory.  At least

10   on April 6th, you had a -- you sent an e-mail to -- to Tran

11   and to Mr. Beads, and that you had indicated to them that

12   you had downloaded the BIRLS extract and placed it on a V

13   drive, and that the file, indeed, contained twenty-six --

14   twenty-six-million-five-hundred-three-thousand-three-hundred

15   and -- or four-hundred-thirty-six records, and that each

16   record was 581-bytes long.  Okay.  There is an e-mail to

17   that effect.

18   A  And that's dated the 6th?

19   Q  April 6th.

20   A  I'm sorry.  Sir?

21   Q  Yeah.

22   A  April 6th?

## Page 18

1    Q  April 6th.

2    A  That's -- that's way before the burglary.

3    Q  I understand.

4    A  Oh, okay.

5    Q  Okay.  I understand that.

6    A  All right.  Okay.  So --

7    Q  What I'm trying to -- what I'm trying to ask here

8    is you send that e-mail --

9    A  Yeah.

10   Q  -- to both Mr. Beads, for whatever reason, I guess

11   to notify him that this information is out on the V drive

12   now.

13   A  Right.

14   Q  Would that have -- letting Tran or Beads or anyone

15   else -- I think they were the only two, but letting them

16   know it was 26 million, would that have been -- would that

17   have been something that they -- something that would have

18   been a new idea for them to know that there was 26 million

19   records in that particular file?

20   A  I don't think so.  I mean, that's about the right

21   number for -- for living veterans.

22       Now, the surprise to me as an analyst is that it

## Page 19

1    would be so close.  I mean, VA administrative data comes

2    from a number of different sources, and basically, BIRLS is

3    stuff that we get from the Defense Department, based on

4    their accumulation of data around 1973, as I believe I've

5    been told.  So the fact that it would be that close to the

6    number of estimated living veterans would strike me just as,

7    wow, you know, that's really good, but --

8    Q  Do you recall having any discussions with Mr. Tran

9    in particular about the size of the BIRLS file from April --

10   well, even -- even during that time period or even slightly

11   before that time period?  Let's say in April.

12   A  I honestly don't, but, I mean -- oh.  Well, wait a

13   second.  Wait a second.  You know, let's back up a minute.

14   Okay?

15   Q  Sure.  Yeah.

16   A  I mean, going at it this way, you know, from April

17   6th onward, what did you say to Mr. Tran, that's all wrong.

18       Now, the way to look at this, in my opinion, is we

19   were trying to get BIRLS data back in 2005, and the reason

20   we were trying to get BIRLS data was that in trying to -- in

21   trying to get Social Security numbers to append to veterans

22   who turned up in the mustard gas file for VBA to track them

## Page 20

1    down using their Social Security numbers through commercial

2    services like Turning Point or Connect Point or whatever it

3    is they use, we have found that one item of information that

4    was often present was the veteran's service number, and if

5    you used his service number with his last name and found

6    that combination in a VA administrative record elsewhere,

7    that that was typically the guy you were looking for

8    because, then if you look at the first names, they generally

9    agreed.  So our idea was --

10   Q  Whose "our idea"?  You keep saying "we" and "our."

11   Who are we talking about?  Excuse me.  I'm sorry for --

12   A  Yeah.  Okay.  My idea, but I had the backing of

13   Dat in seeking BIRLS data because BIRLS has a hell of a lot

14   of data.

15   Q  Okay.  So you had the backing of Dat.  Did Dat

16   know what was contained in BIRLS?

17   A  He must have known what he was asking for.

18   Q  Why?

19   A  Because he got in touch with the people at Austin

20   Automation Center.  He got in touch with the people in VBA

21   Central Office and said, "We need BIRLS.  There is a

22   business requirement.  We're doing work for you guys,

219

1 matching your mustard gas vets against administrative files.

2 So why don't you help us out and give us access to those

3 files?" They agreed.

4     The first thing they did, because they

5 misunderstood what we were seeking, was that they gave me

6 and Calvin access to an online application that would run at

7 AAC where, if you put in information about a vet, it would

8 bring up his BIRLS data. Well, that's useless for me. I

9 mean, I've got thousands of people -- thousands of people to

10 look for. I'm not going to do them one by one.

11     So Dat understood that right away. He -- he went

12 back to the person in VBA who had given us this access and

13 said, you know, "My programmers really would prefer to have

14 access to a file at Austin where the BIRLS data that you

15 have given us access to, one by one, is kept." So then they

16 said okay, you've got to go talk to X.

17     Well, Dat went and talked to X, and the sort of

18 reply we got was, "Well, BIRLS is not a single file. It's a

19 system, and it resides in multiple formats on many different

20 media, and so it's not possible for us to give you access to

21 a single BIRLS file." They were trying to put us off, and

22 we knew that was baloney because there was this ongoing file

1 that was prepared every quarter for Susan Krumhaus, which I

2 already had access to as her custodian of that data.

3     So I talked to Dat about this and suggested -- or

4 he -- he said, "Why don't we just see if we can get Susan's

5 permission to extend the number of variables included in

6 Susan's quarterly extract, and we'll do it that way," and,

7 in fact, that's what eventually worked. And the first fruit

8 of that effort was delivered sometime in early 2006, and

9 that's what I called the "January 2006 file."

10     And the first use I made of this was to get the

11 stuff I was interested in, and Dat subsequently said, "Oh.

12 Hey, ████ I looked at the stuff you put out on the V

13 drive. Didn't we ask for a lot more variables than that?,"

14 and I said, "Yeah, but these are the ones I'm interested

15 in."

16 BY ████████████

17     Q  So did that, that he looked at, that had

18 20-some-million records; is that right?

19     A  I'm sure he did.

20 BY MALE QUESTIONER:

21     Q  Can I ask a question on that?

22     A  Sure.

1     Q  The file that Susan was getting, it came in

2 quarterly or whatever it was.

3     A  Yes.

4     Q  What variables were not included that you wanted?

5     A  Serial number was the biggie. That was -- that

6 was more important to me than anything else. We had already

7 used serial number with good effect against the mustard gas

8 file.

9 ████████

10     Q  Is that the same as service number?

11     A  Yes. That's what I meant.

12     Q  Okay.

13     A  Yeah. Yeah.

14     There were some additional -- now, there is a memo

15 between me and a guy named Munoz -- that's his last name --

16 at AAC where we talked about the additional variables the

17 office was asking for and how we'd like the new record to be

18 formatted.

19     To spare you a lot of details, let's say Susan's

20 record was this long and the new record was going to be this

21 long. What I said was, "Let's just leave the stuff that

22 Susan's already getting. Let's leave it in the same place

1 where it is, and all the new stuff should come out here. So

2 that when I write a program to access it, I don't have to

3 change all of the addresses." Okay?

4     So that -- that correspondence with Mr. Munoz is

5 still in my e-mail, or was, when I was put on AL.

6

7     Q  Now, when the -- when Dat noticed that the file

8 that you stored on the V drive contained fewer variables,

9 that's where you're talking about not records, but

10 variables?

11     A  I'm sure it was.

12     Q  Okay. Now, is that because -- when you did your

13 own extraction of the extract that was provided that would

14 have had all of those variables, is that when you did it?

15 Where did you do the extraction?

16     A  Oh. Well, the way it worked was AAC runs a job.

17 It prepares a file. It's -- it's got a name of the AAC

18 mainframe that I can read.

19     Q  Right.

20     A  Okay. So I already know where the data is

21 supposed to be inside each data record. I go and get the

22 individual items that I'm interested in. So I would -- and

ble btc
220

Page 25

1  this is a big file. It's got 26 million records. So, just
2  to store it, you'd have to put it out onto about six
3  different tapes, and then before downloading it, I would
4  compress each tape, so that the download would take less
5  time. So I'd get six separate downloads, and then I had to
6  sort of read all the separate downloads. I had to re-expand
7  them, decompress them, and then I -- I ran -- let's say I
8  had to do something else. I had to import them into SAS
9  from transport format, and then I read File A, then I read
10  File B, File C, and so on, so that I'd have all the records
11  in the correct order again.
12      So that's not to mystify you.
13  Q  [Inaudible.]
14  A  Okay. But I guess what I'm saying is the -- when
15  I -- whenever I got something off the mainframe, if I could,
16  I'd take just what I needed because I'd pay for it
17  otherwise, just in my own time, waiting around for the
18  download to complete. So, you know --
19  Q  Right. So you defined basically the fields you
20  wanted from their extract.
21  A  Uh-huh.
22  Q  Because of the number of records, it required you

Page 26

1  to split that file up into six or whatever number.
2  A  Right. Right, right.
3  Q  And you reassembled them on your own hard drive,
4  or were you using --
5  A  Yes.
6  Q  Okay. And then the finished product, you stored
7  on your V drive?
8  A  Yes.
9  Q  Can I assume that the finished product would be
10  identical on the V drive to what you had on the external
11  drive, at least you believe you may have had at that point
12  on the external drive?
13  A  What -- what's on my office machine should be
14  exactly the same as what I took home, but what I put on the
15  V drive, I may have put into a delimited format that Dat
16  could read using Microsoft Access. I think I put it out as
17  a SAS file, but Dat liked to read things with Access, and so
18  I may have put it out as a delimited file.
19  Q  In terms of the number of records and so forth,
20  they'd be identified on the fields, the variables would be
21  identified?
22  A  That's what I -- that's what I --

Page 2

1  Q  Formatting, we're talking about?
2  A  Yeah. That's what I believe.
3  Q  Okay. And you're very comfortable in saying that
4  the format that was on the external drive for that BIRLS
5  file would be SAS? You don't have any doubt about that as
6  opposed to delimited?
7  A  Oh, no. I mean, delimited would slow me up.
8  Q  Right.
9  A  Yeah.
10  Q  Okay. I just wanted to make sure I understood.
11  A  Yes, sir.
12      Now, we talked a lot about the SAS being an
13  impediment to people actually accessing the data.
14  Q  Uh-huh.
15  A  And, Mr. Jones, you were there that evening when
16  the FBI interviewed me, but what you need to understand is
17  if you -- if you -- if you connected that hard drive to a
18  computer that had SAS on it and just clicked on a -- a file
19  on the external hard drive that said "BIRLS January 26" or
20  something like that, what would happen is the computer would
21  say okay, from the extension ".sas7bdat," I know this is a
22  SAS file. So I'll use SAS to open it up.

Page 2

1      And the way it would open it up is it would
2  basically show you something that looked like a spreadsheet
3  where each line is a record and the columns are the
4  variables, and so you'd get the variables that are in the
5  file.
6      It wouldn't do you a whole lot of good in terms of
7  massive fraud, but you could begin fraud if you wanted to.
8  I mean, you could at least read the data.
9  Q  Sure.
10  A  Okay. Now, the other thing that I told the FBI
11  while they were there was, okay, what's this data going to
12  look like if you don't have SAS installed on the computer to
13  which the hard drive is attached and you click on that file.
14  Well, if you just click on the file and the machine doesn't
15  have SAS installed, it's going to say, "I don't know what
16  .sas7bdat is. Do you have a program in mind that I should
17  use?"
18      You know, if you -- if you -- actually, I'm not
19  sure about this. I don't think you can specify an arbitrary
20  program to open up an arbitrary file type, but if you had --
21  if you had begun like this, if you had said okay, I am going
22  to open Microsoft Wordpad and then you say okay, now from

221

Sworn Testimony: ███████████ 6/16/06   Condenseit   Administrative Investigation. Missing Data

**Page 29**

1  Wordpad, let's open this file sitting on the hard drive that
2  looks interesting, Wordpad will open almost anything.
3       And when it opens a -- a SAS file, what you're
4  going to see is recurring field types that will sort of set
5  up a pattern on your screen, depending on the sort of
6  coincidence of the 80-character line length and the length
7  of the SAS record. So what you might have is something that
8  looks like a person's name here on this line. Then maybe on
9  this line or down a line, because the record is long, you
10 have the name offset a little bit or maybe it's going to be
11 offset over here, but generally speaking if you identify
12 something that you're interested in, like first names, you'd
13 either see them staking across like this or you'd see them
14 staking across like that.
15      So it would be possible, in my opinion, for
16 character format data to recognize those names. Sure.
17  Q  But, again, we know that.
18  A  Yeah. Okay. Now, BIRLS file did not contain
19 address. That's something you need to know. So --
20  Q  Yes.
21  A  Okay. All right.
22  Q  That's it.

**Page 30**

1  A  All right.
2  ███████████████
3  Q  All right. And -- okay. I don't want to beat a
4  dead horse, but --
5  A  Yeah.
6  Q  -- when you told Dat Tran that your hard drive may
7  have had a BIRLS extract on it, did you feel comfortable
8  that he understood the magnitude of that file?
9  A  Well, I thought he did. I thought he did.
10  Q  And this is because you've had previous
11 conversations with him about getting the extract?
12  A  Yeah. If I had been guessing the size of the
13 BIRLS file without having gone back and looked at it
14 precisely, I'd have said maybe 20 million because from one
15 of my own recollections -- I don't know from when -- I
16 thought the BIRLS actually held less data than the estimated
17 number of living veterans.
18  Q  But you feel he should have known it was millions?
19  A  Yes, I do.
20  Q  Okay. And how about Whitney?
21  A  Mark? I wouldn't -- I wouldn't expect Mark to
22 know the size of the BIRLS file because he's not a mainframe

**Page 31**

1  programmer. It's an IT guy. He installs stuff on the
2  machines. He fixes problems, but he's not a mainframe guy,
3  and he's not a -- he's not a substantive file user. That
4  is, he doesn't use medical data files. He doesn't use
5  BIRLS. He doesn't use C&P. I wouldn't expect him to know
6  anything in particular about them.
7  ███████████████
8  Q  Well, did he -- do you recall him asking you on
9  the 5th, on Friday, about the size of BIRLS or the size of
10 C&P?
11  A  Not specifically, but that doesn't mean he didn't.
12      What I'm -- what I'm saying is I don't remember
13 whether we hammered on that, the way we are now. I'm sorry.
14  Q  Okay.
15  ███████████████
16  Q  And would you have expected either Mr. McLendon or
17 Mr. Duffy to know the magnitude of BIRLS?
18  A  No. Even less. Even less.
19  Q  Okay.
20  A  The expression they use is that they're flying
21 above the earth at the 80,000-foot level, and they can't see
22 that kind of detail.

**Page 32**

1  ███████████████
2  Q  Would you expect that they would know, though,
3  that there -- not necessarily with specificity, 24- to 26
4  million, but that even it would be in the millions and not
5  in the thousands or hundreds?
6  A  You know, this is really embarrassing. I thought
7  I had indicated, when I was talking about this, what was at
8  risk.
9  ███████████████
10  Q  Talking to who?
11  A  Each one of those persons, Mr. McLendon, Dat,
12 subsequently Mark Whitney.
13      And like I say, I thought that the number of cases
14 was smaller, perhaps 20 million, maybe even only 18 million,
15 but still, that's a lot of cases.
16      I can't hang any of them now for you. I'm sorry.
17 I cannot recall whether I did answer a specific number,
18 whether I said it when I said, you know, "Mr. McLendon, I'm
19 sorry to tell you, but, you know, my equipment has been
20 stolen. I think the BIRLS file was on there. I think there
21 were a lot of cases."
22  ███████████████

Sworn Testimony: _____ 6/16/06   Condensed   Administrative Investigation Meeting — ...

**Page 33**

1 Q Let me just for the record say we're not trying to

2 hang anybody. We're just trying to find out exactly who did

3 what, when. That's all.

