**Page 1**

DEPARTMENT OF VETERANS AFFAIRS

OFFICE OF INSPECTOR GENERAL

WASHINGTON, D.C.

Administrative Investigation: Lost Data

CONDUCTED BY

████████████████████████

Office of Inspector General

SWORN TESTIMONY OF

DENNIS DUFFY, Acting Assistant Secretary,

Office of Policy, Planning and Preparedness

Thursday, May 18, 2006

[TRANSCRIPT PREPARED FROM AN AUDIOTAPE RECORDING.]

MALLOY TRANSCRIPTION SERVICE

(202) 362-6622

**Page 2**

1      PROCEEDINGS
2      ████████ This is ████████ with the Office
3  of Inspector General. With me is ████████ Office of
4  Inspector General, and ████████ Office of Inspector
5  general. Today is May 18th, and we are here to interview
6  Mr. Dennis Duffy.
7      Would you raise your right hand?
8      MR. DUFFY: Certainly.
9      ████████ Do you swear or affirm that the
10 information you are about to provide is the truth, the whole
11 truth, and nothing but the truth?
12     MR. DUFFY: I do.
13 Whereupon,
14          DENNIS DUFFY
15 was called as a witness and, after having been first duly
16 sworn, was examined and testified as follows:
17          EXAMINATION
18     BY ████████
19  Q  And for the record, would you please state your
20 name and your title?
21  A  Sure. My name is Dennis Duffy, and I am
22 presenting the Acting Assistant Secretary for Policy,

**Page 3**

1  Planning and Preparedness.
2   Q  Okay. And we are here to talk about the incident
3  that happened earlier this month, the theft of an employee's
4  personal computer and with it some official VA data. Can
5  you start off by telling us when you found out about this
6  and what your reaction was, what you did, and your thoughts?
7   A  Sure. My recollection is that I first became
8  aware of the incident in what I would characterize as an
9  incidental conversation with ████████'s the
10 information security and privacy officer for the Office of
11 Policy, Planning and Preparedness. The organization is
12 rather small. So ████ 's our entire IT staff for all
13 intents and purposes.
14     And in a rather casual hallway conversation, ████
15 noted that there had been an incident where it appeared that
16 sensitive veteran identifier data had been compromised and
17 related to me that it was his understanding that it had
18 occurred, I guess, the evening of the 3rd of May as a result
19 of a burglary.
20     The burglary took place at the home of ████
21 Johnson. ████ is identified by position description as an
22 IT specialist. In fact, ████ is a senior statistician for

**Page 4**

1  the Office of Policy.
2   Q  What was the date of this hallway conversation?
3   A  The 5th. I think it was the morning of the 5th,
4  if my memory serves me correctly.
5     He indicated to me that -- that he had been
6  working with Mike McLendon -- Mike is the Deputy Assistant
7  Secretary for Policy -- and with Dat Tran. Dat is the
8  acting director for -- our services changed names here, as
9  often as I change ties, but it was probably -- I think his
10 current title is acting director of Data Analysis and
11 Reports or something of that sort, but it's -- he's ████
12 immediate acting supervisor.
13     At that time, I asked ████ -- or I'm sorry -- I
14 asked ████ if he would do two things for me. One is provide
15 me with a -- a -- as comprehensive list as he could of the
16 datasets and the specific personal identifier data elements
17 that we believe had been lost or stolen and obviously the
18 magnitude, so -- because I -- in the course of the
19 conversation, my recollection is that ████ indicated
20 that there had been multiple datasets that had been
21 potentially compromised.
22     And I also asked him at that time if he would --

Page 5

1  to advise me as to what the procedures were, since he's the
2  -- both security and privacy officer, what -- what was our
3  obligations with respect to notification, and he
4  subsequently did that. In fact, he reported to me either
5  then or sometime -- and I get confused now. I think that --
6  that was a Friday. So it may have been the following
7  Monday. It was either that day or the following Monday that
8  he gave me a -- a draft memo. It was early in the morning,
9  I believe. My recollection is hazy, but I can give you a
10 copy of the e-mail if you'd like it.
11    Q  Sure.
12    A  It basically -- basically laid out for me what was
13 -- what he originally thought was -- were the datasets and
14 the elements and the numbers compromised, and he also noted
15 -- reported to me that he had already -- I believe it was on
16 the 5th when we had our initial conversation -- that he had
17 already notified orally the SOC, and candidly, I didn't even
18 know there was a SOC, but apparently it's the Cyber Security
19 Operations Center.
20        And subsequently, he provided them -- and again, I
21 want to say it's the 8th, but I'm sure he's already talked
22 to you. On some date, sometime on or about the 8th, I

Page 6

1  believe he provided them with the same memo that he provided
2  me; that is, the listing of datasets, data elements, and
3  individual numbers of veterans whose data may have been
4  compromised.
5    Q  Okay. So that was --
6    A  That was the 5th then and some portion of the 8th.
7  Yes.
8    Q  Okay. And from there, what happened?
9    A  Well, from there, I had a conversation. I guess
10 it was probably sometime on the 8th that I had a
11 conversation with Mike McLendon. Mike wanted an opportunity
12 when -- when ▮▮▮▮ prepared the original memorandum for me,
13 Mike asked for the opportunity to review and validate the
14 accuracy of the information, the substantive information,
15 and that is, you know, what the datasets were and that kind
16 of thing. I had no problem with that.
17        And indeed, he amended slightly the memorandum of
18 May 5th, and again, I can give you -- give you a copy of
19 that, but -- but the substance of what ▮▮▮▮ ported on the
20 5th was basically what has been consistently reported
21 throughout. So that was -- and I apologize. I get
22 confused.

