1

1        DEPARTMENT OF VETERANS AFFAIRS

2         OFFICE OF INSPECTOR GENERAL

3

4

5

6     ADMINISTRATIVE INVESTIGATION:   LOST DATA

7

8   INTERVIEW OF:   MR. DENNIS DUFFY

9

10   INTERVIEWERS:   ▬▬▬▬▬▬▬

11                   ▬▬▬▬▬▬▬▬

12                   ▬▬▬▬▬▬

13

14   DATE:        Thursday, June 1, 2006

15

16   TIME:

17

18

19

20

21

22

Interview of: Dennis Duffy                                        6-1-2006

2

1                          I N D E X

2

3      WITNESS:                                      PAGE:

4

5      Dennis Duffy                                       3

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Olender Reporting, Inc.          (888) 445-3376              WORLDWIDE
Washington, D.C.                 Baltimore, MD              Ft. Lauderdale, FL

3

```
1                     P R O C E E D I N G S

2    ██████████████      ... Inspector General with

3    ████████████ and ████████████.  Today is June 1st,

4    2006, and we're on the record again with Mr.

5    Dennis Duffy.

6              We have a number of questions --

7              MR. DUFFY:  Sure.

8    ████████████████      -- not in any particular

9    order, but I was wondering if you could clarify

10   for us when, to the best of your recollection,

11   when you first found out about this incident

12   because I believe you were telling us it was

13   Friday morning in a hallway --

14             MR. DUFFY:  Right.

15   ██████████████       -- conversation with ████████ -

16   -

17             MR. DUFFY:  With ████████████████

18   ██████████████████████████████████ -

19             MR. DUFFY:  Right.

20   ████████████      -- and we've gotten some

21   people saying Thursday.  So.

22             MR. DUFFY:  Well, yeah.  I mean, again
```

b6 b7C

Interview of: Dennis Duffy                                    6-1-2006

4

1    to the best of my recollection, it was Friday,

2    and the reason that I'm pretty certain it was

3    Friday is because of the date of the memorandum

4    and that is the e-mail subsequent to that

5    conversation came to me, again to the best of my

6    recollection, that afternoon at 3:30, actually

7    3:33. I'd say 3:30, but I know it's 3:33 because

8    I've looked at the damn thing several times now.

9            So, I'm pretty confident that indeed it

10   was Friday.

11                    ██████████: Okay. In the morning, you

12   asked for --

13            MR. DUFFY: Yeah. Again, I'll repeat

14   what I'm certain that I told you before and what

15   I know that I testified to on the Hill, and that

16   is that some time Friday morning, and to be

17   candid with you, I don't -- I couldn't give you

18   an exact time. I'll speculate that, to the best

19   of my knowledge, it was probably around --

20   probably midmorning, I'm guessing around 9:30-10

21   o'clock, and again it was a hallway conversation

22   where -- I mean, I run into ██████four or five

b6 b7C    21

Interview of: Dennis Duffy

6-1-2006

5

1    times a day. He's got one of those jobs where he

2    goes outside the office and meandering to fix

3    systems and that kind of thing.

4           He approached me and basically said, you

5    know, was I aware that there had been this

6    burglary and that there had been, he believed,

7    the possibility that some veterans data had been

8    contained on it, and again my -- what I did was

9    two things. I asked him specifically to put

10   together the memorandum for me that outlined the

11   datasets and the nature of the information that

12   was on it, and the second thing that I asked was,

13   you know, what's the protocol for this, you know.

14   We had never been involved in this sort of thing.

15          Again, my recollection was that he told

16   me that his responsibility was to report to the

17   SOC and again I'm repeating myself from the last

18   time we talked. I wasn't even aware there was a

19   SOC, but he indicated that he had already given

20   them some verbal notification and he later

21   indicated that he would follow up with a

22   memorandum that he provided that afternoon.

Olender Reporting, Inc.                (888) 445-3376              WORLDWIDE
Washington, D.C.                        Baltimore, MD               Ft. Lauderdale, FL

Interview of: Dennis Duffy                                6-1-2006

6

1              So again, my recollection, and I'm

2     pretty certain of it, was that I knew on that

3     Friday, Friday morning.

4              SPEAKER:  When he told you this, did he

5     -- I don't -- I can't recall if you testified to

6     this.  Did he tell you he had been working with

7     McClendon?

8              MR. DUFFY:  You know, I don't think he

9     did.  Again, I don't know.  I mean, I can't be

10    certain one way or the other, but I don't

11    remember -- I honestly don't remember Mike's name

12    being mentioned.  He very well may have, but I

13    really can't recollect that he did.

14             SPEAKER:  Okay.

15             MR. DUFFY:  He may have, and the reason

16    that I say he may have is because again the memo

17    that came to me that afternoon had Mike's name on

18    it.

