Interview of: Dennis Duffy                                    6-1-2006

41

```
1    being they're going to make the determination as

2    to what the next steps are.  So, you know, I

3    don't know how else to --

4              SPEAKER:  No.

5              MR. DUFFY:  -- characterize it.

6              SPEAKER:  I hear what you're saying.

7    I'm just trying to get a feel for even the 10th

8    Floor.  Is this the kind of information -- the

9    amount of information you had, is this the kind

10   of information that they would expect you or

11   someone to come up and raise it to their level on

12   a Friday afternoon, even though may not plan to

13   put together a crisis management team --

14             MR. DUFFY:  Right.

15             SPEAKER:  -- over the weekend?

16             MR. DUFFY:  Right.  Well, I think --

17   clearly, I think if you ask them today, they're

18   all going to go but of course, my God, yes.

19             SPEAKER:  Sure.

20             MR. DUFFY:  And again, you know,

21   hindsight, certainly I should have done that.

22   You know, come on.  I mean, you know, let's --
```

Interview of: Dennis Duffy                                    6-1-2006

42

1          SPEAKER:  I gotcha.

2          MR. DUFFY:  It is what it is.

3          SPEAKER:  I just want to be clear --

4          MR. DUFFY:  Sure.

5          SPEAKER:  -- that when you brought it to

6     the 10th Floor, you didn't know that there was

7     millions of records --

8          MR. DUFFY:  Exactly.

9          SPEAKER:  You did not share that with

10    them, so they did not have that sense of urgency

11    either?

12          MR. DUFFY:  Yeah.  Again, the memo, and

13    you see the notations on it, the memo -- in fact,

14    if I can look at the memo again, --

15          SPEAKER:  Yes.

16          MR. DUFFY:  -- you'll note that.  I

17    believe it's true.  Hold on a minute.  Yeah.

18    You'll note that there was no attempt on my part,

19    and obviously no attempt on Tim's part, to play

20    down the substance of this thing.  There is no

21    reference -- there is a reference to the National

22    Survey of Veterans, a SAS file for the entire

119

43

1    survey database, but it's this reference to 20k

2    records and what's on there which was additional

3    information that I provided in trying to explain

4    to him what I thought was the substance of this.

5              There's nothing on here regarding the

6    size of that extract of the BURLS and that to me

7    is the great Achilles heel in this whole thing.

8    If we -- if I had been aware, and certainly if

9    Tom or anybody else, you start talking about the

10   potential loss of millions of records, it's the

11   magnitude of the potential impact and that's

12   exactly what happened here, is we're now faced

13   with the need to mitigate on a scale that wasn't

14   comprehended when that memo was written, at least

15   in my mind.

16             SPEAKER:  Well, how did you know about

17   the National Survey of Veterans being 20,000?

18             MR. DUFFY:  Because I have been around

19   too damn long.  Because I was the Assistant

20   Secretary when we did the last National Survey.

21   We do them episodically.  We do them about every

22   five years, and I knew that -- and I told Tom

Interview of: Dennis Duffy                                    6-1-2006

44

1    this.  The way we construct it is a telephone

2    survey and it's 10,000 random access numbers;

3    that is, we pay a contractor, Westat, to go and

4    randomly call numbers and say are you a veteran

5    of the U.S. military, would you be willing to

6    talk to us about your service and your

7    involvement with the Department of Veterans

8    Affairs.

9              The other 10,000 come from

10   administrative datasets.  They come from

11   compensation, education.  So that we can compare

12   and contrast users.

13             SPEAKER:  So, it's knowledge you have?

14             MR. DUFFY:  It's knowledge I have, yes.

15             SPEAKER:  Just sort of gathering

16   thoughts.  We said a lot of things, and I'm just

17   going off on a little bit of a tangent here.

18             This guideline, the security guideline

19   that the Secretary mentioned last week with

20   regard to single user remote access, --

21             MR. DUFFY:  Yes.

22             SPEAKER:  -- what's your position on

Interview of: Dennis Duffy                                    6-1-2006

45

1    that particular document in terms of a policy

2    that your folks and everybody in the VA should be

3    following?  Are you familiar with that?

4         MR. DUFFY:  No.  Talking about the one

5    that he just put out?

