**Page 1**

DEPARTMENT OF VETERANS AFFAIRS

OFFICE OF INSPECTOR GENERAL

WASHINGTON, D.C.

Administrative Investigation: Lost Data

CONDUCTED BY

██████████████████████

Office of Inspector General

SWORN TESTIMONY OF

TIM S. McCLAIN, General Counsel

Thursday, May 18, 2006

(TRANSCRIPT PREPARED FROM AN AUDIOTAPE RECORDING.)

MALLOY TRANSCRIPTION SERVICE

(202) 362-6622

**Page 2**

1   PROCEEDINGS
2   ████████████████ with the Office
3   of Inspector General, Office of Investigations. With me is
4   ████████ Office of Investigations, and ███████ Office
5   of Audit. Today is May 18th, 2006. We are here to
6   interview Mr. Tim McClain.
7        Would you raise your right hand, please. Do you
8   swear or affirm that the information you are about to
9   provide is the truth, the whole truth, and nothing but the
10  truth?
11       MR. McCLAIN: Yes, I do.
12  Whereupon,
13       TIM S. McCLAIN
14  was called as a witness and, after having been first duly
15  sworn, was examined and testified as follows:
16       EXAMINATION
17  ████████████
18       Q  And for the record, would you state your name and
19  your title, please?
20       A  I am Tim S. McClain, and I am the General Counsel
21  at VA.
22       Q  Mr. McClain, what we want to do today is we are

**Page ?**

1   trying to piece together the events following the theft of a
2   personal computer by ████████████ and the VA data that
3   was on it. So if you could start by just telling us when
4   you found out about it and who told you and what you did in
5   response to that.
6        A  I found out about it on March 16th -- I'm sorry --
7   May 16th, this week.
8        Q  And how did you find out?
9        A  A memo came up through our normal OGC
10  correspondence, and I saw in the memo that it was a memo
11  from the General Counsel to the Chief of Staff regarding
12  what duties or responsibilities the Department had since
13  there was a disclosure of protected information.
14       Q  And who had prepared that?
15       A  One of my attorneys, Jeff Corzatt, prepared it at
16  the request or at the direction of my Deputy General
17  Counsel, Jack Thompson.
18       Q  So the memo came up on the 16th, and what
19  happened?
20       A  I -- it was very shortly after actually I saw the
21  memo. I signed it, read the file that was with it. It was
22  rather sparse. I mean, there wasn't a whole lot with it.

**Page ?**

1   There was some memorandum, I believe, that was dated like
2   May 5th or something about the loss, and very shortly
3   thereafter, less than 30 minutes later I think, a meeting
4   was called by the Chief of Staff.
5        Q  And who was at that meeting?
6        A  The chief of staff, myself, and to tell you the
7   truth, there have been so many meetings. I believe Mr.
8   Offer [ph] and Agent O'Neal [ph] were there.
9        Q  And so beyond that, what has --
10       A  I'm sorry. Not Mr. Offer. Mr. Wooditch.
11       Q  Okay.
12       A  Mr. Wooditch, not Mr. Offer.
13       Q  Have there been a number of meetings that you've
14  been in on this issue?
15       A  Yes. Yes, there have.
16       Q  And all of them, I guess, started -- it had been
17  since the 16th, so all this week?
18       A  Yes.
19       Q  Can we get a copy of that memo? Is that now an
20  official General Counsel opinion?   b6 b7C
21       A  It is not an official General Counsel opinion. It
22  is simply a memo stating what authorities would control in

Page 5

1  situation like this, essentially the Privacy Act, and what
2  would be our responsibilities. And the memo will speak for
3  itself, but it essentially says that we have a duty to
4  inform and help the veteran mitigate any potential damage
5  that it might -- and yes, you can have a copy of it.
6      BY ▮
7      Q  This apparently is the memo that the Chief of
8  Staff had asked Mr. Thompson to prepare back on the 10th of
9  this month?
10     A  Yes. I believe --
11     Q  Is that correct?
12     A  -- that's right.
13     Q  Okay.
14  ▮
15     Q  And it would be normal for Mr. Thompson just to
16 assign it, and you wouldn't become aware of it until it had
17 to come up for signature?
18     A  Normal -- that's right. Normally -- I mean,
19 obviously Mr. Thompson and I talk, but there's a lot going
20 on, and he certainly has that authority to assign work to
21 other counsel and then review it, and he had reviewed it in
22 our normal course.

