Page 1

DEPARTMENT OF VETERANS AFFAIRS

OFFICE OF INSPECTOR GENERAL

WASHINGTON, D.C.


Administrative Investigation: Lost Data

CONDUCTED BY:

████████████████████████████████

Office of Inspector General


STATEMENT OF

MICHAEL H. McLENDON,

Deputy Assistant Secretary for Policy


Wednesday, May 31, 2006


[TRANSCRIPT PREPARED FROM AN AUDIOTAPE RECORDING.]


MALLOY TRANSCRIPTION SERVICE

(202) 362-6622

---

Page 2

PROCEEDINGS

1
2    [in progress] -- Office of Inspector
3  General with ████████████  Today is Wednesday,
4  May 31st, 2006, and we are back on the record with Mr. Mike
5  McLendon.
6        First of all, could you explain the organizational
7  structure within the Office of Policy, particularly as it
8  related to Wayne Johnson and who his supervisor was?
9        It seems that he either had no supervisor or he
10  had multiple supervisors.  What was the rationale for --
11      MR. McLENDON:  I am so glad that you have finally
12  asked that question.  You have to go back in time, and I'll
13  have to -- I'll have to give you some background, and then I
14  will answer your question more directly if that's okay.
15      ████████  Okay.  That's fine.
16      MR. McLENDON:  The Office of Policy and Planning
17  has been one of the most dysfunctional organizations in VA
18  for 10 years, and that's well documented.  You can talk to
19  the employees.  You can look at past employee surveys.  It
20  is one of the most hostile work environments that I have
21  ever set foot in when I arrived.
22        I knew it to some degree because when Secretary

---

Page

1  Principi asked me to go in to fix the place, he knew it was
2  a rat's nest.
3          ████████ huh.
4      MR. McLENDON:  Now, what do I mean by hostile work
5  environment?  I mean people who scream and holler at staff
6  members, favoritism among the staff, and I'm not meaning
7  favoritism in the sense that you mentor someone and you want
8  to see them move ahead.  I'm talking about just out and out
9  favoritism, a style of management that I have -- that I
10  share absolutely no values with whatsoever.
11          I had not been there more than just a couple of
12  days when the individual who is director of the ████████████
13  ████████████  I heard her screaming and hollering at an
14  employee that was in her office, and even after I put my
15  head in the door to just kind of give her the signal that,
16  you know, "I'm hearing what you're saying" and kind of cease
17  and desist, she continued.  I finally had to stop it and
18  counsel her.
19          And this is an individual who has historically
20  been known for that and has driven out many, many people to
21  leave that organization, and one of the individuals that she
22  verbally abused for years was ████████████ and I think

---

Page

1  you meant ████████████
2        ████████████ h-huh.
3      MR. McLENDON:  Very mild-mannered, nice lady.
4        That environment was fostered and encouraged by
5  Dennis Duffy.
6        I've got a couple of things which I had not
7  planned on doing anything with.  Let me see if I even --
8  yeah.
9        It finally got to the point where it was clear
10  that a lot of stuff had gone on in the past that I knew
11  absolutely -- didn't know anything about, but I had heard
12  rumors of, and so, finally, in 2004, I wrote Duffy that
13  memo, and you might want to make a copy and read it before
14  we go further.
15      ████████  Yeah.
16      MR. McLENDON:  In fact, I would --
17      ████████  Yeah.  Why don't we turn the tape
18  off.  ████████
19        [Off the record.]
20      ████████  Okay.  We are back on the record, and
21  we have been given a copy of the June 30th, 2004, memo;
22  subject, appropriate action regarding performance and

Page 5

1  conduct-related problems.

2  ▮ Carry on. I mean, so you -- you sent

3  this letter to the Acting Assistant Secretary in '04, and

4  who was that at the time?

5  MR. MCLENDON: Duffy.

6  ▮ Mr. Duffy.

7  And you outlined all these performance and

8  misconduct problems. I guess the next question is: What

9  happened?

10  MR. MCLENDON: We had an agreement, at least

11  verbally.

12  ▮ Okay.

13  MR. MCLENDON: He verbally told me that he had

14  made arrangements with Ron Aument to get her reassigned over

15  to VBA. Ron Aument at that time was leaving the Chief of

16  Staff's office and had been nominated to be the deputy to

17  Admiral Cooper over at VBA, but nothing happened.

18  And so I called Ron Aument probably right after he

19  got actually sworn in for that position, and he said, "Oh,

20  yeah. I'm ready to take her," but, you know, then he like

21  called me back the next day or maybe later that day -- I

22  don't remember -- and said, "Well, Dennis has said he's not

Page 6

1  going to do that. He's going to kee▮ ▮ the

2  organization."

3  So then Dennis sent out that e-mail in August with

4  no reference to any of this, just saying that he was

5  reassigning her as his ▮ nd reassigning

6  Mike Moore as the director of the Policy Analysis Service.

7  ▮ That's where she had been?

8  MR. MCLENDON: Yes. Uh-huh.

9  And she had been the one that had hired ▮ when

10  he came in to VA.

11  And so here Dennis was elevating a person that had

12  a known track record of being hostile to employees to the

13  position that, while not, quote, "officially" on a PD as an

14  ▮ as all the other trappings of power and

15  everything else.

16  ▮ Uh-huh.

17  MR. MCLENDON: It's interesting to note that her

18  letter of reprimand never appeared in her records, and when

19  I was asked for a copy of her letter of reprimand, a signed

20  copy, I was never given one.

21  ▮ hen you asked?

22  MR. MCLENDON: When I asked for it.

Page

1  It's my belief -- and I think there's some

2  indirect evidence to support it -- that there may have been

3  a shell game going on to make it appear that she had been

4  given a letter of reprimand when, in effect, she was never

5  given a letter of reprimand. The only thing they ever

6  coughed up for me or that he did was a draft of one that wa▮

7  unsigned.

8  Now, where I come from, there's something wrong

9  with that.

10  ▮ Okay.

11  MR. MCLENDON: And so that's what led to Mike

12  Moore being made acting Policy Service director.

13  My approach in trying to deal with this was to try

14  to separate my staff as much as possible from having to de▮

15  with her. The deputy would not want to talk about it,

16  anything.

17  ▮ Uh-huh.

18  MR. MCLENDON: Tim McClain has a copy of this. H▮

19  did nothing.

20  ▮ He had it from about that time?

21  MR. MCLENDON: No. He had it from probably about

22  I would say, May -- May, the next year --

Page

1  ▮ '05.

2  MR. MCLENDON: -- when certain events occurred and

3  I wound up speaking with him, and he knew it was a

4  dysfunctional environment, evidently.

5  Throughout this period, I kept checking ▮

6  personnel records, never found a letter of reprimand, and a▮

7  I understand what I've been able to piece together in

8  talking to people, because this happened before I got there,

9  was that there was some kind of meeting around the table i▮

10  Dennis' office. Dennis was there, ▮ was there, and I

11  believe ▮ [ph] was there, and something was

12  passed across the table to her in an envelope that

13  supposedly was the letter of reprimand, and I guess ▮

14  ▮ s probably there too. ▮ was the gu▮

15  that was involved. But no one has ever seen the signed

16  letter of reprimand.

17  ▮ nd where is it here that it says

18  that -- well, this is your memo.

19  MR. MCLENDON: Uh-huh.

20  ▮ nd where was it that you were able to

21  determine that a letter of reprimand allegedly was issued?

22  MR. MCLENDON: I just started talking to people,

b6 b7

54

Page 9

1 trying to piece together what had happened.

2        I mean, when you got staff that is scared out of

3 their wits and telling you all this stuff -- and I even

4 called Dave Bland who was the previous DAS for Policy down

5 in Texas to try to get a little background -- you can't very

6 well ignore it. You got to try to run it to ground and

7 figure out what's going on.

8        I even went and talked to HR, and I can't remember

9 exactly who I talked to, and I also talked to somebody in

10 GC, and I can't remember. I should have written all that

11 down. Because I said what is the process because where I

12 come from in DoD, somebody in HR and somebody in GC would

13 know if a letter of reprimand is in the process because

14 there will be -- that thing will get vetted. They had no

15 knowledge of it.

16        So something went on then, and he basically turned

17 a blind eye to what had been going on there for years.

18 That's why I say I have absolutely no values in common with

19 him.

20        And it finally began to come to a head again after

21 the 1st of the year when some of the staff down in the

22 planning shop who work for ███████████ were kind of

Page 10

1 pulling me aside and said, you kno ████████s back at her

2 old stuff again, creating problems, all this other stuff.

3 ████████ is that the 1st of this year, 2006?

4        MR. McLENDON: first of this year.

5        Now, it may have been going on all along. You got

6 to understand, a lot of these people have lived in absolute

7 state of fear for years, and there is a whole host of people

8 that have worked for this person ████████ who left,

9 couldn't put up with it, wouldn't put up with it. A number

10 of them stayed because they had nowhere else to go. You

11 know, they were just stuck.

12        So end of April, really probably the 1st of April,

13 I started putting a lot of this back together in my head,

14 thinking about, okay, how am I going to approach this again

15 because it was clear when Tim McClain wouldn't do anything

16 and it was clear when Gordon Mansfield wouldn't do anything

17 because I told him point blank how dysfunctional it was, it

18 was a hostile work environment, and what the problems were,

19 what do I do.

20        So I started putting a memo together, and this all

21 happened about kind of the same time. So I put that

22 together that I was going to send Dennis, and then all of

Page ██

1 this, this happened. So you might want to make a copy o

2 that too.

3        ████████ eah. Okay.

4        MR. McLENDON: But it basically is a recitation of

5 all this, except now things are a little bit more

6 interesting. Not only had Dennis elevated her up to be an

7 ████████ he was taking formal action to

8 officially reassign her as the ████████ nd had

9 also signed off and endorsed her nomination for the SES

10 Candidate Development Program.

11        Now, from where I sit, all of these things are

12 inconsistent. Imagine how the staff feels, having been

13 burdened with all of that, and now this individual is going

14 to be officially made th ████████ where they've

15 got power to influence virtually everything for that

16 person's career, and then they're going to be potentially

17 become an SES. I just can't -- that's just not right.

18        So, when you ask about the organization, I have to

19 tell you all this, so you understand what a mess this place

20 was when I got there, and I'm not trying to pat myself on

21 the back, but as far as I know, I am the only person who h

22 ever been in there who has tried to do something about this

Page ██

1        So Dennis made Mike Moore acting, and Mike Moo

2 is a fairly -- Mike is a fairly, fairly decent person. I

3 don't know if -- do you know his background?

4        ████████ Not -- not too extensively.

5        MR. McLENDON: Mike is a Navy veteran ████████

6 ████████████████████████████████

7 ████████████████████████████████

8 He has two master's degree, a law degree. He's passed the

9 Bar. He's intellectually a very, very bright guy, and he's,

10 I think, done a pretty decent job in terms of doing a lot of

11 the administrative things that go on.

12        He is not a technical expert any more tha ████████

13 ████████ was a technical expert, and so he's, you know, the

14 administrative supervisor.

15        ████████ Uh-huh.        b6 b7C

16        MR. McLENDON: But you have to understand with

17 people who are programmers, programmers support a wide

18 variety of people in an organization. They're kind of like

19 a resource that a whole bunch of people will go to, to help

20 them do various projects or get data or analyze data or

21 manipulate or do some kind of statistical analysis or

22 whatever may be, and they do that on an ongoing kind of

## Page 13

1  basis.

2      So no one sits down and says give me a list of

3  every little task and every little project that you've

4  worked on for XYZ. I mean, it's just -- you -- you can't do

5  that, and there's no way that at least Mike Moore would be

6  able -- would be able to do that.

7      The impact of what Dennis did was to essentially

8  neutralize my ability to hire a new policy service director

9  because he left ████████ in that position.

10      ████████ He didn't have a -- you didn't have a

11  --

12      MR. McLENDON: Yeah. I couldn't -- couldn't hire

13  anybody to do that.

14      I'm sure one of the questions -- and it has

15  crossed my mind too -- well, would that have made any

16  difference, you know. My sense is that it would not have

17  made any difference because the nature of analytical work

18  doesn't change in terms of that, but that's how Mike Moore

19  wound up being a supervisor.

20      ████████ So ████████ is basically -- works

21  independently?

22      MR. McLENDON: He's just like -- he's just like

## Page 14

1  any -- any analyst in VA that is given tasking work by a

2  whole bunch of people that he services. It's just like

3  programmers in VHA who are out-based somewhere, and they get

4  taskings from various people to do certain analytical things

5  or do runs for them or whatever.

