6-1-2006

1

1    DEPARTMENT OF VETERANS AFFAIRS

2         OFFICE OF INSPECTOR GENERAL

3

4

5

6    ADMINISTRATIVE INVESTIGATION:  LOST DATA

7

8    INTERVIEW OF:    MR. JACK THOMPSON

9

10   INTERVIEWERS:

11

12

13

14   DATE:            Thursday, June 1, 2006

15

16   TIME:

17

18

19

20

21

22

Olender Reporting, Inc.            (888) 445-3376                WORLDWIDE
Washington, D.C.                   Baltimore, MD                 Ft. Lauderdale, FL



b6
b7C

104

```
                              2
 1              I N D E X

 2

 3   WITNESS:                              PAGE:

 4

 5   Jack Thompson                           3

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
```



3

1         P R O C E E D I N G S

2         ██████████ ... along with ██████████

3   and ██████████ We're back on the record with Mr.

4   Jack Thompson, and as I said, we just want to

5   follow up on a few things. We read the testimony

6   and we have a couple questions.

7         The first thing is you told us that Mr.

8   Bowman gave you the May 5th memo and you put a

9   buck slip on it and it went upstairs, and I don't

10  think we're really clear on who you gave it to

11  you and what the instructions were when you gave

12  it to that person.

13        MR. THOMPSON: Well, the buck slip

14  itself, which I believe was dated May 10th, the

15  same day that Mr. Bowman raised the question,

16  said -- basically gave the assignment. It was I

17  think when the chief of staff asks a question and

18  so that was provided to our Staff Group 4. I

19  think it was addressed to 024, --

20        ██████████ Right.

21        MR. THOMPSON:  -- who was Debbie

22  McCallum.

                                                                    4

1                              And is that who you gave it
2   to or --
3        MR. THOMPSON:  I didn't hand deliver it.
4   I gave it to my administrative assistant to --
5                    Okay.
6        MR. THOMPSON:  -- give to her.
7                    And her name is?
8        MR. THOMPSON:  I can't remember which of
9   the two ladies out here.
10       SPEAKER:           or --
11       MR. THOMPSON:
12       SPEAKER:  Okay.  In the normal course of
13  business, would they then hand deliver it or --
14       MR. THOMPSON:  Yes.
15       SPEAKER:  -- put it in the mail?
16       MR. THOMPSON:  They would hand deliver
17  it.
18       SPEAKER:  They would hand deliver it.
19       MR. THOMPSON:  Yes.  Yeah.  Probably.
20  Said here, take this to Group 4.
21       SPEAKER:  Okay.
22       MR. THOMPSON:  Mm-hmm.



5

1          ███████████ And at some point in the

2    transcript, it said you were surprised to learn

3    it had gone to Jeff Corsack, and I was wondering

4    if that was a typo.

5          MR. THOMPSON: No, I didn't mean I was

6    surprised, that I didn't know to which attorney

7    they would assign it.

8          ███████████ Okay.

9          MR. THOMPSON: And that I would not be

10   surprised if it went to Jeff Corsack because he

11   is the senior staff attorney in regard to Privacy

12   Act information disclosure issues.

13         ███████████ Did you have any

14   conversations directly with him while he was in

15   the process of writing up that memo?

16         MR. THOMPSON: Not that I recall.

17         ███████████ And again, did you give any

18   sort of a deadline to anyone upstairs to have the

19   memo back to you?

20         MR. THOMPSON: I don't believe I did.

21         ███████████ Is that something you would

22   normally do?

b6 b7C

108

6

1       MR. THOMPSON:  Well, I think it was
2  self-evident, that this was a priority matter.
3  The chief of staff had handed it to me and I had
4  it hand carried to the individuals.  I would have
5  certainly followed up on it early the following
6  week if it hadn't been acted upon.  In fact, I
7  kept a photocopy of the assignment right here on
8  my desk as a reminder to me.
9       ███████████  Okay.
10      SPEAKER:  Did the chief of staff ever
11 come looking for the memo?
12      MR. THOMPSON:  No.
13      SPEAKER:  He gave you the assignment on
14 the 10th, I believe.
15      MR. THOMPSON:  Yes.
16      SPEAKER:  And it wasn't until the 16th,
17 I believe, that it was finally delivered, however
18 he got it, but between those two dates, he never
19 came looking for the memo or contacted you?
20      MR. THOMPSON:  He did not.
21      SPEAKER:  How did the memo finally get
22 delivered to the chief?

