1

# DEPARTMENT OF VETERANS AFFAIRS
# OFFICE OF INSPECTOR GENERAL

ADMINISTRATIVE INVESTIGATION:    LOST DATA

INTERVIEW OF:    MR. PEDRO CADENAS

INTERVIEWERS:    

DATE:            Wednesday, May 24, 2006

TIME:

b6 b7c
166

Interview of: Pedro Cadenas                                    5-24-2006

Page 2

```
              I N D E X

WITNESS:                              PAGE:

Pedro Cadenas                           3
```

Page 3

PROCEEDINGS

▮▮▮ This is ▮▮▮ with the Department of Veterans Affairs, Office of Inspector General. It's May 24th, 2006. We're at VA Central Office today with Pedro Cadenas and also today in the interview is ▮▮▮ ▮▮▮ from the IG's Office.

Pedro, would you raise your right hand, please?

Whereupon,

PEDRO CADENAS

having been first duly sworn, was called as a witness herein and was examined and testified as follows:

▮▮▮ Okay. Pedro, could you state your full name and position for the record?

MR. CADENAS: Pedro Cadenas, Jr., Associate Deputy Assistant Secretary for Cyber and Information Security.

▮▮▮ Okay. And can give you us a brief overview of your duties and responsibilities?

Page 4

MR. CADENAS: Per General Counsel's Memorandum, dated April 7th, '04, my duties and responsibilities are to ensure, not to enforce but are to ensure the development of guidelines, procedures, pretty much anything relating to security and the best practices, et. cetera, and daily operations, if you will, of the cyber security practice here for the Department of Veterans Affairs.

▮▮▮ Okay. And do you have a security operations center that is part of your organization?

MR. CADENAS: Yes, we just reconstituted as a result of the last contract being terminated abruptly and that's located out in Hines, right outside of Chicago. We had the opening ceremony, I believe, 14 April where Mr. McFarland was in attendance to understand that capability.

▮▮▮ Okay. And is there a privacy office that's located in your organization as well?

MR. CADENAS: No.

Page 5

▮▮▮ Okay.

MR. CADENAS: A couple years back, ▮▮▮ he challenged the validity of the privacy office being within the Office of Cyber and Information Security and requested that the office be reassigned and it was under OINT to what I affectionately call Little P3, Policies, Plans and Programs under ▮▮▮ shop while he was here.

Since the IT reorganization, the privacy organization, I thought, was coming back to OCIS, was decided because of the realignment it would be put under ▮▮▮ organization, a newly-founded organization called Egovernment.

Prior to that, we were lobbying to get privacy back within OCIS because we saw the strong connection and obviously we had to wait for certain personalities to move. When that had happened, that's when we repursued getting privacy back in OCIS.

▮▮▮ Okay. You mentioned at the beginning that you were responsible for



**Page 6**

1  developing guidelines and best practices for
2  cyber security.
3      Can you tell us a little bit about the
4  process that you use to develop those guidelines
5  and have them reviewed and concurred with and
6  implemented?
7      MR. CADENAS: Well, one of the building
8  blocks for this office is PHSMA and PHSMA relates
9  to NIST and the PHPPS standard, Special
10 Publications, et. cetera, and we use that as our
11 main building blocks for our duties as far as
12 development of products within OCIS.
13     We also, because of the number of us and
14 our past relationships within the DoD intel
15 community, et. cetera, rather than reinvent the
16 wheel, we also seek out these organizations
17 because they also have unclassified systems and
18 they have already developed policies or
19 procedures that we, to the best of our ability,
20 we either use or reuse portions of it or, for
21 lack of a better term, I just finished graduate
22 school, so we would plagiarize.

**Page 7**

1      When you're in school, you don't
2  plagiarize, but I guess out here, it's okay to
3  save on taxpayer's money. So, we would use just
4  about any source available from other agencies to
5  develop inhouse policies and procedures.
6      Once we feel as though we have a good
7  draft, then naturally we have to vet it through
8  the VA process, bureaucracy, whatever you want to
9  call it, but NIST, PHSMA, NIST, Eprivacy Act,
10 HIPAA, all the laws out there, I have a very good
11 staff that's always on top of all of that.
12     Okay. So, the process of
13 vetting it through the bureaucracy, can you tell
14 us a little bit about that?
15     MR. CADENAS: Well, once you put it in,
16 then all the program offices or in the
17 administrations have an opportunity to give their
18 hack on it, and this is where I decided in
19 testimony to the Hill awhile back, because we
20 have no authority, it's cumbaya, you know. It's
21 a give and take. It's will you do this, will you
22 do that versus no, you can't do that versus the

**Page 8**

1  OGC ruling or opinion to where everybody's very
2  familiar. So, it's a constant contest for us.
3      You talked about putting
4  it in the system. Do you know what system are
5  you referring to?
6      MR. CADENAS: EDMS.
7      EDMS. Okay. Thank you.
8      Okay. And because of a
9  recent incident that occurred in Policy, Planning
10 and Preparedness, I wanted to ask you to describe
11 any VA policies concerning taking and storing
12 data at an employee's home.
13     MR. CADENAS: Well, according to the
14 telework where it says that all employees must
15 observe all policies, procedures, and guidelines,
16 the one I immediately addressed was the security
17 guideline for single user remote access where it
18 talks -- specifically talks about how to protect
19 or how you should maintain that data while
20 offsite.
21     I believe it's Section 4.5.1 and 4.5.5
22 that talks about data encryption, but prior to

**Page 9**

1  that, depending on the circumstances of the
2  individual walking out with the information, what
3  he violated was the Privacy Act. That's one of
4  my concerns about this whole incident, is
5  depending on how it's portrayed, it could give
6  away or disclose what our security posture is
7  here.
8      The term "electronic data" was used.
9  Automatically, anybody in this industry will
10 assume he hacked in or he did it via some
11 automated online capability. From what I
12 understand, the individual actually downloaded on
13 to CDs and/or a hard drive and walked out the
14 building with it.
15     Now, regardless of what classification
16 level you operate under, this is very, very hard
17 to stop, depending on what your exit procedures
18 are. I mean, with today's technologies of thumb
19 drives, CDs, forwarding, you know, it's very
20 tough. So, we try to ensure that we have
21 policies, procedures, and guidelines in place, if
22 anything, to advise best practices.



