Page 1

DEPARTMENT OF VETERANS AFFAIRS
OFFICE OF INSPECTOR GENERAL
WASHINGTON, D.C.

Administrative Investigation: Lost Data
Case No. 2006-02238-IQ-0132

CONDUCTED BY

▇▇▇▇▇▇▇ OIG Senior Auditor

▇▇▇▇▇▇▇ OIG Supervisory IT Specialist

SWORN TESTIMONY OF

▇▇▇▇▇▇▇, Director,
VBA Systems Development Center

Wednesday, June 7, 2006

[TRANSCRIPT PREPARED FROM AN AUDIOTAPE RECORDING.]

MALLOY TRANSCRIPTION SERVICE
(202) 362-6622

Page 2

1   PROCEEDINGS
2   ▇▇▇▇▇▇ [In progress] -- Affairs, Office of
3 Inspector General. I am in Austin, Texas. Today is June
4 the 7th, 2006, and with me today is ▇▇▇▇▇▇▇ and
5 also accompanying me on the interview is ▇▇▇▇▇▇
6 of the IG's office.
7   ▇▇▇▇▇▇ would you raise your right hand. Do
8 you swear that the following testimony you are about to give
9 is the truth, the whole truth, and nothing but the truth?
10   ▇▇▇▇▇▇: I do swear.
11 Whereupon,
12   ▇▇▇▇▇▇▇
13 was called as a witness and, after having been first duly
14 sworn, was examined and testified as follows:
15   EXAMINATION
16   ▇▇▇▇▇▇
17   Q Okay. ▇▇▇▇ can you state your full name for the
18 position?
19   A My -- ▇▇▇▇▇▇▇▇▇▇ Do you need the middle
20 name?
21   Q That's okay.
22   A Thank you.

Page 3

1   Q And your position here?
2   A I am the director of the Systems Development
3 Center.
4   Q And how long have you been in your position?
5   A I've been in this job since 1987 with two
6 different titles, officer in charge in the beginning and
7 then director.
8   Q Okay. And prior to that, where were you employed?
9   A I was employed at the Hines. I believe it was
10 called Data Processing Center at the time. From 1972 to
11 '87.
12   Q Okay. And can you give us a brief summary of your
13 duties here in Austin?
14   A I manage the three divisions of -- that we have
15 here, our Support Division, Veterans Records Division, and
16 Loan Guarantee Division. So I provide general management
17 over those three areas. I am in charge of the budget,
18 generally do, you know, hiring, long-range planning. Let's
19 see. Those are generally -- in a nutshell, that sums it up.
20   Q And what databases do you have responsibility in
21 connection with here in Austin?
22   A They're -- the one large database is the BIRLS

Page 4

1 system. It's a big database. One I don't have
2 responsibility for, but we have access to and use, the
3 Encorp, a database. There is a database for covers that we
4 -- well, also is maintained by the Hines staff, but we
5 actually program in support of that, and then Loan Guarantee
6 has a database also that is used, again, to support loan
7 guarantee functions. That's -- the production copy is
8 maintained by the Austin Automation Center.
9   Q Okay. And who is your supervisor?
10   A ▇▇▇▇▇▇
11   Q ▇▇▇▇▇▇ Okay. The --
12   [Off the record.]
13   ▇▇▇▇▇▇ Okay. We are back on the record after
14 a brief interruption.
15   ▇▇▇▇▇▇
16   Q And I think I was asking you to just tell me your
17 supervisor.
18   A Yes. As I mentioned, that's ▇▇▇▇▇▇  b6
19   Q ▇▇▇▇▇▇ Okay.                            b7C
20   I wanted to ask you a little bit about how -- your
21 understanding of how people in the VA can get access to the
22 databases that you are responsible for administering down

Page 5

1  here.
2  A   The -- of course, if there is a business feed, our
3  primary customers of the data are regional offices, and so
4  to gain access, many of our systems that we have that have
5  accesses to those databases are controlled through our
6  common security system, and the ISOs administer those in the
7  field. So that system will -- is -- requires specific
8  permissions of -- to portions of the applications that have
9  access to the data.
10      So employees cannot get access to the data unless
11  they are set up in the system and -- and have been
12  authorized from their supervisor through their director to
13  get to that data. So that's the online access to the data.
14  That's our primary purpose.
15      Other accesses would be if there is a request for
16  information -- in other than an online mode -- would be
17  through a project assignment which would come through to us,
18  and then we would -- we would then provide that data, but
19  that -- but those are the two primary ways that we have
20  access to the data.
21  Q   And when you say you would provide the data, do
22  you mean you would approve access to the data or --

