BY [redacted]

Q So this VBA has agreed at some point in time that there was a justified need for at least the Office of Policy to have access?

A Yes.

Q And specifically people like [redacted] would have been named and they would have had -- had to be granted access to these particular --

A No. Basically, I got approval from VBA headquarter here to proceed, that basically the approval was given, you know, that I can go ahead and -- and -- and request for the BIRLS, and VBA Austin was told to help us out.

[redacted] Wait a minute. Are we -- are we --

[redacted] I think we're on. Right, [redacted]

THE WITNESS: Yeah.

[redacted] Oh, okay. I'm --

[redacted] Yes.

[redacted] -- sorry.

THE WITNESS: Yeah. So VBA Austin, you know, was -- you know, they report up here to headquarters. So VBA Austin basically was told, yes, you know, they are allowed,

and at that point, Mr. -- [redacted]s and, I believe, [redacted] filled out a form again to have extract to -- you know, to do this data snapshot, but he can provide you with a copy of that.

BY [redacted]

Q Who? Who is he?

A [redacted] [redacted] or [redacted]

Q Okay.

A I mean, I assume [redacted]

Q And let me -- I just want to be clear that because the BIRLS extract that was being provided for the Office of Policy was somewhat modified, he would have had to fill out a new form?

A Yeah. That's why --

Q So you know he had access to it in the past?

A Yeah. That was my assumption. That's why he -- he went and filled out a new form, and also they have to do like, you know -- for their record, they have to do like the security authorization in VBA Austin to know who get access to what.

BY [redacted]

Q Is there any paper generated when VBA here or VBA

in Austin agreed to your request? Other than the individual who is going to access, is there some memorandum of agreement or understanding that's executed between your office?

A Yeah. By -- well, I justify my e-mail. I sent an e-mail to the -- the -- the business -- I forgot his title. [redacted] [ph]. I sent an e-mail to [redacted] and I explained to him. And I can provide you copies.

I said this -- this is the need for Office of Policy and Planning to need access to the BIRLS data because we would use it for the following reason, and he said, you know, basically to his -- his folks that the needs is justify and --

Q What about when your particular projects are over, that for the reason for which you needed the access? Is this -- is this authorization just infinite at that point, or what?

A Yes. Yes.

Q Really?

A Yes. Here is the reason why. The BIRLS is not just used for one single project, as you know. We have a lot -- we do a lot of work since I came back. Okay. One,

traditionally this office have not done a lot of data mining for analysis for policy purpose or for any kind of purpose. Traditionally, we work mainly with just the C&P Mini Master, but the C&P Mini Master mainly used just to do some simply query to use as in -- in input, you know, to help project veterans population model, but this office have never done a detailed data-mining kind of work that can provide data to the policy analysts and the tenth floor and everybody.

Since I came back here, I'm a very data-driven person, and I believe that you cannot make a decision on policy without some data to back up your options, and when Mr. McLendon came on board in 2003, December, he felt the same way because that's the environment that he came in from. Okay?

So since Mr. McLendon came on board, this Office of Policy have been doing a lot more work that are now -- that are -- that have never been done in VA before, that even the IG is aware of it, and that's why I know Mr. Erlichman [ph]. That's why the IG folks in Austin -- not Austin -- in Atlanta field office and also in your Seattle field office call me up to pick my brain because they know that our office is one of the few that actually work with

b6
b7C

this kind of analysis, where we look at the data and we mine the data, so that we can get information that is not readily visible. Okay?

Q Right.

A And we look at everything from individual and employability to -- to retirees. I mean on a wide variety of issue, on -- on, you know -- and so that's the reason why we need, and the reason why I want us to get access to the BIRLS is this. The C&P Master record is not 100-percent clean.

The combat status, for example, in the C&P Master record is bad. Most people don't know that. Okay? We know that because some of our analysis show that the data coming out, okay, is -- is not right, and when we question C&P service and people that we know in VBA, they told us, "Oh, yeah. Don't use that because the field don't update that field automatically. It -- it have a null for combat."

BY [redacted]

Q BIRLS would be more accurate?

A The -- so people said the BIRLS -- I haven't gone in to look at the combat down in the BIRLS, but there are other fields like POW. Okay?

So like, for example, expert in VBA told me if you want to know about POW status, because if you look at, you know, how many POW are getting common, 100 or IU, blah, blah, blah, you look up their -- their -- their POW status in the BIRLS. Okay?

And also there are information in the BIRLS about potential other benefits that they use that -- that is not existing in CPMR, like education, do they get VA education.

So that's the reason why I requested for the BIRLS, because -- let me tell you something. Not until about a year and a half ago, this is the first time ever in VA that anybody is looking at compensation and relationship between compensation and treatment, and we are doing that right now for the Secretary office on a study. They want to see, you know, if a certain vet get compensated for certain thing, how is -- how -- what is that vet doing with the treatment for that service-connected condition. That have never been done in VA, and that's the reason, more and more, I have to get our staff to, you know -- I have to be able to have, you know, the -- the kind of data, and unfortunately, we don't have a master linkage.

The only thing that we could really use to link

data together, like from the BIRLS and the C&P is Social Security number or, you know, combination of SSN and, you know, like birthday or something.

BY [redacted]

Q Right.

A Okay. That's the reason why I have a need for the BIRLS because that's what we need to do for the Department.

BY [redacted]

Q Did you have a particular project in mind for Wayne when you asked for the additional fields, this additional information?

A No. Those additional fields are the type of thing that I know we typically would take into consideration on the typical analysis of, you know, whether it's compensation, whether it's health care and compensation, whether it's on IU. They have some of the fields that we -- we believe that, you know, would be helpful for us to -- to know about the veteran. Okay.

B[redacted]

Q So he would have -- you would get him access for that, not for specific projects, but because he's a SAS expert, and he had the capability to go in and pull data?

A Right, because he and [redacted]re the only two that can get that stuff for me.

BY MS. SHELLY:

Q At the time of the theft --

A Right.

Q -- was he working on a project for you that required him to have that data?

A At the time of the theft or shortly -- shortly before the time of the theft, he was pulling BIRLS data, so he can scramble the SSN, but he was pulling the BIRLS data for me to provide to IDA. Okay? Because IDA came to ask -- because I coordinate this project for VA with IDA. Okay? VBA is one of the sponsor of this project.

I went to VBA and asked them to do an extract of the BIRLS for us, so that I can give it to IDA, and VBA, because of their workload and because of the way they set up their system over there, they cannot do it that easily. So they told me that if we could do it, we could go ahead and take care of our IDA needs. Okay. And since we have access to the BIRLS now, I told [redacted] you know, that we -- it's our responsibility now is to go because VBA told us to do it.

b6
b7C

178

Q So he is supposed to be scrambling some of this?
A Yeah. And he already did. He already did.
Q Okay.
A But let me make one thing clear. The extract that he had on the hard drive supposedly was not the same extract that he pulled for IDA. It was an extract that was pulled way back in January. Okay? That was when they only -- that was when they still only have access to the -- the -- you know, the original one.
BY [redacted]
Q The lesser amount.
A The lesser amount.
But he did not pull all of the variable from that lesser amount. He only pulled 20 variables, and that's what you have.
BY [redacted]
Q So do you have any reason -- do you know why he had that file on his hard drive?
A To be honest with you, I don't know why he had that file on that hard drive, except for him to test on -- you know, to use it for testing on a bunch of other things that he would work on. I mean, sometimes there are things

that he work on that I don't -- I -- I don't get involved with 100 percent.
For example, like he worked with C&P service on this mustard gas thing, okay, he would go and look at the BIRLS, for example. Okay. I mean, I don't stay on top of that 100 percent because, you know, that's something that he and C&P service work together.
My only take that why he have that on there is because we have been talking about preparing to do another National Survey of Veterans within the next fiscal year, and also my take of that is that he might have pulled that BIRLS extract out because he was testing to see if he -- he can get the right variable in the right sequence and so on because one of the problems that [redacted] have with -- in the past, when we first got access to the C&P Master record was that -- and let me draw again since I can -- I do better if I draw.
I don't know if you are familiar with the way the files are structured on these old mainframes. Each record, okay, it does not have fixed length. It does not have fixed variable. So let's say if your first is SSN, for example, and second is your diagnostic code, okay, and then the third

one is POW -- I'm just using three as an example. If you have an SSN, okay, you have some field here. Okay? And then right next to it, if you have a diagnostic code, you would have it here. If you have a POW code, you will have it here, but if you don't, it will go on to the next one. Let's say combat. Okay? Let me circle it out. Combat. So it would have a code. Okay?
The way -- the way I understand the dataset, the -- the legacy, the mainframe extract is set up is you have a pointer that tells you like what field begins where. Okay? If you don't read your pointer and you just assume that the first nine string -- because this -- just think of this as a string of just character. Okay? If you just assume that the first nine string is automatically SSN, you basically just mess up your database because --
Q So if there is no SSN --
A If there is no SSN, you wouldn't have the first nine characters. So the first nine characters or whatever, the first characters then, the pointer would tell you that it's a diagnostic code.
[redacted] got burned on this when he first worked with the C&P Master record. So what happened was I

