**U.S. REPRESENTATIVE STEVE BUYER (R-IN) HOLDS A HEARING ON VETERANS ADMINISTRATION DATA THEFT - COMMITTEE HEARING**

29,887 words
25 May 2006
Political Transcripts by CQ Transcriptions
English
(C) 2006 CQ Transcriptions, Inc. All Rights Reserved.

**HOUSE COMMITTEE** ON VETERANS' AFFAIRS HOLDS A HEARING ON VETERANS ADMINISTRATION DATA THEFT

MAY 25, 2006

SPEAKERS: U.S. REPRESENTATIVE STEPHEN E. BUYER (R-IN) CHAIRMAN U.S. REPRESENTATIVE MICHAEL BILIRAKIS (R-FL) U.S. REPRESENTATIVE TERRY EVERETT (R-AL) U.S. REPRESENTATIVE CLIFF STEARNS (R-FL) U.S. REPRESENTATIVE DAN BURTON (R-IN) U.S. REPRESENTATIVE JERRY MORAN (R-KS) U.S. REPRESENTATIVE RICHARD H. BAKER (R-LA) U.S. REPRESENTATIVE HENRY BROWN JR. (R-SC) U.S. REPRESENTATIVE JEFF MILLER (R-FL) U.S. REPRESENTATIVE JOHN BOOZMAN (R-AR) U.S. REPRESENTATIVE JEB BRADLEY (R-NH) U.S. REPRESENTATIVE GINNY BROWN-WAITE (R-FL) U.S. REPRESENTATIVE MICHAEL R. TURNER (R-OH) U.S. REPRESENTATIVE JOHN CAMPBELL (R-CA)

U.S. REPRESENTATIVE LANE EVANS (D-IL) RANKING MEMBER U.S. REPRESENTATIVE BOB FILNER (D-CA) U.S. REPRESENTATIVE LUIS V. GUTIERREZ (D-IL) U.S. REPRESENTATIVE CORRINE BROWN (D-FL) U.S. REPRESENTATIVE VIC SNYDER (D-AR) U.S. REPRESENTATIVE MICHAEL MICHAUD (D-ME) U.S. REPRESENTATIVE DARLENE HOOLEY (D-OR) U.S. REPRESENTATIVE SILVESTRE REYES (D-TX) U.S. REPRESENTATIVE TED STRICKLAND (D-OH) U.S. REPRESENTATIVE SHELLEY BERKLEY (D-NV) U.S. REPRESENTATIVE TOM UDALL (D-NM) U.S. REPRESENTATIVE STEPHANIE HERSETH (D-SD) U.S. REPRESENTATIVE JOHN SALAZAR (D-CO)

WITNESSES: R. JAMES NICHOLSON, U.S. SECRETARY OF VETERANS AFFAIRS

R. ALLEN PITTMAN, ASSISTANT SECRETARY FOR HUMAN RESOURCES AND ADMINISTRATION, U.S. DEPARTMENT OF VETERANS AFFAIRS

ROBERT J. HENKE, ASSISTANT SECRETARY FOR MANAGEMENT, U.S. DEPARTMENT OF VETERANS AFFAIRS

MAJOR GENERAL ROBERT HOWARD (RET.), ACTING ASSISTANT SECRETARY FOR INFORMATION AND TECHNOLOGY, U.S. DEPARTMENT OF VETERANS AFFAIRS

PEDRO CADENAS JR., ASSOCIATE DEPUTY ASSISTANT SECRETARY FOR CYBER AND INFORMATION SECURITY, ACTING DEPUTY ASSISTANT SECRETARY FOR INFORMATION TECHNOLOGY, U.S. DEPARTMENT OF VETERANS AFFAIRS

DENNIS M. DUFFY, ACTING ASSISTANT SECRETARY FOR POLICY, PLANNING AND PREPAREDNESS, U.S. DEPARTMENT OF VETERANS AFFAIRS

MICHAEL MCLENDON, DEPUTY ASSISTANT SECRETARY FOR POLICY, U.S. DEPARTMENT OF VETERANS AFFAIRS

TIM S. MCCLAIN, GENERAL COUNSEL, U.S. DEPARTMENT OF VETERANS AFFAIRS

GEORGE J. OPFER, INSPECTOR GENERAL, U.S. DEPARTMENT OF VETERANS AFFAIRS

JON WOODITCH, DEPUTY INSPECTOR GENERAL, U.S. DEPARTMENT OF VETERANS AFFAIRS

MICHAEL STALEY, ASSISTANT INSPECTOR GENERAL FOR AUDIT, U.S. DEPARTMENT OF VETERANS AFFAIRS

STUART PRATT, PRESIDENT AND CHIEF EXECUTIVE OFFICER, CONSUMER DATA INDUSTRY ASSOCIATION

DENNIS HOFFMAN, VICE PRESIDENT FOR INFORMATION SECURITY, EMC CORPORATION

AVIVAH LITAN, VICE PRESIDENT AND RESEARCH DIRECTOR, GARTNER, INCORPORATED

[*] BUYER: The **House Committee** on Veterans' Affairs dated May 25, 2006 will come to order.

If somebody will get the door for us, please.

