detailing logging for later investigation. By hardware safeguards, I mean physically disabling or blocking access to drives or ports where personal data storage devices could be connected.

47. Safeguards for each computer system or data collection requiring access limitation must be determined on a case by case basis to be effective. The only professionally adequate method to determine which safeguard or combination of safeguards provide adequate security for a particular system is to perform and document an analysis of the potential threats and the possible consequences of failing to protect against each threat (commonly referred to as a "threat analysis" or "security analysis").

48. It is clear, therefore, that only if safeguards are based on a thorough security threat analysis that accurately considers current threats and known system vulnerabilities can the safeguards be reasonably considered adequate.

49. Based on my review of the information available, there is no indication that the VA has performed a security threat analysis or otherwise assessed the threats, risks, or vulnerabilities of its computer systems, or whether such an analysis has been maintained current.

50. It is my conclusion, based on my education, experience, and the relevant professional standards, that the failure to perform a security threat analysis, or the failure to update an existing analysis based on new technology and emerging security vulnerabilities, is contrary to longstanding consensus standards and good practices for safeguarding sensitive information.

51. Based on my education, experience and training, and review of the professional literature, it is my professional opinion that in May 2006 any competent security professional or organization charged with safeguarding sensitive information would recognize downloading files from a computer system without any hardware or software security

barriers onto personal media such as an external hard drive or memory stick is a fundamental security threat and that failing to consider safeguards against such a threat would be contrary to the information security policies and procedures of which I am aware.

52. It is my further opinion that a security threat analysis of a computer system and basic security policies and procedures should have considered the scenario of an unauthorized employee downloading of files and implemented safeguards to prohibit unmonitored downloading of files containing sensitive information. The fundamental nature of the security threat posed by such downloads suggest that a failure to consider at least the possibility of it occurring must have been intentional or the result of gross professional incompetence that recklessly endangered the information that was to be protected.

53. It is my conclusion, therefore, that a failure to provide safeguards to prevent or at least mitigate the effects of unmonitored employee downloading of sensitive data, was either willful and intentional or the result of professional incompetence to the degree of reckless disregard for the security of the information to be protected.

## TRAINING IS AN INADEQUATE SAFEGUARD

54. As I understand the discussion in "Defendants' Statement of Material Facts As To Which There Is No Genuine Issue" and Defendants' "Memorandum of Law in Support of Defendants' Motion to Dismiss or, in the Alternative, For Summary Judgment," Defendants' sole safeguard against compromise and transfer of VA Privacy Act record files from VA computer systems, including BIRLS, was training VA employees on generic security practices.

55. While training of employees is a necessary component of an adequate information security program, it has long been known and accepted in the industry that training alone is not adequate, by itself, to safeguard information. Training, no matter how rigorous or

repeatedly provided, suffers from the flaw that a single failure to comply with the training places the protected information at risk. Arbitrary training, meaning training that is not based on a threat or security analysis specific to the computer system or systems intended to be safeguarded, is even less effective, because the training itself may be based on flawed or incorrect assumptions regarding the actual security threats. In such a case, even complete compliance by all individuals may not be sufficient to ensure that the information is protected.

56. The security vulnerabilities of an information security program that relies solely on administrative controls, such as employee training, are well known. The primary vulnerability is that such a system can be compromised by a single failure to comply by a single employee. Further, the compromise can be caused either by intentional or unintentional acts. The fragile nature of a training-based security program, therefore, requires comprehensive and continuous monitoring of compliance by every employee to provide any level of security to the information sought to be protected.

57. It is my professional opinion based on my education, training, and experience, therefore, that Defendants' Privacy Act records safeguards on May 3, 2006, were fundamentally flawed in that the security of the records rested solely on the premise that every VA employee would fully comply with the training at all times. Such an assumption directly conflicts with industry standards and good practices and Defendants' have provided no basis for their deviation from accepted information security principles.

58. It is my further opinion that Defendants' failed to conduct any oversight or monitoring of VA employees' information security practices for compliance with the requirements in the VA security training. Thus, on May 3, 2006, Defendants had no basis to conclude that their sole safeguard was effectively providing minimal security for the VA Privacy Act records.

