**NOTICES**

(4) Establish procedures to assure that records transferred to the National Archives of the United States pursuant to 44 U.S.C. 2103, are properly safeguarded and that public notices of the existence and character of such records are issued in conformance with 5 U.S.C. 552a (1), (2), and (3).

(5) Revise procedures governing the clearance of interagency data collection forms for which it is responsible to assure that those requesting information from individuals are revised in conformance with 5 U.S.C. 552a(e) (3).

(j) Revise procurement guidance to incorporate language consistent with 5 U.S.C. 552a(m); i.e., to provide that contracts which provide for the maintenance of a system of records by or on behalf of an agency to accomplish an agency function includes language which assures that such system will be maintained in conformance with the Act.

(7) Revise computer and telecommunications procurement policies to provide that agencies must review all proposed equipment and services procurements to assure compliance with applicable provisions of the Act; e.g., Report on New Systems.

d. The Civil Service Commission shall, consistent with guidelines issued by OMB:

(1) Revise civilian personnel information processing and record-keeping directives to bring them into conformance with the Act.

(2) Devise and conduct training programs for agency personnel including both the conduct of courses in various substantive areas (e.g., legal, administrative, ADP) and the development of materials which agencies can use in their own courses.

e. The Director of the Office of Telecommunications Policy shall, consistent with guidelines issued by OMB, issue and/or revise policies governing government data telecommunications consistent with the Privacy Act.

f. The Director of the Office of Management and Budget will:

(1) Issue guidelines and regulations to the agencies to implement the Act. While the application of the requirements of the Act is the agency's responsibility, interpretive guidelines have been devised to:

Assist agencies in interpreting the requirements of the Act;

Establish minimum standards or criteria, where appropriate, in applying the Act;

Provide illustrative examples of the application of the Act; and

Assure a uniform and constructive implementation of the Act.

(2) Provide assistance, upon request, to agencies.

(3) Review proposed new systems or changes to existing systems.

(4) Compile the annual report to the Congress on agency activities to comply with the Act in accordance with 5 U.S.C. 552a(p).

(5) Revise procedures governing the clearance of data collection forms and reports for which it is responsible to as-

sure that those requesting information about individuals in conformance with 5 U.S.C. 552a(e) (3).

6. *Reports.* Agencies are required to submit the following reports consistent with guidance on format, content, and timing to be issued under separate transmittal.

a. Reports on new systems to the Congress, OMB, and, for the period of its existence, the Privacy Protection Study Commission. Reports shall be submitted not later than 60 days prior to the establishment of a new system or the implementation of a change to an existing system.

b. Annual report on agency activities to comply with 5 U.S.C. 552a to OMB not later than April 30 of each year.

7. *Effective Date.* The provisions of this Circular are effective on September 27, 1975 except that:

a. Reports on new systems which cover the implementation of new or altered systems of records proposed to be effective after September 27, 1975 shall be submitted not later than 60 days before the effective date of those new systems or changes; and

b. Rules and notices prescribed by the Act and regulations and guidelines to be issued by the responsible agencies shall be issued in advance of the effective date where required by law (e.g., the Administrative Procedures Act, 5 U.S.C. 553) or as otherwise necessary to permit timely and effective compliance.

8. *Inquiries.* Inquiries concerning this Circular may be addressed to the Information Systems Division, Office of Management and Budget, Room 9002, NEOB, Washington, D.C., 20503, telephone 202 395–4814.

JAMES T. LYNN.
*Director.*

NOTE: Each agency shall order sufficient quantities of the OMB guidelines in accordance with the instructions which will be provided by the FEDERAL REGISTER. At a later date, copies will be available for sale from the Superintendent of Documents, U.S. Government Printing Office, Washington, D.C.

[FR Doc.75–17773 Filed 7–8–75;8:45 am]

---

**PRIVACY ACT GUIDELINES—
JULY 1, 1975[1]**

**Implementation of Section 552a of Title 5 of the United States Code**

[1] Section 3 of the Privacy Act of 1974, Pub. L. 93–579.

TABLE OF CONTENTS

Subsection

(a) DEFINITIONS.
(1) Agency.
(2) Individual.
(3) Maintain.
(4) Record.
(5) System of Records.
(6) Statistical Record.
(7) Routine Use.

(b) CONDITIONS OF DISCLOSURE.
(1) Disclosure within the Agency.
(2) Disclosure to the Public.
(3) Disclosure for a "Routine Use".
(4) Disclosure to the Bureau of the Census.
(5) Disclosure for Statistical Research and Reporting.
(6) Disclosure to the National Archives.
(7) Disclosure for Law Enforcement Purposes.
(8) Disclosure under Emergency Circumstances.
(9) Disclosure to the Congress.
(10) Disclosure to the General Accounting Office.
(11) Disclosure Pursuant to Court Order.
(c) ACCOUNTING OF CERTAIN DISCLOSURES.
(1) When Accounting is Required.
(2) Retaining the Accounting of Disclosures.
(3) Making the Accounting of Disclosures Available to the Individual.
(4) Informing Prior Recipients of Corrected or Disputed Records.
(d) ACCESS TO RECORDS.
(1) Individual Access to Records.
(2) Requests for Amending Records.
(A) Acknowledgement of Requests to Amend Records.
(B) Actions Required on Requests to Amend Records.
(3) Requesting a Review of the Agency's Refusal to Amend a Record.
(4) Disclosure of Disputed Information.
(5) Access to Information Compiled in Anticipation of Civil Action.
(e) AGENCY REQUIREMENTS.
(1) Restrictions on Collecting Information about Individuals.
(2) Information is to be Collected Directly from the Individual.
(3) Informing Individuals from whom Information is Requested.
(4) Publication of the Annual Notice of Systems of Records.
(A) Describing the Name and Location of the System in the Public Notice.
(B) Describing Categories of Individuals in the Public Notice.
(C) Describing Categories of Records in the Public Notice.
(D) Describing Routine Uses in the Public Notice.
(E) Describing Records Management Policies and Practices in the Public Notice.
(F) Identifying Officials(s) Responsible for the System in the Public Notice.
(G) Describing Procedures for Determining if a System contains a Record on an Individual in the Public Notice.
(H) Describing Procedures for Gaining Access in the Public Notice.
(I) Describing Categories of Information Sources in the Public Notice.
(5) Standards of Accuracy.
(6) Validating Records before Disclosure.
(7) Records on Religious or Political Activities.
(8) Notification for Disclosures Under Compulsory Legal Process.
(9) Rules of Conduct for Agency Personnel.
(10) Administrative, Technical and Physical Safeguards.
(11) Notice for New/Revised Routine Uses.
(f) AGENCY RULES
(1) Rules for Determining if an Individual is the Subject of a Record.
(2) Rules for Handling Requests for Access.
(3) Rules for Granting Access to Records.
(4) Rules for Amending Records.
(5) Rules Regarding Fees.

Annual Publication of Notices and Rules

(g) CIVIL REMEDIES
(1) Grounds for Action.
(A) Refusal to Amend a Record.
(B) Denial of Access to a Record.
(C) Failure to Maintain a Record Accurately.
(D) Other Failures to Comply with the Act.
(2) Basis for Judicial Review and Remedies for Refusal to Amend a Record.

(3) Basis for Judicial Review and Remedies for Denial of Access.

(4) Basis for Judicial Review and Remedies for Adverse Determination and Other Failures to Comply.

(5) Jurisdiction and Time Limits.

(h) RIGHTS OF LEGAL GUARDIANS.

(i) CRIMINAL PENALTIES.

(1) Criminal Penalties for Unauthorized Disclosure.

(2) Criminal Penalties for Failure to Publish a Public Notice.

(3) Criminal Penalties for Obtaining Records Under False Pretenses.

(j) & (k) EXEMPTIONS.

(j) GENERAL EXEMPTIONS APPLICABILITY AND NOTICE REQUIREMENTS.

(1) General Exemption for the Central Intelligence Agency.

(2) General Exemption for Criminal Law Enforcement Records.

(k) SPECIFIC EXEMPTIONS APPLICABILITY AND NOTICE REQUIREMENTS.

(1) Exemption for Classified Material.

(2) Exemption for Investigatory Material Compiled for Law Enforcement Purposes.

(3) Exemption for Records Maintained to Provide Protective Services.

(4) Exemption for Statistical Records.

(5) Exemption for Investigatory Material Compiled for Determining Suitability for Federal Employment or Military Service.

(6) Exemption for Testing or Examination Material.

(7) Exemption for Material used to Evaluate Potential for Promotion in the Armed Services.

(l) ARCHIVAL RECORDS.

(1) Records Stored in GSA Records Centers.

(2) Records Archived Prior to September 27, 1975.

(3) Records Archived on or after September 27, 1975.

(m) GOVERNMENT CONTRACTORS.

(n) MAILING LISTS.

(o) REPORT ON NEW SYSTEMS.

(p) ANNUAL REPORT.

(q) EFFECT OF OTHER LAWS.

SUBSECTION (a) DEFINITIONS

Subsection (a) "For purposes of this section—"

*Agency.* Subsection (a) (1) "The term 'agency' means agency as defined in section 552(e) of this title;"

The definition of "agency" is the same as that used in the Administrative Procedures Act as modified by the recently enacted Freedom of Information Act amendments (Pub. L. 93–502) : " 'agency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency . . ." (5 U.S.C. 551(1)). "[T]he term agency * * * includes any executive department, military department, Government corporation, Government controlled corporation or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." (5 U.S.C. 552(e) as added by Pub. L. 93–502)

Two aspects of this definition require further explanation:

The scope of the term; i.e., what entities are covered, how has the definition of agency been broadened to encompass additional organizations as a result of the FOIA amendments?

Whether or not entities within an agency are to be considered agencies. This is particularly significant in applying subsection (b)(1), in determining what constitutes an interagency transfer.

The first question—the scope of the definition—is covered in the House report on the FOIA amendments quoted below, as modified by the conference report language set out thereafter:

For the purposes of this section, the definition of "agency" has been expanded to include those entities which may not be considered agencies under section 551(1) of title 5, U.S. Code, but which perform governmental functions and control information of interest to the public. The bill expands the definition of "agency" for purposes of section 552, [and 552a] title 5, United States Code. Its effect is to insure inclusion, under the Act of Government corporations. Government controlled corporations, or other establishments within the executive branch, such as the U.S. Postal Service.

The term "establishment in the Executive Office of the President," as used in this amendment means such functional entities as the Office of Telecommunications Policy, the Office of Management and Budget, the Council of Economic Advisers, the National Security Council, the Federal Property Council, and other similar establishments which have been or may in the future be created by Congress through statute or by Executive order.

The term "Government corporation," as used in this subsection, would include a corporation that is a wholly Government-owned enterprsie, established by Congress through statute, such as the St. Lawrence Seaway Development Corporation, the Federal Crop Insurance Corporation (FCIC), the Tennessee Valley Authority (TVA), and the Inter-American Foundation.

The term "Government controlled Corporation," as used in this subsection, would include a corporation which is not owned by the Federal Government * * * (House Document 93–876, pp. 8–9, Report on the Freedom of Information · Act amendments, H.R. 12741).

The conferees state that they intend to include within the definition of "agency" those entities encompassed by 5 U.S.C. 551 and other entities including the United States Postal Service, the Postal Rate Commission, and government corporations or government-controlled corporations now in existence or which may be created in the future. They do not intend to include corporations which receive appropriated funds but are neither chartered by the Federal Government nor controlled by it, such as the Corporation for Public Broadcasting. Expansion of the definition of "agency" in this subsection is intended to broaden applicability of the Freedom of Information Act but it is not intended that the term "agency" be applied to subdivisions, offices or units within an agency.

