# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| In Re: DEPARTMENT OF VETERANS AFFAIRS (VA) DATA THEFT LITIGATION | : : : : | |
| | : | Misc. Action No. 06-0506 (JR) |
| This Document Relates To: ALL CASES | : : : : | MDL Docket No. 1796 |

## PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE EXHIBITS 1, 4, 5 AND 6 TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Pursuant to Federal Rules of Civil Procedure 7 and Local Civil Rule 7, Plaintiffs hereby reply to "Defendants' Opposition to Plaintiffs' Motion to Strike" filed on March 27, 2007 (Defs.' Opp."). Defendants' Opposition sidesteps the main issues raised by Plaintiffs in their Motion to Strike and in doing so, fails to provide any valid reason to deny Plaintiffs' Motion to Strike. In fact, Defendants completely fail to address Plaintiffs' main authorities, *Palmer v. Hoffman*, 318 U.S. 109, 113 (1943), and *Barry v. Trs. of the Int'l Ass'n Full-Time Salaried Officers & Emples. of Outside Local Unions & Dist. Counsel's (Iron Workers) Pension Plan*, 467 F. Supp. 2d 91, 102 (D.D.C. 2006), instead citing to outdated caselaw from outside this district.

Reduced to its essence, Defendants' Opposition argues (1) that the Exhibit 1 is trustworthy; (2) that no authentication of Exhibits 1, 4 and 5 are necessary; and (3) that Exhibits 4 & 5 are admissible under Fed. R. Evid. 803(8). Finally, Defendants attach the declaration of Mike Cook in an attempt to correct the admitted deficiencies of Exhibit 6.

Plaintiffs will concede for the purposes only of this motion that Exhibits 1, 4 and 5 are authentic.[1]  However, nothing in Defendants' Opposition alters the fact that Exhibits 1, 4 and 5 are inadmissible hearsay that should be stricken.  Furthermore, Defendants' attempted corrections to Exhibit 6 are procedurally improper, and in any event, fail to lay a proper foundation for its admissibility.

## I.    Exhibit 1 is untrustworthy and should be stricken

Fed. R. Evid. 803(8)(C) allows for the admission of government reports in civil cases "unless the sources of information or other circumstances indicate lack of trustworthiness."  Because the veracity of the sources of information is an essential component of the hearsay exception, "the court has an independent obligation to assess the trustworthiness of the findings." *Zenian v. District of Columbia*, 283 F. Supp. 2d 36, 40 (D.D.C. 2003), citing *United States v. Warren*, 310 U.S. App. D.C. 1, 42 F.3d 647, 657 n.8 (D.C. Cir. 1994).  Should a court finds that circumstances do indicate a lack of trustworthiness, the proposed evidence ***must*** be excluded:  "a trial judge has the discretion, ***and indeed the obligation***, to exclude an entire report or portions thereof -- whether narrow 'factual' statements or broader 'conclusions' -- that she determines to be untrust-worthy." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167-168 (1988). (emphasis added).

---

[1] However, as noted by the primary case cited by Defendants, *United States ex re Parikh v. Premera Blue Cross*, 2006 U.S. Dist. LEXIS 70933 (W.D. Wash. September 29, 2006), there is a paucity of law defining what qualifies as a "self-authenticating document" under 902(5). Notably, no court within this circuit has made the determination that a governmental report qualifies as a "self-authenticating document."  Further, Defendants offer no explanation why Exhibits 1, 4 and 5 are "official publication[s]," under 902(5) as opposed to a domestic public documents or public records which must satisfy Rule 902(1), (2) or (4), each requiring some sort of attestation or certification by an authorized person.  Nevertheless, Plaintiffs will concede for the limited purposed of this Reply that Exhibits 1, 4, and 5 are authentic.

Exhibit 1 to Defendants' Motion to Dismiss is a July 11, 2006 report prepared by the Department of Veterans' Affairs Office of Inspector General ("VA OIG"), titled "Review of Issues Related to the Loss of VA Information Involving the Identity of Millions of Veterans." (the "VA OIG Report") The VA OIG Report is untrustworthy for multiple reasons:

- The VA OIG Report was prepared by the primary defendant in this litigation;

- The VA OIG Report omitted key information damaging to the VA;

- The Defendants denied Plaintiffs access to the supportive materials underlying the VA OIG Report, thereby thwarting any ability to test their veracity;

- The VA OIG Report is inaccurate;

- Even if the VA OIG Report is admissible, it contains numerous hearsay statements that must be excluded on an individual basis.

## A.    The VA OIG Report is untrustworthy because it was prepared by a party in active litigation

Plaintiffs' Motion to Strike emphasized that pursuant to the seminal and oft-followed rule of *Palmer v. Hoffman*, 318 U.S. 109, 113 (1943), a report prepared in anticipation of litigation is typically not admissible under a hearsay exception.[2] (Plaintiffs' Motion at 6-10). *Palmer* warned that admitting such a report would serve as "a real perversion of a rule designed to facilitate admission of records which experience has shown to be quite trustworthy." *Palmer*, 318 U.S. 113. Therefore, "[t]he doctrine has since been applied to deny the business records exception to any document prepared

---

[2] Although *Palmer* dealt with business records under 803(6) rather than public records under 803(8), per the Advisory Committee on Fed. R. Evid. 803(8) there is no functional distinction. See Advisory Committee's Notes on Fed. R. Evid. 803(8), 28 U.S.C. App., at 725.

with an eye toward litigation when offered by the party responsible for making the record." *United States v. Smith*, 172 U.S. App. D.C. 297 (D.C. Cir. 1975).

Plaintiffs' Motion to Strike thus cited numerous examples of courts applying *Palmer* to reject the admission of governmental and business reports when a party prepared the report in anticipation of litigation. Plaintiffs' Motion to Strike, pg. 8-9, citing *Wetherill v. Univ. of Chicago*, 518 F. Supp. 1387, 1390-1 (N.D. Ill. 1981); *Chambliss v. Illinois Dept. of Corrections*, 2007 U.S. Dist. Lexis 10534 (S.D. Ill. February 15, 2007); *Scheerer v. Hardee's Food Systems, Inc.*, 92 F.3d 702, 707 (8th Cir. 1996). Notably, all three cases at issue here were filed ***before*** the VA OIG issued its Report on July 11, 2006.[3] Thus, the Report was not merely prepared "with a view towards possible litigation," but instead ***in response to pending litigation*** and, in any event, with full knowledge of the Defendants' significant potential liability.

"Precedent teaches that courts typically should not admit documents made in anticipation of litigation as they 'lack sufficient guarantees of trustworthiness to be excerpted from the hearsay rule.'" *Stolarczyk v. Senator Int'l Freight Forwarding*, 376 F. Supp. 2d 834, 841 (D. Ill. 2005), citing *Moffett v. McCauley,* 724 F.2d 581, 584 n.1 (7th Cir. 1984) (citing *Palmer,* 318 U.S. 109); *see also U.S. v. Blackburn,* 992 F.2d 666, 670 (7th Cir. 1993) ("We adhere to the well-established rule that documents made in anticipation of litigation are inadmissible under the business records exception [to the general hearsay prohibition]"). In fact, "precedent instructs that, based upon the context

---

[3] The first-filed lawsuit in this action was *Hackett v. United States Department of Veterans Affairs*, Case. No. 2:06-cv-114 WOB, filed in the Eastern District of Kentucky on May 30, 2006. *Vietnam Veterans of America, Inc. v. Nicholson*, Case No. 1:06-cv-1038-JR, filed in the District Court for the District of Columbia*,* on June 6, 2006. *Rosato v. Nicholson*, Case No. 1:06-cv-03086-ENV-JMA, was filed in the Eastern District of New York on June 21, 2006.

they were made in anticipation of potential litigation, the ***presumption is in favor of untrustworthiness***" and thus inadmissibility. *Id*. at 842. (emphasis added).

Defendants' opposition papers totally ignore this black-letter authority, and in doing so, make no effort to argue why the *Palmer* rule should not apply here. In fact, Defendants are able to cite only a single district court decision that runs counter to *Palmer* and its progeny - *Diaz v. United States*, 655 F. Supp. 411 (E.D. Va. 1987). Significantly, none of the other cases cited by Defendants address whether a report generated by a party to litigation may be introduced by that party. In *Diaz*, a Navy JAG officer completed an incident report regarding an injury to a civilian contractor who slipped on a Navy vessel. The Navy utilized witness statements contained in the JAG report to defend itself against the civilian's personal injury lawsuit.

*Diaz* recognized that the use of a report prepared by a party to the litigation was problematic, but ultimately allowed the admission of the report under Fed. R. Evid. 803(8) under the specific facts of the case. *See id*. at 416. Notably, the court emphasized the routine nature of the report prepared by the JAG officer and the lack of bias amongst the witnesses interviewed. *See id*. "The Court is not faced with the same problems of trustworthiness expressed by the Supreme Court in *Palmer v. Hoffman*, 318 U.S. 109, 63 S. Ct. 477, 87 L. Ed. 645 (1943). Rather, JAG reports are routinely prepared as a candid recitation of the facts involved in a particular incident." *Id*.

Unlike *Diaz*, however, this case does not present a routine inquiry into the activities of the VA. In fact, the data theft that gave rise to this litigation is anything but routine, being described "as the worst crisis in the VA's history."[4] Numerous members of

---

[4] Statement of Jim Mueller, head of Veterans of Foreign Wars of the United States, in "VA knew early about data theft," Washington Post, May 27, 2006, http://www.washingtonpost.com/wp-

the VA, including Inspector General George Opfer, the author of the VA OIG Report, were called to testify before Congress regarding the data theft.[5]  In fact, Inspector General Opfer appeared before Congress on May 25, 2006, and again on July 20, 2006.[6]

Further, as a result of the failures at the VA, the Deputy Assistant Secretary for Policy, Michael McLendon, reportedly resigned.[7]  Additional resignations and even potential criminal prosecutions of those involved were openly discussed in the VA OIG Report.  The Senate Appropriations Committee reportedly committed $160.5 million to pay for credit monitoring for the affected veterans.[8]  Notably, $131.5 million of the $160.5 million was to be reallocated from the White House budget.[9]  Thus as an appointee serving solely at the pleasure of the President, Inspector General Opfer's report certainly could be viewed as crafted to protect against liability here and to prevent the $131.5 million "reallocation" from the While House budget.  In fact, the VA OIG Report contained the first public statement that the OIG and the FBI were "highly confident that the files on the external hard drive were not compromised after the burglary."  VA OIG Report, pg. ii.  It was this conclusion that resulted in cancellation of plans to spend $160.5 million for credit monitoring:  "Given the FBI's high degree of confidence that the

---

dyn/content/article/2006/05/25/AR2006052501237_pf.html, attached as Exhibit 1 to Declaration of Todd B. Naylor, attached hereto as Exhibit A
[5] Statement of George J. Opfer Inspector General Department of Veterans Affairs before the Committee on Veterans' Affairs United States Senate, July 20, 2006, available at http://www.va.gov/oig/pubs/VAOIG-Testimony_20060720_Opfer_Testimony.pdf, attached as Exhibit 2 to Declaration of Todd B. Naylor, attached hereto as Exhibit A.
[6] *Id.*
[7] "Veterans official steps down after theft," May 30, 2006, available at http://www.usatoday.com/news/washington/2006-05-30-vets-id-theft_x.htm, attached as Exhibit 3 to Declaration of Todd B. Naylor, attached hereto as Exhibit A
[8] "VA Asking for More Money After Data Theft," June 28, 2006, available at http://www.cbsnews.com/stories/2006/06/28/ap/politics/mainD8IH0MK80.shtml, attached as Exhibit 4 to Declaration of Todd B. Naylor, attached hereto as Exhibit A
[9] *Id.*

information recently recovered was not accessed or compromised, VA believes that individual credit monitoring will no longer be necessary."[10]

These facts are similar to another sensitive investigation faced by the court in *United States v. Durrani*, 659 F. Supp. 1183 (D. Conn. 1987), affirmed by *United States v. Durrani*, 835 F.2d 410 (2d Cir. 1987). *Durrani* refused to admit a report under 803(8)(C) that was issued by the President's Special Review Board on the Iran/Contra affair. The court cited *Palmer* in finding that the report was inadmissible, in part for its failure to comply with the trustworthiness requirement in 803(8)(c). *See id.* at 1186.