4 A Okay. All right.

5 Q Now, there may be one other avenue that

6 [inaudible]. Do you recall conversations, before the

7 burglary at any time, with Mr. McLendon about BIRLS and

8 what's in it or --

9 A No. Never with Mr. McLendon.

10 Q Never?

11 And the same thing for Mr. Duffy?

12 A No. Mr. Duffy and I hardly ever spoke. I mean,

13 he was an extremely busy person. I have spoken with Mr.

14 Duffy, and he's a very cordial gentleman, but we never had

15 occasion to talk about that sort of thing.

16 Q Okay. All right.

17

18 Q And now another database that you mentioned -- and

19 this, if you haven't looked at it -- I believe it's your

20 initial submission to Mark Whitney, and you mentioned the

21 C&P Mini Master.

22 A Right.

**Page 34**

1 Q Now, again, did -- did you explain to Mr. Whitney

2 or Dat Tran what the C&P Mini Master was? Did they ask you?

3 A Well, you know, when I look at this, I can -- I

4 can see that I haven't mentioned file sizes, and it's just

5 sort of sickening to think that that sort of omission could

6 have led to the lapse in responding.

7 Again, Mark doesn't use mainframe files. I

8 wouldn't expect him to know anything about the sizes. Dat

9 certainly uses mainframe files through me and through

10 Calvin. I would expect him to know roughly how many cases

11 there are in the C&P.

12 Now, if you ask me, "Well, ____ how many cases

13 are there in the C&P Mini Master," I have to think for a few

14 minutes because the C&P not only contains records for

15 veterans themselves, but it has records for beneficiaries

16 which can be spouses, parents, dependent children,

17 survivors. But when I download cases to my office

18 equipment, I'm only interested in veterans. So, while the

19 total number of records in the C&P is about 4.8 million, I'd

20 say, when you cut down to just the veterans themselves, it's

21 more like 2.8-, 2.9 million, and I know that stuff.

22 And you know, I feel that at least for C&P, Dat

**Page 35**

1 should have known how many cases there are in the C&P. Now,

2 it's possible that he didn't know what I had downloaded or

3 why I was downloading, but the C&P has about 2.8 vets -- 2.8

4 million vets in it, and it just seems to me, that's

5 something he should know.

6 Connected to this is, you know, Dat passes on a

7 lot of stuff that goes out of the office in response to

8 requests for information. Mike Wells is called "Mr. Veteran

9 Data." He generally responds to requests from VA-published

10 data, tabular data that has been prepared at VBA.

11 Sometimes, though, we've had to do special runs, and

12 whenever there is a special run that I have been involved

13 with, it goes back to Dat before it goes off through the

14 requester. So I -- you know, I -- I feel that Dat basically

15 passes on each thing that goes out of the office to make

16 sure it's accurate.

17 Q But when you say a C&P Mini Master, could that be

18 referring to a lot of different types of files?

19 A No. I don't think -- well, yeah, there's --

20 there's probably different sources of Mini Masters. There's

21 -- there's two places where I could pick up Mini Master

22 data. I could picked it up as prepared by the Veterans

**Page 36**

1 Health Administration, or there was an extract or, I should

2 say, there was a file that was prepared by Cathy Tomczak for

3 use in our office, and I'm not sure that there was any real

4 difference, but I couldn't tell you whether for a given

5 quarter, the tapes would be identical either because maybe

6 one came from a snapshot taken a day later than the other,

7 and, you know, there could be a couple thousand different --

8 Q Right. But they're --

9 A -- alterations.

10 Q They're all millions; is that right?

11 A They're all millions, yeah.

12

13 Q I have one question.

14 A Yes, ma'am.

15 Q On one of the CDs that you had, you had C&P Mini

16 Master June of 2000. Do you think that that might be the

17 one that you're speaking about in this letter?

18 A Could I see?

19 Q Oh. The letter that you just gave to him and he

20 gave you a copy of.

21 A Oh.

22 Q Do you think it might have been the June 2000 or a

223 b6 b7c

Sworn Testimony: ███████  6/16/06    Condenseit™   Administrative Investigation: Missing Data

**Page 37**

1 later one than that?

2     A   Well, that would go to why I was using it. The

3 reason I have -- the reason I was interested in June 2000

4 was that was part of the administrative frame for the NSV.

5 That was the version of the C&P that got used to instruct

6 the NSV administrative sampling frame.

7     The other -- the other thing that went into making

8 the frame, which incidentally was stored in something called

9 "s4frame," was information that we had gotten from VHA which

10 contained a formatted veteran's name, like last name, then

11 separately first name and so on, and a telephone number as

12 well as an address. And what we got instead on the C&P was

13 their sort of typical six-line mailing label --

14     Q   Right.

15     A   -- where everything was --

16     Q   There's line one, the name.

17     A   That's right.

18     Q   So do you think it might have been a different

19 year, then, on the hard drive than the one that you had just

20 on the CD?

21     A   Well, it's a possibility. For sure, it's a

22 possibility, but --

**Page 38**

1     Q   Okay. Well, was that -- let me reword that. The

2 C&P file that might be on the hard drive, you were still

3 working on the project for the telephone numbers, how you

4 were doing the reverse programming. So, if you were still

5 working on that, then would you still use the C&P file from

6 the original file of the old frame?

7     A   Yeah. I think so.

8     Q   Okay.

9     A   Yeah.

10     Q   Okay. I didn't know whether there was another

11 project you were working on --

12     A   No.

13     Q   -- that you needed an updated C&P.

14     A   No.

15     Q   Okay.

16     A   No. I -- I kept the s4frame --

17     Q   Uh-huh.

18     A   -- and I tried to keep the actual separate pieces

19 that went into the s4frame. I think at one point, I may

20 have had the -- the -- the actual file from VHA that was

21 their contribution to the sampling frame, and then the June

22 00 was the -- the C&P contributions to the sampling frame.

**Page 39**

1 And I think I just kept those because those were good things

2 to have for what I was doing. Yeah.

3     [Side B of Audiotape 1 of 3 begins.]

4     THE WITNESS: [In progress] -- is if there were

5 not a C&P later than the 00 amongst those that were on CDs

6 or DVDs, that had been held in my possession at home, and if

7 there not also any CDs or DVDs in my -- my storage bin at

8 the office, then it's not likely that I had taken any home

9 other than that because -- well, no. There is one other way

10 that I took stuff home.

11     The other way that I took stuff home was I just

12 brought my hard drive into the office and wrote onto it.

13 So, you know, unfortunately, looking at -- looking at what

14 remained in CD and DVD form can't rule out the possibility

15 that there was a later C&P actually on my hard drive. I'm

16 sorry.

17

18     Q   Oh, that's okay. No, that's okay.

19

20     Okay. And finally, before I move on to another

21 topic, as far as the National Survey of Veterans, would Mark

22 Whitney or Dat Tran be familiar with that, so that when you

**Page 40**

1 wrote down that you had that file on your hard drive, would

2 they know what kind of records that we're talking about?

3     A   Would they know that there was -- some had Social

4 Security numbers, some had names and addresses?

5     Q   And that there were 20,000 of them.

6     A   No, they wouldn't know that. They wouldn't know

7 that. They wouldn't know that, but, you know, let's --

8 let's face it. This appreciation of what was at risk

9 doesn't convey perhaps everything to give to someone else

10 completely unfamiliar with data and these data files, what

11 the magnitude of the risk was.

12     On the other hand, this wasn't bad for a rush job.

13 I didn't have a lot of time to do this. I had had my

14 conversation with Mark in the morning. I don't know what

15 time we wrapped up, but he was pretty definite that he

16 needed to give stuff to his bosses that day.

17     So I came out with this. Maybe I wasted some time

18 describing the damn burglary, but I felt that I had at least

19 given them a good taste of what was at risk.

20     Now, having said that, if there were questions

21 about what was actually at risk, there I was. I was in the

22 office. I was there the whole next week, absolutely

Page 41

1  reachable, and so, you know, I guess I'm feeling a little
2  defensive about this.
3      I wasn't trying to minimize the risk here. What
4  --
5  Q  Do you --
6  A  Sorry, ma'am.
7  Q  Do you recall them asking you questions?
8  A  After this?
9  Q  After -- when you -- after you submitted that?
10  A  No. Let me think now. The burglary was on the
11  3rd.
12  ▓▓▓▓▓▓▓
13  Q  Wednesday the 3rd.
14  A  Yeah. So a week later would have been the 10th,
15  and then, so the 12th would have been the Friday, and I
16  think Mr. O'Neill and Ms. King came to see me on the
17  following Monday. So that would have been the 15th. Yeah.
18  That works out.
19      I think on Thursday the 11th, Dat called me in the
20  evening at home, and he said, "▓▓▓▓ this is right -- this
21  thing is rising to the secretarial level. General Counsel
22  wants you to write up a description of the files, so that

Page 42

1  when they present to Mr. Nicholson, they can tell him what
2  was stolen." So he said, "There's a special format for
3  this. I'm e-mailing it to your office address, and they're
4  going to need it by noon."
5      Within an hour, he called again and said, "Change
6  of plan. The times moved up. They want it by 9:00 in the
7  morning." So I said okay.
8      So, when I came in, I began with what I thought
9  were the most serious files. BIRLS was the largest. So
10  that was the one I began with, and the only way that I could
11  see to answer some of the -- some of the questions in Dat's
12  format were, well, how many of -- how many of the records in
13  the file has SSNs. So what I did was I said okay. I'm
14  pretty sure that the version that was at home was just like
15  what I had been using here in the office. So I accessed my
16  office copy, and I began doing runs to see how many -- how
17  many records in my office copy had non-blank or non-zero
18  SSNs, and I came up with a number, and one of the things in
19  the format that he had asked for was, well, how many records
20  were in the file, how many have SSNs, that sort of thing.
21  So I did that. Then --
22

Page 43

1  Q  Before you go any further --
2  A  Yes, ma'am.
3  Q  -- I think our e-mails suggest that you might have
4  your dates a little wrong.
5  ▓▓▓▓▓▓  Yeah.
6  MALE QUESTIONER:  Yeah.
7  ▓▓▓▓▓▓  Yeah.
8  THE WITNESS:  Sorry.
9  ▓▓▓▓▓▓▓
10  Q  Let me help you out here a little bit.
11  A  All right.
12  Q  Let's -- let's back up a little bit --
13  A  All right. Sure.
14  Q  -- with the Whitney interview. How long did
15  Whitney spend with you?
16  A  Well, I wouldn't say --
17  Q  To your recollection.
18  A  I'd say half -- half an hour to an hour.
19  Q  Half an hour to an hour.
20  A  Yeah.
21  Q  And did he ask you questions?
22  A  I'm sure he did, but I think he also let me just

Page 44

1  tell him what I thought was out there. Yeah.
2  Q  Okay. At one point, then he left you alone to
3  construct this -- this memo. Correct?
4  A  Right.
5  Q  In the construction of that memo, did you have
6  occasion to look at your home -- look at your work computer
7  at that point, or did you use the CDs to try to refresh your
8  memory as to what may have been on the external hard drive
9  or was that all from your memory? To the best of your
10  recollection.
11  A  Well, I don't know if I said so right here. Oh.
12  Well, okay. I'm not sure whether I had actually scooped up
13  and brought in all of the CDs at home yet.
14  Q  At that point?
15  A  Yeah. I'm not sure.
16  Q  Because we want to talk about that in a second.
17  A  Yeah.
18  Q  All right. So you're not quite sure. Is it fair
19  to say you did most of this from your memory as to what you
20  had?
21  A  I used my memory with respect to intention, why
22  did I have stuff at all. I used the CDs and my memory stick

225 b6 b7C

Sworn Testimony: ███████ 6/16/06    CondenseIt™    Administrative Investigation: Missing Dat

**Page 45**

1  to see what was on there, and then if that sort of -- if I
2  could say, oh, yeah, well, here's something about BIRLS, I
3  was already certain I had BIRLS out there.
4      Q  Right.
5      A  And I was pretty sure that I had NSV out there,
6  and I was also pretty sure that I had NSV precursors, like
7  the administrative frame from the survey out there.  So --
8  but I looked at my memory stick and the Cds themselves just
9  to see, well, you know, these things were at home.  If I
10 took them home, I presume I wrote them at some point.
11     Q  At this point.
12     BY MALE QUESTIONER:
13     Q  On the 5th, as you're preparing that.
14     A  Yeah, I think so.
15     Q  So that probably means that you brought them from
16 your home back then.
17     A  Well, it could, but the thing is I also delved
18 into the locked drawer that I had in my office where I had
19 some Cds also.
20     Q  Oh, okay.  All right.
21     A  But I always had my memory stick with me.
22     Q  Sure.

**Page 46**

1      A  Yeah.  So -- but to be honest with you, I'm not
2  sure that I had all of the CDs, which had been at home, back
3  into the office on the 5th.
4      BY MR. JONES:
5      Q  Okay.
6      A  It might have been next week as well.
7      Q  Okay.  Well, we'll get to that.
8         All right.  So that's Friday.  So you construct
9  this memo.  You e-mail it to Mark, to Mark, and then he does
10 whatever he needs to do with it.
11     A  Yeah.  Right.
12     BY MALE QUESTIONER:
13     Q  Did he come back to you that day for any
14 clarification?
15     A  No.  If I could just digress for a moment?
16 ███████
17     Q  Sure.
18     A  Okay.  The whole following week, before -- before
19 things rose to the Secretarial level, I just had my head
20 down.  I was trying to make progress on -- on my work and
21 stay out of trouble.  So I had no idea what was happening
22 with various, you know, percolations of this news, but in

**Page 47**

1  looking at newspaper accounts subsequently, I was mystified
2  why all of the blame for the delayed -- for the delay in
3  bringing this to the attention of the Secretary.  I was
4  mystified why the only people who appeared to have any blame
5  for this were people in the Office of Policy and Planning
6  because, on the day I got back to work, I prepared this much
7  for Mr. Whitney, presumably to pass along to IT folk.
8         I never heard any breath of IT taking any portion
9  of blame for the delay, and I couldn't understand that
10 because they at least had to be as aware as Mr. McLendon and
11 Mr. Tran.  So I'll just leave it there.
12     Q  Okay.  Let's follow up with that, though.  So,
13 Friday, you're finished with -- you're finished.
14     A  Right.
15     Q  You come in Monday.
16     A  Yeah.
17     Q  Does Mr. Tran or anybody come to you and have any
18 discussions about have you been able to think about what
19 else might be possibly on that external hard drive?
20     A  I don't think so.  I don't think so.
21     BY MALE QUESTIONER:
22     Q  I think earlier you said you don't think anybody

**Page 48**

1  came to you for any further clarification of anything until
2  this rose to the Secretary level.
3      A  Right.
4      Q  That's your conversation about General Counsel.
5      A  Yes.
6      Q  Is that a fair, accurate --
7      A  Yeah.  That's pretty accurate in my opinion.
8      Q  Okay.
9      A  I had set aside this, you know, appreciation of
10 what had gone, just to make some progress on other work.  So
11 I was sort of dismayed when I came in on Friday the 12th.  I
12 had to get to work on this thing because --
13 ███████
14     Q  I think we're off on that date too.
15     A  Oh.  Yeah.  All right.  All right.
16     BY MALE QUESTIONER:
17     Q  Let's -- let's -- I just want to make sure that
18 we're clear, to the best of your recollection, again, that
19 that Monday in particular, the 8th --
20     A  Yeah.
21     Q  -- okay -- that no one came back to you as they're
22 looking at the information that you had provided to Mr.

Case 1:06-mc-00506-JR    Document 20-15    Filed 03/28/2007    Page 13 of 36

Sworn Testimony: ▓▓▓▓▓-6/16/06    Condenselt™    Administrative Investigation. Missing Dat...