Page 7

1    Actually, can I refer to a chronology that I have?
2    Q  Sure. Yes.
3    A  Because we have been trying to rebuild this
4  upstairs, as you can imagine.
5        So sometime, yeah, on the 8th, Mike and I talked.
6  It's my understanding that the slightly modified version of
7  the memo was forwarded by ▮▮▮▮ to the SOC, and again, you'd
8  have to confirm that by ▮▮▮▮ but I -- that's my
9  recollection -- best recollection.
10       And then on the afternoon of Tuesday the 9th,
11 fairly late afternoon, I had a conversation with Tom Bowman
12 who is the Department's chief of staff and, in the course of
13 a conversation on a number of different topics, reported to
14 him verbally that there had, in fact, been this burglary and
15 what I perceived as being a fairly serious breach of
16 sensitive data and told him at that time that I thought it
17 was important that we, that is, the Department senior
18 leadership, get together and assess what our affirmative
19 obligation was to notify the beneficiary population whose
20 data may have been compromised.
21       Tom agreed and I -- and indicated that what he
22 would do is touch base with Tim McClain -- Tim is the

Page 8

1  General Counsel -- and that he would ask the Office of
2  General Counsel to review what the -- what our
3  responsibilities and obligations were, and again, you know,
4  I'm not the Privacy Act or security -- cyber security
5  expert. I just knew that, you know, identity theft is a big
6  issue, and we had some obligation in some fashion, and we
7  needed to craft a strategy based on whatever the obligations
8  and requirements were.
9        My next -- you know, the next thing I know is you
10 damn IG people came barging in here demanding, as you always
11 do -- demanding ▮▮▮▮ phone number. That was
12 Friday, and again, I apologize. Friday the 12th. ▮▮▮▮
13 ▮▮▮▮ who is my secretary, advised me -- is that right?
14 Yeah, Friday the 12th. ▮▮▮▮ who is our secretary,
15 advised me that a couple of your crack agents were here
16 looking for ▮▮▮▮ was on CWS that day, and you wanted
17 his home phone number. We validated your identification and
18 gave you the phone number, and then it's my understanding
19 that you subsequently interviewed ▮▮▮▮ nd -- and ▮▮▮▮ and
20 -- and others.
21       Now, the only other involvement that I've had, I
22 mean, I have not -- well, let me back up. Clearly, this

Page 9

1  thing has now gotten the attention of the tenth floor based
2  on what Tom and I had talked about a week ago, and so
3  they're -- they're now in the process -- and we've been in a
4  series of a meetings over the last couple of days -- in the
5  process of putting together a roll-out strategy for
6  notification to the appropriate oversight committees on the
7  Hill. We'll probably be putting out some press release here
8  in the not-too-distant future.
9      I am aware secondhand that the Secretary has had
10 conversations with The White House, with the Deputy Chief of
11 Staff, and even more recently with the Chief of Staff
12 regarding potentially compromised data, the fact that we are
13 on the process of trying to -- to make whatever
14 notifications we have -- we are obligated to do.
15     I know secondhand that -- that Mike McLendon and
16 Dat pulled together almost immediately -- it was probably
17 that Monday. I'm not -- not sure of the date, but pulled
18 together their analytical staff and, you know, reminded them
19 of what the -- what the obligations and responsibilities
20 were with respect to securing information and the rest of
21 it.
22     And then we've been -- you know, we have been

Page 10

1  pulling together some basic information to take a look at,
2  you know, what was in place, what are our policies and
3  procedures, both with respect to our people and, perhaps as
4  important, the whole question of -- because we do a lot of
5  data analysis in this organization, and we use a lot of
6  contractor support, and so one of the things that was of
7  keen interest to me was what -- you know, what internal
8  controls do we have in place regarding nondisclosure and all
9  of those sorts of things, and so we've been pulling together
10 some -- some information just to educate me on exactly what
11 our policies are or were.
12     And the other thing is that earlier today, I
13 called ▓▓▓ in. Well, let me back up. Yesterday, I had a
14 conversation with ▓▓▓ It's actually the first
15 conversation. ▓▓▓ And it's the first
16 conversation that I had with ▓▓▓, and what I was really
17 interested in was -- because I had the basic information
18 from ▓▓▓ and conversations with Mike. What I was
19 interested in was this whole question of culpability, was he
20 -- was he asked to do what he was doing or was it
21 self-initiated, and the answer plainly is this was
22 self-initiated. He -- he wasn't asked to -- to take the

Page 11

1  data and go do this sort of thing. He was, in fact, upon
2  his own initiative trying to solve a problem related to
3  development of the next national survey of veterans.
4      He also -- you know, he -- he acknowledged to me
5  personally that, you know, he understood after the fact that
6  he would -- he had violated a number of different provisions
7  regarding security of sensitive data, obviously regrets it
8  terribly, understands all of that. I -- I say that in the
9  front, and yesterday also took from him -- if you know the
10 background here, what he essentially did was he downloaded a
11 lot of data onto CD-ROMs and I guess a memory flash stick or
12 whatever the hell this medium is called now.
13 ▓▓▓
14 Q  Uh-huh. Right.
15 A  Downloaded it to that, took those CD-ROMs and the
16 memory stick home, and then downloaded yet again the data
17 from those medium to an external disk drive, and it was the
18 external disk drive that was stolen. What he tells me is
19 the CD-ROMs were there. I guess the flash stick, he was
20 carrying around his neck, but the CD-ROMs were there and
21 were not stolen.
22     We have secured those with the Office of General