19             SPEAKER:  Well, did you ever stop and

20    think or go back and ask McClendon that whether

21    or not he knew about this and if he did, why he

22    didn't come to you?

7

1              MR. DUFFY:  No.

2              SPEAKER:  Why wouldn't you do that as

3    his supervisor?

4              MR. DUFFY:  Well, again, and I

5    referenced this the last time we talked, and that

6    is that there was an extremely -- had been and --

7    well, has been a very strained relationship

8    between McClendon and I and there's a long, long

9    history of this, where, from the very beginning,

10   when Mike came on board, and, you know, I don't

11   know how germane it is to any of this, but Mike

12   had a very strong belief that as a political

13   appointee, he reported in some fashion to the

14   Secretary and that mere careerists like myself

15   had no real need to in any way supervise him, to

16   the extent that I had multiple meetings with him

17   and the General Counsel regarding this issue, to

18   the extent that, you know, I complained to both

19   Nora Eagan early on and to Tom Bowman later.

20             I mean, it's not -- you know, this isn't

21   some deep dark secret that was kept in the Office

22   of Policy and Planning.  So, it's in that

8

1    context.

2         SPEAKER:  Well, I understand what you're

3    saying in terms of the relationship, but still

4    you have a right to know.  You're his supervisor.

5         MR. DUFFY:  Absolutely.

6         SPEAKER:  And if you're getting

7    information thirdhand from a GS-13 in the hallway

8    about potentially significant data, I would go

9    back to my underlings and say what shakes here.

10        MR. DUFFY:  Sure.  And in hindsight,

11   that all sounds absolutely right.  You know, when

12   you look back on this, I think, you know, we all

13   have regrets and my great regret is that

14   obviously I failed to recognize the magnitude of

15   the whole thing.

16        I mean, my perception is that this thing

17   is what it is now primarily because of the size

18   of the dataset that was lost.  If you reflect

19   back on the memo of the 5th and look at the memo

20   as it was amended on the 8th, I mean, it was

21   clear that there were indeed thousands of

22   veterans records identified, and again, you know,

Interview of: Dennis Duffy                                    6-1-2006

9

1    I'm not saying this as my defense, but I
2    recognized right away, once I saw the memo, that
3    there was an issue regarding the need for us to
4    mitigate the potential impact on the
5    beneficiaries, and I think, candidly, I think I
6    did that.
7            I went to the chief of staff and said
8    we, senior leadership, the department senior
9    leadership need to sit down and talk about some
10   strategy for notifying, and it wasn't like there
11   wasn't an acknowledgement.  I mean, Tom Bowman's
12   response to me again was twofold.  One is, "Oh,
13   my God.  Timing couldn't be worse."  The
14   president had just released or was about to
15   release, I guess, the Executive Order on the Task
16   Force on Personal Privacy.  I think that's the
17   name of the task force, whatever it is.
18           SPEAKER:  Yeah.
19           MR. DUFFY:  They were about to announce
20   the establishment of the task force, and he said,
21   "You know, God, this isn't going to sit well."
22           But we also sat down and went through

10

1    the memorandum because Tom's relatively new to

2    the department.  So, terminology.  What is SAS?

3    What is BURLS?  Those kinds of things.  NSV?  You

4    know, what is the National Survey of Veterans?

5    You know, what kind of data do you collect from

6    them?

7              In fact, you know, I specifically

8    remember him making notations on the memo that I

9    handed him that he then says he turned over to

10   General Counsel and I have no reason to doubt

11   that he did.

12             SPEAKER:  Right.

13             MR. DUFFY:  Again, I certainly

14   recognized that it was an issue.  Again, my own

15   perception is it has become this great crisis du

16   jour because of the sheer magnitude of the

17   numbers involved here.  I mean, we've had -- we,

18   the department, have had data compromised

19   previously.  I mean, again after the fact, based

20   on discussions with others upstairs in preparing

21   for hearings and stuff, I'm aware the VHA has had

22   some issues in this regard.

87

11

1        SPEAKER:  Right.

2        MR. DUFFY:  So, it's not like this was

3   new to us and it's not like I didn't understand

4   the gravity of it, but I didn't understand the

5   sheer numbers and that, you know, makes me appear

6   to be stupid.  I guess I am.

7        I can't -- to this day, I have trouble

8   believing that you can download 26 million

9   records on a piece of medium as small as it was.

10       SPEAKER:  Yes.

11       MR. DUFFY:  That's my lapse in judgment,

12  but that's what it is.

13       SPEAKER:  Okay.

14       ███████████     So, when the memo came to

15  you, the May 5th memo came to you, --

16       MR. DUFFY:  Right.

17       ███████████     -- what was your

18  understanding of the magnitude?