6         SPEAKER:  Yeah.  The single user remote

7    where initially I think it was the understanding

8    that that guideline applied in this particular

9    case with the actual, you know, taking home of

10   data loaded on personal computers.

11        MR. DUFFY:  Oh.

12        SPEAKER:  That kind of thing.

13        MR. DUFFY:  Yeah.  Again, I don't have a

14   personal position on it.  I assume it applies in

15   this instance.

16        SPEAKER:  Have you ever read it, the

17   guideline itself?

18        MR. DUFFY:  I guess I did when it came

19   out.  I mean, I would suggest to you that I've

20   read it.  I mean until recently, just before the

21   hearing, no, you know.

22        SPEAKER:  Right.

Interview of: Dennis Duffy                                    6-1-2006

46

1              MR. DUFFY:  We have a lot of directives

2       and guidelines.

3              SPEAKER:  This one in particular because

4       it is --

5              MR. DUFFY:  No.

6              SPEAKER:  -- becoming highlighted, if

7       you will.

8              MR. DUFFY:  Sure.

9              SPEAKER:  Okay.  What about access to

10      data by -- you use contractors in your office?

11             MR. DUFFY:  Oh, sure.

12             SPEAKER:  What kind of access do they

13      have?

14             MR. DUFFY:  They have lots of access.

15      The most prominent -- let me back up.  I just

16      mentioned NSV.  We use contractors for the

17      National Survey of Veterans.

18             SPEAKER:  Right.

19             MR. DUFFY:  So, while we use our data

20      people to help structure the survey instrument

21      and that sort of thing, --

22             SPEAKER:  Right.

6-1-2006

47

1          MR. DUFFY:  -- they certainly have

2     access to some of the information coming out of

3     the administrative -- the multiple administrative

4     datasets.  More critical -- I mean, if you're

5     looking at the issue of data access and use of

6     sensitive data, more critical for me would be the

7     experience with our program evaluation function.

8          These are large multiyear, multimillion

9     dollar contracts that we let and program

10    evaluation evolved out of the Government

11    Performance and Results Act and the Act says that

12    government departments and agencies should be

13    able to assess and evaluate whether their

14    programs and services are meeting the legislative

15    purpose and intent of the program itself and

16    focus on outcomes, not throughputs, and so the

17    whole question is asking basic questions, like do

18    the benefits and services the VA offers make any

19    real difference in the lives of real people is

20    the way I would explain it.

21          SPEAKER:  Mm-hmm.

22          MR. DUFFY:  So, we have for the last

Interview of: Dennis Duffy                                6-1-2006

48

1    seven years done major program evaluations on

2    things like education, survivors benefits,

3    dependency indemnity compensation insurance and

4    the like.

5           We have two major program evaluations

6    currently underway. One is on the clinical care

7    provided to oncology patients in the Veterans

8    Health Administration, and in that instance, we

9    hired a company called Abbott and Associates.

10   They partnered with Harvard Medical School and

11   the Dana Farber Cancer Institute.

12          The way that these things work is we

13   serve -- my staff serves as the COTR. We help to

14   facilitate the development of a fairly detailed

15   and extensive statement of work. We do it with

16   clinical experts from the Veterans Health

17   Administration. In the instance of oncology, we

18   have oncologists from around the country who work

19   -- they probably worked for a year in designing a

20   set of elaborate research questions that attempt

21   to get at how good the clinical care for cancer

22   patients is.

49

1        So, if we want to ask basic questions,

2   like how well do VA physicians -- how good are VA

3   physicians at identifying early symptoms and ...

4   basic treatment.  How good are we at providing

5   the appropriate interventions in terms of

6   polypharmaceuticals and the rest?

7        Very detailed and extensive questions

8   that I don't know anything about, but what you do

9   is you hire someone.  In this instance, ▓▓▓▓

10  ▓▓▓▓▓▓▓▓▓▓, who is the head of the Harvard

11  Program on Health Policy, she and a team of

12  experts from Harvard and others all look at

13  extensive VA data records, to include patient

14  data files, EPRP files.  They actually do

15  clinical reviews of those files.