Page 6

1  ▮
2      Q  But he had not, prior to you seeing the memo,
3  discussed it with you?
4      A  No, he had not.
5      Q  So, as you see it, this is -- what happened is
6  Privacy Act violation. Is there anything more to it than
7  that?
8      A  Well, that's kind of an open-ended question.
9         Yeah. There's a lot to it, but I think if -- if
10 the question is, is it a Privacy Act violation, there's no
11 question. It is. Yes. It's a Privacy Act violation.
12        For a custodian of personally identified
13 information to disclose that, without the permission of the
14 person outside of the Privacy Act notification that is in
15 the Federal regs -- in other words, we collect private
16 information through a Privacy Act notification that's --
17 like everybody else does, and there are uses that we can use
18 this private information for, health care benefits, all
19 sorts of things, but if it's disclosed to someone outside
20 the agency without permission and not in accordance with one
21 of these uses, then it's an unauthorized disclosure.
22     Q  And is the disclosure to the thieves, or who is

Page

1  the disclosure to?
2      A  Well, in this case, it's a potential disclosure.
3  We don't know where it is, it is my understanding. So we -
4  at least to date, we have not received any indication that
5  it's in the public domain. We would be just speculating if
6  we were to say, you know, exactly where it is or what's
7  happened to it. We don't know.
8      Q  And I know there are levels of disclosure. So
9  would this be considered an unintentional disclosure, or is
10 there some negligence?
11     A  That, I'm not familiar with, and so I -- I don't
12 know the answer to that.
13 ▮
14     Q  But the issue is that it's the potential
15 disclosure, the fact that this employee had this type of
16 personal data at his home, or is that an issue as well?
17     A  Well, that's an issue obviously that you're
18 looking into and investigating and that the Department is
19 also looking into and investigating, but that's not
20 something that the General Counsel would get involved.
21 We're not a law enforcement authority or anything, but we
22 would advise and assist in any internal administrative

Page

1  investigation.
2      Q  So, as far as you're concerned, the fact that he
3  had it at home in itself is not a Privacy Act violation?
4      A  No, it is not. No. He was our employee, doing
5  Government work, you know, potentially. So, no, it was n
6  a Privacy Act violation.
7  ▮
8      Q  Are you aware of any VA directives that he may
9  have been in violation by bringing this work home?
10     A  I believe there are VA directives that cover this
11 sort of thing about taking -- I don't know whether it's
12 taking home, but taking information outside the agency.
13     Q  One of the things that -- on the 6th -- so the
14 first time you heard about this was on the 16th, and Mr.
15 Thompson had this, I guess, from the -- from the Chief of
16 Staff on the 10th. Once you learned of this -- and I guess
17 you had a meeting that took place -- did you ever go back t
18 Mr. Thompson and -- was there any -- ever any question wl
19 it may have taken 6 days for this memo to be generated and
20 for action to be taken on this once -- once the Office of
21 General Counsel received this and received some direction
22 from the Chief of Staff to put together some information

**Sworn Testimony of Tim McClain**

Page 9

1  about what are our duties and responsibilities?
2      A  Well, the only question that was asked of us -- it
3  was a very specific question -- is what are the Department's
4  duties and responsibilities regarding notification.
5      Q  Right.
6      A  And that's the question that we answered.
7      Q  Right. Okay. My question is -- is that was there
8  any sense of urgency that you're aware of after the fact
9  that perhaps this is something that we need to jump on and
10 to get back? Presumably, the Chief of Staff, I guess, is
11 where this information went or was returned to because he is
12 the one who asked for it?
13     A  As I say, you may want to talk to Mr. Thompson
14 about his conversation with --
15     Q  Yes.
16     A  -- Mr. Bowman.
17     Q  Yeah. I hear you.
18     A  I was not privy to it and --
19     Q  Yeah. I didn't know if you may have had
20 conversations with Mr. Thompson, so okay. That's fine.
21 Appreciate that.
22     ▓▓▓  That's all I have.

Page 10

1  ▓▓▓
2      Q  Are you -- are you certain that the meeting that
3  you said occurred right after you saw the memo included Mr.
4  Wooditch and Mr. O'Neal? I mean, because you were saying --
5      A  It was --
6      Q  -- that you had a number of -- you've had a number
7  of meetings.
8      A  It was either that meeting or some other meeting
9  at a very close time in time.
10     Q  In your response as far as the duties and
11 responsibilities, was notifying the IG part of that?
12 Obviously, if they were there 30 minutes later, it's a moot
13 point, but --
14     A  Right. No. The memo did not address notifying
15 anyone else other than the veteran. We were addressing
16 notifying the veteran.
17     Q  Okay.
18 ▓▓▓
19     Q  So-called "mitigating strategy," I guess?
20     A  Exactly. Under -- in the Privacy Act, we have a
21 duty when there's a disclosure to try and mitigate any
22 potential harm or loss.

Page 11

1  ▓▓▓
2      Q  Can we -- can we get a copy of the memo?
3      A  Certainly.
4      Q  Before I turn the tape, do you have anything you
5  want to say?
6      A  No, I don't.
7      [Whereupon, the sworn testimony of TIM S. McCLAIN
8  concluded.]

MALLOY TRANSCRIPTION SERVICE (202) 362-6622

Page 9 - Page 11

b6 b7C