6      ████████, when he's tasked, he does not

7  declare it with anybody?

8      MR. McLENDON: No. It's just -- I'll give you a

9  good example. ████████ who is probably 40 years in VA,

10  he's the guy that fields all the questions from the public

11  and from Congress and anything else on the veterans'

12  demographics and publicly available information. I mean,

13  ████ gets tons of calls every day, every week, you know. He

14  keeps a logbook, okay, that we started, but we don't have

15  him sit down and say, okay, at the end of every day -- or

16  tell us who you think you are going to get called from the

17  next day. So analytical people service a wide variety of

18  clients that they do, and ████████ had been doing this same

19  kind of work way before I got there. I guess ever since --

20  ever since he came on to the job that he had been working.

21  ████████ even -- even knowing that, though,

22  that they take in requests and so forth, wouldn't have Wayne

## Page

1  been a better fit for being supervised by Dat Tran? I mea

2  that's the hard part I'm having. Why -- why with Moore

3  is it a numbers game? Dat works with him -- I don't kno

4      MR. McLENDON: We --

5      ████████ -- 90 percent of the time.

6      MR. McLENDON: well, let me -- let me give you the

7  other piece of this.

8      ████████ Yeah.

9      MR. McLENDON: Dat Tran, before I got there, had

10  been acting service director for a couple years, and Dennis

11  had never promoted him.

12      If you go back in history -- and I can't remember

13  the exact dates, but, I mean, we can pull all of this out --

14  Jesse Brown created something called the Veterans Center

15  Statistics or National Center for Veterans Statistics, I

16  think, if I recall. Susan Krumhaus was in it and a whole

17  lot of good people.

18      Dennis -- in fact, Congress was even notified that

19  this center was created. Dennis decided to disband that

20  center, and that's why you go look in the paid system and

21  you look at the PD numbers and the titles of the

22  organizations, that you will see National Center for

## Page

1  Statistics in there. Well, Dat essentially runs what is

2  that old part of the organization.

3      Wayne was in the policy analysis shop because

4  that's the way they had set it up a long, long time ago, and

5  it makes sense to some degree, and it's a matter of

6  philosophy of how you manage.

7      Some people believe that you just should

8  consolidate all of your analytical people in one -- one

9  group. Other people would say no, you need to disperse the

10  in the organization because that way they are closer to

11  their customer, they are closer to the people that have the

12  demands for their talents. They also can get domain-smart

13  in a particular area, the area that they are working in. So

14  I can't, you know, say, well, it's absolutely wrong to do

15  that. I think it depends on how you -- how you want to

16  manage it.

17      We were on target to move in the direction of

18  consolidating some of those people, not because what they

19  were doing was wrong, but because the direction I was

20  taking, the Office of Policy. I was serious when I said in

21  here that I just refused to hire anybody. There was no way

22  that I could in all conscience hire somebody to come in and

Administrative Investigation: Lost L

Page 17

```
 1   work under ████████ knowing what I knew.
 2        So I had started over the past 9, 10 months began
 3   to hire new people, good, quality people like █████████
 4   ████████████████████████████████████ ho I
 5   got from VBA. There's another lady I'm trying to get from
 6   VHA, actually a couple other ladies.
 7        So we were moving the Office of Policy to a much
 8   more professional group of people, and in that environment,
 9   Wayne would have been moved along with ████████ who is
10   another -- another analyst over into Dat's area. We just
11   didn't have a critical mass yet to get there to do that.
12        So that's why people are organized and set up the
13   way they are.
14        ███████ Okay.
15        MR. McLENDON: If I hadn't been dealing with all
16   of this mess, we could have done things a lot different.
17        ███████ don't want to get crazy about this
18   right now for time purposes, but, again, this memo, you
19   learned about -- you know, I read it, but I read it very
20   quickly, but it's not in here, the fact that there was a
21   letter of reprimand that was -- that was issued. You just
22   learned that on your own, or is that documented in here?
```

Page 18

```
 1        MR. McLENDON: Yeah. I -- well, I don't know if I
 2   say exactly how I learned, but --
 3        ███████ Yeah.
 4        MR. McLENDON: -- nobody ever sat down and told me
 5   when I came on board that you need to know and understand
 6   that blah, blah, blah, blah.
 7        ███████ Uh-huh.
 8        MR. McLENDON: I just finally had to piece all of
 9   this together.
10        ████████ Okay.
11        ████████ The letter of reprimand for what?
12        MR. McLENDON: She struck somebody.
13        ████████ For actually hitting somebody.
14        MR. McLENDON: ███████████
15        ███████ okay.
16        ███████ Okay.
17        MR. McLENDON: And, you know, that happened way
18   before I got there. There was an incident report written on
19   it.
20        ████████ s any of that in the OPF?
21        MR. McLENDON: No.
22        ████████ where would that -- where would that
```

Page

```
 1   -- where would that incident report be written or be filed,
 2   I should say?
 3        MR. McLENDON: Office of Security would have it.
 4   ████████████████████ file a complaint as
 5   far as you can recall?
 6        MR. McLENDON: I would just be giving you third-
 7   and fourth-hand here.
 8        ████████ Yeah. Okay.
 9        MR. McLENDON: As it was related to me ████████
10   advised several people about this, and there wasn't a lot o
11   initial action, but finally some action agenda was taken.
12   But this happened before I got here. So I --
13        ████████ got you. Okay.
14        MR. McLENDON: -- don't know.
15        I was just left to deal with the aftermath of this
16   and the environment that I --
17        ████████ Is it fair to say that it was -- from
18   almost from the very beginning when you began learning c
19   this and so forth that your relationship with Mr. Duffy had
20   been on south since then? Is that a fair statement?
21        MR. McLENDON: Oh, it was -- it was -- it was --
22   let's put it this way. When I was announced at an all-hanc
```

Page

```
 1   meeting that I was going to be the DAS for Policy, Dennis
 2   never even came out of the office.
 3        You got to understand, I've known this
 4   organization for years.
 5        ███████ Uh-huh.
 6        MR. McLENDON: Okay?
 7        ███████ Right.
 8        MR. McLENDON: And I was asked to come in there
 9   and try to get the place fixed, and when I say hostile work
10   environment, you know, I've been in the workplace for
11   40-something years. I'm serious when I say that.
12        ████████ Okay.
13        ████████ How long had ██████████ been in that
14   office?
15        MR. McLENDON: You know, I think I put something
16   in here. She went from a 14 to a 15 and the -- and the
17   ████████████████ n the span of 2 years. I went down
18   and reviewed her records and looked at the fifties and just
19   kind of added up the time.
20        And you don't do that and you don't behave in the
21   manner that she behaves in unless somebody thinks that's
22   acceptable behavior.
```

b6 b7C

59

1 ██████████ Do you know how long Mr. Duffy has been
2 in that office?
3    MR. McLENDON: Dennis is a career VA employee. He
4 was an appointee in the Clinton administration and confirmed
5 as the Assistant Secretary for Policy and Planning. They
6 created a -- or somebody did -- a principal Deputy Assistant
7 Secretary position for him, and so he's essentially been
8 running the place for now going on close to 8 years, pretty
9 much the way it's always been.
10    ████████ Okay.
11    ████████ But again, just to be clear as far as
12 Wayne is concerned and his projects, he pretty much manages
13 his own workload. Is that fair to say?
14    MR. McLENDON: Yeah. I mean, I think that's fair
15 with about any professional office that you have that people
16 -- people manage their workload, and if they have problems
17 or issues, they let you know about it.
18    I treat all my staff as professionals for what
19 they -- what they are and what they do, and ████ has always
20 been -- what's the right word? -- collegial type in his
21 working environment, although I've certainly been reflecting
22 since then about is there anything I could have picked up on

1 about Wayne.
2    And the only thing that comes to mind, it's
3 something one of my staff members commented on this week --
4 was that -- and after I thought about it, it's really true.
5 Wayne sometimes didn't exhibit an awful lot of common sense,
6 not common sense meaning that he was mean-spirited or he did
7 really strange crazy things, but he just almost had -- had
8 the sense that sometimes he was real absent-minded professor
9 kind of guy.
10    ████████ Uh-huh.
11    MR. McLENDON: But ████ never exhibited anything
12 that I would put him in a category of high risk kind of
13 personality or an employee that you always had to watch all
14 the time because there was some big history, and never in
15 the time I was there did I ever have a complaint about Wayne
16 or anybody bring to my attention that there was a problem
17 with him or he wasn't doing quality work.
18    ████████ Are you aware of any specific policy
19 that he violated when he took the data home and put it on
20 his personal computer?
21    MR. McLENDON: I knew you were going to ask me
22 that.

1    You know, I have been going back through
2 everything that I have, and I'm not aware today that he is.
3 Now, I don't know everything that is out there.
4    I went back and I looked at the telework
5 agreements. I don't know if you all have looked at the
6 telework forms that the VA has. The telework form doesn'
7 have anything on it about security. There is an attachment
8 to the telework form that's also some other form.
9    Now, these may be OPM forms. I'm not sure. I
10 don't remember, but it -- that form is about workplace
11 safety, is your home safe for you to work in. There is
12 nothing in there about security.
13    There is attachment to that, that the Office of
14 Policy and Planning created, and I don't know when. It
15 existed before I got there. It has some cryptic words in
16 there about security and 5 USC something or other, but
17 nothing that I would perceive as being specific and detailed
18 enough.
19    As far as I know, there is nothing in writing
20 about people taking work home and working from home w
21 aren't teleworking, and again, there might be something, bu
22 I'm just not aware of it, and there are probably some career

1 people in HR that can tell you that better than I -- than I
2 could.
3    ████████ How about this security guideline?
4 It's called security guideline for single-user remote
5 access. When's the first time you saw that, or have you
6 seen it?
7    MR. McLENDON: Well, they just put it out in an
8 EDMS for coordination. It's a poorly written document. The
9 first time I became aware of it was about -- what's the
10 date? Wednesday?
11    ████████ Today is the 31st. You know, that's
12 why --
13    MR. McLENDON: Some -- sometime last week, maybe.
14    ████████ What is this? May. Right?
15    MR. McLENDON: I'll just tell you from what I've
16 heard and from what Dat shared with me, who has been trying
17 to piece this back together about what he knows. This thing
18 allegedly was on IT's website as a draft document. Draft
19 documents have no weight. Plus, guidelines are not
20 enforceable, and as I understand it in VA's administrative
21 system, there's certain hoops and loops you have to go
22 through before something is, quote, "directive" in nature

Page 25

1  VA-wide.

2  ████████ Uh-huh.

3  MR. McLENDON: It was never widely disseminated.

4  It's my understanding from Dat when he went and looked at it

5  -- and he's very knowledgeable. He went in and could pull

6  up kind of what would be the master record of that document.

7  There had only been like 10 hits on that document. So for

8  something that supposedly was widely distributed, I mean,

9  that just doesn't make any sense.

10  ████████ Right.

11  MR. McLENDON: And so the first time I actually

12  saw it was when it came through on the EDMS this week, and

13  it's just a poorly written document, and that's all kind of

14  loopholes in it.

15  ████████ did you hear the Secretary talk about

16  this document in his -- in his testimony last week?

17  MR. McLENDON: Yeah, I was sitting -- sitting

18  behind him. I guess I was a little bit perplexed because

19  the scuttlebutt in the building, you know, is the GC hasn't

20  found anything, you know --

21  ████████ specific?

22  MR. McLENDON: -- that ████ violated, but you

Page 26

1  know, that's scuttlebutt. I haven't seen anything in

2  writing or an opinion or anything like that.

3  ████████ well, did you hear any scuttlebutt or

4  anything official in terms of who it was that the Secretary

5  may have been taking guidance on in identifying this

6  particular document as the document?

7  MR. McLENDON: Well, I can only, you know -- by

8  deduction, I can kind of tell you where that came from.

9  ████████ well, if you don't have firsthand

10  knowledge, we'll -- we'll take deduction.

11  MR. McLENDON: Take deduction?

12  ████████ Yeah.

13  MR. McLENDON: Well, cyber security is kind of

14  like this black hole. You don't get much from them except

15  down through your security and information officer, ████

16  ████ whoever his counterpart is in your department is

17  kind of like the first line of -- kind of as the wall there

18  that says cyber security information, security, that kind of

19  thing.

20  You may want to go back and take a look at how

21  some of those people got hired into those positions.