1        MR. THOMPSON: I believe Mr. McClain
2   signed the memo and I'm not the delivery person,
3   so I'm not sure whether he had it hand carried to
4   him. I would assume so.
5        SPEAKER: How come Mr. McClain signed
6   it?
7        MR. THOMPSON: He's the General Counsel.
8        SPEAKER: Does he sign everything or do
9   you ever --
10       MR. THOMPSON: Well, this was requested.
11  Mr. McClain was not here when Mr. Bowman came.
12  Mr. Bowman was looking for Mr. McClain to make
13  the assignment. So, I thought it appropriate for
14  Mr. McClain to respond.
15       ████████ And also last time, you
16  said that it came downstairs on the 12th and some
17  sort of a typo was identified and it went back up
18  and it reappeared again on the 15th, that would
19  have been Monday, but the memo is dated the 16th,
20  and I'm wondering if you can recall what happened
21  in the interim, during the time it reappeared
22  here and --

1       MR. THOMPSON: I think its reappearance
2  on the 15th, I would surmise on my part, I think
3  we had relatively minor editorial problems with
4  it, according to █████ because I didn't see it
5  on the 12th. She sent it back up for repairs,
6  and I assumed it came back on the 15th. It might
7  have been the 16th. I'm not certain. Once I got
8  it, I acted on it promptly.
9             ████████████ And did it come back to you
10 and then from you to Mr. McClain?
11      MR. THOMPSON: That's right.
12            ████████████ And that was on the 15th or
13 16th?
14      MR. THOMPSON: I'm not sure.
15            ████████████ There is a -- these
16 guidelines for remote access. Are you familiar
17 with that?
18      MR. THOMPSON: I am now.
19            ████████████ Okay. Did you have any
20 conversations with the Secretary about that?
21 We're surmising that someone must have told the
22 Secretary that those guidelines were binding, and



                                                              9

1   I was wondering if that came from you, if you're

2   part of any discussions on that.

3           MR. THOMPSON:  I was part of the

4   precongressional hearing preparations at which

5   there was a meeting in the conference room a day

6   or two before the hearings, and there was

7   discussion as to, you know, what guidelines or

8   directives might have been violated.

9           Somebody raised the point that there

10  were these guidelines but they're only that,

11  they're only guidelines, and I did at that

12  meeting say, "But nevertheless if they are office

13  policy and they were violated, you know, that can

14  be cause for personnel action for violating

15  office policy."

16          ▬▬▬▬▬▬▬  And did you present it as

17  if it's office policy?

18          MR. THOMPSON:  No.  As I recall, what I

19  said was if it is defined office policy and the

20  individual was aware of the office policy, then a

21  failure to abide by it can result in disciplinary

22  action.  So, the mere fact that it's in a



                                                                      10

1   guideline as opposed to a directive or to a

2   circular or some other administrative issue isn't

3   the point.

4              ██████████ And what do you mean by a

5   defined office policy?

6              MR. THOMPSON: It's written. That is

7   the defined office policy --

8              ██████████ Okay. And then --

9              MR. THOMPSON: -- with regard to that

10  issue.

11             ██████████ And beyond that, you're

12  saying that the employee must be aware of it?

13             MR. THOMPSON: If you're going to charge

14  an individual with wilful violation of an office

15  policy, you've got to show he was aware of it.