### Page 10

1    It comes down to the individual or his
2    supervisors whether or not they are observed or
3    enforced.
4    ▮▮▮ Right. Let me back up. You
5    mentioned remote access policy. We've looked at
6    a copy that was issued March 10th, 2006.
7    MR. CADENAS: Well, that wasn't when it
8    was updated. All our policies and procedures are
9    living documents. I gotta check, but I believe
10   it was first generated in 2003.
11   ▮▮▮ And who would have the
12   history file as far as the prior versions and the
13   concurrences and approvals?
14   MR. CADENAS: I will have to check with
15   my team, but I believe it's ▮▮▮ She's
16   a couple of doors down.
17   ▮▮▮ Okay.
18   MR. CADENAS: The reason why I say I
19   would have to check is, depending on the area of
20   expertise, if you will, that's where they're
21   developed and then they're run through our
22   internal process for tracking.

### Page 11

1    ▮▮▮ Okay. And you mentioned
2    earlier about vetting policies and going through
3    the VA bureaucracy to get the approval, through
4    the EDMS.
5    Is this policy something that has been
6    entered into the EDMS for approval and
7    concurrence?
8    MR. CADENAS: That is something I'll
9    have to check what our procedures are for
10   policies, procedures and guidelines. One example
11   I can give you is VA Directive 6500, that we
12   tried to get through the process last year or two
13   years ago.
14   The original directive was 14 pages
15   long. When we were done and everybody had their
16   hack on it, it's four pages long, and in the
17   original directive, it talks about giving us the
18   authority to identify data, how it's stored,
19   custodial, you know, ownership of the data,
20   allowing us to do our job, for lack of a better
21   term, and I have copies for both of you, the
22   original and then the result of the cumbaya, and

### Page 12

1    I just briefly reviewed it in the interests of
2    the incident now.
3    We specifically requested through this
4    directive that we would want to address data,
5    concept of operations, who has access, rights,
6    privileges, et. cetera, and that's not in the
7    revised one, and that's all based off of the
8    April 7th, 2004, General Counsel letter stating
9    we only have authority to ensure, not to execute
10   or enforce.
11   So, with that being the case, our
12   office's and my own opinion is a reactionary
13   office, not a proactive office.
14   ▮▮▮ So, just let me clarify that.
15   Are you saying that you had originally proposed
16   issuing some policies governing data storage that
17   were more comprehensive than currently exist, but
18   that in the concurrence process, that other
19   elements in the department requested that that be
20   deleted from the policy?
21   MR. CADENAS: Well, let me give you an
22   example and this pertains to this incident.

### Page 13

1    Developing data integrity controls that
2    protect the operating system, application
3    software, data and other information in VA
4    information systems from accidental or malicious
5    alteration or destruction whereby providing
6    assurance to the information owner and user of
7    the quality and integrity of that data. That's
8    no longer in the revised book, you know,
9    assurances.
10   That means user profiles. Who has
11   access to what? What can they do? What can't
12   they do? There are technologies today that would
13   have allowed me to implement applications out
14   there that would have raised a flag in near real
15   time that says, hey, I got a guy who's
16   downloading the entire database. That's not in
17   the revised one. Fourteen pages down to four
18   pages.
19   It just goes on and on and on and on
20   where we cite specifics --
21   ▮▮▮ Okay. We're back.
22   MR. CADENAS: Here's another one.

14

1  Establishing personal controls that result in
2  individual's duties that are separated to ensure
3  at least privilege and accountability and are
4  periodically monitored and updated to reflect
5  changes in the level of authorization, authorized
6  access or termination.
7       That's not in here. We know how to do
8  our job. We're not allowed to do our job. Hence
9  that's why I'm embarrassed, I'm frustrated, and
10 I'm tired. This is a negative reflection of the
11 training that I've been through, my mentors, and
12 I don't mean to get on my soapbox here, and the
13 institution that trained me to do my job.
14       ████████ Okay. Help me understand
15 that. Were there any particular organizations
16 within the department that you are aware of that
17 were responsible for carving this proposed record
18 down to its current size?
19      MR. CADENAS: Well, according to the
20 memorandum, and I keep going to this, General
21 Counsel specifically states who is responsible
22 for ensuring that the policies, procedures or

15

1  guidelines, whether either out of this office or
2  under VA, who is actually responsible for
3  ensuring that they are enforced, and it is not
4  OCIS.
5       ████████ Who is responsible?
6       MR. CADENAS: Well, I would have to
7  reread this again, but it basically starts at the
8  Secretary and it goes down to the Under
9  Secretaries. It goes down to the supervisors.
10 It talks about enforcement of these policies.
11      ████████ In your recollection, I know
12 you haven't read this recently, but is it very
13 decentralized execution then where VBA does their
14 own thing, VHA does their own thing, NCA does
15 their own thing, rather than being under one
16 umbrella of your shop?
17      MR. CADENAS: In my professional opinion
18 of being here three years and some odd months,
19 everything that is done in the VA is
20 decentralized, period. Even the IT federated
21 model is being done decentralized. We're
22 starting to get extreme kickback on that. So,