Page 6

1  A   No. Actually --
2  Q   -- are you physically going to give them some
3  data?
4  A   No. The -- if there is a specific request that we
5  send -- you know, let's say C&P Service has a request, that
6  we send data to a location. FBI is one of those that we
7  have, that they have a requirement that we track, you know,
8  different individuals. So that comes in the form of a
9  project assignment, authorizing us to do the work, and upon
10  verification that the data is correct, that we will then set
11  that up, and a lot of those might be in a recurring job. So
12  that there is a requirement that monthly, quarterly,
13  annually, we would send data out, but the authority for us
14  to do that is through a project assignment.
15  Q   Okay. Now, in some instances, would you be giving
16  approval for access to data, but then the person would go
17  and go through the Austin Automation Center and download the
18  data themselves?
19  A   No. They would -- we don't -- I don't know of any
20  interface or extract that we would actually have somebody
21  come in. I don't know anybody who extracts the data
22  directly from any of the databases from the outside. We may

Page 7

1  -- we may put it on a file that's for secure FTP files
2  transfer and say this has been put on this file for a secure
3  file transfer, and they, by specifically having that
4  permission, can come in and take that file and move it to
5  their location.
6  Q   And the permission -- they would have to get
7  permission from the Austin Automation Center to come in and
8  get a secure file?
9  A   I believe that's how it works, but, you know, one
10  of the technical people would have to say how that actually
11  is set up. I just know in some cases, they would set up
12  that facility to do a file transfer.
13  Q   Okay.
14  A   And I don't get into that level of detail.
15  Q   Sure. Does the Austin Automation Center have a
16  copy of the Comp and Pension Mini Master file down here?
17  A   I believe they do.
18  Q   Okay. What's in that database?
19  A   You're asking me now to guess. I don't -- I don't
20  really know enough about it. It's an -- it's a portion of
21  the full Compensation Pension database, and we don't have a
22  business requirement to have that. You know, it's by its

Page 8

1  virtue of being here, sometimes we've been asked to do som[e]
2  -- some data, some copying of that file, like our data
3  warehouse group has asked us to copy that file for them, but
4  -- but we don't have -- you know, we don't have working
5  knowledge of it because we don't deal with the data.
6  Q   Okay. How about the BIRLS system? Are you
7  familiar with that system?
8  A   Yeah. At a higher level, yeah.
9  Q   Okay. What's your understanding of the categories
10  of individuals that are in the BIRLS system?
11  A   In BIRLS, we have service people, people who have
12  been in the service and who have exited the service. We
13  have people --
14  Q   You mean veterans?
15  A   Veterans.
16  Q   Okay.
17  A   Okay. An easy way to say that, we have veterans
18  and we have active-duty people also.
19  Q   Okay.
20  A   Reservists and National Guard.
21  Q   Okay. Are they -- are all the active -- current
22  active-duty and National Guard people in the BIRLS system,

Page 9

1 to your knowledge?
2   A  I don't know. We get the data from the DMDC, and
3 if they send us everybody they have, then we have it. If
4 they don't send us everybody, you know, then we don't. So I
5 don't know exactly. Just their -- you know, the extract
6 that we did recently, they said something like 80 to 90
7 percent of their people. So why don't we have the other 20
8 -- 10 to 20 percent, I have no clue. Whether they're just
9 recent or whatever, I just don't know.
10   Q  Okay. Does your office have anything to do with
11 the mustard gas database?
12   A  Not that I know of. No. I haven't heard of that
13 one. No.
14   Q  Okay. I was just checking.
15     Next one, I will ask about a recent incident in
16 which an employee had some data at their home, and it was
17 taken in a burglary. Was your office involved in responding
18 to this incident?
19   A  Yes, we were.
20   Q  Can you tell us the major things that you were
21 involved in?
22   A  Okay. The weekend of whatever it was, May 16th,