-- my -- my -- my understanding is at one point earlier this year, when he had access to the -- the BIRLS, you know, the snapshot and so on, you know, he was pulling the BIRLS out, you know, to see if he can extract, you know, what he -- what he was looking to extract if it come back with its matches. That's my thing, and that's one of the other things that he was doing back in January, but I don't know --
Q The reality, as far as you're concerned, is a manager is -- you didn't even know he had this BIRLS extract data in January. So he wasn't working on anything for you with that January data?
A No. No. Yeah. In January -- in January, I know he was working with -- with the IG -- not IG -- IT folks down in VA, you know, to get -- try to get access to the BIRLS and, you know, work out the technical stuff for us. So --
Q Well, now I'm a little confused. Because you talked about earlier this year, you needed to modify what you were getting from BIRLS because you needed different data or additional data?
A Right.

b6 b7C

Q But was that going to be the first time [redacted] had access to BIRLS as well, or did he have access to it --
A No.. He have access to -- my belief is that he have access to the BIRLS before, but I don't know if he -- he, you know, did it one time or he did it multiple times.
Q Okay.
A My thinking is it probably is just a one-time thing --
Q The first time they asked --
A -- because he think it was a snapshot. So --
Q Right. Then he found out he was getting -- you had access to a quarterly.
A Right. That he found out that, hey, actually, you know, we're getting a snapshot quarterly. It's not just a one-time thing. Okay. That's my best recollection of what --
Q Somewhere in the past, someone would have authorized him that access?
A Oh, he have to. I would be -- to answer your question earlier, I would be very shocked that [redacted] can access the BIRLS using someone else's ID --
Q Right.

A -- because Austin would have --
A So, whether it's [redacted] or someone in Austin, there should be --
A Somebody should have a record of a form that he filled out.
Q With supervisory --
A Right. And [redacted] came on board with us, I think, before I came back to this office, but he did not come into this office, I don't believe, much longer than I had. So he came into VA probably around 2000, 20001, something like that --
Q Uh-huh.
A -- right around the time the NSV was being kicked -- kicked up. So my take is if they go back and look at their records between now and 2001, they should have -- they should have a form from him to access the BIRLS because they are pretty strict about that.
There is a security officer in Austin that is responsible for signing off and authorize before they could even get through, you know, the -- the particular folder.
Q Uh-huh.
A So I would ask [redacted] and if [redacted] does not have it,

he should -- he should be able to contact Austin and get a copy of the form that was faxed to them.
BY [redacted]
Q Of all the files that [redacted] had on his hard drive or believed he had on his hard drive at home, were any of them those that would be used for a project that you requested he do?
A The -- the files that I told you that he had mentioned, the NSV, no. I don't deal with NSV. The BIRLS, you already know what he is doing with me for the BIRLS. He is trying to get the BIRLS, you know, eventually that he going to go in the BIRLS and get stuff for me, but I have not given him any assignment yet to use the BIRLS.
The mustard gas, like I said to you before, late, sometime last summer, you know, because of my work with SHAD project, which is the Shipboard Hazard and Biological, I think --
BY [redacted]
Q So you call that SHAD?
A SHAD, S-H-A-D, like the fish.
Q Okay.
A Shipboard Hazard and Defense.

Okay. Because of VBA and familiarity with my work on the SHAD, because Mr. McLendon is the head of the SHAD task force for the Secretary, okay, VBA, [redacted] at the time was a member of the SHAD task force, but he was with VBA, C&P service. So he was very familiar with me.
He came to me and he asked me if we could help them. Because they cannot match data to VHA treatment file readily, he came to me and said, "Hey, if -- if we give you the list of mustard gas individual that DoD provide to us and it have limited information" -- most of them have only names -- "can you guys run the data match with VHA and -- and find out what -- you know, what SSN or find out just, you know, what you can, if any of these folks that we cannot find in our C&P Master record and, you know, in our BIRLS, if you can find any of these folks in -- in health care?"
And when that came to me, naturally, you know, I don't do data match because I have to -- I would have to go through Austin, you know. I would have to access Austin. So, naturally, I gave it to [redacted] because he is familiar with that kind of work, and I -- I told him that Wayne, you know -- C&P service have requested for us to have him do a data match of these mustard gas veterans to health

b6 b7C

180

Page 93

1  care, and all they have name, see what you can do for them.
2      So he said, "Yeah. Fine. I'll talk to, you know,
3  VHA. I'll talk to," I think, "[REDACTED ph] in VHA,"
4  and he said, you know, "I'll work with it," and so basically
5  that was it. I handed it off to him, and I told him the
6  point of contact was [REDACTED]. Okay.
7      So he worked directly with [REDACTED]
8  [REDACTED] VHA, and, you know, he -- he -- now and then, he
9  would like, you know, cc me in an e-mail saying that, you
10 know, what he found and blah, blah, blah, and what VHA is up
11 to, but that's basically kind of hands off because [REDACTED]
12 [REDACTED]'s the expert in chem bio for VA, and [REDACTED]
13 [REDACTED] is an expert, in my opinion, in data matching and,
14 you know, know what variable to pull to -- to do matching
15 stuff. So I kind of left it up to them.
16     So I have not been involved or, you know, worked
17 with that since probably last summer. I would say like July
18 or August of '05. So that's -- that's the reason why when I
19 look at my file, my file was different from his by
20 2,000-some, you know, records because he did all of that
21 work, but he didn't share it with me. Okay?
22     The third one was a C&P Mini.

Page 94

1  [REDACTED]
2      Q  Can I just --
3      A  Yeah.
4      Q  Before we leave mustard gas, is [REDACTED]
5  still doing work on that?
6      A  No, not that much. He -- he's still the issue
7  person, but as far as the data match, no. He's not involved
8  with that at all.
9      Q  So, as far as you know, there would be no active
10 need for [REDACTED] to be working with --
11     A  Oh. No. No. That's not necessarily true because
12 there -- the outfit that's mainly responsible for mustard
13 gas is C&P service.
14     Q  Okay.
15     A  Okay? And -- and [REDACTED] could easily still working
16 with individual in that office after [REDACTED] left because [REDACTED]
17 transferred over from VBA into Office of Policy. Okay? So,
18 as far as day-to-day operation on the mustard gas and data
19 match and things like that and do all of that, Wayne
20 probably deal with -- you know, if he's still working on it,
21 he's probably dealing with whoever replaced [REDACTED] over there.
22     Q  You wouldn't have any idea on who that would be?

Page 95

1      A  The first name that I could think of i[REDACTED]
2  [REDACTED]
3      Q  What's that last name?
4      A  [REDACTED]
5      Q  So he might still be -- [REDACTED] might still be --
6      A  In communication, yeah. He might still be in
7  communication with [REDACTED] that, but, see, like I
8  said, I don't know. I have not been involved with it.
9      Q  All right. Thank you.
10     A  And the one thing that we had decide -- I get so
11 many e-mails sometimes when people cc me. I just save them
12 for a rainy day to go back and read, especially if I skim at
13 it and it's not an issue that is immediate concern to me. I
14 get an average of 100 and some, sometimes 200 e-mails a day.
15 So, you know --
16     But let me go to the fourth one, the C&P Mini.
17 The C&P Mini, this office -- the C&P Mini, there are many
18 different versions of the C&P Mini Master out there. The
19 C&P Mini Master is basically an extract of the C&P Master
20 record, and my understanding, if my understanding is
21 correct, the C&P Mini Master does not contain records that
22 are deemed sensitive. Okay?