By way of housekeeping, we only have the secretary for about 45 minutes, and there's a hearing on the Senate side that starts at 10 o'clock. He will be taking Mr. McClain with him. Others of his staff will remain and step forward at the table when the secretary leaves.

I will give an opening, and then I'm going to yield to Mr. Strickland for an opening, and then we're going to immediately go to questions.

What I would propose is that, because we only have him for 45 minutes, I do a unanimous consent that each member may have three minutes to do questions so we try to give quick latitude to all the members. Any objections? All right. Hearing no objections, so ordered.

The purpose of this hearing is to learn more about the recent loss of personal data belonging to as many as 26.5 million veterans and some spouses experienced by the Department of Veterans Affairs.

We have a meltdown in V.A.'s information management. According to V.A. this meltdown has resulted in a catastrophic failure to safeguard sensitive personal data.

Last Monday, the Department of Veterans Affairs released a statement acknowledging that a data analyst took home electronic data which he was authorized to access at work but not authorized to bring home.

2

The burglary of his home and the theft of his computer resulted in the loss of that data. This serious incident was not communicated to this committee until Monday, May 22nd, 19 days after the theft and one hour prior to its release to the public.

We must answer some pressing questions, which include how did this breach of information management happen, what will we do to protect veterans' identity theft, what policies and regulations are in place at the department that should have stopped the mismanagement of information, and what is the V.A. doing to eliminate the vulnerabilities associated with the security of sensitive information, and many others from my colleagues.

And let me be clear, we are here today to inform America's veterans and their families what the government is doing to protect them against fraud and ease their efforts to protect themselves.

Our veterans and their families must be assured of how you, Mr. Secretary, will safeguard the information they place in your hands. Whether or not any identity fraud results from the theft of this computer carried home by this V.A. employee, what is clear is damage has been done.

Speaking as one of those millions of veterans such as even yourself, Mr. Secretary, the prospect of fraud, of theft, of the awful prospect of repairing damaged credit is bad enough. For that stress to be caused by our own federal government is deeply disturbing, and I know everyone here agrees it is intolerable.

There will, unfortunately, be a certain percentage of the 26.5 million veterans that will have to deal with identity theft in the normal course of life. And now some of them will blame the V.A., so that's going to be a challenge for you.

Beyond the very personal dimension, this incident has implications regarding the larger picture of control over V.A. information technology. Over the last seven years, we've seen compelling evidence of information security problems at the V.A., and I refer to committee hearings in which I've chaired.

On May 11th of 2000, the GAO stated that computer security is, quote, "critical to the V.A.'s ability to safeguard its assets, maintain the confidentiality of sensitive information, and ensure the reliability of its financial data. The V.A. I.G. acknowledged the department-wide weakness in information security systems that continue to make V.A.'s program and financial data vulnerable to error and fraud," end quote.

At a September 21, 2000 hearing GAO stated, quote, "Serious computer security problems persisted throughout the department and VHA because V.A. had not yet fully implemented an integrated security management program and VHA had not effectively managed computer security at its medical facilities," end quote.

At the April 4, 2001 hearing the I.G. continued, quote, "to identify significant information security vulnerabilities that placed the department's data systems at risk of unauthorized access and disclosure." The I.G. testified that, quote, "Many of these vulnerabilities exist in violation of V.A. policy," end quote.

At a March 13, 2002 hearing the I.G. repeated findings of the vulnerabilities of V.A.'s information technology.

Then, almost four years ago today, on May 20th and May 21st, WISH-TV 8 I-team led by Karen Hensel in Indianapolis, Indiana went to Goodwill and bought three computer hard drives.

Two of those hard drives, she learned, were never cleansed, and they contained hospital patient records from the Roudebush V.A. Hospital in Indianapolis -- the names of veterans, their Social Security numbers, home address, phone numbers, pages and pages of government credit card numbers, information regarding veterans' arrest records, whether they were receiving drug and alcohol counseling, whether they were disabled.

One of the veterans was blind, disabled and living alone and was a combat veteran and discussed his case. One of the patients was HIV -- 120 of those computers were sold at a surplus sale without ever having been cleansed. So we went through all the hearings on that -- oh, the controls are going to be in place, we assure the committee.

At the September 26, 2002 hearing the I.G.'s testimony stated that, quote, "Penetration testing completed during the past two years verified that the V.A.'s information system could be exploited to gain access to sensitive veteran health and benefit information.

At a March 17, 2004 hearing the V.A. testified that, quote, "There was a glide path in place for meeting the April 2004 deadline for the beginning of the VETSNET deployment." VETSNET has been in development for a decade. I've been told that VETSNET will not deploy in 2006 and maybe not even now till 2007.

As chairman of the Subcommittee on Oversight and Investigations and now chairman of this committee, I've led a bipartisan effort to centralize V.A.'s I.T. infrastructure and control over its I.T. systems.

Last November this House voted unanimously, 408-0, to centralize I.T. management of the department's chief information officer. Both the department and the Senate have sadly resisted such centralization of V.A.'s I.T. architecture. Even the independent budget of the VSOs opposed centralization of V.A.'s I.T. infrastructure in their 2007 budget.