59. I conclude that Defendants' reliance on employee training as the sole safeguard for Privacy Act records in light of the mandatory minimum security requirements and available security guidance and procedures, was the result of an intentional and willful decision to ignore the applicable security requirements or was the result of extraordinary professional incompetence.

60. I further conclude that Defendants' failure to monitor and oversee VA employees' compliance with the VA security training requirements in light of the mandatory minimum security requirements, available security guidance and procedures, and the known vulnerabilities of a training-based security process, was the result of an intentional and willful decision to ignore the applicable security requirements or was the result of extraordinary professional incompetence.

61. I further conclude that Defendants' apparent failure to base the VA employee security training on the specific threats or security challenges to the computer systems desired to be protected in light of the mandatory minimum security requirements and available security guidance and procedures was the result of an intentional and willful decision to ignore the applicable security requirements or was the result of extraordinary professional incompetence. Indeed, the May 3, 2006, event scenario, as I understand it, was not discussed in the VA employee security training.

## UNDETECTABLE ACCESS TO PLAINTIFFS' INFORMATION ON THE STOLEN HARD DRIVE

62. The information stored on a computer hard drive, such as the portable device described as being stolen from the VA employee's home on May 3, 2006, can be accessed and copied in a number of ways. Not all of those ways leave indications that copying has occurred. Many methods of copying data from a hard drive exist which leave no detectable indications of access or copying.

63. If the person or persons who stole the hard drive on May 3, 2006, or any subsequent individual who came into possession of the hard drive, had freely obtained or readily available hardware or software described above, all the files on the hard drive could have been copied to another medium without any trace.

64. In this case, such a technique would have allowed the data thief to startup the installed SAS application and access all the VA records stored in the SAS format.

65. More significantly, however, the available tools would have made access to SAS unnecessary. SAS stores information in a file that can be read by several types of general file reader software, including "Notepad," which is included in every version of the Windows operating system. While the original formatting of the SAS data would not be preserved, all of the personal information such as names, addresses, and SSNs would have been easily exploited. The thief, therefore, could have copied the stolen hard drive information, taken it home, and used Notepad to open the SAS files. He or she would then have complete access to all the Privacy Act information on the stolen hard drive. With only minimal programming skills, a thief could even develop a program to convert or strip all the SAS formatting information from the files and to produce clean text files of the personal information.

66. Even where specialized software, such as SAS, applies a custom formatting (not including encryption) to the data rendering it unreadable by general programs such as Notepad, it is very easy to make it readable again by using a simple program that removes the formatting and saves the information into generally formatted and readable text.

67. It is my professional opinion based on my education, training and experience, therefore, that it is impossible to state with any certainty at all that data and files on the external

68.     hard drive recovered by the VA have not been surreptitiously accessed or copied by performing forensic analyses after recovery of the device.

68. I further conclude that, based on my review of the press reports cited by Defendants, the FBI did <u>not</u> state that the stolen hard drive was not accessed while missing with absolute certainty. The press reports clearly state that the FBI expressed only a "confidence" that the drive was likely not accessed. Without the results of the actual forensic analysis performed by the FBI, it is not possible to evaluate the technical basis for any such conclusion regarding hard drive access. In any event, however, the FBI analysis must be limited to the copying methods that leave some indication of file access. It is my professional opinion, based on the discussion above, that no analysis, by the FBI or anyone else, could provide a technical basis for an absolute conclusion that the hard drive data was not accessed.

69. I conclude, therefore, that Defendants' purported statement of fact that "the data on the hard drive was never accessed after the theft" is both technically unsupported and unsupportable, and a mischaracterization of the FBI analysis results.

70. I further conclude that the several weeks that the stolen hard drive was missing was easily enough time for the thief or others to make an undetectable copy of the Privacy Act records using one of methods described above.

### METHODS EMPLOYED BY IDENTIFY THIEVES

71. I am knowledgeable of the methods currently employed by identity and data thieves. This knowledge arises from my work as a consultant analyzing potential methods for gaining access to data in order to advice vendors on how to best protect data stored on media such as hard drives. I have personally met with customers and discussed targeted thefts of laptops due to the data that they potentially could contain. This is true both for

72. commercial as well as government customers. I have either talked to them directly or heard about cases through colleagues discussing their customers.