With respect to the meaning of the term "Executive Office of the President" the conferees intend the result reached in *Soucie v. David,* 448 F. 2d. 1067 (C.A.D.C. 1971). The term is not to be interpreted as including the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President." (House Report 93–1380, p. 14–15)

Whether or not an agency can exist within an agency is a somewhat more complex issue. This is addressed, in part, in the above quotation from the conference report language in the statement "* * * but it is not intended that the term 'agency' be applied to subdivisions, offices, or units within an agency." The issue was also addressed in debate on

H.R. 16373 on the House floor in a statement by Congressman Moorhead—"* * * 'agency' is given the meaning which it carries elsewhere in the Freedom of Information Act, 5 United States Code, section 551(1), as amended by H.R. 12471 of this Congress, section 552(e), on which Congress has acted to override the veto. The present bill is intended to give 'agency' its broadcast statutory meaning. This will permit employees and officers of the agency which maintains the records to have access to such records if they have a need for them in the performance of their duties. For example, within the Justice Department—which is an agency under the bill—transfer between division of the Department, the U.S. Attorney's offices, the Parole Board, and the Federal Bureau of Investigation would be on a need-for-the-record basis. Transfer outside the Justice Department to other agencies would be more specifically regulated. Thus, transfer of information between the FBI and the Criminal Division of the Justice Department for official purposes would not require additional showing or authority, in contrast to transfer of such information from the FBI to the Labor Department." (*Congressional Record* November 21, 1974, p. H10962)

In addressing this question the Justice Department has advised that

* * * it is our firm view that the 1974 [FOIA] Amendments require no change in the original Act, that it is for the over-unit—the Department or other higher-level "agency"—to determine which of its substantially independent components will function independently for Freedom of Information Act purposes. Moreover, as the Attorney General noted in that portion of his Memorandum dealing with the subject, "it is sometimes permissible to make the determination differently for purposes of various provisions of the Act—for example, to publish and maintain an index at the overunit level while letting the appropriate subunits handle requests for their own records." (Attorney General's Memorandum on the 1974 Amendments to the Freedom of Information Act, February, 1975, p. 26). In our view, this practice of giving variable content to the meaning of the word "agency" for various purposes can be applied to the Privacy Act as well as the Freedom of Information Act. For example, it may be desirable and in furtherance of the purposes of the Act to treat the various components of a Department as separate "agencies" for purposes of entertaining applications for access and ruling upon appeals from denials, while treating the Department as the "agency" for purposes of those provisions limiting intragovernmental exchange of records. (Of course, dissemination among components of the Department must still be only on a "need-to-know" basis. 5 U.S.C. 552a(b) (1).) Needless to say, this practice must not be employed 'invidiously, so as to frustrate rather than to further the purposes of the Act; and there should be a consistency between the practice under the Privacy Act and the practice for comparable purposes under the Freedom of Information Act. For this reason it seems to us doubtful (though not entirely impossible) that a Department or other over-unit which has treated its components as separate agencies for all purposes under the Freedom of Information Act could successfully maintain that all of its components can be considered a single "agency" under the Privacy Act, simply to facilitate the exchange of records (Letter from Assist-

ant Attorney General, Office of Legal Counsel, dated April 14, 1975)

In addition to the matter of determining when a component of an agency is to be considered an agency itself when the entire agency is to be treated as a single entity, the issue arises as to whether an entity or individual serving more than one agency may be considered an "employee" of each agency he serves, for certain purposes. While this is not specifically addressed in the Act, it is reasonable to assume that members of temporary task forces, composed of personnel of several agencies, should usually be considered employees of the lead agency and of their own agency for purposes of access to information. Similarly, members of permanent "strike forces" and personnel crossdesignated to serve the functions of two or more agencies should usually be treated as employees of both the lead agency and their own employing agency, e.g., employees or State or local officials assigned to organized crime, and customs officers cross designated to perfrom each others functions.

*Individual.* Subsection (a) (2) "The term 'individual' means a citizen of the United States or an alien lawfully admitted for permanent residence;"

This definition is intended to "distinguish between the rights which are given to the citizen as an individual under this Act and the rights of proprietorships, businesses, and corporations which are not intended to be covered by this Act. This distinction was to insure that the bill leaves untouched the Federal Government's information activities for such purposes as economic regulations. This definition was also included to exempt from the coverage of the bill intelligence files and data banks devoted solely to foreign nationals or maintained by the State Department, the Central Intelligence Agency and other agencies for the purpose of dealing with nonresident aliens and people in other countries." (Senate Report 93–1183, p. 79).

The language cited above suggests that a distinction can be made between individuals acting in a personal capacity and individuals acting in an entrepreneurial capacity (e.g., as sole proprietors) and that this definition (and, therefore, the Act) was intended to embrace only the former. This distinction is, of course crucial to the application of the Act since the Act, for the most part, addresses "records" which are defined as "* * * information about individuals" (subsection (a)(4)). Agencies should examine the content of the records in question to determine whether the information being maintained is, in fact, personal in nature. A secondary criterion in deciding whether the subject of an agency file is, for purposes of the Act, an individual, is the manner in which the information is used; i.e., is the subject dealt with in a personal or entrepreneurial role.

Files relating solely to nonresident aliens are not covered by any portion of the Act. Where a system of records covers both citizens and nonresident aliens, only that portion which relates to citizens or

resident aliens is subject to the Act but agencies are encouraged to treat such systems as if they were, in their entirety, subject to the Act.

The Act and the legislative history are silent as to whether a decedent may be considered to be an individual and whether anyone may authorize the rights of the decedent to records pertaining to him maintained by Federal agencies. It would appear that the thrust of the Act was to provide certain statutory rights to living as opposed to deceased individuals. But for the provision enabling parents to act on behalf of minors and guardians to act on behalf of those deemed to be incompetent, the rights of an individual provided by the Privacy Act could not have been utilized in their behalf by those interested. The failure of the Privacy Act to so provide for decedents and the overall thrust of the Act—that individuals be given the opportunity to judge for themselves how, and the extent to which, certain information about them maintained by Federal agencies is used, and the implicit personal judgement involved in this thrust—indicates that the Act did not contemplate permitting relatives and other interested parties to exercise rights granted by the Privacy Act to individuals after the demise of those individuals. These same records, however, may pertain as well to those living persons who might otherwise seek to exercise the decedent's right with regard to that information and thereby be covered by the Privacy Act. Furthermore, access to a decedent's records may be had in various judicial forums as a part of, or ancillary to, other proceedings.

*Maintain.* Subsection (a) (3) "The term 'maintain' includes maintain, collect, use, or disseminate;"

The term "maintain" is used in two ways in the Privacy Act.

First, it is used to connote the various record keeping functions to which the requirements of the Act apply; i.e., maintaining, collecting, using, or disseminating. Thus, wherever the word "maintain" appears with reference to a record, one should understand it to mean collect, use, or disseminate or any combination of any of these record-keeping functions.

Second, it is used to connote control over and hence responsibility and accountability for systems of records. This is extremely important given the civil and criminal sanctions in subsections (g) and (i) for failure to comply with certain provisions. The applicability of certain provisions, including the exemptions in subsections (j) and (k), can be determined by an agency's ability to demonstrate that it has effective control over a system of records. See, for example, subsections (b)(1), (d), (e)(1), (e)(9), (g), and (i) wherein the term "maintain" clearly means having effective control over a system of records. To have effective control of a system of records does not necessarily mean to have physical control of the system. When records are disclosed to Agency B from a system of records maintained by Agency A, they are then considered to be maintained by Agency B (as well as Agency A) and are subject to all of the provi-

sions of the Act in the same manner as though Agency B had originally compiled them. If one agency turns over a record from its system of records to a second agency and that record is placed in a separate system of records maintained by the second agency, then the record becomes part of the system of records maintained by the second agency and all of the published material as to the second agency's system of records would apply to the record moved into its system.

The requirements of subsection (m) must also be carefully considered in determining which systems are to be considered as "maintained," i.e., controlled by an agency within the terms of the Act. Subsection (m) stipulates that systems of records operated under contract or, in some instances, State or local governments operating under Federal mandates "by or on behalf of the agency . . . to accomplish an agency function" are subject to the provisions of Section 3 of the Act. The intent of this provision is to make it clear that the systems "maintained" by an agency are not limited to those operated by agency personnel on agency premises but include certain systems operated pursuant to the terms of a contract to which the agency is a party. The qualifying phrase "to accomplish an agency function" limits the applicability of subsection (m) to those systems directly related to the performance of Federal agency functions by excluding from its coverage systems which are financed, in whole or part, with Federal funds, but which are managed by state or local governments for the benefit of State or local governments.

*Record.*—Subsection (a) (4) "The term 'record' means any item, collection or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph;"

The term "record", as defined for purposes of the Act, means a tangible or documentary record (as opposed to a record contained in someone's memory) and has a broader meaning than the term commonly has when used in connection with record-keeping systems. (It may also differ from the usual definition of a computer record.) An understanding of the term "record", as it is used in the Act, is essential in interpreting the meaning of many of the Act's requirements.

A "record":

Means any item of information about an individual that includes an individual identifier:

Includes any grouping of such items of information (it should not be confused with the use of the term record in the conventional sense or as used in the automatic data processing (ADP) community) ;

Does not distinguish between data and information; both are within the scope of the definition; and

Includes individual identifiers in any form including, but not limited to, finger prints, voice prints and photographs.

The phrase "identifying particular" suggests any element of data (name, number) or other descriptor (finger print, voice print, photographs) which can be used to identify an individual. Identifying particulars are not always unique (i.e., many individuals share the same name) but when they are not unique (e.g., name) they are individually assigned—as distinguished from generic characteristics.

The term "record" was defined "to assure the intent that a record can include as little as one descriptive item about an individual." (Congressional Record, p. S21818, December 17, 1974 and p. H12246, December 18, 1974). This definition "includes the record of present registration, or membership in an organization or activity, or admission to an institution." (Senate Report 93-1183, p. 79). (While this language was written with reference to the definition of the term "personel information" in the Senate bill, it would appear to be equally applicable to the term "record" as used in the Act.)

A record, by this definition, can be part of another record. Therefore prohibitions on the disclosure of a record, for example, apply not only to the entire record in the conventional sense (such as a record in a computer system), but also to any item or grouping of items from a record provided that such grouping includes an individual identifier.

*System of Records.* Subsection (a) (5) "The term 'system of records' means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual;"

The definition of "system of records" limits the applicability of some of the provisions of the Act to "records" which are maintained by an agency, retrieved by individual identifier (i.e., there is an indexing or retrieval capability using identifying particulars, as discussed above, built into the system), and the agency does, in fact, retrieve records about individuals by reference to some personal identifier.

A system of records for purposes of the Act must meet all of the following three criteria:

It must consist of records. See discussions of "record" (a) (4), above.

It must be "under the control of" an agency.

It must consist of records retrieved by reference to an individual name or some other personal identifier.

The phrase "* * * under the control of any agency * * *" was intended to accomplish two separate purposes: (1) To determine possession and establish accountability; and (2) to separate agency records from records which are maintained personally by employees of an agency but which are not agency records.

As previously noted, the definition of "maintain" was broadened to encompass all systems used by Federal agencies. The phrase "* * * under the control of any agency * * *" in the definition of "system of records" was not intended to eliminate from the coverage of the Act any of those systems (which would largely negate the definition of "maintain"), but rather was intended to assign responsibility to a particular agency to discharge the obligations established by the Privacy Act. An agency is responsible for those systems which are "* * * under the control of" that agency. The concept of possession implicit in this phrase is also apparent in the language which begins most of the operative subsections of the Act. For example, the concept is evident although tacit in subsection (b); express in subsection (c) "under its control * * *" "* * * that maintains a system of records * * *" in subsections (d), (e) and (f); "agency records" in subsection (i), and "* * * any system of records within the agency" in subsection (j) and (k).