> The Tower Board's study took place following the Iran/Contra affair having been made public. Not only was the President's ability to manage foreign affairs being questioned, but the possibility of criminal prosecution for various officials lingered on the horizon. While the Court does not question the Board's ability to impartially consider the evidence before it, ***the Court does question the underlying sources of information.***

*Id*. at 1187. (emphasis added)

This case is strikingly similar to *Durrani*: here, the VA's ability to manage its affairs was being publicly questioned; $160.5 million dollars were set aside by Congress for credit monitoring; criminal prosecution for at least one VA employee was possible; and numerous federal officials potentially faced the loss of their jobs. Furthermore, multiple lawsuits seeking financial redress were already filed with potentially more on the horizon.

In such an environment, a party's motive to misrepresent is patent. As the court of appeals noted in *Palmer*:

> The person making the record, or supplying the information on which it is based, must have had no peculiarly powerful motive to misrepresent; such

---

[10] "Latest Information on Veterans Affairs Data Security," available at http://www.usa.gov/veteransinfo/#FAQs, attached as Exhibit 5 to Declaration of Todd B. Naylor, attached hereto as Exhibit A

a motive, if it exists must be relatively minimal and marginal. Wigmore, speaking of records made in the regular course of business, says: It is often added that there must have been no motive to misrepresent. This does not mean that the offeror must show an absence of all such motives; *but merely that if the existence of a fairly positive counter-motive to misrepresent is made to appear in a particular instance, the entry would be excluded*.

*Hoffman v. Palmer*, 129 F.2d 976, 980 (2d Cir. 1942) (emphasis added), aff'd

*Palmer,* 318 U.S. 109, citing Wigmore, Evidence (3d ed. 1940) § 1527.

Given the presumption in favor of inadmissibility for reports prepared by a party

in anticipation of litigation, and the existence of an obvious motive to misrepresent, this

Court should exclude the VA OIG Report as untrustworthy.

Defendants' argument that the VA OIG Report is trustworthy hinges upon

nothing more than a conclusory assertion that the VA OIG is an "independent and

objective" part of the VA that would have "little 'motive' to exculpate the VA in an

investigation." Defs.' Opp. at 9.   Moreover, Defendants are unable to cite to any judicial

recognition of this supposed objectively, or presumption in favor of impartiality for an

OIG office.

Furthermore, Mr. Opfer, the head of the VA OIG, is a political appointee of the

President, a highly relevant consideration when one notes that the issuance of the VA

OIG Report resulted in Congress restoring some $131.5 million it intended to take from

the White House budget.[11]    And while the VA OIG Report did engage in some

perfunctory hand-slapping, issuing conclusions "critical of VA activities," (Defs.' Opp. at

9 n4) it was overall watertight enough in the main that the Defendants eagerly employed

it as the core foundation for a motion for summary judgment.

---

[11] *Id.*

**B.    The VA OIG Report is untrustworthy because it omitted information damaging to the VA**

Even based upon the trickle of documents that Plaintiffs obtained through their own industry, that the VA OIG Report is untrustworthy is apparent when the Court considers that it studiously ignored key information.  As Plaintiffs already argue in their Joint Opposition to Defendants' Motion to Dismiss, or, In the Alternative, For Summary Judgment, filed March 28, 2007, the VA OIG Report is a whitewash in many key respects.  Key omissions pointed out in Plaintiffs' opposition papers include:

- Jack Thompson, Deputy General Counsel, stated to OIG investigators that he personally told Secretary Nicholson that the backdated "guidelines" document was (1) relevant to the May 3, 2006, theft and (2) provided a specific basis to charge John Doe with willful violation of office policy. Plaintiffs' Joint Opposition, pg. 17 (citation omitted).

- On May 18, 2006, Tim McClain, VA General Counsel at the time, stated to OIG investigators that "there's no question" regarding the May 3, 2006, theft.  "It's a Privacy Act violation." Plaintiffs' Joint Opposition, pg. 11 (citation omitted).

- OIG investigators were specifically told by VA employees of the Austin, Texas data center that the current Federal Register notice describing the BIRLS database did not accurately describe the contents of the database and would not inform millions of individuals that VA had their personal information.  Plaintiffs' Joint Opposition, pg. 21 (citations omitted).

Equally troubling as to its reliability, not a single statement in the VA OIG Report is cited or referenced to any of the myriad of underlying documents or testimony.

**C.    The VA OIG Report is untrustworthy because the Defendants oppose Plaintiffs access to the supportive materials**

Defendants decry Plaintiffs' alleged failure to provide "specific evidence" of the OIG's bias (Defs.' Opp. at 11) while at the same time barring the door for Plaintiffs to access the materials used to compile the VA OIG Report.  Notably, *Beech Aircraft* upheld the "broad admissibility" of facts, conclusions, evaluations and opinions contained in an aircraft accident report, because it found that "the admission of a report containing 'conclusions' is subject to the ultimate safeguard - the opponent's right to present evidence tending to contradict or diminish the weight of those conclusions." *In re Korean Air Lines Disaster*, 932 F.2d 1475, 1482 (D.C. Cir. 1991), citing *Beech Aircraft*, 488 U.S. at 168.

Here, Defendants oppose Plaintiffs' Civ. R. 56(F) Motion for Discovery, which centers on obtaining the documents underlying the VA OIG Report.  Secondly, Defendants moved for summary judgment before any discovery has even been allowed by this Court (see Scheduling Order dated February 28, 2007).  Defendants thus seek to remove the "ultimate safeguard" so critical to *Beech Aircraft* by preventing Plaintiffs from compiling and presenting "evidence tending to contradict or diminish the weight" of the VA OIG Report. *Beech Aircraft*, 488 U.S. at 168.  Without the presence of this "ultimate safeguard," the VA OIG Report is wholly untrustworthy.

Besides just obtaining the underlying documentation to the report, in determining trustworthiness for purposes of 803(8), courts have heavily weighed whether the opposing party is given an opportunity to cross-examine the witnesses whose testimony,

statements, or knowledge generated the ex parte report. *Denny v. Hutchinson Sales Corp.*, 649 F.2d 816, 821 (10th Cir. 1981). No such cross examination was allowed here: Plaintiffs have not even been provided with transcripts of the witness testimony used to generate the VA OIG Report, let alone an opportunity to cross-examine these witnesses.[12] Defendants' opposition to allow the VA OIG Report to be tested through normal litigation raises self-evident and severe questions about its trustworthiness.

### D.    The VA OIG Report is untrustworthy because it is inaccurate

As detailed in Plaintiffs' Joint Opposition to Defendants' Motion to Dismiss, or, In the Alternative, For Summary Judgment, numerous factual errors permeate the VA OIG Report. As just one example, the VA OIG Report contains assertions that John Doe was authorized to perform the types and volumes of file transfers that resulted in Plaintiffs' records being stolen from his home. VA OIG Report at 4. But as Plaintiffs demonstrate on page 51 of their Opposition to Defendants' Motion to Dismiss, this conclusion ignores sworn testimony and records to the contrary. Additional examples may be found in Plaintiffs' Joint Opposition to Defendants' Motion to Dismiss, or, In the Alternative, For Summary Judgment, including:

- The VA OIG Report states that Mr. Tran "assigned the [mustard gas] project to [John Doe]," VA OIG Report at 6, but Mr. Tran testified that he never gave any such assignment. Plaintiffs' Joint Opposition, pg. 55, citing Tran May Test. At 91.

---

[12] The limited factual information Plaintiffs have compiled thus far is strictly the result of their own investigation. See Plaintiffs' Joint Opposition to Defendants' Motion to Dismiss, or, In the Alternative, For Summary Judgment, pg. 3 n3.

- The VA OIG Reports states that "[John Doe] had an official need to use Large VA Databases," VA OIG Report at 3, but John Doe testified that he was using the BIRLS, NSV and C&P systems of records for a task of his own design that he referred to as his "fascination project." Plaintiffs' Joint Opposition at 56, citing Doe May 17 Test. At 19, 22-25, 30-31.

E.    **Even if admitted, the VA OIG Report contains hearsay statements that must be excluded**

"Statements made by third persons that are recorded in an investigative report are hearsay within hearsay. As such, they are inadmissible unless they qualify for their own exclusion from the hearsay rule[.]" *Barry v. Trs. of the Int'l Ass'n Full-Time Salaried Officers & Emples. of Outside Local Unions & Dist. Counsel's (Iron Workers) Pension Plan*, 467 F. Supp. 2d 91, 102 (D.D.C. 2006), citing 5 Weinstein's Federal Evidence § 803.10[4][a]. *See also Wilson v. Maricopa County*, 2007 U.S. Dist. LEXIS 15451 (D. Ariz. March 2, 2007) ("the admissibility of a report as a public record does not result in the admissibility of hearsay statements contained within the report"); *Means v. Cullen*, 297 F. Supp. 2d 1148, 1151 (D. Wis. 2003) (statements made by third parties recorded in a public report are hearsay within hearsay and are inadmissible unless they qualify for their own exception or exclusion to the hearsay rule).

While Defendants appear to acknowledge this basic rule, they nevertheless urge the Court to sidestep *Barry* in favor of "the better view," which they claim is presented in older cases from outside this district.[13] Defs' Opp. at 11. But any such view not only runs afoul of *Barry*, but ignores the plain language of Fed. R. Evid. 805, which states that

---

[13] The so-called "better view" would wholesale allow any hearsay statement contained within an 803(8)(C) report to be admissible into evidence so long as the report itself was trustworthy.