Page 49

1  Whitney on Friday, that no one came back to you that you
2  recall to sort of try to refresh your memory and to try to
3  see whether or not anything needed to be added on to that
4  memo, after you've had a chance now to think about it over
5  the weekend.
6      A  I don't think anyone did.
7      Q  That day or the rest of the week?
8      A  I don't think so.
9      Q  Okay.
10     A  Now, if you've got an incident in mind, you can
11  describe it, and I'll see if I can remember that.
12     Q  No.  I'm just -- I'm just trying to make sure that
13  you weren't given an additional opportunity to think about
14  this after you had sat on it for a couple days.
15     A  I don't think so.  Now --
16     Q  And Mr. Tran, in particular, your de facto
17  supervisor, I guess --
18     A  Yes.
19     Q  -- you don't recall him coming?
20     A  Well, no.  And like I say, Mr. Tran was not always
21  at the office.  He was a very busy man.
22          The only -- the only thing that sticks out in my

Page 50

1  mind about that next week was that -- I think it was on
2  Tuesday.  Mr. McLendon called an all-hands meeting for
3  people in 008A, and Mr. Tran was there for that, and I think
4  this is worth repeating to you.
5          I don't know whether we did this when we
6  interviewed before.
7      Q  Go ahead.
8      A  But Mr. McLendon basically said, "Now, you know,
9  as a parent having raised a couple of young people, I can
10  tell you something about young people.  They think they are
11  going to live forever.  They think they're indestructible,"
12  and he said, "And this is true of all of us."  He said,
13  "Sometimes we just can't imagine things going wrong."  So
14  then he said, "But now I'd like ▓▓▓▓ here to get up and
15  tell you something."
16          So I -- he had asked me before whether I was okay
17  with doing this, and I said yeah.  So I described the
18  burglary, and people were just sort of curious about this,
19  you know, "Oh, you know, gee, this is someone I know whose
20  house has been burgled," but when as I began to describe
21  what had actually been on my machine, I could just sort of
22  see shock on faces.

Page 51

1          I mean, I'd say, you know, BIRLS.  Maybe not
2  everybody knew what BIRLS was, but, you know, at least it
3  seemed to me that's a biggie, the C&P, NSV.  Susan looked
4  kind of surprised when I mentioned that.  I mean, I don't
5  think up to that point that people had really appreciated in
6  the office what had gone awry and what had been stolen.
7      Q  Right.
8      A  So -- and the other thing I'm going to tell you --
9  and this isn't just because the tape is running.  Mike had
10  been very encouraging about this thing.  He had said, you
11  know -- he had said to me privately when I spoke to him, the
12  day I got back on the 5th -- he said, "▓▓▓▓ I bet you've
13  really learned your lesson, haven't you?"  I said, "Yep, I
14  sure have."
15          At the close of this meeting on the Tuesday where
16  we had all of the 008A people, he said, "This could have
17  happened to any one of us, and it's a wake-up call," and now
18  what I'm going to tell you is that my interpretation of his
19  remark was that had to know that other people in 008A were
20  using data at home, and that this was a clear warning that
21  it was at risk.
22          Okay.  So I'm done.

Page 52

1      Q  Okay.  I just wanted to question about --
2      A  I'm finished with my polemic.
3      Q  During your presentation, did you happen to
4  mention any specific numbers of veterans?
5      A  No.
6      Q  So it was just BIRLS, C&P?
7      A  Yes.
8      Q  Okay.  Got you.  Just wanted to make sure.
9          ▓▓▓▓▓▓▓▓▓
10     Q  Okay.  So that following week, beginning the 8th
11  and after your meeting and so forth --
12     A  Right.
13     Q  -- no recollection that -- that anyone came to you
14  to discuss any additional information about that, and then
15  the following week comes, and on the 17th actually, I
16  believe, is when we first interviewed you, if I'm not
17  mistaken.
18     A  Yeah.
19     Q  And in fact, my recollection is -- is that you
20  said you had just finished up.  It might have been in the
21  afternoon because you -- I believe you said you had just
22  finished up constructing this new memo that came down, and I

Page 53

1 recall you saying that initially they wanted it by noontime

2 --

3    A  Yeah.

4    Q  -- and then they knocked it down to 9:00 and so

5 forth and so on.  So something obviously happened.

6        My initial question is this.  You've already said

7 that Tran came to you and told you that you needed certain

8 -- you needed to reconstruct and that you needed to put it

9 in a particular format.

10    A  Right.

11    Q  What did you do different --

12    A  Between --

13    Q  -- that time -- no.  What did you do different

14 that time in reconstructing the new memo?  Okay.  What did

15 you do different from then than you did originally with this

16 in terms of trying to stir your mind up as to what may or

17 may not have been on that -- that external hard drive?

18    A  Okay.  Well, this was based on looking at CDs, my

19 memory stick.  What Dat said he wanted was numbers.  He

20 wanted to know how many SSNs were in these files.  So I had

21 to go and find the files on my office machine.

22    Q  On your work computer.

Page 54

1    A  I had to do SAS runs to sort of count how many

2 SSNs there were.  Now, you can't really count SSNs very

3 satisfactorily.  What you've got to do is you've got to look

4 for things that are going to be out of range or missing.  So

5 I did that.

6        And the other thing he asked, he said we want to

7 know how many records there were in the file, how many of

8 them had SSNs.  I don't think his format asked for how many

9 had names or how many had addresses.  I think SSN was the

10 primary thing, but that was the major difference.

11        Now, when I tried to figure out what was in the

12 BIRLS file that had gone astray on my hard drive, I never

13 imagined -- let me back up.  That doesn't even sound right.

14        I -- I never considered it even a remote

15 possibility that the whole BIRLS extract that had been

16 prepared for Susan at AAC had been stolen because I would

17 have never bothered to bring that home.  That was just

18 filled with stuff that, from my point of view, was junk,

19 clutter, cost space on my drive, cost time to prepare, just

20 drek.  So -- but I do remember when I was trying to talk

21 about BIRLS.  I think I got hold of a memo that I had traded

22 back and forth with this guy Munoz at AAC that showed

Page 55

1 basically what we were asking him to include that hadn't

2 been included before, and I don't know whether that got

3 appended on that occasion or not.  If it did, I have a

4 really bad feeling about that because that would have really

5 misled people badly.

6        What I think went astray for BIRLS from my hard

7 drive was what I told you initially, the names, the Social

8 Security number, and then the items for up to three periods

9 of service, entry, exit, and service number.  There were a

10 whole lot of other things that had been prepared for Susan

11 that I don't think we're ever at risk.  Okay?

12        So -- so that's what I'd like to say on that.

13    Q  So, just so I'm clear on this then, the -- you did

14 use, in fact, to prepare that memo that you have in your

15 hand there -- you used some of the CDs, CDs that you had in

16 your desk drawer.

17    A  Yes.

18    Q  You didn't need to go to your work computer for

19 that, but in order to satisfy Mr. Tran's wishes, you needed

20 to go -- by the way, and -- and using those CDs, though, you

21 would have been able to come up with number of records,

22 would you not have?

Page 56

1    A  With one exception.  When I was later trying to

2 use those materials to see what was actually on them, there

3 was one file or set of files that was in compressed format,

4 and I put a password on it, and I don't think -- I don't

5 think I put the right password in myself.  So, for that one,

6 I said I don't have the time, and I went to my office

7 version on my desktop --

8    Q  Right.

9    A  -- to see what I had because Mr. O'Neill had asked

10 what was the password for these compressed files, and I told

11 him what I thought it was.

12        I mean, there's a couple more possibilities.

13 There's not a whole lot of possibilities.

14    Q  Right.

15    A  But I wasn't able to read it, and I was in a

16 hurry.  So I just went to what was on my desktop.

17    Q  So you could have gotten the numbers off there and

18 then -- and then just the added information you would need

19 the computer to get the files to get the Social Security

20 numbers.

21        Now, there's some information that we have when

22 you are preparing this memo, the 17th memo, helping to --

228

Page 57

1 helping to prepare information that's going to go in a memo

2 that's on the 17th --

3    A  Yeah.

4    Q  -- you're getting rushed.  It's -- they're looking

5 for this information, and we have information that -- that

6 Mr. Tran gave you assistance in developing the mustard gas

7 file.  Do you recall that?

8    A  Yeah.  Okay.  Now, on the mustard gas file, one of

9 the questions that Dat asked me was: "Well, ████, the

10 numbers aren't the same.  What's going on here?"  And --

11    Q  Let me back up a little bit --

12    A  Yeah.

13    Q  -- and see if I can refresh your memory.  Did he

14 not -- because of time constraint, did he not himself assist

15 in providing the information about the mustard gas file?

16    A  I don't think so.

17    Q  You don't recall that?

18    A  No.  I mean, it's possible after I had given him

19 what I had that he might have done something.

20    I think Dat was really concerned with getting this

21 ready, but I don't know if he -- he did that.  What --

22    Q  Well, could you say unequivocally that on that

Page 58

1 day, on the 17th, that -- that you prepared the information

2 about the mustard gas file initially?

3    A  Yeah, I would say so, and I think Dat pointed out

4 that the numbers didn't agree with something that I had done

5 previously on this.

6    And now this is confusing to me because I see here

7 that there's nothing about numbers, and then there is this

8 rush thing that we did for rising to the Secretarial level

9 which I thought was, you know, like Friday of the week

10 before I was put on AL, but maybe it was later.  But I

11 remember -- I have a memory that the numbers were

12 discordant, and one of the reasons was this.

13    Q  The number of records, you're talking about?

14    A  Yes.

15    Q  Okay.

16    A  Number of records.

17    Q  Okay.

18    A  Let me just tell you.  The mustard gas file was an

19 Excel spreadsheet.  Okay.  Now, what we got initially for

20 Joe Salvatore had big "N" records.  Okay.  Now, not all of

21 the big "N" needed me to help it in any way because some of

22 them already had --

Page 59

1    BY MALE QUESTIONER:

2    Q  I'd like to get a clarification.  The big "N"

3 records?

4    A  Yeah, big "N."  That's the number of records that

5 came from VBA and Joe's file, whatever it was.  It could

6 have been -- let's say 13,000.  That's big "N."

7    Q  Okay.  Got it.

8    A  Okay?  Now, my part in this was to help find SSNs

9 for vets in that file who didn't have an SSN yet.  So I

10 wouldn't have been interested in looking at the guys who had

11 the SSNs already.  So I'd be looking at the smaller number,

12 little "n."  Okay.

13    So, again, I wasn't able to consult the file that

14 might have been on the hard drive.  I wasn't even positive

15 that the stuff was on the hard drive.  I said it could have

16 been because it was on my memory stick.

17    And now you've got to understand something too

18 about all of this process.  I didn't find all of the CDs

19 that I had at home and bring them back on the 5th.  I mean,

20 I brought them in when I found them, but there had been CD

21 in the drawer where the -- the hard drive had been hidden

22 and then stolen from.  I brought those in, but I'm not sure

Page 6

1 when it was.  It could have been on the 5th.  It might have

2 been the next week.

3    I began to bring in stuff as I found it, and I

4 also began trying to expunge stuff off my -- my home hard

5 drive.  Now, on that, what I was trying to do was I was

6 trying to at least keep a copy of it, but I wanted to get it

7 off my home hard drive, if I could.

8    I was still in the mode of thinking that I might

9 be able to retain my job, and I didn't want to just flush

10 this work.  So I had either put it on a CD or I had put it

11 on my memory stick.  So there I was.  I was trying to put

12 stuff on media to bring back to the office, get it out of

13 the house, but I didn't do it all at once, and in fact, I

14 never completed.  There is stuff on my hard drive that when

15 I talked to your guys is clearly going to be office-related,

16 but I wasn't able to complete this.

17    So, anyway, what I'm getting at is on -- on one

18 occasion, when I was writing up an appreciation for number

19 of cases in the mustard gas file, I think I used my memory

20 stick.  Well, that might have been little "n."  I was also

21 trying to get stuff off my memory stick, and then when I had

22 to come up with another estimate about what was at risk from

229

Sworn Testimony: ██████ 6/16/06    Condensed

1  the mustard gas file, the only thing I had left, as I
2  recall, was my office machine. So I used the version of the
3  data that was on my office machine, but that version was
4  probably the original file that Joe had given me to work
5  with, and so it would have had a larger number.
6      And so this is the sort of thing that in the
7  Office of Policy, Planning and Preparedness drives people
8  bats. If you ever give them a number, they are like dogs,
9  and they say, you know, "Last time we spoke to you about
10 this, it was X. Now you say it's Y, you know. So why is
11 there a difference here?" And, you know, I've tried to
12 explain why there was a difference. It was because time was
13 short, and this wasn't a perfect process, but anyway, go
14 ahead.
15     Q  That file -- I don't want to forget to ask you.
16     A  Yeah.  Yeah.
17     Q  The mustard gas file, you deleted that on your
18 memory stick after the burglary or before?
19     A  Oh, it was on my memory stick after the burglary.
20     Q  So you recall deleting it?
21     A  I thought I had.
22     Q  You did.  I just wanted to confirm that's how

1  the chronology ran.
2      A  Yeah.  I thought I had, but to be honest with you,
3  I think it was after I had already had this confusion of the
4  two versions of it because the -- the name wasn't spelled
5  out perfectly, as I recall, and so I was -- I was really
6  looking for these files in a hurry, and if I didn't see it,
7  then I'd go to my office machine and use what was there as
8  my last resort, but my share resort. Everything that I had
9  taken home basically was on my office machine still.
10
11     Q  As you brought in these CDs, what did you do with
12 them?
13     A  Well, some of them had my own private data, like
14 my tax stuff and other information confounded with office
15 stuff. This is embarrassing to say, but the reason was that
16 after I got my notebook computer from the office, it could
17 read and it could write CDs, and my home computer could
18 write CDs, and I was having problems with my home computer.
19 So what I did was I wrote my private stuff on the home
20 computer out onto a CD, and then I plopped it all into a
21 directory on my notebook from the office, so that I'd have a
22 copy of it, and then I went ahead and put Windows XP,

1  brand-new installation, out onto that home computer.
2      Well, so there I was with yet more copies of my
3  data. I mean, I had -- I had backups prepared from backups
4  prepared from backups. So, anyway, when I brought all of
5  this stuff back to the office, I thought, you know, I really
6  got to figure out what of my stuff I want to keep and what
7  of the office stuff to leave on this, and I didn't want to
8  just hand my own stuff over to the office. I wanted to make
9  copies of that, so that I could keep those, and I didn't
10 want to give any of that stuff to the office.
11     BY MALE QUESTIONER:
12     Q  But this is when you were exchanging your laptop,
13 VA-issued laptop for a VA-issued desktop that you would have
14 had left. Is that right? Is that what you thought at the
15 time there?
16     A  Yeah.  Yeah.  CDs, right.
17     Q  Okay.  Just wanted to make sure of the relative
18 time frame.
19     A  Yeah.  But when I -- when I was bringing stuff
20 back to the office after the burglary, I was trying to sort
21 out what's mine from what's the office's because there was
22 mixed stuff on some of these CDs. So what I did with some

1  of these mixed CDs was, I said, okay, I could tell from the
2  directory names what's mine and what's the office's. So I
3  made a copy of what was mine onto one of my CDs, a fresh CD.
4  I'd make a copy of what the remnant was onto another CD for
5  the office, and then I'd break the CD in question in part
6  with my hands. I'd break them into four pieces. I just did
7  that in the office.
8      Now, the drawback with that procedure is I'm sure
9  that some of those CDs where I had sequestered what was mine
10 probably still contained at least source code that I had run
11 for this matching process and may have had some of the text
12 files that were used in matching, but that was much closer
13 to what was mine than any previous version had been, and
14 what -- what I created for the office as a remnant from
15 these confounded CDs would have held only what was the
16 office's -- I made sure of that -- but may not have held
17 everything that was the office's from the confounded CDs.
18 Yeah.
19     Q  Do I understand you to say that the CDs that were
20 in the drawer in proximity to the external drive that was
21 stolen --
22     A  Yes.