Page 12

1  Counsel, and I guess Tim is planning to turn those over to
2  the IG if you're looking for them. That's presently where
3  they're at. I also have the -- the memory flash stick or
4  whatever it's called, but I'm told by ▓▓▓ that he had
5  already deleted whatever veteran data was already on there,
6  and he also had some personal data. I asked him to delete
7  -- he had tax record and tax returns and that kind of stuff.
8  I asked him to delete that. So we have the memory stick,
9  but I'm not sure it has any real probative value for you.
10     Let me just finish.
11 Q  All right. Go ahead.
12 A  This morning, I called ▓▓▓ in and provided him
13 with a memorandum, placing him on immediate administrative
14 leave, and this was about a little before 10:00, I guess.
15 It was 8:50 because I made a contemporaneous note on the
16 memo. At 8:50, I served him with notice. So that he's been
17 placed on administrative leave pending the outcome of
18 whatever administrative review or investigation is currently
19 being conducted with instructions that he is to call his
20 supervisor every day no later than 10:00, just to touch base
21 and assess where we are in the process.
22     Then that's where we're at. We're upstairs now in

Page 13

1  a series of meetings with the Secretary and Chief of Staff
2  and, again, trying to craft what the -- the public
3  announcement is to Hill, veteran service organizations, and
4  the -- and the media.
5  ▓▓▓▓▓▓
6      Q  So, between the -- the afternoon of the 9th when
7  you talked to the Chief of Staff --
8      A  Uh-huh.
9      Q  -- and Friday the 12th with the special agents,
10 were there any meetings?
11     A  No. No. There may have been meetings upstairs.
12     Q  But you weren't involved.
13     A  But I wasn't involved. I didn't -- I didn't begin
14 -- and, in fact, I'm almost certain there were meetings
15 because my perception is that at least the General Counsel
16 and the Chief of Staff had met on a couple of occasions, and
17 this is, again, secondhand and certainly not firsthand
18 knowledge, but my sense is that they had met, reviewed
19 whatever General Counsel had prepared for them, probably
20 instructed -- again, this is all secondhand based on the
21 meetings that we're now participating in. My sense is that
22 they've also asked Bob Howard who is currently the acting --

Page 14

1  he's just acting -- I don't know what title they've given
2  him, but he's essentially the Acting Assistant Secretary for
3  Information Technology -- asked him to go back and look at
4  regulations and procedures as it relates to the SOC, what
5  incident report requirements are there, did they meet their
6  obligations, when they -- when they're given a report like
7  this, what do they do with it.
8          And I guess the other issue that -- and I know
9  that talking with John Woodage [ph] that your intent here is
10 to not just look at this incident, but perhaps evolve into a
11 larger scale review of policies, which I think is absolutely
12 critical.
13         We're unique here, again, because of the small
14 size of the office. ▓▓▓▓ ears -- ▓▓▓▓ ill had it. He
15 does Privacy Act, and he does IT security. It turns out, I
16 guess, it never the twain shall me. Like so many things in
17 VA, we work in silos, and so cyber security is over here.
18 So reporting to the SOC doesn't necessarily mean that we did
19 whatever we had to do with respect to the Privacy Act
20 requirements, and I guess there's some question as to what
21 -- you know, what SOC did with the data when the incident
22 report -- when they got it and -- and who was obligated, at

Page 15

1  any rate.
2  ▓▓▓▓▓▓
3      Q  Just to make -- make sure I understand this, Mr.
4  McLendon spoke to Mr. Johnson the evening of the event --
5      A  That's correct.
6      Q  -- the 3rd and --
7      A  That's my understanding.
8      Q  That's your understanding.
9      A  Right.
10     Q  You and he didn't speak at all about this the
11 following --
12     A  We didn't speak at all. I didn't even know about
13 the incident until the 5th with the -- the morning of the
14 5th in a -- in a hallway conversation with ▓▓▓▓
15     Q  Okay.
16 ▓▓▓▓▓▓
17     Q  And you never talked to Mike McLendon until the
18 8th, you believe?
19     A  That's probably correct. It may have been -- may
20 have been late afternoon of the 5th. What our -- what I --
21 no. I'm almost certain it was Monday the 8th, and the
22 reason that I say that is because when I asked ▓▓▓▓ to give

Page 16

1  me the -- the summary of what he believes had been
2  compromised, I told him to "cc" Mike on it. So my -- my
3  recollection is that that would have been the -- that would
4  have been the thing that brought the two of us together, his
5  saying, you know, it looks -- you know, it looks good, but
6  let me go behind it and make sure, and he -- and he and --
7  he -- I guess he instructed Dat -- again, this is all
8  secondhand, so you'd have to check with them -- to -- to go
9  back and work with Wayne on ensuring as much as practically
10 possible.
11     Q  On the 5th when you talked to ▓▓▓▓ you said you
12 asked him to give you a list of the dataset, the data
13 elements that had been left. You told him -- that you had
14 also asked him to advise you on procedures for notifying.
15 What did he tell you about who to -- who had to be notified?
16     A  Well, my recollection is that he told me that --
17 my memory is that he told me orally that he had -- that he
18 had already notified orally the SOC, and my perception was
19 that that was the -- was the primary obligation and that he
20 -- he needed to follow up with them with the document and
21 that he was, indeed, going to forward to them a copy of
22 this, what I referred to as the May 5th memo.