19       MR. DUFFY:  My understanding of the

20  magnitude is what was reflected in the memo and

21  that is, that there was some BURLS extract, and

22  that's the piece that I guess I failed to follow

b6 b7C

d8

12

1    up on.  BURLS extract.

2            In my mind, the BURLS extract could be

3    20 records, it could be 50 records, it can be a

4    thousand records.  That's the magnitude that I'm

5    thinking of.  It clearly said the NSV and it

6    clearly said 20,000 records, and I know I'm

7    fairly familiar with NSV and what we do with it

8    and how it was developed and that sort of thing.

9            It said there were some 6,000 mustard

10    gas records, and I remember looking at the memo

11    and thinking what in God's name was he doing with

12    mustard gas records, and what relevance did it

13    have to anything that he might be working on, and

14    then it had one -- if my memory serves me

15    correctly, it had reference to one Excel

16    spreadsheet file or something that had -- and the

17    reason it struck me so much was it was the one

18    that talked so much about the diagnostic -- this

19    was the 57 visits.  It was the hospital patient

20    visits that concerned me.

21            There was one that looked like it was --

22    because everything else seemed to suggest that it

13

1    was name, social security number, date of birth,

2    and then there was this record that seemed to not

3    fit the rest of the pattern.

4           So again, it certainly struck me as

5    being important.  Again, let me go back and

6    repeat what I told you the last time we talked

7    and that is, to the best of my recollection,

8    tells me Friday morning, memo comes to me that

9    afternoon.  Mike comes in and sees me immediately

10   after he gets that memo and says to me, "I'd like

11   the opportunity to have SOC review this and

12   validate the data," and he amended it, and I

13   believe we had the conversation about it.  He

14   wanted clearly to reflect that the data was in a

15   SAS format.  To him, that was critically

16   important that that information be contained in

17   the memo because I think he felt it mitigated the

18   potential vulnerability of the information in

19   terms of it being compromised.

20          So that -- and again, you know, should I

21   have gone upstairs and sat down with the chief of

22   staff or, you know, called the IG or something

b6  b7C

Interview of: Dennis Duffy                                    6-1-2006

14

1    like that?  In hindsight, sure.  It would have

2    made all the sense in the world.  I probably

3    wouldn't be sitting here.

4              But having said that, my failure was to

5    not recognize the magnitude of the BURLS extract.

6    The other thing is a foolish expectation on my

7    part in hindsight that processes are in place and

8    that they work and I honestly believed and

9    believe to this day it should have, that formal

10   notification, as ▆▆▆▆ suggested, was the

11   appropriate protocol.

12             Formal notification to the SOC would

13   then take on its own life in terms of incident

14   reporting and in terms of whatever was going to

15   follow, in terms of administrative review of

16   systemic weaknesses or whatever.

17             I mean, --

18             SPEAKER:  Let's explore that a little

19   bit.

20             MR. DUFFY:  Sure.

21             SPEAKER:  Who in the SOC, even ▆▆▆▆▆▆

22   ▆▆▆▆▆ who really knows what data, what

b6 b7C   01

Interview of: Dennis Duffy                                    6-1-2006

15

1    possible data is out there?  For instance, does

2    █████████ know BURLS?  Does he have any idea

3    what BURLS --

4              MR. DUFFY:  No, and again that's one of

5    the reasons that I thought it made all the sense

6    in the world for Mike and Dac Tran to go back and

7    validate.  No, and again I think if you go back

8    and listen or look at the transcript from our

9    last meeting, I acknowledge, you know, ██████

10   ██████ is, you know, plugs and --

11             SPEAKER:  Yes.

12             MR. DUFFY:  I mean that's what he does.

13             SPEAKER:  Mm-hmm.

14             MR. DUFFY:  And like most organizations

15   of our size, which is a relatively small one, we

16   gave him ancillary duties.  We gave him the

17   security responsibility.  We gave him, God knows

18   why, the SOC.

19             SPEAKER:  Just about everything, it

20   sounds like.

21             MR. DUFFY:  Everything that seemed to

22   align with what his primary duties and

b6  b7C    ar

Interview of: Dennis Duffy                                    6-1-2006

16

1    responsibilities were.

2              SPEAKER:  Right.

3              MR. DUFFY:  So, in that context, he

4    didn't -- to me, he didn't need to know what

5    BURLS was.  He didn't need to know what NSV was.

6    What he needed to know and what I thought he did

7    and I thought he, if I understood him correctly,

8    he made formal notification that there had been a

9    loss of sensitive data and that personal data may

10   have been compromised, and again my expectation

11   would have been, candidly, that Cyber Security or

12   somebody else would be sending people just like

13   the IG shows up or whatever it was to talk to

14   ███████  That -- you know, is that foolish to

15   assume that there are processes in place that

16   work in that fashion?  That was indeed what my

17   thought process was at the time.