16       What we do it in those instances, one is

17  we build into the statement of work and build

18  into the contract a confidentiality non-

19  disclosure statement and then we have a form that

20  I'm advised every one of the contract analysts

21  who work on the project sign that basically says

22  that I understand the sensitivity of the

50

1    information that is being provided to us and that

2    I understand the penalties under, you know, the

3    Privacy Act and whatever other statutory pieces

4    there are.

5         Each of them signs that. They also go

6    through whatever the standard -- I believe

7    Mackey's right now is the standard level for

8    review.

9         SPEAKER: Yeah.

10        MR. DUFFY: But yeah, they have it, and

11   in most instances, -- we've had experience. Some

12   years ago, we did one on cardiac care. Data

13   becomes the driver in these. How good -- the

14   more data you have, the more elaborate the data

15   analysis, the better you're able to deduce

16   whether in fact we're meeting program purpose and

17   intent.

18        What we do now is we -- again using

19   oncology as an example, but it's only an example

20   of what we do with most of these, we actually

21   convened at the beginning -- after hiring the

22   contacter, letting a contract, bringing on



51

1    Harvard, we actually convened a large data

2    summit.  We brought in -- I'd say there were 30

3    or 40 different data managers from the Veterans

4    Health Administration and elsewhere who came into

5    the Under Secretary's conference room and met

6    with the Harvard team and reviewed just what

7    kinds of information was available and how one

8    might access it, but all of it was done with, you

9    know, full consent and understanding of the

10   individual data managers in Veterans Health

11   Administration because it's their expertise, it's

12   their ability to not only help gain access to

13   those systems but also to be able to answer the

14   nuances of how good is the data and what does

15   this actually reflect, that kind of thing.

16          It becomes a critical bridge between the

17   contractor and the data use.

18          SPEAKER:  Right.  Well, I think what our

19   interest is, we talk about the Mackey's, and I'd

20   like to just shift into talk a little bit about

21   security clearances and suitability examinations

22   and sensitivity levels.

52

1              MR. DUFFY:  Right.

2              SPEAKER:  We've had an opportunity to

3       review some of the 2280s that are signed --

4              MR. DUFFY:  Sure.

5              SPEAKER:  -- and with all due respect,

6       we're looking at them and the sensitivity levels

7       just look like they're out of whack for the

8       people who have access to such volumes of

9       sensitive data.

10             MR. DUFFY:  Yeah.

11             SPEAKER:  Maybe you could run us through

12      the process and just comment on that.

13             MR. DUFFY:  Yeah.  I don't know that I

14      can.  I mean, you now, most of those 2280s were

15      probably prepared at the time that the employee

16      was hired.  I don't know that there's -- if

17      there's a protocol, I guess I'm not aware of it,

18      but I don't know that there's a standard

19      requirement for annual reviews of them and that

20      sort of thing.  So, I'm not surprised that

21      they're out of whack.

22             SPEAKER:  Well, let me ask you this.  Do

Interview of: Dennis Duffy                                        6-1-2006

53

```
1     you think that people in your shop, at least some

2     people -- take ████████████ or ██████████. Do

3     you think that the kind of level, the levels that

4     they have are the levels that they should have

5     for investigations or some sort of -- should

6     their sensitivity level be higher than minimum

7     risk?

8             MR. DUFFY: Yeah, yeah. And I

9     apologize. Who's the -- who's your IG -- who's

10    your Assistant IG for IT? Who's your --

11            ████████████: ████████████████████

12            SPEAKER: Rick.

13            MR. DUFFY: No, not Rick. I apologize.

14            SPEAKER: Woolridge.

15            MR. DUFFY: No, not John. Let me back

16    up. I'm trying to put this in a context for you.

17            SPEAKER: Sure.

18            MR. DUFFY: The other day, George Alford

19    and two or three of his senior assistants for

20    Audit and Investigation came over --

21            SPEAKER: Mike Staley.

22            MR. DUFFY: Staley. Yeah. Mike Staley.
```

Interview of: Dennis Duffy                                    6-1-2006

54

1     Okay. Yeah. Okay. So, they come over to

2     basically talk to the Deputy and the senior

3     leadership at a 9 o'clock meeting Tuesday. Okay.

4     They came over to basically kind of repeat the

5     major findings and recommendations from the

6     material -- '05 material weakness report and so

7     we went through in about an hour that kind of

8     thing.