22  ████████ Uh-huh.

Page ██

1  MR. McLENDON: I don't know, you know, Pedro oth

2  than, you know, professionally across the table, but there

3  is some history there that you might want to go look at.

4  My guess would be that somebody in the bowels of

5  that organization generated that document at some point in

6  time. I don't know when. It may have been well intended

7  but it's clear when you scan the document, it's not written

8  well. Somebody did not really know VA.

9  ████████ Uh-huh.

10  MR. McLENDON: They didn't understand all the

11  potential scenarios.

12  The scenario that ████ is caught up in here is

13  not even covered in that --

14  ████████ Yeah.

15  MR. McLENDON: -- document.

16  It's my guess that when the question came up,

17  knowing how this building operates, that people react rathe

18  than think. Somebody just said, "Oh, we've got this

19  document."

20  ████████ Uh-huh.

21  MR. McLENDON: And there was this rush to get it

22  to the tenth floor, and nobody ever said, like a good IG or

Page ██

1  analyst would say, "Okay. Now, wait a minute. What is

2  this? Where does it come from? Who generated it? When

3  Give me the audit trail," you know, so that there is -- I

4  need to vet this a little bit before I understand and accept

5  what this thing is.

6  My guess is -- and I'm just guessing --

7  ████████ Yeah.

8  MR. McLENDON: -- that probably never happened.

9  ████████ Uh-huh.

10  MR. McLENDON: And so once it got up out of IT, it

11  probably took on a life of its own, and so I'm sitting there

12  in the back, you know, and when the Secretary brings up

13  this, well, he violated some kind of policy, what? And I'm

14  not trying to make excuses for Wayne, but --

15  ████████ was that -- was that in his testimony,

16  or was that as a result of a question that he actually

17  recalled?

18  MR. McLENDON: No. I don't -- I don't remember.

19  ████████ Yeah.

20  MR. McLENDON: I don't remember.

21  ████████ Right. Okay.

22  MR. McLENDON: And I'm sure he was just going on

Page 29

1  what he ad been told.

2  ▮▮▮▮ah.

3  ▮▮▮▮-huh.

4  MR. McLENDON: But somebody, you know, up there

5  essentially accepted that, and by doing that, vetted it.

6  So, therefore, I would assume the Secretary, when somebody

7  told him that or whatever, assumed that, you know, it is

8  what it is.

9  ▮▮▮▮ht. Did you get any feedback from

10  -- from your -- from your staff with regard to this

11  document, like over the --

12  MR. McLENDON: Yes. Dat asked several of our

13  staff members, particularly those -- we have -- we have

14  three staff members who telework, two ladies and ▮▮▮▮

15  ▮▮▮▮who has got a young baby at home, and none of them

16  knew anything about it, never heard, never seen.

17  ▮▮▮▮idn't know anything, you know, about it in terms of

18  being something that's a requirement or anything like that,

19  and quite honestly, if somebody had given it to me and it

20  had said "draft" on it, I wouldn't have done anything with

21  it --

22  ▮▮▮▮right.

Page 30

1  MR. McLENDON: -- because it is a draft document,

2  and the only way anybody should have done anything was if,

3  for example, it had come out under the Secretary's signature

4  or somebody in authority that says this is draft, but for

5  right now we are going to do X, Y, and Z, that's a different

6  thing.

7  ▮▮▮▮Okay.

8  ▮▮▮▮What -- what kind of information do

9  contractors have, contractors with -- within your office?

10  Do they have access to these big databases, extracts from

11  them?

12  MR. McLENDON: No. We don't provide any online

13  access to any contractor for any databases. We don't do

14  that.

15  The only data that they would have access to would

16  be data that has been extracted and placed in certain files

17  to support the specific work that needs to be done. If it's

18  data, for example, that comes from VBA, we always vet that

19  back through the program analysis, integrity staff, or

20  compensation and pension service when we do that. Dat is

21  very diligent about that, or anything that may come -- come

22  from VHA in terms of administrative data.

Page

1  That's another thing I need to make clear. We

2  deal in administrative data. We don't deal in clinical

3  data. That is, we don't go in and pull your health records

4  out of the system. The only thing that would even remote

5  come to that is that we would say we want to know for al

6  middle-aged white guys who have mustaches like we do a

7  receding hairlines, how many times, how many clinic stop

8  did they make in the last 10 years. Okay? So we don't g

9  -- we don't do that. If there's a question that comes up

10  where that analysis would need to be done, we would go t

11  VHA and have them -- have them do that. So we deal in b

12  administrative data that -- that comes -- that comes out of

13  those.

14  ▮▮▮▮So, if we could just recap then, no

15  contractor in your shop anyway is able to go out to snatch

16  the data?

17  MR. McLENDON: No.

18  ▮▮▮▮So there is no need for them to have

19  authorization forms, these ACRE forms or anything of that

20  nature?

21  MR. McLENDON: No. We -- we just don't -- we

22  don't -- there's no need for it --

Page

1  ▮▮▮▮Okay.

2  MR. McLENDON: -- for what we -- what we do.

3  ▮▮▮▮Right.

4  MR. McLENDON: And we just wouldn't do it. I

5  mean, there's no need for it.

6  ▮▮▮▮nd any data that would be -- that

7  they would be using for whatever analysis or whatever

8  project you have is vetted through Dat or your staff, and

9  that data wouldn't have the so-called Privacy Act --

10  MR. McLENDON: No.

11  ▮▮▮▮or the personal identifiers or

12  anything of that nature?

13  MR. McLENDON: There's no need for them to --

14  ▮▮▮▮Okay.

15  MR. McLENDON: -- no need for him to have that.

16  ▮▮▮▮Okay.

17  MR. McLENDON: What you're typically doing in

18  these analyses is you're looking at high-level issues.

19  You're looking at high-level trends and those kind of

20  things.

21  ▮▮▮▮Okay.

22  ▮▮▮▮what about the contractor that does

## Page 33

1  the National Survey of Veterans? Don't they, by necessity,
2  have to have certain personal information?
3      MR. MCLENDON: I can't -- I can't speak about
4  Westat. That happened way before my watch, the 2001 survey
5  of veterans.
6      The only time that I could imagine that that would
7  come into play -- and Susan could tell you because she ran
8  all that -- is when it comes time to do -- pull a sample of
9  veterans and you're trying to verify who these people are,
10  then VA would probably do an extract and do some matching to
11  make sure that they've got the right veterans to do that.
12      You would probably also, once you got the survey
13  data in, try to see if in the course of the survey you had
14  picked up any identifying information that would allow you
15  to do a match back into VA, so you could increase the size
16  of the dataset in terms of knowing something about this
17  population of people; but giving somebody like a Westat
18  access, online access and do your databases, no. But Susan
19  can tell you about the 2001 survey of veterans.
20      MS. SHELLY: Okay. When you initially spoke to
21  [blacked out] that Wednesday evening after his house was
22  burglarized and then again on Friday when he came in, did

## Page 34

1  you -- what kind of idea did you have about the -- what the
2  magnitude of the records were that were compromised?
3      MR. MCLENDON: No idea about the scope or the
4  number. In fact, today, I'm -- I would be surprised if you
5  can find an official audited statistic that tells you how
6  many records are in BIRLS.
7      When I talked to [blacked out] that afternoon, you know,
8  after getting through all of the -- you know, him describing
9  everything that happened, he was very emotional, very upset.
10  He was just really kind of all over the map about talking
11  about what had happened. You know, well, there may have
12  been some data on this external hard drive. He talked about
13  data disks and memory stick. He said USB device. I
14  interpret that as a memory stick, I think.
15      And then when he came in on Friday and he came in
16  really early that morning right into my office, he was still
17  kind of all over the map in talking about what had happened,
18  and I basically told him that, you know, people are going to
19  need to sit down with you and try to pull out of you in a
20  much more detailed way what happened and what may have been
21  transferred onto there.
22      It wasn't until we started putting the memo

## Page [cut off]

1  together, that first memo, which we then finalized kind of
2  over the weekend and Monday as we thought about it, that we
3  really had anything on paper that I could go to the white
4  board and say, okay, I've got some reasonable competence
5  that these words describe in some way what may have been on
6  there, but nowhere to say there were, what, 25 million
7  records when we didn't know. I mean -- and that's why I
8  said I may have said to you all or somebody, we deal in
9  extracts of extracts, and the way the system typically works
10  across VA is that if you have an analysis job to do, once
11  you've been given access or maybe you already have access,
12  you'll talk to the people at Austin or Hines or wherever it
13  may be, and they'll do the job for you, and then they will
14  go post that on a server somewhere that only you can access,
15  and it is an extract of something based on what you've asked
16  for. So then they will pull that.
17      So you don't have any idea when somebody says,
18  "Oh. Well, I've got X." Well, what does that mean? You
19  don't know. So it really wasn't until we put that memo
20  together, finalized it kind of on Monday that, okay, I could
21  at least write something on the white board, but in terms of
22  filling in the blanks, couldn't do that.

## Page [cut off]

1  [blacked out] So when did he first say that there
2  was something about BIRLS on there? I mean, did he say that
3  Wednesday or Friday?
4      MR. MCLENDON: I think -- I think -- I don't know
5  if -- I don't think he ever used the word "BIRLS" with me.
6  He could have, but that by itself doesn't signify anything
7  because BIRLS is this huge voluminous database, and clearly,
8  he doesn't have, quote, "the BIRLS database" because you
9  can't have access to that. So you don't know.
10      I think it was probably sometime late Friday and
11  certainly Monday when we finalized that first memo tha[blacked out]
12  [blacked out] en used that I understood that it had something to
13  do with BIRLS.
14      [blacked out] nd -- and then what was your
15  assumption at that point as far as the data?
16      MR. MCLENDON: No assumption because -- just
17  because somebody uses the word "BIRLS," it's like -- it's
18  like how many hotline calls does the IG get, and somebody
19  sits there and listens to the hotline calls, right, weekly,
20  monthly, whatever it may be, and you go through some logic
21  in your mind about do I think -- how serious do I think this
22  one is, what do I think needs to be done. You do a little

Page 37

1 due diligence and vetting in the decision process, and then
2 you make a determination as to, okay, this one goes in this
3 file, this one goes in that file.
4         It wasn't until, you know, after we did that on
5 Monday and we began kind of working through the logic that
6 you kind of get to the point of, okay, what -- what kind of
7 jobs could he be potentially working on and what kind of
8 extracts might he -- might he have out of this.
9         I can tell you, it was a shock to me when I
10 realized and was told that he had 25 million records.
11 ████████████ And when did you learn that? Was
12 that, that Monday?
13        MR. McLENDON: I didn't learn that until Dat had
14 done the -- [audio break].
15        [Side B of Audiotape No. 1 of 2 begins.]
16 ████████okay. I was -- when the tape cut
17 off, you were saying when you learned about the 25 million.
18 MR. McLENDON: This -- this was when Dat had come
19 in and done the data run, and I think that was on a Sunday,
20 but you'll have to check with him on that date.
21        The thing that's strange to me about this and
22 remains inexplicable is it was real clear in ████mind

Page 38

1 that what the process was for him to report. When we sat
2 down, Dat and I sat down with him on Thursday morning. He
3 knew what he was supposed to go do, and he met with Wayne
4 I'm fairly well convinced that ████lked to people on
5 Thursday. He didn't come back and give me a briefing every
6 hour, but, you know, he talked to people.
7         And then he -- then that memo was put together,
8 and it went. So both the management side and the technical
9 side of the building had the best sense that we had at that
10 time about what was going on.
11        So I fully expected the next day to see a wave of
12 IG people, people calling from upstairs saying come up here
13 and give us a simple version of this and what do we think
14 potential exposure may be, what, here's some questions.
15 Nobody ever called. Nobody ever called.
16        First call I got from anybody was to come up to
17 the tenth floor, I think it was on the 16th because that
18 memo I put together was the 17th that's got the 25 million
19 records on it. Right?
20 ████████believe so.
21        MR. McLENDON: Yeah. The 16th, and Tim McClain
22 came out of a meeting, and he said, "We'd like you to go

Page

1 look at all of these data disks and, you know, tell us
2 what's on them." That was the first time anybody had sa
3 boo, and, you know, we are pretty well trained to, you kn
4 think in terms of protocols and what you're going to do, a
5 so we sat there and that's what we did. We waited. The
6 process had been notified. The process will tell us what
7 we're supposed to do here.
8 ████████ You said that Dat did a data run a
9 week later, possibly Sunday.
10        MR. McLENDON: Well, he did a -- he did -- well,
11 I'm getting two things confused.
12        He came in Sunday --
13 ████████sunday the 7th or the 14th?
14        MR. McLENDON: No. This is about a week ago. I'm
15 getting all confused in time here.
16        He came in this past Sunday to do some work for
17 the tenth floor.
18 ████████The 21st?
19        MR. McLENDON: Yeah.
20 ████████Okay. So what you're saying then is
21 that because you had just said that it wasn't until a week
22 later that --

Page 4

1        MR. McLENDON: Well, it was the 16th. Let me look
2 here at may notes. Yeah. It was the 17th when we did the
3 memo that Dat had gone through, and this was in response to
4 Tim McClain's question --
5 ████████Okay.
6        MR. McLENDON: -- on the 16th, and this came up
7 late in the afternoon. Wayne was already gone home, and we
8 needed to talk to him before we tried to answer this
9 question, and so Dat started working on the 16th. We had
10 Wayne come in very early on the 17th because I think you all
11 had asked him or somebody from the IG had asked him to go
12 get a copy of the police report. So we had him come in
13 early the morning of the 17th, and based on the analysis
14 that he did, which Dat then vetted and re-did, that's then
15 when we knew it was 25 million records.
16 ████████So --
17        MR. McLENDON: And I took this up to Tim McClain.
18 ████████Okay. So, as far as you're concerned,
19 the 25-million figure was never mentioned until that point?
20        MR. McLENDON: No. Nobody -- nobody knew.
21 ████████Okay.
22        MR. McLENDON: And it was 26.5.

b6
b7C

(3/31/2006) CondenseIt ™                    **Administrative Investigation: Lost**

Page 41

1   twenty-six and a half, yeah.