16             SPEAKER: And that discussion of

17  awareness came up during that meeting with

18  ██████████

19             MR. THOMPSON: It did.

20             SPEAKER: Okay.

21             MR. THOMPSON: I was there, the

22  Secretary was there, a number of officials were

1   there, prepping him for the congressional
2   hearings.
3           SPEAKER:  I see.
4           SPEAKER:  I just want to be clear.  The
5   fact that this was a guideline makes it a policy?
6           MR. THOMPSON:  The policy is written in
7   such a way that it is's not equivocal.  It is
8   direct in specifying, you know, we shall not and
9   so, you know, that is the policy.
10          SPEAKER:  Had you had a chance to read
11  that policy beforehand?
12          MR. THOMPSON:  Before when?
13          SPEAKER:  Before that meeting.
14          MR. THOMPSON:  Yes.
15          SPEAKER:  In terms of the single user
16  remote access?
17          MR. THOMPSON:  Yes.
18          SPEAKER:  In your estimation, does that
19  policy reflect and actually apply to the facts of
20  this particular case?
21          MR. THOMPSON:  My understanding is it
22  does.



12

1         SPEAKER: Your understanding. You've

2    read -- you know the facts of the case and you

3    read the policy.

4         MR. THOMPSON: Yes.

5         SPEAKER: You've put them together, and

6    it's --

7         MR. THOMPSON: Yes.

8         SPEAKER: -- judgment that this

9    guideline, if it's defined in the policy, would

10   be applicable?

11        MR. THOMPSON: Yes.

12        SPEAKER: Okay.

13        ▓▓▓▓▓▓▓▓▓ Okay. I thought -- I'm

14   confused now. Is it defined in policy or is it

15   defined policy? I guess I don't understand why

16   you're saying something that is --

17        MR. THOMPSON: Well, I mean, if you have

18   an oral sort of common agreed policy, it's much

19   more difficult to enforce than if you have a

20   written established policy.

21        ▓▓▓▓▓▓▓▓▓ All right. So, by defined,

22   you mean written?

```
 1              MR. THOMPSON:  Yes.

 2              ████████  Written.

 3              MR. THOMPSON:  Mm-hmm.

 4              ████████  And what was the discussion

 5   about employee's awareness of the guidelines?

 6              MR. THOMPSON:  I'm not following you.

 7              ████████  Well, you said that during

 8   the meeting, there was some discussion about

 9   whether this guideline had been disseminated and

10   employees were aware of it.  What was that

11   discussion?

12              MR. THOMPSON:  No.  During the meeting,

13   somebody said it's only a guideline, it's not

14   enforceable, and my point was the fact that it's

15   in a guideline as opposed to a directive or some

16   other -- that was the conversation.  It was but,

17   you know, whether the particular kind of

18   administrative issuance, you know, was somehow

19   controlling here, and my point was whether it's

20   in the guideline or directive, if the individual

21   was aware of it, of the established policy, it

22   potentially was actionable.
```

b6 b7C

                                                                      14

1         ▮▮▮▮▮▮▮▮  Okay.  And again, was there

2    any discussion about whether employees had been

3    made aware of this?

4         MR. THOMPSON:  No, not that I remember,

5    and I have no indication, I have no reason to

6    know whether this individual was aware.

7         ▮▮▮▮▮▮▮▮  Do you know whether

8    employees in general were made aware of it?

9         MR. THOMPSON:  I don't know one way or

10   the other.

11        SPEAKER:  When Mr. Bowman brought this

12   issue to you, was there any discussion that this

13   could involve millions of records?

14        MR. THOMPSON:  No.

15        SPEAKER:  Was there any discussion at

16   all about numbers?

17        MR. THOMPSON:  Not when Mr. Bowman

18   brought it to me.

19        SPEAKER:  Were there subsequent to that?

20        MR. THOMPSON:  Days later, yeah.

21        SPEAKER:  Days later?

22        MR. THOMPSON:  Yeah.



                                                                    15

1        SPEAKER: Okay. Between you and Mr.
2   Bowman again or --
3        MR. THOMPSON: No, I don't recall
4   discussing it with Mr. Bowman.
5        SPEAKER: When would you have gotten
6   information on the magnitude?
7        MR. THOMPSON: Oh, not until subsequent
8   memos started.
9        SPEAKER: After Mr. McClain signed the
10  memo, some time after that?
11       MR. THOMPSON: Yeah. Mm-hmm.
12       ████████ Okay. I think that's it,
13  unless you have something to say.
14       MR. THOMPSON: Okay. No.
15       ████████ All right. Thank you.
16       MR. THOMPSON: Okay.
17       (End of Interview of Jack Thompson.)
18
19
20
21
22