16

1  you know, when is enough enough?
2       ████████ And --
3       MR. CADENAS: I'm sorry.
4       ████████ Sure.
5       MR. CADENAS: What you're hearing is
6  frustration on my part. I've been living it for
7  three years.
8       ████████ How is the recent
9  reorganization of OIT that was just announced a
10 couple of months ago going to impact that
11 relationship with the other elements of the
12 department?
13      MR. CADENAS: It's impacting them now.
14 This is how ridiculous -- this is a bureaucracy
15 at work. NTE will reassign a detail the office
16 but not the supervisors. So now you go figure it
17 out. Not the supervisors. What the heck is the
18 Office of General Counsel doing with a developer
19 that they get to retain? What do they develop as
20 far as applications?
21      See, this is part of the bureaucracy
22 that I'm talking about. People are looking for

17

1  loopholes. Nothing is really developed in the
2  VA. It's all integration. Development to me in
3  any bona fide organization is modifying, writing
4  source code, not scripts.
5       So, VHA has close to a thousand
6  developers out there. How many systems are we
7  supporting? And since Mr. McFarland's departure,
8  I knew it would start up again 1 May, people now
9  are starting to pull back. Individuals that are
10 identified to come over to go back over.
11      So, the bureaucracy is alive and well in
12 VA. Now, will the CIO be successful? Odds are
13 against him, you know. Once the CIO has been
14 identified, Mr. Howard has a challenging job
15 ahead of him as the supervisor. I'm the acting
16 deputy CIO currently. I forgot to mention that.
17 I apologize. Mr. McFarland gave me that
18 designation. He basically said, "Sorry, I'm not
19 giving you the choice. You're it." I said,
20 "Well, thank you, sir. May I have another?"
21      I don't think the IT reorganization --
22 keeping in mind what the VA got cited for was for



Interview of: Pedro Cadenas

5-24-2006

**18**

1  development systems, not operational systems.
2  So, will it be successful, in my own personal
3  opinion, no, because I've been part of two major
4  reorganizations much larger than the VA. This is
5  15,000 people.
6      The problem is you easily recognize the
7  authority by the rank on the shoulders and so
8  it's much easier to execute. It's a game here
9  and what you'll hear in the next six to eight
10 months, it's an election year. We'll slow roll
11 it even more.
12     So, in my professional opinion, in my
13 observations, will it change? No. We will
14 constantly get hammered.
15     ▓▓▓▓ And are you currently aware
16 of any VA policy that would prohibit an employee
17 from downloading a large privacy sensitive
18 database on to media and taking it to their
19 residence?
20     MR. CADENAS: Once again, I cite the
21 guidelines to ask that question of policy. There
22 is a difference. I would have to check and trust

**19**

1  me, we've all been checking and looking for said
2  policy.
3      What I have found thus far is per the
4  telecommuting/telework agreement, that users not
5  observing all policies, procedures or guidelines,
6  will -- their connection will immediately be
7  revoked and that includes the handling of
8  information. It doesn't talk about downloading
9  or anything else like that.
10     I would suggest that falls under concept
11 of operation of the system owners, you know. A
12 lot of people use a lot of names to get access.
13 I ask for documentation. This particular office
14 asked me for some information and I told them no,
15 I'm not going to give it to you. Well, people
16 are intimidated when they hear the strategic plan
17 for the VA. I'm doing this for my assistant
18 secretary, whatnot, and because there are no
19 operational policies and procedures -- keep in
20 mind, this is not only a cyber security or
21 security thing. This is an operational
22 procedures.

**20**

1      You don't give away the keys to the
2  kingdom to any one individual.
3      ▓▓▓▓: And as far as your
4  understanding, is the operational unit that had
5  possession of the data or had access to it, are
6  they responsible for controlling access to the
7  data and how it can be stored and downloaded?
8      MR. CADENAS: Absolutely. All system
9  owners are. They're held accountable. I'm not
10 trying to divert, but all system owners are held
11 accountable for who accesses their information,
12 what level of access do they have, rewrite or
13 execute, and also to practice due diligence to
14 ensure that they have the proper internal
15 functions turned on, such as audit, and to
16 practice their own due diligence.
17     Nothing is stated anywhere that it must
18 come from cyber security, regardless of what
19 agency you're in. This is called due diligence,
20 and to claim ignorance of X, Y or Z is not an
21 excuse. I mean, hence my frustration. I was
22 brought in to make a change, to implement

**21**

1  security, and I am not allowed to because this
2  thing, this memorandum that I'm pointing to from
3  General Counsel keeps getting thrown in my face.
4      ▓▓▓▓ Okay. And are you aware of
5  any VA policy that provides how sensitive data
6  should be protected if it's downloaded on to
7  personal computers or CDs or whatever as far as
8  technical controls, like encryption and passwords
9  and stuff like that?
10     MR. CADENAS: Well, according to PHPPS
11 46-3, there's one paragraph in there and PHPPS
12 applies to everybody that is part of the due
13 diligence that I'm talking about under PHSMA,
14 that if an organization or individual deems
15 information to be sensitive, then they have to go
16 through the due diligence of ensuring that that
17 information is properly encrypted, either via des
18 or triple des, which is another challenge that
19 we're having here.
20     Blue tube is not PHPPS 140-2 compliant,
21 but it is all over the place in the VA and we're
22 constantly getting -- I said, look, it's not

6 (Pages 18 to 21)

Olender Reporting, Inc.
Washington, D.C.