Page 10

1 believe it was, one of those weekends -- I wasn't in -- in
2 Austin, anyway, at this point -- ▓▓▓▓▓▓▓ was contacted
3 to bring people in to begin looking at, you know, the data,
4 what would take place. So -- so during that week, ▓▓▓
5 and he'd have to speak in some detail because I was out of
6 town in Washington and just reading my e-mails through
7 Blackberry a little. So I just knew that we were supporting
8 this effort, and things that we started working with and
9 carrying on through last week is getting the data that we
10 believe was -- and those files that the employee had, then
11 going off to -- to DMDC. We were --
12     You know, like last week, we then sent that -- a
13 portion of that data to them, so they can go and determine
14 how many of those records contained active-duty people as
15 opposed to veterans. So we sent that file to them.
16     We also supported the effort --
17   Q  And they are in DOD?
18   A  Yes.
19   Q  Okay.
20   A  And we also supported the effort to -- this, I
21 believe, was going on the week before -- to get the file to
22 Social Security. This is the -- the -- again, the file that

Page 1

1 we thought was compromised -- to Social Security to
2 determine which veterans were -- which people on that file
3 were deceased, and then from there, it went to IRS, so that
4 -- for the wife of people on the file. We'd get addresses
5 with the result, with the intent that those letters would be
6 sent out by a contractor, contacting veterans who were on
7 that file, live veterans, and -- well, and service people
8 that were on that file, that their data was potentially
9 compromised, and, you know, to the extent of what's on the
10 letters, how many of them are there, there, you know,
11 addresses, I don't know that we have knowledge of that. I
12 don't have here -- that here. IRS is keeping that kind of
13 close.
14   Q  Okay.
15   A  And our other activities were just kind of
16 supporting, trying to gather data on just, you know, what
17 kind of information might have been there, the type of
18 veterans, type of service people, you know. So we've been
19 -- it wasn't 100-percent clear because some of these -- a
20 lot of these things were set up very early, you know, many
21 years ago, so operational. So we're, you know -- they've
22 been running without flaw. So we -- and not changing. So

Page 1

1 we had to do research to figure out exactly what was, you
2 know -- what was in the file that we were working with.
3   Q  Okay. And as far as the specific file that was
4 taken, it was an extract that was done for Policy, Planning
5 and Preparedness?
6   A  That's -- yes.
7   Q  Okay. And as far as you know, did that extract
8 contain the active-duty personnel that are in BIRLS?
9   A  That -- we discovered that it did contain
10 active-duty personnel.
11   Q  Okay. And when did you discover that?
12   A  Actually, that was into last week, as late as
13 Thursday and Friday. We were just confirming that. We
14 understood that it contained active duty, but, you know,
15 initially when we sent this up, not all services were
16 participating, but they are fully now, and our expert was
17 out of town. So we weren't sure if it was Reservist,
18 National Guard, which we found subsequently through DMDC
19 that it was.
20   Q  Who is your expert that was out of town?
21   A  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ He's worked
22 on the system for a long time.

Page 13

1  Q  Okay. What about spouses and dependents of
2  veterans? Was there identity information in the extract
3  that was taken?
4  A  It's my understanding they were not. It's that
5  the file has -- I'm not sure if it's logically or physically
6  separated, but we have a veteran file and we have a
7  beneficiary file, and the beneficiary file was not what we
8  selected from. It was Payee00 which is the veteran and the
9  veteran file.
10       Now, the -- what we found out is that active-duty
11  people are in that veteran file, even though it's called
12  "veteran."
13  Q  Okay. And what about sensitive records for senior
14  elected officials and senior Department officials? Were
15  their names in the extract as far as you could tell?
16  A  I don't know. We -- we weren't asked to look for
17  that, and I just -- I just don't know.
18  Q  Okay.
19       ████████  Any questions at this point?
20       ████████  No.
21       ████████
22  Q  Initially, when the Department was gathering