Page 96

1  What does that mean? When VBA process a claim or
2  intake a claim and input them into a system, on the -- and
3  in whatever system that they use -- I think RBA2000 is what
4  they're using now. There is a feeling there that they can
5  indicate the level of sensitivity, and I think it's called
6  "Secure" or something like that.
7      And what is that level of sensitivity? Public
8  official. It could be, you know, the Secretary if he does
9  have a disability payment, and I hope he doesn't have a
10 pension payment -- disability payment. It could be a
11 Government employee. Okay. It could -- I believe also --
12 and, you know, VBA can clarify this more with you. I
13 believe that even well-known criminals will get a sensitive
14 level, so that their record will not be seen by, you know,
15 your day-to-day data people and even relatives of VA
16 employee, I was told. If a relative of a VA employee is a
17 veteran that's receiving compensation, would get a certain
18 level that the C&P Mini would bypass and not pull the
19 record.
20     There are multiple C&P Mini, to the best of my
21 knowledge, out there. The C&P Mini records have been out
22 there for years, and I believe it was created by VHA. Okay?

Page 97

1  That's to the best of my knowledge, and it's down in Austin.
2  A certain authorized user can go out there and pull down the
3  data from the C&P Mini that -- the system probably have an
4  automatic job to put it out. Okay. The C&P Mini have been
5  around here probably as long as I have been in VA and even
6  longer, probably going back to like even the -- I came to
7  '92. Probably been around here since at least the '80s.
8  Okay?
9      And the reason that I -- I -- I was under the
10 understanding that it came from VHA was because in the C&P
11 Mini, there is a scrambled SSN field, even though a lot of
12 the time, that field is blank. Okay? But I was told the
13 reason that field was there, because VHA people who pulled
14 that field down will take the real SSN and scramble it, so
15 that they will be able, you know, to -- to hook up to VHA
16 data, so they can look up like service-connected status and
17 things like that.
18     The C&P Mini Master have -- there's a lot of
19 people in VA and VHA have access to it. Okay. In our
20 staff, ████████████████████████████ and I
21 think, you know -- I think ████████ several of our
22 analyst/programmer have access to the C&P extract -- C&P

Page 98

1  Mini extract that they can pull down.
2      So your question is does he do anything for me
3  that has to do with the C&P Mini? My answer is no because
4  as of August, September of last year, we have full access to
5  an extract of the C&P Master record. Okay? And all of my
6  work, I don't want to look just at a subset and always put
7  in a qualifier that, you know, 70-some-thousand records or
8  50-, 60-some-thousand records are not in this study because
9  they have security-sensitive level, whatever, because that
10 -- you know, that just raises questions from people that,
11 okay, so your number is not complete.
12     We have access to the C&P Master record. All of
13 the work that I do, okay, since August and September of last
14 year comes directly from the C&P Master record.
15     Q  What you're telling me is one of the main
16 differences is that that full C&P Master record has
17 everyone, even if they're a Category 9 or a, you know,
18 public official?
19     A  Yes.
20     Q  Okay.
21     A  But here's the catch. When you download a C&P --
22 the snapshot of the C&P Master record that we have access

Page 99

1  to, the security level is blank. So you can't tell who's
2  who. The only way you can tell who the sensitive records
3  are is by doing a match against the C&P Mini and find the
4  difference, but we have no -- we have no need to do that.
5  We have no reason to do that. Okay?
6      So, to answer your question as far as me
7  personally, individually, no, ████████ would not be
8  working on anything for me that is on the C&P Mini at that
9  point in time.
10     BY ████████
11     Q  Back up a little bit. Something is just clinging
12 to me. What was that? If you had access to the master, you
13 couldn't -- in terms of seeing congressional and the people
14 who are sensitive, you wouldn't be able to because --
15     A  No, because that blank. The snapshot is blank.
16 See, they don't put that --
17     BY ████████
18     Q  So, if you were scanning it, though, and you saw
19 James Nicholson, obviously you'd know --
20     A  Well, there's no name.
21     Q  Oh. There's no name?
22     A  There's no name in the C&P data. The C&P data,

Page 100

1  there -- there is no full name of individual, like in health
2  care, like in -- not health care -- like in the enrollment
3  file, for example, you see full names, for example, like --
4  like in the mustard gas that DoD gave us, you see the full
5  name.
6      In the C&P Master record -- in the C&P Master
7  record, there is a field called Pay Name. Basically, the --
8  the rule of that field is your first initial, your middle
9  initial, whether you have a middle initial or not -- if you
10 don't have a middle initial, that second field is blank.
11     Q  So it's basically the stop name.
12     A  The Stop -- yeah, it's the stop name. There you
13 go. There you go.
14     Q  And it's got like four or six --
15     A  And the -- no -- and the first five characters of
16 your last name. Okay? The first five characters of your
17 last name. So, basically, that's the Pay Name. Okay.
18     BY ████████
19     Q  So we had some questions early on about what level
20 of access did ████████ have. Is there such a thing as actually
21 having a level of access to look at this, or is there
22 specific authorizations or what?

BY [redacted]

Q Well, let's -- let's back -- and I think this will answer that. Let's back up. How did [redacted] get this C&P Mini Master extract? Is it the same thing, through the Austin mainframe?

A He would have to fill out the same thing. See -- see, the way you go out to Austin is -- the way you go out -- the way Austin is set up -- sorry. I should get --

[redacted] There's got to be a marker here.

THE WITNESS: I apologize.

[redacted] we like your little pieces. Go ahead.

THE WITNESS: Oh, okay. You know, I do this one time, and then after, the person's finished and asks me, "Can I take a copy of that?" I gave it to them. They came back and go, "I can't make it out."

The way Austin work -- okay?

Thank you very much, [redacted]

The way Austin work is in order for you to get -- it's compartmentalized. Okay? You have patient treatment file. You have -- you have C&P Master record and all of that. All of these have a path. Okay? Like a -- when I say a path, it's like a -- it's like a file location, okay,

of like MDPPR/something, something, something, something, just like a folder that you would get access, like our V drive, for example. Okay?

BY [redacted]

Q Right.

A If you don't have authorization, you go out of this path, you can't get in. So, in order for [redacted] for [redacted] to have access to the C&P Mini, when he first came to VA, he would have to fill out a form and request to have -- to give -- to have -- to be given access to the folder that have the C&P Mini, and I would say that if you go to [redacted] and if [redacted] doesn't have it, if you go to Austin, they should, and God help them, they should keep track of those things -- is the original request that should have been faxed down to Austin to ask specifically for Mr. [redacted] to have access to that folder or whatever they -- they don't call it a folder. They call it something, a data path or something like that. They have access to that data path for him to get to the C&P Mini.

Q So every one of those, the C&P Mini? The BIRLS?

A Yeah. The BIRLS is the path, the C&P Mini. The CPMR is in a different path. The PTF, which is Patient

Treatment File, is in a different path because it's controlled by VHA, so all of these have different --

Q Everyone is different or --

A Right. In order for you to have access to these paths, you had to ask for it specifically on your form, and the security officer down in Austin and [redacted] is, you know, signing -- you know, [redacted] signed off here if there's a need for it, but the final authority given to [redacted] [redacted] had to come from Austin because they control access to those folders.

Q Right.

[redacted]

Q And your understanding -- and this is getting back to Steve's question is -- that the C&P Mini --

A Yeah.

Q Now, the C&P Mini in general or the C&P Mini that he had access to did not have the higher level sensitive records?

A None of the C&P Mini have access to high-level record.

Q Okay.

A Okay? The only C&P data that have high-level

record without this -- without that field is the C&P Master record, and that's sitting in a different -- completely different area.

BY [redacted]

Q That would be a different path?

A Right.

Q So, if I want to access the C&P Mini, that would be different than I want to access the C&P Master.

A Exactly.

Q Two different authorizations.

A Exactly. You had to get two different authorizations.

Q Got you. Okay.

A Right.

[redacted]

Q And [redacted] or someone else would know maybe what levels the C&P Mini does not have, or someone in Austin?

A What do you mean what level?