The V.A. inspector general, in his November 2005 report entitled Major Management Challenges of Fiscal Year 2005, stated that, quote, "V.A. has not been able to effectively address the significant information security vulnerabilities and reverse the impact of its historically decentralized management approach."

The report went on to say that, quote, "While the V.A. has accelerated efforts to improve federal information security, more needs to be done to put security improvements in place that effectively eliminate the risk and vulnerabilities of unauthorized access and misuse of sensitive information," end quote.

Look where we are here today, Mr. Secretary. This committee, this Congress -- we've asked to empower the CIO to put his arms around this one, and that was resisted. I have even asked about letting the V.A. be on parity with other departments with regard to political appointments. That's been resisted.

And now what we have is we've got some management questions. This isn't just an issue of a low-level employee. There's very serious mismanagement of information technology that's at stake.

So with that context, I believe there's a damaged trust, angered veterans and families, and there are systematic flaws. And, Mr. Secretary, this is a defining moment of your leadership.

With that, I yield now to Mr. Strickland.

STRICKLAND: Mr. Chairman, I would yield to my colleague from California, Mr. Filner, and I would ask that my statement be entered into the record, please.

BUYER: Thank you, Mr. Strickland.

All members who may have opening statements, your statements will be submitted for the record.

Mr. Filner, you're now recognized.

FILNER: Thank you, Mr. Chairman. And thank you for this hearing. Thank you for your opening remarks. I associate myself completely with them. You laid out the complete record. I think that we don't have to -- anybody has to repeat. So I appreciate the strong attitude toward this.

We are now presented, as the chairman said, with a catastrophic problem. The V.A. simply did not protect essential personal information entrusted to its care. Now and for the next few decades, maybe, a potential sword of Damocles hangs over the financial well- being of over 26 million veterans unless this data is recovered.

In the last five years, as the chairman outlined, a host of agencies -- the V.A. inspector general, the GAO, prominent I.T. consultants -- have reported that V.A. has many problems with information security.

We found multiple failures under the Federal Information Security Management Act, the reviews of that act, and we note that three or four information security recommendations to the V.A. by the Government Accountability Office in March 2002 have yet to be implemented. Outside contractors note related problems. And what does V.A. react to, apparently? With indifference.

Internal V.A. recommendations to strengthen the control of information meet with resistance. Even Secretary Principi's directive to centralize information technology at the V.A. in 2002 was met with indifference. It was not implemented.

In the last few years, this committee and its subcommittees have chronicled problems related to unclear lines of I.T. management authority throughout the V.A.,

5

to information security officer training in the VBA, to sensitive information releases on unscrubbed computer hard drives at the V.A. medical centers -- a host of very expensive major computer projects failures and delays.

We rarely see accountability in either the I.T. or information security world at the Veterans Administration. The individual responsible for the release of the unscrubbed hard drives was soon promoted. Again, V.A. seems to react with indifference to its problems in this area.

As Chairman Buyer pointed out, the problem before us today is not unexpected. It has sprung from a culture of indifference, a culture of indifference at the Veterans Administration, and grown strong among the leaders that have allowed it to grow.

The most important agent in information control and security in an organization is its leadership. When they are not proactive, Mr. Secretary, bad things happen. And a very thing's happened that we're looking at today.

Too much time transpired before Congress was notified. Sure, you needed to hope that the thing was found, but you could have briefed the chairman and others in this body about what happened.

Too much time transpired before veterans were notified. And when you did notify them, you left it to them to go contact their credit bureau or their banks. You didn't say we will take care of it, we will be behind you, we will pay for the problems that you might have.

V.A.'s message was trust us, we will handle it. Well, we should now question if, even after this wake-up call, you are up to the task.

Certainly, this administration has proclaimed its need to collect information on our citizens. On May 11th President Bush defended those actions by noting that the privacy of ordinary Americans is fiercely protected in all of our activities.

Well, I think this debacle before us today clearly demonstrates the folly of the president's attempt to place us at ease regarding the administration's ability to fiercely protect our privacy. This does not meet my definition of fierce protection. I only see indifference.

Mr. Chairman, I appreciate again this opportunity to look into this incredible disaster.

BUYER: Thank you, Mr. Filner.

And I associate myself with Mr. Filner's comments.

Testifying now will be Secretary Nicholson. Secretary Nicholson is accompanied by the Honorable Allen Pittman, the assistant secretary of human resources and administration; the Honorable Robert J. Henke, assistant secretary for management; retired Army Major General Bob Howard, the acting assistant secretary for information and technology; Pedro Cadenas, Junior, associate deputy assistant secretary for cyber and information security and the acting deputy assistant secretary for information technology; Dennis M. Duffy, acting assistant secretary for

6

policy, planning and preparedness; Michael McLendon, deputy assistant secretary for policy; and the Honorable Tim McClain, the department's general counsel.

All individuals of whom I have just identified, if you would please stand, and I'm going to swear all of you in. Please raise your right hand. Do solemnly swear the testimony you're about to give, including answers to questions of the committee members, is the truth, the whole truth, so help you God? Please take your seats.

Mr. Secretary, you're now recognized.