72. It is widely known that personal data theft is a growing motivation for laptop and portable storage device theft. Recently, identity thieves expanded the scope of their activities and have begun targeting health care records because fraudulent charges can be easily hidden in legitimate medical bills. *See, e.g.,* http://software.silicon.com/security/0,39024655,39157622,00.htm. VA Privacy Act records, therefore, make a particularly attractive target for identity thieves.

73. An experienced and determined identity thief possesses or has access to a number of software tools to search for and identify personal information useful in accomplishing identity theft including, but not limited to:
    - Forensics software for analyzing and searching for specific data on a hard drive, such as WinHex;
    - Text search utilities that can open and search files save in different formats such as Microsoft office files and Adobe PDF files such as Disk Search Assistant, http://www.disk-search.com; and
    - Programs that can search for patterns (e.g., "xxx-xx-xxx" for identifying social security numbers or "(xxx) xxx-xxxx" for phone numbers) such as Omnixray, http://www.omnixray.com.

74. The most valuable information sought by information thieves is a Social Security Number ("SSN") that can be tied to a name and accurate home address. Based on my review of recent literature, the value of a single SSN, name, and address combination is anywhere from $0.20 to $75 depending on whether the information contained only a SSN or whether it had complete information connecting a SSN, Name and Address together. *See, e.g.,* http://www.mercurynews.com/portlet/article/html/fragments/print_article.jsp?articleId=5470582&siteId=568; http://www.macworld.com/news/2007/03/19/idtheft/index.php.

75. The largest and most active identity thieves do not conduct actual burglaries or data thefts, but rely on others to bring them devices, such as computers and hard drives, that are believed to contain identity information, which the identity thieves buy. The identity thieves then cull the information from the stolen devices using one or more of the tools described above.

76. Accomplished identity thieves also do not directly use the stolen identity information; instead they act as "wholesalers" and sell the information in small increments on an active black market to other individuals for use in fraudulent transactions.

77. As a practical matter, therefore, an experienced identity thief receiving more than 26 million identities would be unable to process and distribute more than a very small percentage of the veterans' identities in the time since the May 3, 2006, theft. In fact, the sheer number of records likely (1) prevented use of any of the stolen identities before the event was made public and (2) so far exceeded the capability of the thieve(s) to process, that it may be several years before a particular identity is used for illegal purposes.

78. Similarly, experienced data thieves would recognize that the uproar over the loss of the veterans' information after the public was informed would heighten sensitivity to potential identity thefts and would so "lie low" for some extended period until the uproar diminished.

79. Further, although the use of stolen identities to obtain credit cards and fraudulently purchase goods and services is widely known, stolen identities are increasingly being used to obtain employment and deter law enforcement in criminal investigations and civil legal matters. These non-financial uses would not show up on "credit watches" or similar services.

80. It is my professional opinion, therefore, that there is no factual basis for a conclusion that individuals whose personal information was stolen on May 3, 2006, have not or will not in the future be used in a manner adverse to the individual.

81. To the contrary, if the information was surreptitiously copied from the stolen hard drive, a sophisticated identity thief would likely attempt to minimize detection by retaining the information for future use. Thus, individuals whose personal information was lost in the May 3, 2006, theft will never be assured that the information will not be used to their detriment.

**FURTHER AFFIANT SAYETH NOT.**

*Kurt Uno Rudolf Edgar Lennartsson*
Kurt Uno Rudolph Edgar Lennartsson

SWORN to and subscribed before me,

this _____ day of _____, 2007.

_____
Notary Public for ___California___

My commission expires: _Dec 18 2010_

State of California County of
__SANTA CLARA__
Subscribed and sworn to (or affirmed)
Before me on this 23rd day of MAR 2007, by
KURT UNO RUDOLF EDGER LENNARTSSON
~~personally known~~ to me or proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.
Signature _____
(Seal)

JAYANTI M. PATEL
Commission # 1706837
Notary Public - California
Santa Clara County
My Comm. Expires Dec 18, 2010