The intent was, despite the different wording for each subsection, not to have each of the subsections apply to a different roster of systems of records, but to express, in terms of possession, for which systems of records an agency was responsible.

The second purpose of the phrase was to distinguish "agency records" from those records which, although in the physical possession of agency employees and used by them in performing official functions, were not considered "agency records." Uncirculated personal notes, papers and records which are retained or discarded at the author's discretion and over which the agency exercises no control or dominion (e.g., personal telephone lists) are not considered to be agency records within the meaning of the Privacy Act. This distinction is embodied, in part, in the phrase "under the control of" an agency as well as in the definition of "record" (5 U.S.C. 552(a) (4)).

An agency shall not classify records, which are controlled and maintained by it, as non-agency records, in order to avoid publishing notices of their existence, prevent access by the individuals to whom they pertain, or otherwise evade the requirements of the act.

The "are retrieved by" criterion implies that the grouping of records under the control of an agency is accessed by the agency by use of a personal identifier; not merely that a capability or potential for retrieval exists. For example, an agency record-keeping system on firms it regulates may contain "records" (i.e., personal information) about officers of the firm incident to evaluating the firm's performance. Even though these are clearly "records" under the control of" an agency, they would not be considered part of a system as defined by the Act unless the agency accessed them by reference to a personal identifier (name, etc.). That is, if these hypothetical "records" are never retrieved except by reference to company identifier or

some other nonpersonal indexing scheme (e.g., type of firm) they are not a part of a system of records. Agencies will necessarily have to make determinations on a system-by-system basis.

Considerable latitude is left to the agency in defining the scope or grouping of records which constitute a system. Conceivably all the "records" for a particular program can be considered a single system or the agency may consider it appropriate to segment a system by function or geographic unit and treat each segment as a "system". The implications of these decisions and some limitations on them are discussed in connection with subsection (e) (4), publication of the annual notice. Briefly, the two considerations which the agency should take into account in its decisions are

Its ability to comply with the requirements of the Act and facilitate the exercise of the rights of individuals; and

The cost and convenience to the agency, but only to the extent consistent with the first consideration.

*Statistical Record.* Subsection (a) (6) "The term 'statistical record' means a record in a system of records maintained for statistical research or reporting purposes only and not used in whole or in part in making any determination about an identifiable individual, except as provided by section 8 of title 13;"

A "statistical record," for purposes of this Act, is a record in a system of records that is not used by anyone in making any determination about an individual. This means that, for a record to qualify as a "statistical record", it must be held in a system which is separated from systems (some perhaps containing the same information) which contain records that are used in any manner in making decisions about the rights, benefits, or entitlements of an identifiable individual. The term "identifiable individual" is used to distinguish determinations about specific individuals from determinations about aggregates of individuals as, for example, census data are used to apportion funds on the basis of population.

By this definition, it appears that some so-called "research records" which are only used for analytic purposes qualify as "statistical records" under the Act if they are not used in making determinations. A "determination" is defined as "any decision affecting the individual which is in whole or in part based on information contained in the record and which is made by any person or any agency." (House Report 93-1416, p. 15.)

Most of the records of the Bureau of the Census are considered to be "statistical records" even though, pursuant to section 8 of title 13, United States Code, the Census Bureau is authorized to "furnish transcripts of census records for genealogical and other proper purposes and to make special statistical surveys from census data for a fee upon request." (House report 93-1416, p. 12)

In applying this definition, it might be helpful to distinguish three types of collections or groupings of information about individuals: (1) Statistical com-

pilations which, because they cannot be identified with individuals, are not subject to the Act at all; (2) "records" maintained solely for the purpose of compiling statistics—which are the types of records covered by (a)(6); and (3) "records" on individuals which are used both to compile statistics and also for other purposes, e.g. a criminal history record used both to compile individual statistics and to assist a judge in making a sentencing decision about the individual to whom the record pertains, which is not a "statistical record."

The term "statistical record" is used in subsection (k)(4), specific exemptions.

*Routine use.* Subsection (a)(7) "The term 'routine use' means, with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected."

One of the primary objectives of the Act is to restrict the use of information to the purposes for which it was collected. The term "routine use" was introduced to recognize the practical limitations of restricting use of information to explicit and expressed purposes for which it was collected. It recognizes that there are corollary purposes "compatible with the purpose for which [the information] was collected" that are appropriate and necessary for the efficient conduct of government and in the best interest of both the individual and the public. Routine uses include "transfer of information to the Treasury Department to complete payroll checks, the receipt of information by the Social Security Administration to complete quarterly posting of accounts, or other such housekeeping measures and necessarily frequent interagency or intra-agency transfers of information." (Congressional Record p. S21816, December 17, 1974 and p. H12244, December 18, 1974)

Additional guidance on the conceptual basis for "routine uses" is found in the statement of Congressman Moorhead on the House floor:

It would be an impossible legislative task to attempt to set forth all of the appropriate uses of Federal records about an identifiable individual. It is not the purpose of the bill to restrict such ordinary uses of the information. Rather than attempting to specify each proper use of such records, the bill gives each Federal agency the authority to set forth the "routine" purposes for which the records are to be used under the guidance contained in the committee's report.

In this sense "routine use" does not encompass merely the common and ordinary uses to which records are put, but also includes all of the proper and necessary uses even if any such use occurs infrequently. For example, individual income tax return records are routinely used for auditing the determination of the amount of tax due and for assistance in collection of such tax by civil proceedings. They are less often used, however, for referral to the Justice Department for possible criminal prosecution in the event of possible fraud or tax evasion, though no one would argue that such referral is improper; thus the "routine" use of such records and subsection (b)(3) might be appropriately construed to permit the Internal Revenue Service to list in its regulations such a referral as a "routine use."

Again, if a Federal agency such as the Housing and Urban Development Department or the small Business Administration were to discover a possible fraudulent scheme in one of its programs it could "routinely", as it does today, refer the relevant ment or the Small Business Administration investigatory arm, the FBI.

Mr. Chairman, the bill obviously is not intended to prohibit such necessary exchanges of information, providing its rule-making procedures are followed. It is intended to prohibit gratuitous, ad hoc, disseminations for private or otherwise irregular purposes. To this end it would be sufficient if an agency publishes as a "routine use" of its information gathered in any program that an apparent violation of the law will be referred to the appropriate law enforcement authorities for investigation and possible criminal prosecution, civil court action, or regulatory order. (*Congressional Record, November 21, 1974, p. H10962*)

In discussing the final language of the Act, Senator Ervin and Congressman Moorhead, in similar statements said that "[t]he compromise definition should serve as a caution to agencies to think out in advance what uses it will make of information. This Act is not intended to impose undue burdens on the transfer of information to the Treasury Department to complete payroll checks, the receipt of information by the Social Security Administration to complete quarterly posting of accounts, or other such housekeeping measures and necessarily frequent interagency or intra-agency transfers of information. It is, however, intended to discourage the unnecessary exchange of information to other persons or to agencies who may not be as sensitive to the collecting agency's reasons for using and interpreting the material." (*Congressional Record*, December 17, 1974, p. S21816 and December 18, 1974, p. H12244). This implies, at least, that a "routine use" must be not only compatible with, but related to, the purpose for which the record is maintained; e.g., development of a sampling frame for an evaluation study or other statistical purposes.

There are certain "routine uses" which are applicable to a substantial number of systems of records but which are only permissible if properly established by each agency:

Disclosures to a law enforcement agency when criminal misconduct is suspected in connection with the administration of a program; e.g., apparently falsified statements on a grant application or suspected fraud on a contract.

Disclosures to an investigative agency in the process of requesting that a background or suitability investigation be conducted on individuals being cleared for access to classified information, employment on contracts, or appointment to a position within the agency.

The Act further limits the extent to which disclosures can be made as "routine uses" by requiring an agency to establish the "routine uses" of information in each system of records which it maintains by publishing a declaration of intent in the FEDERAL REGISTER, thereby permitting public review and comment (subsection (e)(11)).

## SUBSECTION (b) CONDITIONS OF DISCLOSURE

Subsection (b) "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be—"

This subsection provides that an agency may not disclose any record contained in system of records, as defined in subsection (a)(5) above, to any person or to any other agency unless the agency which maintains the record is requested to do so by the individual to whom the record pertains or the agency has obtained the written consent of the individual or the disclosure would fall within one or more of the categories enumerated in subsections (b)(1) through (11), below. The phrase "by any means of communication" means any type of disclosure (e.g., oral disclosure, written disclosure, electronic or mechanical transfers between computers of the contents of a record).

Disclosure, however, is permissive not mandatory. An agency is authorized to disclosure a record for any purpose enumerated below when it deems that disclosure to be appropriate and consistent with the letter and intent of the Act and these guidelines.

Nothing in the privacy act should be interpreted to authorize or compel disclosures of records, not otherwise permitted or required, to anyone other than the individual to whom a record pertains pursuant to a request by the individual for access to it.

Agencies shall not automatically disclose a record to someone other than the individual to whom it pertains simply because such a disclosure is permitted by this subsection. Agencies shall continue to abide by other constraints on their authority to disclose information to a third party including, where appropriate, the likely effect upon the individual of making that disclosure. Except as prescribed in subsection (d)(1), (individual access to records) this Act does not require disclosure of a record to anyone other than the individual to whom the record pertains.

A disclosure may be either the transfer of a record or the granting of access to a record.

The fact that an individual is informed of the purposes for which information will be used when information is collected pursuant to subsection (e)(3) does not constitute consent.

There are two instances in which consent to disclose a record might be actively sought by an agency (i.e., without waiting for the individual to request that a disclosure be made).

Disclosure would properly be a "routine use" (b)(3)) but disclosure is proposed to be made before the 30 day notice period; e.g., the agency is developing a sampling frame for an evaluation study or a statistical program directly related to the purpose for which the record was established.

Disclosure is unrelated to the purpose for which the record is maintained but the individual may wish to elect to have his or her record disclosed; e.g., to have information on a Federal employment application referred to State agencies or to permit information on such an application to be checked against other Federal agency's records.

In either case, however, care must be exercised to assure that the language of the request is not coercive and that any consequences of refusing to consent are made clear. It is particularly important that the impression not be created that consent to disclose is a prerequisite to obtaining a benefit when it is not.

The consent provision of this subsection was not intended to permit a blanket or open-ended consent clause; i.e., one which would permit the agency to disclose a record without limit. At a minimum, the consent clause should state the general purposes for, or types of recipients, to which disclosure may be made.

A record in a system of records may be disclosed without either a request from or the written consent of the individual to whom the record pertains only if disclosure is authorized below.

*Disclosure within the Agency.* Subsection (b)(1) "To those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties;"

This provision is based on a "need to know" concept. See also definition of "agency," (a)(1). It is recognized that agency personnel require access to records to discharge their duties. In discussing the conditions of disclosure provision generally, the House Committee said that "it is not the Committee's intent to impede the orderly conduct of government or delay services performed in the interests of the individual. Under the conditional disclosure provisions of the bill, 'routine' transfers will be permitted without the necessity of prior written consent A 'non-routine' transfer is generally one 'n which the personal information on an individual is used for a purpose other than originally intended." (House Report 93-1416, p. 12).

This discussion suggests that some constraints on the transfer of records within the agency were intended irrespective of the definition of agency. Minimally, the recipient officer or employee must have an official "need to know." The language would also seem to imply that the use should be generally related to the purpose for which the record is maintained.

Movement of records between personnel of different agencies may in some instances be viewed as intra-agency disclosures if that movement is in connection with an inter-agency support agreement. For example, the payroll records compiled by Agency A to support Agency B in a cross-service arrangement are, arguably, being maintained by Agency A as if it were an employee of Agency B. While such transfers would meet the criteria both for intra-agency disclosure and "routine use," they should be treated as intra-agency disclosures for purposes of the accounting requirements (e)(1).