"[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Defendants present no legitimate reason why this Court should ignore Fed. R. Evid. 805, and *Barry*, in favor of outmoded cases from outside this district. Thus, Defendants have an obligation to identify a proper hearsay exception for each individual hearsay statement within the VA OIG Report on which they rely.

Specifically, on page 11 of the Motion to Strike, Plaintiffs set forth 8 examples of supposed "facts" relied upon by Defendants that are the product of hearsay statements, which are:

1. The reason(s) John Doe took the laptop home. Defs.' Facts ¶ 1;

2. Whether the laptop was ever accessed after the theft. Defs.' Facts ¶ 3;

3. John Doe's job responsibilities. Defs.' Facts ¶ 16;

4. Whether John Doe had an official need to access the data that was on the stolen hard drive. Defs.' Facts ¶ 16;

5. Whether the "mustard gas file" contained social security numbers. Defs.' Facts ¶ 18;

6. Details regarding John Doe's work on the NSV project, including why he worked on the project at home. Defs.' Facts ¶ 19;

7. Whether John Doe's work on the NSV project was a legitimate work effort. Defs.' Facts ¶ 20; and

8. What VA information was downloaded to the hard drive stolen from John Doe's home. Defs.' Facts ¶21.

Tellingly, Defendants do not contest that these "facts" are the product of hearsay statements. Nor do they even argue that a hearsay exception applies to allow for the admission of these "facts." Therefore, these hearsay statements must be stricken per Fed. R. Evid. 805 and *Barry*. *Barry*, 467 F. Supp. 2d at 102.

In place of addressing *Barry*, Defendants make a novel,[14] counter-intuitive argument for the wholesale admission of ***all*** the hearsay statements in the VA OIG Report. Here, the Defendants point out that since the entire VA OIG Report is so thoroughly saturated with hearsay it is impossible to extract the non-hearsay statements from those that are hearsay. Defs.' Opp. at 11-12. Therefore, according to Defendants, the burden shifts upon Plaintiffs to "provide a consistent distinction between acceptable and unacceptable factual findings and conclusions in the VA OIG Report" to enable this Court to rule on the admissibility of hearsay. *Id.*

Defendants' topsay-turvy logic achieves a remarkably backwards result: hearsay-mired reports would be presumptively admitted into evidence, while reports not so entangled, would not. Courts, however, have ruled exactly to the contrary: the hearsay entanglement, alone, is reason to refuse to admit a government report. See *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1125, 1148 (D. Pa. 1980) ("when hearsay dominates, the report may be excluded") *See also Swietlowich v. County of Bucks*, 610 F.2d 1157, 1165 (3d Cir. 1979) (district attorney's report proffered in civil rights litigation excluded because based on hearsay); *John McShain, Inc. v. Cessna*

---

[14] Defendants cite *United States v. Davis*, 826 F. Supp. 617 (D. R.I. 1993) for the proposition that "multiple layers of hearsay clearly fall within the scope of FRE 803(8)(C)." Defs' Opp. at 12. No court has ever followed *Davis* on this point and moreover, the *Davis* court never addressed whether individual hearsay statements within a 803(8)(C) report should be excluded, instead focusing on whether a report based on hearsay should be excluded in its entirety. That the *Davis* court found the particular report in that case trustworthy does not at all impact whether individual statements in the VA OIG Report are hearsay.

*Aircraft Co.*, 563 F.2d 632 (3d Cir. 1977) (National Transportation Safety Board report based upon hearsay statements excluded). Defendants' abdication of this burden of proof, if anything, makes it clear that the objectionable statements identified by Plaintiffs are inadmissible.

## II.    Exhibits 4 and 5 are hearsay documents that contain only interim or preliminary opinions- they are not "factual findings"

Exhibit 4 to Defendants' Motion to Dismiss purports to be a press release from the United States Department of Justice, Federal Bureau of Investigation, dated June 29, 2006. Exhibit 5 to Defendants' Motion to Dismiss purports to be another press release from the FBI, dated July 13, 2006. Defendants rely on Exhibits 4 and 5 to conclude that "[t]he data on the hard drive was never accessed after the theft." Defs.' Facts ¶3.

But neither Exhibit 4 nor Exhibit 5 contains this conclusion. Exhibit 4 references merely a "preliminary review," and notes that "the results will be shared as soon as possible" because "[t]he investigation is ongoing." Exhibit 5 limits its conclusions "[b]ased on all the facts gathered *thus far* during the investigation…" (emphasis added). Neither of these Exhibits presents final "factual findings…" Fed. R. Evid. 803(8)(C). Instead, these are interim or preliminary opinions carefully limited in scope, a fact which Defendants do not dispute.

As interim opinions, these press releases do not satisfy the express requirement of 803(8)(c) since they are ***not*** the "findings" of an agency or official. *See New York v. Pullman, Inc.*, 662 F.2d 910, 914 (2d Cir. 1981) (upholding the trial court's decision to refuse to admit a report prepared by the staff of the Urban Mass Transit Administration when the report was not final), citing *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 505 F. Supp. 1125, 1145 (E.D.Pa.1980); *Pollard v. Metropolitan Life Ins.*

*Co.*, 598 F.2d 1284, 1286-87 (3 Cir. 1979), cert. denied, 444 U.S. 917, 62 L. Ed. 2d 171, 100 S. Ct. 232 (1979).

Furthermore, Defendants miss the mark when they claim that this Court can take judicial notice of a disputed fact as it is contrary to the plain language of Fed. R. Evid. 201(b).  Certainly, this Court may take judicial notice of the ***existence*** of the FBI press releases, but not any such conclusions reached therein.  *See, e.g.*, *United States v. Wagner*, 19 Fed. Appx. 542, 543 (9th Cir. 2001) (While the existence of the [FDIC] manual may be judicially noticed, the legal conclusions Wagner infers from it are inappropriate for judicial notice because they include disputed facts).

**III.        Exhibit 6 is inadmissible as it is completely lacking in foundation**

Exhibit 6 to Defendants' Motion to Dismiss, of, In the Alternative, For Summary Judgment is a letter from Bruce Hansen dated November 15, 2006 to R. James Nicholson.  Plaintiffs moved to strike Exhibit 6 because Defendants failed to lay the proper foundation for its admission.

In their Opposition to Plaintiffs' Motion to Strike, Defendants attempt to correct their deficient authentication of Exhibit 6 by attaching the Declaration of Mike Cook as Exhibit A.   Mr. Cook states in Exhibit A that he is the "Vice President and Chief Operating Officer at ID Analytics."  Cook Decl. at ¶2.  Mr. Cook then attempts to state that the "November 15, 2006 letter…is a true and accurate report of the analysis of the VA records file performed by ID Analytics."  *Id.* at ¶5.

But Defendants' effort to salvage Exhibit 6 misses the mark.  First, they failed to seek leave of this Court to substitute Exhibit A to their Opposition to the Motion to Strike for Exhibit 6 to their Motion to Dismiss, or, In the Alternative, For Summary Judgment.

Second, even if the Defendants properly did so, Exhibit A to Defs' Opp. is still inadmissible as it is utterly lacking in foundation. Exhibit A contains opinion testimony that is technical in nature. *See* Fed. R. Evid. 702. Thus to be admissible, Exhibit A must comply with the rules for expert testimony under Fed. R. Evid. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Put simply, Exhibit A provides no foundation whatsoever for this Court to conclude that (1) the testimony of Mike Cook is based on sufficient facts or data, (2) the testimony of Mike Cook is the product of reliable principles and methods, and (3) Mike Cook has applied the principles and methods reliably to the facts of the case. In fact, Exhibit A contains no evidence that:

- Mike Cook is qualified to produce or supervise production of a "breach analysis"

- The "proprietary ID Analytics' technology" used to perform the "breach analysis" is reliable

- The "standard processes and analytical tools" used by ID Analytics are reliable

- The VA records file was properly entered into the software

- The VA records file was kept secure from loss or alteration

"The admissibility of expert testimony and the qualification of an expert witness are preliminary questions to be determined by the district court, *see* Fed. R. Evid. 104(a),

and [the party seeking introduction of such evidence] ha[s] the burden of establishing these matters by a 'preponderance of proof.' *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127n9 (D.C. Cir. 2001), citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993).

"The Supreme Court has identified four factors for courts to consider in evaluating scientific validity, focusing on whether the theory or technique had been tested, whether it had been subjected to peer review and publication, the method's known or potential error rate, and the method's general acceptance in the scientific community." *Id.*, citing *Daubert*, 509 U.S. 579, 593-594.

Defendants' Exhibit A fails to provide any information that would enable this Court to determine if any of these factors are met, and therefore that the conclusions reached therein are sufficiently reliable to be admitted into evidence. Because Defendants failed to meet their burden, Exhibit A should be excluded. *Meister*, 267 F.3d 1127 (rejecting admission of expert report for failure to comply with Fed. R. Evid. 702 and *Daubert*).

### IV.    Conclusion

For the forgoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion to Strike Exhibits 1, 4, 5 and 6 to Defendants' Motion to Dismiss Or, In The Alternative, For Summary Judgment.

_/s/ John C. Murdock_____

John C. Murdock
Jeffrey S. Goldenberg
Murdock, Goldenberg, Schneider & Groh, LLP
35 East Seventh Street
Suite 600
Cincinnati, OH 45202
(513) 345-8291
(513) 345-8294 (fax)
Counsel in Case No. 1:06-CV-01943(JR)

Donald A. Cockrill
Douglas J. Rosinski
Ogletree, Deakins, Nash, Smoak &
  Stewart, P.C.
2400 N St. NW
Washington, DC 20037
(202) 887-0855
(202) 887-0866 (fax)
Counsel in Case No. 1:06-CV-01038(JR)

Marc D. Mezibov
Christian A. Jenkins
Mezibov & Jenkins, LLP
401 East Court Street, Suite 600
Cincinnati, Ohio 45202
(513) 723-1600
(513) 723-1620 (fax)
Counsel in Case No. 1:06-CV-01943(JR)

Mark D. Smilow
Weiss & Lurie
The French Building
551 Fifth Avenue, Suite 1600
New York, New York 10176
Tel: (212) 682-3025
Fax: (212) 682-3010
Counsel in Case No. 1:06-CV-01944(JR)

Gary E. Mason
Alexander E. Barnett
The Mason Law Firm, P.C.
1225 19th Street, N.W., Suite 500
Washington, D.C. 20036
(202) 429-2290
(202) 429-2294 (fax)
Counsel in Case No. 1:06-CV-01943(JR)

Dated: April 3, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In Re: DEPARTMENT OF VETERANS AFFAIRS (VA) DATA THEFT LITIGATION | : : : : |
| | : |
| | : Misc. Action No. 06-0506 (JR) |
| This Document Relates To: ALL CASES | : MDL Docket No. 1796 : : : |

## DECLARATION OF TODD B. NAYLOR

I, Todd B. Naylor, declare as follows:

1.      I am of majority age and otherwise competent to testify as to the matters herein, based on my personal knowledge.