Sworn Testimony: ▮▮▮▮▮ 6/16/06    Condensed    Administrative Investigation

Page 65

1    Q -- we don't really have those CDs. We have copies
2    of files that were on those CDs?
3    A Not in all cases.
4    Q Just in some cases.
5    A Yes.
6    Q Okay. Got you.
7    ▮▮▮▮▮▮:
8    Q Just in those cases where you had shared
9    information on a CD, your guesstimation on how many CDs that
10   might have been?
11   A I made two such CDs at the office during what I
12   was just describing, and there's something called like
13   "▮▮▮▮ Stuff" and ▮▮▮▮ Stuff Two. There's two CDs that
14   were created on the same date, and then there was a CD that
15   was created at a wholly different time, and those would have
16   been the three CDs that Mr. O'Neill seized on the 24th of
17   May.
18         BY MALE QUESTIONER:
19   Q Oh. That was from your home.
20   A Yes.
21   Q Okay. Got you. Well, then we've got all that.
22   A Yeah. I think you've got it all.

Page 66

1    Q I just would like to remove any possibility of any
2    date confusion here because earlier you said on May 11th,
3    Thursday, May 11th, you thought Dat Tran called you at home
4    and said the next day, you needed to write this up. What I
5    -- I guess what I'd like to make sure -- because that
6    doesn't conform with our study to date. We -- as Steve
7    said, our records would indicate that that conversation
8    probably occurred on the night of the 16th, and you came in
9    on the 17th, and there was some conversation I remember
10   reading in the transcripts about you wanted -- you needed --
11   you were asked to get a police report. You were going to be
12   late that morning, but then you abandoned that because you
13   were told to get in earlier because they needed it at 9:00.
14   So I am trying to help you make sure that it wasn't May
15   11th, Thursday, that it was actually the following week
16   after you were interviewed by Agent O'Neill and Agent King.
17   Does that help at all or --
18   A Okay. Tell me what the day was that I spoke with
19   Agent O'Neill.
20   Q Monday the 15th.
21   A Okay.
22

Page 67

1    Q Let me give you another date. You spoke to us on
2    the 17th.
3    A Okay.
4    Q The day that you came in.
5    ▮▮▮▮▮▮:
6    Q Right. And you told us that you had not finished
7    writing it or that it was not completed, and so we asked you
8    to complete it, and then on May 18th, you sent us this, a
9    more complete version.
10   A Yes.
11   Q You can look at it.
12   A Yeah. This stuff here is good stuff, and I gave
13   you this on what date? Yeah, the 18th.
14        So, yeah, I -- I still don't know what date -- I
15   mean, I am confused as to what the date was that Dat asked
16   me to get the stuff prepared for the General Counsel to
17   present to the Secretary.
18        BY MALE QUESTIONER:
19   Q Do you think it preceded your first encounter with
20   an OIG employee?
21   A Well, that makes sense to me because --
22   Q Remember, you were keeping your head down.

Page 68

1    A Yeah, I was. I was keeping my head down.
2    Q When did you realize your head was no longer down?
3    A Well, for sure -- for sure -- for sure when I met
4    the two agents.
5    Q Is it fair to say that if you were asked to
6    prepare something for the Secretary, you would realize your
7    head wasn't down far enough?
8    A Yes, exactly, but I had the impression that that
9    was before I met the agents.
10        See, what I -- what I don't understand is how,
11   after having met the agents, I would then hear that this was
12   rising to the Secretary's level. For something to rise to
13   the Secretary's level, it would have had to have been before
14   Agents O'Neill and King visited.
15   Q Don't assume that. Don't assume that.
16   A Oh, okay.
17   Q Let's just say for sake of argument, it may have
18   happened as a result of being interviewed with the agents --
19   A Yeah.
20   Q -- and then the magnitude of the loss became
21   known.
22   A Okay.

231  b6 b7

Sworn Testimony: ██████████ 6/16/06   Condenselt™   Administrative Investigation: Missing Dat

Page 69

1   Q   So --
2   A   Well, you know, I can't really help you out any
3   further on this.
4   Q   Okay.  That's fine.  I just wanted to clarify.
5   A   All I can tell you is that one evening, I got the
6   call, and the next day, I cobbled something together.
7      Now, what I don't understand is since you've got
8   all of this stuff, where is the stuff that I cobbled
9   together that I thought was going to be given to the General
10  Counsel for the Secretary's presentation?  What date was
11  that actually if --
12             ████████
13  ` Q   I believe that was the 17th.
14  A   Really?
15             ████████ Yeah.
16         BY MALE QUESTIONER:
17  Q   Yeah, I think so.
18  A   Well, I'm --
19  A   But I can't confirm with my records here.
20         ████████ I can --
21         MALE QUESTIONER:  Actually, Steve, you're familiar
22  with this.  It's probably right there.

Page 70

1         BY MALE QUESTIONER:
2   Q   Let me maybe help you, your memory, a little bit
3   more.
4   A   Sure.
5   Q   If you were asked to prepare this --
6   A   Yes.
7   Q   -- do you recall delaying it for 5 or 6 work days
8   to prepare it, or did you prepare it to present the very
9   next day?
10  A   If I -- I think -- I wouldn't have been permitted
11  to delay 5 or 6 days.  I mean, that's absurd.
12  Q   Right.  But, I mean, you don't recall any -- I
13  mean, you -- to the best of your recollection, is it fair to
14  say you would have provided it the next day, whatever that
15  next day is?
16  A   Yes, absolutely.
17  Q   Okay.
18  A   And the version that you seem to have in your
19  hands for the 18th looks like an elaboration or a completion
20  of what I had abortively prepared the day before.
21  Q   Exactly.
22  A   So the conversation with Dat where he was telling

Page 71

1   me that the stuff was probably rising to the Secretary's
2   level could have been the 16th, I admit, but I don't know
3   why I remember it as earlier than that.
4             ████████
5   Q   I think even though this is in memo format --
6   A   Yeah.
7   Q   -- from Mike McLendon, I think this is the data
8   that you had prepared on the 17th.
9   A   Okay.  All right.  Yeah.  Yeah.  And -- and the
10  elaboration --
11  Q   It's right here.
12  A   Yeah.  -- has data fields in it, but basically --
13  and there was something -- there was a lot more on -- oh,
14  yes.  Here's the discrepancy in numbers and the difference
15  in fields.  This thing here says that there were 4,495, and
16  this one here says there were 6,743, and this has a whole
17  scat of variables.  That is the original file.  This, I
18  think, was the file that I had been working with that
19  probably did not have SSNs to begin with, and also I would
20  not have trudged along with all of the extraneous fields
21  that have no bearing on making an identification that I had
22  the right guy.  So this -- this probably, if I had to make a

Page 72

1   guess, was what came off my memory stick, and this probably
2   was what came off of my office computer.  Okay?
3   Q   But you made the change yourself from one memo to
4   the next?
5   A   I'm sure I did.
6   Q   And do you recall at any point early on that Dat
7   came to you and asked you -- he was a bit confused after
8   reading what Mark Whitney had written up because it sounded
9   like your CDs had been stolen.  So he came back to you and
10  asked you to clarify that?
11  A   That, in fact, is what I had told Mark.  I feared
12  that even my CDs had been stolen, but -- and this is really
13  -- looking back on it, it's difficult for me to -- to
14  understand why I did this, but when we looked at what had
15  been taken on the 3rd, there was the bag that had contained
16  the hard drive on the floor, and we were just looking
17  through what was left, and I didn't -- I didn't rummage
18  until I found the CDs.  I just thought, oh, you know,
19  probably the CDs are gone.
20     Later, I was more thorough, and I went back
21  through all the drawers that remained in the house in that
22  dresser, and I found a whole bunch of CDs, and I said,

252-06 b?

Sworn Testimony: ███████ 6/16/06    CondenseIt™    Administrative Investigation: Missing Dat

**Page 73**

1   "Well, you know, they didn't take these," and I think upon
2   the point of finding them, I said, "But I better not keep
3   them here anymore. So I'll take them to the office."
4   Q   But you had told Mark Whitney that you thought
5   that they were stolen?
6   A   Yes. I think I did.
7   Q   And that was on Friday the 5th?
8   A   Yes. Yes.
9   Q   And do you remember Dat Tran coming to you and
10  asking you to clarify that or --
11  A   He may have. I mean, it seems to me people have
12  asked this before. So it's possible it was Dat. Yeah.
13  Yeah.
14  ███████
15  Q   Once you got the CDs back in, who did you
16  specifically turn them over to?
17  A   I didn't turn them over to anyone. I brought them
18  into the office. They went into my drawer in the same
19  plastic bag that I brought them from home in, and there they
20  sat until Mr. Duffy asked for them.
21  Q   So you gave them to Mr. Duffy?
22  A   I did.

**Page 74**

1   Q   Do you recall what day you did that?
2   A   Not really. And my guess, though, if I had to
3   guess, was -- would be that it would have been the week that
4   King and O'Neill came in. That's my guess, and he also took
5   my -- he asked for my memory stick. In fact -- yeah. I
6   think he got the CDs, and he asked for the memory stick on
7   the day that you interviewed me because I had said, "Mr.
8   Duffy, I'll give you my memory stick, but I've got stuff on
9   here that's mine and not the office's. I want to get that
10  off." He said, "Okay. Fine," you know, "Do that."
11      Well, our interview ran past my stipulated
12  quitting time, and I had to bolt. So I apologized to him
13  the next morning and said, "Mr. Duffy, I'm sorry," you know,
14  "I meant to give this -- I would have given this to you if
15  my interview with Mr. Jones and Ms. Shelly had not run past
16  quitting time." He said, "Okay. That's fine."
17      So I gave him the memory stick on the 18th.
18  Q   Did you give him the CDs on the 17th?
19  A   I think so, yes, and the plastic bag of CDs
20  specifically those that I brought in from home and that --
21  but it included that I said were just the office's
22  copies, I think, and it didn't include any of the CDs that I

**Page 7[**

1   had retained in my office lock-up all the time, anyway, but
2   what I gave him was stuff that I brought in from home.
3   Yeah.
4       MALE QUESTIONER: What time do you want to take a
5   break?
6       ███████ well, I was thinking the tape is
7   about to run out.
8       MALE QUESTIONER: Okay. When that runs out.
9       ███████ I thought when it runs out.
10  ███████
11  Q   Could I ask you if this looks familiar to you?
12  And for the record, I am giving you Security Guideline for
13  Single-User Remote Access.
14  A   No.
15  Q   So you've never seen it?
16  A   I have never read it.
17  Q   Have you seen it? Has it been presented to you as
18  this is something you need to follow?
19  A   No. It was never presented to me by a human
20  being.
21      Now, let me tell you, this may have been on a
22  directory that I downloaded from AAC or -- [audio break].

**Page 7[**

1   [Side A of Audiotape 2 of 3 begins.]
2   THE WITNESS: When I was going to install VA --
3   One VA VPN on my privately owned notebook, because I
4   intended to travel with that and I wanted to use it to
5   connect with the office to check e-mail, when I began to
6   look at that, I remembered that recently there had been some
7   sort of announcement that there had been a change in the one
8   VA suite of software. It could have been the virus. It
9   could have been the firewall. It could have been ERASS, or
10  it could have been One VA or it could have been Citrix. I
11  don't remember which, but I went to a VA website, and I
12  copied a whole subdirectory of stuff down to my office
13  machine, and amongst the things that I got were a lot of
14  documents on how to install it, and there were -- there were
15  subdirectories and pieces of installation software for those
16  software suite items.
17      It's possible this was in there.
18  ███████
19  Q   Does this specifically look familiar to you?
20  A   It doesn't. I mean, I never printed all that
21  stuff out, but I will tell you this. No one, absolutely no
22  one ever handed me this document, said, "███████ I want you

233 b6 b7[

Page 77

1  to read this." That never happened, and -- and actually,
2  Mr. Axelrod and I have been talking about this.
3      In all legitimate access to VA datasets that I was
4  granted, you have to go through a gateway called ACRS, and
5  that stands for Automated Customer Registration System with
6  AAC, and I think it's run by VBA people down there. Okay.
7      I had three separate ACRS forms signed by my
8  supervisors, two by Laura O'Shea, one by Dat Tran, for
9  access to this or that through the Austin mainframe. On
10 none of those occasions was I ever given any instruction as
11 to the proper custody or care of VA data. I was never asked
12 to sign anything acknowledging that I had read or been told
13 such guidelines.
14     I mean, I'm -- I'm sorry. I'm getting sort of
15 polemical here, but I feel strongly about it, and obviously,
16 it's not your fault. But when the Department in its
17 releases says this employee was -- took material home which
18 he was not authorized, my feeling is the Department never
19 authorized or dis-authorized anything one way or the other.
20     So excuse me. Sorry, folks
21   Q  But again, this is something -- if you did get it,
22 it was at your own initiative, going on to the -- going

Page 78

1  online. Is that what you're saying?
2    A  Yes, it was.
3        BY MALE QUESTIONER:
4    Q  And it would have been something you stumbled
5  across at best. It wasn't something you devoured or read,
6  that you don't remember anything like that?
7    A  No.
8    Q  So it's just a possible document that was housed
9  on that?
10   A  Yeah.
11       Now, one further thing -- and, John, I don't think
12 I've drawn this out for your particular attention -- was
13 that when I installed One VA VPN software on my private
14 notebook -- I mean, I had already done that also on my
15 office notebook, but when I had it installed on my private
16 notebook, I had problems. I found that when I tested this
17 stuff from home to see whether I could get to AAC, there was
18 something wrong, and I wasn't sure what the problem was.
19       I brought my office -- sorry. I brought my
20 private notebook to the office, and I called the folks who
21 support One VA VPN for some assistance, and I took it down
22 to the B level where the cafeteria is -- no -- C level.

Page 79

1  Yeah. I took it down to the C level, went way over to the
2  left as you get out of the elevators, end of the corridors,
3  sort of over near the gymnasium, and folks there actually
4  spent a lot of time trying to help me configure this stuff,
5  so that it would work on my private notebook. So this is
6  something else where -- I mean, they were doing their jobs,
7  but, again, in what has come out in the newspaper, I feel I
8  am being goaded unfairly.
9      I didn't just put this stuff on my notebook. I
10 had VA assistance in putting it on my notebook.
11   Q  This stuff being the VPN suite of --
12   A  Absolutely. Absolutely.
13   Q  And SAS. Right?
14   A  Yeah, but the SAS was legitimate.
15   Q  I understand.
16   A  And I did not require assistance for that part,
17 but the One VA VPN, I definitely needed help, and I got it.
18 Yeah. I mean, I have no complaints about that. It's just
19 that I feel I was painted as -- as someone who was doing
20 something really beyond the pale, but it wasn't. It
21 absolutely was not.
22     And in fact, the One VA VPN suite of software, as

Page 80

1  I understood it, was expressly to be used for employees to
2  communicate with VA ADP resources from remote locations. I
3  mean, I don't understand what the purpose is otherwise.
4      Okay. Sorry.
5    Q  There's no argument there.
6    A  Yeah. End of polemic.
7    ＿＿＿＿＿＿
8    Q  Okay. I have one more question before we take a
9  break. Did you tell Mr. McLendon that you had done
10 something wrong? Did you admit that you had done something
11 wrong?
12   A  I did.
13   Q  And what did you base that on?
14   A  Okay. Now, this is a crucial point. I felt that
15 as a person of my experience and wisdom, I should have known
16 better to remove VA data from its safe environment. That
17 is, if it had been stolen from the building, no blame would
18 have attached to me.
19       When I put it on storage media outside the
20 building in my own house, I was basically exposing it to
21 risk that it would not have had otherwise. Okay. That was
22 wrong.