**Page 17**

1    One of the problems that we have here is that the
2  memo was modified, but it maintained that May 5th date. So
3  I guess they just for purposes --
4    Q  Is that May 5th memo that we -- we have from ▮
5  ▮ it was probably really updated on May 8th?
6    A  Yes, absolutely. And again, I can give you copies
7  of both of them, but the point I'm making and it's important
8  for you to understand is the actual date of the document
9  didn't change. Now, you'd have to go back to ▮ and say
10  what specific document did you give to the SOC and on what
11  specific date because I -- I don't know.
12    My recollection is orally he had -- and it may
13  have even been before the 5th, but my recollection is that
14  he advised me on the 5th that he had notified the SOC and
15  that he was obligated to give them a document. My
16  perception is that he gave it to -- gave them a document on
17  the 5th and then may have given them the amended document on
18  the 8th, but that's supposition on my part.
19  ▮
20    Q  And why was it amended?
21    A  The intent was -- was, I believe, on ▮ part
22  -- I mean -- I'm sorry -- Mike McLendon's part that we

**Page 18**

1  needed to, A, ensure the accuracy and validity of the data
2  contained in the memo and the perception that -- that ▮
3  didn't have -- necessarily have the kind of insight into
4  what's contained in the multiple dataset. He is an IT
5  specialist, but he doesn't do -- he doesn't do the data
6  elements that are contained in BIRLS or the mustard gas
7  filings. He didn't use any method. So that -- that was
8  part of it.
9    I think he also, frankly, wanted to ensure that
10  whoever was receiving the memo of potential loss or
11  compromised data also understood the nature of the files
12  that were compromised, and it was important to him to note
13  that the files were in a SAS format, that they weren't Word
14  documents, text files. So it was a -- and you'll see in the
15  text that the modifications are minimal, but that's why one
16  of the points to be made is that it was in a format, and his
17  point was that, you know, if this was a theft of
18  opportunity, chances are that, you know, they probably don't
19  have SAS background and wouldn't know how to --
20  ▮
21    Q  But, you know --
22    A  I don't -- I had no objection to that.

**Page 19**

1    Q  I think it's fair to say that when you heard about
2  this information that you immediately determined it to be a
3  pretty -- a pretty serious problem. Is that -- is that
4  accurate?
5    A  Yeah. I mean, it's -- it's certainly -- I mean,
6  there was certainly enough. I mean, we, you know -- there's
7  -- there's enough common knowledge about the potential for
8  identity theft in this modern global economy for it to be --
9  be of concern.
10    We -- I also think that it's absolutely essential
11  for Government officials to assume responsibility for
12  transparency in what we do. Otherwise, we'd lose the trust
13  of the people that we're --
14    Q  Right.
15    A  -- obligated to serve. So, to me, it was this is
16  a no-brainer. We had data, and, you know, we could argue
17  about how important it is. If my name, Social Security
18  number, and date of birth are compromised, I'm concerned.
19  I'm concerned. I'm not -- you know, I'm not going to panic,
20  but I would appreciate the Government being at least
21  concerned enough to say, "Mr. Duffy, we've had a -- you
22  know, we've had an incident, and your personal identifier

**Page 20**

1  data may have been compromised, and there are some things
2  you can do," and that's the conversation that Tom and I had,
3  and I think it's the appropriate response.
4    Q  Well, one of the strange things -- and I guess it
5  just happened, but, I mean, Mr. McLendon learns about this
6  on the 3rd. You learned about it about the 5th, but you
7  don't talk to your -- to your deputy until the 8th.
8    A  Well --
9    Q  Is there any explanation? I mean, both of you
10  know how serious this is. Both of you are working together.
11  It's kind of interesting that neither one of you talked to
12  each other for a few days.
13    A  I think it's -- I think it's fair to characterize
14  the relationship as one that's strained. I mean, you know,
15  there's no reason not to be completely open and candid with
16  you.
17    Q  We appreciate that.
18  ▮
19    Q  Do you mean you and McLendon?
20    A  Sure. There's been no -- there is no secret to
21  most people in the organization that -- that our -- our
22  personal relationship and our professional relationship is



### Page 21

1  probably -- I would identify it as not necessarily a
2  completely healthy one for a whole variety of reasons, but
3  probably aren't relevant to this. But the point I would
4  make is that there's a -- there are a whole series of
5  activities in the Office of Policy that -- that -- where
6  frequently, I'm notified later than what one would assume
7  should be standard practice or protocol.
8       ██████████ All right.
9       ██████████
10      Q  And I just want to be clear --
11      A  Sure.
12      Q  -- in an effort to be clear that you became aware
13  on the 5th. You did not talk to anyone above you in the
14  chain until the 9th when you talked to the Chief of Staff?
15      A  Yeah. And to be -- to be honest with you, it's
16  difficult for me to remember the exact date. I knew when --
17  I knew after I saw those, the memo, the draft memo, the
18  original memo from ████ that it was -- that it was
19  significant.
20      Q  Uh-huh.
21      A  My recollection is that -- that -- I mean, my
22  intent was the whole time to notify generally my principal

### Page 22

1  interface with the tenth floor, with the Deputy Secretary,
2  and he had been on travel I think, and we traditionally --
3  that is, the Deputy and I -- meet every Tuesday and Thursday
4  as part of a standing Assistant Secretaries' meeting. My
5  recollection was my intent would have been to -- to alert
6  because that would have been the appropriate forum also
7  because the General Counsel, the Assistant -- Policy
8  Assistant Secretary, including Bob Howard as the Acting
9  Assistant for IT -- would have been a good forum to have
10  that discussion. My recollection, in fact, I'm sure Gordon
11  was on travel that whole week, and so I didn't have the
12  opportunity to do that.
13      I had an opportunity, and I don't even remember
14  what the specific -- it may have been that I actually
15  decided maybe I'd better take this up and have the
16  conversation with -- with, you know -- with Tom, and -- and
17  so that's -- that's really how it happened, but my
18  recollection is that it was late in the afternoon, and to be
19  honest with you, what we're -- when we were trying to put
20  together a chronology here, what specific day I talked to
21  Tom was difficult, but I think the way that we've -- we have
22  arrived at the date is he, as I said, contacted the Office