18             SPEAKER:  I'm just thinking back.  I

19   mean just like the all-hands that went into

20   motion on the 16th to get the data, why couldn't

21   that have been done --

22             MR. DUFFY:  Well, it probably could have

17

1    been.  You know, you want to go -- I mean, you

2    want to go back.  The all-hands -- what all-hands

3    on the 16th?

4              SPEAKER:  Well, on the 16th, when OGC

5    started coming down saying we need this data, we

6    need your folks to sit down and look at this, --

7              MR. DUFFY:  Well, let me just -- let me

8    back up because you clearly don't understand just

9    how strange the organizational setting in Policy

10   and Planning was then.

11             SPEAKER:  Okay.

12             MR. DUFFY:  Are you aware that I wasn't

13   even aware that that meeting on the 16th took

14   place?  I'll tell you that the only time that I

15   knew of the magnitude of the BURLS extract was on

16   the 17th, when I went up, was invited up to

17   participate in a prebrief for the congressional

18   hearing and was handed a copy of the McClendon

19   memo of the 17th which I assume you have a copy

20   of.

21             SPEAKER:  Mm-hmm.

22             MR. DUFFY:  That's the first time I saw

94

18

1       that memo, and I assumed that that memo was

2       evolved and developed out of the meeting on the

3       16th.

4               The point I'm making is that there was

5       constant communications back and forth directly

6       between McClendon and, I guess, McClain or

7       somebody on Tim's staff in the Office of General

8       Counsel.

9               The point being that after I notified

10      Bowman on -- is it the 10th?

11              SPEAKER:  9th.

12              MR. DUFFY:  9th.

13              SPEAKER:  Verbally.

14              MR. DUFFY:  Yeah.  10th, gave him the

15      memo, though, early that morning.

16              SPEAKER:  Right.

17              MR. DUFFY:  Like 7 or whatever it was.

18      That's the last substantive involvement that I

19      had in any of this until the 17th.

20              So, all of this -- you know, you can ask

21      why, and I can't answer you.  The question would

22      have to be posed to people up on the 10th Floor,

a5

19

1    people in the Office of General Counsel, and I

2    guess McClendon, but it gets back to this

3    perception that, you know, McClendon didn't feel

4    he worked for me, and, I mean, it was that

5    strange.

6           It was -- and it was nothing new to

7    people on the 10th Floor. At one point, many,

8    many months ago, I can remember -- probably well

9    over a year ago. I can remember having a meeting

10   in Tim McClain's office, in the Office of the

11   General Counsel, where, after about three or four

12   days, I would be -- I had been consistently

13   called up to explain some decision that I had

14   made as the Acting Assistant Secretary and

15   McClendon sitting there unbeknownst to me and we

16   have this conversation about, you know, what was

17   my decision and why would I have done it that way

18   and finally, at one point, this was after about

19   three of these meetings, I looked at Tim McClain

20   and I said, "Hold on a minute." I said, "I don't

21   understand the purpose of this meeting." I said,

22   "This is the second or third time." I said, "I'm

20

1    trying to be polite," I said, "but the Secretary,

2    Tony Principi, appointed me as the Acting

3    Assistant Secretary.  I'm within my bounds of

4    authority in terms of managing the office the way

5    I deem appropriate, and if you, Tim, have a

6    problem with that, then my advice would be we

7    need to go in and talk with Tony Principi.  If he

8    doesn't want me to be Acting Assistant Secretary,

9    I'll be happy to step down, but until then, I'm

10    going to manage the organization the way I deem

11    appropriate."

12        I give you that little vignette only to

13    point out to you just how strained the

14    relationship was, and again this was no secret to

15    anybody on the 10th Floor.  I mean, we had

16    multiple meetings going all the way back to

17    probably two weeks after Mike showed up as the

18    PAS for Policy.  I mean, it was just -- it was a

19    very awkward relationship, and as acting, -- and

20    I don't mean to put too much on it, but I think

21    it was doubly awkward because if you g back and

22    take a look at my career, you know, back in '95,

Olender Reporting, Inc.
Washington, D.C.