9          The only reason that I mention that

10    meeting is because Mike Staley reminded us at the

11    meeting that about a year ago, I had met with

12    Mike, in fact I convened a meeting in the 300

13    Suite on the issue of sensitivity levels and my

14    recollection is that it tied into the morass the

15    department finds itself in with respect to

16    implementation of FIPS 201 which is this whole

17    question of identification.

18         Let me back up. I'm the most

19    technologically illiterate person in the world,

20    but as I understand it, what we're supposed to be

21    doing with these ID cards is we're supposed to be

22    developing a process and a system that provides

55

1    multiple variables for determining who gets both

2    physical and logical access to both space and

3    systems.  Okay?

4              The idea is that if you're a VA

5    hospital, not everybody needs to be in the

6    research area and so there ought to be some way

7    of coding the card and determining through

8    personnel classification and the like that you're

9    permitted in the research area and I'm not.

10   Okay?

11             The same thing with respect to -- and

12   the larger piece to me is these damn systems and

13   who gets them in and who doesn't.  That whole

14   conversation that morning focused on the dilemma

15   that we have in the department that nobody is

16   responsible for large systems changes and it's

17   kind of like this.

18             Badges are issued by Security and Law

19   Enforcement.  John Batha happens presently -- his

20   organization happens presently to be tied to

21   Policy and Planning.  So, somehow the perception

22   was, well, John's going to have to determine what

56

1    level of IT access you get.

2              At the same time, Ed Marr, who at the

3    time was the Deputy CIO, said oh, no, I have

4    responsibility, and HR says no, I have

5    responsibility. Nobody had responsibility. It's

6    one of these, you know.

7              So, the idea was to convene the meeting

8    to have Mike talk, first of all, about what the

9    inherent problems are and then to talk about it

10   in the context of FIPS 201. I had a very -- you

11   know, I clearly remember making some very basic

12   proposals.

13             One was it seemed to me that the first

14   thing that we needed to do was process map how an

15   employee is determined for purposes of physical

16   and logical access. So, I said, "Let's walk

17   through Jane Doe or John Smith coming through the

18   organization and who has responsibility?" I

19   said, "It seemed to me that if we process map

20   this thing out, what we're going to find is that

21   Human Resources can't make that determination and

22   IT can't make that determination. The person

133

57

1    that's going to have to make the determination is

2    the individual program manager for the most

3    part."

4          I said, "So, when I decide that I'm

5    hiring Jane Doe, I make some basic

6    determinations. Jane Doe should have access to

7    these parts of the organization and Jane Doe has

8    access to systems, but here's the limitation on

9    the systems." Okay? I said, "Somehow, we need a

10   basic form that says that I just hired Jane Doe

11   and here's the limitations."

12          SPEAKER: Yeah.

13          MR. DUFFY: I said, "But to do that," I

14   said, "I can't tell you how many systems there

15   are." I said, "I have data analysts. I can't

16   tell you, VA can't tell you how many information

17   and data systems there are." I've heard numbers

18   from, you know, a hundred to a thousand. I have

19   no idea what it is. I said, "I don't care."

20          I said, "What I can tell you, though, is

21   that the chief information officer and the senior

22   data owners, predominantly VBA, VHA, ought to be

134

58

1   able to sit down in a conference room over the

2   course of several days, pull out a compendium of

3   data systems and walk through an exercise that

4   basically says that we will prioritize the

5   systems because not all systems are equally

6   sensitive."

7           SPEAKER:  Right, right.

8           MR. DUFFY:  So, you know, let's work our

9   way up and let's agree that if there's a hundred

10  or 500 or a thousand systems, that we have a

11  compendium that basically says these are the top

12  20.  They're a level pen, and you aren't going to

13  get in there unless, you know, you've got a top

14  secret clearance.  I don't care what the process

15  is, but define the damn process, and if I've got

16  -- if I have a program manager have this list and

17  I know that I'm giving you access to Level 8,

18  then there ought to be a quick handbook that

19  basically says Level 8 requires the following.

20          It requires that the program manager

21  certify that indeed you need the access.  It

22  requires maybe that the cyber security officer,



Interview of: Dennis Duffy                                    6-1-2006

59

1    you know, reaffirm that this is an appropriate

2    use of -- an appropriate access level for the

3    nature of the work that you're doing, but more

4    critical to me is somebody, somebody, not the

5    first-line supervisor but senior management needs

6    to lay out the process that says if you're at

7    this level, it requires a Mackey or it requires a

8    background investigation or it requires whatever.