2       And why is it that you assumed that

3   the process would go on? I mean, who -- who was it you were

4   --

5       MR. MCLENDON: why would I not assume that the

6   process would go on?

7       who were you relying on to get that

8   process moving?

9       MR. MCLENDON: well, you report it to your

10  security and information, security person --

11      Okay. So it's

12      MR. MCLENDON: And -- and Dennis had made some

13  comment, and I -- don't hold me to the exact time, but

14  Dennis had already talked to the tenth floor about it, at

15  least on Tuesday, and so it had gone out of the office. I

16  mean, it had gone into this ether up there, and, you know,

17  I'm just, you know, expecting that somebody is going to

18  call, ask a question.

19      Okay. So            is aware the

20  day after the burglary of what happened?

21      MR. MCLENDON: oh, yeah. Yeah. Yeah.

22      and did he report back to you what he

Page 42

1   had done?

2       MR. MCLENDON: He -- he talked to Dat. I knew

3   that he was in dialogue. You know, I'd see him in the hall,

4   and I'd say how's it going, you know. You know, he said

5   yeah, I'm talking to info security, and they're asking

6   questions or whatever, you know, do you need anything. No,

7   I'll let you know if I need anything.

8       And so it's gone off to cyber security, info

9   security, and that's, you know --

10      The last time we spoke to you, you did

11  say it was my assumption was that the standard procedure in

12  VA was going to take care of who got notified because this

13  was an information security, but, you know, you as an executive

14  in policy and planning, did you have any idea what that

15  procedure might have included? I mean, you spoke about you

16  expected the IG to be -- to be going in and so forth.

17      MR. MCLENDON: I don't know that -- at least not

18  since I've been at VA or the meetings I've been in -- I

19  don't know that there has been any kind of all-hands

20  meeting, senior-level manager meeting, where anybody has

21  said this is the crisis management protocol reporting

22  procedure or anything like that.

Pa

1       uh-huh.

2       MR. MCLENDON: You just kind of know from

3   experience that when you have information security concerns,

4   whether they be on purely the technical cyber side or data

5   and information side, that there is a reporting process that

6   you go through.

7       Right.

8       MR. MCLENDON: And when your information security

9   guy is there and says okay, this is what I have to do now,

10  I'm not wanting to say, well, you just assume and walk away,

11  but you are told that there is a process in place.

12      It's like -- it's like coming into an agency as a

13  new employee. You -- you operate as if within this agency,

14  there are certain processes that work, right, or there

15  wouldn't be an agency.

16      h-huh.

17      MR. MCLENDON: okay? You don't know until a

18  process fails or there is a hole that, you know -- I got my

19  security clearance updated, but nobody ever told me that

20  only new employees to VA as of a certain date got a

21  background check. Okay. You don't get pushed a list on an

22  annual basis of all the people you have and what their

Page 4

1   security clearances are or when the last time their security

2   check was done because nobody ever put in place a process

3   that requires everybody to have a national agency check or

4   something more than that.

5       we want to talk about that in a few

6   moments as well.

7       Well, did -- did -- in your circles, if you will,

8   in your meetings, did anyone ever early on or later on --

9   did anyone ever discuss the need? Did they ever view this

10  as a criminal offense that had occurred and that -- that the

11  IG is a requirement under Title 38, to call you? Does

12  anything -- anything that -- anything of that nature come

13  up?

14      MR. MCLENDON: You have to understand that until I

15  was called to the meeting on the 16th where Tim came out of

16  a meeting and asked me to go do this analysis, I had not

17  been included in anything. Nothing.

18      Okay.

19      MR. MCLENDON: So I can't -- I can't speak to

20  that.

21      well -- oh, I'm sorry. Go ahead.

22      well, what kind of discussions did

Statement of Michael McLendon (5/31/2006) CondenseIt™    Administrative Investigation: Lost

Page 45

1 you --
2       Do you want to turn this off?
3       What kind of discussions did you have with Mr.
4 Duffy just one on one about this?
5       MR. McLENDON: I think we both viewed it as very
6 serious. I think Dennis was perplexed, as I was, about how
7 this came about. I mean, this is not something you sit
8 around and think about, of all the things that are going to
9 happen today, this could be one; therefore, how are you
10 going to relate to that.
11      I knew that he had taken the memo and talked to
12 the tenth floor.
13      I don't -- I think what I'm saying is true, but
14 you can verify this with Dennis. I don't think he was
15 immediately pulled in to any of these discussions either.
16 I'm not sure how that -- how that came about.
17      We were -- I guess an outsider would look at that
18 and say that we were almost just kind of left out here on a
19 fishing limb. You want to do more of what the right thing
20 is, that there's a process in place, and if you -- my
21 background as DoD is you start messing around with the
22 protocol, you're going to create more problems than what

Page 46

1 you're trying to solve, but yet nobody is telling you what
2 the game plan is or what's going on. It's just like this
3 just kind of went up here, and you don't -- you don't know
4 what's going on.
5      _____ when the memo as -- the May 5th memo,
6 when it was final in your mind and in Mr. Duffy's mind and
7 ready to go to the tenth floor, didn't you still feel that
8 there was -- there were some unanswered questions?
9      MR. McLENDON: Oh, I had tons and tons and tons,
10 and that's why I thought, well, surely somebody is going to
11 be coming down here in the next day or so and want to talk
12 and want to get more information, and that's why I say this
13 whole thing to me, a lot of it is inexplicable.
14      I mean, something happened or didn't happen that
15 was supposed to have happened after _____ started talking to
16 the cyber security and information security.
17      _____ But is there a reason why you on your
18 own initiative didn't try to be getting more detailed
19 information?
20      MR. McLENDON: Well, we did. We were trying to
21 talk to _____ Dat was trying to talk to him. I'm not
22 saying that _____ has been evasive or devious or something,

Page 47

1 but, quite honestly, _____ explanations of what he thought
2 he had and what he thought he may have done sometimes were
3 just kind of all over the map. It was -- I hate to say
4 inconsistent, but they were, and I don't think he was trying
5 to be devious about it. But we just couldn't get a total
6 consistency every time we talked to _____ about what was
7 going on.
8      And what was kind of going through my mind is, you
9 know, I figured you folks were going to come in the door at
10 any minute. I figured tenth floor was going to send
11 somebody from GC down at any minute and want to question,
12 and I don't think any of us wanted to do anything that would
13 be perceived as being presumptuous or precipitate what
14 people would consider to be more of a problem.
15      It's kind of like preserve the scene of an
16 incident until somebody tells you what they need and how
17 they want it and what they want to do.
18      I don't think it was a question of anybody being
19 scared or saying, well, we just don't need to do. It was we
20 believe there was a process in place, and because that's
21 what we have been led to believe. After all, this is the
22 second-largest Federal agency in terms of employees. We

Page 48

1 spend $80 billion a year. You have a cyber security office
2 You have an information security program.
3      _____ The only problem I have with that is
4 you have yourself, you have Mr. Duffy at the top -- top of
5 the office there, and you have _____
6 gentleman, who -- who had Privacy Act officer
7 responsibilities. He has ISO responsibilities, security
8 officers. It just -- it's just awkward to me that we would
9 be relying on someone of his level to be sort of running the
10 show, if you will, in terms of the reporting process.
11      MR. McLENDON: That -- that was put in place long
12 before I got there.
13      _____ Yeah.
14      MR. McLENDON: That's a policy decision that
15 people made, and under the IG system -- I mean, under the
16 federated IT structure that we have now, _____ doesn't even
17 work for 008.
18      _____ Yeah.
19      MR. McLENDON: He just is still co-located, you
20 know, 008.
21      So, if anything, the problem could have been more
22 severe because there would potentially have been less desire

Administrative Investigation: Lost [

## Page 49

1  on that person's part to be responsive to what was going on

2  because he doesn't work for those people.

3  ███████ Uh-huh.

4  MR. McLENDON: ███████ as been there for many years,

5  and you'll have to talk to somebody else about -- about that

6  part of it.

7  ███████ well, did you talk to -- did you

8  advise Mr. Duffy of this incident on the 3rd?

9  MR. McLENDON: We -- we talked not on the 3rd

10 because I didn't know enough. I mean -- and Dat still

11 didn't know enough after he talked to ███████ that afternoon,

12 but we did talk about it the next day.

13 ███████ on Thursday?

14 MR. McLENDON: Yeah. We talked about it on

15 Thursday.

16 ███████ Okay.

17 MR. McLENDON: And ███████ I think, also -- by the

18 time ███████ ad got some information had also done his due

19 diligence.

20 ███████ just want to be clear. "We talked

21 about it" meaning you and Dennis Duffy talked about it on

22 Thursday?

## Page 50

1  MR. McLENDON: I think we talked sometime about it

2  on Thursday, certainly no later than early Friday morning.

3  ███████ was that the first that he heard of

4  that, that you recall?

5  MR. McLENDON: I can't say. I know I -- I think

6  that ███████ ay have talked to him sometime on Thursday, but

7  I'm not sure.

8  ███████ okay.

9  MR. McLENDON: I mean, our -- our approach was

10 basically, ███████ ell me what you need. We'll give it to

11 you. Tell us what we're supposed to do, A, B, and C."

12 ███████ And again, why wouldn't you have told

13 Duffy about the incident on Wednesday when you learned of

14 it?

15 MR. McLENDON: Probably because I didn't know

16 enough. I mean, what -- what am I going to tell him over

17 than there was some theft at ███████ house? There may have

18 been some data involved, but until ███████ comes in the office

19 and we can interview him, we don't know what's going on, and

20 that was true. We didn't know what was going on.

21 ███████ okay.

22 ███████ just have a question on -- going back

## Page [

1  to this memo that started to be drafted, I guess, on the 5th

2  and submitted on the 8th.

3  MR. McLENDON: Yeah.

4  ███████ At any time during that process on

5  Friday or Monday or Tuesday, were you or anyone else asking

6  how many records?

7  MR. McLENDON: Yeah. ███████ probably talked with

8  him more than anybody.

9  ███████ Uh-huh.

10 MR. McLENDON: And Dat talked with him more than

11 anybody. I'm not sure -- well, if this -- if the fact that

12 there were 25 million records had come out in those

13 discussions, we would have known about it.

14 ███████ o you don't -- you're guessing, I

15 guess, that ███████ wasn't mentioning the magnitude of these

16 files?

17 MR. McLENDON: No. And you know, to this day, I

18 am not sure that ███████ knows exactly what he did transfer --

19 ███████ Uh-huh.

20 MR. McLENDON: -- over to that hard drive.

21 ███████ Right.

22 ███████ he thing of it is too is how -- how

## Page [

1  -- I mean, pretty much, we left it up to ███████ to

2  question ███████ on that very issue. What -- what -- what

3  experience and knowledge does ███████ have of these -- of

4  these data systems, and even to be able to question ███████

5  about that very issue, how many records and so forth? I

6  don't know.