(888) 445-3376
Baltimore, MD

WORLDWIDE
Ft. Lauderdale, FL

b6 b7c

**22**

1  PHPPS 140-2 compliant. So that encryption
2  algorithm is not a bona fide one for use in
3  government agency facilities regardless of what
4  you're doing. So, what you need to do, because I
5  cannot approve this request to purchase this, you
6  need to go to the system owner or whoever your
7  DAA or approving authority is, have them sign a
8  letter that the use of this technology they
9  accept within their area of responsibility on a
10 system, general support application system, that
11 they accept all known and unknown risk, okay,
12 because when the IG comes by and does their
13 audit, if you don't have that letter, who's going
14 to be accountable?
15     Two years I've been saying that.
16 Nothing.
17     ▓▓▓▓: And as far as the PHPPS or
18 the PHSMA requirements that you cite in terms of
19 the encryption of the data, how has the VA
20 communicated that information to the program
21 offices, like Policy, Planing and Preparedness,
22 so that they would be aware of their

**23**

1  responsibilities?
2      MR. CADENAS: Well, we have a web
3  portal. Every year, we have the Info Sec
4  Conference. These are -- there are constant
5  reminders and the yearly training requirement.
6  We're constantly reminding them, the 300+
7  information security officers out there today.
8      I mean, last year's Info Sec, we had
9  close to a thousand, not only information
10 security officers but system administrators, LAN
11 and WIN managers. We do as much as we can to get
12 the word out on PHSMA, PHPPS, best practices,
13 policies.
14     I believe we had over a hundred or over
15 200 presentations on security, best practices.
16 Unfortunately, until someone is held accountable
17 and in this case, it might even be me, for all I
18 know, examples are being made, once again, it may
19 even be me, no one's going to do anything. It's
20 going to be status quo or until an unfortunate
21 incident like this occurs, and then I can tell
22 you exactly what's going to happen, based on my

**24**

1  three years.
2      They'll go ahead and do all this.
3  People will get slapped. Unfortunately, somebody
4  or many multipeople will lose their job, things
5  will settle down and we'll go back to status quo
6  because no one is held accountable and no one
7  organization, such as OCIS, has the authority to
8  enforce. Okay. Status quo.
9      I even have a review and inspection
10 division that physically goes out there and I had
11 to fight for that to tell people, look, better to
12 hear from us your weaknesses and vulnerabilities
13 versus the IG because if they cite it, they could
14 shut you down. We're trying to be proactive.
15     When the team goes out there, they look
16 at technology, they look at training, they look
17 --
18     ▓▓▓▓ They've been at the Office of
19 Policy, Planning and Preparedness?
20     MR. CADENAS: That, sir, I'd have to
21 check.
22     ▓▓▓▓ Okay. We've talked earlier

**25**

1  about something that you've sent through the
2  concurrence process with this VA Directive 6500.
3  I know we've also talked about this security
4  guidance for single user remote access.
5      Just for clarification's sake, obviously
6  these directives are here. Those are considered
7  VA policy, is that --
8      MR. CADENAS: Well, we're still going
9  through the concurrence on this, and one example
10 I'd like to give you, if I may, the reference of
11 the original --
12     ▓▓▓▓ Okay.
13     MR. CADENAS: -- is where we cite two
14 and a half pages of references, PHPPS, Security
15 Act, et. cetera, --
16     ▓▓▓▓ Right.
17     MR. CADENAS: -- as reference points.
18 On the revised one, because security, you guys
19 are overkill, you know, you don't know what
20 you're talking -- excuse my language. We have A
21 through H and that's what it's got to come down
22 through.

26

1        ▓▓▓▓ Sure.
2        MR. CADENAS: That's the bureaucracy.
3        ▓▓▓▓ Let me rephrase my question.
4   I'm sorry. Something obviously completes the
5   concurrence process. The VA directive, that's
6   considered VA policy, right?
7        ▓▓▓▓ And someone signs it.
8        ▓▓▓▓. And someone signs it?
9        MR. CADENAS: Right. I'm sorry. Yes.
10       ▓▓▓▓ Okay. And then we also have
11  this document that we've been referring to as the
12  security guidance for single user remote access,
13  and this is in a different format.
14       MR. CADENAS: Right.
15       ▓▓▓▓ Do you consider this to be VA
16  policy?
17       MR. CADENAS: I consider that to be best
18  practices because of our lack of authority.
19  We're trying desperately to get it out there one
20  way or another, and if we're not allowed to get
21  it out of this office as a directive, then we try
22  to get it out as guidelines or procedures, you

27

1   know. That's our loophole in trying to get the
2   word out there.
3        ▓▓▓▓ Okay. Could I get a yes or
4   no about whether you consider that to be VA
5   policy?
6        MR. CADENAS: Oh, I'm sorry. From a
7   bureaucratic point of view, no, no one would
8   consider that policy.
9        ▓▓▓▓ I mean, the legal official
10  point of view. Officially, as far as the
11  department is concerned?
12       MR. CADENAS: No.
13       ▓▓▓▓ Okay.
14       MR. CADENAS: Sorry.
15       ▓▓▓▓ That's all right. I just
16  wanted to be clear on that.
17       Do you have any questions about the
18  policy?
19       ▓▓▓▓ I know I looked on your
20  website yesterday and today trying to find this.
21  It does not appear readily apparent to me.
22       MR. CADENAS: Mm-hmm.