Page 14

1  information about what was in the file, did Central Office
2  have any conversations with you or your staff concerning
3  whether active-duty members were in the file?
4  A  Well, the first week, you know, I don't -- I don't
5  know. You know, I was -- as I say, I was out of town, and I
6  -- I don't remember hearing that question.
7       Last week, you know, that did come up, were
8  active-duty members in the file, and that's when we -- we
9  started to confirm exactly what was there. We weren't
10  100-percent sure. As I said, our -- our expert was out of
11  town. He probably could answer the question very quickly,
12  but we went around and double-checked. We verified. We
13  took a look at the file itself and looking for -- there's an
14  indicator that would tell us that, if it's a -- comes from
15  DMDS or VADS, which is the -- when we get a DD-214, it comes
16  through VADS. So we update the file that way, and we can
17  tell that, and then also we were looking for no release from
18  active-duty date in there. So we then had -- could tell.
19       And then once we found some of that, we were
20  looking at what services. We found Air Force. We found
21  Army. So that's why we were fairly certain, but then I had
22  confirmation from the DMDC actually that they sent

Page 15

1  everything. So, as I say, we wanted to be sure what we were
2  looking at.
3  Q  What's the number of active-duty members that the
4  DOD has confirmed that they believe was in your extract?
5  A  I wasn't -- to be precise, I think you'd have to
6  go to somebody else. I wasn't told exactly the number. You
7  know, I was told it's over -- was over a million.
8  Q  Okay. It's over a million.
9       Now, last -- on Saturday, the Secretary issued a
10  statement in which he estimated that the number of active
11  duty was more like 50,000. Were you familiar with that?
12  A  I saw that later. Actually, I saw that this week
13  someplace in an article.
14  Q  Okay. Did anyone in Central Office check with
15  your organization to determine whether that estimate was
16  accurate before the Secretary released it?
17  A  Not that I know of. Not that I know of.
18  Q  Did they contact your office at all to get an
19  estimate of the number --
20  A  No.
21  Q  -- of service members?
22  A  That would have been me.

Page 1(

1  Q  Okay. All right.
2       ████████  Did you have a question about the
3  indicator?
4       ████████
5  Q  On that indicator that you specified that it comes
6  -- a "D" says it's from DMDC and a "Y" or from --
7  A  I think it's a -- I think it's a "V," if I'm --
8  Q  Okay.
9  A  -- if I remember seeing it right.
10  Q  Okay. Does it get turned off when the DD-214
11  comes in for --
12  A  It gets sent to VADS. Yes. We -- we confirm
13  that. So, you know, when it's initially sent in, like witl
14  the data, it's a "D," and so then when it -- then when w
15  get the DD-214, it gets updated.
16  Q  Okay.
17  A  And then it becomes a "V."
18  Q  Right. In all cases, all the time?
19  A  To the best of my knowledge, that's what it's
20  supposed to do. It's my understanding.
21  Q  Okay. Does it -- does it do some checking before
22  it automatically does that, like comparing with --

## Page 17

1  A  I think you --
2  Q  -- what's in there as a "D" versus what is on the
3  DD-214?
4  A  I know the program looks for differences, you
5  know, in data, and -- but does it -- you know, does it do
6  that? You know, I can't tell you, you know, without
7  somebody looking at the program logic.
8  Q  Would ▓▓▓▓ be able to?
9  A  ▓▓▓▓▓▓▓▓▓▓ would know.
10 Q  ▓▓▓▓▓▓ would know?
11 A  Yeah.
12 Q  Okay.
13 A  And if he wouldn't, he'd have -- he has access to
14 the program and can read them. I probably can read Cobalt,
15 but haven't for a number of years, 20 years or so, but,
16 yeah, that -- that would probably be the way to go to get
17 the confirmation of what really happens.
18 ▓▓▓▓▓▓ Okay.
19 
20 Q  Okay. Now, when you all are giving -- did you
21 determine whether your office had been aware of or given
22 permission for the Office of Policy, Planning and

## Page 18

1  Preparedness to have access to the BIRLS extract?
2  A  Yes. If I'm -- I believe we have a PIR on that, I
3  believe, but, you know, ▓▓▓▓▓▓ would have access to
4  that. If he didn't give it to you yesterday or whatever,
5  you know, he would be the one that would do that, but that
6  -- but that's our understanding, that the request came
7  through in a project assignment to give that data, and it's
8  quite a large bit of data. It was on, you know, actually
9  tapes in the beginning.
10 Q  Sure. And when you all give your permission for
11 someone to have access to data like this, do you explain to
12 them what the sensitivity of the data is?
13 A  No. We're not really the owners of the data. I
14 would expect in the BIRLS case, C&P is the owner of the
15 data, and so, you know, when they -- you know, there --
16 there should be some level, you know, of understanding
17 between that and their ultimate customer who receives that
18 data. So we're -- we're the provider of the service. You
19 know, I don't own the data. So I would expect C&P to do
20 that.
21 Q  Okay. And when you're approving access, do you
22 check to see if the employees that are going to be receiving