Q Well, I mean, I know you can -- a record can be from zero to 9, varying degrees of sensitivity, with 7, 8, and 9 typically being the -- what would be --

A [redacted] would know.

b6 b7C

183

Q Austin would know.
A Austin would know.
Q Okay.
A You ask VBA people data, they wouldn't know either because I asked them one time. I said, "What -- can you give me the list of what the different sensitive" -- because the Secretary -- our office, one of the senior advisors to the Secretary asked me one day, "So who is this population that have a sensitive whatever indicator," and I said I -- I know some of them, but I don't know them all. So they said, "Well, can you find out what the criteria this VBA use?" I call over the VBA, and they didn't know.
So Austin would be able to tell you. Yeah.
BY [redacted]
Q Interesting. But again, on the Master --
A You guys are finding out more about VA data than you probably wanted to know.
BY [redacted]
Q And as far as you know, would [redacted] have had access to the C&P Master?
A He does have access to the C&P Master.
In our office, there is only two people that have

direct access to Austin C&P Master record, and that is [redacted] [redacted] and [redacted]
BY [redacted]
Q Let's track real quickly then what [redacted] would have access to, at least you're aware of. He had access to BIRLS?
A He had access to the BIRLS. He have access to the C&P Master record, and he have access to the C&P Mini.
Q Mini.
A And I don't -- like I said, I don't work with the C&P Mini in terms of directly because I cannot go out to Austin, but from my understanding is there are different versions of the C&P Mini out there.
Q And [redacted] has access to those because you want him to have access or --
A He had access to the C&P Mini before I --
Q Before you got here, but --
A -- I even know him.
Q But -- that's okay, but still, that's something that he would need to sometimes pull data that you may --
A Oh, yeah.
Q -- you may request.

A He have to have access to the C&P Mini, the C&P Master record, the Patient Treatment File, the Outpatient Treatment File, and the BIRLS because -- not only me, Mr. McLendon, Mr. Duffy, or anyone who have a need for certain data would have to go through him to get for us.
Q So he had access -- in addition to C&P, then, you said he had access to patient files as well?
A Yeah. Treatment. Treatment.
Q Treatment files.
A PTF and OPC -- outpatient -- OPC, I believe, or outpatient -- whatever the outpatient treatment file.
Q So he should have a slew of authorizations in some --
A He should.
Q Yeah.
A He should have.
BY [redacted]
Q Are you aware of any others, CPRS, anything like that?
A Oh. And education because I was the one who signed off, even though I'm not his supervisor, but I was the one who personally negotiated with education. So I was

fully aware of the education data agreement, and, you know, [redacted] was fine with me because I'm the one who know the data. Mr. Moore does not know anything about this, you know -- these individual data files. So I sign off the authorization from the standpoint that, yes, M[redacted] [redacted] will need to have access to the education data to do work for me, and [redacted] sign off, but Austin and VBA Education Service had to clear it for him.
We have not done anything with the education file. So --
BY [redacted]
Q Does access also authorize you to download?
A Yes. As long as you have access to the extract, you can download the data. You can -- you can download the data as long as you have access to it.
Q So, in your mind, what did Wayne Johnson do wrong, if anything?
A Bad judgment. He -- he was doing something, I think, that he, in my opinion -- let me take a step back. Like I said -- and I -- you know, I will go on the record and say this again. [redacted] is a very dedicated, hard-working employee. He comes down here many times on the

b6 b7C

184

weekend sometime because, you know, he -- I need for him to run some major data run now in Austin on the mainframe, and he would come here, and he would run and sit sometimes for several hours to make sure that the data was downloading correctly and did not even want to take, you know, comp time for it, and I had to tell him that I'll give comp time.

[redacted] is a very dedicated employee. He's one of our top employees here in 008. Okay. [redacted] is a very hard worker. [redacted] always have his nose to the grindstone, and he's looked up to by a lot of our programmers.

Now, to answer your question why [redacted] did what he did, in my opinion [redacted] just -- he make a bad judgment. Okay. It was poor judgment.

Q In his decision to take this data home?

A In his decision to take the data home, which is poor judgment. Okay? It was poor judgment because [redacted] probably never thought his house would get burglarized. Okay? [redacted] probably think, you know, if I carry, you know, that hard drive with me, it's always with me, and when I'm not home, I put it in my office and I put it in my desk drawer or whatever or hide it or whatever, you know.

Q Now, what if he had a Government laptop and had that information on the laptop and took it home? Is that any different?

A If he had a Government laptop and he take that home, no, that would not be any -- that -- that -- there would be a difference is because his laptop is protected, but here is the bottom line. If he does that, if he take home sensitive data, okay, if he didn't have that bad judgment and if he remember what he was taught in the privacy course, he would have at least asked or request, you know, or at least notify somebody. If he was working on something for me, he would have known he should have notified me that, "Hey, you know, I'm taking down -- I'm taking the C&P Mini home, so I can run this for you."

Q And did he ever notify you he was taking any of this home?

A No. No. No.

And now you got to remember, this is something that I think the Department -- and I mentioned this to my boss. A few years ago, the Department decided to be on the cutting edge. So what did we do? We get hybrid workstations that are basically docking stations, and what

do we do? We tell the employee that they can use the docking station like a laptop. We tell the employee that if they don't take it home like a laptop, just lock it up at night, so you don't lose it.

But you know what, Judy, I told -- I told the Secretary's office this last night too. I said, "Here is the problem in VA. People have e-mail. People send SSN-level data, you know, on spreadsheets back and forth." I have seen it, not just in here, all over VA because people think when you e-mail, it's within the system, nobody sees it, but guess what happens? It sits in attachment all over this building and all over the Department countrywide, and what do we do now? We pushing people for telecommute. We encourage people to go home and work from home. Okay? And then we give people access into, you know, VPN and all of those things.

There is a gray line. There is a gray line that -- that need to be addressed by senior management and by IT and people who are responsible for overseeing all of this. There needs to be some guidelines that we're putting out there, okay, as far as what you cannot do and do with VA-sensitive -- or not even VA -- any data, DNDC data, State

data, and so on, what you can and cannot do. That policy need to be communicated very clearly to all employees and the consequences, and I even recommended to Mike McLendon to tell the Secretary office, have everybody read it and sign off, acknowledge that they understood that is a requirement.

So, to make a long -- a long answer short for you is that, no, it wouldn't make a difference if he take a work laptop and have data on it and not telling us, okay, because he could have -- same thing could have happened. He could have laptop home, and the burglar would come in and would grab the laptop, but I would have to say the big difference is that with a VA laptop is you had to have a password to get in, unless you are absolutely, you know, very, very good and savvy, at least from my limited knowledge of network and in Window, you cannot bypass and get in -- into the -- the computer where, you know, like My Documents, for example, to steal data, okay, unless you reformat, you know, the hard drive, but if you reformat the hard drive, you lose all of that data.

So there is that layer of security maybe, but, no, it is still not 100-percent secure to have a laptop because there are software out there that you can generate and --

and get, you know --

What am I preaching to you guys for? You guys are the expert in this.

BY [redacted]

Q Well, it's kind of interesting. I just have a couple of follow-up questions. Let's stick with that -- that theme. I guess the question arises that a guy like Wayne Johnson who works with -- with data, I mean, that's his job. He works --

A Uh-huh.

Q -- with data every day, and he might -- he might take the position, well, I'm taking this -- this laptop home. People should know. They see me carrying this thing out, that I'm not going to leave these big monstrous files that I have on this that I've just downloaded because I'm going to be working on it at home, that if someone didn't know, they probably should have known that that's what I was -- that I was -- that's what I was doing with bringing this laptop home. This was back when he had a laptop.

A Right. Right.

Q Not nothing recently.

A Right. Right.

Q A couple years back, I guess, and so forth.

A No. That --

Q No one can argue with --

A Well, that would be a bad assumption. That would be a bad assumption on his part because we have had conversation. We have had conversation in our office, okay, and [redacted] was involved with it. It's that we even go -- we even -- we even told our staff that technically if you had to work with sensitive-level data on your PC here at work, okay, you are supposed to delete that data off of your computer here after you're done. Okay?

And -- and we are -- you know, that's the reason why we even go the step further where we are going to scramble, so that they are not even taking the chance.