NICHOLSON: Mr. Chairman, members of the committee, thank you for giving me the opportunity to appear before you today to explain a devastating occurrence that has happened in my agency that's come to my attention recently and it was announced to all on Monday of this week.

I am the person ultimately responsible to our veterans, and therefore the responsibility for this situation rests on me. A V.A. employee who was a data analyst took home electronic data files from the V.A. He was not authorized to do so, nor were they encrypted. His house was burglarized and the data were stolen. This happened on May 3rd.

If that wasn't bad enough, I wasn't notified about this event until May 16th. As a veteran myself, I have to tell you that I'm outraged. I'm frankly mad as hell.

But I must carry on and lead the efforts to get to the bottom of this and take the corrective actions to see that it doesn't happen again. My compass for this is the veterans. How do we best take care of them now and mitigate the effects of this on them?

These stolen data contained identifying information, including names and dates of birth, for up to 26.5 million veterans and some of their spouses.

In addition, that information, plus Social Security numbers, was available for some 19.6 million of those veterans. Also included, possibly, were some numerical disability ratings and the diagnostic codes which identify the disabilities being compensated.

It is important to note that the data did not include any of the V.A.'s electronic health records. Neither did it contain explicit financial information, although knowing of a disability rating could enable one to compute what the implied terms of compensation payments are.

On May 3rd, the employee's home was broken into in what appears to local law enforcement to have been a routine breaking and entering -- that is, a random burglary, not a targeted one -- and the V.A. data were stolen.

The employee has been placed on administrative leave pending the outcome of an investigation with which he is cooperating.

As I've said, I am a veteran too, and I am outraged at the loss of our veterans' personal data. And I'm outraged at the fact that an employee would put us all at risk by taking it home in violation of V.A. policies with which he was very familiar.

I'm also very outraged that it was not until May 16th that I was notified of this incident. And I'm upset about the timing of the department's overall response once the burglary became known. I will not and have not tolerated inaction and poor judgment when it comes to protecting our veterans.

Appropriate law enforcement agencies, including local police, the FBI and the V.A. inspector general's office, have launched full-scale investigations into this matter. Authorities believe it is unlikely the perpetrators targeted the items stolen because of any knowledge of the data contents.

It is possible that the thieves remain unaware of the information they possess or how to make use of it. Because of that, we have attempted to describe the equipment stolen, the location from which it was stolen and other information in quite general terms.

We have not and do not want to provide information to the thieves that might be more helpful as to the nature of what they have. We still hope that this was a common theft, and that no use will be made of the V.A. data.

From the moment I was informed, the V.A. began taking all possible steps to protect and inform our veterans. However, there were those in the law enforcement community who wanted me to wait longer before announcing this theft so as to pursue leads and keep the burglars in the dark.

I chose to inform our veterans nevertheless, but limiting the details of where and when initially so as not to tip our hand to the robbers. Whether it is one veteran or the numbers we are talking about here today, the V.A. needed to act in a manner that maintained a balance between protecting our veterans and informing the crooks.

Another very disturbing aspect of this circumstance is that although it happened on May 3rd, and the V.A. employee informed his bosses of this fact on that day, I was not made aware, as I said, until May 16th.

Equally disturbing is that federal law enforcement and investigating agencies were not informed immediately either. It wasn't until May 10th that the V.A. I.G. became aware of it. I cannot explain these lapses in judgment on the part of my people. It makes me really angry and disappointed. And after the I.G. finishes his investigation as to exactly what went on, I plan to take decisive actions.

V.A. now also has begun a relentless examination of our policies and procedures to find out how we can prevent something like this from happening again. We will stay focused on the problems until they're fixed.

I've formed a special task force under the deputy secretary to examine comprehensively all of our information security programs and policies to bring about a ringing change in the way we do business.

Ever since 1999, the V.A. has gotten low marks from the I.G. on its information and cyber security programs. Last year, the GAO flunked the V.A. on its cyber security system. This has to change.

This situation is exacerbated by the fact that the assistant secretary for I.T., who has been at the V.A. since the beginning of '04, has just recently resigned. He came to the V.A. from the private sector, Dell Computers, and has now returned to the private sector. We do have and think we have recruited a good replacement, but he's not in place at this time.

Ironically, we, the V.A., continue to get very exemplary evaluations on electronic medical record systems. And during Hurricane Katrina, the system and our people performed heroically to evacuate hundreds of patients and save many lives.

We're also off to a strong start on our I.T. reformation to centralize all of our I.T. applications except for development. What this suggests is that we can get this information and cyber security mission done right also.

I'm also pleased that just yesterday the president announced his intention to nominate a brilliant recently retired Navy admiral to head up our office of policy and planning, where this incident arose from. He should be on board very soon.

Additionally, we are taking direct and immediate action to address and alleviate veterans' concerns and to regain their confidence. I have taken the following actions so far: Directed all V.A. employees complete the V.A. cyber security awareness training course and complete the separate general employee privacy awareness course by June 30, 2006.

I've also directed a memo be issued requiring all V.A. employees to sign annually an employee statement of awareness that includes their awareness of the privacy act, unauthorized disclosing or using directly or indirectly information obtained as a result of employment in the V.A. which is of a confidential nature or which represents a matter of trust or other information so obtained of such a character that its disclosure or its use would be contrary to the best interests of the V.A. or the veterans being served, and certify their awareness on the loss of, damage to or unauthorized use of government property, through carelessness or negligence, or through maliciousness or intent.