In this case, however, Agency B would remain responsible and liable for the maintenance of such records in conformance with the Act.

It should be noted that the conditions of disclosure language makes no specific provision for disclosures expressly required by law other than 5 U.S.C. 552. Such disclosures, which are in effect congressionally-mandated "routine uses," should still be established as "routine uses" pursuant to subsections (e)(11) and (e)(4)(D). This is not to suggest that a "routine use" must be specifically prescribed in law.

*Disclosure to the Public.* Subsection (b)(2) "Required under section 552 of this title;" Subsection (b)(2) is intended "to preserve the status quo as interpreted by the courts regarding the disclosure of personal information to the public under the Freedom of Information Act (*Congressional Record* p. S21817, December 17, 1974 and p. H12244, December 18, 1974). It absolves the agency of any obligation to obtain the consent of an individual before disclosing a record about him or her to a member of the public to whom the agency is required to disclose such information under the Freedom of Information Act and permits an agency to withhold a record about an individual from a member of the public only to the extent that it is permitted to do so under closed (i.e., they are permitted to be 552(b)). Given the use of the term "required", agencies may not voluntarily make public any record which they are not required to release (i.e., those that they are permitted to withhold) without the consent of the individual unless that disclosure is permitted under one of the other portions of this subsection.

Records which have traditionally been considered to be in the public domain and are required to be disclosed to the public, such as many of the final orders and opinions of quasi-judicial agencies, press releases, etc. may be released under this provision without waiting for a specific Freedom of Information Act request. For example, opinions of quasi-judicial agencies may be sent to counsel for the parties and to legal reporting services, and press releases may be issued by agencies dealing with public record matters such as suits commenced or agency proceedings initiated. Records which the agency would elect to disclose to the public but which are not required to be disclosed (i.e., they are permitted to be withheld under the FOIA) may only be released to the public under the "routine use" provision (subsection (b)(3)). Note, however, that an agency may not rely on any provision of the Freedom of Information Act as a basis for refusing access to a record to the individual to whom it pertains, unless such refusal of access is authorized by an exemption within the Privacy Act. See subsections (d)(1) and (g) below.

*Disclosure for a "Routine Use".* Subsection (b)(3) "For a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section;"

Records may be disclosed without the prior consent of the individual for a

"routine use', as defined above, if that "routine use" has been established and described in the public notice about the system published pursuant to subsections (e)(4)(D), and (e)(11) below.

*Disclosure to the Bureau of the Census.* Subsection (b)(4) "To the Bureau of the Census for purposes of planning or carrying out a census or survey or related activity pursuant to the provisions of title 13;"

Agencies may disclose records to the Census Bureau in individually identifiable form for use by the Census Bureau pursuant to the provisions of Title 13. (Title 13 not only limits the uses which may be made of these records but also makes them immune from compulsory disclosure).

*Disclosure for Statistical Research and Reporting.* Subsection (b)(5) "To a recipient who has provided the agency with advance adequate written assurance that the record will be used solely as a statistical research or reporting record, and the record is to be transferred in a form that is not individually identifiable;"

Agencies may disclose records for statistical purposes under limited conditions. The use of the phrase "in a form that is not individually identifiable" means not only that the information disclosed or transferred must be stripped of individual identifiers but also that the identity of the individual can not reasonably be deduced by anyone from tabulations or other presentations of the information (i.e., the identity of the individual can not be determined or deduced by combining various statistical records or by reference to public records or other available sources of information.) See also the discussion of "statistical record" ((a)(6)), above.

Records, whether or not statistical records as defined in (a)(6), above, may be disclosed for statistical research or reporting purposes only after the agency which maintains the record has received and evaluated a written statement which:

States the purpose for requesting the records; and

Certifies that they will only be used as statistical records.

Such written statements will be made part of the agency's accounting of disclosures under subsection (c)(1).

Fundamentally, agencies disclosing records under this provision are required to assure that information disclosed for use as a statistical research or reporting record cannot reasonably be used in any way to make determinations about individuals. One may infer from the legislative history and other portions of the Act that an objective of this provision is to reduce the possibility of matching and analysis of statistical records with other records to reconstruct individually identifiable records. An accounting of disclosures is not required when agencies publish aggregate data so long as no individual member of the population covered can be identified: for example, statistics on employee turnover rates. sick leave usage rates.

Viewed from the perspective of the recipient agencies, material thus transferred would not constitute records for its purposes.

*Disclosure to the National Archives.* Subsection (b)(6) "To the National Archives of the United States as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, or for evaluation by the Administrator of General Services or his designee to determine whether the record has such value."

Agencies may disclose records to the National Archives of the United States pursuant to Section 2103 of Title 44 of the United States Code which provides for the preservation of records "of historical or other value". This subsection ((b)(6)) allows not only the transfer of records for preservation but also the disclosure of records to the Archivist to permit a determination as to whether preservation under Title 44 is warranted. See subsections (1)(2) and (1)(3) for a discussion of constraints on the maintenance of records by the Archives.

Records which are transferred to Federal Records Centers for safekeeping or storage do not fall within this category. Such transfers are not considered to be disclosures within the terms of this Act since the records remain under the control of the transferring agency. Federal Records Center personnel are acting on behalf of the agency which controls the records. See subsection (l)(1), below.

*Disclosure for Law Enforcement Purposes.* Subsection (b)(7) "To another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought:"

An agency may, upon receipt of a written request, disclose a record to another agency or unit of State or local government for a civil or criminal law enforcement activity. The request must specify

The law enforcement purpose for which the record is requested; and

The particular record requested.

Blanket requests for all records pertaining to an individual are not permitted. Agencies or other entities seeking disclosure may, of course, seek a court order as a basis for disclosure. See subsection (b)(11).

A record may also be disclosed to a law enforcement agency at the initiative of the agency which maintains the record when a violation of law is suspected: *provided,* That such disclosure has been established in advance as a "routine use" and that misconduct is related to the purposes for which the records are maintained. For example, certain loan or employment application information may be obtained with the understanding that

individuals who knowingly and willfully provide inaccurate or erroneous information will be subject to criminal prosecution. This usage was explicitly addressed by Congressman Moorhead in explaining the House bill, on the floor of the House:

It should be noted that the "routine use" exception is in addition to the exception provided for dissemination for law enforcement activity under subsection (b)(7) of the bill. Thus a requested record may be disseminated under either the "routine use" exception, the "law enforcement" exception, or both sections, depending on the circumstances of the case. (*Congressional Record.* November 21, 1974, p. H10962.)

In that same discussion, additional guidance was provided on the term "head of the agency" as that term is used in this subsection ((b)):

The words "head of the agency" deserve elaboration. The committee recognizes that the heads of Government departments cannot be expected to personally request each of the thousands of records which may properly be disseminated under this subsection. If that were required, such officials could not perform their other duties, and in many cases, they could not even perform record requesting duties alone. Such duties may be delegated, like other duties, to other officials, when absolutely necessary but never below a section chief, and this is what is contemplated by subsection (b)(7). The Attorney General, for example, will have the power to delegate the authority to request the thousands of records which may be required for the operation of the Justice Department under this section.

It should be noted that this usage is somewhat at variance with the use of the term "agency head" in subsections (j), and (k), rules and exemptions, where delegations to this extent are neither necessary nor appropriate.

This subsection permits disclosures for law enforcement purposes only to governmental agencies "within or under the control of the United States." Disclosures to to foreign (as well as to State and local) law enforcement agencies may, when appropriate, be established as "routine uses."

Records in law enforcement systems may also be disclosed for law enforcement purposes when that disclosure has properly been established as a "routine use"; e.g., statutorily authorized responses to properly made queries to the National Driver Register; transfer by a law enforcement agency of protective intelligence information to the Secret Service.

*Disclosure under Emergency Circumstances.* Subsection (b)(8) "To a person pursuant to a showing of compelling circumstances affecting the health or safety of an individual if upon such disclosure notification is transmitted to the last known address of such individual;"

Agencies may disclose records when, for example, the time required to obtain the consent of the individual to whom the record pertains might result in a delay which could impair the health or safety of an individual; as in the release of medical records on a patient undergoing emergency treatment. The individual pertaining to whom records are

disclosed need not necessarily be the individual whose health or safety is at peril; e.g., release of dental records on several individuals in order to identify an individual who was injured in an accident.

*Disclosure to the Congress.* Subsection (b)(9) "To either House of Congress, or, to the extent of matter within its jurisdiction, any committee or subcommittee thereof, any joint committee of Congress or subcommittee of any such joint committee;"

This language does not authorize the disclosure of a record to members of Congress acting in their individual capacities without the consent of the individual.

*Disclosure to the General Accounting Office.* Subsection (b)(10) "To the Comptroller General, or any of his authorized representatives, in the course of the performance of the duties of the General Accounting Office;"

*Disclosure Pursuant to Court Order.* Subsection (b)(11) "Pursuant to the order of a court of competent jurisdiction."

SUBSECTION (c) ACCOUNTING OF CERTAIN DISCLOSURES

Subsection (c) "Each agency, with respect to each system of record under its control, shall—"

*When Accounting Is Required.* Subsection (c)(1) "Except for disclosures made under subsections (b)(1) or (b)(2) of this section, keep an accurate accounting of—

"(A) The date, nature, and purpose of each disclosure of a record to any person or to another agency made under subsection (b) of this section; and

"(B) The name and address of the person or agency to whom the disclosure is made;"

An accounting is required

For disclosures outside the agency even when such disclosure is at the request of the individual with the written consent or at the request of the individual;

For disclosures for routine uses (see (b)(3));

For disclosures to the Bureau of the Census (see (b)(4));

For disclosures to a person or another agency for statistical research or reporting purposes (see (b)(5));

For disclosures to the Archives (see (b)(6));

For disclosures for a law enforcement activity consistent with the provisions of subsection (see (b)(7));

For disclosures upon a showing of "compelling circumstances" (see (b)(8));

For disclosures to the Congress or the Comptroller General (see (b)(9) and (10)); or

For disclosures pursuant to a court order (see (b)(11)).

An accounting of disclosures is not required

For disclosures to employees of the agency maintaining the record who have a need to have access in the performance of their official duties for the agency.

(Agencies are required to establish safeguards, pursuant to subsection (e) (10), to assure that individuals who do not have a "need to know" will not have access.) (see (b)(1)); or

For disclosures to members of the public which would be required under the Freedom of Information Act (see (b)(2)).

(NOTE: That the accounting requirement is not one from which an agency may seek an exemption under subsections (j) and (k).)

"The term 'accounting' rather than 'record,' [was used] to indicate that an agency need not make a notation on a single document of every disclosure of a particular record. The agency may use any system it desires for keeping notations of disclosures, provided that it can construct from its system a document listing of all disclosures." (House Report 93–1416, p. 14). For example, if a list of names and other pertinent data necessary to issue payroll or benefit checks is transferred to a disbursing office outside the agency, the agency transferring the record need not maintain a separate record of such transfer in each individual record provided that it can construct the required accounting information when requested by the individual (subsection (c)(3)) or when necessary to inform previous recipients of any corrected or disputed information (subsection (c)(4)). The accounting should also provide a cross-reference to the basis upon which the release was made including any written documentation as is required in the case of the release of records for statistical or law enforcement purposes.

In some instances, (e.g., investigation or prosecution of suspected criminal activity) a disclosure may consist of a continuing dialogue between two agencies over a period of weeks or months. In such a situation, it may be appropriate to make a general notation that, as of a specified date, such contact was initiated and will be maintained until the conclusion of the case.