2.      I am a member in good standing of the Bar of the highest court of the state of Ohio, where I regularly practice law.

3.      I am also a member in good standing of the United States District Court for the Southern District of Ohio, the Sixth Circuit Court of Appeals, and I am admitted to practice before the United States Supreme Court.

4.      Attached hereto as Exhibit 1 is as true and accurate copy of the newspaper article "VA knew early about data theft," Washington Post, May 27, 2006, available at http://www.washingtonpost.com/wpdyn/content/article/2006/05/25/AR2006052501237_pf.html.

5.      Attached hereto as Exhibit 2 is as true and accurate copy of Statement of George J. Opfer, Inspector General Department of Veterans Affairs, before the Committee on Veterans' Affairs, United States Senate, July 20, 2006, available at

{00017089; 1}

EXHIBIT

A

http://www.va.gov/oig/pubs/VAOIG-Testimony_20060720_Opfer_Testimony.pdf.

6.      Attached hereto as Exhibit 3 is as true and accurate copy of the newspaper article "Veterans official steps down after theft," May 30, 2006, available at http://www.usatoday.com/news/washington/2006-05-30-vets-id-theft_x.htm.

7.      Attached hereto as Exhibit 4 is as true and accurate copy of the article "VA Asking for More Money After Data Theft," June 28, 2006, available at http://www.cbsnews.com/stories/2006/06/28/ap/politics/mainD8IH0MK80.shtml.

8.      Attached hereto as Exhibit 5 is as true and accurate copy of "Latest Information on Veterans Affairs Data Security," available at http://www.usa.gov/veteransinfo/#FAQs.


I declare under penalty of perjury that the foregoing is true and correct.


_____4-3-07_____                          _____
DATED                                                   TODD B. NAYLOR

EXHIBIT

1

# washingtonpost.com

# VA Knew Early About Data Theft

Officials Did Not Tell Secretary for 13 Days,
Document Shows

By Christopher Lee
Washington Post Staff Writer
Saturday, May 27, 2006; A04

Senior officials at the Department of Veterans Affairs
knew that sensitive personal information about
veterans had been stolen from a VA employee's home
within hours of the crime but did not tell Secretary Jim
Nicholson until 13 days later, according to a VA
briefing document.

Advertisement

Avoid the
back and forth.

Michael H. McLendon, VA deputy assistant secretary
for policy, learned of the May 3 burglary less than an hour after the worker reported it to his supervisors
and to Montgomery County police, according to the briefing document, given to congressional
committees this week and obtained yesterday by The Washington Post. McLendon met with two high-
ranking VA information security specialists the next day.

Among items stolen from the Aspen Hill home was an external computer hard drive that VA officials
say contained the unencrypted names, birthdates and Social Security numbers of 19.6 million to 26.5
million veterans.

The 12-page timeline provides the first detailed accounting of how VA officials reacted to one of the
nation's largest information security breaches, an institutional failure that ignited anxiety and anger
among millions of veterans concerned about identity theft.

It also reveals new details about the 60-year-old man at the heart of the scandal. He is a senior-level
career employee working as an information technology specialist in the Office of Policy. As a GS-14
level employee, he earns between $91,407 and $118,828 a year.

In a meeting with McLendon two days after the theft, the employee "assumed full responsibility,
acknowledging he knew he should not have taken the data out of the office," the summary says. James J.
O'Neill, VA deputy assistant inspector general for investigations, said in an interview yesterday that the
employee is cooperating fully in the investigation. "He reported it [the theft] immediately, and he
certainly could have kept it quiet," O'Neill said.

According to the document, Dennis M. Duffy, acting assistant secretary for policy, planning and
preparedness, was told of the theft May 5. Duffy asked VA computer security specialists to determine
the extent of the data lost and three days later asked them to draft a memo. McLendon convened a
meeting of the Office of Policy staff May 9 to stress the importance of data security and had the data
analyst discuss his experience.

It was not until that day, May 9, that Duffy informed VA Chief of Staff Thomas Bowman about the
theft, suggesting that senior management should discuss the department's obligations to notify veterans
whose data may have been compromised. Bowman told Deputy Secretary Gordon Mansfield, the

department's No. 2 official, the next afternoon, but neither man informed Nicholson until May 16, the document shows.

Nicholson told the White House that day but did not inform Congress or the public until six days later, on May 22.

"What the timeline shows is that, once he was informed, the secretary acted quickly, decisively and in the best interest of veterans," said Matt Burns, a VA spokesman.

Burns also said that Mansfield, who predates Nicholson at the department and is a former executive director of Paralyzed Veterans of America, was told May 10 only that "thousands" of veterans' records may have been compromised. He directed the staff to get more information, Burns said.

"Deputy Secretary Mansfield was not made aware of the full scope and extent of what those records included until the same day the secretary found out," Burns said.

Members of Congress criticized the department's security practices and sluggish response. Some lawmakers and veterans groups have demanded that VA leaders resign or be fired.

"Secretary Nicholson's lack of knowledge about the handling of personal data within his own agency is shameful," said Rep. John T. Salazar (D-Colo.), who has introduced a bill that would provide veterans one year of free credit monitoring. "And the agency's two-week coverup of the data theft has been completely irresponsible. . . . The people in charge, like Secretary Nicholson, need to be held accountable."

Jim Mueller, head of Veterans of Foreign Wars of the United States, said in a statement yesterday that the entire episode "reflects a serious lack of leadership, management and accountability" in the department.

"To not inform your boss of what can only be described as the worst crisis in the VA's history is unconscionable, inexcusable and does tremendous injury to America's veterans," Mueller said. "These individuals cannot be trusted to fix what they allowed to happen."

© 2007 The Washington Post Company

Ads by Google

Top 2007 Spyware Removers
Compare and Download the 5 Top 2007 Spyware Removers for Free.
SpywareRemoversReviewed.com

Spyware Removal Download
Award-winning Spyware Remover. Block Popups & more. Download Now.
www.STOPzilla.com

Spyware Remover Download
2006 Leading Spyware Remover. Fix your Computer - Free Download!
NoAdware.net

**STATEMENT OF**
**GEORGE J. OPFER**
**INSPECTOR GENERAL**
**DEPARTMENT OF VETERANS AFFAIRS**
**BEFORE**
**THE COMMITTEE ON VETERANS' AFFAIRS**
**UNITED STATES SENATE**

**July 20, 2006**

INTRODUCTION

Mr. Chairman and members of the Committee, thank you for the opportunity to testify today on the results of the Office of Inspector General (OIG), Department of Veterans Affairs (VA), review of issues related to the loss of VA information involving the identity of millions of veterans. I am accompanied by Jon Wooditch, Deputy Inspector General, and Maureen Regan, Counselor to Inspector General.

As you know, on May 3, 2006, the home of a VA employee was burglarized resulting in the theft of a personally-owned laptop computer and an external hard drive, which was reported to contain personal information on approximately 26 million veterans and U.S. military personnel. The VA Secretary was not informed of the incident until May 16, 2006, almost 2 weeks after the data was stolen. The Congress and veterans were notified on May 22, 2006. Since then, the Senate Veterans' Affairs Committee, as well as other congressional committees and members of Congress, have expressed considerable interest in how this incident occurred and in how VA management responded after being notified of the loss of data.

When I testified before this committee on May 25, 2006, I described the OIG's involvement as a three-pronged approach including: (1) a criminal investigation, (2) an administrative investigation of the handling of the incident once reported to VA, and (3) a review of VA policies and procedures for using and safeguarding personal and proprietary data. I am pleased to announce that we completed the administrative investigation and the review of policies and procedures, and issued our final report on July 11, 2006.

More importantly, I am also pleased to acknowledge that through the diligent and coordinated efforts of the VA OIG, the Federal Bureau of Investigation, and the Montgomery County Police Department in Maryland, the stolen data was successfully recovered on June 28, 2006. Based on all the facts gathered thus far during the criminal investigation, as well as the results of computer forensics examinations, we are highly confident that the data was not compromised after the burglary. I would also like to point out that we are continuing to pursue the criminal investigation into the burglary.

**EXHIBIT**

2

tabbies®

The July 11, 2006, report essentially addresses whether the employee had authorization to access and take the data home, whether management responded appropriately to the incident, and whether VA policies and procedures were adequate to protect information. The report also discusses long-standing information security weaknesses in VA, even though OIG reports have repeatedly made recommendations for corrective action.

EMPLOYEE NOT AUTHORIZED TO TAKE DATA HOME

Because the employee was responsible for planning and designing analytical projects and supporting surveys involving all aspects of VA policies and programs, he was authorized access to, and use of, VA databases. The employee explained that much of the data that he had stored on the stolen external hard drive was for his "fascination project" that he self-initiated and worked on at home during his own time. Because of past criticism on the reliability of the National Survey of Veterans, his project focused on identifying approximately 7,000 veterans who participated in the 2001 survey, in order to compare the accuracy of their responses with information VA already had on file. He began the project in 2003, but could not recall spending time working on it during 2006.

To conduct this project, the employee took home vast amounts of VA data and loaded it on an external hard drive. The stolen laptop did not contain VA data. The employee reported that the external hard drive that was stolen likely included large record extracts from the Beneficiary Identification and Records Locator Subsystem that contained records on approximately 26 million living veterans. The extract contained veterans' social security numbers, names, birth dates, service numbers, and combined degree of disability. He also reported that the stolen hard drive likely contained an extract of the Compensation and Pension file, containing personal identifiers of over 2.8 million living veterans.

While the employee had authorization to access and use large VA databases containing veterans' personal identifiers in the performance of his official duties, his supervisors and managers were not aware that he was working on the project, and acknowledged that if they had, they would not have authorized him to take such large amounts of VA data home. By storing the files on his personal external hard drive and leaving it unattended, the employee failed to properly safeguard the data. While the employee stored the laptop and the external hard drive in separate areas of the house, he acknowledged that he took security of the data for granted.

The loss of VA data was possible because the employee used extremely poor judgment when he decided to take personal information pertaining to millions of veterans out of the office and store it in his house, without encrypting or password-protecting the data. This serious error in judgment is one for which the employee is personally accountable. The Department proposed administrative action prior to issuance of our report.

## MANAGEMENT RESPONSE TO THE INCIDENT WAS NOT APPROPRIATE OR TIMELY

The burglary was reported to the local police on May 3, 2006. When the employee discovered that the computer equipment was among the items stolen, he immediately notified VA management in the Office of Policy, Planning, and Preparedness (OPP&P), including Security and Law Enforcement personnel, that the stolen computer equipment contained VA data.