Sworn Testimony: ████████████ 6/16/06   Condensed Transcript

1    What I don't consider wrong was the use I was
2  making of the data. I was fully entitled to use that data,
3  but perhaps not in the manner and place where I used it.
4  But I had legitimate access to that data. I had been given
5  it. It was all signed for.
6    The project that I was working on hadn't been, you
7  know, signed off on, but [inaudible] of my projects ever
8  were. But I will say it hadn't even been suggested by
9  anyone at the office, but then I would also say, well, which
10  of my projects were necessarily. I mean, what I did for the
11  mustard gas people, which I thought was great, was I -- I
12  provided some additional data that could save VBA people
13  time in figuring out how to get in touch with these people
14  because what they needed was the SSN, and I did that pronto.
15    Q  Okay. Can --
16    A  Sorry.
17    Q  Can we stop now because --
18    MALE QUESTIONER: Can I as something before?
19    ████████ sure.
20    MALE QUESTIONER: In the disciplinary process,
21  which I understand you are not part of, we have taken the
22  position that by giving him authority to take the SS – SAS

1  program, they had to know that he was using SAS data at
2  home, and that this was all with at least the knowledge and
3  certainly the approval of people. Obviously, it didn't work
4  out quite the way anyone expected, and I'm not saying that
5  -- that there's not some fault there, but in terms of taking
6  the data home, they had to know when they gave him access to
7  the program and also when they gave him the Government
8  laptop to take home that the data was going home.
9    ████████ okay.
10    THE WITNESS: There's -- if we're going to
11  continue, I'll just hold my --
12    ████████ Yeah. I think after we take a break,
13  we'll talk more about what projects you were working on.
14    MALE QUESTIONER: Let's discuss what kind of break
15  everybody wants, but I just want to --
16    ████████ We'll do it off. We'll do it off.
17    [Off the record.]
18    ████████ okay. We're back on the record.
19
20    Q  I think what we'd like to do is to go through
21  these files that you believe you had on your hard drive --
22    A  Uh-huh. All right.

1    Q  -- and make sure we understand them. The first
2  one, obviously, is the BIRLS extract, the January 2006
3  extract.
4    A  Right.
5    Q  And I was -- for that one, I was just wondering.
6  You said that for the first time, you -- you finally got
7  service numbers, and so are you saying that that -- that was
8  not on what Susan Krumhaus was getting?
9    A  Prior, that's correct.
10    Q  And did you use the BIRLS prior to that, prior to
11  January '06 for any projects or any reason?
12    A  Yes. I had -- I had downloaded it. Now, what the
13  use I made of it was -- I'm not altogether sure.
14    I don't think it would have been -- oh. Oh, oh,
15  oh, oh, oh. The BIRLS itself wouldn't have been a
16  particular help in my matching project except as far as this
17  is concerned. BIRLS has separate name fields; that is, you
18  can look in one place, and you can get the vet's first name.
19  You can look in another place and get his last name and so
20  on.
21    My thought was -- and it's one of the datasets
22  that I referred to later in this document -- that what I

1  could do was I could take the June 2000 administrative file
2  from sort of -- one of the precursor files for making the
3  administrative frame for the survey, NSV 2000. What I could
4  do is I could match on SSN, and I could get the guy's actual
5  name finally, almost 100 percent by matching on SSN, and
6  then I wouldn't have to write programs to parse the
7  addresses and look for all of the weird exceptions like
8  spouses, custodians, guardians, executors, that sort of
9  thing. I just get their names cleanly, that way.
10    Of course, I'd still have a problem with female
11  vets who might have married in the meantime and legally
12  changed their names, but that would have been really a small
13  problem because, by and large, even though there are a lot
14  of women in the armed forces today, as a percentage of
15  existing veterans, they are still a small percentage,
16  something like 10 percent. So that would have been okay.
17    Q  Okay. So this was using an older version of
18  BIRLS?
19    A  Yes. But I wouldn't have kept two versions on the
20  same computer at the same time because this version, which
21  think was on the hard drive, was better, and I'm not going
22  to pay for the same thing, in terms of storage, twice.

235  b6 b7C

**Page 85**

1  Q  Right.

2  A  Okay?  Right.

3        ██████████ Did you have any questions on that

4  BIRLS? ███████

5  ████████ No, not that one.

6  ██████ Okay.

7  ██████ I do.

8  ████████

9    Q  I just want to understand this.  I mentioned

10  earlier that I may have to explain this in layman's terms.

11    A  Sure.

12    Q  You were using the January 2006 version because it

13  had service numbers in this first extract that had it.

14    A  Right.

15    Q  And you were matching it up against the mustard

16  gas file --

17    A  Right.

18    Q  -- because you wanted to -- when you found the

19  match, you would extract the serial number from the BIRLS

20  extract and move it into the mustard gas file or to another

21  file altogether?

22    A  If I could find a record in BIRLS that had the

**Page 86**

1  same service number as one of the guys in the mustard gas

2  file --

3    Q  Uh-huh.

4    A  -- then what I'd take from the BIRLS record is the

5  guy's Social Security number --

6    Q  That's what I meant.  Yes.

7    A  -- and put that in the mustard gas record.

8    Q  Oh.  If I didn't say it, that's what was in my

9  mind.

10    A  Yeah.  But that's -- that's what it was for.

11    Q  All right.  And then you -- that was your sole

12  purpose of matching the BIRLS against mustard gas was to

13  identify Social Security numbers.

14    A  Yeah.

15    Q  Is that accurate?

16    A  That is correct.

17    Q  Okay.  Then what would you do when you found --

18  how many matches would you compile before you would turn it

19  into somebody?  Give me that.  What would you do with the

20  information once you developed it?

21    A  Well, you know, I know that at least twice I sent

22  files to some guy over in VBA.  I think his name was Abbot,

**Page 87**

1  but I'm not really clear on that.  Joe -- Joe Salvatore

2  could tell you if you needed to know.

3        And Abbot may just have been -- he might have been

4  the sort of higher level guy.  What I ultimately wound up

5  doing, though, sending Excel files to someone over there,

6  and I'm not really sure what they did with those Excel files

7  afterwards.

8    Q  What would the Excel file look like that you were

9  sending over?

10    A  It would have enough information in it from my

11  point of view for someone to say, "Yeah, I think Johnson" --

12  they all did, you know.  This is the name out of the -- this

13  is the name, birth date, service number, out of the mustard

14  gas file itself, and here is the same information obtained

15  from BIRLS, so that you could look at them side by side and

16  say yeah, that's the same guy or looks like the same guy.

17    Q  Okay.  So going back to what I said then --

18    A  Yeah.

19    Q  -- you were taking more out of BIRLS than just

20  Social Security number.  You were also taking off the name

21  and some other identifiers out of BIRLS, so that it could be

22  married up with the same data for the same record that was

**Page 88**

1  in the mustard gas file?

2    A  I guess that's right.

3    Q  Okay.  And tell me one more time what you can

4  recall you'd take out.  You would take the SSN?

5    A  Yeah.  I'd take the SSN, the -- the guy's name.

6    Q  And they would be separate fields?

7    A  Yeah.  Yeah.  And I think also the birth date

8  because, if you -- if you said, "Oh, yeah, I think this is a

9  match," based on service number and you had a serious

10  discrepancy on something like the year the guy was born in,

11  then you'd have to say, "Well, maybe this isn't such a good

12  match," but I -- I pulled those things, and I think what I

13  passed along finally were the things that looked solid on

14  last name, service number, and maybe the guy's birth date,

15  but I didn't get too absorbed in whether the month or the

16  day was exactly the same.  The year had to be the same or I

17  didn't think it was authentic.

18    Q  Okay.  So this -- this match --

19    A  Yeah.

20    Q  -- you would -- you would do the match, and then

21  it would, let's say, hit on what percentage?  In the mustard

22  gas file where you had -- I'm just going to make this up.

Sworn Testimony: ~~[redacted]~~ 6/16/06  Condensed

1   Let's say there were 3,000 people and they were without
2   SSNs.
3       A   Yeah.
4       Q   And you made the first match, and let's just say
5   you found 2,000 of them.
6       A   Yeah.
7       Q   Did you look at one record at a time to see if the
8   names kind of matched?  It sounds like you did.
9       A   Well, what I do is I'd let the program develop the
10  matches for me based on criteria that I had written, but
11  then I thought I need to at least look at this before I send
12  it over to VBA --
13      Q   Right.
14      A   -- because I'll look like a dope if -- if there's
15  some sort of glaring error.  So I -- I would look through a
16  sample at least of them, maybe the first hundred or maybe
17  even the whole thing.  Sometimes I'd look through the whole
18  thing, depending on how many there were.
19      Q   All right.  And was I in the ball part?  I mean,
20  did you have a quantity of percentage of hits the first time
21  you ran the match?  Then did you --
22      A   I -- to be honest, Mr. O'Neill, I don't remember.

1       Q   You don't remember?
2       A   But also I would say this is stuff that I sent by
3   e-mail --
4       Q   Yeah.
5       A   -- to those people in VBA.  It is surely something
6   you could check or ask them to verify for you.
7       Q   Okay.  Well, the last question I had --
8       A   Sorry.
9       Q   -- on that issue was, would you only send back
10  records where the match occurred and not send them if those
11  records, for whatever reason, didn't match up at all?
12      A   Well, they already knew the people who didn't have
13  the information they needed.
14      Q   I know, but they didn't know what you -- they knew
15  when they gave the file to you what -- what didn't have the
16  numbers, but then did you exclude all the non-matches when
17  you replied to them and gave them -- "Okay.  I've got all of
18  these hits"?
19      A   I only sent them stuff that I thought was hot.
20  Yes.  Yeah.
21      Q   Okay.  Good.  So different files.
22      A   I just sent them hot stuff.

1       Q   All right.  So I -- I just wanted to make sure.  I
2   think I have a full understanding now of why you would need
3   BIRLS for the mustard gas file.
4       A   Right.
5       Q   And you were asked to look at the mustard gas
6   files.  I know I've read your transcript, and I've read all
7   of -- but refresh my memory.  Who asked you to work on the
8   mustard gas file?
9       A   Well, Dat did.  Joe Salvatore brought this file
10  with him to our office when he left the Compensation and
11  Pension Service, came to work for Mike McLendon.  After --
12      Q   Was that before he came to you -- I'm sorry --
13  before Salvatore was transferred to 008A, had you worked on
14  the mustard gas file before that?
15      A   No, not prior to that.
16      Q   Okay.
17      A   The funny thing was that Joe had moved into the
18  cubicle across the aisle from mine, but the first I hard
19  about the mustard gas file was from Dat, and then it turned
20  out, oh, it's Joe's, and then so Joe and I would talk about
21  it frequently.
22      Q   Okay.  So it's coincidental then that Salvatore

1   was then sitting across the --
2       A   Yes.
3       Q   -- hall from you.  You were asked to work on it by
4   Dat --
5       A   Correct.
6       Q   -- for comp and pen -- I mean for VBA comp and pen
7   section?  What did you call it, "comp and pen service"?
8       A   Well, actually, Joe had sort of put this mustard
9   gas file together while he was in the comp and pen service,
10  and he sort of stayed in touch with that problem.  He
11  actually stayed in touch with a number of issues from his
12  old office, even though he was now in our new office, but
13  the idea of using BIRLS as a further source of serial --
14  service number was basically my idea.
15          Now, where I draw a blank is what effect did
16  having the service number in the BIRLS file actually have on
17  matching against the mustard gas file, and I'm not sure that
18  I can give you an answer on that, and I don't know why, bu
19  what I think is the case is recall that the first instance
20  in which we got a BIRLS that included the service numbers
21  was sometime in January.
22      Q   Uh-huh.

Page 93

1    A   Okay.  And I think my matching was very cold by
2    then.  So I think, you know, that was sort of like that was
3    yesterday's business by the time we actually got the file
4    that we had been seeking.
5          BY MS. SHELLY:
6    Q   So you had been working on it prior to when you
7    got the January '06 extract?
8    A   All of the matching that I remembered doing
9    against the mustard gas file using BIRLS data was with the
10   previous version of -- no.  I didn't even use BIRLS.  I
11   didn't use the previous BIRLS to match against mustard gas
12   because it didn't have service number.
13         What I used for matching against mustard gas file
14   was information that I derived from the comp and pen Master
15   Record because we had access to the comp and pen Master
16   Record, and get ready for a big embarrassment, folks.
17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18   Q   No.  We know where you got it.
19   A   Okay.
20   Q   And why you got it.
21   A   All right.  Okay.  So -- but the comp and pen
22   Master Record has a -- has a segment in it that is called

Page 94

1    the reference number segment, and each -- each type of ID
2    number that can be found in the reference number segment has
3    a code like an alphabetic letter, and it was possible to
4    find SSNs.  It was also sometimes possible to find service
5    numbers in the C&P Master.
6          So what I did was I looked in the C&P Master to
7    see if I could find the SSNs and service numbers.  If I
8    found those, then that was a good source of going after
9    this.
10         Service number itself is not part of the Mini
11   Master.  So the Mini Master to which I would have had access
12   anyway was no use in trying to solve this problem, but
13   having access to the C&P Master Record did help.
14   Q   Can you tell me the first -- the best of your
15   recollection the first time you got access to the C&P Master
16   Record?  About what month did you --
17   A   I remember pretty closely that my son was wrapping
18   up his summer course at the University of Maryland when I
19   was working on this stuff.  He was -- he had had to clear
20   out of his housing in College Park, and I think he was
21   living with us in our house, and so I'm going to take a
22   guess.  I think this was in either July or August.

Page 95

1    Q   Okay.
2    A   Surely by September, we had begun to feel that we
3    were -- we were reading the C&P Master Record with some
4    assurance.
5          Later, we went through a whole deal with Susan
6    Perez in VBA's Office of Program Analysis and Integrity to
7    get -- for her to draw a thousand records from her current
8    version of the C&P file, which they keep in an Oracle
9    database, and we said, "Susan, if you'll oblige us by just
10   choosing a thousand records and giving us every single field
11   that you have in your Oracle database for those, then we're
12   going to draw the same 1,000 persons from the version of the
13   CPMR that we eventually get down in Austin, and we are going
14   to pull the data using our program for the variables that we
15   need to provide to the Institute for Defense Analyses, and
16   we are going to compare for those variables," not all of
17   Susan's, but for the variables that we needed to give IDA,
18   we are going to compare what we read from the CPMR from what
19   Susan had read from the CPMR and see if they agreed, and we
20   did that,'and the agreement was very good.  So --
21   Q   Okay.  So -- well --
22   A   Sorry.

Page 9▮

1    Q   In terms of -- that's okay.  In terms of the
2    mustard gas file --
3    A   Yeah.
4    Q   -- if I understand it, you were asked to work on
5    it by Dat Tran --
6    A   Right.
7    Q   -- probably sometime around July or August of last
8    year?  Is that possible?
9    A   Oh.  Well, sorry.  The mustard gas and the CPMR --
10   let's see.  Yeah.  The CPMR came later.  I don't know
11   exactly when I was asked to work on the mustard gas.  If I
12   knew when Joe came on board, that might be a help, and it
13   might not be because I just don't remember when Dat asked me in
14   relation to Joe's coming on board.
15   Q   Okay.
16   A   Sorry.
17   Q   Well, we can probably find that, but you'd say --
18   let me go back a minute.
19   A   Yeah.
20   Q   You were asked to look at the mustard gas file to
21   see if there is a way to develop an SSN --
22   A   Right.