### Page 23

1  of General Counsel and said do this, and so either Tim or
2  Jack Thompson, I guess, probably put a note, an e-mail out
3  to -- to one of the professional staff saying pull together
4  some -- some information regarding what our obligations to
5  the rules and regulations are regarding privacy or cyber
6  security breach itself.
7      Q  I'm sorry. I just got --
8      A  I'm sorry.
9      Q  -- lost there.
10     A  Yeah.
11     Q  How did the General Counsel know to request that?
12     A  I said earlier that when I had a conversation with
13  Tom, Tom's reponse to me was: "I agree that we need to do
14  something. Let me touch base with General Counsel" --
15     Q  Oh. So you'd have that.
16     A  -- "and have them provided us." Right.
17     And the point I'm making is I don't remember, you
18  know, I don't have any note to tell me this is when you sat
19  down with Tom and talked, but what -- what generates the
20  date that I gave you is the fact that he talked with the
21  General Counsel, and the General Counsel probably has an
22  e-mail that went from either Tim or Jack Thompson as the

### Page 24

1  Deputy to their staff saying we've got a request from the
2  Chief of Staff to pull together some -- some information,
3  pull it together and get it to me. That I'm just telling
4  you that that's my best way of --
5      Q  Right.
6      A  -- rebuilding -- [audio break].
7      [Side B of audiotape begins.]
8      THE WITNESS: Right.
9      ██████████
10     Q  More -- more or less?
11     A  Yeah. Yeah.
12     Q  Okay. And he said he agreed that -- with you that
13  it was a serious -- a serious issue --
14     A  Right.
15     Q  -- and he would talk to McClain. When did you
16  hear back from Mr. Bowman or McClain or when --
17     A  Well, let me go back. The conversation took place
18  with Tom Bowman if -- again, if -- if we're all correct --
19     Q  Right.
20     A  -- on late afternoon of Tuesday the 9th.
21     Q  Right.
22     A  The next morning, I provided him -- we had a

Page 25

1  conversation. So I didn't have the memo with me at the
2  time. I gave him then a copy of the so-called, but amended,
3  May 5th memo, and then I -- I haven't -- hadn't heard
4  anything from -- from Tom probably until maybe 2 or 3 days
5  ago when we began or they began meeting, and my first
6  involvement in this little group, which now includes the
7  Chief of Staff and the General Counsel and Public Affairs
8  and Congressional Affairs, the usual group of suspects that
9  we pull together --
10   Q  Right.
11   A  -- every time we have some little crisis du jour
12  -- my first involvement was yesterday, and we've met once or
13  twice yesterday and meeting again today, and again, the
14  intent of these meetings is to do a number of things. One
15  is to build our own chronology, trying to recapture what we
16  knew, when we knew it, but more specifically is to craft a
17  -- a departmental strategy for informing those who may have
18  been impacted and informing the appropriate stakeholders; in
19  this instance, The White House, OMB, congressional oversight
20  committees, the veteran service organizations, and the
21  general public.
22   Q  Right.

Page 26

1  ▓▓▓▓▓▓
2   Q  You said you typically meet with the Deputy
3  Secretary on Tuesdays and Thursdays. Have you brought this
4  to his attention?
5   A  I didn't bring this to his attention. Again,
6  these are odd weeks because he's been --
7   Q  Traveling.
8   A  -- traveling a lot, and I -- I don't think we met
9  again this week.
10       I haven't, and to be candid with you, I've seen
11  Gordon. He and I went to a President's management council
12  meeting together in the interim, had no conversation with
13  him about this.
14       I know definitively, based on the chronology, that
15  Tom Bowman had briefed him, and the date, I don't have.
16  It's probably in this chronology, but he was informed
17  through the Chief of Staff. The Secretary was informed
18  through the Chief of Staff.
19       So, at some point not long after I talked with Tom
20  and provided him with a memo, it's been elevated to that
21  point where it's now a departmental issue to be resolved, as
22  it should be. It's a -- it's a big public relations issue

Page 27

1  as much as it is one of trying to assess where we have
2  fallen short in terms of our process and procedures.
3  ▓▓▓▓▓▓
4   Q  Now, you said that in recent days that you've been
5  pulling together existing policies and procedures. What
6  have you learned from that? What --
7   A  Well, if you give me 30 seconds and I'll find what
8  constitutes really a brief summary, I mean, basically it's
9  -- it's this, and I'd -- again, I'd be happy to give you a
10  copy of it.
11       I had my executive assistant take a look and
12  bulletize it. It breaks down to some things as basic as
13  this, HR requires that each position description contain a
14  position risk and sensitivity level designation, VA Form
15  2280, and we comply with that. For every employee, I think
16  you'll find -- and in fact, I have attached -- and I'd be
17  happy to give you a copy of it -- the position sensitivity
18  level designation for ▓▓▓▓▓▓ so, you know, based --
19  basically attempts.
20       You know, strangely enough -- and it's part of the
21  problem with being around here -- is some of this policy was
22  articulated in Directive 0710 which I think deals with

Page 28

1  guidance on personal identifier data related to these
2  things, and we've gotten wrapped around the -- the long and
3  short of it is I ended up signing -- signing and issuing the
4  directive that deals with some of this, but I certainly
5  didn't remember it. But sensitivity designations for
6  position descriptions are based on guidance that's provided
7  in 0710, and 0710 is an attempt, I guess, and again, I get
8  things mixed up, but I think I'm -- I'm expressing this
9  correctly.
10       We're dealing at the Department level on trying to
11  comply with FIPS 201 which deals with how do we ensure the
12  appropriate physical and logical access to buildings and
13  systems, not just for VA employees, but for contractors, and
14  so 07 -- FIPS 201 and 0710 is an attempt to begin building
15  the structure for who gets an ID card, what background
16  investigations do they have, how do you ensure that you have
17  appropriate access to sensitive areas like research
18  facilities and VA hospitals. She doesn't, or she has access
19  to certain sensitive administrative datasets. At some
20  point, IT is supposed to begin, you know, tying these cards
21  into access to your computers, and that in turn gives you
22  access to datasets. We're not there, but that's all part of