(888) 445-3376
Baltimore, MD

WORLDWIDE
Ft. Lauderdale, FL

21

```
 1      I was the Deputy Assistant Secretary for

 2      Congressional Affairs.  Jesse Brown came to me

 3      and said, "Would you be willing to take a

 4      political appointment?  Would you be willing to

 5      go through Senate confirmation and serve as a

 6      presidential-appointed, Senate-confirmed

 7      Assistant Secretary for Policy and Planning?"  I

 8      thought long and hard about it, took me two weeks

 9      to make the decision, and I said, "Yes, I'd be

10      honored to do that."

11               Then when my -- so, I spent five years

12      in that position as a PAS, and at the end of

13      that, you know, life takes you in strange ways,

14      at the end of that period, I was also the Acting

15      Assistant Secretary for Congressional Affairs

16      because there had been a big management meltdown

17      in Congressional Affairs which McCready -- I

18      don't know how many of you are familiar with that

19      episode, but I was asked to go up there because

20      of my previous experience in Congressional

21      Affairs and restructure that organization because

22      it had been -- there had been a complete
```

Interview of: Dennis Duffy                                      6-1-2006

22

1    meltdown, and so I was up there at the time,

2    wanted to stay there because I thought it was

3    going to be awkward when a new Assistant

4    Secretary for Policy and Planning came in, wanted

5    to stay up there as a PAS or something until my

6    career was finished, and instead when Tony came

7    in, said no, I'd rather you go back, we need you,

8    and Kicklighter came in, didn't have a lot of

9    familiarity with Policy and Planning, I'd like

10   you to come back and be the PAS in -- and then

11   even that was awkward because Nick was off, you

12   know, at the Pentagon for a period of time and

13   doing a lot of other things and so the only point

14   I'm making is I think there -- and maybe I'm

15   making too much of it, but there was this

16   perception that I wasn't necessarily one of them,

17   that is, that, you know, the current

18   administration.

19            It's just -- and again, maybe it's

20   paranoia on my part, but --

21   ██████████████        So, when OGC --

22       MR. DUFFY:   -- it's an observation.

Olender Reporting, Inc.              (888) 445-3376              WORLDWIDE
Washington, D.C.                     Baltimore, MD                Ft. Lauderdale, FL

Interview of: Dennis Duffy                                    6-1-2006

23

1             ████████: When OGC asked for more

2     information, --

3             MR. DUFFY: It was without my knowledge.

4     Yeah. It must have gone directly to Mike or Dac,

5     and I'm guessing that that's how that transpired,

6     but again you want to create a timeline here,

7     I've got a void between -- let's see. Again help

8     me out here. Tuesday, the 9th, I have the

9     conversation. That afternoon, I have a

10    conversation with Tom Bowman.

11            SPEAKER: Right.

12            MR. DUFFY: The next morning, first

13    thing in the morning, I give him a copy of the

14    memorandum and I remember again -- I remember

15    very specifically his making notations regarding,

16    you know, what SAS is and BURLS, so that he can

17    understand the acronyms that had been used in the

18    previous memo.

19            From that date then, literally until, I

20    want to say, the 17th, -- well, it had to be the

21    17th, at least the 17th, might have been the

22    18th, because handed out at the meeting and

24

1    getting ready for the hearing was the McClendon

2    memorandum of the 17th.  The first time I had

3    seen it and it's the first time -- and again, you

4    can call me a dumb ass or call me stupid.  It's

5    the first time I had seen that it was 26.5

6    million records and the specificity of, you know,

7    how many of them had social security numbers and

8    that kind of thing, that level of detail that had

9    not been in the two previous memos.

10          If you look at ███████ memo of the 5th

11   and then the memo of the 5th, amended on the 8th,

12   there's -- the only real -- I think the only real

13   significant change is the attempt on Mike's part

14   to mitigate the fact that, you know, it was SAS

15   programming and that kind of lead-in paragraph.

16          I don't think, if you look at the

17   substance of the data files, I don't think it

18   changed that much, if at all.

19          SPEAKER:  That's correct.  Did you edit

20   any of the drafts that --

21          MR. DUFFY:  No.

22          SPEAKER:  -- you --

25

1              MR. DUFFY:  No.

2              SPEAKER:  And with regard to that SAS,

3    you didn't have an opinion one way or the other?

4    Was that Mr. McClendon who was saying that we

5    need to put that in there?

6              MR. DUFFY:  Yeah.  And I didn't have an

7    opinion one way or the other, but I thought it

8    was relevant information and ought to be shared.

9              SPEAKER:  Okay.  What is your

10   understanding of SAS?  Do you have any personal

11   knowledge about how --

12             MR. DUFFY:  No.

13             SPEAKER:  -- that actually protects the

14   data?

15             MR. DUFFY:  No.  I mean, I know that

16   it's in -- and again, if you read the Washington

17   Post, and I look for my name every morning when I

18   get up, you know, if you looked at the article

19   this morning, I mean, I know enough to be

20   dangerous, is what I know about IT.  Everything I

21   know is kind of --

22             SPEAKER:  Right.

Interview of: Dennis Duffy                                      6-1-2006

26

1          MR. DUFFY:  -- thirdhand, fourthhand.

2          SPEAKER:  Yeah.

3          MR. DUFFY:  What I know is that it's

4    special programing language, but it's not

5    encryption, and if you have the SAS software,

6    then it's no big deal, and if you read the

7    article this morning, they quoted some cyber

8    security expert who said yes, there's some

9    protection, but if they took the machine and the

10   machine had the software programming on it, you

11   can probably gain access.