9         This place drives me crazy, with all due

10   respect. This place drives me crazy because we

11   talk and talk and talk and we never fix it.

12        SPEAKER: Yeah.

13        MR. DUFFY: You know, the Secretary was

14   shocked that ███████████ didn't have some sort

15   of a background investigation. This is telling

16   tales out of school. The Secretary's driver,

17   previous driver, was actually found after he had

18   been driving for the Secretary for two years to

19   have -- by doing a basic Mackey after the fact,

20   had actually been convicted of homicide, had

21   actually served 20 years in prison.

22        Now, you want to talk about an

Interview of: Dennis Duffy                                    6-1-2006

60

1    embarrassment, go up and tell the Secretary, Mr.

2    Secretary, that guy that you like, who's been

3    driving for you for the last year, turns out,

4    sir, that he served 20 years in prison for

5    vehicular homicide.  He ran his girlfriend over.

6            Now, I say that not to get -- not to

7    tell tales out of school.  I say it because we

8    talk systems, we don't have systems in place.

9    You -- somebody has to decide does the

10   Secretary's driver get that background and at

11   what point does he or she get that background.

12           SPEAKER:  That's right.

13           MR. DUFFY:  But they don't exist.  If

14   they exist, I've been here 30+ years, I haven't

15   seen them, and it's not that damn difficult.  It

16   really isn't if you took the right people and

17   said to them don't come out of the room until the

18   damn thing is done, because 80 percent -- not 80.

19           A large part of the problems could in

20   fact -- no, I won't even go that far.  Some of

21   the problems could be resolved by going through

22   that exercise and it's not FIPS.  It's this whole

61

1    system, you know.  If you -- I don't know if any

2    of you were at the hearing, House hearing.

3            The only thing that I found enlightening

4    about the House hearing was the panel that

5    followed us and, unfortunately, they were on

6    there for all of five minutes and that was three

7    cyber security experts up there and to a person,

8    two men and a woman, they said, look, VA is not

9    unique in government, VA is not unique in the

10   larger cyber world in the context of danger.  The

11   size and volume of the records compromised here,

12   the magnitude is just overwhelming.

13           SPEAKER:  Yeah.

14           MR. DUFFY:  But it's not, you know, you

15   didn't have the right 2280.  It's people, it's

16   processes, it's technology.  Should we have had

17   technology that prevents employees from

18   downloading large extract files or at the very

19   least sends an alert to a cyber security officer

20   or first-line supervisor?  I don't know what the

21   answers are, but they're out there, and the other

22   thing that they said is that when we talk about

Olender Reporting, Inc.
Washington, D.C.

(888) 445-3376
Baltimore, MD

WORLDWIDE
Ft. Lauderdale, FL

6-1-2006

62

1    these things, too frequently what we talk about

2    is protecting the criminal, you know.  We're

3    going to stop people from hacking.

4          I can tell you if you try and access a

5    form site, but I can't tell you if you download

6    26 million veterans records.  So, I don't mean to

7    sound facetious.  I'm just telling you that

8    that's the environment in which this organization

9    has worked for years.

10         SPEAKER:  Okay.

11         MR. DUFFY:  I don't mean to --

12         SPEAKER:  No.  I appreciate that.

13         MR. DUFFY:  -- get philosophical here.

14         ████████████  At any time, say, between

15    the 5th when you found out about the theft --

16         MR. DUFFY:  Right.

17         ████████████  -- and the 9th when you

18    told the chief of staff, did it occur to you to

19    contact the Inspector General's Office?

20         MR. DUFFY:  No, no, and I didn't, I

21    mean, for two reasons.  One is, you know, it's

22    not standard practice for -- I don't believe it

Olender Reporting, Inc.
Washington, D.C.

(888) 445-3376
Baltimore, MD

WORLDWIDE
Ft. Lauderdale, FL

63

1    is. Maybe you'll correct me. It's not standard

2    practice for somebody at the Assistant Secretary

3    level to call the IG on something like this. I

4    think the standard practice is to notify up the

5    chain.