7  MR. McLENDON: ███████ a pretty smart IT guy. He

8  may not be intimately familiar with the ins and outs, for

9  example, of BIRLS, but by the time you get to be a 13 on the

10 IT side, with his responsibility and knowledge -- and by the

11 way, he's the person that we work with and had been working

12 with months before to start putting in place new security

13 features and taking people's access off and cleaning up

14 drives and all of this. I mean, he -- he knew enough to

15 ask, you know, to ask questions, but the fact that it was

16 26-million-.5 records, you know, we didn't know until Dat

17 and I vetted the analysis on the morning of the 17th and I

18 took this up to Tim McClain.

19 He wanted it at 9 o'clock, but I couldn't get it

20 to him until 10:30 because I wasn't going to give it to him

21 until Dat had gone through with me everything that had been

22 done and how he had vetted this and how we had checked out

b6
b7C

b5

Page 53

1   the data.

2          Uh-huh.

3          So -- so how did he come to the

4   realization that it was 20-some million?

5          MR. McLENDON:  That who?

6          How did Dat come to that realization?

7          MR. McLENDON:  I think he loaded the data and went

8   through and verified and validated how many records there

9   were and SSNs and all that kind of stuff.

10         When you say loaded the data, from the

11  disks that        was using?

12         MR. McLENDON:  I would assume he did it from the

13  disk.  You'll have to talk to him.

14         Okay.  And I didn't know if there was

15  a mechanism just checking his hard drive on his work

16  computer as well.  Would that --

17         MR. McLENDON:  Well, you've got to understand that

18  -- think of this matrix that across the top, there are

19  X-number of variables.  Down on the left, there are 25

20  million records, okay, and let's assume that one record

21  equals one potential SSN, okay, and so you've got 25 million

22  times X in terms of numbers of cells that are out there.

Page 54

1   Okay?  BIRLS is a very dirty database, and a number of

2   people will tell you that it's so dirty for certain type

3   data that people don't use it without going and verifying it

4   somewhere else in some other system.  Okay?

5          So, first of all, when somebody says they may have

6   something from BIRLS, that doesn't tell you anything about

7   the scope and content?

8          Then when somebody says, okay, there may be

9   X-number of records, okay, let's peel the onion more.

10  Define for me what the record is that you're calling a

11  record that you have pulled from BIRLS.  Okay.

12         Then you get to the question of which variables

13  were in this extract; that is, how many, you know, columns

14  across the top --

15         Right.

16         MR. McLENDON:  -- and then you've got to say,

17  okay, let's peel the onion again, how many full or empty

18  cells are in this huge, huge database.  Okay?

19         Right.  Right.

20         MR. McLENDON:  And because BIRLS is dirty, the

21  question, you know, you immediately have when you look at

22  this, as I did that day, was, okay, we've got 19.6 million

Page

1   SSNs, and we've got 6.8 that do not have SSNs.  Okay.  Is

2   the 6.8 because they're all dead and the SSNs were deleted,

3   or is it because of something else?  And out of the 19.6, m

4   guess is that there are a lot of these people that are dead

5   because the estimate for the veterans population is only 25

6   million.  Okay?

7          And a lot of the birth dates appeared to be before

8   1900 or shortly after 1900.  So then what you want to say

9   is, well, how did they address death dates in here.  Well,

10  the death field wasn't filled in, but you can't assume that

11  that means all these people are alive.

12         So what I'm trying to describe to you is you kind

13  of have to go through a triage process here to figure out

14  what do I really -- what do I really have.  It's like the

15  question you asked me about the Secretary and this guideli

16  document.

17         Uh-huh.

18         MR. McLENDON:  Okay?  At a certain point, you are

19  remiss in doing your due diligence if you just throw

20  something up that you don't have some idea of what is this

21  thing that we're talking about, and all we knew on the 17th

22  was that we knew there were 26.5 million records, and we

Page

1   knew how many had SSNs, and we knew what the variables were

2   across the top, okay, and we knew that the data was

3   extremely dirty inside that, and that's what we could do in

4   the time that was allocated to give -- give to Tim about --

5   about what had gone on.

6          So, if there wasn't too much in the

7   way of specifics known around the 4th and 5th of May, why

8   was there a need to hold on to that memo over the weekend

9   and I think even until Tuesday?  Right?

10         MR. McLENDON:  No.  It was Monday.

11         It was purely and simply because, as Dat and I

12  kept talking, we weren't convinced that -- we just wanted to

13  vet it a couple more days to make sure that the scope of it

14  was as accurate and as complete as it needed to be, and part

15  of that, if I remember right, was about the data disk

16  because when        had first talked to me, as I look back on

17  it, it wasn't clear if the data disks were missing or not,

18  and so we had a good bit of discussion about that, and so we

19  started working through that, and as soon as we agreed that,

20  yeah, it looks like the memo, other than some typos and a

21  couple of words, it seems about right for what we can do

22  now, you know, we released it.  And it wouldn't have made

Statement of Michael McLendon (5/31/2006) Conducteh          **Administrative Investigation: Lost D**

Page 57

1  any difference.

2  ███████ And when you say you released it, as

3  far as you're concerned, that's when you gave that to

4  Dennis?

5      MR. McLENDON: Well, I gave it to Dennis. Yeah.

6  Yeah.

7  ███████ And then what he chose to do with it

8  was --

9      MR. McLENDON: Yeah. I -- I assumed he sent it

10  right on up. I don't know.

11  ███████ So how many times did -- let's get

12  this. I think we need to get this straight right now. How

13  many -- how many times was this memo edited? I mean, you

14  have ███ memo. Presumably, this is Johnson's. I

15  wrote down ███ memo."

16      MR. McLENDON: Well, it was -- it was the -- it

17  was the same memo, other than a few typos on it, and they

18  just -- the date just didn't get changed.

19  So ███ -- ███ -- I don't know

20  if you're familiar with this. That's what ███ I think,

21  wrote up for ███

22      MR. McLENDON: I don't know anything about this.

Page 58

1  ███████ All right. You haven't seen that one.

2      MR. McLENDON: I've never seen it.

3  ███████ Okay. But some of the same

4  information, other than the background?

5      MR. McLENDON: I would assume ███ when he

6  prepared that memo, maybe he used some of that to prepare

7  the memo. I don't know.

8  ███████ That's -- that's -- that's correct.

9  Then ███ ent presumably to you and -- I don't

10  know -- Mr. -- Mr. Duffy as well?

11      MR. McLENDON: He said he sent it to Dennis, and

12  if memory serves me right, then Dennis at some point

13  forwarded it on to me.

14  ███████ So -- so you didn't get a copy

15  directly from --

16      MR. McLENDON: ███ No.

17  ███████ rough an e-mail?

18      MR. McLENDON: I don't think so. I don't think

19  so. I think -- I think Dennis sent it to me.

20  ███████ Okay. So Dennis sent it to you that

21  Friday?

22      MR. McLENDON: Yeah, sometime that day, and then

Page

1  Dat and I started going through it to make sure we

2  understood. I kept looking at it over the weekend to make

3  sure that I thought -- ███ you were talking about

4  ███ ing a GS-13.

5  ███████ Yeah.

6      MR. McLENDON: I was trying to think about the

7  memo from the standpoint, would people upstairs understa

8  what was being said and is it comprehensive enough, given

9  what we do know, that the whole thing is framed right.

10  ███████ All right. And -- and you made some

11  edits? I think you've described them as minor edits or som

12  adjustments.

13      MR. McLENDON: There were minor edits. We didn't

14  -- I mean, we didn't change the guts or the substance or

15  anything like that, and Dat and I came to the conclusion

16  that, yeah, okay, after we checked again, it kind of fairly

17  represents what we're doing now.

18  ███████ Okay. So there's only from one final

19  thing. So -- so, essentially, you had -- you had a chance

20  to edit, and then at one point, you wanted Dat to see it, I

21  guess, maybe one more time?

22      MR. McLENDON: One more time.

Page 6

1  ███████ Uh-huh. And then -- then you came up

2  with the document?

3      MR. McLENDON: I -- you know, I always want to

4  make sure that we were all communicated and we were all o

5  the same page and that if we looked at the cat, we all said

6  it was a cat, it wasn't a dog.

7  ███████ Okay.

8  ███████ So, by -- by the end of Monday,

9  it was --

10      MR. McLENDON: Oh, yeah.

11  ███████ it was done?

12      MR. McLENDON: Yeah. In fact, I -- I think I sent

13  Dennis an e-mail and said, you know, press ahead or

14  something like that.

15  ███████ One thing I notice on that memo is it

16  stated -- the first thing I believe it stated was that there

17  was a copy of the BIRLS production file on the external hard

18  drive. What would that mean to you?

19      MR. McLENDON: Well, first of all, it's -- it

20  would come across to me as probably not true. It couldn't

21  be true because, when you say the BIRLS production file,

22  that means production is an online database system that

Administrative Investigation: Lost [

### Page 61

1  resides down at Austin, and we don't mirror databases; that
2  is, we don't have a duplicate copy of the online BIRLS
3  database.
4  ▓▓▓▓  Right.
5  MR. MCLENDON: So, when somebody says you got a
6  production XYZ, you know, I don't know what it is that you
7  -- all I know is that it's got something to do with BIRLS,
8  but that doesn't tell me exactly what it is.
9  Plus, I know that the way we deal with Austin and
10  the other data centers is they give us extracts, and there
11  would be no reason for us to have an extract which is
12  equivalent to the entire -- we don't have the capability to
13  store that anyway. So that just did not make -- make any
14  sense, and that --
15  ▓▓▓▓  So should that terminology have been
16  changed in the memo?
17  MR. MCLENDON: I think they were trying to be as
18  specific as they could from what ▓▓▓▓ maybe had -- maybe
19  had said. I don't think anybody was trying to, you know,
20  create a false thing or anything else. I think they were
21  just trying to be as accurate as they could about what had
22  been described.

### Page

1  ▓▓▓▓ would you -- would you have had any
2  idea, though, that we're probably talking about
3  2-point-something-million records?
4  MR. MCLENDON: No. I just -- it just would be
5  inconceivable to me that anybody would take something like
6  that home, and given he came from Center for Medicare and
7  Medicaid Services, it just -- it's just unbelievable that he
8  would do something like that. There's just no reason why
9  anybody would do that.
10  ▓▓▓▓ so that might have been part of the
11  issue with not defining this magnitude? So you just
12  couldn't comprehend?
13  MR. MCLENDON: Well, yeah. I mean, it just makes
14  absolutely no sense, no sense.
15  I can't -- you know, other than a national
16  emergency, you know, I cannot conceive of any circumstances
17  where anybody in our staff needs to take that kind of stuff
18  home. You know, we're not in the operational business.
19  ▓▓▓▓ Uh-huh.
20  MR. MCLENDON: We're not processing claims.
21  ▓▓▓▓-huh.
22  MR. MCLENDON: It's not a life or death matter.

### Page 62

1  ▓▓▓▓ One other thing that kind of jumps out
2  at me -- and it's easy for me to do this in hindsight -- was
3  that there was a file that had a BIRLS name for each mention
4  in the C&P Mini Master with Social Security number being the
5  common link. I mean, what would that have meant to you?
6  MR. MCLENDON: We don't -- well, what it would
7  have meant was that there was some kind of extract of the
8  C&P Master record or Mini Masters that had been used, looked
9  at, or something, but it's not enough to tell you anything.
10  It's like somebody says that they have the C&P Mini Master.
11  Well, there is no "the C&P Mini Master" because it's a
12  function of what you ask for, and C&P Mini Masters are all
13  over VA, and what you have on your C&P Mini Master is a
14  function of the variables that you have asked Compensation
15  and Pension Service to put in that file that you have.
16  Okay.
17  So it's -- it's like I was doing the example here.
18  There's a certain amount of peeling the onion that you have
19  to do before you know truly and surely that, yes, this is a
20  Vidalia onion versus some -- some other onion and therefore
21  why it's important to do that, and it just took -- took a
22  little time to figure out some of that.