28

1        ▓▓▓▓ I can type in the title
2   and I can get to it. Do you know, do you have
3   any idea when that may have been put up on the
4   website? Do you have any knowledge of that?
5        MR. CADENAS: When our web portal was
6   originally developed over a year ago to stand up,
7   to get all that stuff out there.
8        ▓▓▓▓ Okay. Now, I note, you
9   know, we're talking about the same security
10  guidelines, Revision 3.0, dated March 10, and
11  inside the first page is Revision 1, 2, going
12  back a couple years.
13       MR. CADENAS: Right.
14       ▓▓▓▓ Would those -- if you
15  know, would those have been posted on the Web
16  back in '03 and '04, whenever the Versions 1 and
17  2 were out, if you know?
18       MR. CADENAS: Sir, I can easily find out
19  when the web portal was established. The reason
20  why we developed the web portal is as a resource
21  to the community and ISOs. I don't have that off
22  the top of my head, but I know it's over a year

29

1   old. The web portal, and when the documentation
2   was released out there.
3        ▓▓▓▓ I'd appreciate that.
4        MR. CADENAS: Yes, sir.
5        ▓▓▓▓ Also another question
6   about this. You talked about the ISOs a moment
7   ago.
8        MR. CADENAS: Mm-hmm.
9        ▓▓▓▓ Would this guideline,
10  Version 3.0, would that have been given out at
11  the Info Sec Conference, do you know?
12       MR. CADENAS: I know at the Info Sec
13  Conference, we're constantly advertising it, and
14  we do through our monthly telecons as well, I
15  believe, the web portal, and to use it as a
16  reference for any information on policies
17  procedures, guidelines, PHPPs, et. cetera.
18       ▓▓▓▓ Do you have user rules for
19  ISOs that we need to push information out
20  quickly?
21       MR. CADENAS: Yes, we do. I don't know
22  what it is off the top of my head. I will tell



```
                                    30
1    you that we have monthly ISO telecons. So, not
2    for OCIS internal but the OCIS community as a
3    whole.
4           █████████ Okay.
5           MR. CADENAS: And whenever there are
6    updates, whatnot, it's declared then. It's
7    disclosed then. Hey, we have an update. We have
8    this, we have that. As a matter of fact, during
9    this year's Info Sec, one of the guidance I gave
10   was to have our score card posted out there so
11   everybody could see whenever you see a directive,
12   policy, guidebook or what we're doing, you can
13   relate it to the score card as to why, and I even
14   gave my team specific instructions to say
15   anything that we do on the future, because all
16   users want to know why am I doing this, and to
17   put -- to post our scores out there, I used it a
18   reference.
19          ██████████ Briefly talk about the
20   Rules of Behavior for using the VA systems and
21   who's responsible for developing them and giving
22   them to the employees?
```

```
                                    31
1           MR. CADENAS: Well, that's something
2    that we have been working on. There is a Rules
3    of Behavior Users Group. Timing is everything.
4    It hasn't -- from what I understand, it has not
5    been officially let. I believe it's still in
6    draft form, but I could be wrong. I have to get
7    back to you on that.
8           ██████████ Do you mean the official
9    Rules of Behavior haven't been distributed?
10          MR. CADENAS: Well, you used the term
11   "official" like it's a policy or directive. I
12   don't know under what level --
13          ██████████ Okay.
14          MR. CADENAS: -- we will be allowed to
15   let it. I will tell you, if I can't get it out
16   as a directive or policy, then my next course
17   will be to get it out as a guideline.
18          ██████████ When you say that you
19   might not be able to get it out, are you dealing
20   with the issue of what the other elements of the
21   department tend to tolerate as far as you issuing
22   guidance on a particular subject or what?
```

```
                                    32
1           MR. CADENAS: Absolutely. We will issue
2    it. If it gets shot down, to a certain extent,
3    then I will direct my team, okay, you know, if we
4    can't get it out there as a directive or policy,
5    get it out there as procedure. If we can't get
6    it out there as a procedure, then get it out
7    there as guideline.
8           ██████████ Okay.
9           MR. CADENAS: My goal is to get
10   something out there.
11          ██████████ Sure. And as far as the
12   information in these security guidelines for
13   remote access concerning the downloading data and
14   storing it at home, was there any attempt to
15   incorporate that into a policy that was -- that
16   you received difficulty on?
17          MR. CADENAS: That I'll have to check.
18          ██████████: Okay.
19          MR. CADENAS: I can say with a certain
20   amount of confidence we do have procedures for
21   guidelines, you know, what constitutes a --
22   developing a guideline or best practice or a
```

```
                                    33
1    procedure, that's an obvious one, and a policy.
2           ██████████ Who normally is
3    responsible for keeping copies of the signed
4    Rules of Behavior once they've been distributed
5    to employees and signed?
6           MR. CADENAS: Well, we have █████
7    █████ who is our EDMS guy, █████ who
8    is our business assurance director two offices
9    down from me. As a matter of fact, I went to her
10   to get copies of the 6500 and we have a shared
11   protected file out there in paper.
12          ██████████ Okay. What next I wanted
13   to ask you about was there was an incident by an
14   employee in Policy, Planning and Preparedness
15   earlier this month in which data was reported
16   stolen.
17          Can you tell us about when you became
18   aware of that incident?
19          MR. CADENAS: 16 May.
20          ██████████ And can you tell us how
21   you became aware?
22          MR. CADENAS: Someone had mentioned it.
```



34

1  I can't remember who had mentioned it to me. I
2  followed up with Johnny Davis who is the Acting
3  Deputy for Security Operations. I said, "Please
4  look into this and let me know what's going on
5  with this." He looked into it and then he gave
6  me a follow-up report the next day with some of
7  the particulars.
8           ▇▇▇▇▇▇▇ Okay. And did you have
9  any communication with any of your superiors
10 concerning this issue?
11          MR. CADENAS: No.
12          ▇▇▇▇▇▇▇ Why?
13          MR. CADENAS: Why? Per our procedures,
14 and this is part of lessons learned from us,
15 until we validate that this has been done because
16 the e-mail that I saw, it said possible loss, --
17          ▇▇▇▇▇▇▇ Right.
18          MR. CADENAS: -- we have to go through a
19 validation process and once we've been notified
20 or confirmed and this was part of the problem
21 with the non-responsiveness of the ISO to
22 validate that in fact it was taken, I don't