## Page 19

1  access have the appropriate clearance of background
2  investigations to access that data?
3  A  No. Again, we provide the service and that, you
4  know -- you know, we were saying that we give approval for
5  the data. We really don't give approval for anybody to
6  access. We provide the service to produce the data, and
7  then at the C&P Service, they should be doing that,
8  requesting -- you know, they are giving the approval for
9  that person or that organization to have access to the data.
10 It's not my group doing that.
11 Q  Okay. And who in C&P Service should we talk to,
12 to get more information about that?
13 A  That would be, you know, the -- gees, I can't even
14 name the current director there, you know, but that should
15 be the person that would point to the -- to the right person
16 in -- in that group.
17     You know, historically, you know, some of the
18 people that -- that have provided these, you know, the
19 extracts, requests for the extracts, that we do the
20 extracts, most -- a lot of them aren't even in the agency
21 anymore. They have retired over the years or moved on to
22 other positions. So, you know -- so how they -- you know,

## Page 20

1  how they do that would be the -- I think -- I think they
2  would have that in their records, you know, and again,
3  whoever would be the person there.
4     The people we primarily work with today, I don't
5  think any of them, that if I remember, even get into
6  extracts. We're primarily working with online systems
7  today. Over the last 5, 6 years, it's been our primary goal
8  or work.
9  Q  Okay. How did the BIRLS system come about?
10 A  Well, those are the historical records that we
11 could drag up, but, you know, there is a -- I have a copy of
12 a feasibility study from 1967 that discusses going from
13 3-by-5 cards to an automated system, and so -- so, even as
14 early as 1967, there was recognized a need to bring this,
15 you know, away from massive file cards, you know, drawers of
16 cards to -- to an automated system. So they began some
17 studies back in that time.
18     I believe the first major portion of the system
19 really went up -- you know, the early days, it was mainly
20 assigning just claim numbers, and then about 1972, a group
21 here in the building actually came up with the first online
22 system with a database. Actually, it was a homegrown

Page 21

1 database that they had and produced a system that provided
2 access to the data. They did more of the early functions,
3 and again, I don't know exactly, you know, what those
4 functions are, but I'm sure like ▓▓▓ I think, can help with
5 those.
6     I believe the time frame was around '75 to '78 is
7 when the system was upgraded and then again in about the '86
8 time frame to early '87 because BIRLS was redesigned to
9 provide many more functions, and that's about the time frame
10 when I came here, after BIRLS's "redesign" -- is what they
11 called it at the time. So there was a steady progression of
12 adding more functions through the years, going to the
13 current database that was done in that '75 time frame to the
14 IDMS, you know, fully supported commercial database. So
15 that was done in that time frame and then, you know, is kept
16 current through the years.
17  Q  When did the VA start receiving information from
18 DOD concerning all the personnel that had been entered into
19 active duty?
20  A  That began in 1993.
21  Q  Okay. And was -- beginning in 1993, was there any
22 effort to catch up with historical information prior to

Page 22

1 1993?
2  A  There was an effort. I don't have the date on
3 this, but ▓▓▓▓▓▓▓, I believe, has an e-mail on this
4 right now that they went back. There's -- there's -- they
5 went back to the early '80s, providing data from that time
6 frame, an so that that appears. That's something we just
7 discovered, actually, because they just provided the data,
8 and since this data is just like any other data, you know,
9 I'm not sure that we were consciously aware that they did
10 that actual -- kept going backwards. We did have a period.
11 Then they stopped sending data to us for a while, and then
12 they did a catch-up at that time, and it might have been the
13 same time frame that they went further back, but I'm not
14 positive.
15  Q  Okay. And when did the DOD start providing
16 information automatically when someone was discharged?
17  A  That would be the '93 time frame, I believe.
18  Q  It was the same as the enlisted?
19  A  Oh. I may have that confused. I think we better
20 check with ▓▓▓▓▓▓▓
21  Q  Okay.
22  A  -- because I'm not sure if I --