Now, to answer your question, [redacted] cannot and should not assume that because [redacted] took the privacy training, just like all of us have to, and the privacy training is very, you know, clear about what data that we are supposed to possess, you know, and so on.

Now, for [redacted] to assume that he can just take the -- you know, the laptop with the data home, okay, that management know and -- and, you know, that it's okay. No.

No. Because you know why? People telework here, and people take work home here, take laptop home, but they take it home because they're working on Microsoft PowerPoint. They work on, you know, Excel spreadsheets, Word document. They use the laptop to hook up, you know, to check their e-mail because they had to be home to wait for the satellite dish guy come to fix. Okay? That's the kind of thing that people know that they are supposed to be working home.

Q Yeah.

A Now, let me tell you something. If an employee take data out, okay, that have no personal identifier, okay, now, I don't see that as a problem.

For example, if we -- and I'll show you an example later on. Ironically, [redacted] was the person who came up with a way recently for -- for us to scramble the SSN. Okay? C&P Master record, that we need to give to IDA for part of their study, in addition, you know, and to the BIRLS, Wayne was the one who scrambled that. So, if you get that data, you'll have no earthly clue, each one of those records, who those people belong to, and to me, that's safe because there's no way anybody can ever trace that back to an individual. Okay.

But as far as any information that can be traced back to an individual or combination thereof, like name, birthday, or SSN and birthday and so on, no, that's not -- that's not acceptable.

Q Two other things. You talked -- you talked earlier right out of the box --

A Right.

Q -- earlier today about you've been addressing -- you're trying to tighten up the ship, if you will --

A Right.

Q -- in terms of policies and so forth. Talk a little bit about that as it relates to the policies that are in existence, the regulations, that prohibit what he did, if there are any.

A The policy -- the policy that -- well, I don't want to say the policy.

What I was trying to pass on to our staff, okay -- and Mr. McLendon was fully supportive of what I was trying to do -- what I was -- what I was trying to impress on to our staff is that we need to be -- you know, because now, I told you before, we do very little with all of these files. We have not data-mined, and we have not done justice for the

b6 b7C

186

Department, but now because we are doing a lot of analysis and so on, we cannot just solely rely on one or two analysts that work with, you know, SSN-level data because [redacted] [redacted] and [redacted] will be, you know, way over their head, and all of our project will have to wait for them to get to. Okay.

Excuse me. More and more, we want our analysts to be able to work with this data -- this data. Okay? And that's when it dawned on me that, wait a minute, if I'm going to have [redacted] [redacted] and so on and son, you know, work on these projects, I would have to give them access to all SSN-level data. So now, instead of like two or three people that have access to SSN-level data, we're going to have a bunch of analysts running around getting access to this, and that's when I started to feet there needs to be some control because, you know, the more people that have access to this data, the more opportunity for somebody to drop the ball and the data will get out. Okay?

So that's when I started to talk to [redacted] and [redacted]s about -- because they are our -- my two data downloader. I said, "We need to come up with a way to

scramble the SSN, so that our analysts" -- [audio break].

[Side B of Audiotape No. 2 of 2 begins.]

THE WITNESS: [In progress] -- to have SSN-level data in their possession, okay, or stored on their hard drive or whatever and they, you know, might forget that they have it there someday. Okay?

So -- so this talk started around early February, and in February -- and I can give you a copy of it -- I went to my staff. I told my staff directly to remove all SSN-level data that they had from their hard drive or network drive that is accessible by other people. It was like February 6th. I even have an e-mail of it, I can give you. Okay?

And I start talking to [redacted], okay, a couple days after that and [redacted] to come up with a way to scramble the data, okay, because if you look in the directive, that was my goal. Okay?

And when I say my goal, by the way, I can't tell anybody -- everybody to do what I want. The best I can do is recommend it to Mr. McLendon. Okay?

BY [redacted]

Q Sure.

A Because you've got to understand we have three services under Mr. McLendon. I'm only the acting service director for one, and that's Management Data and Analysis, but our Office of the Actuary and Policy Analysis, the folks who deal in those offices, they kind of naturally like, you know, come to me, to me, you know, to talk about work and data and issues like that because they know that, you know, that's the area that I work with.

Q Right.

A Okay? But I cannot come out with a directive on my own. I can come out with a directive to my staff, but I cannot come out to the Office of the Actuary or I cannot go to [redacted] and say, "[redacted] I am giving you a directive that you're going to start doing X, Y, and Z." [redacted] probably will do it because that's the type of guy he is, but officially, I have no authority to do that, and I don't do that. Okay. So that's the reason why Mr. McLendon put out that policy -- you know, new policy.

So -- so we have been working, looking at how we can scramble data. So [redacted] came up with a way to scramble the data for the C&P Master record. We stripped off all of the addresses in the data. We stripped off all of the SSNs.

We took the claim number and we took the Pay Name, and he used an algorithm to match the two together and scramble it to come up with a unique ID, and that is the C&P master record that we have out there for our staff to use.

So, from year to year, okay, because these are snapshot, if you want to look longitudinally from year to year, you had to tie the record in together to follow, you know, the pattern and the trend and things like that of a vet, for example, or a group of vets. So they used that special ID to match, but they could never go and trace back to a particular individual. Okay?

Well, there was a catch. We didn't think ahead. There is no claim number and Pay Name in health care file. So, when we got to the point that we wanted to look at compensation pattern and treatment pattern, we found out, oh, shoot, the only thing we had to work with was SSN, at least, you know, that can tie the two together, and that's when I told [redacted] "Hey, you're going to need to come back and figure out a way to scramble the SSN."

The reason he -- we did not use the scrambled SSN in VHA data, because you know what? This is very ironic. [redacted] when he first came here and got access to VHA

b6 b7C

187

data, he was able to -- to figure out by himself the same scrambling method that VHA used, and he was able to unscramble his scrambled SSN.

And I told [redacted] during my meeting with him and [redacted] -- I said, "I don't want to use the scrambling method of VHA," because I said if a [redacted] can unscramble it, you know, other similar programmers will.

So I asked him. I said, "I want you and [redacted] to work it out and talk among yourself and figure out a way for us to scramble the SSN on the C&P Master record and on the health care file, so we will be able to let our staff doing, yo know, analysis without having access to real SSNs.

Q Right.

A And he was working on that. Guess when he got that done? The day his house got burglarized.

Q Is that right?

A I was at the conversation. He's sending me an e-mail, and I will provide you a copy of that e-mail. He sent me an e-mail that morning while I was at the SAS conference. He said, "Dat," you know, whatever -- I forgot what he said, you know, all about scrambling. "I just test this out and I used" -- whatever, some method, "And I was

able to scramble it, and I was able to unscramble it back to the original," and I don't know if he sent it in the e-mail or he told me verbally later on.

He said that even if you put the scramble SSN right next to the unscramble, in a million year, nobody will be able to be able to figure out how it was scrambled because he did a triple -- double or triple layer of scrambling or something he came up with.

So I told Mr. Duffy. I told Mr. McLendon. I told -- I told the Chief of Staff last night. I said, "It's very ironic that the day he came up and told me, 'Whoa, I came up with a way,' that afternoon his house got burglarized." Okay.

So now here is my point to you.

Q Yeah.

A We have been doing that. My goal has been for them to scramble all SSN data. That's why I told him to remove all SSN data from their file, and we started using scrambled, you know, C number and Pay Name. My goal is we -- we are going to take all of the SSN data that we have, okay, even the ones that are non-VA. We get the SSN data from DNDC as well, okay, that low extract that they send to

us. We got to put it in a fireproof, waterproof safe, and that safe, unfortunately, you know, I didn't get around to ordering it until after the incident, but you can talk to anyone -- some of my staff -- I don't want to say anyone.

You can talk to [redacted] you can talk to [redacted] and they will tell you that we have discussed about -- you know, I have discussed with them and have been telling them that I have been trying to spec our safe, so we can purchase, and what our intention is to -- the plan was for us to scramble the SSN, the original data download, whether it's CPM or whether it's DMDS data that we had or it's the Mini Master or the BIRLS. We are going to store them on portable USB external drive, and I know this is a dirty word around here lately, and we are going to put it in the safe, and only X-number of people designated by Mike McLendon that will have access to the combination, and then we will have a log-out/log-in procedure if somebody absolutely need to have access to that data. Okay?