In addition, the department will immediately be conducting an inventory and review of all current positions requiring access to sensitive V.A. data. The inventory will determine whether positions, in fact, require access to data.

We will then be requiring all employees requiring access to sensitive V.A. data to undergo an updated national agency check and inquiries and/or a minimum background investigation, depending on the level of access required by the responsibilities associated with their position, because it's come to my attention also that we know virtually nothing about these people that have access to these enormous amounts of data -- for example, this individual having the entire veteran's file, one person, who has not, to our knowledge, had a background check for 32 years.

I've directed the Office of Information & Technology to publish by June 30 of this year, as a V.A. directive, the revisions to the security guidelines for single-user remote access developed by the Office of Cyber and Information Security. This document will set the standards for access, use and information security, including physical security, incident reporting and responsibilities.

V.A. is working with Congress, the news media, and veterans' service organizations and other government agencies to help ensure that those veterans and their families are aware of the situation and of the steps they may take to protect themselves from misuse of their personal information.

V.A. is coordinating with other agencies to send individual notifications to all 19.6 million individuals whose Social Security numbers were stolen, instructing them to be both vigilant in order to detect any signs of possible identity theft and how to protect themselves.

In the meantime, veterans can also go to www.firstgov.gov for more information on this matter. This is a federal government Web site capable of handling large amounts of Web traffic.

Additionally, the V.A. has set up a manned call center that veterans may use to get information about this situation and learn more about consumer identity protections. That toll free number is 1- 800-333-4633.

The call center operates from 8 a.m. to 9 p.m., Monday to Saturday, and it will as long as it's needed. The call center handles up to 20,000 calls an hour. Through the end of the day yesterday, concerned veterans had made a total of 105,753 calls to this number.

I want to acknowledge the significant efforts of numerous government agencies in assisting the V.A. in preparing for this announcement on May 22nd. Agencies at all levels of the federal government pitched in to ensure that our veterans had information on actions they could take to protect their credit. Hundreds of people worked around the clock last weekend writing materials to inform the veterans and setting up call centers and a Web site to ensure maximum dissemination of the information. And I want to personally thank each of these agencies and the people therein for their selfless efforts on behalf of our veterans.

The three nationwide credit bureaus have established special procedures to handle inquiries and requests for fraud alerts from our veterans.

Experian and TransUnion have placed a front-end message on their existing toll-free fraud lines, bypassing the usual phone tree, with instructions for placing a fraud alert. Equifax has set up a new toll-free number for veterans to place fraud alerts.

The new procedures became operational on Tuesday. The bureaus report a spike in phone calls, 171 percent of normal, and in requests for free credit reports through the annual free credit report web site. The Federal Trade Commission also experienced high call volumes about the incident earlier this week.

On Monday, the Office of Comptroller of the Currency notified its examiners of the theft. On Tuesday, the Office of Comptroller posted an advisory on an internal network available to its banks and instructed the examiners to direct their banks to the advisory. It explains what happened and asks the banks to exercise extra diligence in processing veterans' payments.

The advisory also reminds the banks of their legal obligations to verify the identities of persons seeking to open new accounts and to safeguard customer information against unauthorized access or use and attaches a summary of relevant laws and regulations.

I briefed the attorney general and the chairman of the Federal Trade Commission, co-chairs of the president's identity task force, shortly after I became aware of this occurrence, and they have been very cooperative as well.

Task force members have already taken actions to protect the affected veterans, including working with the credit bureaus to help ensure that veterans receive the free credit report that they're entitled to under the law.

Additionally, the task force met on Monday to coordinate the comprehensive federal response, to recommend further ways to protect affected veterans, and increase safeguards to prevent the recurrence of these incidents.

On Monday, following the announcement of this incident, I also issued a memorandum to all V.A. employees. The purpose was to remind them of the public trust we hold and to set forth the requirement that all employees complete their annual general privacy training and V.A. cyber security awareness training for the current year by June 30.

Following that, all will be required to sign a statement of commitment and understanding which will acknowledge consequences for non-compliance.

Information security is challenging business. And ultimately, it depends on the integrity and the work ethics of the work force.

BUYER: Mr. Secretary, if you could summarize your conclusion, please.

NICHOLSON: OK. I wanted to just, for purposes of one graphic -- and this is not the equipment that was involved in this, so I can use it. But this is a hard drive. This little piece of equipment that's smaller than my wallet has 60 gigabytes.

The information that we're dealing with here, this entire roll of our veterans and the data on it, has five gigabytes. So you could put 12 times that on that piece of equipment that fits easily into one's pocket.

All of us carry a cell phone, a BlackBerry or a personal digital assistant, and they contain vast amounts of data. I promise you that we will do everything in our power to structure a policy and a regulatory regime that make clear what is proper use of this data by our employees. We will train employees in these policies and enforce them.

11

We've already begun discussions regarding the immediate automatic encryption of all sensitive information. We will work with the president's task force very closely.