While the accounting of disclosures, when maintained apart from the record, might be considered a system of records under the Act, this could lead to the situation of having to maintain an accounting of disclosures from the original accounting and having to maintain that second accounting for five years, etc. Note that subsection (c)(3) gives an individual a right of access to the accounting which would not have been necessary if the accounting were considered a separate system of record. Therefore, it would seem that the intent was to view the accounting of disclosures as other than a system of records and to conclude that an accounting need not be maintained for disclosures from the accounting of disclosures.

*Retaining the Accounting of Disclosures.* Subsection (c)(2) "Retain the accounting made under paragraph (1) of this subsection for at least five years or the life of the record, whichever is

longer, after the disclosure for which the accounting is made;"

The purposes of the accounting are (1) to allow individuals to learn to whom records about themselves have been disclosed (subsection (c)(3)); (2) to provide a basis for subsequently advising recipients of records of any corrected or disputed records (subsection (c)(4); and (3) to provide an audit trail for subsequent reviews of agency compliance with subsection (b) (conditions of disclosure). As discussed above, with respect to maintaining the accounting, the accounting need not be retained on a record by record basis as long as the procedures adopted by the agency permit it to satisfy these objectives. While the accounting is required to be maintained for at least five years, nothing in the Act requires the retention of the record itself where the record could otherwise lawfully be disposed of sooner.

The accounting is required to be retained for five years from the date of the disclosure unless the record is retained longer. Record retention standards remain as prescribed in applicable law and GSA regulations.

*Making the Accounting of Disclosures Available to the Individual.* Subsection (c)(3) "Except for disclosures made under subsection (b)(7) of this section, make the accounting made under paragraph (1) of this subsection available to the individual named in the record at his request;"

Upon request of the individual to whom the record pertains an agency must make available to that individual all information in its accounting of disclosures except those pertaining to disclosures to another agency or government instrumentality for law enforcement purposes pursuant to subsection (b)(7) unless the system has been exempted from this provision pursuant to subsections (j) or (k). Agencies may wish to maintain the accounting of disclosure in such a manner that notations of disclosures pursuant to (b)(7) are readily segregable in order to facilitate timely release of the disclosure accounting when requested by the individual. Since the accounting will often not be maintained in a form which is readily comprehensible to the individual, the process of "making the accounting available" may entail some transformation of the accounting by the agency so as to make it intelligible to the individual. This may require the agency to compile, from the accounting, a list of those to whom the record was disclosed.

*Informing Prior Recipients of Corrected or Disputed Records.* Subsection (c)(4) "Inform any person or other agency about any correction or notation of dispute made by the agency in accordance with subsection (d) of this section of any record that has been disclosed to the person or agency if an accounting of the disclosure was made."

When a record is corrected at the request of an individual acting in accordance with subsection (d)(2) or a statement of dispute is filed as provided in subsection (d)(3), the agency maintain-

ing the record shall notify each agency or person to which the record has been disclosed of the exact nature of the correction or that a notation of dispute has made. If the recipient was another agency, that agency is required, in turn, to notify those to whom it disclosed the record.

This requirement does not apply to disclosures to personnel within the agency with a "need to know" or to the public under the Freedom of Information Act (subsections (b)(1) and (2)) or to disclosures made prior to September 27, 1975 for which no accounting was made. (Note that the language in subsection (c)(4) differs from the corresponding language in H.R. 16373 so that the House report discussion of this provision is no longer applicable).

Given the definition of "record" (a record may be construed to be a part of another record) and the language of subsection (d)(4), below, it would appear that the notification of correction or of the filing of a statement of disagreement is required only to the extent that the correction or disagreement pertains to the information actually disclosed; i.e., recipients of a portion of a record other than the portion which is subsequently corrected or disputed need not be informed. Where there is any doubt as to whether the corrected information was included in or might be relevant to a previous disclosure, agencies should notify the recipients in question.

The language of this subsection explicitly requires only that prior recipients be notified of corrections made pursuant to a request to amend a record by an individual and does not address records corrected for other reasons; e.g., agency staff detects erroneous data or a third party source provides corrected information. Nevertheless, agencies are encouraged to provide corrected information to previous recipients, irrespective of the means by which the correction was made whenever it is deemed feasible to do so if information included in a previous disclosure was changed particularly when the agency is aware that the correction is relevant to the recipient's uses irrespective of the means by which the correction is made.

## SUBSECTION (d) ACCESS TO RECORDS

Subsection (d) "Each agency that maintains a system of record shall—"

*Individual Access to Records.* Subsection (d)(1) "Upon request by an individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him and upon his request, a person of his own choosing to accompany him, to review the record and have a copy made of all or any portion thereof in a form comprehensible to him, except that the agency may require the individual to furnish a written statement authorizing discussion of that individual's record in the accompanying person's presence;"

An agency must, upon request: (1) Inform an individual whether a system of records contains a record or records

pertaining to him, (2) permit an individual to review any record pertaining to him which is contained in a system of records, (3) permit the individual to be accompanied for the purpose by a person of his choosing, and (4) permit the individual to obtain a copy of any such record in a form comprehensible to him at a reasonable cost. This provision it should be noted, gives an individual the right of access only to records which are contained in a system of records. See (a) (5), above.

This language further suggests that the Congress did not intend to require that an individual be given access to information which the agency does not retrieve by reference to his or her name or some other identifying particular. See subsection (a) (5). If an individual is named in a record about someone else (or some other type of entity) and the agency only retrieves the portion pertaining to him by reference to the other person's name (or some organization/subject identifier), the agency is not required to grant him access. Indeed, if this were not the case, it would be necessary to establish elaborate cross-references among records, thereby increasing the potential for privacy abuses. The following examples illustrate some applications of this standard.

1. A record on Joan Doe as an employee in a file of employees from which material is accessed by reference to her name (or some identifying number). This is the simplest case of a record in a system of records and Joan Doe would have a right of access.

2. A reference to Joan Doe in a record about James Smith in the same file. This is also a record within a system but Joan Doe would not have to be granted access unless the agency had devised and used an indexing capability to gain access to her record in James Smith's file.

3. A record about Joan Doe in a contract source evaluation file about her employer, Corporation X, which is not accessed by reference to individuals' names, or other identifying particulars. This is a record which is not in a system of records and, therefore, Joan Doe would not have a right of access to it. If, as in 2, above, an indexing capability were developed and used, however, such a system would become a system of records to which Joan Doe would have a right of access.

Agencies may establish fees for making copies of an individual's record but not for the cost of searching for or reviewing it (subsection (f) (5)). When the agency makes a copy of a record as a necessary part of its process of making the record available for review (as distinguished from responding to a request by an individual for a copy of a record), no fee may be charged. It should be noted that this provision differs from the access and fees provisions of the Freedom of Information Act.

The granting of access may not be conditioned upon any requirement to state a reason or otherwise justify the need to gain access.

Agencies shall establish requirements to verify the identity of the requester. Such requirements shall be kept to a minimum. They shall only be established when necessary reasonably to assure that an individual is not improperly granted access to records pertaining to another individual and shall not unduly impede the individual's right of access. Procedures for verifying identity will vary depending upon the nature of the records to which access is sought. For example, no verification of identity will be required of individuals seeking access to records which are otherwise available to any member of the public under 5 U.S.C. 552, the Freedom of Information Act. However, far more stringent measures should be utilized when the records sought to be accessed are medical or other sensitive records.

For individuals who seek access in person, requirements for verification of identity should be limited to information or documents which an individual is likely to have readily available (e.g., a driver's license, employee identification card, Medicare card). However, if the individual can provide no other suitable documentation, the agency should request a signed statement from the individual asserting his or her identity and stipulating that the individual understands that knowingly or willfully seeking or obtaining access to records about another individual under false pretenses is punishable by a fine of up to $5,000. (Subsection (i) (3).)

For systems to which access is granted by mail (by virtue of their location) verification of identity may consist of the providing of certain minimum identifying data; e.g., name, date of birth, or system personal identifier (if known to the individual). Where the sensitivity of the data warrants it; (i.e., unauthorized access could cause harm or embarrassment to the individual), a signed notarized statement may be required or other reasonable means of verifying identity which the agency may determine to be necessary, depending on the degree of sensitivity of the data involved.

NOTE: That section 7 of the Act forbids an agency to deny an individual any right (including access to a record) for refusing to disclose a Social Security Number unless disclosure is required by Federal statute or by other laws or regulations adopted prior to January 1, 1975.

Agencies are also permitted to require that an individual who wishes to be accompanied by another person when reviewing a record furnish a written statement authorizing discussion of his or her record in the presence of the accompanying person. This provision may not be used to require that individuals who request access and wish to authorize other persons to accompany them provide any reasons for the access or for the accompanying person's presence. It is designed to avoid disputes over whether the individual granted permission for disclosure of information to the accompanying person.

Agency procedures for complying with the individual access provisions will necessarily vary depending upon the size and nature of the system of records. Large computer-based systems of records clearly require a different approach than do small, regionally dispersed, manually maintained systems. Nevertheless the basic requirements are constant, namely the right of the individual to have access to a record pertaining to him and to have a copy made of all or any portion of such records in a form which is comprehensible to him. Putting information into a comprehensible form suggests converting computer codes to their literal meaning but not necessarily an extensive tutorial in the agency's procedures in which the record is used.

Neither the requirements to grant access nor to provide copies necessarily require that the physical record itself be made available. The form in which the record is kept (e.g., on magnetic tape) or the context of the record (e.g., access to a document may disclose records about other individuals which are not relevant to the request) may require that a record be extracted or translated in some manner; e.g., to expunge the identity of a confidential source. Whenever possible, however, the requested record should be made available in the form in which it is maintained by the agency and the extraction or translation process may not be used to withhold information in a record about the individual who requests it unless the denial of access is specifically provided for under rules issued pursuant to one of the exemption provisions (subsections (j) and (k)).

Subsection (f) (3) provides that agencies may establish "a special procedure, if deemed necessary, for the disclosure to an individual of medical records, including psychological records, pertaining to him." In addressing this provision the House committee said:

If, in the judgment of the agency, the transmission of medical information directly to a requesting individual could have an adverse effect upon such individual, the rules which the agency promulgates should provide means whereby an individual who would be adversely affected by receipt of such data may be apprised of it in a manner which would not cause such adverse effects. An example of a rule serving such purpose would be transmission to a doctor named by the requesting individual. (House Report 93-1416, pp. 16-17)

Thus, while the right of individuals to have access to medical and psychological records pertaining to them is clear, the nature and circumstances of the disclosure may warrant special procedures.

While the Act provides no specific guidance on this subject, agencies should acknowledge requests for access to records within 10 days of receipt of the request (excluding Saturdays, Sundays, and legal public holidays). Wherever practicable, that acknowledgement should indicate whether or not access can be granted and, if so, when. When access is to be granted, agencies will normally provide access to a record within 30 days (excluding Saturdays,

28958

**NOTICES**

Sundays, and legal public holidays) unless, for good cause shown, they are unable to do so, in which case the individual should be informed in writing within 30 days as to those reasons and when it is anticipated that access will be granted. A "good cause" might be the fact that the record is inactive and stored in a records center and, therefore, not as readily accessible. See subsection (l) (1). Presumably, in such cases the risk of an adverse determination being made on the bases of a record to which access is sought and which the individual might choose to challenge is relatively low.

*Requests for Amending Records.* Subsection (d) (2) "Permit the individual to request amendment of a record pertaining to him and—"

Agencies shall establish procedures to give individuals the opportunity to request that their records be amended. The procedures may permit the individual to present a request either in person, by telephone, or through the mail but the process should not normally require that the individual present the request in person. If the agency deems it appropriate, it may require the requests be made in writing, whether presented in person or through the mail. Instructions for the preparation of a request and any forms employed should be as brief and as simple as possible. If a request is received on other than a prescribed form, the agency should not reject it or request resubmission unless additional information is essential to process the request. In that case, the inquiry to the individual should be limited to obtaining the needed additional information, not resubmission of the entire request. Incomplete or inaccurate requests should not be rejected categorically. The individual should be asked to clarify the request as needed. Requests presented in person should be screened briefly while the individual is still present, wherever possible, to assure that the request is complete so that clarification may be obtained on the spot.