Mr. Michael McLendon, Deputy Assistant Secretary for Policy, was one of the managers notified on May 3, 2006. However, it was not until May 5, 2006, that the Information Security Officer (ISO) for OPP&P interviewed the employee to determine more facts about the loss. The ISO reported that the employee was so flustered that the ISO decided not to discuss the matter; rather he asked the employee to write down what data was lost. The employee's written account of the lost data was an identification of database extracts with little quantified information concerning the significance or magnitude of the incident. This is important because this report served as the basis for all further notifications in VA up to, and including, the Deputy Secretary.

Mr. McLendon received the report of the stolen data on May 5, 2006. Instead of providing the report to higher management, Mr. McLendon advised his supervisor, Mr. Dennis Duffy, Acting Assistant Secretary for Policy, Planning, and Preparedness, of his intent to rewrite the report because it was inadequate and did not appropriately address the event. He submitted his revised report to Mr. Duffy on May 8, 2006.

Our review of Mr. McLendon's revisions determined that his changes were an attempt to mitigate the risk of misuse of the stolen data. He focused on adding information that most of the critical data was stored in files protected by a statistical software program, making it difficult to access. This, however, was not the case because we were able to display and print portions of the formatted data without using the software program. Mr. McLendon made these revisions without consulting with the programming expert on his staff or with the employee who reported the stolen data. Mr. Duffy provided the revised report to Mr. Thomas Bowman, VA Chief of Staff, on May 10, 2006. Mr. Duffy also did not attempt to determine the magnitude of the stolen data nor did he talk to the employee.

Mr. McLendon also did not inform his direct supervisor, Mr. Duffy, when he learned of the incident on May 3, 2006. Mr. Duffy advised us that he did not learn of the theft until Friday morning, May 5, 2006, when he spoke with the OPP&P ISO, in what Mr. Duffy described as a rather "casual hallway meeting."

Mr. Duffy did not discuss the matter initially with Mr. McLendon, noting that there had been a long and very strained relationship with him. Mr. Duffy said that Mr. McLendon had a very strong belief that, as a political appointee, he reported in some fashion to the Secretary and that there was no need for a "careerist" to supervise him. Mr. McLendon

3

characterized the office as one of the most dysfunctional organizations in VA, and that it was one of the most hostile work environments he ever worked in.

Mr. Duffy said he just did not perceive this as a crisis. In hindsight, he added that his greatest regret is that he "failed to recognize the magnitude of the whole thing." Both Mr. Duffy and Mr. McLendon bear responsibility for the impact that their strained relationship, which both acknowledged, may have had on the operations of the office in handling this incident.

We also concluded that Mr. John Baffa, Deputy Assistant Secretary for Security and Law Enforcement, who was notified of the incident on May 4, 2006, also failed to take appropriate action to determine the magnitude and significance of the stolen data.

Shortly after Mr. Bowman received the report from Mr. Duffy on May 10, 2006, he provided it to Mr. Jack Thompson, Deputy General Counsel, and asked him to provide legal advice on the agency's duties and responsibilities to notify individuals whose identifying information was compromised. On May 10, 2006, Mr. Bowman also informed Mr. Gordon Mansfield, Deputy Secretary. While the Deputy Secretary does not recall discussing the magnitude of the number of veterans affected by the theft, he too decided not to raise the issue to the Secretary until they knew more information on what VA's legal responsibilities were and more about the magnitude of the problem. Once again, no attempt was made to contact the employee who reported the theft to determine the magnitude of the stolen data.

The OIG was able to determine the extent of the stolen data after one interview with the employee on May 15, 2006. As soon as I learned of the magnitude of the incident on the morning of May 16, 2006, I immediately notified the Chief of Staff that the stolen data most likely contained personal identifiers on approximately 26 million records. The Chief of Staff then notified the Secretary.

The delay in notifying the Secretary was spent waiting for legal advice from the Office of General Counsel (OGC). This 6-day delay can be attributed to a lack of urgency on the part of those requesting this advice and those responsible for providing the response. This is not to say that everyone who was notified of the incident failed to recognize its importance, but no one clearly identified it as a high priority item and no one followed up on the status of the request until after I notified the Chief of Staff on May 16, 2006.

## INFORMATION SECURITY OFFICIALS ACTED WITH INDIFFERENCE AND LITTLE SENSE OF URGENCY

On May 5, 2006, the OPP&P ISO forwarded information concerning the theft to the District ISO, who is responsible for coordinating ISO activities among VA Central Office staff offices. He also submitted it to the Security Operations Center (SOC), which has responsibility for assessing and resolving reported information security incidents.

However, the OPP&P ISO's incident report had significant errors and omissions, and information security officials did not adequately attempt to identify the magnitude of the incident or elevate it until May 16, 2006.

At nearly every step, VA information security officials with responsibility for receiving, assessing, investigating, or notifying higher level officials of the data loss reacted with indifference and little sense of urgency or responsibility. At no time did the District ISO or SOC attempt to interview the employee who reported the data stolen to clarify omissions in the OPP&P ISO's report or to gain a better understanding of the scope and severity of the potential data loss. While the District ISO elevated the matter to Mr. Johnny Davis, Acting Associate Deputy Assistant Secretary for Cyber Security Operations, this occurred as another "hallway conversation," and he was not provided any details on the nature of the missing data. No further notifications were made up the chain-of-command.

Twelve days after receiving the original incident report, the SOC had made no meaningful progress in assessing the magnitude of the event and, ironically, had passed responsibility to gather information on the incident back to the OPP&P ISO to review it as a possible privacy violation, an area outside the jurisdiction of the SOC. The OPP&P ISO also serves as the Privacy Officer (PO).

## POLICIES AND PROCEDURES DID NOT ADEQUATELY SAFEGUARD PROTECTED INFORMATION

The potential disclosure of Privacy Act protected information resulting from the theft raised the issue of whether VA policies adequately safeguard information that is not stored on a VA automated system. Based on our review of VA policies that existed at the time of the incident; policies that have been issued since the incident; and interviews with VA employees, Chief Information Officers, POs, and ISOs; we concluded that VA policies, procedures, and practices do not adequately safeguard personal or proprietary information used by VA employees and contractors.

We found a patchwork of policies that were difficult to locate and fragmented. None of the policies prohibited the removal of protected information from the worksite or storing protected information on a personally-owned computer, and did not provide safeguards for electronic data stored on portable media or a personal computer.

The loss of protected information not stored on a VA automated system highlighted a gap between VA policies implementing information laws and those implementing information security laws. We found that policies implementing information laws focus on identifying what information is to be protected and the conditions for disclosure; whereas, policies implementing information security laws focus on protecting VA automated systems from unauthorized intrusions and viruses. As a result, VA did not have policies in place at the time of the incident to safeguard protected information not stored on a VA automated system.

Although policies implemented by the Secretary since the incident are a positive step, we determined that more needs to be done to ensure protected information is adequately safeguarded. We found that VA's mandatory Cyber Security and Privacy Awareness training are not sufficient to ensure that VA and contract employees are familiar with the applicable laws, regulations, and policies. We also found that position sensitivity levels designations for VA and contract employees are either not done or are not accurate. In addition, we found that VA contracts do not contain terms and conditions to adequately safeguard protected information provided to contractors.

We determined that VA needs to enhance its policies for identifying and reporting incidents involving information violations and information security violations to ensure that incidents are promptly and thoroughly investigated; the magnitude of the potential loss is properly evaluated; and that VA management, appropriate law enforcement entities, and individuals and entities potentially affected by the incident are notified in a timely manner.

## INFORMATION SECURITY CONTROL WEAKNESSES HAVE PERSISTED FOR YEARS

For the past several years, we have reported vulnerabilities with information technology security controls in our Consolidated Financial Statements (CFS) audit reports, Federal Information Security Management Act (FISMA) audit reports, and Combined Assessment Program (CAP) reports. The recurring themes in these reports support the need for a centralized approach to achieve standardization, remediation of identified weaknesses, and a clear chain-of-command and accountability structure for information security. Each year, we continue to identify repeat deficiencies and repeat recommendations that remain unimplemented. These recommendations, among other issues, highlight the need to address security vulnerabilities of unauthorized access and misuse of sensitive data, the accuracy of position sensitivity levels, timeliness of background investigations, and the effectiveness of Cyber Security and Privacy Awareness training. We have also reported information technology security as a Major Management Challenge for the Department each year for the past 6 years.

## CONCLUSION

Because the employee was responsible for planning and designing analytical projects and supporting surveys involving all aspects of VA policies and programs, he was authorized access to, and use of, these and other large VA databases. However, at the time of the burglary his supervisors were not aware of the employee's self-initiated project and, as such, had no official need or permission to take the data home. In addition, the employee reported that the data stored on the stolen external hard drive was neither password-protected nor encrypted.

Although senior managers and other OPP&P staff were informed of the possible loss of data on May 3, 2006, the incident was not communicated up the chain-of-command until the VA Chief of Staff was notified 6 days later. Poor communication, partially resulting from a dysfunctional working relationship among senior OPP&P executives, contributed to the delay. While there was considerable rhetoric among management concerning the need to identify the extent and scope of the stolen data, there was virtually no follow-up with the employee to obtain results. Also, the lack of urgency in addressing this issue was impacted by the false assumption that the SOC had the responsibility to investigate the incident and make all required notifications.

On May 10, 2006, Mr. Bowman requested legal advice from OGC. Yet, during the 6 days following this request, Mr. Bowman did not follow up to determine the status of the request, or task anyone to develop a more definitive description of how many veterans' records may have been stolen. Although Mr. Bowman acknowledged he knew the data stolen could potentially affect millions of veterans, he demonstrated no urgency in notifying the Secretary of the incident and decided to wait for OGC's response before doing so.

Mr. Bowman also notified Mr. Mansfield on May 10, 2006, but Mr. Mansfield too decided not to raise the issue to the Secretary until they knew more information on what VA's legal responsibilities were and more about the magnitude of the problem.

At nearly every step, VA information security officials with responsibility for receiving, assessing, investigating, or notifying higher level officials of the data loss reacted with indifference and little sense of urgency or responsibility. Efforts to investigate the incident were further impeded by errors and omissions in the ISO's incident report and were delayed due to ineffective coordination between the OPP&P ISO and the SOC. Twelve days after receiving the original incident report, the SOC had made no meaningful progress in assessing the magnitude of the event and had attempted to pass responsibility to gather information on the incident back to the OPP&P PO. Coincidentally, this is the same individual who referred the matter to the SOC in the first place, which he did in his dual capacity as ISO for OPP&P.

The OIG was able to determine the magnitude and extent of the stolen data after one interview with the employee on May 15, 2006, and I notified the Chief of Staff on the morning of May 16, 2006. The Chief of Staff notified the Secretary shortly after my call. It is unexplainable why no one in the management chain-of-command ever attempted to re-interview the employee to gain a better understanding of the scope and severity of the potential data loss, prior to my call.