238 b6 b7▮

Sworn Testimony: ██████████ 6/16/06   Conducoser?

Page 97

1    Q  -- which you would then give back to VBA and that
2    they would continue their reference using the SSN to
3    identify who the person is and the current address is.
4    A  Right.
5    Q  Is that a fair way of saying it?
6    A  Yeah.  That's -- that's -- that's very fair.
7    Q  Okay.  Now, when you were first given this
8    assignment, do you recall what pools you -- what databases
9    you used in order to go under that Social Security number?
10   A  Well, I think the first thing I -- before settling
11   on service number -- before settling on service number as a
12   good tool -- see, I couldn't have even used service number
13   until we had gotten going with the CPMR, and like I say, the
14   CPMR stuff wasn't really cooking until about the time that
15   my son was finished up with Maryland and getting ready to go
16   overseas, but I might have been working on the problem for
17   the mustard gas before then, and if I had been, I'd have
18   been using the tools available to me, which would have been
19   possibly using just names to try to match these guys.  In
20   other words, the mustard gas had first and last names well
21   distinguished.  The BIRLS, of course, has first and last
22   names well distinguished.  I might have tried matching on

Page 98

1    that, less likely that I would have used the C&P because the
2    C&P has the name confounded.  You can't find it.
3    Q  The C&P Mini Master or both?
4    A  Or either, really.  Yeah.
5    Q  Okay.  So do you recall what database gave you the
6    first successes that you can remember?
7    A  I -- I really can't.
8        Now, what I would say again, though, is I remember
9    sending at least two Excel spreadsheets to a guy in VBA.
10   Q  Dave Abbot?
11   A  It might have been Dave or Dan, yeah, but it was
12   Abbot something, something Abbot.
13       You can surely find those in my e-mail unless I've
14   scratched them from my sent list, which could have happened,
15   but then they might be in his.
16       The -- the other thing that you could look at is
17   -- on my office computer, you could look in -- well, there's
18   a number of subdirectories.  One that you might look in
19   would be -- there's a subdirectory called "DATTRAN," which
20   is sort of assignments that I get from Dat.  I don't think
21   that I had a specific mustard gas subdirectory.  In fact, if
22   you ever find the mustard gas file itself on my machine,

Page 99

1    that's probably where I would have stored results, but they
2    would have been in the form of -- first, they would have --
3    first, there would have been a SAS file, and then there
4    would have been a similar-looking named Excel spreadsheet.
5
6    Q  Actually, I think I've seen an e-mail where you
7    said that you used the VHA Health Enrollment file.  Would
8    that have -- like maybe back in September of '05?
9
10   Q  There were a couple of files on the CDs that had
11   -- that you just pulled very limited name, address, and one
12   was from VHA, and one was from C&P, and then you combined
13   them both together, and so that made obviously a larger
14   file, and I think it had Social Security number in three
15   also, and it's in both.  It's combined together to say both.
16   A  Well, that's interesting.  I mean -- VHA stuff.
17   Well, when I think of the enrollment file, I think of what I
18   get from Ralph Eskanosi [ph] on a monthly basis, but that
19   doesn't include names.  So, when I am thinking -- what I
20   think may have happened on that is that I might have gone
21   back to the health part of the frame, the health part of the
22   administrative frame for the National Survey of Veterans

Page 100

1    because that had the distinguished name fields and Social
2    Security number.  So it's possible that I used that to -- to
3    match against the names in the mustard gas file, but now
4    that would only work for the guys who were named.
5        The mustard gas files were a total mess.  They
6    were -- they were built from rosters, and just to tell you
7    how conservative they were in constructing this thing, they
8    didn't ever try to say this is the same guy, see the same
9    name twice.  What they said was: "We're going to put an
10   entry in here for every time there is a name on a roster,
11   even if we think it's the same."
12       Suppose Steve Jones had been named on two
13   different rosters.  They wouldn't say, "Oh, you know, same
14   guy."  No.  They'd say, "Here's a Steve Jones who was
15   exposed on this date, and then here's a Steve Jones who wa
16   exposed on that date."  So they didn't want to miss anyone
17   is why they didn't.
18       So what I'm thinking is that I might have used the
19   distinguished name part of that health admin frame to go
20   after the -- the named guys in the mustard gas file, but
21   there were an awful lot of guys who didn't even have name
22   There were just, in some instances, service numbers.

b6 b7c
239

**Page 101**

1    But plus, name isn't really a great thing to chase
2  people down with. I mean, you know, take a name like
3  Richard Harris. There's an awful lot of them. So it's not
4  -- if that's all you got, you're going to have to really
5  winnow through a lot of stuff.
6    BY MALE QUESTIONER:
7    Q  Okay. I need an understanding of what you mean by
8  "frame." I reasonably could understand a database, but
9  that's a new one on me.
10    A  No. It's just -- it's just out of survey
11  sampling. When you are going to draw a sample of cases or
12  veterans, the -- the file that contains those names that you
13  are going to draw from is a frame.
14    Q  Oh, okay. It's just a --
15    A  It's just a -- it's just a sampling term.
16    Q  So you would say it's a complete database that
17  you're going to draw certain records from --
18    A  Yeah.
19    Q  -- in a random manner or whatever manner you're
20  going to do it?
21    A  Right.
22    Q  Okay.

**Page 102**

1    A  Yes, sir.
2    Q  All right. So, when you are talking about this
3  frame, one is the -- the two core databases were what?
4    A  There was the C&P from June 2000, and then there
5  was a special run that VHA had done to oblige Susan that
6  just had Social Security number, the guy's name and
7  distinguished fields, one or two lines of address, city as a
8  distinguished field, State as a distinguished field, and --
9    Q  Do you know was this from the national enrollment
10  database, or was this from an --
11    A  I --
12    Q  -- ITF file?
13    A  I think it was supposed to be users and enrollees.
14  That is, if a person was either of those, he'd be included,
15  but I -- I could be wrong.
16    Q  Okay.
17    A  I mean, it could just have been users. It
18  wouldn't have been just enrollees, though, I'm sure.
19    Q  Okay. Well, that helps me in case -- let me ask.
20  The language appears in different reports and records.
21    A  Yeah.
22    Q  Okay.

**Page 103**

1
2    Q  And did I hear you say that by the time you got
3  the January '06 extract with the service numbers that
4  basically you were done with the project?
5    A  I don't remember working on it after I got this
6  thing, which we had justified getting partly on the grounds
7  that, you know, it would help the --
8    Q  The mustard gas.
9    A  -- mustard gas. Yeah. But I mean, it took so
10  long. What -- maybe it doesn't show, but we were extremely
11  frustrated in trying to get this file. We were -- we were
12  really -- there was a lot of foot-dragging. Dat was
13  extremely patient and never let go. He just -- if people --
14  you'd give them a week, you know. If they said they were
15  going to get back to him, they didn't get back to him by the
16  end of the week, then he'd wait until next week to call, but
17  he was just irresistible.
18    BY MALE QUESTIONER:
19    Q  And plus, were there more reasons to get that
20  version of BIRLS than just the mustard gas file?
21    A  We asked --
22    Q  At least as listed in terms of the rationale for

**Page 104**

1  --
2    A  Well, we asked for other variables. I mean, we --
3  we looked at these things, and a lot of the things, we just
4  couldn't figure out what they were, and we weren't getting a
5  lot of help on that either, but some things, we thought,
6  "Oh, yeah. You know, here's" -- maybe it says the guy was
7  Purple Heart. Okay, let's get it. So we asked for a bunch
8  of stuff that we didn't have a specific use in mind for
9  immediately, but, you know, you can't just keep asking for
10  --
11    Q  Right. Get what you can in case you --
12    A  Exactly.
13    Q  Okay. Got you.
14
15    And prior to that, you had been using or accessing
16  the extract that Susan Krumhaus had; is that right?
17    A  That's -- that's correct. Yeah.
18    Q  Okay. The next file is BIRLS information
19  extracted for veterans in C&P.
20    A  Yeah.
21    Q  Can you just explain what that was used for?
22    A  I'm not sure I ever actually put it to use. What

240

**Page 105**

1  it was intended to be for was to get for a version of C&P
2  the right names, and that was it, and in fact, that sort of
3  looks like -- yeah. Everything in that file was just from
4  BIRLS. So my intention would have been to merge this
5  subsequently with the C&P if I wanted to use C&P variables,
6  but otherwise, this was just to get me down to folks who
7  were in C&P, so that I could get their -- their proper
8  names.
9      Q  Did you have a specific project in mind?
10     A · This would have been related to my interest in
11  matching.
12     Q  Okay.
13        BY MALE QUESTIONER:
14     Q  Not for a particular project, but just in matching
15  in general?
16     A  Matching -- trying to identify who the people were
17  in the administrative part of the national survey.
18  Sometimes I -- I could get names out of the survey database
19  itself, if the person had agreed to take part in future
20  surveys, or I could use reverse directory look-up and find
21  out who the telephone had been solicited and from which
22  someone had responded, who was the subscriber for that line,

**Page 106**

1  and I always reasoned that while it was possible that a line
2  might have changed ownership in the meantime, that if one of
3  the names for such a subscriber actually looked close to one
4  of the names from the 14,000 or so that Westat had told us
5  about, that I was on the right track. That's -- that's what
6  I was after.
7      Q  Okay. So that's number two on the list. It would
8  be BIRLS information extracted for veterans and C&P. The
9  sole use or the primary use, if nothing else --
10     A  Well, there was the other --
11     Q  -- and, of course, the national survey?
12     A  No. There was -- I mean, that was -- that would
13  have been my personal interest. The other thing was I had
14  -- I had asked Sandy Harns-Taylor [pb], who was the one
15  person in C&P service who would answer questions from us
16  whom we -- whom we really treated with kid gloves because
17  she was the only person who'd even answer our questions,
18  much less acknowledge them.
19        I had asked her during a telephone conversation
20  once, "Sandy, is it possible that while the name is
21  confounded with the address in the C&P Mini that you have an
22  actual separate first name and last name for each of the

**Page 107**

1  vets who belong to the C&P file somewhere else?," you know,
2  "Am I just looking in the wrong place?" I was going outside
3  the box here, and she said, "No." She said, "I can't even
4  get that information."
5      Q  But BIRLS has separate name fields. Right?
6      A  Yes, it does.
7      Q  Are you trying to tell me, then, your intent was
8  to get a database with separate name fields --
9      A  Yes.
10     Q  -- so you didn't have to deal with some
11  [inaudible] --
12     A  That's exactly right.
13     Q  Is that right? In C&P?
14     A  That's exactly right.
15        So, I mean, I thought that was sort of an
16  achievement, but I never got around to sharing that with
17  VBA. It's not the sort of thing they actually would have
18  appreciated, someone showing them how to do their job
19  better.
20     Q  Oh, I see. You were saying she was unaware of any
21  databases that had these separate fields for the --
22     A  Yeah. Well, I don't think they did have a

**Page 108**

1  separate database. I think she was telling me the truth,
2  and, you know, I'm sure their data people were fully
3  occupied with other things, but it just -- VBA did not have
4  any sort of uncanned analysis capability. They couldn't --
5  they couldn't answer questions like this themselves. If it
6  wasn't in a report that had been defined when their data
7  systems were first created, they had no hope of coming up
8  with that sort of response.
9  ██████████
10     Q  And when it says C&P here, is that the Master or
11  the Mini Master?
12     A  Well, that's a good question. I think it's the
13  Mini. That's what I think because still, to go after the
14  C&P Master, it's more time-consuming. I'd have to run a
15  mainframe job.
16        I mean, actually, I'd have to run some sort of a
17  mainframe job anyway, but it's more of a pain to go after
18  the Master Record because then I sort of have to assume
19  responsibility for reading things right. If I went after
20  the Mini, then all I had to do was select the right records
21  out of a SAS file. That's a lot easier.
22     Q  Uh-huh.

241 bb b7C

**Page 109**

```
 1   A  Okay.
 2   Q  The next one is the National Survey of Veterans.
 3  Where did this file come from?  Is this something that was
 4  in Austin, or is it something that your office had?
 5   A  That's -- that's correct.  It was -- we always
 6  received data for the NSV -- excuse me -- in the form of CDs
 7  from Westat, and in fact, we didn't get all of the data at
 8  once.  We got the questionnaire responses before we got the
 9  sampling plan, and then on another occasion, we got imputed
10  income, so that we would just have one place to go look at
11  income if we wanted to make tables for veterans income.
12  Otherwise, it would have been a mess.  There were -- do you
13  want to hear about that?
14  ███████████
15   Q  Absolutely.  That's one of the key [inaudible].
16   A  Oh, all right.
17   Q  We have to fully understand --
18   A  Okay.
19   Q  -- your work in the National Veterans Survey.
20   A  All right.  Well, income, first, the veteran was
21  asked --
22   Q  Well, let's go back a minute --
```

**Page 110**

```
 1   A  Surely.
 2   Q  -- and maybe you can start a little bit earlier.
 3  Correct me if I'm wrong, but my understanding of this
 4  process was that VA employed Westat to conduct this survey.
 5   A  They did the logistics and the survey design, yes.
 6   Q  Okay.  Then I may not have the full story, but --
 7  okay.  So they did the survey design.  They must have
 8  developed the sampling plan or whatever.
 9   A  Yeah.
10   Q  Okay.  Then VA provided them, I think if I
11  remember correctly, 14,000 records that contained Social
12  Security numbers and contact information about veterans.  I
13  may [inaudible], but that's okay, and why don't you start
14  there.
15   A  Well, what we gave them essentially was the file
16  called s4frame, and that contained -- I'll take a guess.
17  I'll say it was 5- to 6 million records, and it consisted of
18  people who either were recipients of comp and pen and who
19  were veterans or people who were veterans who had been
20  served by VA Health Care.
21      Now, even that may be a little imprecise.  I don't
22  know whether the -- VA Health Care guys were including
```

**Page 111**

```
 1  people who might only have been enrolled, but not users.  I
 2  just don't know.
 3      I know that the intention was to at least have the
 4  users in there, but it might have had non-using enrollees,
 5  which can happen --
 6   Q  Sure.
 7   A  -- because the way that process used to go was
 8  that if there was a window to enroll, it was in your
 9  interest to go and get it done as soon as it could because
10  that window could close, and then -- but once you were
11  enrolled, you were gold.  You were -- you were good to go if
12  you needed that care in the future.
13      So Susan --
14   Q  All right.  Well, let me stop you.
15   A  Sorry.
16   Q  You're saying that we -- someone in VA, someone in
17  OOS that provided this data to Westat?
18   A  Yes.
19   Q  Okay.  So they provided a database of the 5- to 6
20  million records --
21   A  Right.
22   Q  -- of, A, they had to be veterans and, B, they had
```

**Page 112**

```
 1  to be recipients of either comp and pen or have some nexus
 2  to VHA.
 3   A  Yes.  That's exactly right.
 4   Q  All right.  Now, what information did they provide
 5  through the database in [inaudible] for claims?
 6   A  There was Social Security number, date of birth.
 7  Then because these veterans came from two sources, the guy
 8  who came from -- a guy could come from both sources
 9  actually.
10      So -- now, Susan did the merge of these files.
11  What she did was she said, "Okay.  I am going to bring over
12  the address information and name information, which is
13  confounded from C&P, and separately, I am going to includ
14  the name fields, the city and State and zip fields for those
15  who come from the Health Care site."  So, potentially, a
16  record would have redundant information, and some records
17  did.  So --
18  ███████████
19   Q  Excuse me.  This is the next file that you're
20  talking about.
21   A  Oh.
22   Q  Right?  This one?
```

Sworn Testimony: ▇▇▇▇▇ -6/10/06  Condensed  Transcribed ▇▇▇▇▇

## Page 113

1  A  Yes. Oh, yeah. Yeah, yeah, yeah.

2  Q  This is the next file that's on the list.

3  A  Hey, that's pretty good recall for [inaudible]. I

4  had that nailed. ▇▇▇▇▇

5  ▇▇▇▇▇▇▇▇▇

6  Q  All right.

7  A  Okay.

8  Q  Well, let me tell you, that's good. I might as

9  well understand this one.