Page 29

1  what we're dealing with here. So the sensitivity
2  designation on the PD is an attempt to comply with 710.
3       And then what I have here, sensitivity
4  designations are generally developed and approved based on
5  direction from OPP management and input from human resources
6  liaison and our information cyber security officer.
7       Truth be told, it's as basic as I'm the program
8  manager, and I know that the nature of your job is such that
9  you're going to need access to the health data. We've got
10 an agreement with VHA for clinical records, for example.
11 Then I'm going to give you a security level at that level.
12      I also know that my secretary doesn't have any
13 need for any of that stuff, and so obviously -- and there
14 are designated levels of access.
15      Responsibility for sensitivity designation and
16 appropriate documentation for non-VA employees -- and this
17 is important in this office because we do deal with a lot of
18 contractors and their employees -- is the responsibility of
19 the COTR. so that responsibility rests with the individual
20 who is managing that contract on behalf of the office, and I
21 went back because we do big contracts and we do sensitive
22 contracts.

Page 30

1       I'll give you an example, as we are presently
2  engaged in a major program evaluation on oncology, and it's
3  with APT Associates, Harvard University, and the Dana-Farber
4  Cancer Institute, and the whole purpose of this study, a
5  multi-year, multi-million-dollar study, is to take a look at
6  how good is the Veterans Health Administration in
7  diagnosing, treating, and caring for cancer patients, and so
8  working with VHA, we put together a big series of research
9  questions that we want answers to, but to do that,
10 ultimately you need to look at the patient records.
11      And so the contractor -- in this instance, APT
12 Associates and Harvard have access to the system. So, in
13 those instances -- and I went back to look -- within the
14 statement of work is a fairly detailed nondisclosure
15 requirement advising them of what their obligations are with
16 respect to sensitive personal data and the like.
17      And then -- and again, I can give you an example
18 -- we have each of the individuals who are actually engaged
19 by the contractor with signing a -- a disclosure statement
20 that lays out their obligations under the Privacy Act and
21 advises them of what the -- what the penalties are, $10,000
22 or whatever it is, and have them sign it on -- sign it in

Page 31

1  each of the individual contracting officials, so that -- so
2  that we're assured they have been advised of their
3  obligations and responsibilities.
4       Now, we also work with VHA on, you know, the
5  scrambling of Social Security identifiers and all of that
6  sort of thing because we are not interested in John Smith.
7  What we're interested in is populations and cohorts of
8  patients and aggregates and disaggregates of those
9  populations.
10      So I think we've -- you know, I think we have
11 safeguards in place. The best and most appropriate remains
12 for you to tell us.
13      In cases where OPP creates, collects, or otherwise
14 generates individual identifiable data, OPP establishes a
15 system of records. That's what we're all required to do in
16 accordance with Federal guidelines, including those in the
17 Federal Register, and we do have some systems like that.
18 The National Survey of Veterans is an example of where we
19 build a whole dataset and, again, use sensitive identifier
20 data to compose the -- the sample set and the like.
21      And then each employee in OPP is required to
22 complete the two online training courses each year, both the

Page 32

1  Privacy Awareness course and the Cyber Security Awareness
2  courts, and again, if you'd like, I'll give you the
3  documentation for Wayne's most --
4     Q  I think we got --
5     A  -- recent certifications, but, I mean, I -- I
6  think anybody who takes the tutorial would know that they
7  could probably do better in terms of -- but that -- you
8  know, that's kind of an opinion of what we're doing.
9     Q  So, in your mind, what did ▮▮▮▮▮▮▮ do wrong?
10    A  Well, ▮▮▮▮▮▮▮ did a lot of things wrong.
11 ▮▮▮▮▮▮▮ -- part of the -- you know, we have
12 all these conflicts in -- in life, but we certainly have
13 them here in VA. On the one hand, we're obligated to
14 protect sensitive data and information. On the other hand,
15 I'm -- I'm encouraged to be a worker-friendly workplace and
16 give you the opportunity to telecommute, to take compressed
17 workdays and rest.
18      I was reflecting the other day with my executive
19 assistant. When we purchased the new equipment for our
20 offices, the new IT equipment, we were actually encouraged
21 to have data analysts requisition a laptop that could, in
22 fact, be plugged onto your -- your desk, but the point I'm

Page 33

1 making is that -- that one of the -- one of the virtues
2 there was if you're telecommuting, you just take your laptop
3 home, and we do that every day here. So the question of how
4 much sensitive data walks out of this building every day is
5 -- is one that probably needs to be addressed in a larger
6 venue, but ▓▓▓▓ knows.
7     I mean, again, when I talked to him this morning
8 and placed him on administrative leave, he knew that it was
9 a direct violation of everything that he knew to download
10 the kinds of data that he -- he had.
11     If we have somebody telecommuting, we give them
12 the access for secure lines and the -- you know, our IT and
13 security official works with them, set up whatever the
14 configurations are for permitting them that kind of access,
15 and we have people that do that, but ▓▓▓▓ knew that in this
16 instance, it was a matter I think of his own personal
17 convenience and just a terrible mistake in judgment to -- I
18 mean, it was almost clumsy to, you know, download all of
19 this data on -- when you look, when you thought if you want
20 them -- Tim McClain probably has -- I don't know how many
21 there are -- 8, 10, 12, 15 different CD-ROMs full of data
22 and information and then this -- this stick. So -- and then