12          It was relevant and again I thought it

13   was germane and relevant and important to be

14   shared.  So, yeah.

15          SPEAKER:  Okay.  But you had no personal

16   knowledge of what the capability of SAS is --

17          MR. DUFFY:  No, no.

18          SPEAKER:  -- to keep Steve Jones from

19   opening a file up --

20          MR. DUFFY:  Yeah.

21          SPEAKER:  -- and accessing the data?

22          MR. DUFFY:  No.

Interview of: Dennis Duffy                                    6-1-2006

27

1          SPEAKER:  Not from a manipulation of

2     data point of view, but from an identity theft

3     point of view --

4          MR. DUFFY:  Right.

5          SPEAKER:  -- is what we're trying to get

6     at.

7          MR. DUFFY:  No, I don't know anything

8     about SAS, except, you know, that it was

9     statistical programming lang and used to build

10    large datasets and spreadsheets.

11         SPEAKER:  Right.  So, this memo comes up

12    -- this May 5th memo, and you had asked ████████

13    ███████ to do things, to try to come to some

14    grips about what data was missing, maybe even to

15    the extent of the data, and also the procedures

16    that he followed to sort of mitigate what your

17    duties and responsibilities were.

18         MR. DUFFY:  Right.

19         SPEAKER:  And presumably that memo met

20    those two expectations of yours because you

21    eventually did move it up, and is that fair to

22    say

b6  b7C  ₁₀ᵗ

28

1          MR. DUFFY:  Yeah.

2          SPEAKER:  Okay.

3          MR. DUFFY:  Again take a look -- because

4   I want to make sure.  I don't -- his memo doesn't

5   talk about what the protocol is for notification.

6   I don't believe it does.  I think it just --

7          SPEAKER:  No.  No, it doesn't.

8          MR. DUFFY:  Yeah.  So that was -- I mean

9   that was basically our conversation --

10          SPEAKER:  Right.

11          MR. DUFFY:  -- and followed up by a

12   second conversation with this memo in hand,

13   saying yeah, you know, if you have no objection,

14   I plan to share this with the SOC and that's my

15   clear recollection of it.

16          SPEAKER:  Okay.

17          ██████████  And the May 5th memo

18   satisfied you as far as the magnitude of what was

19   compromised, possibly compromised?

20          MR. DUFFY:  Yeah.  Again, you know,

21   hindsight is 20/20, and if I had recognized that

22   the BURLS was 26 million records, it probably

Interview of: Dennis Duffy                                    6-1-2006

29

1       would have been a lot more alarming to me.

2              Having said that, though, 20,000 NSV

3       records and 6,000 mustard gas records is of

4       sufficient magnitude to have caught my attention

5       and to have taken it upstairs and said we

6       collectively have an obligation to do something.

7       That's --

8              SPEAKER:  And that's one of the things I

9       wanted to get into because this is a memo that

10      you did bring upstairs and there's some notes on

11      it.  I just want to make sure.  I think you were

12      saying that Mr. Bowman was taking notes.

13             MR. DUFFY:  Right.

14             SPEAKER:  And he has written there

15      20,000, 20k.  Could you specifically --

16      MR. DUFFY:  Yes.

17             SPEAKER:  -- go through a little bit

18      about what you told him --

19             MR. DUFFY:  Sure.

20             SPEAKER:  -- first on the 9th, okay,

21      verbally what you told him what you had, because

22      I think you said that you went up there on other

30

1      matters.

2              MR. DUFFY:  Yeah.

3              SPEAKER:  You didn't go up there

4      specifically to talk to him about this, but as a

5      matter of conversation, you went ahead and

6      mentioned this to him.

7              MR. DUFFY:  Yeah.  I went up

8      specifically to talk to him about a concern that

9      I had regarding a contracting issue and indeed,

10     you know, life is full of ironies.  Indeed, what

11     I was telling him was that I was sufficiently

12     concerned about a contracting issue that I was

13     probably going to bring the Inspector General

14     into it and the answer I got back from him was,

15     "Well, why don't we do this?  I would ask you to

16     go ahead and prepare a memorandum for Bob

17     Hankey," who is the Assistant Secretary for

18     Management.  Jan Frye, Acquisitions and Material

19     Management.  Ask them to do a technical review

20     before we go running off to have the IG look at

21     it.

22              So, it was in that context, it was that

31

1    discussion, and I said, "Okay.  I'll prepare a

2    memo, pass it by you, and I'll do that.  In fact,

3    I'll do it to Jan Frye.  I'll send it directly to

4    Jan" because I had had a conversation with Jan

5    about another contracting issue recently.  We had

6    resolved it amicably, and I thought that was a

7    good idea.