6        But the other point is, and, you know, I

7    -- God. You know, this is the piece that really

8    makes me angry and that is, I honestly thought

9    that the SOC process was one that did incident

10   management reporting and indeed when you guys

11   showed up, when your people showed up on the 10th

12   to talk to -- to try and find ▌▌▌ -- was it the

13   10th? Yeah.

14       SPEAKER: 12th.

15       MR. DUFFY: Or 12th? That Friday.

16       SPEAKER: Was it Friday?

17       MR. DUFFY: Yeah. My assumption was

18   that it had been done through the normal process

19   of the SOC incident management process. You

20   know, foolish me thinks that the SOC must include

21   you guys or that there's a process that says once

22   an incident is reported, if it reaches a

Olender Reporting, Inc.
Washington, D.C.

(888) 445-3376
Baltimore, MD

WORLDWIDE
Ft. Lauderdale, FL

Interview of: Dennis Duffy                                          6-1-2006

64

1       particular threshold, it's to be reported to the

2       IG, you know.

3               But no, I hadn't thought of calling the

4       IG.  I -- you know, it -- kind of going back to

5       what I said earlier, just to reinforce what I

6       just said about no, it's not standard practice,

7       the conversation that I had with Tom when this

8       issue came up was one of a contracting issue

9       where I said I'm sufficiently concerned that I'm

10      going to probably call the IG and again the

11      response is let us look into at it first and

12      assess whether in fact it merits -- you know, you

13      guys, with all due respect, I mean, you have

14      obligations to report up, to, you know, tell the

15      Congress and the rest, and if a problem is, you

16      know, can be resolved administratively, then

17      let's fix it in that fashion and so, you know,

18      honestly, I didn't think of calling you all, much

19      as I like all of you.

20      ██████████████          And I have one last

21      question on the chronology of events.  You had

22      mentioned before that there was some point where

Interview of: Dennis Duffy

6-1-2006

65

1    you and the Deputy Secretary were together at a

2    meeting and I think that we pieced things

3    together and maybe it was the President's

4    Management Council meeting which happened on the

5    10th.

6              MR. DUFFY:  Oh, okay.

7    ████████████████      And --

8              MR. DUFFY:  And I was with him.

9         ████████████      Right.

10             MR. DUFFY:  I took him over to that

11   meeting.

12        ████████████      And you said you didn't

13   mention anything.

14             MR. DUFFY:  Was that on the 10th?

15        ████████████      According to his calendar.

16             MR. DUFFY:  Okay.

17        ████████████      That's all I know.

18             MR. DUFFY:  I will clearly tell you that

19   I did in fact accompany him to the President's

20   Management meeting.  It was kind of a last-minute

21   and it happens this way, is, you know, the

22   Secretary will call and say, oh, the Secretary or

66

1   Deputy wants you to go with him over to the PMC.

2   This would be a quarter of 12 and I went over at

3   12 o'clock with him and we were probably over

4   there until close to 2 or 2:30 anyway.

5          So, yeah.  If that's the case, I don't

6   remember having a conversation with him about

7   this.

8          What I do remember, I remember a

9   conversation with Tom where he said that I've

10  briefed the Deputy and I don't know what that

11  time was.  I assume you have that.

12          SPEAKER:  That Tom briefed the Deputy?

13          MR. DUFFY:  Yes, and I, you know, I'm

14  not looking to throw stones here, but I'm

15  rattling my brain and I'd be willing to bet you a

16  dime to a donut that Tom also told me that he had

17  had a conversation with the Secretary.  I --

18  that's what -- you know, you want to -- that's

19  the piece that bothers me.

20          I have nothing to substantiate that, but

21  I've been knocking my brain and I'm willing to

22  bet you that there -- that that was in fact the

.43

67

1    case. So.

2              SPEAKER:   The Secretary or the Deputy

3    Secretary?

4              MR. DUFFY:  No, the Secretary.  My

5    recollection is that Tom said, you know, I've

6    briefed -- and I think -- again, I don't know

7    where the Secretary was.  I don't see his

8    calendars and I seldom see him, but my

9    recollection was that somewhere incident to this,

10   might have been the 10th when I took the memo up,

11   you know might be confused, or in passing in some

12   other event immediately following that, that my

13   recollection is he said he had had a conversation

14   with the Secretary, but it's -- again, I have

15   nothing to substantiate that.