### Page

1  There's just no need for anybody, you know, to do that. It
2  doesn't make any sense.
3  And then on top of that, ▓▓▓▓ was kind of all
4  over the map about where he thought that he had and what h
5  thought he had placed on that external hard drive. I just
6  hope we find it sometime. I'd like to find out exactly what
7  he did.
8  ▓▓▓▓ Also on that memo was a reference to
9  -- because they were in -- or most of them -- most of the
10  data were in SAS files, that it was somehow a mitigating
11  factor, can you explain that?
12  MR. MCLENDON: Only to the extent that we put that
13  in there to make sure that people knew that this is not like
14  looking at a Word document or an Excel spreadsheet, that
15  these were in statistical formats that you would only access
16  if you had access to SAS program, and that it was loaded
17  onto ▓▓▓▓ computer. It was just a further attempt to be
18  precise and clear as to what -- what it was.
19  ▓▓▓▓ Was that something you knew, or was
20  someone telling you that that was --
21  MR. MCLENDON: Didn't know it until, I think, Dat
22  told me that it was from SAS, or maybe ▓▓▓▓ told me it was

b6
b7C

Statement of Michael McLendon (5/31/2006) Condenseit    **Administrative Investigation: Lost I**

**Page 65**

1  from SAS, but, you know --

2  ▓▓▓▓▓ But -- but would you know from Dat

3  telling you it was in SAS that -- would you feel that that

4  gave it some protection, or was that something he would have

5  told you as well?

6  　　MR. MCLENDON: I would have felt -- I wouldn't say

7  it gave me -- it would give me a warm cozy feeling of

8  protection, but relative to this being blasted out on the

9  Internet in an Excel spreadsheet or a Word file, the virtue

10  of the fact that it was in SAS suggested that anybody who

11  wanted to try to access it would have to have some

12  familiarity with SAS, be probably technically adept and

13  agile at manipulating large databases, and then if they

14  really wanted to do anything super-creative with the data

15  that a normal kind of analyst would do, that they would

16  probably have to know and understand SAS.

17  ▓▓▓▓▓ from that perspective, yes, but from

18  what we've learned is that from an identity theft point of

19  view --

20  　　MR. MCLENDON: Oh, it doesn't matter.

21  ▓▓▓▓ -- it doesn't matter.

22  　　MR. MCLENDON: I understand that.

**Page 66**

1  ▓▓▓▓ Yeah.

2  　　MR. MCLENDON: We were -- we were thinking about

3  it at the time from the standpoint of just somebody turning

4  on the computer and accessing something and finding out --

5  finding out what's there. I'd must rather have it in a SAS

6  format than just stuck out there --

7  ▓▓▓▓ Yeah.

8  　　MR. MCLENDON: -- on a Word document or something

9  like that.

10  ▓▓▓▓ And it may afford some protection, but

11  even ▓▓▓▓ has indicated that there should be no false sense

12  of security here.

13  　　MR. MCLENDON: Oh, no. No, not at all. Not at

14  all.

15  ▓▓▓▓ Yeah.

16  　　MR. MCLENDON: Never said that. We were just

17  saying that it is in SAS format, and SAS is loaded on -- is

18  loaded on the computer.

19  ▓▓▓ -- I'm just -- I'm just concerned

20  that folks that are not, you know, knowledgeable about these

21  kinds of things may have interpreted the fact that it was in

22  SAS format gives it some sense of protection, if you will,

**Page**

1  from the kind of thing that really is the biggest issue

2  right now is that you have possibly 26-1/2 million vetera

3  whose identity could be compromised.

4  　　MR. MCLENDON: I don't think it was ever presentec

5  as, hey, this is a bulletproof solution because it's never

6  going to get out. It was presented more from the fact that

7  it's in SAS format, it's not in Word, it's not in Excel,

8  that here is what the SAS program is, and I think the reaso

9  we put that in there is because the tenth floor doesn't kno

10  what SAS is, and if we hadn't put in what the format was,

11  somebody would have asked us what is this format.

12  ▓▓▓▓ I'm surprised the tenth floor didn't

13  ask you more about numbers, records and so forth. I mea

14  there are some numbers here, you know, on the last page a

15  what's on the memory stick, but --

16  　　MR. MCLENDON: They didn't come to me.

17  ▓▓▓▓ They didn't come to you.

18  　　Let me ask you this. So you're working on this

19  project. Okay. You're trying to -- trying to make some

20  confirmations and validate. Did you have any discussions

21  with Duffy or are you aware of any discussions that Duffy

22  may have had with anyone about the importance of letting

**Page**

1  up chain know just that there is this issue out there that

2  could be potentially serious, very, very serious, let

3  somebody know that we're working on this thing, it might

4  take us a couple days to work this out, but just give

5  somebody a verbal? Did that discussion ever take place?

6  　　Considering what we know now, I mean --

7  　　MR. MCLENDON: Well --

8  ▓▓▓▓ -- in terms of the notification

9  process.

10  　　MR. MCLENDON: Well, you know, hindsight is always

11  much better.

12  ▓▓▓▓ Right.

13  　　MR. MCLENDON: But, you know, when I understood

14  from Duffy that he had talked directly to the Chief of Staff

15  --

16  ▓▓▓▓ what -- when, though?

17  　　MR. MCLENDON: I believe -- I believe he told me

18  that he talked to him on Tuesday. Don't hold me to that,

19  but I think it was around Tuesday that he talked to him.

20  ▓▓▓▓ Which would have been what, the 9th?

21  　　MR. MCLENDON: Yeah.

22  ▓▓▓▓ Yeah.

ble b7C

Page 69

1   MR. McLENDON: So, you know, when I understand the
2   Chief of Staff has been told and you've got what we have so
3   far, you know, if I had been on the tenth floor knowing what
4   I know based on my background and I had gotten this, might I
5   have taken, you know, a different position? Dag gone right,
6   I would.
7         ███████ Again, it's easy in hindsight, but do
8   you think there's any -- I mean, looking back, do you think,
9   like Steve was saying, that maybe on the 5th, someone
10  upstairs should have been told this happened, we're working
11  to development the issue, we'll give you more details next
12  week?
13        MR. McLENDON: Probably not on the 5th because
14  there was nothing to say.
15        There is this period of time you kind of have to
16  go through where you kind of need to get lost a little bit
17  to understand what it is you're dealing with, and I don't
18  think we really knew that until probably the Friday when we
19  actually sat down with ██████and said okay, talk to us, and
20  we started pulling -- pulling things.
21        ███████but you knew as much as -- as much on
22  -- as much on the 5th as you knew on the 8th and 9th?

Page 70

1   MR. McLENDON: No, we didn't. No.
2         ███████ You knew more on the 8th and 9th?
3   MR. McLENDON: Oh, yeah. I knew a lot more than I
4   did on the 5th.
5         ███████ Like -- like what?
6   MR. McLENDON: All I knew on the 5th was I called
7   this guy, he was extremely emotional. I couldn't get a lot
8   of good answers out of him. He was very concerned about his
9   wife having potentially shown up at the house and the
10  burglars still have been there.
11        ███████ Are you thinking of the 3rd?
12  MR. McLENDON: Oh, I'm talking the 3rd. I'm
13  sorry.
14        ███████ I'm talking about Friday when your --
15  you first see this memo. Now, you're going to work it over
16  the weekend, okay, and -- and why not that Friday as opposed
17  to Tuesday? You didn't know any more information.
18        ███████ MR. McLENDON: You mean, why didn't I pick up the
19  phone and call?
20        ███████ Not you, but I'm just -- in general,
21  you talk about taking the position from upstairs. Was there
22  any discussion? Do you see any utility in just letting the

Page

1   folks know upstairs?
2         ███████ MR. McLENDON: Well, let me -- let me just put it
3   this way.
4         ███████Yeah.
5         MR. McLENDON: If you want to cut that off, it
6   would be good.
7         [Off the record.]
8         ███████ Okay. Back on the record.
9         ███████Okay. Where were we?
10        ███████Well, could I ask, do you have
11  regular meetings with the Deputy Secretary of the Chief o
12  Staff?
13        MR. McLENDON: No. I'm not included in any of
14  that.
15        ███████ And so --
16  MR. McLENDON: Duffy is.
17        ███████Mr. Duffy does.
18  MR. McLENDON: He goes to all the senior
19  management meetings.
20        ███████You know of no senior management
21  meetings that he might have attended between the 4th and
22  and the 9th?

Page

1   MR. McLENDON: You know, I -- I have some
2   recollection of him going to some meetings up on the tenth
3   floor about this, but they're just -- they're just
4   recollections. I know that just from what you hear in the
5   hall that, you know, there is a lot of stuff, quote, "going
6   on," but in terms of anybody giving you a list of this is
7   the meeting that's at 10:00, this is a meeting at 3:00, and
8   this is who is there are not --
9         ███████Right.
10        ███████And --
11        ███████MR. McLENDON: -- I'm sure somebody has that.
12        ███████ould -- would -- do you have any
13  knowledge of him going to any meetings before he talked to
14  the Chief of Staff about this issue?
15        MR. McLENDON: I don't know. One would have to go
16  back and look at his calendar and see.
17        I do recall -- and maybe it was a question that I
18  asked him, you know, something about, you know, what is
19  going on, have you heard anything, and I do recall him
20  expressing, I would say, a little frustration and, you know,
21  uncertainty about, "Well, you know, I don't know. Nobody
22  has really told me."

Statement of Michael McLendon (5/31/2006) Condenseit™          **Administrative Investigation: Lost D**

**Page 73**

1   At some point, he was invited to some of all this.
2   I don't know whether he was invited and then wasn't invited
3   to some and then invited to others. I don't know. You'll
4   have to talk to him about that.
5        And I'm -- you know, I don't know to this day how
6   many of these meetings were held. The only one that I --
7   the only two that I was involved in was the one on the 16th
8   where I got called up to the tenth floor and Tim McClain
9   came out and asked me to put this together, and the other
10  one was the morning of the Secretary's testimony when we met
11  at 7 o'clock in the morning to get ready for the testimony
12  that day.
13        _____ why don't you -- I've got a couple,
14  couple things I'd like to go over.
15        _____ You did notice -- well, did you want to
16  go over it?
17        _____ you had some follow-up?
18        _____ you had talked about -- I think I heard
19  you say you knew _____ had SAS on his computer.
20   MR. McLENDON:  Well, all of our programmers are
21  SAS-qualified. So it would be -- when somebody says they
22  have data and they're a SAS programmer, they can't very well

**Page 74**

1   do any work unless they've got SAS.
2        _____ And you -- you would have no concern
3   with the programmer having SAS on their home computer?
4   MR. McLENDON:  No. No. Yeah. There's -- I mean,
5   it's just a -- it's sold. It's sold out in the public, you
6   know. Tons and tons of people have SAS. There's nothing
7   unique about that.
8        _____ I got a couple of things I want to run
9   by. I know we're running -- running long. Do you need to
10  take a couple minutes?
11   MR. McLENDON:  I'm okay.
12        _____ To finish up, I'll just go straight
13  through.
14        In your previous -- when we previously met last
15  week, you stated that you began to crack down and instill
16  some "discipline," I think is the word, or in the process of
17  trying to change the mind-set of what you had found, trying
18  to change it to what you -- from where you had come from, I
19  guess, DoD at the time, and everyone was required -- where
20  everyone was required to have a security clearance and you
21  had removable hard drives, safes, and so forth.
22        What have you accomplished up to this point?

**Page**

1   MR. McLENDON:  We -- I think what we've been abl
2   to accomplish is elevate the expectations on the part of the
3   staff in terms of what they are supposed to do and how th
4   are supposed to perform an act. I think anybody will tell
5   you that.
6        Under _____ the organization was really
7   weak and limp and didn't have a high regard for data. I'r
8   very data-centric kind of person.
9        We've been trying to instill discipline about
10  quality of work, how we plan, how we approach work, sen
11  lot of people off to SAS school to get -- get all their
12  skills updated, had even brought the Institute for Defense
13  Analysis in to do an independent verification and validati
14  of our analytical process for estimating the veterans
15  population because I wasn't comfortable with that. I
16  thought we needed to really improve that process.
17        We had also been turning our attention to
18  establishing relationships with other agencies. The Office
19  of Policy and Planning has always been very introverted a
20  didn't have good relationships without side organizations.
21  So we established good working relationships with people
22  like Department of Labor, National Institute for Disability

**Page**

1   Rehabilitation Research, folks over at Department of
2   Defense, Social Security.
3        _____ Uh-huh.
4   MR. McLENDON:  In fact, are just in the process of
5   concluding an inter-agency agreement with Social Security
6   for them to do some data-matching for us, and also worked
7   with the Census and IRS to put together a similar type
8   agreement where Census would be the honest broker for us
9   with IRS to do some data-matchings.
10        One of the things that we try to do is kind of get
11  up to the 10,000-foot level to understand the veterans
12  population and different cohorts of the veteran population
13  in terms of their characteristics, their earnings, their
14  economic status, and all those kinds of things, so really
15  have elevated all of that, and I think my people will tell
16  you that.
17        We also have been working on technical skills. We
18  have a pilot project in place to develop a web portal that's
19  a SAS web portal. We have tons and tons of publicly
20  available information that analysts can't use, VA people
21  can't use, veterans services organizations can't use because
22  they can't get to it. So the data portal is designed to

Statement of Michael McLendon (5/31/2006) Condenseit™          Administrative Investigation: Lost Da

**Page 77**

1 facilitate that, and it's also going to have a mapping

2 capability, so that if the IG wanted to download some of

3 this stuff, you can manipulate it online as well as map it

4 and put it in GIS.