35

1  report anything up the chain or it's not reported
2  to me. I'm not even aware of it until it's been
3  validated.
4       Why? Because in the past, we've had a
5  number of these and it's like you're nickel and
6  diming me to death. You know, when you have
7  something hard, then come tell me, and we follow
8  -- we have documented escalation procedures.
9       Also keep in mind that we realize that
10 this was not a cyber security incident, we
11 recommended to the ISO contact your privacy
12 office and your privacy officer or office in the
13 privacy office and open a ticket.
14      From what I understand, the ISO was in
15 fact dual-hatted. He was in fact a privacy
16 officer and he was not responsive again. My team
17 then made several calls to the privacy office to
18 say open up a ticket on this.
19          ▇▇▇▇▇▇▇ Could I ask you to name
20 this ISO?
21          MR. CADENAS: I found out his name was
22 ▇▇▇▇▇▇▇

36

1           ▇▇▇▇▇▇▇ Okay. Just as a point of
2  clarification. You say it was not a cyber
3  security incident. Explain that. Was that
4  because no one's hacking into the system --
5           MR. CADENAS: Right.
6           ▇▇▇▇▇▇▇ -- on a macro level?
7           MR. CADENAS: Right. This was not
8  hacked. It was not determined, and we suspected
9  that there would be an IG investigation and we
10 were right, that, you know, one could argue
11 whether it's cyber security incident or not.
12 Because he was an authorized user and we don't
13 know what authorizations his supervisor gave him
14 to either leave the facility with the information
15 or not, the first thing that comes to mind is the
16 privacy because of the information that was
17 contained on there.
18          ▇▇▇▇▇▇▇ Wouldn't your office be
19 interested to know whether the employee was
20 authorized to download and store that data at his
21 home or not?
22          MR. CADENAS: Absolutely. But let me

37

1  tell you, this place got tighter than a clam. I
2  didn't find out the user's name until -- what's
3  today's date?
4           ▇▇▇▇▇▇▇ 24th.
5           MR. CADENAS: 24th. Until almost a week
6  after I found out about the incident. One, the
7  name was never released to us, and two, I
8  discovered the individual's name through casual
9  conversation that people were having.
10          ▇▇▇▇▇▇▇ Had you known his name as
11 soon as possible, what steps could you have
12 taken?
13          MR. CADENAS: Oh, we would have
14 immediately gone down there and conducted our own
15 due diligence and we would have asked -- you
16 know, we -- once again, I don't have lay men here
17 working for me. These are security professionals
18 and they would immediately engage. They would
19 have been on it, especially here. The guy's only
20 two floors below me.
21          ▇▇▇▇▇▇▇ Right.
22          MR. CADENAS: And yeah, we would have

## Page 38

1  been down there conducting our interviews, et.
2  cetera. The name was never disclosed to us.
3  ▮▮▮▮▮▮ If you had done an
4  investigation, would you have been able to see
5  what level -- I presume you would be able to see
6  what levels of access he had, what he was able --
7       MR. CADENAS: Well, we would have spoken
8  with him and then gone through our own due
9  diligence to find out that, you know, how did he
10 get that, and I've since learned that the IG has
11 spoken with VBA and he followed all the proper
12 procedures, et. cetera, to get access to the
13 data.
14      The issue comes now that he downloaded
15 it and that the fact that he walked out of the
16 building with it. You know, because it's a
17 privacy, it's no longer, for lack of a better
18 term, in our area of responsibility, but that's
19 why we insisted on many occasions that the
20 privacy office be contacted and after three or
21 four attempts, I have to check my records, I
22 believe the privacy office finally opened up the

## Page 39

1  ticket or a ticket was opened up because their
2  response was we only open tickets that are issued
3  by privacy officers, and I'm sitting there going
4  you've got to be kidding me.
5       Hence part of the reasoning for trying
6  to get privacy back in OCIS.
7  ▮▮▮▮▮▮ We learned there was a
8  problem with their website as far as getting the
9  online reporting.
10      MR. CADENAS: I don't know anything
11 about that, sir.
12 ▮▮▮▮▮▮ Okay.
13 ▮▮▮▮▮▮ To change subjects a little
14 bit about cyber security and training that's on
15 the Web and, you know, the Secretary put out a
16 message that everybody's got to take it by June,
17 and this is the cyber security awareness FY '06.
18 I printed it off this morning from the Web.
19      Was this developed by your office or --
20      MR. CADENAS: Yes.
21 ▮▮▮▮▮▮ Okay.
22      MR. CADENAS: As a matter of fact, our

## Page 40

1  office, our group up in West Virginia does the
2  training. They received the Telly Award for that
3  -- for development of that, and I also will tell
4  you because of what we've been able to do here
5  within OCIS, we have worked with a number of
6  other agencies, as I said in the very beginning
7  of this discussion, to share with them so that
8  way they don't have to reinvent the wheel.
9  ▮▮▮▮▮▮ This was developed inhouse or
10 contractor or both?
11      MR. CADENAS: It's a combination of
12 both.
13 ▮▮▮▮▮▮ Okay. Is this thing updated
14 periodically or --
15      MR. CADENAS: Oh, absolutely. I mean,
16 we update our -- and that's why I said earlier,
17 all our documents are living documents. So, when
18 PHPPS, NIST, general best practices, laws,
19 whenever -- it's a ripple effect. We have to do
20 our due diligence and go all the way down and
21 then out as far as we can, as far as our
22 documentation, training, our concept of