Page 23

1  Q  Well --
2  A  I'm not sure if my information is correct on that.
3  Q  Okay.
4  A  I thought it was one in the same, but maybe I'm
5 wrong.
6  Q  Okay. The -- who is responsible for maintaining
7 the Privacy Act system of records information about what is
8 supposed to be in BIRLS?
9  A  That's a good question. I think that probably --
10 that would be C&P.
11  Q  Okay. So it's not done here at Austin?
12  A  No.
13  Q  The -- I'm going to give you a document.
14     ▓▓▓▓▓ we're going to go off the record, so
15 you can look at it.
16     [Off the record.]
17     ▓▓▓▓▓ Okay. We are back on the record.
18     ▓▓▓▓▓
19  Q  And while we were off the record, I was showing
20 you a document that has the Privacy Act system of records
21 for the BIRLS system, and what I wanted to ask you was does
22 it appear, based on your reading of the contents of the

Page 24

1 system, that the current description that we have provided
2 was describing the fact that all the service members were
3 being included into the BIRLS?
4  A  It doesn't appear that it says that.
5  Q  Okay. Have -- are you aware of any discussions
6 within VBA or the C&P Service to collect information about
7 what is in BIRLS and to update the information prior to this
8 incident?
9  A  No.
10  Q  Okay. All right. I think that's all I have on
11 that.
12     The -- have there been any similar incidents where
13 VA employees have downloaded BIRLS information and then it's
14 been lost or stolen that you're aware of?
15  A  I have not heard this --
16  Q  Okay.
17  A  -- at all. I've been with the VA since '72.
18 Haven't heard of it.
19  Q  What would be your standard operating procedure if
20 you had learned that an incident like this had occurred?
21  A  Well, you know, our -- our standing operating
22 procedure, if somebody violated policy, you know, it would

Page 25

1  be to take appropriate disciplinary action, you know,
2  depending on the severity of -- of what they did and, you
3  know, of course, if it was compromised, actually
4  compromised. You know, without having the -- you know, the
5  regulation on what the possible penalty is, but I believe
6  firing would be one of the things that would be very
7  possible.
8    Q  And besides the administrative action concerning
9  an employee, how -- what else would you do as far as
10 responding to the incident?
11   A  Well, of course, we -- you know, we would, of
12 course, notify management through the channels, you know, as
13 fast as we can, and, you know, we would -- we would always
14 do that.
15      You know, as our -- our manager in this -- this
16 goes for problems -- when we have problems, we are
17 encouraged for any kind of problems that to report those
18 problems up the management chain as quickly as possible, as
19 good news does not get better with time -- bad news does not
20 get better with time. So we've been, you know -- I don't
21 want -- you know, want to use the term "indoctrinated," but
22 we've been highly encouraged that any problem, we report it

Page 26

1  up the chain as quickly as possible, and then that's what we
2  would do in this kind of case if some -- if there was
3  anything that happened to compromise data that would -- loss
4  of equipment even, you know, because people do have
5  equipment out of the office. If any of that would happen,
6  we would absolutely report that up the line. That's the
7  standard -- that's standard policy.
8    Q  Okay. And in your -- in the responding to this
9  incident, have you heard any information about whether Mr.
10 ▓▓▓▓▓▓▓▓▓▓ the employee who had the information,
11 obtained it through any way other than the approved process
12 of obtaining it?
13   A  No. I have -- it's has been always my assumption
14 that it has been through an approved process. So I have not
15 heard anything else, and up to this point, I wasn't -- I
16 haven't even heard his full name.
17   Q  Okay.
18 ▓▓▓▓▓▓▓▓ Any other questions?
19 ▓▓▓▓▓▓▓▓ No.
20
21   Q  Has there been anything that we have talked about
22 today that you'd like to add to or clarify?

Page 27

1    A  No. I don't think so.
2 ▓▓▓▓▓▓ Okay. Well, we will end your
3  testimony, then. Thank you.
4        [Whereupon, the sworn testimony of ▓▓▓▓▓▓
5  concluded.]
6           - - -

b6
b7c