That was the plan, and also the plan was to have a Request for Data sheet, which I'm currently finishing up. I'm using the template from VHA because there is no Request for Data sheet for the Department. So I'm marking up the

one from VHA because that is the one most bulletproof that I could see out there, and the -- [redacted], who he is the privacy officer for VHA, told me where to go look for them, and that's what I'm doing, and we should have that done this week.

Q Okay. So, with regard to this incident, though, [redacted] taking data home, can you -- can you put your hands on any specific VA regulation, not the -- not that he went to the privacy, no training, or -- or specific directions or guidance that you or anybody else may have told him in general discussion, but is there any VA directive that has been violated as far as you know?

A No. The only thing that I know is whatever that -- that he would have violated in the privacy training that we have.

Q In the privacy.

A That's the only thing that we get. That's the only thing that we get.

Q I have a -- I had taken it for a few months ago, but we keep hearing from a lot of people, you know, privacy training is great, you know, but that needs to be revised and revamped because it doesn't really -- it doesn't really

b6

b7C

188

pinpoint even some of the things that's happened here.

A I agree because that privacy training is aimed at the mass. Okay. Sure, you everyday -- the [redacted] of the world, they don't have a need to get access to SSN data, but it's the people that I think the VA need to worry about in term of, you know, not only to protect them, but to protect the VA and, more importantly, to protect the privacy of the veterans are those VHA programmers that are working, let them know, you know, you're familiar with it, but a lot of VHA programmer are working from home. Guys that run data that send to me from VHA work out of their house in South Dakota.

I raised the question with VHA recently about some data integrity that I found on their website, and the person called me was from Mississippi, and they all work from home.

Q Yeah.

A Okay? They all have access to health care data. They all have access to Patient Treatment File. They all have access to Enrollment File. Okay. And that's a direction that more and more, we are being encouraged as supervisor to grant to our employees.

Q Right.

A Fortunately, none of my staff telecommute, you know. It's too hard for me to find them, but, no, that's because a lot of them, they don't want to telecommute every first CWS, but the fact of the matter is -- and I'll tell you this right now -- if anything that will come out of this, that I think the -- if I can see a light that I can see at the end of the tunnel on this is it will raise exactly what you just said to me, and we need to look at sound, logical policy on how to handle and manage data and also, just as important, the consequences if you don't follow those policy.

I have heard around this building, okay, walking around -- when I say around this building, I am talking about within 008A here. Okay? Because, you know, we -- everyone under [redacted] know about it. I have been walking around here, and, you know, some people have said, "Hey, you know, what they should do is they should like, you know, random check your bag when you leave, so if anybody take out," and I go, "How are you going to execute that? Who going to find -- who going to look at a USB stick from [redacted] [redacted] Are you expecting the security guard at the front desk to pluck that in? And, oh, by the way, how many

different software are they going to have to be able to open? So we have to install SAS, Oracle, X, Y, and Z?" I go, "That is a knee-jerk reaction," and I told that to my staff.

As a matter of fact, I told one of them this morning. I said, "I think the sound policy should be what you can and cannot do with data. If you need to take data out of the building, what you need to do, i.e., you need to request. You have to get pre-authorized. Who needs to sign off? How many need level to sign off?" Get that policy and make every single one of these people that have access to the policy, read it, just like you go buy a car, initial after each line. By the way, the form that I'm putting out, the VHA use, they had to initial after -- after every line, okay, and then they sign off at the bottom. Then they know that they now cannot go back and say, "Oh, gee, I didn't know," and you know what, I told a lot of our staff. Okay? Actually, no. I told this to one of the people in the Secretary's office last night.

I said, you know, "When you start telling people that their job is on the line, if they break any of those things" -- I said, "How many people do you think will

realistically and honestly walk out of there sneaking data, so they can go home and work on a project at the risk of losing their job?" Okay?

Q Yeah.

A And the answer is probably zero, which leaves those people who will want to sneak data out, okay, and if they want to sneak data out and they -- at the risk of losing their job --

Q Yeah.

A -- then you know what, they will find a way to sneak it out, whether or not you randomly check your bag out the door. Okay? And I said this last night to them. I said, "Look, I can take a USB stick and I could put it in my socks and walk out the door. They can check my bag all they want." Okay?

So I -- this, you know -- like I said, this is a hopeful way. This is a hard lesson learned. This is like the school of hard knocks. What I hope come out of this is we take a better look at how we manage data, sensitive data, VA, and I warned the -- I told the Chief of Staff and the GC and the Deputy Under Secretary for Benefits, whoever people was in the room last night. I said, "Look, the next thing

b6 b7C

that the VA going to need to think about is all of these SSN data that sit in attachment in Outlook." Not only are they sitting in Outlook, but employee In Box, archives. Okay? But it's also are being made copies because, you know, they make copies backup of e-mail in IT.

Q Yeah.

A So you have all of these things that have SSN and -- and secure, sensitive, or personal identifier.

Q Right.

A I said that is the thing that people don't think about, and people said, "Oh, you know, when I send my SSN thing to XYZ, I'm password-protected." You know what, [redacted] and I talked about this. You can go to the Microsoft website. You dig and search hard enough, you will come up with a knowledge-based article telling you how to break the password, for those people whose password and forgot and had to go in -- back in to get their data.

Q You just struck something with me by saying that. What's your position? I know you're not a SAS, as you were saying, a SAS or S-A-S expert. Okay.

A Yeah.

Q But knowing what you know about SAS, do you think

that the fact that this data was in that format --

A Yes.

Q Do you think that that's really a useful thing, or shall we -- or are we becoming too -- what's the word I'm looking for? False sense of security, believing that -- that because it's in that format, that that mitigates the -- the issue somewhat because it would take a trained person?

A Well, it will minimize a great deal, okay, and the reason I'm telling you this is because, you know, I work very closely with SAS because one of my projects right now is doing a web portal for VA using SAS, business intelligence software for analysis. So I talk to them all of the time, and I know all of the costs.

Q Okay.

A It costs $4,000 for an individual right now to go out there and buy a copy of SAS software. Okay? $4,000 for a desktop copy of SAS software that we will be able to open.

You cannot open the SAS dataset with your standard run-of-the-mill, off-the-shelf software, okay, like Excel access, okay, or even SQL unless you have like special add-in, and you have to know to go buy special add-in to be able to open it. Okay?

But I myself is not an expert, but I didn't even know that you can get -- buy add-in, you know, for some of the more expensive software, like Oracle and so on, to be able to open SAS.

I tried to open SAS using an Excel spreadsheet. You know how you open up a document that got corrupted? It got garbage characters all over? I tried to open it using a Microsoft Word document. I tried to use it, open a Notepad, which is the standard tool to open most data file.

Q Right.

A Nothing can open it. So I would say yes, it can minimize because, A, whoever get a hold of this -- okay. Let's assume that they really wanted to get to it. Number one, they have to know that that is a SAS dataset. Okay. Number two, they have to have access to the SAS software.

SAS software traditionally have been mainframe. Okay. Not until the past 4 or 5 years has SAS started to come out with a Windows version, and the Windows version is what costs $4,000, but a lot of your data shop is still running SAS software over mainframe. Okay.

So -- so, first off, that is the one thing that I think will help minimize, okay, the chance of that person,

whoever, individuals, and have access to that database, and let's say that it gets passed on. They sell that thing at a pawn shop. The next person to get it, unless they deal with SAS programming or unless even if they know SAS, but if they work for a company that does not have SAS, they can't open that database anyway unless they go out and get it. Okay?

And my only concern is if this thing gets sold to a bad guy that happened to be an expert. Okay? Because here I'll tell you why. If I go to a pawn shop or if I go to eBay or Craig List or whatever and I buy a hard drive and if I'm a legit honest, you know, person, when I take it home and I open up and I see all of these things on there, probably likelihood is that I would suspect that it was stolen or I probably would expect that, hey, there might be some stuff on here that I probably don't want to know, I probably would reformat the hard drive.

So what I'm saying is that for -- for the -- for the individual that took that hard drive, if they can't get to it and they going to sell it -- okay?

Q Right.

A Whoever buy it, unless that person have criminal intent of trying to figure out what those files contain,

b6 b7C

190

they would have to go through a lot of work to be able to open up that file. Okay?