V.A.'s mission to serve and honor our nation's veterans is one we take seriously. And the 235,000 dedicated V.A. employees are deeply saddened by any concern or anxiety this incident is causing to our veterans and their families.

We honor the service of our veterans and what they've done for our country, and we're working hard to keep this most unfortunate circumstance from causing them undue pain and anxiety. Thank you.

BUYER: Thank you, Mr. Secretary.

To my colleagues, sitting to the secretary's right is Mr. George Opfer. He is the V.A.'s I.G. and it was on purpose that he was not sworn in.

I will also ask unanimous consent that Thelma Drake and Jim Walsh be permitted to sit at the dais of the Veterans Affairs Committee. Hearing no objection, so ordered.

I want to thank Chairman Walsh for being present today. He also wanted to hold his own hearing on this and given the time constraints was not able to. And it's impressive that he's taken equal concern on this.

What we have here, Mr. Secretary, is this committee working cooperatively with Mr. Walsh and Mr. Chet Edwards on I.T., and when we -- before you took this job, we've been working hard on I.T. And when we couldn't get the V.A. to listen, we worked cooperatively with not only setting forth our budget, taking out $400 million to get somebody's attention, but the appropriators also followed suit.

I'm going to yield so other members can ask questions. The only thing I'd like for you to take away from this at this point, Mr. Secretary -- we intend to have follow-on hearings.

I would ask this of you. Whether you at the V.A. would likely -- no, rephrase this. Would you consider offering a reward, say a $1 million reward, for information that would lead to the arrest or recovery of this device? I want you to think about that. I want you to work with the Department of Justice on whether or not that could be helpful to us.

That $1 million is nothing compared to what we're about to expend. You've already sent us a reprogramming notice for $25 million. So I don't know where this could end. But I want you to consider that.

At this point, let me yield to Mr. Bilirakis for two minutes.

BILIRAKIS: Thanks, Mr. Chairman.

Mr. Secretary, welcome, I guess. Mr. Secretary, in Vietnam you were a true, most courageous hero, a true hero. You received many awards. I doubt that the difficulties you found there are as bad as they are with the V.A.

12

I'd like to get to -- in two minutes' time, how can we? But, you know, foundationally, this is a problem in the V.A. It's foundational. Others will ask questions regarding this particular instance, and I'm as concerned about it as anybody else is.

But let me just go into this -- Mr. Chairman, I'd like to ask unanimous consent that a two-page document, a written statement by a Dr. Leon A. Kappelman, be made a part of the record.

And I'd like to quote from that, Mr. Secretary, very quickly here. "V.A. has tens of thousands of dedicated, hard-working employees committed to the important mission of serving our nation's veterans and their families. But there is a dark side to V.A. Its bureaucratic culture is unprincipled, profligate and intransigent. I've seen them ignore Congress, GAO, OMB and one executive appointee after another. Oh, they know how to play the game to get the executive and Congress to open the budget floodgates, but V.A. doesn't really care how the dollars are actually spent as long as it doesn't interfere with business as usual at V.A. I have personally seen V.A. personnel sabotage and subvert hundreds of millions of dollars' worth of I.T. projects and read about billions more wasted and other failures. I've seen a total disregard for one cyber security effort after another. These are only the tip of the iceberg. And why do such things happen at V.A.? Largely because these systems and efforts would make the utilization of budget and personnel more transparent and thereby make accountability possible." Mr. Secretary, without going into the merits of these statements and that sort of thing -- the gentleman is not here for us to cross examine or whatever -- but I think we all agree that there is a problem there, a basic bureaucratic type of a problem -- at least I hope we all agree.

And I ask you, if that is the case -- let's go on the premise that that is the case -- can't you do something about it? What is preventing you from -- I guess this task force reviewing the entire V.A. and basically saying hey, we're going to chop here, we're going to change here, we're going to do this, we're going to do that?

Is it civil service? Does anything prevent you from doing these things? Are we sort of stuck with this kind of an image on the premise, now, again, that this is basically true? And I, frankly, think that it is, based on my experience over 24 years on this committee.

NICHOLSON: No. I mean, I'm aware of the history of these problems that the chairman and the ranking member have recited. There are others. I'm trying to ascertain exactly how many people telecommute.

Yesterday I was talking to an employee on this subject. It was a data expert who asked somebody to burn some records, some health records, for him onto a C.D. that he needed for a project. It was done. They were mailed to him very timely, tidy.

He wrote an e-mail back to him and he said that was great, that was prompt, I really appreciate it, where do you work here at the V.A. central office, maybe I'll run into you and we could have a cup of coffee. And the guy says I don't work here, I work in South Dakota. And so we have people telecommuting all over this country.

And we need to get our arms around who these people are and what they're like. And they have enormous amounts of data, with enormous amounts of potential, not

13

necessarily because they may be up to mischief, but they may be like the current case where they're negligent, and this is an enormous troubling situation.

But I will say to you that you cannot default to it. We have to fix it. And we can.

BILIRAKIS: Do you have the authority? Do you have the power to fix it?

NICHOLSON: Well, if we don't have it, we'll come and seek it. But you raise a good point, Mr. Chairman, because there are things that are called guidelines which some employees think do not apply because they say guideline, and they don't say directives.