These provisions for amending records are not intended to permit the alteration of evidence presented in the course of judicial, quasi-judicial or quasi-legislative proceedings. Any changes in such records should be made only through the established procedures consistent with the adversary process. These provisions are not designed to permit collateral attack upon that which has already been the subject of a judicial or quasi-judicial action. For example, these provisions are not designed to permit an individual to challenge a conviction for a criminal offense received in another forum or to reopen the assessment of a tax liability, but the individual would be able to challenge the fact that conviction or liability has been inaccurately recorded in his records.

The agency should also require verification of identity to assure that the requestors are seeking to amend records pertaining to themselves and not, inadvertently or intentionally, the records of other individuals.

*Acknowledgement of Requests to*

*Amend Records.* Subsection (d) (2) (A) "Not later than 10 days (excluding, Saturdays, Sundays, and legal public holidays) after the date of receipt of such request, acknowledge in writing such receipt; and"

A written acknowledgement by the agency of the receipt of a request to amend a record must be provided to the individual within 10 days (excluding Saturdays, Sundays, and legal public holidays). The acknowledgement should clearly describe the request (a copy of the request form may be appended to the acknowledgement) and advise the individual when he or she may expect to be advised of action taken on the request.

No separate acknowledgement of receipt is necessary if the request can be reviewed, processed, and the individual advised of the results of the review (whether complied with or denied) within the 10-day period.

For requests presented in person, written acknowledgement should be provided at the time the request is presented.

*Actions Required on Requests to Amend Records.* Subsection (d) (2) (B) "Promptly, either

(i) Make any correction of any portion thereof which the individual believes is not accurate, relevant, timely, or complete; or

(ii) Inform the individual of its refusal to amend the record in accordance with his request, the reason for the refusal, the procedures established by the agency for the individual to request a review of the refusal by the head of the agency or an officer designated by the head of the agency, and the name and business address of that official;

In reviewing an individual's request to amend a record, agencies should, wherever practicable, complete the review and advise the individual of the results within 10 days of the receipt of the request. Prompt action is necessary both to assure that records are as accurate as possible and to reduce the administrative effort which would otherwise be involved in issuing a separate acknowledgement of the receipt of the request and subsequently informing the individual of the action taken. If the nature of the request or the system of records precludes completing the review within 10 days, the required acknowledgement (subsection (d) (2) (A) above,) must be provided within ten days and the review should be completed as soon as reasonably possible, normally within 30 days from the receipt of the request (excluding Saturdays, Sundays, and legal public holidays) unless unusual circumstances preclude completing action within that time. (The number of cases on which the agency was unable to act within 30 days will be included in the annual report (subsection (p)). If the expected completion date for the review indicated in the acknowledgement cannot be met, the individual should be advised of that delay and of a revised date when the review may be expected to be completed.

"Unusual circumstances" can be viewed as situations in which records cannot be reviewed through the agency's normal process. By definition, such cases would, statistically, be the exception. A

review which entails obtaining supporting data from retired records or from another agency and which could not, therefore be completed within the required time might qualify.

In reviewing a record in response to a request to amend it, the agency should assess the accuracy, relevance, timeliness, or completeness of the record in terms of the criteria established in subsection (e) (5), i.e., to assure fairness to the individual to whom the record pertains in any determination about that individual which may be made on the basis of that record.

With respect to requests to delete information, agencies must heed the criteria established in subsection (e) (1), namely, that the information must be "* * * relevant and necessary to accomplish a statutory purpose of the agency required to be accomplished by law or by executive order of the President." This is not to suggest that agencies may routinely maintain irrelevant or unnecessary information unless it is challenged by an individual, but rather that receipt of a request to delete information should cause the agency to reconsider the need for such information. Reviews in connection with the development of a system, the preparation of the public notice and the description of the purposes for which it is maintained and periodic reviews of the system, to assure that only information which is necessary for the lawful purposes for which the system of records was established is maintained in it will be the primary vehicles for assuring that only relevant and necessary information is maintained.

Agency standards for reviewing records in response to a request to amend them may, at the agency's option, be included as part of the rules promulgated pursuant to subsection (f) (4). Generally, it would seem reasonable to conclude that such standards for review need be no more stringent than is reasonably necessary to meet the general criteria in subsections (e) (1) and (e) (5) for accuracy, relevance, timeliness, and completeness.

Judicial review is available for agency determinations to grant an individual access and to amend or not amend a record pertaining to the individual. While the definite burden of proof for granting access is upon the agency in such judicial review, in the judicial review of the refusal of an agency to amend a record there is no similar burden upon the agency. An analogous standard may be utilized by the agencies in establishing standards for review of individual requests for amendments of records. The burden of going forward could be placed upon the individual who in most instances will know better than the agency the reasons why the record should be amended. It would be appropriate, in agency regulations setting forth the standards they will use upon review of such request, that the individual be required to supply certain information in support of his request for amendment of the record. The request would then be

appropriate for resolution upon determination of preponderance of evidence.

If the agency agrees with the individual's request to amend a record, the agency shall—

Advise the individual;

Correct the record accordingly; and

Where an accounting of disclosures has been made, advise all previous recipients of the record of the fact that the correction was made and the substance of the correction.

If the agency, after its initial review of a request to amend a record, disagrees with all or any portion thereof, the agency shall

To the extent that the agency agrees with any part of the individual's request to amend, proceed as described above with respect to those portions of the record which it has amended.

Advise the individual of its refusal and the reasons therefor including the criteria for determining accuracy which were employed by the agency in conducting the review;

Inform the individual that he or she may request a further review by the agency head or by an officer of the agency designated by the agency head; and

Describe the procedures for requesting such a review including the name and address of the official to whom the request should be directed. The procedures should be as simple and brief as possible and should indicate where the individual can seek advice or assistance in obtaining such a review.

If the recipient of the corrected information is an agency and is maintaining the information which was corrected in a system of records, it must correct its records and, under subsection (c) (4), apprise any agency or person to which it had disclosed the record of the substance of the correction. Subsequent recipient agencies should similarly correct their records and advise those to whom they had disclosed it. Agencies are encouraged to establish in their regulations, time limits by which, except under unusual circumstances, transferees of any amendment to a record.

*Requesting a Review of the Agency's Refusal To Amend a Record.* Subsection (d) (3) "Permit the individual who disagrees with the refusal of the agency to amend his record to request a review of such refusal, and not later than 30 days (excluding Saturdays, Sundays, and legal public holidays) from the date on which the individual requests such review, complete such review, and make a final determination unless, for good cause shown, the head of the agency extends such 30-day period; and if, after his review, the reviewing official also refuses to amend the record in accordance with the request, permit the individual to file with the agency a concise statement setting forth the reasons for his disagreement with the refusal of the agency, and notify the individual of the provisions for judicial review of the reviewing official's determination under subsection (g) (1) (A) of this section;"

An individual who disagrees with an agency's initial refusal to amend a record may file a request for further review of that determination. The agency head or an officer of the agency designated in writing by the agency head should undertake an independent review of the initial determination. If someone other than the agency head is designated to conduct the review, it should be an officer who is organizationally independent of or senior to the officer or employee who made the initial determination. For purposes of this section, an "officer" is defined to be "* * * a justice or judge of the United States and an individual who is—

(1) Required by law to be appointed in the civil [or military]* service by one of the following acting in an official capacity—

[*It is assumed that, while the language above does not specifically cover it, a military officer otherwise qualified as the reviewing official would be permitted to serve as the reviewing official.]

(A) The President;

(B) A court of the United States;

(C) The head of an Executive agency; or

(D) The Secretary of a military department;

(2) Engaged in the performance of a Federal function under authority of law or an Executive act; and

(3) Subject to the supervision of an authority named by paragraph (1) of this section, or the Judicial Conference of the United States, while engaged in the performance of the duties of his office. (5 U.S.C. 2104(a) ).

Delegations must be made in writing. In conducting the review, the reviewing official should use the criteria of accuracy, relevance, timeliness, and completeness discussed above. The reviewing official may, at his or her option, seek such additional information as is deemed necessary to satisfy those criteria; i.e., to establish that the record contains only that information which is necessary and is as accurate, timely, and complete as necessary to assure fairness in any determination which may be made about the individual on the basis of record.

Although there is no requirement for a formal hearing, pursuant to the provisions of 5 U.S.C. 556, the agency may elect generally or on a case by case basis to use such or similar procedures. The procedures elected by the agency, however, should insure fairness to the individual and promptness in the determination. The procedures should provide that as much of the information upon which the determination is based as possible is part of the written record concerning the appeal. The records of the appeal process should be maintained by agencies only as long as is reasonably necessary for purposes of judicial review of the agency's refusal to amend a record upon appeal.

If, after conducting this review, the reviewing official also refuses to amend the record in accordance with the individual's request, the agency shall advise the individual:

Of its refusal and the reasons therefor;

Of his or her right to file a concise statement of the individual's reasons for disagreeing with the decision of the agency;

Of the procedures for filing a statement of disagreement;

That any such statement will be made available to anyone to whom the record is subsequently disclosed together with, if the agency deems it appropriate, a brief statement by the agency summarizing its reasons for refusing to amend the record;

That prior recipients of the disputed record will be provided a copy of any statement of dispute to the extent that an accounting of disclosures was maintained (see subsection (c) (4) ) ; and

Of his or her right to seek judicial review of the agency's refusal to amend a record provided for in subsection (g) (1) (A), below.

If the reviewing official determines that the record should be amended in accordance with the individual's request, the agency should proceed as prescribed in subsection (d) (2) (B) (i), above; namely, correct the record, advise the individual, and inform previous recipients.

A notation of a dispute is required to be made only if an individual informs the agency of his or her disagreement with the agency's determination under subsection (d) (3) (appeals procedure) not to amend a record.

A final agency determination on the individual's request for a review of an agency's initial refusal to amend a record must be completed within 30 days unless the agency head determines that a fair and equitable review cannot be completed in that time. If additional time is required, the individual should be informed in writing of the reasons for the delay and of the approximate date on which the review is expected to be completed. Such extensions should not be routine and should not normally exceed an additional thirty days. Agencies will be required to report the number of cases in which review was not completed within 30 days as part of the annual report (subsection (p) ).

*Disclosure of disputed information.* Subsection (d) (4) "In any disclosure, containing information about which the individual has filed a statement of disagreement, occurring after the filing of the statement under paragraph (3) of this subsection, clearly note any portion of the record which is disputed and provide copies of the statement and, if the agency deems it appropriate, copies of a concise statement of the reasons of the agency for not making the amendments requested, to persons or other agencies to whom the disputed record has been disclosed";

When an individual files a statement disagreeing with the agency's decision not to amend a record, the agency should clearly annotate the record so that the fact that the record is disputed is apparent to anyone who may subsequently access, use, or disclose it. The notation itself should be integral to the record

**28960**

**NOTICES**

and specific to the portion in dispute. For automated systems of records, the notation may consist of a special indicator on the entire record or the specific part of the record in dispute.

The statements of dispute need not be maintained as an integral part of the records to which they pertain. They should, however, be filed in such a manner as to permit them to be retrieved readily whenever the disputed portion of the record is to be disclosed.

If there is any question as to whether the dispute pertains to information being disclosed, the statement of dispute should be included.

When information which is the subject of a statement of dispute is subsequently disclosed, agencies must note that the information is disputed and provide a copy of the individual's statement.