While no policy was violated in the handling of the incident, staff and senior managers who were notified of the theft failed to take appropriate action to determine the magnitude of what was stored on the stolen external hard drive, or whether it was properly safeguarded. The failure to determine this resulted in not recognizing the potential

7

significance on VA programs, operations, and veterans. Since the local police were not told for 13 days that VA data was stolen during the burglary, valuable forensic evidence was most likely lost. The delay also prevented the burglary from receiving the urgency it warranted from Federal law enforcement agencies.

We found that VA's policies and procedures for safeguarding information and data were not consolidated or standardized to ensure all employees were following all applicable requirements in a similar fashion, and that policies and procedures were not adequate in preventing the loss of the data. We also found that VA employees and contractors were not adequately trained and reminded of the policies and procedures to follow to safeguard personal or proprietary information, sensitivity level designations were not always accurate, information and data provided to contractors need to be better safeguarded, and VA incident reporting procedures and controls need improvement.

Since the incident VA managers have attempted to strengthen policies, procedures, and controls to prevent similar disclosures, but additional actions need to be taken to safeguard protected information and VA's automated systems.

Our CFS audits, FISMA audits, and individual CAP reports of VA medical facilities and regional offices all highlight specific vulnerabilities that can be exploited, but the recurring themes in these reports are the need for a centralized approach to achieve standardization in VA, remediation of identified weaknesses, and accountability in VA information security. Specific recommendations were not made in our July 11, 2006, report because 17 recommendations are listed in previously issued OIG reports and are being followed up on separately.

RECOMMENDATIONS

We recommend that the Secretary:

- Take whatever administrative action deemed appropriate concerning the individuals involved in the inappropriate and untimely handling of the notification of stolen VA data involving the personal identifiers of millions of veterans.

- Establish one clear, concise VA policy on safeguarding protected information when stored or not stored in VA automated systems, ensure that the policy is readily accessible to employees, and that employees are held accountable for non-compliance.

- Modify the mandatory Cyber Security and Privacy Awareness training to identify and provide a link to all applicable laws and VA policy.

- Ensure that all position descriptions are evaluated and have proper sensitivity level designations, that there is consistency nationwide for positions that are similar in nature or have similar access to VA protected information and automated systems, and that all required background checks are completed in a timely manner.

- Establish VA-wide policy for contracts for services that requires access to protected information and/or VA automated systems, that ensures contractor personnel are held to the same standards as VA employees, and that information accessed, stored, or processed on non-VA automated systems is safeguarded.

- Establish VA policy and procedures that provide clear, consistent criteria for reporting, investigating, and tracking incidents of loss, theft, or potential disclosure of protected information or unauthorized access to automated systems, including specific timeframes and responsibilities for reporting within the VA chain-of-command and, where appropriate, to OIG and other law enforcement entities, as well as appropriate notification to individuals whose protected information may be compromised.

The Secretary agreed with the findings and recommendations in our report and provided acceptable improvement plans.

CLOSING

In closing, I would like to assure the Committee that we will follow up on the implementation of these recommendations until they are completed. Mr. Chairman and other distinguished members of the Committee, thank you again for this opportunity and I would be pleased to answer any questions.

Advertisement



⊙🖶 PRINT THIS

Powered by 🄯Clickability

## Veterans official steps down after theft

Updated 5/30/2006 8:06 PM ET
WASHINGTON (AP) — A Veterans Affairs deputy assistant secretary who didn't immediately notify top officials about a theft of 26.5 million veterans' personal information is stepping down, citing missteps that led to the security breach.

Michael McLendon, deputy assistant secretary for policy who supervised the VA data analyst who lost the data, said he would relinquish his high-level post on Friday.

The data analyst also will be dismissed while the acting head of the division in which he worked, Dennis Duffy, has been placed on administrative leave, VA Secretary Jim Nicholson said Tuesday.

McLendon is the first official to depart after Nicholson pledged to hold officials accountable following the May 3 burglary, in which a laptop computer and disks were stolen from an agency analyst's home in Maryland.

"Words are inadequate to describe how I feel about these recent events and the impact on the band of brothers and sisters of service members and veterans that we are supposed to serve," McLendon wrote in a letter obtained Tuesday by The Associated Press.

"Given that this very serious and tragic event occurred on my watch and in my organization, I feel it necessary that I tender my resignation," stated the letter, which was submitted to the VA late Friday. "I would be modeling the wrong behavior to my staff and others in VA if I took no action to be responsible."

The resignation comes as the VA is under attack for a three-week delay in publicizing the burglary in what has become one of the nation's largest security breaches. During hearings last week, Nicholson said he was "mad as hell" that employees did not notify him of the May 3 burglary until May 16; the public was told on May 22.

On Tuesday, Nicholson announced that he had named Paul Hutter, the current assistant general counsel for management and operations, as interim head of VA's Office of Policy and Planning, filling Duffy's spot.

Hutter will lead the department "in light of recent, unacceptable events within VA's Office of Policy and Planning" while the Senate considers the recent nomination of Patrick Dunne to the post, Nicholson said.

According to congressional testimony, the VA data analyst immediately informed his supervisors — including

Advertisement



EXHIBIT

3

McLendon — after the theft of a laptop and disks that contained veterans' birthdates, Social Security numbers and disability ratings at the data analyst's home in Aspen Hill, Md.

At the time, the data analyst took responsibility and acknowledged he had violated agency procedures by taking the information home, according to a VA briefing paper given to Congress.

McLendon informed other officials, who then told Deputy Secretary Gordon Mansfield, the agency's No. 2 official, on May 10. But no formal action was taken until the VA inspector general's office heard about the theft through office gossip on May 10 and began a separate investigation.

On Tuesday, some veterans' groups said it was appropriate that McLendon stepped down. But they expressed concern that he and the midlevel data analyst — who has been placed on administrative leave pending the investigation — would be made scapegoats, citing a complete communications breakdown in the agency.

"We can't be blaming this whole thing on some data analyst and his boss," said Bob Wallace, executive director of Veterans of Foreign Wars. "There are many more individuals in this chain of command that I hope would be held accountable."

The breach is second only to a hacking incident last June at CardSystems Solutions in which the accounts of 40 million credit card holders were compromised.

*Copyright 2006 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.*

**Find this article at:**
http://www.usatoday.com/news/washington/2006-05-30-vets-id-theft_x.htm

☐ Check the box to include the list of links referenced in the article.

Copyright 2007 USA TODAY, a division of Gannett Co. Inc.

Case 1:06-mc-00506-JR    Document 21-3    Filed 04/03/2007    Page 14 of 15

## ◉CBS NEWS



EXHIBIT

4

# VA Asking for More Money After Data Theft

**WASHINGTON, Jun. 28, 2006**

**(AP)** Veterans Affairs Secretary Jim Nicholson promised Congress on Tuesday he could turn his agency into a "model for information security" but said lawmakers will have to be patient.

Nicholson also said the Bush administration was asking for at least $160.5 million in emergency funds for credit monitoring and other measures to protect veterans and military troops whose sensitive personal information was stolen from a VA employee's laptop computer.

Besides covering monitoring for about half of the 17.5 million people whose Social Security numbers were compromised, the money would pay for out-of-pocket expenses ranging from $10,000 to $20,000 for those whose identities are stolen, Nicholson told a House panel.

Under questioning, Nicholson acknowledged that much more money may be needed to revamp information security at the VA and other agencies. He also left the door open to providing veterans more than one year of free credit monitoring following the May 3 burglary at a VA data analyst's home.

"Unfortunately, a very bad thing happened," Nicholson told a House Appropriations subcommittee that oversees VA spending.

"I think we can turn VA into the model for information security," he added. "I will not try to mislead you and delude. This will not be easy and it will not be overnight."

Of the $160.5 million requested for monitoring, Nicholson said, about $29 million will be taken from VA funds budgeted in 2006 to cover personnel costs at the Veterans Benefit Administration. That money would not have been used this year due to hiring plans that already had been pushed back to 2007, he added. The other $131.5 million would be reallocated from other areas of the White House budget.

"It will take some belt tightening. It will not come out of veterans' benefits," Nicholson said.

No reports of identity theft have been reported in connection with the May 3 theft of a computer from the data analyst's home in suburban Maryland. The laptop contained names, birth dates and Social Security numbers for up to 26.5 million people.

Last week, the Senate Appropriations Committee approved $160 million in emergency funds to pay for credit monitoring. It is one of many expected payments as the government struggles with fallout from data thefts and other breaches now crossing at least six agencies.

Earlier in the hearing, the House panel was urged to spend whatever necessary to avoid undue hardships for data theft victims.

David McIntyre, president and CEO of TriWest Healthcare Alliance, which administers the Pentagon's health care program in 21 Western states, proposed creating a central government "nerve center" to assist agencies after any such security breach.

"Unfortunately, as we have all come to realize, the question is not whether another incident of information theft will occur but when," McIntyre said. "Events such as these are happening with increased regularity _ and, surely, spending a few million to prepare is preferable to spending hundreds of millions to react."

Rep. James Walsh, R-N.Y., chairman of the House subcommittee, chastised the VA for waiting three weeks to notify veterans about the theft. "This represents a significant lapse of time that could have been vital to protect identity theft," Walsh said.

In his testimony, Nicholson called the burglary a "wake-up call" that should not have come at the expense of veterans, some of whom have challenged the free monitoring in court as potentially inadequate. He said about half of the affected veterans were expected to take the government's offer.

Separately, the VA asked a federal judge to revise his order barring the VA from publicizing its free credit monitoring offer. The VA said it wished to continue providing information to veterans through its Web site and call center and had no intention of asking veterans to relinquish their rights to a potentially larger payout in court.

U.S. District Judge William Bertelsman in Kentucky scheduled a hearing for Friday to determine whether the VA should revise its deal.

The class-action lawsuits, which are pending in Covington, Ky., and Washington, seek free monitoring and other credit

protection for an indefinite period as well as $1,000 in damages for each person _ or up to $26.5 billion total.

Stacy Hinners, an attorney representing veterans, said veterans did not wish to shut down the call center and Web site but simply wanted the VA to be clear what rights veterans would have if they accepted the free offer.

Veterans groups and lawmakers from both parties have criticized the VA for the theft and noted years of warnings by auditors that information security was lax. The data analyst _ who was in the process of being dismissed _ had taken the information home on a personal laptop for three years.