10  A  Yeah.

11  Q  All right.

12  A  So some of these items -- [audio break].

13  [Side B of Audiotape 2 of 3 begins.]

14  THE WITNESS: [In progress] -- in parentheses

15  following them, and those are the -- the sources from which

16  those fields came from. ▇▇▇▇▇

17  ▇▇▇▇▇▇▇▇▇

18  Q  Correct.

19  A  There was no field where one could overlay the

20  other as far as I'm aware, except that everything was merged

21  on Social Security number. So -- but the way SAS works, it

22  -- it had to be the same for that stuff to get into the same

## Page 114

1  record.

2  Q  Okay. Well, there are two fields which you see in

3  that. Social Security number was nothing in parens, and the

4  Social Security number indicator C&P.

5  ▇▇▇▇▇▇▇▇  You just write it out that way.

6  C&P [inaudible].

7  BY MALE QUESTIONER:

8  Q  Well, so are we saying one came from the VHA file?

9  A  Oh. No, no, no, no, no. The Social Security

10  number was the Social Security number, and it would be the

11  same whether it came from the C&P or the VHA or both.

12  Q  By definition of the match they had [inaudible]?

13  A  Exactly, sir.

14  Q  All right, then.

15  A  And then the Social Security number indicator, I

16  don't know why that item was even included, but I think it

17  meant that C&P had verified the Social Security number

18  information. I don't think it had any other use, and I

19  don't know that anybody actually made use of that sort of

20  strengthening information.

21  Q  All right. Now, this file was provided to Westat.

22  A  Yes.

## Page 115

1  Q  What would they do with the file?

2  A  Well, Westat -- Westat had to do a couple things.

3  One of their charges was to draw an adequate -- I have to

4  say it slowly, so it doesn't come out "inadequate." They

5  had to draw an adequate sample for each of the priority

6  levels. So one of the things --

7  Q  Now, was it priority levels as opposed to applied

8  by VHA? Are we talking about per Health Care?

9  A  Yes, sir. Yeah. Yeah. Because one of the things

10  that the survey was supposed to address was -- well, it was

11  supposed to provide estimates for each priority level, and

12  the idea about using an administrative frame and not -- you

13  know, a lot of the vets, two-thirds of the vets in the

14  survey were reached just by random-digit dialing, and that's

15  fine, but if you relied only on random-digit dialing, you

16  wouldn't get enough vets in the Health Care system and

17  particularly not in some of the smaller priority levels

18  because, if you look at folks who are in C&P -- let's see.

19  Folks in C&P are only like 10 percent of the veteran

20  population. Okay. And now --

21  Q  And it wouldn't have identified in C&P whether

22  their priority [inaudible]. Right?

## Page 116

1  A  That's right.

2  Q  Okay.

3  A  And then folks who are in VA Health Care, while

4  there's more of them than there are in C&P, you -- you

5  wouldn't get enough of -- of them either. It wasn't just

6  the folks that were -- that Westat was supposed to get

7  adequate numbers in the priority classes. They were

8  supposed to get adequate numbers also, I think, for the --

9  well, perhaps not. I was going to say for the percentage,

10  the combined percentage of disability levels, but that would

11  be extremely hard to do because some disability levels occur

12  very infrequently.

13  If you look at 10, 20, 30, 40, 50, up through a

14  hundred, there's some of those that are very thin. Don't

15  know why, but I think the real target was they had to have

16  an adequate number of females. They had to have an adequate

17  number of males. They had to have adequate numbers to make

18  estimates for each of the Health Care priority classes, and

19  that Health Care priority class thing, they could have

20  picked up for people who were in the Health Care system out

21  of the admin records. For people in the general population

22  reached by random-digit dialing, they had to estimate which

Sworn Testimony: ▓▓▓▓▓▓▓ /0/16/06    Condensed    Administrative Investigation Hearing – –

**Page 117**

1  Health Care priority class the person would fall into.  So
2  they needed to know income.  They needed to know whether the
3  guy had any VA disability percentage at all.
4      Q  But these were questions that were asked in the
5  respondent as opposed to reference in the database that we
6  [inaudible]?
7      A  Yeah.  That's true.
8      Q  Okay.
9      A  Yeah.  But so --
10     Q  Let me stop.  I don't want to jump --
11     A  Yeah.
12     Q  -- ahead to the random.
13     A  Yeah, yeah, yeah.
14     Q  I want to fully understand.  So they provided 5-
15  to 6 million records.
16     A  Yes.
17     Q  They needed to identify an appropriate sample that
18  would properly account for males, females, priority levels.
19     A  Yes.
20     Q  So they would use this as their claims, so to
21  speak?
22     A  That's right, sir.

**Page 118**

1      Q  And did they or did they not identify -- was it
2  7,000 people that they used this, that represented the
3  sampling that came from this, irrespective of the random
4  sampling that they were going to --
5      A  That's correct.  What they actually did was they
6  said, "Okay.  Taking all of these things that we got to do
7  into account, we're going to draw 14,000 names out of a
8  hat," after it sort of structured the hat, so that they'd
9  get their adequate counts.  They took 14,000 out, and from
10  those 14,000, they actually contacted and interviewed 7,000.
11     Q  All right.
12     A  Okay?
13     Q  Yeah.  That's [inaudible].
14     A  Okay.
15     Q  And now would they ask the people that they got
16  out of here the same set of questions they would ask the
17  randomly dialed?
18     A  Absolutely.
19     Q  Okay.  Now --
20     A  Well -- okay.  Go on, sir.
21     Q  No.  You can [inaudible].
22     A  Okay.  There was one questionnaire, but what they

**Page 119**

1  found out, I don't know how far along in the process it was,
2  but the interviews were averaging like 45 minutes, which wa[s]
3  too long.  So the survey wasn't going to come in within
4  budget.  So they said we got to do something to save time,
5  and so one of the stratagems they adopted was:  "Well, why
6  are we asking the guys from the admin frame what their
7  Social Security number is.  We know that.  It's in the --
8  it's in the file."  So they decided to drop that.
9          Well, so then they thought, "Well, if we're not
10  going to ask them the Social Security number, why are we
11  giving them all the informed consent stuff too because we
12  are not going to ask them for" -- you know --
13     Q  Okay.
14     A  Why give them the informed consent stuff if we're
15  not going to ask them?  Well, but this was extremely
16  unfortunate because, after all of the data had been
17  collected, Westat's internal review board said, "Well, we
18  can't give the SSNs to VA for people who weren't asked the
19  consent information," and we got all -- we got one file
20  from Westat all by itself with SSNs, and when we looked at
21  it, we said, "Huh," you know, "Something I don't understan[d]
22  about this, we don't have any -- we don't have any SSNs in

**Page 12[0]**

1  the admin frame for the -- for the people who were
2  identified as having been drawn from the admin frame."  So
3  we asked them about it, and that's when we heard about this
4  -- this decree from the internal review board.  They hadn't
5  told us until then.
6      Q  Well, all right.  [Inaudible.]
7      A  Sorry.
8      Q  You're saying those drawn from the admin frames --
9      A  Yes.
10     Q  -- they -- they stopped asking the respondent
11  their Social Security number.  Therefore, they didn't give
12  them any sort of consent --
13     A  They -- they just --
14     Q  -- [inaudible] they didn't gain anything
15  [inaudible]?
16     A  They didn't -- they decided that they could also
17  economize by not asking --
18     Q  Sure.
19     A  -- the consent questions.
20     Q  The random, though, they would have kept doing
21  that, I would assume.
22     A  Yes, they did.

Sworn Testimony: ~~~~~~~~ 0/10/00   Conclusion ~~~~~~~~

---

**Page 121**

1   Q  All right.  But for these, they didn't.

2   A  Right.

3   Q  But they already had the Social Security number in

4   the file.

5   A  Right.

6   Q  So you knew which -- well, not so much you, but

7   they knew which 14,000 were originally drawn out of the

8   sample, and then they -- then they also would have known

9   which of the 7,000 they called.

10   A  Exactly.

11   Q  But if I'm understanding correctly from reading

12   the transcripts, they refused to identify by Social Security

13   number the 7,000 people they called from the admin frame.

14   A  That's right.

15   Q  Okay.  And I don't want to put words in your mouth

16   after that, but you see where I'm going with that.  So

17   that's -- now, I just want to understand the random, for no

18   other reason that I can't imagine giving somebody my Social

19   Security number over the telephone just as they call me.

20   A  Yeah.

21   Q  And they say, "Are you a veteran?," and --

22   A  Well, actually, I'm not sure about all of that.

---

**Page 122**

1   It -- it may be that they even had a letter soliciting their

2   cooperation.  I just don't know.

3   Q  Okay.

4   A  I --

5   Q  That's fine.

6   A  Yeah.

7   Q  It's probably not relevant.

8   A  All right.

9   Q  It's why we have to look at this data.  So your

10   only concern at that point, if I'm -- when they provided the

11   responses for the random-dialed recipients or participants,

12   they included the Social Security number, so that wasn't an

13   issue to you when you weren't trying to identify the Social

14   Security number, the random-dialed, because they gave it to

15   you, or am I incorrect?

16   A  Well, here's the thing.  If we got the Social from

17   someone who was in the random dial, that was fine.  Take

18   someone from the random who didn't give his Social.  Well, I

19   could apply the same techniques to try to find that, but I

20   had no reason to think that that person had a strong -- an

21   association with VA Benefits and Health Care as the people

22   from the admin file.  That was my -- my point of view.

---

**Page 123**

1   Here were 7,000 people who had at least some

2   ongoing relationship with VA already, and I wanted to look

3   at that.

4   Q  Okay.  Now [inaudible].

5   A  Yeah.

6   Q  So that's why you were intent on getting Social

7   Security numbers associated with the fairly 7,000 that were

8   in the -- in the administrative frame that were eventually

9   called?

10   A  Exactly.  And the other thing is, if you think

11   about it, take someone who -- who might have been -- who

12   might have been identified as having come from the RDD, the

13   random digit dialing, and we don't have his SSN. okay.  So

14   what are my options?  Well, maybe I've got his date of

15   birth.  Maybe we even got the guy's name if he was willing

16   to be interviewed in the future, but I didn't have the

17   assurance that I had for the people who were identified as

18   coming from admin that I would find this guy anywhere in VA

19   data.  Whereas, for the people in the 7,000 admin responses,

20   I was told that you will find each of them in the 14,000

21   folks from the frame that we gave them.  So that was a much

22   simpler problem, and, you know, so I took the simple problem

---

**Page 12-**

1   first.  I mean, I never got around to any other harder

2   problem.  What was simple was actually hard enough.

3   Q  Okay.  And now tell me.  Who asked you to do this

4   research to identify the Social Security numbers?  Was this

5   self-generated or --

6   A  It was self-generated.

7   Q  Well, describe your work on this project

8   independent of this, or how did you even get involved in it?

9   Did you have a discussion with Susan, or how does that --

10   A  Well, okay.  Let me -- let me just tell you.  I --

11   I spent a number of years at the National Center for Health

12   Statistics.  I had -- I had used national surveys that were

13   very well blinded; that is, when you got the analysis

14   datasets.  I never had the sort of insider's view of

15   datasets that I had on this occasion.

16   But one of the things about this survey was that

17   we -- we were asking veterans what I thought were a lot of

18   tricky questions for older people especially to answer.  One

19   of them was: "You're getting money from the Veterans

20   Administration.  Is it disability compensation, or is it

21   pension?"  Now, you know, maybe people are clear on this.

22   Maybe each and every veteran who gets that knows exactly

---

245

Sworn Testimony: W. JOHNSON 6-1-05

## Page 125

1  what he's getting and why he's getting it, but it wasn't
2  clear to me that that was the case.
3      Another question that we were asking --
4  Q  Okay.  Let's stop there.
5  A  Sure.
6  Q  So you thought there would be a value for them to
7  confirm their answer to that question, for example, if they
8  said pen or pension --
9  A  I wanted to know if that was true.
10  Q  -- you wanted to know if that was actually true.
11  A  Yeah.
12  Q  But again, nobody was tasking you to determine
13  this?
14  A  No.  No.
15  Q  Okay.
16  A  Okay.  Well, but the other thing you need to
17  understand is every time we came up with an estimate out of
18  the survey, we'd get hammered because, ah, you know, our
19  data -- our data doesn't agree with that.  You know, you're
20  either a couple hundred thousand over, a couple hundred
21  thousand under, and people just -- people felt that if we
22  didn't nail their figures that it was all sort of worthless,

## Page 126

1  or that's how we were made to feel.
2      So I thought, okay, let's see whether the
3  respondents are giving us the truth.  I mean, you can build
4  anything you want on respondent data, but it would be nice
5  to know in the first place whether the respondent data is
6  reliable.
7      So another thing that we asked respondents was
8  you've got a VA disability percentage, can you tell us what
9  it is, and they would tell us what percentage -- what their
10  total disability percentage was.  That's something else I
11  wanted to check because that was something we used in
12  deciding what or which of the Health Care priority classes a
13  veteran might fit into if he decided to go after VA Health
14  Care.
15      See, a lot of --
16  Q  Was that to project future users?
17  A  Yeah, because a lot of people in C&P aren't
18  necessarily users of VA Health Care.  You know, they get --
19  they see their -- their monetary benefit as something
20  different.  So that was another thing.
21      Even asking people whether they're disabled or not
22  is sort of a weird thing.  You know, we thought it was at

## Page 12[7]

1  least possible that people who are actually obtaining
2  disability compensation payments might, if you asked them
3  whether they are disabled, say no because it didn't really
4  stop them from, you know, pursuing a living or whatever they
5  do.
6  Q  [Inaudible.]
7  A  Yeah.
8  Q  Okay.
9  A  You know, so there was that.  So there was the
10  percentage of disability.  There was the comp and pen
11  question.  Then a lot of the -- the questions that had to do
12  with actual provision of VA Health Care were traced like
13  this -- and I -- I don't have a copy of the questionnaire
14  with me.  So you'll just have to bear with me.
15      We either asked did you use such and such a
16  service during the past year.  I think we asked have you
17  been diagnosed with whatever, you know, what -- what your
18  medical issues are.  There were just a whole number of
19  things that we could have checked against actual patient
20  care databases to see whether the patients were recalling
21  because a lot of our questions had to do with a time period,
22  you know, did you obtain VA Health Care services either

## Page 12[8]

1  during a calendar year or just what.  Now I don't remember,
2  but I think it would have been like a year back from the
3  date of the interview.
4  Q  Okay.
5  A  That's what I think.  So those were more things,
6  and to not try to do that, if you could, just seems foolish
7  to me.
8  Q  Did you discuss your efforts with anybody in 008
9  what you were doing with this particular file?
10  A  No, because 008 ran the National Survey for
11  Veterans on a shoestring.  Until I was hired, Susan was the
12  only employee on it at all, and I was their data processor.
13  There was no one else in the office even qualified to talk
14  about things like, you know, trying to validate some of the
15  -- the data, and we just -- so I thought this was, you know,
16  a good thing to do, and I didn't -- I didn't need a lot more
17  reason to do it.
18  ▮▮▮▮▮▮▮▮
19  Q  So then did you go on your own to Westat to ask
20  for their Social Security numbers that they wouldn't give
21  you?
22  A  No.  Susan asked them.