Page 34

1 he -- and then to take it and download it to something else,
2 I think he thought he was just being -- he was -- you know,
3 first of all, he's a character. A lot of people here are
4 very highly educated with little problems that -- he wanted
5 -- he had a problem, and he was trying to solve it, and by
6 taking the data home, he thought he was going to be able to
7 work in the evening without, you know, all the nonsense that
8 we produce around here and focus on -- on the issue and come
9 back with a solution.
10   Q  So, if he had taken a VA laptop computer home and
11 was accessing the information from that and that computer
12 was stolen, then this wouldn't be a problem?
13   A  Oh, no. It would definitely be a problem. No, I
14 -- no. The point I -- the only point I'm making, this was
15 -- this was clearly stupid and a violation. The only point
16 I'm making is that if we're going to look at this incident
17 and try and -- try and draw lessons learned regarding
18 systemic problems, then we need to begin looking at the
19 conflict in -- in incentives around here, and -- and the
20 only point I'm making is, again, I've got data analysts who
21 are working from home, and we give them a secure line and
22 all of the rest. The only point I'm making is that -- that

Page 35

1 on the one hand, I'm encouraging you to take the initiative
2 and work at home if that's what you want to do, but there's
3 no way that I can ensure that when you walk out of here with
4 our VA laptop that there isn't some sensitive data on it.
5     I think if you went over to VBA or the Board of
6 Veterans Appeals, we have got -- I mean, we have judges
7 across the street who walk home every day with Redrope
8 folders, the C files, which have a lot more sensitive data
9 than name, Social Security number, and date of birth, and
10 I'm not saying that to in some way exonerate ▓▓▓▓ I'm
11 just saying that we systemically have not really thought
12 through the ramifications of all of the conflicting messages
13 that we send to employees, and -- and while -- while we --
14 while we emphasize and reinforce privacy and cyber security,
15 how much of it is absorbed and how much of that is in
16 conflict with you got to get the work done, you know. So --
17 ▓▓▓▓
18   Q  But if I'm hearing you correct that if he was
19 accessing -- say this data was on a server here at VA --
20   A  Right.
21   Q  -- and he was accessing it through secure --
22   A  Right.

Page 36

1   Q  -- connections, he could get to it through the
2 server, and whatever he does, he could save on the server,
3 but not on his personal --
4   A  Again, I don't know enough. I'm not -- I'm not
5 technologically sophisticated enough.
6     All I am saying is that I do know that we -- we
7 grant people the opportunity to telecommute doing similar
8 kinds of work and provide them with the -- the equipment to
9 do that. So, again, the larger issue is for the IG to
10 resolve.
11     In this instance, it was a clear -- and the
12 individual involved will clearly tell you that he knew --
13   Q  The violation of Privacy Act?
14   A  The violation of Privacy Act, absolutely.
15 ▓▓▓▓
16   Q  I hear what you're saying in terms of the overall
17 systemic issue and everything.
18   A  Yeah. Right.
19   Q  What about his ability to simply have access to
20 the kind of data, the buy-ins of data on a regular basis?
21   A  Right.
22   Q  Is that something that needs to be taken a look at

Page 37

1  as well? I mean --
2  A  Oh, I would -- I would certainly urge that you do
3  that.
4  Q  And I don't mean Wayne. Again, we're not -- let's
5  not, you know -- let's not -- I'm now generalizing to -- to
6  lessons learned from the incident.
7  A  Yeah, absolutely. But it gets back to struggling
8  with the larger question that I referenced regarding FIPS.
9  I've sat in this room with, at that time, Ed Moore, who was
10 the principal -- or the Deputy Assistant Secretary for IT.
11 Originally, FIPS was the responsibility of IT. We were
12 involved. I got peripherally involved because security in
13 law enforcement happens, at least at the present time, to
14 fall under our programmatic jurisdiction.
15     HR has responsibility because they process all the
16 personnel actions for you as an employee. All of us were in
17 this room struggling with who's responsibility for what, and
18 what we didn't have was any clear sense from IT, for
19 example, that -- that they wanted to assume responsibility
20 for determining that people, like a ▮▮▮▮▮▮▮ who
21 probably have programmatic need for multiple datasets with
22 multiple sensitivity, required some special formulation.

Page 38

1  I -- I'm always overly simplistic, but it seems to
2  me -- and we get into these arguments about how many -- how
3  many datasets the Department has, and I don't know if it's,
4  you know, 50, 100, or 200, but it seems to me that between
5  -- between the program manager, IT, and human resources,
6  there ought to be a -- we ought to be able to develop a
7  process -- and we haven't yet -- that basically says this:
8  I am the -- I am the manager, and I'm hiring this young lady
9  to do a job for me. I'm in the best position to determine
10 that she needs access at some level to data, and, you know,
11 I don't care how many sensitivity levels you want to
12 establish, but let's say four. I need her to get health
13 records, and I need her to get pay records. She is a 4.
14     Now, collectively, we need to establish, if I am
15 going to give her that level of access, what confidence do I
16 have that she is -- she meets all of the requirements, not
17 just the technical skills, but character and the rest, and
18 we get into these discussions about, well, let's do a NACI
19 or let's do the whole background investigation. I mean --
20 and then you get wrapped around the axle because you hear
21 people in VHA say, "Well, I've got -- you know, I have 3,000
22 employees coming through the door every year. I can't

Page 39

1  afford to wait to hire her because I've got to first do a
2  background investigation."
3      The only point I'm making is this is a problem
4  Government-wide that hasn't been solved that requires a lot
5  of attention, and this might help be a forcing mechanism in
6  terms of resolving some of those issues.
7  Q  I hear you there.
8  A  And it's not just the logical access, although
9  it's the bigger issue. There's also the physical access as
10 we -- you know, post 9/11 and with some areas, computer data
11 centers, finance centers, research centers, how do we ensure
12 from a -- from a security and law enforcement.
13     You know, John Baffa and our police force have
14 responsibility for protection of -- of employees and
15 patients in hospitals. It's -- it seems to me it's not
16 their job to be able to determine that you do have research
17 to the facility or the data center. Some program manager
18 has to -- should have an ability to say yes, no, and pass
19 forward a form to both IT and HR where finally this card
20 says yes or no, depending on what your qualifications and
21 responsibilities are.
22 Q  Just one follow-up question. ▮▮▮▮▮▮▮