8         All that is context and background.  So,

9    it was in that discussion, I said, "By the way,

10   there has been -- there was a theft of computer

11   data at the home of one of my employees,"

12   something to that effect.

13        SPEAKER:  Mm-hmm.

14       MR. DUFFY:  And there was personal data

15   identifiers on it.

16        SPEAKER:  Right.

17       MR. DUFFY:  And we need to -- we, senior

18   leadership, I remember specifically using the

19   language.  We, senior -- VA senior leadership

20   need to get together and determine a strategy for

21   making notification to the beneficiaries whose

22   information may have been compromised.  Something

32

1    to that effect was my language, and again the

2    immediate reaction was, "Oh, my God."  Somewhere

3    here, and I think I remember picking up -- I

4    believe it was an e-mail or fax that he had

5    gotten.  He gets a lot of White House heads-up.

6    "Oh, my God.  You know, the president's about to

7    issue today or the next day this Executive Order

8    on identity theft."  I kind of shrugged and said,

9    "Yeah.  Well, you know, we need to do something."

10            So, the next morning, again the first

11   thing in the morning, because both of us are in

12   there very early, took this up and I said, "Here,

13   this is what I know about the information that

14   was lost."  We sat down and he read through it,

15   and it's at that point that he started writing

16   these notes because again he didn't understand

17   what SAS was.

18            SPEAKER:  Right, right.

19            MR. DUFFY:  BURLS, he didn't -- again,

20   benefit --

21            SPEAKER:  Did you give him a description

22   of what BURLS has and what it --

33

1        MR. DUFFY:  I told him what BURLS was

2    and I told him that it was the primary system

3    used by VBA in particular.  I came up through the

4    VA.  Primary system used by VBA in particular to

5    identify veterans and match up name, social

6    security number, and claim number, but did I say

7    to him -- I said -- I don't remember saying the

8    magnitude of the file set.  I probably did not.

9        Here is the 20,000 records refers to the

10   conversation we had on NSV because 20,000 is the

11   size of the NSV --

12       SPEAKER:  Okay.

13       MR. DUFFY:   -- dataset.

14       SPEAKER:  So, just thinking about it in

15   his mind then, that 20,000 is probably the

16   largest number?

17       MR. DUFFY:  Right.  Yeah.

18       SPEAKER:  Okay.  That's what the concern

19   would be at this point?

20       MR. DUFFY:  Yeah.  No, hold on a minute

21   because I want -- yeah.  And then we had a

22   conversation.  The 6,000 mustard gas records, and

34

1    I remember clearly saying how I found it odd that

2    ████████████ had the mustard gas records.    I

3    couldn't imagine how it fit in, if what I was

4    told was true, and that is that he was trying to

5    resolve some problem related to NSV.  I don't

6    know where the mustard gas piece came in.  It

7    just struck me as odd that he had those records.

8              SPEAKER:  Mm-hmm.

9              MR. DUFFY:  And then this single patient

10   treatment record and that struck me as odd

11   because I knew McClendon had been working -- has

12   been working on a whole set of analytical issues

13   related to posttraumatic stress disorder and one

14   of the things that he had been trying to match up

15   was disability comp claims, date of disability

16   comp claims from VBA, and trying to look at and

17   assess treatment patterns in VHA, either before

18   or after disability comp and his premise or his

19   hypothesis had been based on some analysis that

20   he and staff had done was that it looked -- his

21   perception is that posttraumatic stress disorder

22   is being gained tremendously by veterans, large

35

1    volumes of them filing claims at about the point

2    where they're retiring which seems odd.

3             SPEAKER:  Mm-hmm.

4             MR. DUFFY:  And then this whole -- this

5    issue of no treatment at all and then a burst of

6    treatment immediately before filing the claim and

7    then kind of a tailing off of it.  So, this one

8    struck me as strange, primarily because of the

9    large volume of data, and I was thinking what --

10   you know, did this have something to do with

11   Mike's PTSD thing.  I mean that's all that ran

12   through my mind.

13            I don't remember talking to Tom about

14   it, other than referencing that it was very odd

15   to see that single record.

16            SPEAKER:  Right.

17   ████████████:  So, had you not had this

18   conversation with the chief of staff, when --

19   what were you planning to do with that memo?