16             I just find it odd.  You know, to me, --

17   I won't go any further.  His outrage about not

18   being informed and maybe he doth protest too

19   much, but that's my -- one man's bitter opinion.

20             SPEAKER:  I have a couple things.  Is

21   that it for the chronology now?

22                              That's it.  That's all I

Interview of: Dennis Duffy                                    6-1-2006

68

1     have.

2                    SPEAKER:   I just have a couple to

3     accelerate things here.  We found a strange

4     development in talking to ██████████

5     supervisor, immediate supervisor.

6                    MR. DUFFY:  Mike Moore?

7                    SPEAKER:  Mike Moore.

8                    MR. DUFFY:  Yeah.

9                    SPEAKER:  That he didn't really know

10    what ██████ was doing.  He had no idea of his

11    projects and so forth, and he said something to

12    the nature that he has a couple different jobs to

13    include executive assistant in the office of

14    something.

15                    MR. DUFFY:  Yeah.

16                    SPEAKER:  What are those two -- I mean,

17    talk about that.  Talk about why he's in the

18    position he is, supervising a guy he doesn't have

19    no idea what he's doing and that he's the

20    executive assistant for --

21                    MR. DUFFY:  Well, yeah.

22                    SPEAKER:  We didn't really query on

146

69

1    that.  I thought maybe you could help us out.

2         MR. DUFFY:  Well, let me -- I'll try.

3         SPEAKER:  Yeah.

4         MR. DUFFY:  But it goes beyond my powers

5    of comprehension.

6         Again, the organization, Policy and

7    Planning has been -- the organization itself

8    probably contributes to some of the confusion

9    here.  Mike Moore was the -- Mike Moore is, I

10   think still by position description, if you

11   looked at his PD, I think he's -- I think his

12   title is Executive Assistant to the Deputy

13   Assistant Secretary for Policy.

14        There are a number of vacancies in

15   Policy and Planning.  When Mike came in, we had

16   an Office of the Actuary.  Mike and Dr. Meskin,

17   Steve Meskin, who was the department's chief

18   actuary, had serious, serious disagreements

19   regarding directions and Dr. Meskin finally left.

20        There were a lot of vacancies and what

21   Mike did was he moved -- when Meskin left, he

22   moved Mike in as the acting director of Policy,

70

1    and you'd have to ask ███████████ if there's a

2    52 action to that effect or anything of that

3    sort, but Mike has been the titular acting

4    director of Policy.

5           My own perception is that Mr. Moore is

6    extremely weak and ineffective on a whole variety

7    of different levels, but Mike McClendon thought

8    he was one of the more intelligent people that

9    he's ever met in his life and used him in that

10   capacity.

11          I think candor would say to you, and I

12   think if you go back and asked individuals in the

13   organization, I think what you would find is that

14   the real work -- Mike Moore did all of the

15   administrative BS.  He managed EDMS packages, you

16   know, that comes through the office.

17          The real data analysis work was probably

18   being done directly for McClendon and Dac Tran

19   and, you know, the fact, the mere fact that Mike

20   went to Dac on all of this was not just an

21   acknowledgement that Dac knows the datasets, it's

22   a real acknowledgement that Dac Tran was in fact,

Interview of: Dennis Duffy

6-1-2006

71

1    whether on paper or not, was in fact supervising

2    or heavily engaged in the day to day data,

3    analytical data work that was being done wherever

4    it was within the Office of the Deputy Assistant

5    Secretary for Policy.

6            Mike basically collapsed the

7    organization. Again, we had the Office of the

8    Actuary. We had Policy and we had Data Analysis.

9    Mike basically ran his own agenda and did some

10   good analytical work, but the way in which he

11   managed was sometimes chaotic.

12           SPEAKER: Okay.

13           MR. DUFFY: That's one person's opinion.

14           SPEAKER: Just so I understand, Mike is

15   or was the executive assistant but only for the

16   PAS for Policy, --

17           MR. DUFFY: Right.

18           SPEAKER: -- not the whole Office of

19   Policy?

20           MR. DUFFY: And he's been in that

21   capacity for preceding my original tenure and I

22   have been there in one fashion or another, Policy

72

1    and Planning, for 10 years as either the

2    Assistant Secretary or the Principal Deputy or

3    the Acting Assistant Secretary.  Call me anything

4    you want, I'm still there or was still there.