5          Uh-huh.

6          MR. McLENDON: We've done things like take all the

7 annual reports of VA back to 1918, and Institute for Defense

8 Analysis found a technology that would automatically convert

9 all of those tables into Excel spreadsheets.

10          Uh-huh.

11          MR. McLENDON: And so we now have 6,500 data

12 tables that have been converted to Excel spreadsheets. They

13 go back to 1918, and the next phase of the analysis is to

14 kind of figure out how to come up with a standardized

15 taxonomy and all of those things because how we define

16 things has changed over time.

17          Right.

18          MR. McLENDON: So there are a lot of things that

19 we have been doing to kind of work on the data improvement,

20 and then we also started to clean up the data, and Dat had

21 been working with          ince probably -- probably started

22 late January, but certainly February time frame, and they

**Page 78**

1 can describe that process in terms of tightening up who had

2 access, what data was on certain servers.

3          I think one of the things that's -- [audio break].

4          [Side A of Audiotape No. 2 of 2 begins.]

5          MR. McLENDON: [In progress] -- that put in place

6 to start, and that's why on the Tuesday after the event, I

7 was able to do an all-hands meeting and give verbal

8 directions on what Dat and I had already been working on in

9 terms of what the security procedures were going to be --

10          Right.

11          MR. McLENDON: -- which I then put in writing on

12 the 19th.

13          Is that -- is that -- I guess that's

14 the -- that's the document?

15          MR. McLENDON: Yeah. Yeah.

16          Okay.

17          MR. McLENDON: That's what I put in place on the

18 19th of May, and people said, "Well, why did you wait until

19 the 19th of May to do that?" The simple reason is I wanted

20 to have the safe in hand before I put out the written

21 procedure on the 19th, the 19th of May.

22          Right. Well, do you -- I mean, do you

**Page 79**

1 keep tabs of who actually has what access? I mean, do you

2 have any records of -- personal records --

3          MR. McLENDON:          nd Dat keep that, the

4 number of people that have like online access to like a

5 BIRLS or a C&P or something like that. It's like down in

6 you know, two or three, maybe four people. Not everybody in

7 the organization has access, and we don't grant the access,

8 by the way. It's the -- it's the only organization of the

9 data --

10          Right.

11          MR. McLENDON: -- that -- that grants -- grants

12 the access --

13          Right.

14          MR. McLENDON: -- and that's another thing that

15 Dat had been typing up is, you know, who -- who has that

16 access. Just becaus          h] or somebody wants to go

17 off and get disks of that nature.

18          ight. Let's shift to security

19 clearances. You had mention this a little bit earlier, for

20 your staff, and perhaps you could walk us through the

21 process. I think I understand it, but, you know, the sense

22 -- starting off with, I guess, the designation of the

**Page 8**

1 position, the sensitivity of the position, what that leads

2 to in terms of background investigations and suitability

3 determinations, and I say this because from my

4 understanding, as I look at the 2280's for your staff, that

5 many of them have, if not all, other than the supervisors --

6 have low thresholds, low risk, if you will, and knowing tha

7 some of your people at least have access to great volumes o

8 highly sensitive data, it seems to me some incongruence

9 there.

10          Maybe you could speak about the process and -- and

11 where you think the office is in that regard.

12          MR. McLENDON: I think the whole thing is a mess.

13 I think it's a mess across VA.

14          Yeah.

15          MR. McLENDON: I'll just tell you what I know --

16          kay. Sure.

17          MR. McLENDON: -- from my experience.

18          You come into an organization, and if it's an

19 organization of 235,000 people, you have this huge HR

20 function, and the HR function hires people, puts people in

21 positions. You believe that there are certain things in

22 place.

Statement of Michael McLendon (5/31/2006) CondenseIt™    Administrative Investigation: Lost Data

**Page 81**

1    You have a telework process. People, you know,
2  come to you, and you sign their telework process. The IT
3  people provide one VPN access, and they provide the disks
4  and the training of how to get hooked up to do that, and
5  people work. Okay?
6    What I found when I started advertising the --
7  putting the package together to advertise for -- to fill a
8  GS-15 position was -- and that was the first time in all the
9  positions that I have filled since I've been there -- that
10  anybody ever provided me this form, this sensitivity form to
11  fill out, and then I had to go through a few hoops and loops
12  to figure out how to fill it out.
13    Have you ever filled out one of those forms?
14    It's -- yeah -- calculating numbers
15  and --
16    MR. McLENDON: Yeah.
17    Yeah.
18    MR. McLENDON: Go get one of those and try to
19  figure out how to fill it out, and then ask somebody what
20  you're supposed to do.
21    Yeah.
22    MR. McLENDON: And I spent a whole day doing that

**Page 82**

1  for that position. That was the first position that I
2  filled since I came in where that even came up on the radar
3  as something I was supposed to do. First time.
4    So, as this thing unfolded, I started looking
5  around at several things. One was how do I even find out
6  who has security clearances, how do I find out who has had
7  background checks, what systems are in place that push this
8  information to me on some kind of basis that says, okay, you
9  are supposed to revalidate or do something.
10    Uh-huh.
11    MR. McLENDON: And what I found was that there
12  were no institutional processes in place in VA that do that.
13    It's like this used to be some kind of art form,
14  and everybody has forgot about it and nobody pays any
15  attention to it.
16    So I found out that other than some of the new
17  people who have come in, who got background checks, like
18    and a few others, none of these people had ever
19  gotten background checks, and I was appalled at that. And I
20  asked -- you know, I even asked    [ph] in HR how
21  is this possible, you know.
22    A big concern to me, because people can be nice

**Page 83**

1  and polite at work and all that kind of stuff, but that has
2  nothing to do with anything else that's going in their life,
3  you know.
4    Yeah.
5    MR. McLENDON: The second thing is I'm not sure
6  that that's adequate. I believe that VA is very loose
7  analytically. That's one reason I had already begun a
8  discussion with    [ph] over at National Academy of
9  Sciences.    a well-respected senior statistician. He
10  runs a national statistical program. He's retired Army,
11  three star. For them to come do a study for us on what we
12  need to do to become a Federal statistical data center,
13  which is one way to tighten up all of that process, and I
14  could talk to you all about that for 2 hours. Okay.
15    So I'm not convinced that just having a national
16  agency check is enough. I think in VA, we probably have a
17  core group of hundreds of analysts, programmers, maybe
18  others, but certainly not tens of thousands, whose full-time
19  job is mucking around in large datasets and have access to
20  certain systems.
21    I don't think that they need to have security
22  clearances. I think that's an overkill.

**Page 84**

1    Uh-huh.
2    MR. McLENDON: But somewhere between a basic
3  national agency check and a total background investigation
4  where you fill out a -- do a long form 398, there's
5  something, I don't know what that is --
6    Uh-huh.
7    MR. McLENDON: -- that's needed.
8    I'm not aware that that is in place anywhere in VA
9  at all, and I think that's a huge hole in the process
10  because what that would do is it puts it on the table as a
11  proactive process.
12    See, right now, there's nothing in the system that
13  gives me anything that says on a yearly basis you need to
14  identify anybody that you think who hasn't had a background
15  check in say 10 years should be considered for another
16  background check or here, you know, we have reviewed all of
17  the sensitive -- sensitivity-level forms for positions X, Y,
18  and Z, and these are the ones that haven't been re-reviewed
19  or recertified in the last 5 years. There is no system in
20  place that does that whatsoever.
21    Would it be fair to say that someone
22  like    or    just the people I know that had access

Page 85

1  to significant data, probably should have had something,
2  some type of background?
3      MR. MCLENDON: Oh, yeah. Until this, I didn't
4  know that they didn't.
5      ▮▮▮▮▮▮  same way -- presumably the same way
6  with contractors who would have access to data. Now, not
7  knowing exactly what they're getting from your shop, but
8  contractors as well in terms of having any type of sense --
9  I don't know if they do 2280's for contractors. Presumably,
10  they -- they would, but that's something we need to take a
11  look at.
12      MR. MCLENDON: The -- I'm not exactly sure of
13  this, but I think it's generally right. You can check it
14  out. The dividing line with the contractors appears to be
15  online access. If I were to have a contract and because of
16  the nature of the work, it required that we provide you
17  online access to certain databases, there's different level
18  things that kick in to do that.
19      ▮▮▮▮▮▮  Yeah.
20      MR. MCLENDON: We don't get into that because we
21  don't --
22      ▮▮▮▮▮  Right.

Page 86

1      MR. MCLENDON: -- provide a lot of people online
2  access.
3      ▮▮▮▮  Right. You -- you talked about --
4  previously, you talked about a lot of data being out there
5  on different drives that shouldn't have been there and that
6  you're looking to begin, if you haven't already, cleaning
7  that up. Just out of curiosity, was there any type of
8  incident that led to that process?
9      MR. MCLENDON: No. No. It's -- I'm a very
10  data-centric kind of guy.
11      ▮▮▮▮▮  Uh-huh.
12      MR. MCLENDON: And I just have -- have not been
13  happy since I've been there with the quality of what we do
14  and how we do what we do, and to get to the level that we
15  need to get to, there are a lot of things that need to be
16  worked on, and that's one that Dat took on with ▮▮▮▮▮▮
17  to start working on and start doing, and that's why we were
18  so quickly able to put this thing together to deal with it.
19      ▮▮▮▮▮  Just a couple more quick things. It
20  seems like what we've learned -- it seems like there was a
21  figure that was being tossed around upstairs on the tenth
22  floor when this floated up, the final document. Apparently,

Page 8

1  it left the impression possibly that 20,000 records were
2  involved. Would you have any idea where that may have come
3  from?
4      MR. MCLENDON: I don't know. I don't know. I
5  mean, unless something I've totally missed somewhere, but,
6  you know, this was -- that was what we -- what we sent up
7  there.
8      ▮▮▮▮▮▮  right. 20,000, though, does sort of
9  equate with the national survey sample for the population.
10      MR. MCLENDON: Yeah. The National Survey of
11  Veterans, there were 20,000 records.
12      ▮▮▮▮▮▮  records, yeah.
13      MR. MCLENDON: 20,000 records.
14      ▮▮▮▮▮  eah.
15      MR. MCLENDON: So somebody may have taken
16  something from one column and put it under another one.
17      ▮▮▮▮  yeah. Okay. We'll have to explore
18  that.
19      ▮▮▮▮  I just want -- there's one issue that's out there,
20  and I want to make sure we're squared away, and I think we
21  are, but previously you described the various workers, your
22  team, and Wayne may have had -- may have had stolen on his

Page 8

1  laptop, and you went through what's on there. And with
2  regard -- when we spoke the last time, we were discussing
3  BIRLS and the C&P Mini Master, and you stated, "Apparently,
4  he did a match. My assumption is that ▮▮▮▮ did a match
5  with these two files to figure out how to do a match and
6  also to see what he could find out in terms of additional
7  data elements that would be added to that" -- "to that," end
8  quote. Is that a legitimate project?
9      MR. MCLENDON: Yeah. Yeah.
10      ▮▮▮▮▮  kay.
11      MR. MCLENDON: I mean -- and I'm kind of going
12  back, and Dat can give you the dates, but ▮▮▮▮ was doing
13  some work looking at -- and I think this was a test file
14  that he had had on extract that he had Austin download for
15  him, and he was, as I understand it, testing this extract by
16  doing some matches, and, yeah, that's a valid thing to do.
17  You've always got to improve your skills. You've got to
18  figure out how you improve the matches and what you're doing
19  to do. So, yeah, I would think that --
20      ▮▮▮▮  would he need specific authorization
21  from anyone to do that?
22      MR. MCLENDON: No, not if he had access to --

## Page 89

1  ▮▮▮▮▮ okay.