## Page 41

1  operations, et. cetera.
2       I will tell you that the Security
3  Operations Center, their concept of operation is
4  based off of U.S. Cert. When they were
5  developing that, if you'll look at it, I had a
6  couple of my guys who actually participated in
7  the development of that, trying to re-emphasize.
8  We do have experts here who know -- everybody
9  knows what they need to do in an instance such as
10 this, but you can only do that once it's been
11 confirmed.
12      You know, with that being said, we also
13 know the policy -- not the policy but the
14 procedures and that's why I asked that question.
15 Did the IG in fact open up a criminal
16 investigation or administrative investigation
17 because if they have, then it's the best
18 interests of the agency, I don't go touch
19 anybody, I don't touch any machine, nothing,
20 because that's their job, and I don't want there
21 to be any possible obstruction or anything else
22 like that because I was asked to go do something.

**42**

1  I'm not going to do it.
2       You know, I asked until someone can
3  confirm for me if in fact the IG is involved and
4  if they are, and I said this late one night over
5  the weekend, you can my ass, I will not do it and
6  I will not tell anybody in my organization to do
7  it.
8       There are rules of engagement. Now, are
9  they documented? Well, you know, some are, some
10 aren't, but common sense comes into play,
11 especially if you're talking about potential
12 evidence and, you know, being maintained in a
13 pristine environment.
14         ███████  Sure. Are you aware of any
15 other problems that have been similar to this as
16 far as employees downloading information and
17 taking it offsite and it being compromised?
18      MR. CADENAS: Just through discussion. I
19 mean, hearing, with the word getting out on this
20 event, you know, I'm hearing comments like this
21 happens all the time, they just don't report it,
22 or it's reported to the medical director and

**43**

1  that's where it stops. I jokingly said yesterday
2  must have been -- yesterday, I said, "It must be
3  a religious holiday today," and they said, "Why?
4  Because now I'm getting a couple of reports in."
5       I had one up in New York somewhere where
6  a laptop was stolen from HR with 700 and some odd
7  fingerprints on there and everything and
8  everybody's coming to confession because they're
9  trying to cover their butts, but I can only
10 report once it's been validated and what has been
11 reported. I don't have the authority to go out
12 there and talk to anybody.
13         ███████  Right. That's part of the
14 enforcement mechanism you were talking about that
15 you don't have?
16      MR. CADENAS: I'm telling you, once you
17 read this, I think you'll be surprised, and what
18 I'm referring to on the tape is April 7th, '04,
19 the General Counsel Opinion.
20         ███████  Let me make sure I understand
21 this correctly. If I'm wrong. You essentially
22 have no authority over any VA medical center or

**44**

1  regional office in terms of their security in
2  terms of that you're the guy that they have to go
3  when an incident needs to be reported?
4       MR. CADENAS: Well, no. We give
5  guidance on incidents and the proper procedures
6  for reporting incidents and that is reporting it
7  to the SCO, the Security Operations Center, but,
8  you know, I've only been here three years.
9  People have been here 30 years, 20 years. They
10 go to the medical facility director. They go
11 XYZ, you know, because these are some very
12 serious things that happen.
13      I mean, OGC just reported yesterday that
14 one of the back-up tapes was lost yesterday.
15 Okay? So, I can only react.
16         ███████  Right.
17      MR. CADENAS: I'm not in proactive mode
18 here. This office has never been in proactive
19 mode because we have never been allowed to. I'm
20 venting again, but that's my opinion. I mean
21 that's part of the reason why Rush Brody left,
22 you know. Frustration with bureaucracy. Even

**45**

1  Mr. McFarland, frustration. Pedro Cadenas, Jr.,
2  TBD, you know, I have my own personal reputation
3  to worry about as well, professionally speaking,
4  you know, and I didn't appreciate having to call
5  my father and then having my brother chew me out,
6  my kid brother, when he knows what my job is over
7  here, you know. You talk about driving it close
8  to home. That's unsat, and I know a lot of
9  veterans out there in current active duty calling
10 me up saying, hey, I hope it wasn't me. This is
11 my buddy here who works up at NSA, says hey, I
12 figure you are way up there, kick butt and change
13 the way things are done, you know, track. Hey,
14 looks like you're going to be able to apply your
15 master's degree because there's a concentration
16 on security. They don't know the environment I'm
17 working in.
18      I mean, these are the kinds of e-mails
19 I'm getting from people and what's even more
20 embarrassing, if you allow me to vent, I'm
21 getting vendors up here, I've gotten 23 phone
22 calls and 16 e-mails from vendors. We can help

46

1  you with your problem with data encryption, with
2  this and that. They're assuming I don't know
3  about data encryption. They're assuming I don't
4  know anything about security. They assume I have
5  the authority.
6           ▓▓▓▓▓▓▓ You mentioned earlier about
7  your escalation procedure.
8       MR. CADENAS: Yes.
9           ▓▓▓▓▓▓▓ I was about to ask you about
10 the escalation procedure. What's the process
11 that people go through to determine whether an
12 incident warrants immediate action as far as
13 reporting further up in the department?
14      MR. CADENAS: Well, according to U.S.
15 Cert, we use that as a guideline as well as
16 Carnegie-Mellon, Software Engineering Institute,
17 who is the founder of this sort of stuff. We use
18 their tables. I have to go look at it to be
19 specific as exactly what it is, but based on the
20 categories, I believe there are six categories.
21      Depending on where it falls within the
22 category determines the escalation process that