And like I said, your normal everyday person would probably not going to go through all of that trouble and investigate and invest in the software just to -- out of curiosity.

Q Right.

A And that's my take on it.

Q Right.

BY MR. DAHL:

Q What I have a harder time reconciling in my mind, though is the fact that -- and I think that's what you gave Judy at the beginning of the meeting -- is that [redacted] was allowed to copy SAS on his home computer.

A Okay.

Q I mean, why would he be allowed to put SAS on his home computer if he wasn't going to be working with --

A No. Because -- because here's the thing. Not all of our SAS datasets -- not all of our SAS dataset have sensitive information in there.

Q That's good to know.

A Yeah. You got -- yeah. That's the -- that's the

one thing -- yeah. That's -- I'm glad you asked. That's a very, very important good question, and I'm sorry. I'm putting on my geek hat here.

When it comes to data, okay, there are three -- there are three phases if you're talking about data analysis and data mining or work with data.

You have the front end. Okay? You have the operational end, and then you have the back end. What is the front end? The front end is a software, the application that allow an adjudicator or an admission person in health care to process a patient or a new case or C&P, for example. So this is usually like a GUI screen that they type in information, you know, name, address, and things like that. Right?

This stuff here gets passed on to what we call the middle end. Okay? This is basically like the C&P Master record. The data get captured and get dumped into like the C&P Master record, the -- the PTF file and so on.

And this is operational end. That's usually like a database. It can be Oracle. It can be SQL. Okay. It can be other, you know, DB2. I think that's IBM. Okay. The front end is usually like a GUI, graphical interface --

I'm not very good at these acronyms. Okay.

SAS is a back-end software. SAS is a software that you use to analyze data because SAS have statistical packages function, that you can take data, whether it's individual record or aggregated data. You can run like Kise-ware [ph]. You can run standard deviation. You can run mean and all that.

So we use SAS not just for querying data. We use SAS for analysis of data. From SAS, you can create, you know. You can do like summary of your dataset. You can do your min and your max, and from SAS, you can do like your graphs and everything all in one. Okay.

That's the reason why --

Q Does that one typically include the sensitive -- it would be the higher level, the statistical --

A Yeah. We use SAS for like -- you know, we -- most of our folks use SAS. I'm just now start using SAS because it come in with a drag-and-drop tool that make it easy to use. Before, you know, I would have to like get the data and convert them to Microsoft Access and use Access, but SAS is widely used by our staff just to -- you know, to do data analysis, you know, to query in and summarize data.

Q Okay. Well, that brings up another point. Because he had SAS on his computer and, you know, assuming that the computer and the hard drive are still together and someone had intent, would --

A Uh-huh. You mean the laptop, his laptop?

Q Right.

A Yeah.

Q His laptop and hard drive stayed together, and he has SAS and he gets on the computer, and these SAS files and hard drive would warn me or [redacted]

A Or me.

Q -- or you.

A Right.

Q You happen to go in and open SAS first and then get these files and then maybe be able to make sense of them?

A If they can get through the Windows password screen. See, his laptop -- and I asked specifically, asked [redacted] this. I understand his laptop have Windows XP. That's my assumption because of how new his laptop was, you know. I know he only bought it like a few years ago.

Windows XP, you go in. You have to get a user

b6 b7C

191

name or, at the worst case, just a password because in Windows XP, the way it's created, you create the name, and when you go in, you get an icon, and you have [redacted] Okay? And you have, you know, so and so and so. [redacted] pass -- [redacted] told me specifically that he password-protected. His Windows is password-protected on his laptop.

So what happen is when you go in on that first front screen on Microsoft XP and, you know, like a normal edition, not the kind we have here, you click on this icon with [redacted] name on it. It would pop up underneath. Okay? It would pop up underneath, a box for you to type in your password. If you cannot get the right password, you can't get in. Okay.

Now, can that be cracked? Yeah. A very expert individual can crack it, of course.

Now, can that be cracked by a regular person who just know enough to use Windows? The answer is no. The only way that they can use that laptop is to completely reformat the hard drive.

Q Which means that SAS would --

A Which means that SAS would get wiped out.

BY [redacted]

Q The only thing is that if you happen to have a password laying around close by, which is unclear -- I guess it was there. It's not clear whether or not --

A I asked him about that. I asked him. I said, "Did you tape the password to your laptop, so that your wife could get in or anything?" He go no.

Q Not on his laptop. I have to check back on my notes. I hear you.

A Yeah. I asked him specifically, I can tell you that, during my course of conversation with him. I said, "Did you write the password, you know, like on -- somewhere on the computer that people can just like grab it and find it in?" He go, "No. It's not on the computer."

BY [redacted]

Q Did he ever talk to you about a project that he was working on that he called the "fascination project" or a hobby project?

A Those names don't ring a bell. Do you know the specific of it?

Q Well, this is what he was telling us he was working on at home, using the BIRLS information.

A If he did tell me, he might have not used those

acronyms or term. He might have explained like the concept of what it is that he's doing.

Q It was related to the National Survey of Veterans.

A No.

Q Okay.

A No. I don't know that one.

BY [redacted]

Q Who is [redacted] or --

A [redacted] sed to work -- oh, my gosh. That goes way back. [redacted] was a programmer in VHA when she retired, I think, a year or two ago. [redacted] used to be [redacted] in Office of Policy and Planning, and she took a job. I think she took at 14 from [redacted] and went to VHA.

Q Was she working with Susan, do you think?

A Oh. [redacted] when she was not retired, she -- sometimes I get stuck with stuff, and sometime she'd come down here and visit, and I would pull her and say, "Hey, you know, can -- can you tell us how we can do this?" She is an expert. She is one of the best SAS programmer from -- I mean, I only know the person. She never did any work for me or with me, but she -- from institutional knowledge around

here, she was our A-plus programmer.

Q You talked to [redacted] about how he transferred this data --

A Uh-huh.

Q -- from CDs, I guess, disks and so forth. Did you get in a conversation -- from here to his residence. Did you get into a discussion about that at all?

A Yeah. I asked him what are you talking about, that CD. You're sitting right there with them.

Q Right.

A This is what we got earlier, and you said we could send this later. I said to him. I said, "[redacted], why do you have all of these CDs, and in here, you said that you lost them?" He said, "Well, what I'm -- what I said to [redacted] was I might have copied some of those files on those CDs onto my hard drive to work on," and I said, "So which ones are they?" He said, "I don't know, Dat." He said it could be any of them, it could be none of them.

Q Yeah.

A And that's when I said to him -- I said, "So are the only thing that we know for sure is the BIRLS?," and that's when he told me, "No, Dat. I don't even know the

b6
b7c

192

BIRLS is on there. I don't remember if I deleted it," and so he said, "So I -- you know, because you and [redacted]d Mr. McLendon and everybody said to me, forward and up front and state everything, that's why I have to state everything," and I said, "No, that's what we wanted you to do."

Q Well, he had these CDs at home that did not get stolen --

A Right.

Q -- that he was using.

A Yeah, at least that's what he told me.

Q And -- and we've taken possession of those through Mr. McLendon, but what about these other CDs that were out of his desk? Does he still have CDs? I mean, I would presume that he did, that -- that you were talking about. Here's all those CDs, what you're talking about.

A Oh, no. Those were the CDs that he was waving at me that you took.

Q Oh, okay.

A He have them in like a stack, a plastic bag or something.

Q Okay.

A And he --

Q There weren't other CDs. These --

A No, I haven't seen any other CD from him.

Q Okay.

A And that was the one he waved at me when I said, [redacted], why did you only tell me about the hard drive?," and he -- he pulled it out, I think, from his coat pocket or something. He go, "No." I said, "What about the thumb drive, USB drive?," and he pulled it out from under his shirt, and he said, "No. I had it with me."

Q Okay. So there are no other CDs then.

A No.

Q Okay.

A Not that I know of. That's all I know of, the CD that he have.

Q Got you. So these quarterly extracts, again, it's not something that's automatically sent from Austin to here. You have to go and get them.

A No, we have to go out and get them.

BY [redacted]

Q They sit on the mainframe.

A They sit on the mainframe. They are available, usually, typically 15 days after the end of each quarter.

Hines would send a copy down to -- to Austin, and then those copies get uploaded onto the mainframe in the folder that we were given access to.