And that has a history to it as well, about how expeditious you can get out a guideline versus the time it takes to do a directive. I will say that the thing needs to be reviewed from tip to stern.

We have queued up, I think, a very strong leader to come in and replace the person that has left as the chief information officer that I told you about, who I think did a very good job in forcing us into the transformation that we're now in on centralizing, you know, a portion of I.T. for business purposes and so forth.

But in the information security area, there's a lot needed, but it can be done. These things can be fixed.

BUYER: I thank the gentleman.

I'm going to hit this and go right to Mr. Filner. What assurance can you, Mr. Secretary, give veterans that if, indeed, these records end up in the hands of identity thieves that veterans will not suffer financially or otherwise for these illegal attacks on their credit?

NICHOLSON: Well, I think before I could give you that assurance I'm going to have to work with, you know, the Congress and see if it could be funded if they suffer, you know, a loss from this.

We are working at a fever pitch with several proprietary companies that are in this business trying to help monitor consumers', people's, credit records for them, and we're meeting with them, reviewing their proposals.

With the enormous amount of people involved, there's going to be a substantial cost to that. But that would give a lot of peace of mind to our veterans if they suffer a loss. The system of then compensating that, which I think is something that's owed to a veteran, we'll have to figure out.

BUYER: Mr. Filner, you're recognized for two minutes.

FILNER: Thank you, Mr. Chairman.

What was the highest level official who didn't tell you for 13 days about this?

NICHOLSON: That knew it during that time before -- the deputy secretary.

14

FILNER: Is he going to be fired?

NICHOLSON: I'm reviewing all these issues, Mr. Filner, with a view toward what actions that I'm going to take, and I'm going to take -- but the I.G. is continuing to do some work on this, and I want to...

FILNER: You know, your responses are incredibly bureaucratic. We can't get -- I don't see -- as I've told you, I don't see any passion. I don't see any, you know, view that -- you said I take responsibility. Well, the most dramatic thing you could do to take responsibility is resign.

I mean, you didn't know there was a war going on, so we didn't have enough -- we couldn't take care of the veterans. Now, your own people don't tell you about the theft of 26 million veterans. And you go through all this bureaucratic rigamarole. You issue something to veterans, frequently asked questions, and you tell them if you have any problem, call your credit bureau, call your bank. Where is your responsibility in all this? You claim your responsibility but you tell your veterans go call a number, which -- you gave the wrong number, by the way, from your testimony. At least it's different than in your press release.

So you're not taking any responsibility, not only financially, but, you know, for this management debacle. And you said time and again, from your press release, there's no medical data here. Is that what you have said?

NICHOLSON: Yes, I said none of the medical records were...

(CROSSTALK)

FILNER: Yes, but you're being very bureaucratic. Isn't there a diagnostic code on here that indicates a specific injury, disability or medical condition that's part of the record here?

NICHOLSON: For disability recipients, yes.

FILNER: Well, why not state that clearly and bluntly? Every specific code relates to a specific health condition, and the disability codes are linked to specific individuals by their name and date of birth, and they reveal each disabled veteran's medical problems and conditions, correct?

NICHOLSON: Yes, I think that would be correct, yes.

FILNER: Yes, so we have medical knowledge floating around here on 26 million people. You should resign, Mr. Secretary.

NICHOLSON: No, sir. I mean, it happens to be those that are getting disability, which is not a small number. It's about 2.6 million.

FILNER: Three million people suffer from that, OK.

BUYER: Thank you, Mr. Filner.

15

Mr. Stearns, you're recognized for two minutes.

STEARNS: Yes, thank you, Mr. Chairman.

I would say to Mr. Filner that Mr. Nicholson has indicated he takes full responsibility, so -- but, I mean, he said that personally, and I understand, with his record, how upset he is.

But, Mr. Secretary, have you fired the employee who lost this information? And why not?

NICHOLSON: He has been put on administrative leave pending further action. There are other people, to go back to Mr. Filner's comment, who are also in my sights as a result of this. STEARNS: Do you have internal controls? For example, why wasn't this information encrypted? In commercial corporations, they encrypt all this information as a standard operating procedure. How in the world could a person take this outside and not be encrypted?

NICHOLSON: One, he wasn't authorized to take it home at all, but we have a standing regulation, standing policy, that anybody who is authorized to take sensitive information...

STEARNS: So you had in place...

NICHOLSON: ... outside of their work station...

STEARNS: OK.

NICHOLSON: ... has to have it encrypted.

STEARNS: Do you have in place an internal security operation with a security chief, with internal audits, and occasionally an outside audit to confirm that this information is secure in the Veterans Administration? Just yes or no.

NICHOLSON: Yes.

STEARNS: What is this going to cost the Veterans Administration? Your first diagnosis of this -- what do you think this is going to cost and you're going to need from this committee?

NICHOLSON: That's a tough call, because it's going to depend on what -- you know, at what level we decide -- you --

STEARNS: You're talking about $20 million, $5 million, $2 billion?

NICHOLSON: No, we're talking...

STEARNS: I mean, you must have a figure.

NICHOLSON: ... I would say we're talking way north of $100 million.