Agencies may, at their discretion, include a brief summary of their reasons for not making a correction when disclosing disputed information. Such statements will normally be limited to the reasons stated to the individual under subsection (d)(2)(B)(ii) and (d)(3), above. Copies of the agency's statement need not be maintained as an integral part of the record but will be treated as part of the individual's record for purposes of granting the individual access, subsection (d)(1). However, the agency's statement will not be subject to subsections (d)(2) or (3) (amending records).

*Access to Information Compiled in Anticipation of Civil Action.* Subsection (d)(5) "Nothng in this section shall allow an individual access to any information compiled in reasonable anticipation of a civil action or proceeding."

This provision is not intended to preclude access by an individual to records which are available to that individual under other procedures (e.g., pre-trial discovery). It is intended to preclude establishing by this Act a basis for access to material being prepared for use in litigation other than that established under other processes such as the Freedom of Information Act or the rules of civil procedure.

Excerpts from the House floor debate on this provision suggest that this provision was not intended to cover access to systems of records compiled or used for purposes other than litigation.

Mr. ERLENBORN. Mr. Chairman, as I understand it, the purpose of the amendment is to protect, as an example, the file of the U.S. attorney or the solicitor that is prepared in anticipation of the defense of a suit against the United States for accident or some such thing?

Mr. BUTLER. That is the subject we have in mind.

Mr. ERLENBORN. I appreciate the gentleman's concern. I think it is a real concern, and that protection ought to be afforded.

The only problem I find with that amendment is this: It would presuppose we intended the defining of "record system" to preclude that type of record. I do not think we did.

If these sorts of records are to be considered a record system under the act, then the agency would have to go through all the formal proceedings of defining the system, its routine uses, and publishing in the FEDERAL REGISTER.

Frankly, I do not think the attorney's files that are collected in anticipation of a lawsuit should be subject to the application of the act in any instance, much less the access provision. It is our concern in the access provision that it may then presuppose it is covered in the other provisions, and I do not think it should be.

Mr. BUTLER. Mr. Chairman, I share the gentleman's concern. When this amendment was originally drafted, it stated "access to any record" and we struck the word, "record," and inserted "information."

So we made it perfectly clear we were not elevating an investigation with the word, "record," to the same status of records. We did want to make it clear there was not to be such access, because that access would be within the usual rules of civil procedure.

Mr. ERLENBORN. Mr. Chairman, if the gentleman will yield further, it is the gentleman's contention, under his interpretation of the act, that the other provisions would not apply to the attorney's files as well; is that correct?

Mr. BUTLER. The gentleman is correct. (*Congressional Record,* November 21, 1974 p. H10955).

While the above passage refers primarily to the' defense of suits by the government it is, of course, equally applicable to the assembly of information in anticipation of government-initiated law suits.

The mere fact that records in a system of records are frequently the subject of litigation does not bring those systems of records within the scope of this provision. The information must be "compiled in reasonable anticipation of a civil action or proceeding" and therefore the purpose of the compilation governs the applicability of this provision. It would seem that in a suit in which governmental action or inaction is challenged the provision generally would not be available until the initiation of litigation or until information began to be compiled in reasonable anticipation of such litigation. Where the government is prosecuting or seeking enforcement of its laws or regulations, this provision may be applicable at the outset if information is being compiled in reasonable anticipation of a civil action or proceeding. The term civil proceeding was intended to cover those quasi-judicial and preliminary judicial steps which are the counterpart in the civil sphere of criminal proceedings as opposed to criminal litigation. Although this provision could have the effect of an exemption it is not subject to the formal rule-making procedures which govern the exemptions set forth in subsection (j) and (k). Nevertheless, agencies should utilize the specific exemptions set forth in subsections (j) and (k) to the extent that they are applicable before utilizing this provision.

**SECTION (e) AGENCY REQUIREMENTS**

Section (e) "Each agency that maintains a system of records shall—"

*Restrictions on Collecting Information about Individuals.* Subsection (e)(1) "Maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President;"

A key objective of the Act is to reduce the amount of personal information collected by Federal agencies to reduce the risk of intentionally or inadvertently improper use of personal data. In simplest terms, information not collected about an individual cannot be misused. The Act recognizes, however, that agencies need to maintain information about individuals to discharge their responsibilities effectively.

Agencies can derive authority to collect information about individuals in one of two ways:

By the Constitution, a statute, or Executive order explicitly authorizing or directing the maintenance of a system of records; e.g., the Constitution and title 13 of the United States Code with respect to the Census.

By the Constitution, a statute, or Executive order authorizing or directing the agency to perform a function, the discharging of which requires the maintenance of a system of records.

Each agency shall, with respect to each system of records which it maintains or proposes to maintain, identify the specific provision in law which authorizes that activity. While the Act does not specifically require it, where feasible, this statutory authority should also be cited in the annual public notice about the system published pursuant to subsection (e)(4). The authority to maintain a system of records does not give the agency the authority to maintain any information which it deems useful. Agencies shall review the nature of the information which they maintain in their systems of records to assure that it is, in fact, "relevant and necessary". Information may not be maintained merely because it is relevant; it must be both relevant and necessary. While this determination is, in the final analysis, judgmental, the following types of questions shall be considered in making such determinations:

How does the information relate to the purpose (in law) for which the system is maintained?

What are the adverse consequences, if any, of not collecting that information?

Could the need be met through the use of information that is not in individually identifiable form?

Does the information need to be collected on every individual who is the subject of a record in the system or would a sampling procedure suffice?

At what point will the information have satisfied the purpose for which it was collected; i.e., how long is it necessary to retain the information? Consistent with the Federal Records Act and related regulations could part of the record be purged?

What is the financial cost of maintaining the record as compared to the risks/ adverse consequences of not maintaining it?

Is the information, while generally relevant and necessary to accomplish a statutory purpose, specifically relevant and necessary only in certain cases? For example in establishing financial need as part of assessing eligibility for a program for which need is a legitimate

criterion, parental income may be relevant only for certain applicants.

Subsection (e) (7), below, provides additional criteria governing the maintenance of records on the activities of individuals in exercising their rights under the First Amendment.

This provision does not authorize agencies to destroy records which they are required to retain under the Federal Records Act.

Agencies shall assess the legality of, need for, and relevance of the information contained or proposed to be contained in each of its systems of records at various times:

In preparing initial public notices (subsection (e) (4)).

In connection with the initial design of a new system of records (subsection (o)).

Whenever any change is proposed in system of records (subsection (o)).

At least annually, as part of a regular program of review of its record-keeping practices. This should be done for each system prior to reissuance of the public notice unless a comprehensive review of the system of records was conducted within the previous year in connection with the initiation of the system or implementation of a change to the system.

This provision does not require that each agency conduct a detailed review of the contents of each record in its possession. Rather, agencies shall consider the relevance of, and necessity for, the general categories of information maintained and, incident to using or disclosing any individual records, examine their content to assure compliance with this provision.

It should be noted that subsection (e) is not intended to interfere with the presentation of evidence by the parties before a quasi-judicial or quasi-legislative body. For example, a quasi-judicial board or commission need not reject otherwise admissible evidence because it is proffered by a part other than the individual to whom it relates or because it is not "necessary" to the decision or is not "complete." The normal rules of evidence would contains to govern in such situations.

*Information is to be Collected Directly from the Individual.* Subsection (e) (2) "Collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits and privileges under Federal programs;"

This provision stems from a concern that individuals may be denied benefits, or that other adverse determinations affecting them may be made by Federal agencies on the basis of information obtained from third party sources which could be erroneous, outdated, irrelevant, or biased. This provision establishes the requirement that decisions under Federal programs which affect an individual should be made on the basis of information supplied by that individual for the purpose of making those determinations but recognizes the practical limitations of this by qualifying the requirement with the words "to the extent practi-

cable". The notion of protecting the individual against adverse determinations based on information supplied to other agencies for other purposes is also embodied in the provisions of subsection (b) which constrains the transfer of records between agencies; subsection (d)(2), which gives individuals the opportunity to challenge the accuracy of agency records pertaining to them; and subsection (e)(4) which prohibits the keeping of secret files.

Except for certain "statistical records" (subsection (a) (6)), which, by definition, are "not used in whole or in part in making a determination about an individual * * *", virtually any other record could be used, in making a "determination about an individual's rights, benefits, or privileges * * *" including employment. The practical effect of this provision is to require that information collected for inclusion in any system of records, other than "statistical records", should be obtained directly from the individual whenever practicable.

Practical considerations (including cost) may dictate that a third-party source, including systems of records maintained by another agency, be used as a source of information in some cases. In analyzing each situation where it proposes to collect personal information from a third party source, agencies should consider

The nature of the program; i.e., it may well be that the kind of information needed can only be obtained from a third party such as investigations of possible criminal misconduct;

The cost of collecting the information directly from the individual as compared with the cost of collecting it from a third party;

The risk that the particular elements of information proposed to be collected from third parties, if inaccurate, could result in an adverse determination;

The need to insure the accuracy of information supplied by an individual by verifying it with a third party or to obtain a qualitative assessment of his or her capabilities (e.g., in connection with reviews of applications for grants, contracts or employment); and

Provisions for verifying, whenever possible, any such third-party information with the individual before making a determination based on that information.

It should be noted that a determination by Agency (A) that it is in its best interest and consistent with this subsection to obtain information about an individual from Agency (B) instead of directly from the individual does not constitute, in and of itself, sufficient grounds for Agency (B) to release that information to Agency (A). Agency (B) is minimally required to meet the requirements of any statutory constraints on the permissibility of making a disclosure to Agency (A) including the conditions of disclosure, in subsection (b).

The standards and procedures set forth in the Federal Reports Act (44 USC 3501) as they apply to other than individuals as defined by this Act remain the same. When information is sought, however,

from ten or more individuals, as defined by the Privacy Act, in response to identical questions, the Federal Reports Act requirement that the reporting burden upon individuals be reduced to a minimum should not be construed to override the later enacted requirement that, to the greatest practicable extent, information pertaining to individuals be collected directly from them.

*Informing Individuals from Whom Information is Requested.* Subsection (e) (3) "Inform each individual whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the individual—"

This provision is intended to assure that individuals from whom information about themselves is collected are informed of the reasons for requesting the information, how it may be used, and what the consequences are, if any, of not providing the information.

Implicit in this subsection is the notion of informed consent since an individual should be provided with sufficient information about the request for information to make an informed decision on whether or not to respond. Note however, that the act of informing the individual of the purpose(s) for which a record may be used does not, in and of itself, satisfy the requirement to obtain consent for disclosing the record. See subsection (b), conditions of disclosure.

The information called for in paragraphs (A) through (D) below, should be included on the information collection form, on a tear-off sheet attached to the form, or on a separate sheet which the individual can retain, whichever is most practical. When information is being collected in an interview, the interviewer should provide the individual with a statement that the individual can retain. However, the interviewer should also orally summarize that information before the interview begins. Agencies may, at their discretion, ask the individuals to acknowledge in writing that they have been duly informed.

While this provision does not explicitly require it, agencies should, where feasible, inform third-party sources of the purposes for which information which they are asked to provide will be used. In addition, the agency may, under certain circumstances, assure a source that his or her identity will not be revealed to the subject of the record (see subsection (k) (2), (5), and (7)). The appropriate use of third-party sources is discussed in subsection (e)(2) above.

In providing the information required by subsections (e)(3) (A) through (D), below, care should be exercised to assure that easily understood language is used and that the material is explicit and informative without being so lengthy as to deter an individual from reading it. Information provided pursuant to this requirement would not, for example, be as extensive as that contained in the system notice (subsection (e)(4)).

It was not the intent of this subsection to create a right the nonobservance of which would preclude the use of the

**NOTICES**

information or void an action taken on the basis of that information. For example, a failure to comply with this section, in collecting crop yield data from a farmer, was not intended to vitiate a crop import quota based, in part, upon such information. However, such an individual may have grounds for civil action under subsection (g)(1)(D) if he can show harm as a result of that determination.