———

On the Net:

For veterans suspecting identity theft: http://www.firstgov.gov or 1-800-FED-INFO

---

> **Feedback**  > **Terms of Service**  > **Privacy Statement**





**USA.gov**
Government Made Easy

Government Web | Images | News | USA

**Home    About Us    Site Index    Frequent Questions    Help    Español    Other Languages**

for **Citizens**    for **Businesses and Nonprofits**    for **Federal Employees**    **Government-to-Government**    for **V th**

**By Organization »**
- A-Z Agency Index
- Federal Government
- State Government
- Local Government
- Tribal Governments A-Z

**Contact Your Government »**
- Frequently Asked Questions
- Call by Phone
- E-mail Us
- Chat With Us Online
- Visit an Office In-Person
  more

**Reference Center »**
- Data & Statistics
- Forms
- Laws & Regulations
- Libraries
- Photos and Multimedia
  more

**FREE Subscribe Now**
- USA.gov E-mail Updates
- USA.gov RSS Feeds
- Government E-Newsletters
- Podcast & RSS Libraries

Home > Latest Information on Veterans Affairs Data Security

# Latest Information on Veterans Affairs Data Security

[ E-mail me when this page is updated ]

Here are some questions you may have about the Department of Veterans Affairs data security incidents, and their answers.

## Frequently Asked Questions—Data Security Incidents

- What Happened in August 2006 and How Does this Affect Me?
- Who Has Access to Veteran Information?
- What Should I Do?
- What Is VA Doing About the Situation?
- Frequently Asked Questions—May 2006 Data Security Incident

# What Happened and How Does this Affect Me?

### How did this happen?

VA learned on August 3rd that a computer was missing from Unisys, a subcontractor that provides software support to the Pittsburgh and Philadelphia VA Medical Centers. The computer contained insurance claim data for some patients treated in these two facilities or their community clinics. It is important to note that we have no reason to believe the computer was stolen for the purpose of gaining veteran information or that the information has been or will be used inappropriately.

### Why did this company have this information on the computer?

The Unisys system is used by the Pittsburgh and Philadelphia VA Medical Centers to help sort and track insurance claims that have been billed to insurance companies.

### What information was included?

We believe that for the veterans affected, the information included name, and some or all of the following: date of birth, Social Security Number, address, insurance carrier and other insurance claim related information.

VA Ne
- Veter on M Alab
- VA N Data

Samp
- Lette Sent of Ju

**EXHIBIT**
5

### How do I know if my information was on the computer?

Unisys provided VA with a list of patients whose information may have been on this computer. Letters were sent to these individuals. The list includes approximately 16,000 living individuals and approximately 2,000 now deceased, who received care either at Pittsburgh VA medical center over the last four years or the Philadelphia VA medical center since 2005, and who had third party insurance that was billed for that care.

### I am the spouse, widow, or child of a veteran. Was my information contained on the computer?

At this time, we believe that only one TRICARE dependent may have had information on this computer. This individual will be notified by the VA and receive information that is also being provided to other potentially affected veterans.

Back to Top

## Who Has Access to Veteran Information?

### Is it a common practice to allow data of this nature to be accessed by private contractors?

VA sometimes contracts with companies to provide certain services that enable VA to provide better service to veterans. Some of these VA contractors have veteran information on their computers. All contractors are bound by regulations that limit their use of this information to what they need to provide their service. We are working with our contractors to insure our veterans' data receives the highest standard of security and privacy protection.

Back to Top

## What Should I Do?

### What should I do to protect myself? Do I have to close my bank account or cancel my credit cards?

At this time we have no confirmation of misuse of veteran information resulting from the Unisys loss. Because Social Security Numbers were on this computer, we advise individuals to monitor financial accounts continuously for suspicious activity as a matter of good practice. For tips on how to guard against misuse of personal information, visit the Federal Trade Commission website at http://www.ftc.gov/.

You do not have to close your bank account or cancel your credit cards. You should however take steps to protect yourself against identity theft. We advise you to monitor your financial accounts continuously for suspicious activity. One way to monitor your financial accounts is to review your credit report. By law you are entitled to one free credit report each year from each major credit bureau. Request a free credit report from one of the three major credit bureaus-Equifax, Experian, TransUnion-at www.AnnualCreditReport.com or by calling 1-877-322-8228.

## What is identity theft?

At this time we have no confirmation of misuse of veteran information resulting from this incident. Identity theft occurs when your personal information is stolen and used without your knowledge to commit fraud or other crimes.

## What should I do if I detect a problem with any of my accounts?

Act quickly. Notify local law enforcement. Contact one of the three credit bureaus to place a 90-day fraud alert on your credit report. That bureau will notify the other two bureaus to flag your file. A fraud alert flag tells creditors to follow additional procedures before opening new accounts in your name or changing existing accounts.

- Equifax–1-800-525-6285
- Experian–1-888-397-3742
- TransUnion–1-800-680-7289

## Where can I get more information?

As it becomes available, information will be posted at www.FirstGov.gov and www.va.gov. For more information about the Unisys incident, contact the Veterans Health Administration at 1-800-949-1001, extension 4209.

## Will credit monitoring be offered?

Unisys Corporation is offering free credit monitoring to individuals whose information is believed to have been on its missing computer. Letters were mailed at the end of August to affected individuals providing details on how to get free credit monitorig.

Back to Top

# What Is VA Doing About the Situation?

## What is VA doing about this?

The VA Inspector General has launched a full-scale investigation. VA mailed notification letters on August 10, 2006 to individuals whose information is known to have been on the missing computer.

## When will VA be sending me a letter?

VA is sending letters to all those identified as possibly having their information included on the missing computer. These letters were mailed on August 10, 2006.

## What will be done to prevent this from happening in the future?

VA has safeguards in place to protect private information. We provide

ongoing privacy training to all employees. VA has taken action to rectify this unfortunate situation, and is working to insure our veterans' data receives the highest standard of security and privacy protection.

Back to Top

Here are some questions you may have about the May 2006 Veterans Affairs data security incident, and their answers.

## Frequently Asked Questions—May 2006 Data Security Incident

- What Happened and How Does this Affect Me?
- Recovery of Stolen Laptop?
- What Should I Do?
- What Credit Monitoring Will VA Offer?
- What Else Is the Department of Veterans Affairs (VA) Doing About the Situation?
- What About the Letter VA Sent?
- News Releases from the Department of Veterans Affairs

# What Happened and How Does this Affect Me?

## What happened?

In May 2006, VA learned that an employee, a data analyst, took home electronic data from VA that was stored in his home on a laptop computer and external hard drive. He was not authorized to take this data home. This behavior was in violation of VA policies.

The employee's home was burglarized and the computer equipment, along with various other items, was stolen. The electronic data stored on this computer included identifying information for millions of veterans. Authorities believe the computer equipment, rather than any data on it, was the target of the theft. The stolen equipment has been recovered and the Federal Bureau of Investigation (FBI) has determined with a high degree of confidence through forensic testing that information stored on the stolen laptop and external drive was not accessed or compromised.

## What action has been taken against this employee or his supervisor?

The employee is cooperating fully with the investigation. The employee was initially placed on administrative leave, and VA then implemented procedures necessary to dismiss the employee. Also, the official responsible for the organization in which this employee served has resigned his position because of the events.

## What information was included?

The data lost is primarily limited to an individual's name, date of birth, and social security number. In some cases, spousal information may have been included. However, this information alone may be useful to identity thieves,

and we recommend that all veterans, servicemembers, and reservists be extra vigilant in monitoring for signs of potential identity theft or misuse of this information. Importantly, the affected data did not include any of VA's electronic health records or any financial information.

**See June 6, 2006, News Release on New Information Involved in Data Loss**

**VA says that the information stolen included disability ratings. What information does that include?**

The information stolen did not include medical information about any veteran, servicemember, or reservist, nor did it include VA's electronic health records. For some veterans who have applied for VA disability compensation benefits and have been determined by VA to have a disability related to their military service, the data may have included the number of service-connected disabilities a veteran has and the veteran's overall disability percentage rating. No other information related to any veteran's disability rating was included.

**Will I still get my monthly benefit payment?**

Yes. There will be no impact on benefit payments.

**Have any lawsuits been filed against VA because of the data loss?**

Yes. Several lawsuits have been filed against VA pertaining to the data theft. All of these lawsuits have been filed as class actions. VA is currently aware of the following suits filed in U.S. district courts:

- *Paul Hackett, et al., v. U.S. Department of Veterans Affairs, et al.,* Civil Action No. 2:06-cv-114 (WOB) (United States District Court for the Eastern District of Kentucky) (Lead plaintiffs' counsel-Marc D. Mezibov, Esq., Mezibov & Jenkins, Co. L.P.A., 401 East Court Street, Suite 600, Cincinnati, Ohio 45202;
- *Michael Rosato, et al., v. R. James Nicholson, Secretary of Veterans Affairs, et al.,* Civil Action No. 06-3086 (United States District Court for the Eastern District of New York) (Lead plaintiffs' counsel-Joseph H. Weiss, Esq.; Mark D. Smilow, Esq.; and Richard A. Acocelli, Esq., Weiss & Lurie, 551 Fifth Avenue, New York, New York 10176;
- *Vietnam Veterans of America, Inc., et al., v. R. James Nicholson, Secretary of Veterans Affairs, et al.,* Civil Action No. 1:06-cv-01038 (JR) (United States District Court for the District of Columbia) (Lead plaintiffs' counsel-L. Gray Geddie, Esq., and Douglas J. Rosinski, Esq., Ogletree, Deakins, Nash, Smoak & Stewart, P.C., 1320 Main Street, Columbia, South Carolina 29201-3266.

Back to Top

**Recovery of Stolen Laptop?**

**I heard news reports the computer laptop and hard drive stolen from a VA employees home was recovered by law**

**enforcement. Is this true?**

Yes. On Thursday, June 29, 2006, Veterans Affairs Secretary R. James Nicholson announced that law enforcement authorities have recovered the laptop and external hard drive stolen in early-May from a VA employee's home.

### Do authorities believe the information was copied or accessed while it was missing?

The stolen equipment has been recovered and the Federal Bureau of Investigation (FBI) has determined with a high degree of confidence that information stored on the stolen laptop and external drive was not accessed or compromised.

Back to Top

## What Should I Do?

### What should I do to protect myself? Do I have to close my bank account or cancel my credit cards?

The stolen equipment has been recovered and the Federal Bureau of Investigation (FBI) has determined with a high degree of confidence that information stored on the stolen laptop and external drive was not accessed or compromised. VA plans to hire a company to perform data breach analysis, which will look for patterns of misuse of veterans' data to provide additional assurances that no data has been misused. The Department of Veterans Affairs believes it is good practice for all veterans to be extra vigilant and to carefully monitor bank statements, credit card statements, and any statements relating to recent financial transactions, and to immediately report any suspicious or unusual activity.

For tips on how to guard against misuse of personal information, visit the Federal Trade Commission website at http://www.ftc.gov/.

You do not have to close your bank account or cancel your credit cards. You should, however, take steps to protect yourself against identity theft.

One way to monitor your financial accounts is to review your credit report. By law you are entitled to one free credit report each year. Request a free credit report from one of the three major credit bureaus – Equifax, Experian, TransUnion – at www.AnnualCreditReport.com or by calling 1-877-322-8228.