246 ble▯

Sworn Testimony:

## Page 129

1    Q And so why did she think that you wanted them?

2    A Well, she probably had the same idea in mind that

3 I did, that it would be nice to check, but when they said

4 no, I think she accepted that.

5    Q So then how did you finally get them, though?

6    A Oh. Oh, oh, oh, oh, oh.

7    Q Yeah. I mean, I thought that at some point, they

8 just thought --

9    A Oh. You mean the 14,000 that they gave us.

10    Q Right. They gave you the 14,000.

11    A She did ask. I mean, we complained that if -- if

12 we didn't get the -- the individual Social Security numbers,

13 that we'd never be able to validate any of the responses

14 that we got. They sort of unbent and -- and gave her a file

15 of 14,000 SSNs from which the 7,000 came. That wasn't a

16 specific giving what we wanted, but they may have felt that

17 it was reasonable in terms of looking at the characteristics

18 of the people they had initially selected, but that -- that

19 really wasn't what I was after.

20    Q But did Susan do anything on her own with those

21 Social Security numbers? So what did --

22    BY MALE QUESTIONER:

## Page 130

1    Q Or did she give them to you?

2    A Yeah. Yeah. I got them.

3    ▇▇▇▇▇▇▇▇

4    Q Right. So what did she think you were going to do

5 with it?

6    A I honestly don't know. I mean, I'm not trying to

7 cover for Susan. We didn't talk about matching, really. I

8 don't think I talked with her about matching, although I

9 might have, I mean, to be honest with you. I mean, some of

10 the things I did were good hacks, and I might have mentioned

11 it because I was proud, like, oh, if you use telephone

12 number, you get so many as matches, but the thing was you

13 never got to a point where you could say, well, those

14 matches are representative of all 7,000.

15    I mean, what you might find about -- if you were

16 trying to validate respondents' information using the people

17 whose telephone numbers matched might have had something to

18 do with the fact that their telephone numbers matched rather

19 than not matching. So I -- I never felt like what I had

20 obtained so far was enough. I wanted to get almost all of

21 the file matched, and then I would look at all of the

22 matches before I started saying whether validating it.

## Page 13[1]

1    BY MALE QUESTIONER:

2    Q Okay. Let me understand.

3    A Yeah.

4    Q The data that Susan got back were 14,000 records

5 which represented what they thought was an adequate sampl[e]

6 but they only contacted 7,000?

7    A Yeah. They drew more than they felt they'd need

8 --

9    Q Okay.

10    A -- because they didn't want to sample twice.

11    Q Was there an indicator in the 14,000 records that

12 they returned? First of all, did they return them without

13 Social Security numbers?

14    A No. All we got was 14,000 SSNs, absolutely.

15    Q Oh. All you got was 14,000 SSNs.

16    A Right.

17    Q You didn't get phone numbers associated with

18 those?

19    A Oh, no.

20    Q Okay. But you didn't know which of the 14,000 --

21    A -- had been contacted. No.

22    Q So now I'm really lost. What -- what -- now what

## Page 13[2]

1 was your next step in order to identify the 7,000?

2    A Oh, okay. Well, I mean, this is -- it took a

3 while to think about this. So I got 14,000. You know,

4 Westat had sworn that the 7,000 that we got information on

5 came from these 14,000.

6    Q Right.

7    A So what I said was, "Okay. I got 14,000 SSNs.

8 I'll run that against s4, and I'll have 14,000 framed people

9 from whom the 7,000 admin sample came from."

10    Q Got you.

11    A And that, you know --

12    Q But then what did you do? Because now I'm still

13 at a bit of a loss.

14    A Okay. Well --

15    Q Were you looking up at their answers and then

16 trying to marry them up with whatever --

17    A Yeah. Every respondent -- every -- every

18 interview contained the telephone number on which the

19 interview was conducted.

20    Q Well, that's where I'm lost because I thought you

21 said they only gave you the 14,000 Social Security numbers.

22 I didn't realize they also gave you their phone numbers.

247 b6 b

Sworn Testimony:

Page 133

1    A No, no, no, no. Here's the thing. Westat gave us
2  back these 14,000, but they had already given us the
3  analysis file which -- which had the telephone number used,
4  what the guy said his birth date was. If the guy had been
5  asked and had agreed, it had his Social Security number. So
6  I wasn't concerned with those guys, but -- but that didn't
7  include any from the admin file. So what I did was I said
8  --
9    Q Let me stop you there one second.
10    A All right.
11    Q When they were -- did you -- were you able to
12  distinguish them from the random guy?
13    A Yes.
14    Q Okay. Good. So that's --
15    A Yeah. There was a -- there was a field. I can't
16  remember what it was. It might have been samp type or --
17    Q Okay.
18    A Yeah. So what I did was, with that file of 14,000
19  SSNs, I got the frame information for those 14,000.
20    Q Yes.
21    A So now I had something to cook with. I had
22  possibly redundant information on names, sometimes not. I

Page 134

1  had an SSN, a date of birth, and on and on and on. I could
2  begin to look for data in the sample file to see what
3  matched, and one of the things that was the simplest was the
4  telephone number. I'd look at the respondent's telephone
5  number and see if I could find it amongst these 14,000 in
6  the -- the reduced bunch from the frame.
7    Q But -- so there was a field for telephone number
8  in that frame.
9    A Uh-huh.
10    Q Got you.
11    A So, if I got ahead, I said that's it, you know.
12  I'm not going to look at the guy's birth date or anything
13  else for right now. I considered that problem solved and
14  will move on to the next level.
15    Q And what was your next one?
16    A Well, the next one was, okay, we've got -- we've
17  got people who didn't match immediately on telephone number.
18  Well, there were a couple reasons why. Of course, they
19  could have moved, but in some areas of the country, area
20  codes had changed.
21    Now, the way that happens is if your area code
22  changes, your exchange doesn't. It's just that the area

Page 135

1  code switches, and there's a place where you can find out
2  all those changes. So what I did was, I said okay, I'm just
3  going to start looking for the remainder of these cases.
4  I'm going to find out what the possible area code changes
5  were. I'm going to try those.
6    Q One by one --
7    A Well --
8    Q -- or did you try to regroup them, the area codes
9  had changed, and just run them all through?
10    A Yeah. I think that's what I did. I mean, not
11  really clear without looking at the code.
12    Q Okay.
13    A But that was the idea. I said some -- some
14  changes occurred during 2001 itself, which is when the
15  interviews were conducted, but some also occurred during the
16  year 2000 and might have occurred after VHA gave us their
17  data or, you know, who knows how fresh the data was that VHA
18  gave us anyway. So maybe between the time that VHA ever got
19  this guy's telephone number and when they provided it to us,
20  it could have changed, naturally. So -- so I began to look
21  at other things.
22    In fact, what I -- as a short way of getting

Page 136

1  around a lot of hoo-hah, what I said was, I'll look at the
2  State and the seven digits of the veteran's telephone
3  number, and if those are the same, then I'll say that's
4  probably a match, not as good as the first kind, but we'll
5  set them aside.
6    So then I said okay, and now, afterwards, I can't
7  match on telephone number because I've -- I've tried it
8  every which way. What I'm going to have to do now is look
9  at partial names, and so that's when I began to use the
10  telephone look-up to complete names to see if I could match
11  that way.
12    Q So you would supply -- was that just on one of the
13  websites, or did you actually have a commercial program that
14  did the reverse look-up?
15    A Yeah. I -- I bought something called SelectPhone,
16  and they had gone to some pains over time to prevent people
17  from using their product to make their own mailing lists.
18  So it was difficult for me, but basically, you could do
19  anything you wanted, one at a time, and I did, but also I
20  used AT&T's AnyWho because that was easy to get to.
21    Q Google? Did you look for the phone numbers in
22  Google?

248

Sworn Testimony. W.

1  A  Well, I think I just used AnyWho.

2  Q  Okay. All right. So then [inaudible].

3     MALE QUESTION: Go ahead.

4     BY ▬▬▬▬▬

5  Q  On the AnyWho, did you type in it one by one, or

6  is there a way to extract it out?

7  A  Well, what I do is I -- I didn't want to do all

8  that typing. So what I did was I had a short file that I

9  constructed and have it open in a small window on one side

10  of my screen. I'd open up AnyWho, and then I'd just

11  highlight and cut-and-paste, if I could. It wasn't great,

12  but it worked.

13  Q  Yes.

14  A  But now the problem was if you tried to decide on

15  the spot, yeah, that's a it or no, that isn't, you'd get

16  really subjective. I mean, I did that once for a whole

17  file's worth, and I thought, you know, I don't like what I'm

18  doing. Sometimes the streets were different. Would I have

19  put up with that in a -- in anything but a small town? And

20  I thought no, I don't think I would have. So, anyway, I

21  didn't like what I had done. I felt it was subjective.

22     So, overall, I think I did this about three more

1  times.

2     BY MALE QUESTIONER:

3  Q  And again, you never reached a point where you

4  were satisfied with the results of your labor in this

5  particular file --

6  A  No.

7  Q  -- to pass it on to anybody?

8  A  No.

9  Q  Would that have been your intent to pass on a

10  finished product to somebody?

11  A  Yeah. I mean, I didn't see it as something to

12  hide from the office. Once I could say, look, you know,

13  look at this stuff, you know, here's what they said, here's

14  what we had, that would have been something to show. Just

15  showing them a bunch of, you know, incompletes wouldn't have

16  been anything to show.

17  ▬▬▬▬▬

18  Q  How long had you been working on this?

19  A  I must have begun in 2003, not during 2002, but

20  during 2003.

21     BY MALE QUESTIONER:

22  Q  Now, is this the project that we read about called

1  your "fascination project"?

2  A  Exactly.

3  Q  And did you ever do any of this at work, or was

4  this always at home?

5  A  No, I did some at work, as time permitted.

6  ▬▬▬▬▬:

7  Q  There was a file on one of the CDs that was called

8  "Surveys," in a file called "Surveys." In there, there were

9  some Social Security numbers. Were those the ones that you

10  found and you populated that?

11  A  No. Survey is the NSV file.

12  Q  Okay.

13  A  Yes, ma'am.

14  Q  Okay.

15  A  Yeah. If you -- if you look at the record count

16  --

17  Q  Uh-huh.

18  A  -- it should be 2048 --

19  Q  Uh-huh.

20  A  Sorry. 20,048, and that's the NSV.

21  Q  Okay.

22  A  Yeah.

1     BY MALE QUESTIONER:

2  Q  Now, again, I think you said this once. You

3  abandoned any effort -- you weren't going to do anything

4  with the random-dialed [inaudible] at all. Right? You just

5  ignored them? You weren't going to try to identify them

6  through any of this reverse look-up or --

7  A  No, because -- well, remember, what I've just

8  described is taking 7,000 and matching against 14,000

9  possibilities.

10  Q  Right.

11  A  Okay. Let's say I got all that done. Okay?

12  We'll scrape them off the board. Now let's take people from

13  the remainder, the 14,000 folks that were reached by RDD,

14  and let's say that there's something in their interview that

15  indicates to me that I could find them at all in VA benefit

16  records or Health Care records. I don't know how many there

17  would be, but let's say I take all of those, and we'll call

18  that "Big N" for the moment. Okay.

19     Now, what am I going to match them against?

20  Q  Yes, but a joined frame again.

21  A  The frame, the whole frame. That's a lot harder

22  problem.

249  b6

Page 141

1    Q  Okay.  But the -- but the answer is you never
2  initiated any work with the random-dialed ones.
3    A  No, for that very reason.
4    Q  Right.
5    A  Yes, sir.
6    Q  Did you ever stop to think that when these people
7  responded, were they -- did they think they were responding
8  anonymously?
9    A  Yes.  I thought about that, sir, and, you know, I
10  haven't said anything publicly about this whole thing at
11  all.  I'm not real comfortable ever with divulging to people
12  who have responded to surveys that their responses have been
13  compared with admin data.
14        Now, it's true also that consent was not obtained
15  from the 7,000 of the admin, but nonetheless, I felt that
16  that was well within our right to do.  I mean, we're always
17  comparing C&P people with people in the Health Care files
18  for one reason or another, and we don't have to ask consent
19  to do that.
20        I don't think -- I don't think that -- well, let
21  me put it this way.  When consent was sought for the people
22  in the RDD, it was phrased like this: "VA would like to

Page 142

1  know your Social Security number.  You don't have to give it
2  to us, but it would be helpful to us if you would.  We can
3  guarantee you that your -- that if you give us your Social
4  Security number, it will not have any effect upon your
5  benefits or health care from VA." we were already saying
6  that to the people.
7    Q  The random-dialed?
8    A  Yeah.  So I didn't see a problem.
9    Q  Okay.
10    A  But nonetheless, I wouldn't be happy to see -- to
11  see it at large in the world that for people who weren't
12  actually read their consent that these attempts were being
13  made.  I mean, I'm not proud of it, and -- but worse, worse
14  than that I think is that it could have a real bad effect on
15  cooperation in the future.  People will say, "Oh, you know,
16  whether I give my consent or not, someone may be snooping to
17  compare my answers," but despite the consent, you know, I
18  mean --
19    Q  Well, I have to tell you I don't know that this
20  won't be discussed in the report because we have to explain
21  what you were doing and what were your intentions --
22    A  Yeah.

Page 143

1    Q  -- and this particular one, unlike mustard gas
2  where you're really asked to get this information --
3    A  Yeah.
4    Q  -- this was something you took responsibility for
5  yourself and thought it would be of value.  So I don't know.
6  We'll have to see how this plays out, but in order to make a
7  plausible explanation for why -- what you were doing, I
8  don't know how I get around --
9    A  Yeah.
10    Q  -- not addressing the fact that this was a -- I
11  mean, it's -- it will be self-evident that you were trying
12  to identify the individual based upon the administrative
13  records.
14    A  Exactly.
15    Q  And -- but the fact that you weren't asked to do
16  it may mitigate to a bit because at least from a veteran's
17  point of view, well, we just had one guy who maybe went a
18  little bit over the edge in terms of he really wanted to be
19  helpful and he wanted VHA to be helped, but he wasn't
20  directed to do it.  This wasn't VA policy to try to marry up
21  answers with the particular --
22    A  Oh, no, it wasn't policy.  I mean --

Page 14

1    Q  Right.
2    A  -- if it had been, I'd have had all sorts of
3  backing on this.
4    Q  Exactly.
5    A  I mean, I saw this as a -- as a way to actually
6  check the data that we were getting.  I mean, because we
7  were -- we were building -- I won't say castles in the air,
8  but there was a lot of inference based on the data that we
9  got.  We got a lot of criticism about the end results, and
10  what I wanted to know was, well, was the data that we got
11  right or not, you know, were we working with right data.
12    Q  Is there any element in [inaudible] because it was
13  there?
14    A  Of course, there is.  Of course.
15    Q  Okay.  And however, we would know the other
16  reasons because your division was always being criticized
17  because your figures didn't match with some other element VA
18  had.  That would be a reason that you'd want to confirm what
19  your figures were, but again, it's the thrill of the hunt or
20  challenge of it.  Is that a fair statement?
21    A  Of course, it is.  I've called it the "fascination
22  project" for a reason.