Page 40

1  particular case, should he have had access to -- to that
2  complete BIRLS, BIRLS file, doing what he was doing? And if
3  so, should he have had regular access? Shouldn't -- I mean,
4  should it have been monitored? Should it have been cut off?
5  Well, just offer the first question.
6  A  Right.
7  Q  Should he have had -- should he have had access to
8  -- to all that data to do what he needed to do --
9  A  Yeah.
10 Q  -- as far as you know?
11 A  As far as I know, yeah. Yeah. But -- but again,
12 I'm -- I'm second-guessing here. I would say yeah, he
13 probably does, but recognize too -- and I mean, he
14 downloaded it, and I don't know what the system's
15 protections are.
16     I mean, I can go to any VA regional office and
17 every employee in the building and, in fact, I'm guessing at
18 every VA hospital, most employees would have -- or at least
19 the admissions people would have access to BIRLS. I mean,
20 BIRLS is not --
21 ▮▮▮▮▮▮▮
22 Q  Yeah. But they would have access to BIRLS, but

Page 41

1  not the --
2  A  The whole file.
3  Q  They wouldn't have the whole file.
4  A  Yeah. Okay. Well, again, I'm --
5  Q  And my understanding.
6  A  I'm getting in over my head too, so --
7  Q  Me, too.
8  
9  Q  Are you -- are you specifically -- either before
10 or after the fact -- know exactly what -- what ▮ was
11 working on, specifically what he was looking -- looking to
12 do?
13 A  Well, I'll tell you what problem he told me he was
14 trying to solve, and that is -- and it's kind of convoluted
15 and crazy. It seems to me that it was a stupid exercise.
16 He was trying to solve a problem. We -- one of the things
17 that we produce here is -- is episodically a National Survey
18 of Veterans.
19 Q  Uh-huh.
20 A  One of the things that the Department wants to
21 know is -- we have 24 million veterans in this country.
22    I'm sorry. I've got to go up for a meeting with

Page 42

1  the Secretary at 11:00.
2  Q  Yeah.
3  A  If you want to pick --
4  Q  We have a meeting at 11:00 as well.
5  A  Okay.
6  Q  Could you answer this and --
7  A  Yeah. Okay. I'm sorry. Again, the question was?
8  Q  The national victim -- that what he told you --
9  A  Yeah. National Survey of Veterans. I'm sorry.
10 Q  Survey, yeah.
11 A  We're -- we're going to do a new one. He was
12 looking at the old one. We -- we randomly sampled ▮▮▮
13 veterans. Half of the sample comes from random digit
14 dialing. We hire Westat, and they go out and call 10,000 or
15 100,000 veterans -- 100,000 households, and they say, "Joe
16 Jones, are you a veteran of the U.S. military?" You say
17 yes. "Would you be willing to participate in a telephone
18 interview on behalf of the Department of Veterans Affairs?"
19 It's going to take 45 minutes. Are you willing to put 45
20 minutes into your --
21 Q  "No, thanks." Right?
22 A  -- your dinner time?

Page 43

1  Right. So it's a very difficult, very costly
2  process. 10,000 come that way.
3     The other 10,000 comes from veterans who are in
4  multiple administrative datasets in VA, health, patients,
5  education, beneficiaries, Comp and Pen recipients, and we
6  want that because we want to do a profile and compare and
7  contrast users and non-users of VA benefits, have you ever
8  used VA benefits, what benefits have you used, loan
9  guarantee, voc rehab, et cetera, education, when did you use
10 them, are you a VA health care patient, what's the status of
11 your health today, do you get all of your health from VA or
12 do you get part of the health from Medicare --
13 Q  Right.
14 A  -- or from the private sector,
15 BlueCross/BlueShield.
16    His -- the only problem he was trying to solve is
17 -- Westat said in a critique of the last survey, 45 minutes,
18 you're crazy if you think people are going to stay on the
19 phone for 45 minutes, hang-up rates and all that sort of
20 thing.
21    One of the things that -- for the 10,000 on the
22 administrative dataset is download the data that we already

Page 44

1  have. We already have your name, Social Security number,
2  date of birth. I'll download it into the survey format.
3  Then I don't have to ask Mary what her Social Security
4  number and date of birth is. I already have all of that
5  identifier data. I even know rate of disability
6  compensation, so that I can move on. Because veterans get
7  confused. Are you in receipt of compensation or pension?
8  Yes. Which compensation or pension? Oh. What's the
9  difference? I get a check. How -- what degree of
10 disability are you? I don't know. I just get a check. My
11 check is -- and so we actually have data analysts who, when
12 you say "I think I get $150 a month," have to then tabulate,
13 oh, that equates to 10- or 20-percent service connection.
14    I apologize.
15 Q  That's okay.
16 ▮  That's okay.
17    THE WITNESS: I would be happy to get together
18 with you again, you know, if you need me.
19 
20 Q  Well, if you could just --
21 A  I hope not, but -- no.
22 Q  We will need copies of -- of any -- any e-mails,

Page 45

1  correspondence.
2  A  Would you do me a favor --
3  Q  Yeah.
4  A  -- and send me a real quick -- [audio break].
5     [Whereupon, the sworn testimony of DENNIS DUFFY
6  concluded.]
7         - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22