20            MR. DUFFY:  Well, again, my -- and I'm

21   certain that I told you this the last time.  My

22   standard -- you know, the standard way that I do

Interview of: Dennis Duffy

6-1-2006

36

1    business in the department up the chain is

2    through Deputy Secretary Mansfield.  There is a

3    standing Tuesday-Thursday staff meeting with

4    Assistant Secretaries and General Counsel with

5    the Deputy Secretary, and it's nothing more than

6    an informal meeting in the Omar Bradley

7    Conference Room where we keep each other abreast

8    of what's going on and what we need -- what we

9    collectively need to know, coming primarily from

10   Gordon, but also issues from each of the

11   Assistant Secretaries and the General Counsel

12   about issues that are broader than our little

13   part of the world, and my intent would have been

14   on that Tuesday morning, the Tuesday that I met

15   with Tom, I would have in fact shared the memo

16   with the Deputy Secretary.  I mean that would

17   have been my modus operandi, and it would have

18   happened.

19        I would have said to him exactly, you

20   know, what I told Tom and that is it looked like

21   -- it looks like there may have been some data

22   compromised and we collectively need to do

Interview of: Dennis Duffy

6-1-2006

37

1    something and, you know, how do you want to go

2    about pulling the group together.

3            There was no meeting that day.  I think

4    the Deputy was on travel, you know.  I'm sure his

5    records will reflect that, but there was no

6    meeting.  For whatever reason, the standard

7    Tuesday meeting was canceled, and so, you know,

8    should I have gone up that morning and talked to

9    Tom?  You know, hindsight's wonderful.

10           SPEAKER:  And that's -- you have to take

11   that into consideration, but I guess the question

12   I have is, and I guess many folks have, is this

13   thing happens on the 3rd.

14           MR. DUFFY:  Right.

15           SPEAKER:  You get it the 5th.

16           MR. DUFFY:  Right.

17           SPEAKER:  ██████████ begins to develop his

18   memorandum.

19           MR. DUFFY:  Right.

20           SPEAKER:  The memorandum is prepared by

21   3:30 on Friday afternoon.

22           MR. DUFFY:  Right.

Olender Reporting, Inc.
Washington, D.C.

(888) 445-3376
Baltimore, MD

WORLDWIDE
Ft. Lauderdale, FL

Interview of: Dennis Duffy                                    6-1-2006

38

1              SPEAKER:  I think a lot of people,

2     including ourselves, have the question of where

3     is the sense of urgency, even though we're

4     closing in on a weekend, and --

5              MR. DUFFY:  Right.

6              SPEAKER:  -- and are there any barriers

7     that you think, for instance, you or McClendon,

8     whatever, that would keep you from just going up

9     on to the --

10             MR. DUFFY:  No, there was nothing, no.

11             SPEAKER:  Mr. Duffy, Mr. Secretary,

12    we've got this thing --

13             MR. DUFFY:  Yeah.

14             SPEAKER:  -- and we're working on it.

15             MR. DUFFY:  No.  Well, you know, again,

16    there was no -- I mean, I -- you know, I'm the

17    first to admit there was no real sense of urgency

18    on my part.  I perceived -- again, I knew the

19    magnitude from the 20,000 and the 6,000.

20             SPEAKER:  Right.

21             MR. DUFFY:  I knew that there were

22    personal identifiers that were included in the

39

1      information.

2            SPEAKER:  Right.

3            MR. DUFFY:  I knew that we had an

4      obligation and a responsibility to mitigate.  I

5      also know how the department operates.  We don't

6      do crisis management.  I mean, we don't -- this

7      -- you know, first of all, I didn't perceive this

8      as a crisis.  I perceived, given what I knew,

9      that there had been lots of sensitive data and

10     that the best guess was that this had been a

11     crime of opportunity and that it had been one of

12     a series of crimes in the neighborhood, and again

13     what -- you know, I'm hearing, you know, that it

14     will probably never been released.

15            It didn't matter to me.  I knew we had

16     an affirmative obligation to do something, but,

17     you know, what -- was there an expectation on my

18     part that if I had said something on Friday

19     afternoon, we would have convened a crisis

20     management team over the weekend to work that

21     out?  That would not -- that was not my

22     perception.

Interview of: Dennis Duffy

6-1-2006

40

1     Indeed, my perception, I think,

2 parallels the reality of the situation and that

3 is, you know, VA doesn't -- VA does things in a

4 fairly prudent, methodical fashion. Information

5 shared. I'll tell the General Counsel and that's

6 exactly what I perceive happened, and it's what I

7 would have expected to happen because that's how

8 things work or that's my experience with the 10th

9 Floor.

10     Would it have been different if there

11 had been different players in different chairs up

12 on the 10th Floor? I doubt it. I doubt it. If

13 Tony Principi had been the Secretary and Nora

14 Eagan, only because they're the most recent prior

15 occupants of those chairs, might have been a

16 little bit different only because Tony -- I'm

17 sorry -- Mr. Principi is much more hyperactive,

18 may have perceived a greater sense of urgency,

19 but I think the same thing would have happened.

20     I think, regardless of who the chief of

21 staff was, he or she would have said I'll share

22 this with the General Counsel and the assumption