5          Yeah.  Mike came in way back and I can't

6    tell you how it all worked out, but somehow he

7    was originally, I guess, a Schedule C under

8    Turnage and somehow converted to career status

9    and was given this position and has been in that

10   position the whole time.

11         I don't think I brought the memo, but

12   there's a memo that Mr. McClendon put out with

13   regard to all the things the office was going to

14   do to tighten up.

15         SPEAKER:  Right.

16         MR. DUFFY:  I think it was his recent

17   memo.

18         SPEAKER:  I think if I understood

19   correctly, it was like two or three days after --

20         MR. DUFFY:  It might have been, yes.  I

21   was going to bring a copy, but the memo would

22   suggest that the office was really sort of

73

1      loosey-goosey.  I mean, do you have any comments

2      or did you have a chance to look at that memo?

3                SPEAKER:  I haven't seen the memo.

4                MR. DUFFY:  Did you have any input?

5                SPEAKER:  No.

6                MR. DUFFY:  So, he puts a memo out and

7      you're not consulted?  I mean, you might be

8      seeing a pattern here and that is that Mike acted

9      in many regards as an independent operator and

10     despite numerous expressions of concern, you

11     know, and here, I mean, you know, you all have

12     been around long enough, you know, I would go

13     upstairs and I would complain to everybody, to

14     the chief of staff, to the Deputy, to the General

15     Counsel, and what I would get is yeah, he's a

16     pain in the ass and, you know, but there was

17     always this dynamic of somehow he's a political

18     appointee and, you know, I would just have to

19     bear with it and, you know, don't worry about it,

20     we'll work around it.

21               SPEAKER:  Well, I guess that

22     relationship in terms of -- I mean that's one

74

1    issue, but let's just talk about the content of

2    the memo.

3              Have you had a chance to read it since

4    it was issued?

5              MR. DUFFY:  No.

6              SPEAKER:  It talks about things like

7    security clearances and --

8              MR. DUFFY:  Right.

9              SPEAKER:  -- taking data off the V

10   drive.

11             MR. DUFFY:  Here's what I do know about

12   it.  I do know that I guess either the day before

13   it was issued or the day it was issued, again a

14   hallway conversation, but Dac Tran said to me,

15   "Oh, I put together a series of strong

16   recommendations for Mike regarding cyber

17   security, regarding data management," that kind

18   of thing, he said.  He said, "I assume Mike will

19   bring those forward to you," and again the next

20   thing I knew is the memo was out.

21             I've seen the memo.  I vaguely remember

22   reading it, but if you asked me chapter and

Interview of: Dennis Duffy                                    6-1-2006

75

1        verse, I --

2               SPEAKER:  No, no.

3               MR. DUFFY:  -- know the brief

4        conversations with Mike about, you know, oh, I

5        bought a safe and it's now in Bob's office and I

6        bought these external hard drives and now we're

7        going to, you know, scramble everything.

8               SPEAKER:  Yeah.  That kind of thing.

9               MR. DUFFY:  I'm going to start, you

10       know, insisting on background investigations.

11       I'm going to significantly narrow the number of

12       individuals who have access to this.

13               My perception was this was all right and

14       appropriate, but the horse was already out of the

15       barn, and it seemed to me like what we were doing

16       was giving the impression that we were putting --

17       that we had already had plans for all of these

18       safeguards.

19               I think my perception is that that's --

20               SPEAKER:  You were not personally aware

21       of any plans and you had not initiated any plans

22       of that nature?



76

1          MR. DUFFY:  That's exactly right and had

2    never been consulted by Mike or others regarding

3    that, by the way.

4          SPEAKER:  All right.  Okay.  You have

5    nothing?  I think we're closed.

6          ██████████  I think so.  Do you have

7    anything you want to say before I turn the tape

8    off?

9          MR. DUFFY:  No.  I -- no.  You know.

10         ██████████  Then I'll turn the tape

11   off.

12         (End of Interview of Dennis Duffy.)

13

14

15

16

17

18

19

20

21

22