2      MR. McLENDON: If the user had given him access to

3  request that kind of job be done, which he did.

4      ▮▮▮▮▮ Okay. National Survey of Veterans,

5  we're talking about the 6,200 SSNs, quote, "From previous

6  discussions we had, my guess is he was trying to do a basic

7  match to see if any of these veterans that were on the C&P

8  Mini Master or some other record had ever gotten picked up

9  in the survey to see if we would then have more information

10  on specific groups of people," end quote. Is that a

11  legitimate project?

12      MR. McLENDON: Yeah. I think it would be.

13  Whenever you are trying to do survey work, you are trying to

14  capitalize on all the data that you do have on ▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮ One of the things that we don't have in VA is

16  really good integrated data to profile different cohorts of

17  veterans.

18

19      ▮▮▮▮▮ Uh-huh.

20      MR. McLENDON: To say, okay, this is what we

21  generally know about Vietnam era veterans between age X and

22  age Y. So, if you've got survey data from a very large

## Page 90

1  survey sample, you know, one of the things that I think a

2  lot of people would just naturally think to do was, well,

3  okay, do we have any identifier information on those that we

4  could hit against VA's database --

5      ▮▮▮▮▮ Uh-huh.

6      MR. McLENDON: -- that would give us better

7  insight on that population that then, rather than having

8  this much to look at, we would not have this much data.

9      ▮▮▮▮▮ Right.

10      MR. McLENDON: Now, this survey happened way

11  before I got here. So you would have to go back in time and

12  talk to Susan because she ran all that about what was going

13  on. I'm just answering it from the standpoint --

14      ▮▮▮▮▮ Understood.

15      MR. McLENDON: -- I would -- I would think that

16  that is --

17      ▮▮▮▮▮ And that's all we're trying to

18  understand.

19      MR. McLENDON: And knowing somebody like ▮▮▮ he

20  would do that.

21      ▮▮▮▮▮ Right.

22      MR. McLENDON: ▮▮▮ is the kind of guy that he

---

## Page ▮▮

1  would not be content with measuring the marshmallow with a

2  micrometer. He would keep fiddling at it and fiddling at it

3  until he got as much out of it as he probably could.

4      ▮▮▮▮▮ And what about the mustard gas file as

5  well?

6      MR. McLENDON: You know, the mustard gas file, I

7  am still not sure exactly why he had the mustard gas file.

8  I think you talked to ▮▮▮▮▮ about that.

9      ▮▮▮▮▮ The other team, yeah.

10      MR. McLENDON: Yeah. ▮▮▮ Dat could answer

11  that one much more than I can. I'm not exactly sure why he

12  had mustard gas.

13      We -- we do a lot of work with VBA on all of these

14  files that relate to chemical exposures, and I don't know if

15  they told you, but the data that DoD gets is not very good.

16  They go through a vetting process to identify names.

17      ▮▮▮▮▮ Yeah. Yeah.

18      MR. McLENDON: They pass us names. Many of these,

19  in fact, most of them, don't have Social Security numbers.

20  Their names aren't complete. So VBA goes through this whole

21  huge process of trying to identify who these -- who these

22  people are.

---

## Page ▮▮

1      ▮▮▮▮▮ Okay. That's good.

2      And keeping in line with that last question, we

3  learned that ▮▮▮▮▮ was using a reverse directory search to

4  -- to identify veterans who had been selected in -- for this

5  survey, survey sample, from a VA administrative frame, and I

6  guess we got into a little discussion actually with Susan.

7  I just want to get your comments.

8      You have a survey of veter▮▮▮▮▮▮▮▮▮▮

9  veteran. And I'm not exactly sure how the survey works, but

10  the concept is interesting to me. The veteran elects to be

11  anonymous, but provides his phone number apparently in some

12  shape or form, and if I understand this correctly, what

13  ▮▮▮▮ and Susan have done or at least ▮▮▮ I should say,

14  is to use the phone number to go back and try to identify

15  the veteran for legitimate purposes, I understand, to see --

16  to validate the data that was provided by the veteran to see

17  if it marries up with what was already in the system.

18      And I just got to thinking as to whether or not

19  something like that is an ethical -- is an ethical

20  practice. I mean, it may very well be, but it just sounds

21  --

22      MR. McLENDON: That's the first time I've heard

Statement of Michael McLendon (5/31/2006) Condenselt    Administrative Investigation: Lost Da

Page 93

1  about that.
2  ▮▮▮▮ Yeah.
3  MR. McLENDON: I thought that the context was only
4  those veterans who had Social Security numbers.
5  ▮▮▮▮ Uh-huh. It may be. It may be. I may
6  have it backwards.
7  MR. McLENDON: Yeah. I'm -- you're talking about
8  something I don't know anything about.
9  ▮▮▮▮ Okay. Fascination project, did we
10  talk about that the last time?
11  MR. McLENDON: Uh-huh.
12  ▮▮▮▮ Have you ever heard that term used by
13  ▮▮▮ working on his fascination project or his hobby
14  project?
15  MR. McLENDON: No.
16  ▮▮▮▮ You --
17  MR. McLENDON: What's this about?
18  ▮▮▮▮ I was just wondering. I'm trying to
19  think exactly what he was doing as he described to us.
20  ▮▮▮▮ Yeah. I --
21  ▮▮▮▮ think that last one you were just
22  talking about.

Page 9

1  ▮▮▮▮ can tell you what the project was.
2  What he was trying to do in his so-called "fascination
3  project" was to decrease the amount of time it took for
4  veterans to take the survey, and what he was trying to do
5  was identify data that --
6  MR. McLENDON: Was already --
7  ▮▮▮▮ to identify things that was already
8  there.
9  MR. McLENDON: That he would have to put on a
10  survey.
11  ▮▮▮▮ Exactly.
12  MR. McLENDON: That's a very legitimate thing to
13  do.
14  ▮▮▮▮ Exactly.
15  MR. McLENDON: You're always faced with a dilemma
16  in doing what's typically a 20-minute survey of having too
17  many questions that you want to ask.
18  ▮▮▮▮ s.
19  MR. McLENDON: So the question is if you know the
20  population that you're going to draw a sample from already
21  is it possible to use other means to pull data out about
22  those people and, therefore, not have to ask that particular

Page 94

1  MR. McLENDON: Trying to figure out how many
2  angels dance on the head of a pin? Is that --
3  ▮▮▮▮ Well, I think he was trying to match
4  up Social Security numbers to further identify veterans for
5  the -- from the last sample of the national survey.
6  MR. McLENDON: National survey from the 2001
7  survey?
8  ▮▮▮▮ Right. And I think he was using --
9  we may have this all wrong, but I think he was using --
10  because there was some new data in the January 2006 BIRLS
11  extract that had the service number.
12  ▮▮▮▮ That, I think we -- yeah. We might be
13  running a couple of things together. I think there is a
14  way to maybe improve the mustard gas file by using those
15  service numbers to identify matches.
16  ▮▮▮▮ Okay.
17  MR. McLENDON: That would -- that would make
18  sense. Trying to identify all of these -- all of these
19  folks who are chemical exposure are typically very old. We
20  didn't start using Social Security numbers until about 1970,
21  and so any time that you got an opportunity to refresh some
22  of these databases with Social Security numbers, you can --

Page 9

1  question.
2  ▮▮▮▮ That's -- that's what he was doing.
3  That's exactly what he was trying -- trying to do, anyway.
4  MR. McLENDON: That's a very -- that's a very
5  legitimate thing to do. Why ask somebody something that you
6  already know?
7  ▮▮▮▮ Now, you said you were not here when
8  they did the last survey, but were you here when they were
9  trying to get from the contractor some Social Security
10  numbers that I think initially they thought they were going
11  to get and the contractor said no, and then there was some
12  negotiation, and finally the contractor provided like 14,000
13  Social Security numbers?
14  MR. McLENDON: You know, I have some vague memory
15  of that, but I think that happened before my watch or it
16  happened right in the period of time when I was coming in.
17  It's not something that was a project of mine or anything
18  like that.
19  The National Survey of Veterans Program was
20  essentially done by the time that I got here, or a report
21  had been prepared. If there was any activity going on like
22  that, Susan was managing the program, and it was the



Statement of Michael McLendon (5/31/2006) Confidential

Page 97

1  vestiges of what ████████ was working on until she --
2  until she moved.
3          But it's -- if there was an issue of trying to get
4  Social Security numbers, that was probably a reasonable
5  thing to do. They were probably just trying to fill in
6  holes.
7          What you try -- what you try to do is whenever
8  there is an opportunity to further identify veterans by
9  doing data matches or taking advantage of other data that
10  you have out there, you try to do that because the more that
11  we can do that, the better outreach than we can do.
12          One of the biggest problems we have is current
13  names, addresses, phone numbers for veterans, even that are
14  in the VA system, because if you can't get that contact
15  information, you can't do outreach. So that's always a
16  challenge for all of the administration to do that.
17          ████████ One last thing I had was this IDA.
18  What does IDA stand for?
19          MR. McLENDON: Institute for Defense Analysis.
20          ████████ Defense Analysis. They -- I think
21  we've talked about it previously that they're doing some
22  contract work, some analysis of some -- actually some of the

Page 98

1  data that I guess was apparently lost, and I just want to
2  know what -- what kind of data do they have and what kind of
3  control do we put on those folks.
4          MR. McLENDON: IDA is a federally funded research
5  and development center.
6          ████████ okay.
7          MR. McLENDON: It's an FFRDC for the Office of the
8  Secretary of Defense.
9          ████████ Uh-huh.
10          MR. McLENDON: They operate under DoD information
11  security and cyber security restrictions which are
12  infinitely more restrictive than what we -- what VA has.
13          They have been doing work for VA since 1998 in
14  VBA, and VBA has given them access to comp and pen data and
15  other things. They've done a lot of studies for VBA,
16  developed analytical models for VBA. They're doing a big
17  study that I am jointly funding with VBA on looking at
18  variations and things in the different States, which you all
19  are familiar with, which, by the way, in your all's IG
20  report, you all lifted the exact words that were in my task
21  order about doing a multi-variant analysis, and the first
22  recommendation is you need to do this study.

Page 99

1          ████████ Right.
2          MR. McLENDON: Well, I'm doing the study, and IDA
3  is doing the study. So I have no concerns about IDA in
4  terms of data and those kind of things.
5          ████████ So they're -- but they're getting --
6  are they able to go and snatch the data on their own?
7          MR. McLENDON: No. They get extracts.
8          ████████ They get extracts.
9          MR. McLENDON: They have no online access.
10          ████████ And that's been all prepared through
11  C&P, not you?
12          MR. McLENDON: Yes. Yes.
13          ████████ It's through C&P?
14          MR. McLENDON: All through C&P.
15          ████████ Okay.
16          MR. McLENDON: In fact, the first thing that we
17  had to do was to be able to duplicate the IG's analysis
18  independently. Well, we did. Took about 9 months, but we
19  were able to do that. So they -- they get extracts from the
20  Master record or the Mini Master, and whatever data request
21  they have goes through PA&I in VBA.
22          ████████ Okay. I think that's all I have now.

Page 100

1  It's probably enough for 2 hours. Right?
2          ████████ I just have one thing, going back to
3  the May 5th memo and the reference to SAS, the SAS files.
4  Was it you who added in the statement about SAS, because
5  was in a SAS file, it was mitigating, or was that something
6  that was in ████████ original memo?
7          MR. McLENDON: I don't know, but I -- it wouldn't
8  be beyond possibility that I put it in there. It was put in
9  there to try to be specific and just say that it's not
10  something that was thrown out there in Word or anything
11  else, that it was in a statistical -- statistical file, and,
12  yeah, I could have said that. I don't know.
13          ████████ All right. Do you have anything else
14  you want to say before I turn the tape off?
15          MR. McLENDON: No. I -- I still think this is a
16  very serious matter. There's much about this that remains
17  inexplicable. I think it was -- we've got a huge gap in
18  crisis management, and there are a lot of institutional
19  issues that contributed to this over time, and I think --
20  not to say culture is the cause of everything, but the
21  culture of VA certainly has contributed to this in a very,
22  very large way.

Statement of Michael McLendon (5/31/2006) Condensed

Page 101

1      ██████████ Okay. Thank you.

2      [Whereupon, the statement of MICHAEL H. McLENDON

3    concluded.]

4                    - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

b6
b7C