47

1  we go through, keeping in mind that once it was
2  discovered that there was no logical access,
3  meaning hack, that this individual, this
4  authorized individual was authorized to get to
5  the information and evidently he was authorized
6  to be able to download it, this is still not a
7  cyber security incident per this particular
8  instance, but one would argue it was as far as
9  setting permissions, accessibility, but once
10 again, that's the system's owner responsibility
11 to ensure that they're enforced.
12      One of the things I've been trying to
13 work on for the last couple of years is security
14 configuration baseline. So, I'm digressing
15 again. So, I'll stop there.
16          ▓▓▓▓▓▓▓ You had a question?
17          ▓▓▓▓▓▓▓ Yes. About the
18 escalation. I mean, if true cyber security
19 incidents, a hack, it's a virus or whatever, I
20 mean, it depends on how it gets reported or how
21 the information is disseminated, I presume?
22      MR. CADENAS: Oh, it's happened within a

48

1  matter of seconds, if not minutes, notification
2  all the way up the chain to include U.S. Cert.
3           ▓▓▓▓▓▓▓ Okay. Now, when we have a
4  situation like we're talking about here where an
5  authorized user downloaded some amount of data
6  and now it's lost or stolen or whatever it is, at
7  some point in time, does anyone -- is there some
8  threshold for that if somebody says, you know,
9  it's five million names versus 26 million names,
10 as reported in the paper?
11      MR. CADENAS: No.
12          ▓▓▓▓▓▓▓ Is there anything of
13 magnitude there?
14      MR. CADENAS: One veteran is more than
15 one too many for me. Okay? It has nothing to do
16 with size. It absolutely has nothing to do with
17 size, meaning how far up the chain it goes.
18          ▓▓▓▓▓▓▓ That was my point.
19      MR. CADENAS: No, no.
20          ▓▓▓▓▓▓▓ Does it cause some anxiety
21 on somebody's part that we need to --
22      MR. CADENAS: Well, you know,

49

1  unfortunately, that's a lessons learned, that we
2  will be -- look, I don't care whose area of
3  responsibility it is, I will deal with getting my
4  butt chewed out because I went into someone
5  else's rice bowl. I will go report it. I mean,
6  we followed our process. We did our due
7  diligence and that's no excuse. I wasn't fully
8  aware or appreciated the circumstances or the
9  volume, but one is one too many.
10      I don't know what the heck BURLS
11 database is. Even though it did cite in the
12 original e-mail full names, date of birth and
13 social security number, I'm sitting there going
14 oh, my God, personally being a victim of identity
15 theft six months and $5,000 later, I was able to
16 clear my name, I knew the severity, and I'm just
17 one individual. I did not know the volume of
18 26,500,000, you know, but as I said earlier,
19 regardless of volume, one is one too many.
20      You know, we did -- unfortunately,
21 finding out when I did was too -- I'm sorry --
22 was too late as far as things being time-



**50**

1  sensitive. I know the importance of reporting
2  ASAP because, for lack of a better term, the
3  scene, the crime scene or the scene gets cold
4  real quick, and so I did not know until the 16th.
5  I didn't know until the 17th and I believe this
6  was reported on the 5th. I didn't know until the
7  17th of exactly what the nature of this was,
8  meaning the name, social, date of birth, and the
9  volume or the scope.
10             ████ Okay. That answered my
11  question. I appreciate it.
12      MR. CADENAS: Well, let me just say
13  that's not an alibi for me. I ultimately hold
14  myself and only myself accountable for the
15  actions of OCIS. I'm not -- I don't -- I will
16  not cite anybody in my organization as a
17  potential for discipline or anything else like
18  that. I'm a big believer in that. Regardless if
19  I knew or not, I'm the one that's held
20  accountable, and I'll say that for the record.
21  So, if my team did not perform the way they
22  should have, whether best practices, policies or

**51**

1  guidelines, I am the one that's ultimately held
2  accountable. I got some very scared crew members
3  right now in OCIS walking around thinking about
4  leaving the VA, regretting the fact they ever
5  came to the VA.
6      So, I'm your guy if you're looking for
7  someone in OCIS.
8          ████ Any other questions?
9          ████ No.
10         ████ Anything that we've talked
11  about regarding this incident or the policies
12  that you would like to add to or clarify?
13      MR. CADENAS: You know, I don't have a
14  crystal ball, but in knowing my personal history
15  and my training, we had an opportunity prior to
16  this event to be much more active in our security
17  program here, only if I had the authority to
18  execute.
19      Now, I hope you gentlemen will read
20  these documents, especially this one, which
21  articulates General Counsel went through the
22  trouble of identifying who's accountable for

**52**

1  enforcing, you know, to ensure that it's
2  reactionary, and if this was never brought up,
3  you know, I don't think the guy knows what he got
4  himself into.
5      He did it out of his conscience. If the
6  CDs got stolen or something like that, if it was
7  my own opinion, if there was malicious intent on
8  his part, unless he's a complete idiot, why would
9  he have reported that his laptop got stolen?
10             ████ Sure.
11      MR. CADENAS: You know. So, I'm just
12  sitting there going this is one that we know of.
13             ████ Right.
14      MR. CADENAS: That's my big concern.
15  What about all the unknowns out there because of
16  the system, the bureaucracy, the shh, don't say
17  anything? I can still be held accountable. I'm
18  sitting here going I don't think I want to be the
19  authority now, based on what's going on, and I
20  even remarked late Sunday night this isn't
21  smelling right, and I walked out, and I was very
22  upset.

**53**

1             ████ Okay. Well, we're going to
2  end your testimony now.
3      (End of Interview of Pedro Cadenas.)

14 (Pages 50 to 53)