Q And it's very specific who has access to those?

A Right. Right now, like I said -- let me reiterate -- in the Office of Policy and Planning, the only two people that have direct access to those C&P Master records in Austin is Wayne Johnson and [redacted]

Q And that's the same for BIRLS?

A That's the same, BIRLS. The only two people that have permission to access -- I don't believe [redacted]have doodled in it yet because he's been doing a bunch of other stuff for me -- is [redacted] and [redacted] and I believe [redacted]has been the only one that have been going in and getting BIRLS stuff for us.

Q And you'd be pretty confident that within the Office of Policy that they would be the only two that would have access to those files?

A To the --

Q BIRLS and C&P Master.

A Out in Austin or down here?

Q Austin, to go into Austin and actually --

A Yeah.

Q -- take these download --

A Right.

Q -- to be able to download these.

A Right. The BIRLS and CPMR, I can tell you with 100-percent confidence, unless somebody signed up for them and authorized it without -- while I'm not here, those are the only two, but I have told that I need them to have access and get access to that.

Q Okay. And -- but who else has access to it through other means?

A Me. That's it.

Q On the sensitive --

A On the sensitive folder because --

Q So on the sensitive folder.

A -- I was the one who request [redacted] to create the sensitive folder. So, on the sensitive folder, you have [redacted] -- well, [redacted] who created it, so he feel like he can access anything. [redacted]nd myself.

Q Okay. So any of those files that [redacted] or [redacted] would put on the sensitive file, you would have

b6 b7C

193

access to it?

A Right. Right.

BY [redacted]

Q Do you have any write-ups or any sheets that you can give us that provide the -- the data fields that are in -- the possible data fields, not that they would be filled, but in each -- in a BIRLS, in a Mini Master, and so forth and so on? Is there something that -- that there's a document that can tell us the --

A The only CPMR -- yeah, I can give you, but what I -- I only -- what they only give to me is the extract of the extract. The extract of the extract -- here. I'm going to make this clear again.

We have a CPMR copy that we have put out. By the way, the CPMR copy that we give them access to is the same -- it's the same CPMR that get access to by your office, by the IG office. Okay? And we -- I thank God for it because VBA was not archiving the CPMR. So there was no historical CPMR anywhere, and then I found out that the IG -- except you -- and the reason that I have access to it was because I was talking to [redacted] and they --

BY [redacted]

Q [redacted] [ph]?

A No, not [redacted] Up here. I got permission up here. I talked to your CIO. I talked to [redacted] somebody named [redacted] or something. I have all of that history, I can give you.

The bottom line was they found out that I was doing a study of PTSD, and I was complaining to them that I only have access to 5 years of C&P Mini. So my data is not very complete. So they said, "Why do you only have access to that?" I said, "That's because that's all VBA have," and then that's when they said, "Well, we have archives going back to 1985 that, you know -- that you can use," and that's why we have access to it.

But let me -- CPMR, okay, the list of data that we would have access to would be the same list of data that the Office of IG have access to. Okay? Because it all one long string for each record.

Based on what we typically do around here for analysis, based on my experience, there's only a number of variables that would be useful to us, and that's why I have either [redacted] or [redacted] to extract. So this is the extract from the Master record.

Q Right.

A We don't even have the full extract because the -- the Master record extract, I believe, have like bank information and things like that. We don't deal -- I told them don't deal with -- we don't deal with transactional data. Okay? We don't even go there.

So they extract -- up and extract that we get from the IG or whatever, from Hines, similar to what the IG have, but we have only extract X-number of data. Okay. And basically, I can -- you know, I can give you that list. All of the CPMR sitting in our sensitive folder have a same number of -- of variables. Okay?

And then we took that and we scrambled. Remember, I told you we strip off all of the sensitive stuff or personal identifier stuff, and then we scramble the C number and the stub name. Okay?

By the way, in case you're wondering why we do the C number and the stub name instead of just going by the C number, because over the course of the years, studying and learning and analyzing the CPMR, we found out that VBA reassigned a claim number. So, technically, you could have two people in the file with the same claim number. So, if

you just do a unique, you could be counting two different people as one. So that's the reason why we combine C number and stub name because that is unique. Okay?

So this is the data that we have sitting on the sensitive folder, and I can give you a list of that. Okay. All right.

Can I package all of this and either have somebody hand-deliver to you?

BY [redacted]

Q Yeah. I don't know if we're wrapping it up. I guess actually we should break for lunch, but --

A Okay.

[redacted] Do we have anything else at this time?

[redacted] I'm -- I --

[redacted] No. I think there's a bunch of things we want to get.

[redacted] Yeah.

[redacted] There is a bunch of e-mails and that paragraph you drafted.

THE WITNESS: Yeah.

[redacted] I think we'd like to, maybe after lunch, just come by and get quick --

b6 b7C

194

[redacted] Well, we'll go and get some lunch. He's probably going to take some time to get that, but we --

BY [redacted]

Q I think we probably would like to leave it open that maybe after we have a chance to sit down and -- and sort of consume what you just told us --

A Right.

Q -- we may very well need to get with you for a short period of time in the next couple of days as well just to --

A No, that's fine.

Q -- come back because I know there's some things in my notes here that -- that I want -- I want to address. I've got notes all over the place. So --

A Okay. All right. No, that's fair.

[redacted] mean, does that sound -- does that sound all right you?

[redacted] That sounds good. Yeah.

BY [redacted]

Q If we need be.

A I do -- I'll go on the record. I do have an incentive for you guys to get as much information and wrap

up this investigation or whatever as soon as possible because I have a personal investment in this.

I'm scheduled to be on vacation starting Sunday, June the 11th. I already pay for the trip. I didn't pay for insurance, and if the Secretary office call and say you have to cancel your leave and stay here, my wife will be very unhappy.

We are scheduling a trip to the Dominican Republic to take our two little kids after -- our son, 7-year-old, get out of school. We found a great deal we couldn't turn down. So she negotiate a good package. So --

Q Well, I think from our perspective, we just -- from our perspective here, just, you know, you've given us 3 and -- almost 3-1/2 hours of solid information that we need to maybe take a step back --

A Yeah.

Q -- and see what we have here.

A The only thing that I just want to caution you is that -- well, I shouldn't say "caution" -- I just want to bring up is the period between Thursday and Friday to me was all one big lump. So the time table that I gave you, okay, it might vary, okay --

Q Sure.

A -- from one point or another, but the bottom line is all of the things that took place, not necessarily the time table when it occurred, but all of the things that took place like [redacted]d I talked to Mike McLendon and so on, all of those things I will stand 100 percent behind.

As far as the timeline, I might slip a couple hours here and there, maybe even a half-a-day, but I just want to be honest and share that with you because, you know, I got so much on my mind. I cannot even remember what I did yesterday, so --

Q Understand. That's good.

BY [redacted]

Q Is there anything else you want to say before I turn the tape off?

A No. I -- well, actually yes. I just want to say one thing, and I want to say it for the record because, like I said to you before, I think it was a lapse in judgment. I think it was a bad -- a bad judgment call on Mr. -- on [redacted] part, but I always say I want to point out that I -- I want to go on the record to say that [redacted]s a very hard-working, very honest, very good employee that we have

here, and -- and he have done a lot of work for the Department.

And I also want to say for the record that I will take my hat off to him -- for him to go forward and call up everybody and basically spill out his guts of what he's missed.

All I'm saying is you could have employees out there that have this happen, and we would have never known about it.

So I have said this to [redacted] and I haven't said it -- and, you know, you can check with our staff at the May 8th meeting, when Mike McLendon asked if there's anything anybody else wanted to add, and I told everybody -- and I thanked [redacted] you know, thank you for standing up. I know how hard it was for him because [redacted], as you know, does not like public speaking, and how hard it was for him to stand up in front of the whole Office of Policy to personally confess a major booboo that he did, and -- but I even told him that it's even more than just confessing. For him to step forward and take responsibility instead of just sweep it and keep quiet and not reported it, to me I think that we need to acknowledge.

b6
b7C

195

That's all I wanted to say. Okay? Thank you.

[redacted] Well, thank you, and we'll catch up with you.

[Whereupon, the sworn testimony of DAN TRAN concluded.]

- - -

b6
b7C