16

STEARNS: So you might be talking about $500 million.

NICHOLSON: It could be, yes, sir.

STEARNS: OK.

Thank you, Mr. Chairman.

BUYER: Thank you.

Mr. Gutierrez?

GUTIERREZ: Yes, I yield to...

NICHOLSON: Mr. Chairman, I'm sorry, but I'm going to have to -- I'm committed to go to the Senate.

(UNKNOWN): (OFF-MIKE)

GUTIERREZ: Thank you very much. I yield to Corinne Brown.

C. BROWN: Thank you very much.

Mr. Secretary, can you see me in my nice pretty red suit? This Monday all of us will be facing our veterans in the memorial celebration. And I don't know what we're supposed to say. They're going to paint us all with the same brush.

What assurances will we be able to give them that the 26 million veterans' records -- how have we notified them? Have we assured them that we're going to work with them throughout the process?

And I also want to know -- you know, some of our veterans will say this could have been an inside job. Have we done lie detector with everybody involved?

NICHOLSON: Well, as I said, Congresswoman, I hate this, I'm sure, more than you do, and I'll take responsibility for it. It happened at my organization. And I think what we are doing is everything we can in the time that we've had so far to try to get the word out to the veterans.

We're going to send them each a letter. We can't send 26 million letters instantaneously. We've found out we can't right now get 26 million envelopes. But we're under way getting them. And they will each get a letter.

You could help inform us with the 1-800 number and the Web site, the media, because we want each of them to know what to do and to know that right now there is no reason to panic. There is no sign that any of this is being used at this time.

C. BROWN: Mr. Secretary, I asked the question: What assurances do we have? Because this identity theft is a very possible thing. How do you know it wasn't an inside job?

17

NICHOLSON: Because the local law enforcement authorities that investigated the scene of the crime -- that was the first question I asked, by the way -- are convinced that it was a real break-in.

BUYER: Ms. Brown?

C. BROWN: Yes, sir.

BUYER: I thank you.

C. BROWN: Well, are we going to be able to give these questions in writing?

BUYER: Yes. If anybody has questions in writing, they will be -- please, you can submit them, and we will get them to the secretary.

The last questioner, Mr. Miller, recognized for two minutes. Then the secretary has to leave.

Thank you, Ms. Brown.

MILLER: Thank you very much, Mr. Chairman.

I did hear the secretary in his opening remarks refer to the fact that there were codes that was in this information, so I do think he brought it to this committee's attention, contrary to my colleague's question.

Two things. Number one, why would an employee take this information home?

NICHOLSON: Congressman Miller, he took it home to work it. He was working on a project where he was trying to streamline a telephonic polling that we do of veterans periodically, and it's done randomly, that they're called and asked a series of questions, which is -- you know, it's benign.

We're trying to find out what's going on in their life, how we're doing with them, how they're doing, and so forth, and he thought he had a way that he could make this more efficient in the selection of the veterans that we were calling. And he took this data home to work it.

MILLER: And my second question -- and of course, we're all concerned about the financial implications to the veterans, but I also want to know, you know, the financial institutions, banks, credit unions, retailers, anybody that may get caught up in this -- who is going to be responsible for the costs that maybe incurred for private entities out there?

NICHOLSON: Well, you know, I suppose the ultimate answer to that question is going to be up to you all that make the laws. I mean, we're...

MILLER: Let me ask you...

NICHOLSON: ... it happened because of us.

MILLER: Let me ask it this way. What would your recommendation be?

NICHOLSON: Well, my recommendation would be that we be responsible for it. We caused it.

MILLER: Thank you. That's what I wanted to hear.

BUYER: All right.

Mr. Secretary, thank you very much. You and Mr. McClain are excused. Thank you.

I'd now like the other witnesses to please come to the table to replace the secretary and the general counsel. If staff could help them, what we may have to do is bring your chairs to the front. To all of my colleagues, while this administrative shuffle is occurring, the team that the secretary is leaving behind is the team that's responsible for cyber security and in charge of plans and policy.

There is a hearing on the Senate side that starts at 10 o'clock, and that's the purpose of the secretary's and general counsel's exit.

But what I wanted to ensure for all of my colleagues is that as the secretary leaves these are the individuals who are in the responsible positions.

Ms. Berkley?

BERKLEY: Thank you, Mr. Chairman. With all due respect, and I'm sure these are the men and women that do the nuts and bolts on this issue, but I was hoping to talk to the secretary and have an opportunity to question him.

Will he be available to us? It seems that something this important -- one hour in front of this committee simply is not enough. Oh, I'm sorry, 45 minutes.

BUYER: Forty-five minutes. We will entertain that. We're going to have follow-on hearings. If the secretary is necessary, we will bring the secretary back before the full committee. We can do briefings to members. I'll seek your counsel.

BERKLEY: Yes, I would appreciate that. Thank you, Mr. Chairman.

BUYER: Yes, ma'am.

BERKLEY: And I'm going to the I.R. Committee markup.

BUYER: All right. Thank you.

All right, Mr. Michaud, you're now recognized.

The committee will come to order, please. People can either take seats -- and please close the door. If someone can help out and make sure all the name plates can be read by the members, please.

19