Subsection (e)(3)(A) "The authority (whether granted by statute, or by executive order of the President) which authorizes the solicitation of the information and whether disclosure of such information is mandatory or voluntary;"

The agency should cite the specific provision in statute or Executive order which authorizes the agency to collect the requested information (see subsection (e)(1) above), the brief title or subject of that statute or order, and whether or not the collecting agency is required to impose penalties for failing to respond or is authorized to impose penalties. Where the system is maintained pursuant to some more general requirement or authority, it should be cited. The question of whether compliance is mandatory or voluntary is different from the question of whether there are any consequences of not providing information; i.e., the law may not require individuals to apply for a benefit but clearly, for some types of voluntary programs, to apply without supplying certain minimal information might preclude an agency from making an informed judgment and thereby prevent an individual from obtaining a benefit. (See subsection (e)(3)(D) regarding the requirements to inform individuals of the effects, if any, of not providing information.)

In some instances it may be necessary to include required and optional information on the same data collection form. This should be avoided to the extent possible since the likely effect on some respondents may be coercive; i.e., they may fear that, even though portions of an information request are voluntary, by failing to respond, they may be perceived to be uncooperative and their opportunities would thereby be prejudiced. (See 44 U.S.C. 3511, the Federal Reports Act.)

Subsection (e)(3)(B) "The principal purpose or purposes for which the information is intended to be used;"

The individual should be informed of the principal purpose(s) for which the information will be used; e.g., to evaluate suitability, to issue benefit payments. The description of purpose(s) must include all major purposes for which the record will be used by the agency which maintains it and particularly those likely to entail determinations as to the individual's rights, benefits, etc. As in all other portions of the information collection process, purposes should be stated with sufficient specificity to communicate to an individual without being so lengthy as to discourage reading of the notice. Generally, the purposes will be directly related to, and necessary for, the purpose authorized by the statute or executive order cited above.

Subsection (e)(3)(C) "The routine uses which may be made of the information, as published pursuant to paragraph (4)(D) of this subsection; and"

"Uses" can be distinguished from "purposes" in that "purposes" describe the objectives for collecting or maintaining information, whereas "uses" are the specific ways or processes in which the information is employed including the persons or agencies to whom the record may be disclosed. For example, the purposes for collecting information may be to evaluate an application for a veterans' benefit and issue checks. Uses might include verification of certain information with the Department of Defense and release of check-issue data to the Treasury Department, or disclosure to the Justice Department that the applicant apparently intentionally provided false or misleading information.

The term "routine use" is defined in subsection (a)(7) to mean the disclosure of a record "* * * for a purpose which is compatible with the purpose for which it was collected." A "routine use" is one which is relatable and necessary to a purpose described pursuant to subsection (e)(3)(B), and involves disclosure outside the agency which maintains the record. "Routine uses" must be included not only in the public notice about the system of records published in accordance with subsection (e)(4), below, but also established in advance by notice in the FEDERAL REGISTER to permit public comment. See subsection (e)(11), below.

The description of "routine uses" provided to the individual at the time information is collected will frequently be a summary of the material published in the public notice pursuant to subsection (e)(4)(D). As with other portions of the notification to the individual, care should be exercised to tailor the length and tone of the notice to the circumstances; i.e., the public notice published pursuant to subsection (e)(4) can be much more detailed than the notice to the individual appended to an information collection form.

Subsection (e)(3)(D) "The effects on him, if any, of not providing all or any part of the requested information";

The intent of this subsection is to allow an individual from whom personal information is requested to know the effects (beneficial and adverse), if any, of not providing any part or all of the requested information so that he or she can make an informed decision as to whether to provide the information requested on an information collection form or in an interview.

The individual should be informed of the effects, if any, of not responding. This should be stated in a manner which relates to the purposes for which the information is collected; e.g., the information is needed to evaluate disabled veterans for special counseling and training and if it is not provided, no additional training will be considered but disability annuities payments will continue. Particular care must be exercised in the drafting of the wording of the notice to assure that the respondent to the information request is not misled or inadvertently coerced.

*Publication of the Annual Notice of Systems of Records.* Subsection (e)(4) "Subject to the provisions of paragraph (11) of this subsection, publish in the FEDERAL REGISTER at least annually a notice of the existence and character of the system of records, which notice shall include—"

The public notice provision is central to the achievement of one of the basic objectives of the Act; fostering agency accountability through a system of public scrutiny. The public notice provision is premised on the concept that there should be no system of records whose very existence is secret.

The purposes of the notice are to inform the public of the existence of systems of records:

The kinds of information maintained;

The kinds of individuals on whom information is maintained;

The purposes for which data is used; and

How individuals can exercise their rights under the Act.

All systems of records maintained by an agency are subject to the annual public notice requirement. (The general and special exemption sections permit agencies to omit portions of the notice for certain systems. They do not exempt any agency from publishing a public notice on any system of records).

Care must be exercised to assure that the tone, language, level of detail and length of the public notice are considered to assure that the notice achieves the objective of informing the public of the nature and purposes of agency systems of records.

Defining what constitutes a "system" for purposes of preparing a notice will be left to agency discretion within the general guidelines contained herein. (See also subsection (a)(5)). A system can be a small group of records or, conceivably, the entire complex of records used by an agency for a particular program. Several factors bear on the determination by the agency as to what will constitute a system:

If each small grouping of records is treated as a separate system, then public notices and procedures will be required for each. The publication of numerous notices may have the effect of limiting the information value to the public.

If a large complex of records is treated as a single system, only one notice will be required but that notice and the procedures may be considerably more complex.

Agencies can expect to be required to respond to individual requests for access to records pertaining to them at the level of detail in their public notices, i.e., if an agency treats its records for a particular program as a single system, it may be called upon by an individual to be given access to all information in records pertaining to that individual in the system.

The purpose(s) of a system is the most important criterion in determining whether a system is to be treated as a single system or several systems for the purposes of the Act. If each of several groupings of agency records is used for a

**NOTICES**

28963

unique purpose or set of purposes, as delineated in subsection (e)(3)(B) above, each may appropriately be treated as a separate system. Agencies should keep in mind that a major purpose of the Act is not the restructuring of existing systems of records, but rather the publicizing of what those systems are and how they are used. It does not, of course, preclude such restructuring where otherwise necessary or appropriate such as to reduce the risk of improper access.

Geographic decentralization will not in and of itself be considered a criterion for viewing a system of records as several systems. An agency may treat a decentralized system as a single system and specify several locations and an agency official responsible for the system at each location. See subsections (e)(4)(A) and (F). While the development of central indexes for systems which do not presently require such indexes should be avoided wherever possible, individuals who seek to learn whether a geographically decentralized system of records contains a record pertaining to them (subsection (f)(1)) should not be required to query each location. (In deciding whether or not to construct an index, agencies must weigh the potential threat of misuse posed by making individual records more accessible against the capability to meet the needs of those individuals for access to their records). It may, however, be possible to guide individuals as to which location may have a record pertaining to them; e.g., systems segmented by location of birth, or by range of identification number. In any case, "if a system is located in more than one place, each location must be listed." (House Report 93–1416, p. 15) See subsection (e)(4)(A).

A major criterion in determining whether a grouping of records constitutes one system or several, for purposes of the Act, will be the ability to be responsive to the requests of the individual for access to records and generally to be informed.

Systems, however, should not be subdivided or reorganized so that information which would otherwise have been subject to the act is no longer subject to the act. For example, if an agency maintains a series of records not arranged by name or personal identifier but uses a separate index file to retrieve records by name or personal identifier it should not treat these files as separate systems.

A public notice is required to be published:

For each system in operation on September 27, 1975 on or prior to that date and the notice shall be republished, including any revisions, on or before August 30, each year thereafter.

For new systems, before the system of records becomes operational; i.e., before any information about individuals is collected.

It should be noted that each "routine use" of a system must have been established in a notice published for public comment at least 30 days prior to the disclosure of a record for that "routine use" as specified in subsection (e)(11).

For major changes to existing systems, a revised public notice is required before that change is effective. If the change to an existing system involves changes to "routine uses", they are subject to the 30 day advance notice provisions of subsection (e)(11). The nature of the changes in a system which would require the issuance of a revised public notice before the next annual public notice is described for each element of the public notice in the succeeding paragraphs. Generally, any change in a system which has the effect of expanding the categories of records maintained, the categories of individuals on whom records are maintained, or the potential recipients of the information, will require the publication of a revised public notice before the change is put into effect. In addition, any modification that alters the procedures by which individuals exercise their rights under the Act (e.g., for gaining access) will require the publication of a revised public notice before that change becomes effective.

Changes of the type described above will typically also require the preparation of a "Report on New Systems" under subsection (o), below. Any other change will be incorporated into the next annual revision of the notice.

The General Services Administration (Office of the Federal Register) will issue more detailed guidance on the formats to be used by agencies in publishing their public notices. The formats prescribed by GSA are to be used to facilitate the annual compilation of the notices and to assure that notices are produced in a consistent manner to make them more useful to the public.

*Describing the Name and Location of the System in the Public Notice.* Subsection (e)(4)(A) "The name and location of the system"

Agencies will specify each city/town and site at which the system of records is located. For a geographically dispersed system each location should be listed. A change in the list of locations will not require publication of a revised notice.

While the House report language cited above clearly indicated that the location of each site at which the system is maintained is to be listed, exceptional situations may dictate not including the listing in the body of the notice; e.g., military personnel records are kept at several hundred installations or certain farmer records which are kept at several thousand county extension agent offices. To include the list of locations in each applicable notice would only serve to inflate the size and thereby reduce the readability of the notice. In these instances, it may be appropriate to publish a single list of field stations, or to refer in the notice for all systems at those sites to a list which is generally available.

*Describing Categories of Individuals in the Public Notice.* Subsection (e)(4)(B) "The categories of individuals on whom records are maintained in the system;"

"The purpose of this requirement is for an individual to determine if information on him might be in [the] system. The description of the categories should therefore be clearly stated in non-technical terms understandable to individuals unfamiliar with data collection techniques." (House Report 93–1416, p. 15). For example, the notice might indicate that the records are maintained on students who applied for loans under a student loan program, not persons who filed form X or who are eligible under section ABC–000.

Any change which has the effect of adding new categories of individuals on whom records are maintained will require publication of a revised public notice. If, in the absence of a revised notice, an individual who is the subject of a record in the system would not recognize that fact, a revision should be issued before that change is put into effect. A narrowing of the coverage of the system does not require advance issuance of a revised notice.

*Describing Categories of Records in the Public Notice.* Subsection (e)(4)(C) "The categories of records maintained in the system;"

This portion of the notice should briefly describe the types of information contained in the system; e.g., employment history or earnings records. As with the previous item, non-technical terms should be used. The addition of any new categories of records not within the categories described in the then current public notice will require the issuance of a revised public notice before that change is put into effect. The addition of a new data element clearly within the scope of the categories in the notice would not require the issuance of a revised notice.

*Describing Routine Uses in the Public Notice.* Subsection (e)(4)(D) "Each routine use of the records contained in the system, including the categories of users and the purpose of such use;"

In describing the "routine uses" of the system in the public notice, the notice should be sufficiently explicit to communicate to a reader unfamiliar with the technical aspects of the system or the agency's program.

For a more extensive discussion of "routine uses," see subsections (a)(7) (definitions), (b)(3) (conditions of disclosure), (e)(3)(C) (notification to the individual), and (e)(11) (notice of routine uses).

Any new use or significant change in an existing use of the system which has the effect of expanding the availability of the information in the system will require publication of a revised public notice. Any such change in a routine use must also be described in a notice in the FEDERAL REGISTER to permit public comment before it is implemented.

*Describing Records Management Policies and Practices in the Public Notice.* Subsection (e)(4)(E) "The policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records";