### What do you mean by suspicious activity?

Suspicious activities could include the following:

- Inquiries from companies you haven't contacted or done business with
- Purchases or charges on your accounts you didn't make
- New accounts you didn't open or changes to existing accounts you didn't make
- Bills that don't arrive as expected

- Unexpected credit cards or account statements
- Denials of credit for no apparent reason
- Calls or letters about purchases you didn't make

## What is identity theft?

Identity theft occurs when your personal information is stolen and used without your knowledge to commit fraud or other crimes.

## I haven't noticed any suspicious activity in my financial statements, but what can I do to protect myself and prevent being victimized by credit card fraud or identity theft?

VA strongly recommends that veterans closely monitor their financial statements and review the guidelines provided on this web page (http://www.firstgov.gov/veteransinfo) or call 1-800-827-1000.

## Should I reach out to my financial institutions or will the Department of Veterans Affairs do this for me?

VA does not believe that it is necessary to contact financial institutions or cancel credit cards and bank accounts, unless you detect suspicious activity.

## What is the earliest date at which suspicious activity might have occurred due to this data breach?

The VA employee's home was burglarized and the computer equipment was stolen on May 3, 2006 and recovered on June 28, 2006. If the data has been misused or otherwise used to commit fraud or identity theft crimes, it is likely that affected groups would have noticed suspicious activity beginning in the month of May.

## What should I do if I detect a problem with any of my accounts?

The Federal Trade Commission recommends the following **four** steps if you detect suspicious activity:

Step 1 – **Contact the fraud department of one of the three major credit bureaus:**

- Equifax: 1-800-525-6285; www.equifax.com; P.O. Box 740241, Atlanta, GA 30374-0241
- Experian: 1-888-EXPERIAN (397-3742); www.experian.com; P.O. Box 9532, Allen, Texas 75013
- TransUnion: 1-800-680-7289; www.transunion.com; Fraud Victim Assistance Division, P.O. Box 6790, Fullerton, CA 92834-6790

Step 2 – **Close any accounts that have been tampered with or opened fraudulently.**

Step 3 – **File a police report with your local police or the police in the**

community where the identity theft took place.

**Step 4 – File a complaint with the Federal Trade Commission by using the FTC's Identity Theft Hotline:**

- By telephone: 1-877-438-4538
- Online at www.consumer.gov/idtheft
- By mail at Identity Theft Clearinghouse, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington DC 20580.

## Where can I get more information?

Please check this web page (http://www.firstgov.gov/veteransinfo) for further updates or call the Department of Veteran's Affairs at 1-800-827-1000.

## What are my remedies if my identity is stolen and used illegally?

The Federal Trade Commission has produced a booklet to help you remedy the effects of an identity theft. It describes what steps to take, your legal rights, how to handle specific problems you may encounter on the way to clearing your name, and what to watch for in the future. The contents of the booklet, *Taking Charge: Fighting Back Against Identity Theft*, are available online at http://www.usa.gov/veteransinfo.shtml.

## Can Social Security put a flag on my number?

No, unlike the credit bureaus, the Social Security Administration (SSA) cannot put a flag or security alert of any type on your Social Security number.

To report that someone is using your Social Security number, file a complaint with the Federal Trade Commission by using the four steps outlined above:

- Internet: www.consumer.gov/idtheft
- Telephone: 1-877-IDTHEFT (1-877-438-4338)

## Can I get a new Social Security number?

SSA will not issue you a new Social Security number as a precaution, if you are concerned or think your number may have been stolen as part of the VA data theft. SSA assigns a new Social Security number in rare cases, and only if the number holder provides evidence that the old number has been used with criminal or harmful intent and that the misuse has caused the number holder to be subjected to recent economic or personal hardship.

## The letter from VA warns individuals to guard against "phishing" efforts and telephone solicitations asking for personal information. What does this mean?

"Phishing" is a term that relates to unsolicited messages that individuals receive on their computers. "Phishers" send an e-mail or pop-up message

that claims to be from a business or organization that you may deal with - for example, an Internet service provider (ISP), bank, online payment service, or even a government agency. The message may ask you to "update," "validate," or "confirm" your account information. Some "phishing" e-mails threaten a dire consequence if you don't respond.

The messages direct you to a website that looks just like a legitimate organization's site. But it isn't. It's a bogus site whose sole purpose is to trick you into divulging your personal information so the operators can steal your identity and run up bills or commit crimes in your name.

VA also warns individuals to beware of telephone solicitations by people who claim to be from VA or other trustworthy sources asking you to give personal information or to verify or correct personal information. VA, other government agencies, and legitimate organizations will not contact you to ask for or confirm your personal information.

If you receive such communications, report them to VA though this toll free number: 1-800-827-1000.

## If I need a police report to claim identity theft, where do I get that?

Individuals who are victims of actual identity theft should not have a problem filing a local police report about the incident. The Federal Trade Commission advises consumers who are victims of identity theft to get a copy of the police report or at the very least, the number of the report. It can help you deal with creditors who need proof of the crime. If the police are reluctant to take your report, ask to file a "Miscellaneous Incidents" report, or try another jurisdiction, like your state police.

You also can check with your state Attorney General's office to find out if state law requires the police to take reports for identity theft. Check the Blue Pages of your telephone directory for the phone number or check www.naag.org for a list of state Attorneys General.

Information about steps to take if you are a victim of identity theft is available online at www.consumer.gov or by calling the Federal Trade Commission at 1-877-IDTHEFT (1-877-438-4338).

## What do I do if the local police won't take a report?

In order to file a police report, you must show you have suffered an actual identity theft or harm due to fraudulent activity or misuse of account information.

If you have experienced identity theft or harm, the Federal Trade Commission (FTC) suggests providing as much documentation as you can to prove your case, including debt collection reports, credit reports, or other evidence of fraudulent activity.

Information about steps to take if you are a victim of identity theft is available online at www.consumer.gov or by calling the Federal Trade Commission at 1-877-IDTHEFT (1-877-438-4338).

The FTC also suggests being persistent if local authorities tell you that they can't take a report. Stress the importance of a police report; many creditors

require one to resolve your dispute.

The FTC advises that if you're told that identity theft is not a crime under your state law, ask to file a Miscellaneous Incident Report instead. If you can't get the local police to take a report, try your county police. If that doesn't work, try your state police. Some states require the police to take reports for identity theft. Check with the office of your State Attorney General www.naag.org to find out if your state has this law.

### Can I get a copy of the police report about the stolen computer and veterans' data?

We do not have access to any police reports or any other investigative reports filed as a result of this incident. The investigations by the police, VA's Inspector General, and the FBI are still ongoing.

Back to Top

## What Credit Monitoring Will VA Offer?

### Will VA offer free credit monitoring?

Given the FBI's high degree of confidence that the information recently recovered was not accessed or compromised, VA believes that individual credit monitoring will no longer be necessary. As Secretary Nicholson has stated, VA remains unwavering in its resolve to become the leader in protecting personal information, training and educating its employees in best practices, and establishing a culture that always puts the safekeeping of veterans' personal information first.

### While the FBI is highly confident this information has not been accessed, what will VA do to help protect veterans?

Protecting veterans' private information remains a priority for VA. Out of an abundance of caution, and to further safeguard individuals' information, VA will work swiftly to provide data breach analysis.

### What is data breach analysis?

Data breach analysis looks across multiple industries to detect patterns of misuse related to a specific data loss. While it is considered highly unlikely by the FBI and law enforcement that this data was accessed, data breach analysis will provide additional assurances.

### How will VA pay for data breach analysis?

VA has funds in its budget that can be used for this purpose, and there will be no reduction in the quality of health care and other services provided to veterans as a result of this expenditure.

Back to Top

## What Else Is VA Doing About the Situation?

## How is information about this incident being shared?

VA is providing as much information as we have about the incident and alerting veterans of the situation. We identified those who may have been affected and provided them more information.

Veterans should continue to monitor this web page (http://www.firstgov.gov/veteransinfo) for further updates.

You can also call the Department of Veteran's Affairs at 1-800-827-1000 for information.

## When will more information be available?

Letters were sent to all affected veterans in June 2006 and August 2006. If information about you was included in the data that was stolen, you should have received a letter. Continue to visit this web page for updates. We will also continue to make public service announcements to publicize new information. We continue to urge veterans, servicemembers, and reservists to be vigilant in checking activities on their various accounts.

## What will be done to prevent this from happening in the future?

VA is taking extensive steps to bolster training for employees on privacy and security of sensitive data. Strengthened policies and procedures to protect sensitive data are being put in place so that this does not happen again. VA is also working with other federal and commercial entities that have veteran information for business reasons to ensure they have appropriate safeguards to protect sensitive data. VA also has obtained data breach analysis services to further ensure no misuse of data occurs in the future. While it is highly unlikely that the data were accessed, data breach analysis will provide back-up assurances.

Back to Top

# What About the Letter VA Sent?

## To whom is VA sending letters?

VA sent individual notification letters to veterans, servicemembers, and reservists whose personal information was included on the stolen computer equipment.

## When did the letters go out?

Two letters were released — one in early June 2006 and another in late August 2006.

## If I didn't get a letter, does that mean I wasn't affected?

If you did not get a letter, in all likelihood your identifying information was not part of the data that was on the stolen computer equipment.

### I have never contacted VA directly. How do you know my address?

VA does not have current addresses for all affected individuals. However, the Internal Revenue Service (IRS) has agreed to forward all the letters to the affected veterans, servicemembers, and reservists. It is important to understand that the IRS has not disclosed your address or any other tax information to VA. VA identified the affected veterans to the IRS. The IRS is releasing the letters for VA.

### Can I give you my address to make sure you have it?

We believe that virtually all affected veterans, servicemembers, and reservists will be contacted through the process we have established with IRS. We are therefore not taking addresses by phone.

If you receive VA benefits or have a claim pending and would like to change your address with VA, please contact your local VA regional office by phone at 1-800-827-1000 or in writing. For a directory of VA Benefits and other offices, visit http://www1.va.gov/directory/guide/home.asp.

### I'd like to see the letters even though I didn't get them. Can you send them to me?

VA sent the letters to potentially affected veterans, servicemembers, and reservists. A copy of the letters is available online at FirstGov.gov:

- Letter Sent to Veterans August 25, 2006
- Letter and Enclosure Sent to Veterans Week of June 5

If you don't have access to the Internet, please call The Veterans Administration at 1-800-827-1000.

### News Releases from Veterans Affairs

View VA News Releases for further background on Veterans Affairs Data Security Issue.

Page last updated September 6, 2006

Important Notices    Privacy    Contact Us    Suggest-A-Link    Link to Us



USA.gov ™ is the U.S. government's official web portal:
Office of Citizen Services and Communications, U.S. General Services Administration
1800 F Street, NW, Washington, DC 20405
If you have questions about the federal government, check our frequently asked questions, e-mail USA.gov, or call 1 (800) FED INFO (1-800-333-4636).